# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

## WACO DIVISION

PALTALK HOLDINGS, INC.,

        Plaintiff,

v.

CISCO SYSTEMS, INC.,

        Defendant.

No. 6:21-CV-00757-ADA

JURY TRIAL DEMANDED

REDACTED VERSION

**DEFENDANT CISCO SYSTEMS, INC.'S MOTION TO EXCLUDE PORTIONS OF
EXPERT TESTIMONY BY MR. WALTER BRATIC AND DR. SCOTT SCHAEFER**

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 2

    A.  Mr. Bratic's Royalty Calculation. ........................................................... 2

        1.  Step (1): Mr. Bratic's hypothetical negotiation date ............................. 3

        2.  Step (4): Mr. Bratic's calculations based on Dr. Schaefer's alleged apportionment. ........................................................................... 4

        3.  Step (5) Mr. Bratic's Bargaining Split. .................................................. 7

        4.  Step (6): Mr. Bratic's "Reasonableness Check." ................................... 7

        5.  Step (7): Mr. Bratic's lack of analysis regarding economic compatibility of licenses produced by Cisco. ........................................ 9

        6.  Step (8): Mr. Bratic's use of a running royalty. ................................... 10

    B.  Opinions to be Excluded. ....................................................................... 10

III.  LEGAL STANDARD ....................................................................................... 11

IV.  ARGUMENT ..................................................................................................... 12

    A.  The Court Should Exclude Mr. Bratic's Hypothetical Negotiation Date of July 23, 2015 .......................................................................................... 12

        1.  Mr. Bratic's July 23, 2015 hypothetical negotiation date is factually unsupported and unreliable. ................................................... 13

        2.  Mr. Bratic should be precluded from offering opinions on an earlier hypothetical negotiation date. ................................................... 15

    B.  Mr. Bratic's Running Royalty Lacks Factual Basis and Should Be Excluded. .............................................................................................. 17

        1.  Mr. Bratic's and Dr. Schaefer's 40% apportionment to the value of the accused feature lacks factual support and should be excluded. ...... 17

        2.  Mr. Bratic's split of alleged incremental benefit to Cisco is flawed and unsupportable. .............................................................................. 23

        3.  Mr. Bratic's reasonableness check is based on Dr. Schaefer's unsupported apportionment and both should be excluded. .................. 24

        4.  The Court should preclude Mr. Bratic from offering testimony about economic comparability for licenses that he did not analyze in his report. ......................................................................................... 26

        5.  Mr. Bratic's use of a running royalty is based on a license that does not support its use. ............................................................................... 27

**TABLE OF CONTENTS (continued)**

**PAGE**

C.      Paltalk's experts should not be able to cure any of their deficient analyses.....28

V.      CONCLUSION.................................................................................................29

CERTIFICATE OF SERVICE ..............................................................................31

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846, 2012 WL 2571332 (N.D. Cal. June 30, 2012)...........................................28

*Cassidian Commc'ns, Inc. v. Microdata GIS, Inc.*,
No. 2:12-CV-00162-JRG, 2013 WL 11322510 (E.D. Tex. Dec. 3, 2013) .................13, 16, 28

*Curtis v. M&S Petroleum, Inc.*,
174 F.3d 661 (5th Cir. 1999) ...............................................................................................12

*Daedalus Blue LLC v. SZ DJI Tech. Co.*,
No. W-20-CV-00073-ADA, 2022 WL 831619 (W.D. Tex. Feb. 24, 2022)...............13, 16, 17

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ...............................................................................................12

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................................................................................................... passim

*Eidos Display, LLC v. Chi Mei Innolux Corp.*,
No. 6:11-CV-00201-JRG, 2017 WL 1322555 (E.D. Tex. Apr. 6, 2017) ................................13

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*,
No. 12-540-LPS, 2015 WL 1303643 (D. Del. Mar. 20, 2015)...............................................13

*Fenner Inv., LTD. V. Hewlett-Packard Co.*,
No. 6:08-273, 2010 WL 3911372 (E.D. Tex. Apr. 16, 2010).................................................28

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)............................................................................................26

*GPNE Corp. v. Apple, Inc.*,
No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ................................19

*Johnson v. Arkema, Inc.*,
685 F.3d 452 (5th Cir. 2012) ...............................................................................................12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)............................................................................................................12

*LaserDynamics, Inc. v. Quanta Comp., Inc.*,
694 F.3d 51 (Fed. Cir. 2012).................................................................................13, 17, 22, 29

**TABLE OF AUTHORITIES (continued)**

**PAGE(S)**

*Lind v. Int'l Paper Co.*,
  No. A-13-CV-249-LY, 2014 WL 11332304 (W.D. Tex. Mar. 12, 2014) ...............................12

*Louisiana United Bus. Ass'n Cas. Ins. Co. v. J&J Maint., Inc.*,
  No. 2:15-CV-01769, 2016 WL 6143058 (W.D. La. Oct. 19, 2016)......................................20

*NetFuel, Inc. v. Cisco Sys. Inc.*,
  No. 5:18-CV-02352-EJD, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) .................17, 27, 29

*NetFuel, Inc. v. Cisco Sys. Inc.*,
  No. 5:18-CV-02352-EJD, 2020 WL 1450570 (N.D. Cal. Mar. 25, 2020) .............................29

*Oracle Am., Inc. v. Google, Inc.*,
  798 F. Supp. 2d 1111 (N.D. Cal. 2011) .................................................................................14

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010)........................................................................................26, 28

*ROY-G-BIV Corp. v. ABB, Ltd.*,
  No. 6:11-CV-622, 2014 WL 12465449 (E.D. Tex. Aug. 1, 2014).........................................21

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011)....................................................................................17, 28

*Via Vadis, LLC v. Amazon.com, Inc.*,
  1:14-CV-00813-LY, 2022 WL 23351 (W.D. Tex. Jan. 3, 2022) ...........................................22

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014).............................................................................................22

*Wang Labs., Inc. v. Toshiba Corp.*,
  993 F.2d 858 (Fed. Cir. 1993)........................................................................................13, 16

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010).............................................................................................26

**STATUTES**

35 U.S.C. § 286.......................................................................................................................16

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ....................................................................................10, 12, 21, 28

U.S. Patent No. 6,683,858.................................................................................... passim

## I.     INTRODUCTION

Paltalk Holdings, Inc. ("Paltalk") purchased the application that led to U.S. Patent No. 6,683,858 ("the '858 Patent") for ███████ as part of an asset acquisition from HearMe in 2001, shortly after the dot-com bubble burst.  The '858 Patent issued in 2004, but Paltalk waited over 17 years to file suit for patent infringement against Cisco Systems, Inc. ("Cisco"), alleging that its Webex products infringe the '858 Patent.  Paltalk seeks ███████ in damages, based on the opinions of Mr. Walter Bratic, who calculates a running royalty based on Cisco's past six years of Webex revenues and a 2015 hypothetical negotiation date, after the industry "saw a boom due to the COVID-19 pandemic," and "grew at an annualized growth rate of 31.2% in the five years leading up to 2021."  Ex. 1, (Bratic Report) ¶ 20.

Mr. Bratic's damages opinions are fundamentally flawed and unreliable for a number of reasons, including critically his: (1) use of a 2015 hypothetical negotiation date, with no factual basis, to artificially inflate the damages amount, (2) use of quantitatively unsupported percentages to mimic an apportionment analysis, (3) unsupported and nonsensical use of Cisco's research and development to total operating expenses ratio to support his split of incremental benefits between the parties, (4) failure to analyze economic comparability of licenses produced by Cisco, and (5) application of a running royalty with no factual basis .  Mr. Bratic's ultimate opinion relies on each of these critical steps, and if any is unsupported, then his ███████ request is unreliable and fails to meet the *Daubert* standard of admissibility.  Mr. Bratic's ultimate damages opinion and all unsupported conclusions (detailed below) should be stricken from his report, and the Court should preclude him from offering testimony on these issues.[1]

---

[1] A number of Mr. Bratic's opinions are based entirely on technical opinions provided by Dr. Scott Shaefer.  Cisco has identified the unsupported opinions of Dr. Schaefer, and these should also be stricken, as detailed herein.

