IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| PALTALK HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CISCO SYSTEMS, INC., <br><br> Defendant. | CIVIL ACTION NO. 6:21-CV-00757-ADA <br><br><br> JURY TRIAL DEMANDED |

**PLAINTIFF PALTALK HOLDINGS, INC.'S
MOTION TO STRIKE CERTAIN OPINIONS OF
<u>DEFENDANT'S DAMAGES EXPERT MS. KINDLER</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................2

ARGUMENT ...................................................................................................................................2

    I.      The Court should exclude Ms. Kindler's opinions based on Webex usage data because they are unreliable and unhelpful to the jury. ...........................3

           A.      Ms. Kindler's assumption that PSTN-to-VoIP conferences accounted for 50% of Webex usage from 2015-2020 is speculative and does not provide reliable support for her apportionment opinions. ...............................................................................3

           B.      Ms. Kindler's unjustified extrapolation from 2021 Webex usage does not provide reliable support for her apportionment opinions. ......................................................................................................6

    II.     The Court should exclude Ms. Kindler's opinions that are based on late-produced documents and unreliable deposition testimony. ..............................7

           A.      A party that fails to provide information in discovery should not be permitted to use that information at trial. .........................................7

           B.      The Court should strike Ms. Kindler's opinions about Webex "add-on" revenues and an NCR-WebEx Communications licensing agreement. ..............................................................................7

    III.    The Court should exclude Ms. Kindler's unreliable opinions about non-infringing alternatives. ...................................................................................12

CONCLUSION ..............................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*CliniComp Int'l, Inc. v. Athenahealth, Inc.*,
 507 F. Supp. 3d 774 (W.D. Tex. 2020)..................................................................................13

*Guillory v. Domtar Industries*,
 95 F.3d 1320 ............................................................................................................................5

*J.S. v. Am. Inst. for Foreign Study, Inc.*,
 2013 WL 5372531 (W.D. Tex. Sept. 24, 2013).......................................................................5

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999).................................................................................................................6

*Via Vadis, LLC v. Blizzard Entm't, Inc.*,
 No. 1:14-CV-00810-LY, 2021 WL 5908599 (W.D. Tex. Dec. 14, 2021) ..............................13

*Voxer, Inc. v. Meta Platforms, Inc.*,
 2022 WL 3371634 (W.D. Tex. Aug. 16, 2022).......................................................................6

**Rules**

Fed. R. Civ. P. 26(a)(1)(A)(ii) .......................................................................................................7

Fed. R. Civ. P. 37(c)(1)..................................................................................................................7

Fed. R. Evid. 702(b).................................................................................................................3, 12

**Other Authorities**

U.S. Patent No. 6,683,858........................................................................................................2, 8

## INTRODUCTION

Paltalk moves to strike and exclude certain opinions of Cisco's damages expert, Lauren Kindler. This motion is directed at a subset of Ms. Kindler's opinions that are inadmissible and should not be allowed because they are premised on (1) an unreliable factual foundation, or (2) information not provided during the fact discovery period.

*First*, the Court should exclude Ms. Kindler's opinions about historical usage rates of some of the accused functionalities of Cisco's Webex products. The use of hybrid PSTN-to-VoIP conferencing is a central part of the accused functionalities in this case. In discovery, Cisco produced usage data only for 2021. Cisco asserts that no data exists for prior years. Ms. Kindler nevertheless bases opinions on hypothetical usage rates for a prior six-year period for which she has no data or documentary foundation whatsoever (2015-2020). She does so on the basis of an unreliable extrapolation from speculative testimony from a Cisco witness, who himself admittedly has no documentary support for his guesstimates. Ms. Kindler then uses her opinions about usage to attack the apportionment analysis of Paltalk's technical and damages experts, Dr. Scott Schaefer and Mr. Walter Bratic. Ms. Kindler's opinions in this regard are inadmissible because they lack foundation and are based on an unreliable methodology.