And because Mr. Bratic's unsound methodologies are factually unsupported and unexplained, the Court should not allow the opportunity to cure these fatal defects.

## II.    BACKGROUND

### A.    Mr. Bratic's Royalty Calculation.

Paltalk's damages expert, Mr. Walter Bratic, concludes that Cisco should be liable for ▮▮▮▮▮▮▮▮ based on a "running royalty," which he claims would have been the outcome of a negotiation between Cisco and Paltalk in July of 2015.  Ex. 1 (Bratic Report) ¶¶ 9, 143–63.  To reach this conclusion, Mr. Bratic uses the following iterative steps:

(1)    Applies a hypothetical negotiation date of July 23, 2015, based on an interview with Dr. Schaefer and an alleged 2015 date in the source code that Dr. Schaefer reviewed.

(2)    Begins with ▮▮▮▮▮▮▮▮ in revenues for all Webex Audio Product Family Types between July 23, 2015 and July 26, 2022.  Ex. 1 (Bratic Report) ¶ 149.

(3)    Applies Cisco's gross profit margins to the ▮▮▮▮▮▮, which results in approximately ▮▮▮▮▮▮▮ in U.S. gross profits.  The gross profits do not factor Cisco's R&D expenses.  Ex. 1 (Bratic Report) ¶ 149.

(4)    Then applies a 40% apportionment, which is the portion that Dr. Schaefer determined to be the percent of Cisco's gross profits that are allegedly directly attributable to the '858 Patent.  This brings the total to ▮▮▮▮▮▮.  Ex. 1 (Bratic Report) ¶ 151.

(5)    Determines that Cisco and Paltalk would have split the incremental benefit that Cisco allegedly realized from the '858 Patent, with Cisco receiving between 64.3% and 67.2% of the benefit and Paltalk receiving from 35.7% to 32.8%.  He

bases these percentages on the R&D to total operating expenses ratio for all of Cisco. Ex. 1 (Bratic Report) ¶ 161.

(6) Confirms these calculations using a "Reasonableness Check," in which he performs a similar analysis for all of Webex functionality, rather than only Webex Audio. In this calculation, he imports additional percentages from Dr. Schaefer for the value of non-Audio Webex functionalities, and also uses the same unsupported 40% previously calculated for Webex Audio. Ex. 1 (Bratic Report) ¶¶ 164-167.

(7) Fails to account for or provide economic comparability analysis for licenses produced by Cisco.

(8) Justifies his use of a running royalty on an agreement with NCR Corporation that does not contain a running royalty, after opining that the agreement is not economically comparable. Ex. 1 (Bratic Report) ¶¶89, 141–45.

Each step of Mr. Bratic's analysis suffers unsurmountable errors in methodology, but steps (1), and (4) – (8) are also unreliable and inadmissible as they are unsupported by any quantitative basis or factual support.[2]

### 1. Step (1): Mr. Bratic's hypothetical negotiation date.

Mr. Bratic's damages calculations are allegedly based on his analysis of the *Georgia Pacific* factors, and the hypothetical negotiation date is a fundamental assumption that underlies that entire analysis. Mr. Bratic opines that the date of the hypothetical negotiation between the

---

[2] Steps (2) and (3) are also problematic. Mr. Bratic's estimate of ▮▮▮▮▮▮▮ in Step 2 includes revenue for add-in audio features that do not provide the accused functionality. And in Step 3, Mr. Bratic uses gross profit margins to determine gross profits, but this only factors costs of goods, and not research and development expenses. Cisco reserves its right to challenge these opinions with rebuttal expert testimony and other evidence.

parties would have occurred on or around July 23, 2015.[3]  Ex. 1 (Bratic Report) ¶ 36.  Citing

only to an "[i]nterview of Dr. Schaefer," Mr. Bratic's sole basis for this date is his conclusion

that Cisco's alleged infringement of the '858 Patent "likely occurred at least by July 2015," as

this is "the date of the source code reviewed by Dr. Schaefer."  Ex. 1 (Bratic Report) ¶¶ 36, 102.[4]

However, for other purposes in his report (analysis of non-infringing alternatives), Mr. Bratic

states that "the time of first infringement of the '858 Patent [was] on January 27, 2004, which is

the date the '858 Patent issued."  Ex. 1 (Bratic Report) ¶ 25.  Mr. Bratic also opines that if the

hypothetical negotiation had occurred earlier than July 23, 2015, the outcome would not have

changed as "the underlying economic circumstances would be the same," but provided no basis

for this opinion.  Ex. 1 (Bratic Report) ¶ 36 n.72.

> ### 2.  Step (4): Mr. Bratic's calculations based on Dr. Schaefer's alleged apportionment.

Mr. Bratic attempts to account for the value that the '858 Patent allegedly contributes to

Webex Audio under *Georgia Pacific* Factor No. 13 ("The portion of the realizable profit that

should be credited to the invention as distinguished from non-patented elements, the

manufacturing process, business risks, or significant features or improvements added by the

infringer.").  Mr. Bratic claims that 40% of the value of Webex Audio is attributable to the '858

Patent.  As a basis for this 40%, Mr. Bratic cites to an alleged "Apportionment of Accused

Functionality," provided by Dr. Schaefer:

---

[3] This is exactly six years before the day Paltalk filed suit.

[4] Mr. Bratic uses this 2015 date for his analysis under Georgia Pacific Factor No. 7, but when discussing Georgia Pacific Factor No. 15, he states that "Paltalk would have entered into a hypothetical negotiation with Cisco in or around January 27, 2004."  Ex. 1 (Bratic Report) ¶141.

| Apportionment of Accused Functionality - Dr. Schaefer For Webex Audio | | | |
|---|---|---|---|
| Feature Set | Technical Weight | % Attributable to the Patent-in-Suit | Relative Contribution |
| Support for Webex Audio (Hybrid Audio) Meeting | 25.0% | 90.0% | 22.5% |
| Global Access | 25.0% | 30.0% | 7.5% |
| Scalability and Conference Size | 20.0% | 45.0% | 9.0% |
| Conference Management | 5.0% | 20.0% | 1.0% |
| Compatibility with other Webex Products | 10.0% | 0.0% | 0.0% |
| Remaining Features<br>• Audio on entry and exit<br>• Run reports that show Webex usage<br>• Save default settings | 15.0% | 0.0% | 0.0% |
| Total | 100.0% | | 40.0% |

Ex. 1 (Bratic Report) ¶ 135.

### a. Dr. Schaefer's technical weights.

First, Dr. Schaefer identifies six categories of features that he claims comprise "a comprehensive list of the important features" of Webex Audio. Ex. 2 (Schaefer Report) ¶ 210. These categories include (1) Global Access; (2) Scalability/Conference Size; (3) Conference Management; (4) Compatibility with other Webex Products; (5) Support for Webex Audio (Hybrid Audio) Meeting; and (6) Other Features. Ex. 2 (Schaefer Report) ¶¶ 209–16. Dr. Schaefer provides no reasoning for selecting these particular categories beyond "[i]n my opinion, these six categories of features are the most significant features in Webex Audio." Ex. 2 (Schaefer Report) ¶ 209. He appears to select these "features" from various Cisco documents, but provides no explanation for why he included some, but not all, functionalities described in those documents. *See* Ex. 2 (Schaefer Report) ¶¶ 209-19, 221, nn.165-169, 171, 172; *see also* Ex. 3 (Webex Audio Support); Ex. 15 (Cisco Webex Meeting Center Video Conferencing) at 1;

Ex. 16 (Cisco Webex Meetings Audio PSTN Coverage for Cisco Collaboration Flex Plan) at 3.