*Second*, the Court should exclude Ms. Kindler's opinions about certain accounting data and a WebEx Communications licensing agreement because they were produced after the close of fact discovery. After seven months of document production, written discovery, and depositions, fact discovery in this case closed on September 22, 2022. Yet, after the close of discovery—and without any justification—Cisco produced additional documents that Ms. Kindler then leveraged in her October 27, 2022 report to support her opinions. Paltalk did not have the opportunity to test these materials during discovery, and Cisco cannot justify its delay. Ms. Kindler's opinions that rely on these late-produced materials should be excluded.

1

*Third*, the Court should exclude Ms. Kindler's opinions about non-infringing alternatives to the asserted patent because they are unreliable. In her report, Ms. Kindler says that, to be an "available" non-infringing alternative, an alternative to the accused functionality must have been "commercially acceptable, readily implementable, [and] inexpensive." Ex. 1 ¶ 169. Ms. Kindler, however, did not actually ascertain whether the two alleged non-infringing alternatives she lists could have been readily and reasonably implemented in a reasonable time frame. Neither did anyone else. She has not analyzed and could not identify how much the non-infringing alternatives would have cost to implement or how much time implementation would have taken. *See* Ex. 6 at 116:15-117:6, 117:22-118:6. Her opinions about non-infringing alternatives are thus unreliable.

## BACKGROUND

Paltalk sued Cisco for infringement of U.S. Patent No. 6,683,858 ("the '858 Patent"). The '858 Patent discloses several features integral to audioconferencing applications, including the ability to host both traditional phones and computers in a single conference, echo cancellation, the identification of active speakers and creation of an active speakers' list, and the ability to have the aforementioned features at relatively low bandwidths.

Paltalk filed this suit in this Court on July 23, 2021. The parties' *Markman* hearing was held on February 24, 2022. Fact discovery commenced the following day and concluded on September 22, 2022. Expert discovery concluded on November 17, 2022. Trial is set for February 23, 2023.

## ARGUMENT

Paltalk moves to strike and exclude certain of Ms. Kindler's opinions that are based on an unreliable or improper foundation.

I.  **The Court should exclude Ms. Kindler's opinions based on Webex usage data because they are unreliable and unhelpful to the jury.**

Ms. Kindler's opinions based on the usage of PSTN-to-VoIP conferences are unreliable because her conclusions are neither "based on sufficient facts or data" nor the product of "reliable principles and methods." *See* Fed. R. Evid. 702(b).

A.  **Ms. Kindler's assumption that PSTN-to-VoIP conferences accounted for 50% of Webex usage from 2015-2020 is speculative and does not provide reliable support for her apportionment opinions.**

It is undisputed that Cisco produced Webex usage data *only* for 2021. Ms. Kindler nevertheless proffers opinions about Webex usage going back all the way to 2015. She makes her conclusions on the basis of an unjustified extrapolation from the 2021 data and the guesswork of a Cisco corporate representative, Amit Barave. *See* Ex. 1 at ¶ 194-96. But neither the 2021 data nor the testimony from Mr. Barave constitute sufficient facts or data to support Ms. Kindler's conclusions about the frequency of Webex usage (specifically, the usage of Webex for conferences involving both VoIP and PSTN users).

There is no evidence in the record of the actual number of PSTN-to-VoIP calls from 2015-2020. So Ms. Kindler estimates what Webex usage might have been from 2015 to 2020 in two ways: (1) she extrapolates from Cisco's 2021 data (to estimate that usage ranged from 22.5% to 40.5%), and she (2) relies on a guess by a Cisco witness (to estimate that usage was steady at 50%). *See id* ¶ 194; *see id* at Exhibit 6. Ms. Kindler then uses her conclusions to attack Dr. Schaefer's and Mr. Bratic's analysis. *See id.* ¶ 194 ("I estimated, in two approaches, the share of meeting minutes that simultaneously involved both VoIP and PSTN users during the damages period, based on Cisco's actual usage data from August 2021 through August 2022 and Mr. Barave's testimony."). Ms. Kindler's conclusions are improperly speculative.