Next, Dr. Schaefer assigns a technical weight to each of the six features.  Dr. Schaefer describes

what he considers these features to be and chooses a percentage of total Webex Audio

functionality that can be ascribed to each category.  Dr. Schaefer refers to his "review of Cisco's

documents" and claims to "have apportioned the features of Webex Audio based on technical

significance and consumer ratings using the features described above."  Ex. 2 (Schaefer Report)

¶ 217.  But Dr. Schaefer provides no quantitative explanation for his percentages and instead

rationalizes the arbitrary numbers by pointing to Cisco marketing documents and assigning

percentages of his choosing.  *See* Ex. 2 (Schaefer Report) ¶¶ 209–216, nn.160, 165-169, 171,

172; *see also* Ex. 3 (Webex Audio Support); Ex. 15 (Cisco Webex Meeting Center Video

Conferencing) at 1; Ex. 16 (Cisco Webex Meetings Audio PSTN Coverage for Cisco

Collaboration Flex Plan) at 3.

### b.      Dr. Schaefer's value attributed to the '858 Patent.

After assigning technical weights, Dr. Schaefer assigns a percentage that he claims is

representative of the value for each "feature" that is attributable to the '858 Patent.  Each of Dr.

Schaefer's percentages in this column are arbitrary, and he provides no analysis of non-accused

technologies that contribute to the feature's overall functionality.  His estimates that "90% of the

Hybrid Audio feature is attributable to the '858 Patent," and that "30% of the Global Access

feature is attributable to the '858 Patent" in particular highlight the impropriety of his

methodology.  Ex. 2 (Schaefer Report) ¶¶ 220, 222.  Despite recognizing "both the infringing

and non-infringing nature" of the "Hybrid Audio" and "Global Access" features, Dr. Schaefer

provides no analysis or support for these figures.  His only reference for the reduction to 90%

and 30% respectively is to account for VoIP only and PSTN only calls, and no other non-

infringing technology was analyzed to select these percentages.  Using these percentages (and the other similarly unsupported technical weights and attributions), Dr. Schaefer concludes that 40% of Webex Audio Features are directly attributable to the '858 Patent.  Ex. 2 (Schaefer Report) ¶ 216.

### 3.      Step (5) Mr. Bratic's Bargaining Split.

In step five, Mr. Bratic purports to calculate "the incremental benefit Cisco realized that can be directly attributed to the '858 Patent" using the ratio of all of Cisco's R&D expenditures to Cisco's total operating expenses.  ("Ratio").  Ex. 1 (Bratic Report) ¶ 157.  Without support, Mr. Bratic contends that "it is reasonable to rely on Cisco's R&D-to-operating expenses ratio as an indication of how the parties would have split the incremental benefit Cisco obtained from practicing the '858 Patent."  Mr. Bratic claims that this ratio "is reflective of [Cisco's] own determination of how much money it should invest in technology development relative to the overall cost of product commercialization."  Ex. 1 (Bratic Report) ¶ 158.  Based on this approach, Mr. Bratic concludes that Cisco would have agreed to split this incremental benefit with Paltalk from 67.2 /32.8% to 64.3 / 35.7%.  Ex. 1 (Bratic Report) ¶ 161.

### 4.      Step (6): Mr. Bratic's "Reasonableness Check."

Mr. Bratic purports to perform a "reasonableness check" on his opinions by creating an analysis based on an "alternative calculation."  Ex. 1 (Bratic Report) ¶¶ 164-67.  He begins with ▮▮▮▮▮ of total Webex revenues (Webex Meetings, Webex Meetings (online), Webex Events/Training/Support, and Webex Audio) instead of limiting that to Webex Audio only.  Ex. 1 (Bratic Report) ¶ 165.  He then relies on Dr. Schaefer's "Alternative Apportionment," which purports to factor the entirety of Webex functionality and determine what percentage is specifically attributable to the '858 Patent.  Ex. 1 (Bratic Report) ¶ 166.  From this, Mr. Bratic

concludes that "approximately 18% of the functionality and benefits provided by Webex generically is directly attributable to the asserted claims of the Patent-in-Suit." Ex. 1 (Bratic Report) ¶¶ 166-67.  The below table summarizes Dr. Schaefer's percentage distributions for this "reasonableness check":

| Webex Apportionment - Dr. Schaefer | | | |
|---|---|---|---|
| Feature Set | Technical Weight | % Attributable to the Patent-in-Suit | Relative Contribution |
| Video Conferencing / Computer Features <br>• Session Recording <br>• Remote Control <br>• Screen Sharing | 45.0% | 0.0% | 0.0% |
| Audio Conferencing | 45.0% | 40.0% | 18.0% |
| Other Features <br>• Group Live Chat <br>• File Sharing <br>• Notifications Blocker | 10.0% | 0.0% | 0.0% |
| **Total** | **100.0%** | | **18.0%** |

Ex. 1 (Bratic Report) ¶ 166.

To arrive at his 18% of the value of Webex total functionality attributable to the '858 Patent, Dr. Schaefer identified three categories of "features" that he claims make up the Webex family of products.  These include "video conferencing/computer features," "audio conferencing," and "other features."  Ex. 2 (Schaefer Report) ¶ 235.  Dr. Schaefer then again assigns technical weights to each feature category but gives no quantitative analysis for his percentages or explanation of why video conferencing and computer features are combined for a total 45% technical weight.  He then assigns a percentage attributable to the '858 Patent for each feature category, using the 40% from his first alleged apportionment for "audio conferencing," with no additional analysis or support.  Ex. 2 (Schaefer Report) ¶¶ 239–41.  Essentially, Dr.

Schaefer multiplies his 40% for Webex Audio by his new arbitrary 45% technical weight for Webex Audio to arrive at the final 18% he claims is the portion of Webex that is attributable to the '858 Patent.  *Id.*

Mr. Bratic relies entirely on these unsubstantiated figures from Dr. Schaefer's original apportionment to confirm that same calculation.  Mr. Bratic's "reasonableness check" results in ▮▮▮▮▮▮▮ in damages, so Mr. Bratic claims that his original conclusions are conservative. Ex. 1 (Bratic Report) ¶ 167.

5.      **Step (7): Mr. Bratic's lack of analysis regarding economic compatibility of licenses produced by Cisco.**

For his analysis of *Georgia-Pacific* Factor No. 2, Mr. Bratic claims to have reviewed a list of licenses that Cisco produced.  Ex. 1 (Bratic Report) ¶ 87.  Mr. Bratic only provides a brief economic analysis on two licenses: the Webex Communications/NCR Corporation Purchase and License Agreement ("NCR Agreement") and the WebEx Communications/Raindance Cross-License Agreement ("Raindance Cross-license Agreement"), but rules both out as incomparable and "very different than those that would be contemplated by Paltalk and Cisco in a hypothetical negotiation."  Ex. 1 (Bratic Report) ¶¶ 88–90.  Mr. Bratic provides no economic analysis on eight of the ten licenses that he lists, simply concluding that they are not technically comparable (according to Dr. Schaefer), and that they are not economically comparable.[5]  Ex. 1 (Bratic Report) ¶ 88.

---

[5] Mr. Bratic lists a number of other license agreements that Cisco produced, including Raindance Settlement Agreement, Accolade Settlement Agreement, ABC Settlement Agreement, Apollo Agreement, Realtime Release Agreement, Meetrix Settlement Agreement, Symmetrix Settlement Agreement, and Estech Settle Agreement.  Ex. 1 (Bratic Report) ¶87.  Cisco also produced the Albaise Limited Settlement Release and License Agreement and the Raindance WebEx Action Settlement Agreement that were not included in Mr. Bratic's report.