3

First, Ms. Kindler relies on the testimony of Cisco's Mr. Barave to estimate that PSTN-to-VoIP conference usage stayed constant from 2015 to 2020 at 50%. But Mr. Barave *never testified* about the proportion of PSTN-to-VoIP calls from 2015 to 2020. Mr. Barave was instead asked about the number of PSTN *users*—and he could not answer even that question without access to Cisco's unproduced (and apparently nonexistent) usage data. *See* Ex. 5 at 210:3-16.

> Q:   Do you have any sense of any trends in PSTN usage beyond that 12-month period, in terms of whether the number of PSTN users or minutes or meetings has increased or decreased over time?
>
> A:   Are you referring to … number of people joining in the meetings using phones?
>
> Q:   Yes. Using the PSTN.
>
> A:   And you are also asking about just the number. That that is hard—hard for me to gauge. If it is—so again I don't have data prior to 12 months . . . . Only have anecdotal sort of things that we have seen with customers or gone it.

When pressed by Cisco's own counsel about the number of PSTN users, Mr. Barave reiterated that he did not have the factual data needed to answer that question. The best Mr. Barave could do was try to guess at the PSTN usage from 2015-2020 using "anecdotal and qualitative commentary":

> Q.   Have you noticed any trend in the number of users who access conference via the PSTN since … 2015?
>
> A.   ***Prior to the 12 months here, I don't have factual data at my disposal to, you know, factually answer that question***. The anecdotal and 12·qualitative commentary I have is the—there are two things in play here.
>
> When you talk about the sheer number, right, that number could look like it has grown. Because that may be a factor of, in general, people may be having 100,000 meetings in 2010 and now we have 10 million. So everything goes up. But the trend we have often encountered is the mix, as

> in *if at one point in time there was a 50/50 mix of PSTN and VoIP. That mix could look more like—I don't know—25—75/25.* 75 VoIP, 25 PSTN and so forth."

*Id.* at 211:11-23 (emphasis added).

Without the actual Webex usage data, Cisco's corporate representative was unable to explain how usage shifted over time.[1] If Mr. Barave did not have a factual foundation for his testimony, Mr. Kindler does not have a factual foundation for her opinions.

Notwithstanding the complete lack of evidence regarding Webex usage from 2015-2020, Ms. Kindler bases some of her opinions on an assumption that 50% of Webex users were PSTN users in the 2015-2020 period, based solely on Barave's hypothesizing. Mr. Barave's hypothetical is not a sufficient factual basis for any expert opinion. Mr. Barave stated only that PSTN users *at some point* could have been 50% of Webex users. There is no factual basis for Ms. Kindler's assumption that 50% of Webex minutes from 2015-2020 involved PSTN-to-VoIP conferences. Speculation cannot support an admissible expert opinion. *See Guillory v. Domtar Industries*, 95 F.3d 1320, 1330-31 (affirming decision to strike expert testimony because expert merely speculated as to "what probably happened" or "what possibly could have happened"); *see also J.S. v. Am. Inst. for Foreign Study, Inc.*, 2013 WL 5372531, at *8 (W.D. Tex. Sept. 24, 2013) (citing *Guillory*, 95 F.3d at 1331).

---

[1] Moreover, Mr. Barave's testimony about possible trends in the raw number of PSTN users at a given time does not reveal the number of PSTN-to-VoIP conferences during that time frame. A VoIP-to-PSTN conference refers to a conference where at least one user joins via a PSTN device and at least one user joins via a VoIP device. *See* Ex. 5 at 194:8-14. The raw number of VoIP or PSTN Webex users says nothing about the frequency with which those users join calls or the number of minutes those users spend on calls, so the raw number of Webex PSTN users is not an accurate representation of the "usage" of PSTN-to-VoIP conferences, as Ms. Kindler references in her report.

### B. Ms. Kindler's unjustified extrapolation from 2021 Webex usage does not provide reliable support for her apportionment opinions.