6.      **Step (8): Mr. Bratic's use of a running royalty.**

Despite his admission that the NCR Agreement does not contain a running royalty (Ex. 4 (Bratic Dep.) 81:10–14), and his conclusion that the terms are "very different" from those of the hypothetical negotiation, Mr. Bratic relies on the NCR Agreement to justify his opinion that the parties would have contemplated a running royalty structure.  Ex. 1 (Bratic Report) ¶¶ 143–46. Mr. Bratic cites no other support for using a running royalty instead of a lump sum.

**B.      Opinions to be Excluded.**

Cisco seeks to strike and exclude portions of Mr. Bratic's and Dr. Schaefer's reports that fail to meet the standards of the Federal Rule of Evidence 702 and the standard required under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  For the reasons described below, Cisco respectfully requests that the Court exclude the following paragraphs of Paltalk's experts' reports, and all opinions and Appendixes set forth in them and related to them: Ex. 1 (Bratic Report) ¶¶ 9, 25, 36, 39, 102–03, 106, 135–36, 141–67; Ex. 2 (Schaefer Report) ¶¶ 17–18, 209–41.  These paragraphs are summarized briefly below:

- Mr. Bratic's hypothetical negotiation date based on Dr. Schaefer's unsupported and uncited review of source code: Ex. 1 (Bratic Report) at ¶¶ 9, 25, 36, 39, 102, 106, 141.

- Mr. Bratic's profits apportionment analysis based on Dr. Schaefer's unsupported percentages: Ex. 1 (Bratic Report) ¶¶ 135–36, 151, 162.

  - Dr. Schaefer's opinion, which Mr. Bratic replies upon, that the technical weight of Webex Audio (Hybrid Audio) is 25% of Webex Audio.  Ex. 2 (Schaefer Report) ¶ 218.

- o Dr. Schaefer's opinion, which Mr. Bratic relies upon, that the technical weight of the Global Access feature is 25% of Webex Audio.  Ex. 2 (Schaefer Report) ¶ 221.

- o Dr. Schaefer's opinion, which Mr. Bratic relies upon, that 90% of Webex Audio (Hybrid Audio) is attributable to the '858 Patent.  Ex. 2 (Schaefer Report) ¶ 220.

- o Dr. Schaefer's opinion, which Mr. Bratic relies upon, that 30% of the Global Access features is attributable to the '858 Patent.  Ex. 2 (Schaefer Report) ¶ 222.

- Mr. Bratic's Split of Incremental Benefits.  Ex. 1 (Bratic Report) ¶¶ 157–63.

- Mr. Bratic's "Reasonableness Check" based on Dr. Schaefer's alternative apportionment.  Ex. 1 (Bratic Report) ¶¶ 164–67; Ex. 2 (Schaefer Report) ¶¶ 18, 232–41

- Mr. Bratic's assertion that a running royalty is appropriate.  Ex. 1 (Bratic Report) ¶¶ 141–145.

- Any additional economic comparability analysis of licenses that is not included in Mr. Bratic's report.  *See supra* note 5.

Because Mr. Bratic's opinion that "Paltalk is entitled to reasonable royalty damages of no less than ███████," rests on these unsupported conclusions, the Court should exclude that opinion as well.

## III.    LEGAL STANDARD

Under the Federal Rules of Evidence, a jury may hear expert testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion. *See Daubert*, 509 U.S. at 584–85. The Supreme Court has assigned the district court with the role of gatekeeper for the admission of such scientific evidence to ensure that the scientific testimony is "both reliable and relevant." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 579–80). This gatekeeping role has been extended to admission of technical evidence. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147-49 (1999). "The reliability prong mandates that expert opinion 'be grounded in the methods and procedures of science and ... be more than unsupported speculation or subjective belief'" while "[t]he relevance prong [of Daubert] requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis*, 174 F.3d at 668). In other words, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). A court is not required to admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Lind v. Int'l Paper Co.*, No. A-13-CV-249-LY, 2014 WL 11332304, at *2 (W.D. Tex. Mar. 12, 2014) (citation omitted).

## IV.    ARGUMENT

### A.    The Court Should Exclude Mr. Bratic's Hypothetical Negotiation Date of July 23, 2015 .

A hypothetical negotiation is a tool used to calculate the reasonable royalties for a license to the patent-in-suit. The hypothetical negotiation date is critical because circumstances on that

date drive the *Georgia-Pacific* analysis.  The Federal Circuit has long held that the date of the

hypothetical negotiation is the date that the infringement began because its purpose is to

determine "the value of the patented technology to the parties in the marketplace when

infringement began."  *Daedalus Blue LLC v. SZ DJI Tech. Co.,* No. W-20-CV-00073-ADA,

2022 WL 831619, at *8 (W.D. Tex. Feb. 24, 2022) (citing *LaserDynamics, Inc. v. Quanta

Comp., Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012)).  Specifically, "[t]he date of first infringement

begins when both the patent has issued and accused products have been sold.")  *Eidos Display,

LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2017 WL 1322555, at *7 (E.D. Tex.

Apr. 6, 2017) (citing *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 869 (Fed. Cir. 1993)).

Courts have excluded expert reports that calculate damages based on an incorrect hypothetical

negotiation date.  *See, e.g.*, *Cassidian Commc'ns, Inc. v. Microdata GIS, Inc.*, No. 2:12-CV-

00162-JRG, 2013 WL 11322510, at *2 (E.D. Tex. Dec. 3, 2013); *Fairchild Semiconductor Corp.

v. Power Integrations, Inc.*, No. 12-540-LPS, 2015 WL 1303643, at *2 (D. Del. Mar. 20, 2015).

### 1. Mr. Bratic's July 23, 2015 hypothetical negotiation date is factually unsupported and unreliable.

Mr. Bratic states that the hypothetical negotiation between Paltalk and Cisco would have

occurred on July 23, 2015.  Ex. 1 (Bratic Report) ¶ 36.  Mr. Bratic's *only support* for this

statement is "Dr. Schaefer's review of source code."  *Id.*  However, Dr. Schaefer's report does

not include any analysis of when alleged infringement began and does not identify any 2015

source code that caused him to believe infringement began on July 23, 2015.  In fact, when

questioned about the date of first infringement, Dr. Schaefer admits that he did not provide Mr.

Bratic any opinion about when Webex allegedly first infringed.  Ex. 5 (Schaefer Dep.) 74:18–22.

He further admits that he does not "have a good date for the source code."  Ex. 5 (Schaefer Dep.)

75:8–11.[6]  Dr. Schaefer provides *nothing* to support or explain where the 2015 date came from in

the source code, what part of the code it referred to, or why he considers it evident of the date of

first infringement.  Mr. Bratic is thus "simply resorting to wishful thinking" by relying on Dr.

Schaefer's July 23, 2015 date.  *See Oracle Am., Inc. v. Google, Inc.,* 798 F. Supp. 2d 1111, 1116

(N.D. Cal. 2011).

In fact, documentary evidence shows that Webex was sold long before 2015 and had the

capability to host both PSTN and VoIP users on the same audio conference (the ability that

Paltalk asserts is indicative of infringement and attributed to the '858 Patent) since at least as

early as 2001.  *See* Ex. 11 (WebEx Communications, Inc. SEC Form 10-K for the fiscal year

ended December 31, 2001) at 3 (stating that the WexEx Interactive Platform "supports [PSTN]

or [VoIP] communications within browser-based interactions."); *see also* Ex. 12 (WebEx

Communications, Inc. SEC Form 10-K for the fiscal year ended December 31, 2003) Part I; Ex.

13 (WebEx Communications, Inc. SEC Form 10-K for the fiscal year ended December 31, 2004)

at 4 and 10; Ex. 14 (CISCO-PAL-00003858).  Moreover, Cisco's Vice President of Product

Management, Mr. Amit Barave, testified that the ability to call in from VoIP or PSTN to the

same conference has existed in the industry for the last 25 years.  *See* Ex. 6 (Barave Dep.)