As an alternative to her assumption that 50% of Webex usage was VoIP-to-PSTN, Ms. Kindler tries to reach lower percentages using an unreliable methodology. Ms. Kindler arrives at lower usage numbers by applying unsupported adjustments to Mr. Barave's speculation. In Exhibit 5.1 to her report, Ms. Kindler starts with Mr. Barave's hypothetical 50% PSTN user number for 2015. Then she makes various adjustments, as outlined in paragraph 194 of her report. With no factual support, no technical expertise, and no experience in this area, Kindler makes the following assumptions, as explained on pages 134-136 of her report:

- She assumes that Barave's hypothetical scenario where 50% of Webex users were PSTN users at some point means that 50% of all Webex users in 2015 were PSTN users

- She then assumes that if 50% of all Webex users in 2015 were PSTN users, then necessarily 50% of all 2015 meeting minutes involved at least one PSTN user

- She then assumes that if 50% of all 2015 meeting minutes involved at least one PSTN user, then only 42.1% of all meeting minutes involved at least one PSTN user and one VoIP user

- She then assumes that the 42.1% of meeting minutes involving at least one PSTN user and one VoIP user decreases in "a straight-line fashion" from 2015 to August 2021. Ms. Kindler does not even try to provide any support for the 2.6% "constant negative growth rate" referenced on page 216 of her report.

Ms. Kindler's theory about the prevalence of VoIP-to-PSTN meeting minutes from 2015-2020 is that it "decreases in a straight-line fashion" from 42.1% in 2015 to 24.1% by July 2022, by 2.6% per year. *See* Ex. 1 ¶ 194. Her theory that the number of minutes decreases in "a straight-line fashion" is not reliable because it cannot be tested, subjected to peer review and publication, has no known or potential rate of error or standards controlling its operation, and there is no indication that her methodology is supported by the scientific community. *See Voxer, Inc. v. Meta Platforms, Inc.*, 2022 WL 3371634, at *2 (W.D. Tex. Aug. 16, 2022) (citing *Kumho Tire Co. v.*

6

*Carmichael*, 526 U.S. 137, 151-152 (1999)). Ms. Kindler manufactured this methodology out of thin air, and her opinions based on usage should therefore be excluded.[2]

**II.    The Court should exclude Ms. Kindler's opinions that are based on late-produced documents and unreliable deposition testimony.**

Paltalk moves to strike Ms. Kindler's proffered opinions about (1) revenue from WebEx Audio "add-ons"; and (2) the WebEx Communications-NCR license. The Court should exclude these opinions because they are based on materials produced after the close of discovery that Paltalk did not have a reasonable opportunity to test during the discovery period.

**A.    A party that fails to provide information in discovery should not be permitted to use that information at trial.**

Rule 26 requires parties to produce all documents and information in their possession when that information supports any of the parties' claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(ii). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The party opposing relief under Rule 37(c) "has the burden of demonstrating that a violation of Rule 26 was substantially justified or harmless." *Id.*

**B.    The Court should strike Ms. Kindler's opinions about Webex "add-on" revenues and an NCR-WebEx Communications licensing agreement.**

This case was filed in July 2021 and document and written discovery opened in February 2022, immediately after the *Markman* hearing. Over the ensuing seven months, the parties engaged in extensive discovery. Yet Cisco—without providing any justification or even explanation—did

---

[2] Although Cisco did produce usage information for 2021, all of Ms. Kindler's opinions based on Webex usage should be excluded. The reason is that a single year of data does not provide a reliable foundation for a six-year damages period, and allowing testimony about a single year—particularly a year as anomalous as 2021 (i.e., a year when Covid changed the dynamics of online conferencing)—would be misleading and prejudicial.

not produce two documents that underly Ms. Kindler's report until after the close of fact discovery. Cisco's late production prejudiced Paltalk, which had no opportunity to fully investigate the information in the late-produced materials.

1. *Spreadsheet Identifying Webex "Add-On" Product IDs (CISCO-PAL-00003857)*

On October 11, 2022, nearly three weeks after the close of fact discovery, Cisco produced a voluminous and nearly indecipherable spreadsheet showing Webex revenue associated with various product IDs. This was surprising to Paltalk—not only because discovery had closed but also because Cisco's counsel had told Paltalk just days earlier, September 26, 2022, that "*Cisco does not intend to produce any additional documents*." Ex. 7.