197:19–25.

Moreover, the fact that Mr. Bratic coincidentally selected the date that happens to be six

years prior to the date Paltalk decided to sue Cisco strongly suggests that it has nothing to do

---

[6] During his deposition, Dr. Schaefer did not recall being interviewed by Mr. Bratic or recall talking with Mr. Bratic about his review of the source code. Ex. 5 (Schaefer Dep.) 79:10–20; 80:12–15. After a break, Dr. Schaefer said he consulted his calendar and realized that he had had two meetings with Mr. Bratic's team. Ex. 5 (Schaefer Dep.) 113:11–24. Dr. Schaefer also admitted during his deposition that he had no recollection of telling Mr. Bratic when he believed the product first infringed. Ex. 5 (Schaefer Dep.) 74:18–22.

with when Cisco's alleged infringement began.  Especially given that Paltalk waited 17 years to sue Cisco.  In short, since Webex was sold at least as early as 2001, the '858 Patent issued in 2004, and Dr. Schaefer provided no analysis or identification of the date of first infringement, Mr. Bratic's opinion that the hypothetical negotiation occurred on or around July 23, 2015 is wholly unsupported and completely unreliable.

>           **2.      Mr. Bratic should be precluded from offering opinions on an earlier hypothetical negotiation date.**

The fundamental inconsistency of Mr. Bratic's opinions about the date of first infringement of the '858 Patent makes them unreliable.  *See* Ex. 1 (Bratic Report) ¶¶ 25, 36, 39, 102, 106.  When discussing non-infringing alternatives, he admits that "the time of first infringement of the '858 Patent [is] on January 27, 2004, which is the date the '858 Patent was issued." Ex. 1 (Bratic Report) ¶ 25.  Later, his conclusion that the hypothetical negotiation "would have occurred on or around July 23, 2015," relies on a separate conclusion that "Cisco's alleged infringement of the '858 Patent likely occurred at least by July 2015."  Ex. 1 (Bratic Report) ¶ 36.  However, Mr. Bratic applies the 2015 date for the hypothetical negotiation, noting in a footnote that "if the hypothetical negotiation between Paltalk and Cisco would have occurred earlier than July 23, 2015, the outcome of the hypothetical negotiation would not have changed because the underlying economic circumstances would be the same." Ex. 1 (Bratic Report) ¶ 36 n.72.  These inconsistent and unsupported statements should preclude Mr. Bratic from offering opinions about an earlier hypothetical negotiation.

As an initial matter, the hypothetical negotiation is not determined by providing a date that alleged "infringement occurred at least as early as."  If it were, then an expert could always set the hypothetical negotiation date as the first day of the statutory damages period, which is what Mr. Bratic does here.  Rather, "hypothetical negotiations were determined to have occurred

when the infringement began, which was the date the patent issued, even though, under 35

U.S.C. § 286, the infringer was only liable for damages for the six years prior to the filing of the

infringement action."  *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993).

This legal error justifies exclusion of the 2015 date.  *Id.*

Furthermore, Mr. Bratic's footnote stating that his analysis would not change with an

earlier hypothetical negotiation because the economic circumstances "would be the same" lacks

analysis, support, and is factually wrong.  Courts in similar districts have recognized that

"[s]imply pointing out that 'the record is completely silent with regard to any market changes'

between the two dates, without more, fails to persuade the Court that no market changes took

place between the[se] two dates…."  *Cassidian*, 2013 WL 11322510, at *2 (finding the expert

report to be "fatally flawed" due to calculations based on an incorrect hypothetical negotiation

date and rejecting party's argument that absence of market changes would not impact the

analysis).  Mr. Bratic offers no analysis of the market factors in 2004 or any time before 2015; he

simply concludes that the outcome would be the same.  With no analysis or support for this

statement, Mr. Bratic should not be allowed to keep the door open to using his analysis to

support an earlier hypothetical negotiation.

In fact, the record is not silent on the differences in market factors here: a 2004

hypothetical negotiation would involve different parties (Webex instead of Cisco as the

licensee), very different economic circumstances, and different considerations under multiple

*Georgia Pacific* factors.  *See* Ex. 4 (Bratic Dep.) 36:25–37:11 (discussing a market crash and

"dot-com bubble burst" in the early 2000s).[7]  Mr. Bratic's failure to analyze market factors of a

---

[7] *See Daedalus*, 2022 WL 831619, at *8 (granting a motion to exclude expert report because of a
failure to use the proper parties at the time of the contemplated hypothetical negotiation).

hypothetical negotiation prior to 2015, after admitting that infringement began in 2004, precludes him from providing a new opinion based on a 2004 hypothetical negotiation.  "Courts routinely reject untimely 'supplemental' expert testimony where the opinions are based upon information available prior to the deadline for expert disclosures."  *Daedalus*, 2022 WL 831619, at *4 (collecting cases).

**B.      Mr. Bratic's Running Royalty Lacks Factual Basis and Should Be Excluded.**

**1.      Mr. Bratic's and Dr. Schaefer's 40% apportionment to the value of the accused feature lacks factual support and should be excluded.**

Mr. Bratic's opinion that 40% of the value of Webex Audio can be attributed to the '858 Patent relies solely on Dr. Schaefer's unsupported apportionment figures.  Ex. 1 (Bratic Report) ¶ 134.[8]  An apportionment analysis must be quantitatively supported and cannot rely on "vague qualitative notions of the relative importance" of the accused feature.  *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) ("This complete lack of economic analysis to quantitatively support the [] apportionment echoes the kind of arbitrariness of the '25% Rule' that we recently and emphatically rejected from damages experts, and would alone justify excluding [the expert's] opinions in the first trial.") (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)).  In fact, another Court recently excluded a similar apportionment from Mr. Bratic, based on unsupported percentages provided by the technical expert.  *See NetFuel, Inc. v. Cisco Sys. Inc.*, 5:18-CV-02352-EJD, 2020 WL 1274985, at *8

---

[8] Mr. Bratic admits during his deposition that he did not know the specifics of how Dr. Schaefer arrived at these figures.  "Q: And your report does not have any analysis of how that 40 percent was reached other than the chart that you included from Dr. Schaefer on the top of Page 49; is that correct? A: Well, if you're asking me did I describe any analysis as to how that 45, 40 percent was derived in my report, you are correct.  Because I'm relying on Dr. Schaefer for his technical apportionment.  He explained the basis for it and how he derived it in his expert report."  Ex. 4 (Bratic Dep.) 105:2–11.

(N.D. Cal. Mar. 17, 2020) ("Such vague, qualitative description, without some indication as to the weight of value attributed to each feature are insufficient to support [technical expert's] specific apportionment conclusions."). The Court should preclude Paltalk from presenting unsupported opinions that 40% of Webex Audio functionality is attributed to the '858 Patent because Dr. Schaefer's technical weights and attributions to the asserted patent lack quantitative support and fail to account for value of non-infringing functionality. The Court should exclude both experts' opinions on this matter.

<blockquote>

**a.    Dr. Schaefer's technical weights and feature categories lack quantitative support and should be excluded.**

</blockquote>

Dr. Schaefer identifies six features that he claims are "a comprehensive list of the important features in Webex Audio." Ex. 2 (Schaefer Report) ¶ 210. Dr. Schaefer's features are cherry-picked from a larger set of other non-infringing audio features and technologies that are listed in documents he cites, and he fails to account for these additional features such as "audio broadcast," "integrated Voice-over-IP (VoIP Audio)," "personal conferencing," "other teleconference service," "automatically start the audio conference," "entry and exit tones," and "TCP/UDP support." *See, e.g.,* Ex. 3 (Webex Audio Support); Ex. 15 (Cisco Webex Meeting Center Video Conferencing) at 1; Ex. 16 (Cisco Webex Meetings Audio PSTN Coverage for Cisco Collaboration Flex Plan) at 3; Ex. 2 (Schaefer Report) ¶¶ 212-16, nn.166–69, 173, 175–178. Dr. Schaefer includes no description of why he chose these particular features and capabilities of Webex Audio, and why he excluded others that are described in the same document he references. He also fails to mention other audio quality features like "Webex Automatic Gain Control (AGC)," "Webex Noise Removal," "Optimize for my voice," "Webex Full Duplex," "Webex Spatial Audio," "Webex Music Mode," "Webex beamforming

microphones," and "Webex Full-band Audio." *See* Ex. 7 (Webex Audio? Sounds Good.); *see also* Ex. 6 (Barave Dep.) 134:17-135:14; 136:7-137:19.