At the very outset of discovery, in its First Requests for Production of Documents, Paltalk asked for all of Cisco's revenue and sales data relating to Webex. *See* Ex. 8 at 8-12. After some back-and-forth, Cisco produced reasonably voluminous data that identified revenue associated with "Webex Audio" features in the accused products. *See* Ex. 4 at 2-3. Cisco witnesses and Ms. Kindler have testified that Cisco performed an internal apportionment to identify revenue specifically attributable to audio functionality of the Webex suite of products (including all accused products). *See id.* at 2. Cisco's corporate representative Mr. Boyles further represented that, because the '858 Patent is directed to audio features, all of the accused functionalities were captured by the "Webex Audio" line item. *See id.*

Cisco's lawyers later confirmed in an email to Paltalk's counsel that a prior, timely produced spreadsheet used in Mr. Boyles's deposition—the spreadsheet upon which Mr. Bratic relies—"maps the [product IDs] to the Product Family and the Product Family to the Product Family type, and sums the total revenues for each family type, including the one that is relevant to the accused functionality 'Webex Audio.'" *Id.* at 2-3. Cisco's lawyer further suggested that it

8

would not have been reasonable to expect or require Mr. Boyles to explain each of the product IDs used by Cisco for Webex: "With over 600 PIDs for the Relevant Products, and a spreadsheet that includes a description of each, the complaints that Mr. Boyles didn't know what each PID referred to are unfounded." *Id.* at 2.

Based on Cisco's production of documents during discovery, the testimony of Cisco's corporate representative, and the representations of Cisco's counsel, Paltalk's expert Walter Bratic used the "Webex Audio" revenue, from the above-referenced spreadsheet, as one of the principal bases for his royalty calculation. It is beyond dispute that Mr. Bratic used the best, most reliable, and most complete data produced by Cisco in the discovery period—and that Cisco's own lawyers confirmed the credibility of the data upon which Mr. Bratic relied.

Notably, in the email referenced above Paltalk asked Cisco to re-present its corporate representative on financial topics (Mr. Boyles) to give additional testimony specifically on "Webex Audio" and particularly on "the information contained in the revenue spreadsheets produced by Cisco (and identified in Cisco's response to Paltalk's Interrogatory No. 2), including information about the specific product IDs, product descriptions, product families, and product family types and how information contained in those data fields relates to the Accused Functionalities and Accused Products." *Id* at 3-4. Paltalk's counsel explained, "A fully prepared witness should be able to decipher the acronyms and codes contained in the revenue spreadsheets." *Id.* at 4. Cisco refused to provide a witness to give this testimony. Cisco instead made representations about Mr. Boyles's prior testimony and confirmed that Webex Audio revenue included the accused functionalities. *Id* at 2.

Then on September 27, 2022, *after* the close of discovery and *after* refusing to re-present its corporate representative, Cisco produced an additional voluminous spreadsheet of Webex

9

revenue based on product IDs. *See* Ex. 3. Cisco offered no explanation for its tardy production—which, again, came more than seven months after Paltalk's original request. In her report, to calculate Webex revenue associated with the accused functionalities, Ms. Kindler did not rely on the "Webex Audio" line item in the earlier produced spreadsheet that Cisco's corporate representative referred to in his deposition. Ex. 1 at 137. Ms. Kindler instead relied on Cisco's late-produced "add-on" spreadsheet to create Exhibits 7 and 7.1 to her Report, which she in turn uses to try to attack the basis of Mr. Bratic's royalty calculaion. *See id.* at 136-38 & Ex. 7.

But it's actually worse than that. As explained, in a response to a specific request that Cisco present Mr. Boyles for additional testimony *specifically to decipher product IDs*, Cisco refused. Ex. 4 at 2. Yet as Ms. Kindler testified, Ms. Kindler asked for "add-on" revenue information for the first time after the close of discovery, *see* Ex. 6 at 126-29, and she interviewed Mr. Boyles well after the close of discovery so that she could decipher the product IDs and other information in the late-produced spreadsheet, *see id*. Ms. Kindler used her interview with Mr. Boyles to create Exhibit 7.1 in her report. And based on all of this late-produced information, Ms. Kindler tries to rebut Mr. Bratic's reliance on the "Webex Audio" revenue that Cisco produced in discovery and that was the subject of Cisco's corporate testimony.