Furthermore, Dr. Schaefer double-counts the value that the '858 Patent attributes to Webex's ability to seamlessly transition between devices.  For example, Dr. Schaefer includes "Webex Audio (Hybrid Audio) Meeting," which he claims "is responsible for Webex's ability to 'allow seamless transitions between calling, meeting, and messaging on desktop, mobile, and Webex devices.'"  Ex. 2 (Schaefer Report) ¶ 218, nn.171, 179.  But Dr. Schaefer also considers the "Global Access" feature to describe this same ability, and he assigns each feature 25% technical weight (50% total).  Ex. 2 (Schaefer Report) ¶ 221, nn.172, 185.

Compounding this issue, Dr. Schaefer provides no quantitative basis for his arbitrary technical weight percentages.  He assigns each of Hybrid Audio and Global Access 25% technical weight (totaling 50% for what he describes as the ability to "allow seamless transitions between calling, meeting, and messaging on desktop, mobile, and Webex devices."), 20% to Scalability and Conference Size, 10% to Compatibility with other Webex Products, and 5% to Conference Management.  He assigned 15% to the final "Remaining Features" in his assessment, including "audio on entry and exit."  Ex. 2 (Schaefer Report) ¶ 216.  Dr. Schaefer admits that these percentages are simply "based off of [his] own technical experience and expertise."[9]  Ex. 5 (Schaefer Dep.) 263:10-13.  But "'years of experience' alone does not constitute a sufficiently reliable and testable methodology to prevent exclusion under *Daubert*."  *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014).  "Even an

---

[9] Dr. Schaefer's background is primarily in the "field of computer graphics."  Ex. 2 (Schaefer Report) ¶9.  Although he lists a number of other exemplary experiences, none of these experiences relate to the field of audio conferencing or networking.  Ex. 2 (Schaefer Report) ¶¶5–11.

expert relying on his years of experience must provide how his conclusions are based on his experience and the facts." *Louisiana United Bus. Ass'n Cas. Ins. Co. v. J&J Maint., Inc.*, No. 2:15-CV-01769, 2016 WL 6143058, at *3 (W.D. La. Oct. 19, 2016). When asked about his feature analysis Dr. Schaefer only claimed that "they're all relative…. So they all got to add up to 100 in the end. So it's all relative." Ex. 5 (Schaefer Dep.) 263:5–20. Dr. Schaefer further concedes that he did not use any guidance or treatise for his technical analysis (Ex. 5 (Schaefer Dep.) 265:18–266:8), and that the technical weight percentages he decided on did not come from any document that he cited; "[t]here's not a document that says, you know, 15 percent of WebEx audio is remaining features, including audio upon entry and exit and that type of thing. There's -- there's not a document that's giving that percentage." Ex. 5 (Schaefer Dep.) 266:14–18. Dr. Schaefer is unable to point to any quantitative methodology, or indeed any methodology at all, and his entire technical weight analysis should be excluded. As such, Mr. Bratic's apportionment is unsupported and should also be excluded.

> **b.      Dr. Schaefer's percentages of each feature attributed to the '858 Patent lack quantitative support and should be excluded.**

After assigning technical weights for each category, Dr. Schaefer purports to determine the percent of each feature attributed directly to the '858 Patent. Ex. 2 (Schaefer Report) ¶¶ 216–31. All of Dr. Schaefer's attributions across the six categories of features are arbitrary, but his analysis of the "Hybrid Audio" and "Global Access" features makes this particularly apparent.

***Hybrid Audio.*** Pointing simply to PSTN only or VoIP-only calls, Dr. Schaefer claims to recognize "both the infringing and non-infringing nature of the Hybrid Audio feature," and concludes 90% of the Hybrid Audio features' value is directly attributable to the '858 Patent." Ex. 2 (Schaefer Report) ¶ 220. Dr. Schaefer provides no explanation or accounting of how he determined the 90% figure. And he cites to no quantitative support for this 10% reduction. In

fact, Dr. Schaefer ignores the quantitative data that Cisco produced showing that the non-infringing use he describes (VoIP only and PSTN only calls) for the past 13 months would result in a 76% (instead of 10%) reduction. *See* Ex. 8 (CISCO-PAL-00003157);[10] Ex. 2 (Schaefer Report) ¶ 220.

When asked how he assessed this feature and the attribution to the '858 Patent, Dr. Schaefer testified that his "estimate for the amount associated with the infringing feature of that particular category is given by the percentage that I had. So my estimate for the noninfringing aspect of it would be, well, 100 minus that because they got to add up to 100." Ex. 5 (Schaefer Dep.) 268:5–11. Such vague statements about relative importance of various features does not constitute an acceptable methodology and is "arbitrary due to a lack of sufficient analytic support and is therefore inadmissible under Federal Rule Evidence 702." *ROY-G-BIV Corp. v. ABB, Ltd.*, No. 6:11-CV-622, 2014 WL 12465449, at *3 (E.D. Tex. Aug. 1, 2014).

Furthermore, Dr. Schaefer fails entirely to account for other non-infringing and non-accused *functionalities* that contribute to the ability to seamlessly transition. For example, the Cisco documents Dr. Schaefer cites to describe the "Hybrid Audio" feature consistently discuss Webex's ability to seamlessly transitions between devices, operating systems, and apps—not simply between VoIP and PSTN clients. *See* Ex. 9 (CISCO-PAL-00000714) at 21;[11] Ex. 17 (CISCO-PAL-00001351) at 6; Ex. 18 (CISCO-PAL-00001223) at 12; Ex. 19 (CISCO-PAL-00000662) at 4. These capabilities are driven by countless inventions that are unrelated to the

---

[10] In fact, Cisco produced this data months in advance of the deadline for expert reports. In the last thirteen-months, less than 25% of Webex meeting minutes were calls that involved both VoIP and PSTN users, a far cry from the 90% Dr. Schaefer accounted for. Testimony from Mr. Barave confirms a downward trend in usage of PSTN usage. *See* Ex. 6 (Barave Dep.) 211:14–212:15.

[11] A relevant excerpt of this exhibit is provided here.

'858 Patent, which Dr. Schaefer did not consider in his analysis.  *See* Ex. 2 (Schaefer Report) ¶ 220.  Dr. Schaefer should have evaluated these non-infringing functionalities, and without this analysis his percentage is unsupported.  "No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."  *Via Vadis, LLC v. Amazon.com, Inc.*, 1:14-CV-00813-LY, 2022 WL 23351, at *3 (W.D. Tex. Jan. 3, 2022) (quoting *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)).  Failure to account for these non-infringing functionalities further demonstrates that Dr. Schaefer's opinions are arbitrary and should be excluded.

***Global Access***.  As another example, Dr. Schaefer similarly concludes that 30% of Webex's "Global Access" feature is attributable to the '858 Patent.  Dr. Schaefer again nods to "non-infringing components," but fails to mention what those are or how he quantitatively factored them in his opinion.  Ex. 2 (Schaefer Report) ¶ 222.  In fact, he cites no support of any kind for his conclusion.