Cisco's approach is manifestly unfair and should not be allowed. Cisco produced data in discovery, presented Mr. Boyles (its corporate representative) for testimony, and then attested to the accuracy of the data and the testimony. The Court should not allow Cisco to then try to undercut the data and testimony it offered in discovery with late-produced information and a post-discovery interview with its corporate representative. Paltalk has been prejudiced by its inability to test these the factual foundation of Ms. Kindler's opinions or obtain additional testimony from Mr. Boyles.

The Court should exclude the portions of Ms. Kindler's testimony that rely on the "add-on" spreadsheet and Mr. Boyles's related interview.

          2.         *Webex-NCR Corp. License Agreement (CISCO-PAL-00003856)*

To advocate for a minimal royalty amount, Ms. Kindler relies on a patent purchase and license agreement between NCR Corporation and WebEx Communications from September 2004. *See* Ex. 2. In the agreement, NCR licenses certain patents and technologies to WebEx Communications (before it was acquired by Cisco).

In discovery, Paltalk requested all licensing documents. On February 25, 2022, at the very beginning of discovery, Paltalk served Requests for Production 13 and 46 asking for documents related to Cisco's licensing related to the Accused Products. *See* Ex. 8. On May 13, 2022, Paltalk met and conferred with Cisco about those requests and Cisco's insufficient production of relevant licenses. Cisco produced nothing in response. Nor did Cisco produce anything additional in the discovery period. Cisco waited until September 27, 2022—five days after the close of fact discovery—to produce the license that Ms. Kindler now relies upon.

Ms. Kindler cites to the NCR-WebEx license 16 sixteen times in her report, principally in a section about "WebEx Communications' and Cisco's Licensing History," beginning on page 94 and also at some length beginning on page 131. Ms. Kindler uses the NCR lump-sum payment to try to rebut Mr. Bratic's royalty analysis. She uses the NCR license to argue that Webex would have given Paltalk a lump-sum payment at the time of first infringement rather than a running royalty. *See, e.g.,* Ex. 1 at 131. Cisco has no reasonable justification explanation for its untimely production of the license agreement.

Paltalk has suffered prejudice as a result. Paltalk had already deposed Cisco's corporate representative on licensing, Mr. Hamilton, before the NCR Agreement was produced. And while

11

Mr. Hamilton acknowledged the existence of the Agreement during his deposition, Paltalk did not have the document at the time of Mr. Hamilton's deposition and did not have it during the fact discovery period. And more importantly, Mr. Hamilton's deposition *was on the last day of discovery*—meaning it wasn't particularly helpful for Mr. Hamilton to identify a document that had not yet been produced. Cisco did not produce the document until September 26, 2022, just one day before opening expert reports were due. Ms. Kindler's opinions that rely on the NCR Agreement should be excluded.

### III. The Court should exclude Ms. Kindler's unreliable opinions about non-infringing alternatives.

Ms. Kindler's conclusions about purportedly available non-infringing alternatives are unreliable because they are not "based on sufficient facts or data." *See* Fed. R. Evid. 702(b). Ms. Kindler is not an expert in the field of communication systems, hardware and software design, and/or network signaling services. Thus, in allegedly evaluating the non-infringing alternatives she identifies in her report, she relies entirely upon "a discussion with Mr. Willis." Ex. 1 ¶ 169. But a review of Ms. Kindler's citations to Mr. Willis's technical report lay bare her unsupported conclusions.