Dr. Schaefer's deposition did not cure these deficiencies.  He does not provide any quantitative support for why he assigned these percentages.  Dr. Schaefer only explains that "Global Access is not necessarily always going to be hybrid audio that we talked about; right? ... So I gave a lower percentage to the global access category to accommodate for the fact that one is hybrid audio, which is what the claims are directed at, and I gave a high weight associated with it."  Ex. 5 (Schaefer Dep.) 271:3–11.  Again, "vague qualitative notions of the relative importance" of an accused feature is an unacceptable method for an apportionment analysis.  *LaserDynamics,* 694 F.3d at 69.

Although Dr. Schaefer's apportionment calculations for the Hybrid Audio and Global Access features are the most egregious examples, his explanations related to the other features

suffer from the same flaw; they are all devoid of factual quantitative support.  If any of Dr.

Schaefer's percentages are unreliable, his conclusion that 40% of Webex Audio functionality is

attributable to the '858 Patent cannot be sustained.

Mr. Bratic provides no information about how Dr. Schaefer arrived at his percentages; he

admitted in deposition that he does not know and that he merely "adopted [Dr. Schaefer's]

conclusion and findings and applied them" to his analysis and has "no independent opinion about

the technical matters in this case."  Ex. 4 (Bratic Dep.) 108:16–110:19; 98:17–99:15.

Consequently, Mr. Bratic's conclusion that 40% of Webex Audio gross profits realized are

directly attributable to the '858 Patent should also be excluded for failure to meet the standards

set forth by the Federal Circuit.

> ### 2.      Mr. Bratic's split of alleged incremental benefit to Cisco is flawed and unsupportable.

Mr. Bratic's use of a research and development to total operating expenses ratio ("Ratio")

to determine the percentage of incremental benefit to Paltalk suffers from several flaws.  As an

initial matter, Mr. Bratic uses the total research and development expenditures and operating

expenses for all of Cisco, rather than limiting it to only Webex data.  *See* Ex. 4 (Bratic Dep.)

123:17–24 ("Q: You did not look at R&D expenses related to Webex, specifically? A: Not for

the split, correct.").  Bratic cites no evidence that the Ratio for Cisco as a whole is the same as

the Ratio for Webex alone, so its use has no basis in fact.[12]

---

[12] Indeed, other Cisco business units sell tangible products like switches, routers, and access
points, and logically those will have higher cost of goods associated with them (and therefore a
different Ratio), than Webex which is not a tangible product.  *See, e.g.*, Ex. 20 (CISCO-PAL-
00001395) at 8–11 (listing a number of other products included in Cisco's "Switching portfolio,"
"Routing portfolio," and "Data Center portfolio" that include products like "wireless access
points").

Furthermore, Mr. Bratic's use of the Ratio appears to conflate Cisco's R&D expenses with Paltalk's purported contributions. First Mr. Bratic's bargaining split understates Cisco's own contribution to the commercial success of Webex products. While he does admit that "R&D-to-operating expenses ratio is reflective of [Cisco's] own determination of how much money it should invest in technology development relative to the overall cost of product commercialization," Mr. Bratic's calculation represents Cisco's contribution as *Paltalk's* contribution. Ex. 1 (Bratic Report) ¶ 158. In addition, Mr. Bratic does not consider Cisco's contributions outside of its operating expenses including intangible contributions like identification of product features most important to customers.

Second, Mr. Bratic provides no logical explanation for why he opines that this approach is supported in an inventor/promoter situation such as here. Ex. 1 (Bratic Report) ¶ 160. Using this methodology and holding all else equal, this means that the more Cisco contributes to R&D, the less it receives in benefit surplus, with more of that share (and more damages) going to Paltalk. Conversely, all else equal, if Cisco contributes less to R&D, then Paltalk's damages would also be lower. In an extreme example displaying the absurdity of Mr. Bratic's approach, if Cisco's R&D expenses were zero (such as they would be in a pure inventor/promoter situation where the alleged infringer does not innovate or spend on R&D), then Paltalk's damages would always be zero. This contravenes basic economic principles and cannot be a basis for his division of incremental benefits.

### 3.  Mr. Bratic's reasonableness check is based on Dr. Schaefer's unsupported apportionment and both should be excluded.

Mr. Bratic's purported "reasonableness check" is neither a check on his 40% apportionment nor reasonable. In fact, it is based on Dr. Schaefer's "alternative apportionment,"

which the Court should also be excluded.[13]  Ex. 2 (Schaefer Report) ¶¶ 232–41.  Dr. Schaefer

uses the same unsupported methodology in both apportionments, with the alternative

apportionment simply being a larger scale.  Instead of considering only Webex Audio

functionality and revenues, his alternative apportionment considers the full Webex revenues and

what Dr. Schaefer claims is the entire functionality of Webex.  *See* Ex. 4 (Bratic Dep.) 135:21–

136:4; *see also* Ex. 2 (Schaefer Report) ¶¶ 232–41.  Again, Dr. Schaefer completely ignores

relevant Webex functionality in documents that he cites and provides no explanation or analysis

of why he assigned the technical weight percentages.  *See* Ex. 2 (Schaefer Report) ¶¶ 233–38;

*see also* Ex. 18 (CISCO-PAL-00001223) at 4–16 (highlighting other non-audio features such as

"AI-driven intelligence," "enterprise-grade security" "frictionless deployment and management,"

"polling," "events," "always-on messaging," "central dashboard," "real-time language

translation," and "breakout sessions.").

Compounding this faulty methodology, Dr. Schaefer then imports his 40% value that the

'858 Patent allegedly contributed to Webex Audio (from his original apportionment)[14] to his

alternative apportionment as the value contributed by the patent to "Audio Conferencing"

features.  In other words, he also uses his unsupported 40% apportionment to confirm that 40% is

---

[13] During his deposition, Mr. Bratic admits that he relied entirely on the numbers that Dr.
Schaefer provided in his report for the reasonableness check.  Ex. 4 (Bratic Dep.) 137:12–17
("Q: So Dr. Schaefer provided you the chart at the top of Page 58? A: Yes, he did.  Q: And did
you provide him with the feature sets that are included in that chart? A: No, I did not.")  Mr.
Bratic also admits that Dr. Schaefer provided him with no explanation of how or why he selected
the features.  Ex. 4 (Bratic Dep.) 141:9–21 ("No, I did not -- I don't recall him giving me any
kind of detailed explanation.  He just gave me his conclusion.")

[14] Dr. Schaefer's report is clear that the "Audio Conferencing" feature and 40% attribution in his
reasonableness check refers to the same six features he identified in his original audio-
conferencing apportionment that yielded the 40%.  *See* Ex. 2 (Schaefer Report) ¶238 (listing the
same six features in his original description of "Webex Audio.")

appropriate.  As such, Dr. Schaefer's alternative apportionment, and Mr. Bratic's

"reasonableness check" are unreliable.

> **4.    The Court should preclude Mr. Bratic from offering testimony about economic comparability for licenses that he did not analyze in his report.**

Mr. Bratic lists licenses produced by Cisco under his analysis of *Georgia Pacific* factor

no. 2 with no information besides the names of the parties and the date.  Ex. 1 (Bratic Report) ¶

87.  He claims that "[a]ccording to Dr. Schaefer, none of the Cisco Agreements involve

technology that is comparable to the teachings of the '858 Patent."  Ex. 1 (Bratic Report) ¶ 88.