First, Ms. Kindler opines "that Webex products could be modified so that, at any time in an audio conference, only the audio of the loudest speaker would be sent, instead of sending multiple users' audio" and that doing so would constitute a "well-known implementation" that was "well known in prior art" and would "would be easy to implement in terms of costs and manpower." *Id*. ¶ 170. For this, she relies broadly on Section IX.A. of Mr. Willis' report. But the entirety of the support from Mr. Willis's report she could point to would be only Mr. Willis's own bare and unsupported statement that "[w]hereas the [Webex] system now sends multiple user's audio, the Webex code would be modified from sending, for example the three loudest user's

12

audio, to simply determining the loudest user and sending only that user's audio." Ex. 10 ¶ 255. Mr. Willis's report provides nothing about the engineering costs associated with such a modification. Likewise, Ms. Kindler provides no evidence or analysis whatsoever to support her assertion that changes to the Webex product(s) "would be easy to implement in terms of costs and manpower." In deposition, Ms. Kindler conceded that neither she nor Mr. Willis made any attempt to quantify how long it would have taken or how much it would have cost to implement the purported non-infringing alternatives she identifies. *See* Ex. 6 at 115-19. While courts in this district have generally found that "[a]lternative or opposing facts, data, and assumptions do not preclude admission of expert testimony," here, *no facts or data are present* and there is no indication that Mr. Willis or Ms. Kindler are providing their opinions based upon a supportable assumption. *CliniComp Int'l, Inc. v. Athenahealth, Inc.*, 507 F. Supp. 3d 774, 779 (W.D. Tex. 2020); *cf. Via Vadis, LLC v. Blizzard Entm't, Inc.*, No. 1:14-CV-00810-LY, 2021 WL 5908599, at *3 (W.D. Tex. Dec. 14, 2021) (denying motion to exclude because, even in the absence of a rebuttal sales forecast, Defendants' expert relied on "*substantial evidence sufficiently tied to deposition testimony*") (emphasis added).

Ms. Kindler engages in the same exercise as to the second allegedly non-infringing alternative of "send[ing] mixed audio streams to all users (instead of sending mixed audio streams only to clients that are not capable of mixing)." Ex. 1 ¶ 171. Once again, she opines that this was a "well-known implementation" that was "well known in prior art" and would "would be easy to implement in terms of costs and manpower." *Id*. For support, she relies entirely on Mr. Willis' report (section IX.B.). But, whereas before Mr. Willis' report at least contained some conclusory statement, Mr. Willis' report presents *nothing* to support Ms. Kindler's opinion. Compare Ex. 10

13

¶ 257 with Ex. 1 ¶ 171. Thus, the *Daubert* analysis as to relevant and/or reliable evidence is immediate: none exists. *Nikolova*, 585 F. Supp. 3d at 940 (W.D. Tex. 2022).

Neither Ms. Kindler nor Mr. Willis have identified any evidence regarding the costs and manpower to implement these alleged non-infringing alternatives. Therefore, the Court should exclude Ms. Kindler's opinions regarding the costs and manpower necessary to implement the alleged non-infringing alternative of "sending only the loudest user's audio stream at any given time in an audio conference" and "sending mixed audio to all users."

## CONCLUSION

The Court should grant this motion and exclude the identified portions of Ms. Kindler's proffered testimony.

Dated: December 1, 2022                    Respectfully submitted,

By: */s/ Max L. Tribble, Jr.*
Max L. Tribble, Jr.
State Bar No. 2021395
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666
mtribble@susmangodfrey.com

**ATTORNEY-IN-CHARGE FOR
PLAINTIFF PALTALK HOLDINGS, INC.**

OF COUNSEL:

Ryan Caughey (*admitted pro hac vice*)
State Bar No. 24080827
Bryce T. Barcelo
State Bar No. 24092081
Amber B. Magee *(admitted pro hac vice)*
State Bar No. 24121572
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666
rcaughey@susmangodfrey.com
bbarcelo@susmangodfrey.com
amagee@susmangodfrey.com

Kalpana Srinivasan
State Bar No. 237460
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, 14th Floor
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Fax: (310) 789-3150
ksrinivasan@susmangodfrey.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was forwarded to all counsel of record via email at 12:06am on December 2, 2022.

                                                              */s/ Amber B. Magee*
                                                             Amber B. Magee