When an expert relies on a license that involves "technologies other than the patent in suit,"

(*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)), the expert must also

"account for 'the technological and economic differences' between them."  *Wordtech Sys., Inc. v.*

*Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010); *see also Finjan, Inc. v.*

*Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010) ("[U]se of past patent licenses

under factors 1 and 2 must account for differences in the technologies and economic

circumstances of the contracting parties.").  Although Mr. Bratic provides a short description of

the economic circumstances of the NCR Agreement and the Raindance Cross-license

Agreement, (Ex. 1(Bratic Report) ¶¶ 89–91), he provides no economic analysis of the other

licenses produced by Cisco, other than a conclusory statement that "the Cisco Agreements are

not economically comparable to the hypothetical negotiation between Paltalk and Cisco."  Ex. 1

(Bratic Report) ¶ 88.  Because Mr. Bratic failed to include any economic analysis for the licenses

produced by Cisco, other than his brief analysis of the NCR Agreement (Ex. 1 (Bratic Report) ¶

89) and Raindance Cross-license Agreement (Ex. 1 (Bratic Report) ¶ 90), the Court should

preclude him from offering any further testimony concerning their economic comparability.[15]

### 5.   Mr. Bratic's use of a running royalty is based on a license that does not support its use.

Mr. Bratic rationalizes that "[a] running royalty is the best way to determine the extent of

use made of the '858 Patent" because "Webex Communications was aware of NCR

Corporation's preferred royalty structures involved royalties paid on a licensee's revenues." Ex.

1 (Bratic Report) ¶ 145. Setting aside the irrelevance of NCR's "preferred royalty structures,"

the NCR agreement with Webex does not contain any running royalty and cannot be a valid basis

for Mr. Bratic's conclusion. *See* Ex. 10 (CISCO-PAL-00003856); Ex. 4 (Bratic Dep.) 81:10–14.

This is not a running royalty based on a licensee's revenues,

Ex. 4 (Bratic Dep.) 81:10–14 ("Q: The WebEx/NCR

agreement does not contain a running royalty for the use of the patented invention in its -

WebEx's products or services, correct? A: That would be my understanding."). Mr. Bratic even

states that "[t]he terms of the WebEx Communications/NCR Corporation Purchase and License

---

[15] Mr. Bratic provides even less of an analysis here than he did in a previous case where his
opinion was excluded for failing to account for technological and economic differences for his
use of a license that involved a technology different than the patents-in-suit. *See NetFuel*, 2020
WL 1274985, at *15 ("Without some showing that the economic differences were accounted for,
Mr. Bratic's use of the BNP agreement to calculate his damages amount is unreliable, irrelevant,
and unhelpful to the jury's task of evaluating the result of the hypothetical negotiation.")
(internal quotation omitted).

Agreement were very different than those that would be contemplated by Paltalk and Cisco in a hypothetical negotiation." Ex. 1 (Bratic Report ¶ 89). It is improper to rely on a license that is "radically different from the hypothetical agreement under consideration to determine a reasonable royalty." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed.Cir.2011) (internal quotations omitted). Mr. Bratic's use of a running royalty has no support besides his incorrect statement that the NCR Agreement somehow justifies this payment structure.[16] Furthermore, relying on a license that the expert himself admits is "'not a comparable license to any of the [Defendant's] Intellectual Property In Suit' …. This is improper under *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed. Cir. 2010), and should therefore be excluded under FRE 702 and *Daubert*." *Apple, Inc. v. Samsung Elecs. Co.,* No. 11-CV-01846, 2012 WL 2571332, at *8 (N.D. Cal. June 30, 2012). Mr. Bratic's use of a running royalty is unsupported, and the Court should exclude it.

### C.  Paltalk's experts should not be able to cure any of their deficient analyses.

Should the Court find that Mr. Bratic's damages analysis is based on an incorrectly assessed and unsupported analyses, Paltalk should not be given the opportunity to cure these defects. When an expert "has employed a fundamentally flawed methodology in calculating reasonable royalty, such that the flaw cannot be cured by '[v]igorious cross-examination, presentation of contrary evidence, [or] careful instruction on the burden of proof,'" the party is not given a chance to cure the defect and the case should be remanded for a new trial on damages. *Cassidian*, 2013 WL 11322510, at *2 (citing *Kumho Tire Co. v. Carmichael*, 199 S.

---

[16] The Eastern District of Texas has previously excluded Mr. Bratic's testimony and found his report "inadequate for failing to supports [*sic*] his conclusion that the relied on licenses are comparable to the hypothetical agreements between Plaintiff and Defendants." *See Fenner Inv., LTD. V. Hewlett-Packard Co.*, No. 6:08-273, 2010 WL 3911372, at *2 (E.D. Tex. Apr. 16, 2010) (citations omitted).

Ct.  1167, 1176 (1999); *LaserDynamics*, 694 F.3d at 76 (remanding the case for a new trial on

damages because experts offered testimony based on an incorrect hypothetical negotiation date)).

Based on its inclusion in his non-infringing alternative analysis, Mr. Bratic already considered an

earlier hypothetical negotiation date of 2004 and dismissed it in favor of the later (and more

convenient) 2015 date, claiming that the outcome of the hypothetical negotiation would be

unchanged.  Ex. 1 (Bratic Report) ¶ 36 n.72.  Allowing Paltalk to cure this defect would allow

Mr. Bratic to offer a completely new opinion based on the 2004 date he originally rejected.  Mr.

Bratic could have considered this in his original report and provided an alternative analysis based

on an earlier hypothetical negotiation date.  Mr. Bratic should also not be allowed to cure any of

his running royalty analysis deficiencies, including his reliance on Dr. Schaefer's attribution

analyses, his split of alleged incremental benefit to Cisco, his reasonableness check, or his

license analyses (and lack thereof).  Allowing Paltalk a "second bite" to "advance new theories

and methodologies" would prejudice Cisco, who has invested substantial time, money, and effort

in defending against Paltalk's experts and "already highlighted the deficiencies for Plaintiff's

experts."  *See NetFuel,* 2020 WL 1274985, at *15 (denying Plaintiff's request for leave to serve a

supplemental damages report based on Mr. Bratic and Dr. Rubin's deficiencies).  Moreover,

Paltalk's expert report contains "significant deficiencies, which counsels against supplemental

expert reports."  *NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-CV-02352-EJD, 2020 WL 1450570, at

*2 (N.D. Cal. Mar. 25, 2020).

## V.    CONCLUSION

For the foregoing reasons, Cisco respectfully requests that the Court exclude as unreliable

and impermissible under *Daubert* and progeny the opinions offered by Paltalk's experts

described above, including any argument or testimony related thereto at trial.

Dated:  December 1, 2022

Respectfully submitted,

*/s/ Sarah E. Piepmeier*
Sarah E.  Piepmeier (admitted, Cal. SBN. 227094)
Elise Edlin (SBN 293756) (*pro hac vice*)
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
SPiepmeier@perkinscoie.com
EEdlin@perkinscoie.com
Telephone: 415.344.7000
Facsimile: 415.344.7050

Ryan Hawkins (*pro hac vice*)
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, California 92130
RHawkins@perkinscoie.com
Telephone: 858.720.5700
Facsimile: 858.720.5799

Jessica J. Delacenserie (*pro hac vice*)
PERKINS COIE LLP
1201 3rd Ave, Suite 4900
Seattle, Washington 98101
JDelacenserie@perkinscoie.com
Telephone: 206.359.8000
Facsimile: 206.359.9000

Michael E. Jones (SBN. 10929400)
Shaun W. Hassett (SBN. 24074372)
POTTER MINTON, P.C.
110 N. College Ave., Suite 500
Tyler, Texas 75702
mikejones@potterminton.com
shaunhassett@potterminton.com
Telephone: 903-597-8311
Facsimile: 903-531-3939

Attorneys for Defendant
CISCO SYSTEMS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on December 1, 2022.

I also hereby certify that all counsel of record who have consented to electronic service are being served with a notice of filing of this document, under seal, pursuant to L.R. CV-5(a)(7) on December 1, 2022.

*/s /Sarah E. Piepmeier*
Sarah E. Piepmeier

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order in this case and Judge Albright's Amended Standing Order Regarding Filing Documents Under Seal in patent Cases and Redacted Pleadings.

*/s/ Sarah E. Piepmeier*
Sarah E. Piepmeier