**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **PALTALK HOLDINGS, INC.,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | No. 6:21-cv-00757-ADA |
| | § | |
| **CISCO SYSTEMS, INC.,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | **FILED UNDER SEAL** |

**CISCO'S OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE**
**CERTAIN OPINIONS OF DEFENDANT'S DAMAGES EXPERT LAUREN KINDLER**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT ................................................................................................. 2

      A.    Ms. Kindler's Analysis of Usage Data Is Reliable. ........................... 2

            1.    Ms. Kindler's analysis is supported by the record. ................... 2

            2.    Ms. Kindler's methodology to estimate VoIP and PSTN shares before
                  August 2021 is sound and conservative. .................................. 4

      B.    Ms. Kindler's Opinions That Relate to the Documents Paltalk Complains About
            Should Be Admissible. ....................................................................... 7

            1.    Spreadsheet 2, and Ms. Kindler's related opinions, are admissible. ........... 8

            2.    Cisco's production of the NCR Agreement was justified and harmless... 11

      C.    Ms. Kindler's Use of Non-infringing Alternatives is Admissible. ....................... 12

III.  CONCLUSION ............................................................................................. 14

      CERTIFICATE OF SERVICE ...................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barrett v. Atl. Richfield Co.*,
  95 F.3d 375 (5th Cir. 1996) ............................................................................................8

*Barry v. Medtronic, Inc.*,
  No. 1:14-CV-104, 2016 WL 7665773 (E.D. Tex. July 19, 2016) ............................................6

*Bd. of Regents, U. of Tex. Sys. v. Ethicon, Inc.*,
  No. A-17-CV-001084-LY, 2020 WL 3580148 (W.D. Tex. Apr. 21, 2020)..............................3

*Biomed. Enters., Inc. v. Solana Surgical, LLC*,
  No. A-14-CV-0095-LY, 2016 WL 4198304 (W.D. Tex. Apr. 26, 2016)..................................4

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
  No. 09-290, 2012 WL 3686736 (W.D. Pa. Aug. 24, 2012)....................................................13

*Charles v. Sanchez*,
  No. EP-13-CV-00193-DCG, 2015 WL 1345385 (W.D. Tex. Mar. 23, 2015) ...................8, 10

*CliniComp Int'l, Inc. v. Athenahealth, Inc.*,
  507 F. Supp. 3d 774 (W.D. Tex. 2020)..........................................................................2, 7, 14

*Geodynamics, Inc. v. Dynaenergetics US, Inc.*,
  2:17-CV-00371-RSP (E.D. Tex. Sept. 30, 2018), ECF No. 227 ...............................................4

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010)..........................................................................................2, 4, 7

*Knight v. Kirby Inland Marine Inc.*,
  482 F.3d 347 (5th Cir. 2007) ....................................................................................................2

*Langley v. Intl. Bus. Machs. Corp.*,
  No. A-18-CV-443-DAE, 2019 WL 7284946 (W.D. Tex. Dec. 23, 2019) ...............................8

*Moore v. Ashland Chem. Inc.*,
  151 F.3d 269 (5th Cir.1998) (en banc) ....................................................................................2

*S.W. Refrigerated Warehousing Servs. Jt. Venture v. M.A. & Sons, Inc.*,
  No. EP-16-CV-00421-DCG, 2017 WL 8777393 (W.D. Tex. Sept. 21, 2017)........................8

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015)................................................................................................2

*Via Vadis, LLC v. Blizzard Entm't, Inc.*,
  No. 1:14-CV-00810, 2021 WL 5908599 (W.D. Tex Dec. 14, 2021) .....................................14

*Voxer, Inc. v. Meta Platforms, Inc.*,
  No. A-20-CV-00655-LY-SH, 2022 WL 3371634 (W.D. Tex. Aug. 16, 2022) .......................7

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

RULES

Fed. R. Civ. P. 37(c) ....................................................................................................8

## I.      INTRODUCTION

Cisco's damages expert, Ms. Lauren Kindler, prepared a detailed and thorough rebuttal report ("Kindler Report" ECF No. 59-02) in response to Paltalk's damages expert, Mr. Walter Bratic. As discussed below, Paltalk's quibbles with the analysis or factual underpinnings of the Kindler Report go to the weight of the evidence and the credibility of the witness, both of which are appropriately evaluated and decided by the jury.

First, Paltalk complains about Ms. Kindler's reliance on certain usage data, which cover a ██████ period, and the testimony of Cisco's VP of Product Management, Mr. Amit Barave, who explained that there has been a decreasing trend in PSTN use since at least 2015 from approximately ██ to approximately ██. Ms. Kindler provided a thorough analysis of the usage statistics, a multi-option model to calculate a conservative range of use, and outcomes that considered several variable factors. If Paltalk does not find this credible, it may test these observations in cross-examination.

Second, Paltalk moves to exclude Ms. Kindler's testimony that relate to two documents produced shortly after the close of fact discovery. But there is no prejudice to Paltalk: 1) its expert relied on the license agreement in his own report, and Ms. Kindler provided only a rebuttal, and 2) the spreadsheet contains the exact same information as a previously produced spreadsheet (on which Mr. Bratic also relies), in a slightly different layout. The Court should not exclude Ms. Kindler's testimony about these documents.

Third, Paltalk complains that Cisco's technical expert, Mr. Dean Willis, did not state the exact amount of time and money it would take to implement two non-infringing alternatives that Ms. Kindler discusses in her report. But Mr. Willis testified that the alternatives would be cheap and easy to implement, requiring just a few lines of code. He communicated the negligible cost to

Ms. Kindler, who also testified that she did not need the exact amount for her analysis. This dispute is not a basis for exclusion, and Paltalk can present its own evidence to the jury to assess whether Mr. Willis and Ms. Kindler's testimony are accurate and credible.

## II.   ARGUMENT

### A.   Ms. Kindler's Analysis of Usage Data Is Reliable.

Paltalk argues that Ms. Kindler's analysis of Cisco's usage data uses an unreliable methodology and is based on unsupported facts. Mot. at 3-6. But Ms. Kindler's conservative methodologies are both thoroughly explained and based on the best evidence in the record. Any dispute regarding the underlying facts or the accuracy of her methodologies should be tested before the jury on cross examination.

### 1.   Ms. Kindler's analysis is supported by the record.

Paltalk disputes Ms. Kindler's usage analysis, claiming that the usage and trend information she obtained from Cisco's VP of Product Management Mr. Barave is speculative and lacks a factual basis. Mot. at 3-5. But the Federal Circuit and this Court have repeatedly held that disputes like these concerning the accuracy of evidence relied on by an expert go to the weight of the evidence, not its admissibility. *See e.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) and *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015) ("to the extent Mr. Benoit's credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility"); *CliniComp Int'l, Inc. v. Athenahealth, Inc.*, 507 F. Supp. 3d 774, 779 (W.D. Tex. 2020) ("Any questions related to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. CliniComp may explore these issues by cross-examination.").

Here, Ms. Kindler provided opinion and analysis based on Cisco's available usage data and the corporate testimony of Mr. Barave. Kindler Report ¶¶ 132–35, 160, 192–95; Ex. A, (Kindler Dep. Tr.) 88:5–17. Mr. Barave has been a Cisco employee for over 20 years and spent the last 15 years on the product-management team, where he develops the strategy for Webex based in large part on customer feedback and usage. Ex. B, (Barave Dep. Tr.) 7:11–8:12. Based on observed trends and customer feedback, Mr. Barave testified that Cisco has seen a steady decrease in the percentage of users[1] accessing Webex via the PSTN since 2015. Ex. B, 210:17–213:7. In response to a question from Paltalk about trends in the number of users who access a conference via PSTN since 2015, Mr. Barave estimated that "if at one point in time there was a ▮▮▮▮▮ of PSTN and VoIP[,] [t]hat mix could look more like … ▮▮▮▮▮ PSTN." *Id.* 211:19–23. Mr. Barave further explained that his testimony regarding declining PSTN usage since 2015 was necessarily based on Cisco's experiences with customers and competitors. *Id.* 211:24–212:15. He explained that the "factual data" (Ex. B, 211:9–23) is purged after ▮▮▮▮▮ pursuant to Cisco's document retention policy, but also that Cisco recorded and monitored the same type of data before the ▮▮▮▮▮, and that the usage information is something to which Cisco pays attention. Ex. B, 206:16-207:14; 211:24-25 ("This sort of mix—shift of the mix, we have noticed. I have looked at it.").

Ms. Kindler's analysis is supported by the evidence in the record, and to the extent that Paltalk thinks Mr. Barave's estimate of ▮▮▮ PSTN users in 2015 is incorrect or unsupported, it can cross-examine Mr. Barave and/or Ms. Kindler on those issues. *See Bd. of Regents, U. of Tex. Sys. v. Ethicon, Inc.*, No. A-17-CV-001084-LY, 2020 WL 3580148, at *4 (W.D. Tex. Apr. 21,

---

[1] Paltalk also disputes Ms. Kindler's use of testimony about PSTN users instead of meetings or minutes. However, Ms. Kindler's conservative models include explanation of the methodologies and assumptions that she used to estimate the share of meetings and meeting minutes that simultaneously involved both VoIP and PSTN users, based on Mr. Barave's testimony and data provided by Cisco. Kindler Report ¶ 194; *see also* Kindler Report ¶ 35 (referencing Section X.A of Mr. Willis' expert report).

2020) ("Alternative or opposing facts, data, and assumptions do not preclude admission of expert testimony, that is, they go to the weight of the evidence, not admissibility."). The Federal Circuit has recognized that "any reasonable royalty analysis necessarily involves an element of approximation, and uncertainty." *i4i*, 598 F.3d at 856-58 (internal citation omitted).

### 2. Ms. Kindler's methodology to estimate VoIP and PSTN shares before August 2021 is sound and conservative.

Ms. Kindler's usage analysis from 2015 to 2022 not only has a basis in fact and observations documented on the record, but she thoroughly explains and accounts for two different usage scenarios, takes a conservative approach, and provides an alternative, even more conservative methodology. This analysis is more than sufficient to overcome Paltalk's *Daubert* challenge. "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Biomed. Enters., Inc. v. Solana Surgical, LLC*, No. A-14-CV-0095-LY, 2016 WL 4198304, at *6 (W.D. Tex. Apr. 26, 2016) (denying motion to exclude Ms. Kindler on several issues including her reasonable-royalty opinions and holding that "Defendants' contention that this apportionment is inadequate and any weaknesses Defendants want to explore may be addressed by Defendants during cross-examination. The court, exercising its gatekeeper function, will not exclude Kindler's reasonable-royalty opinions on this basis."). *See also* Order Denying Motion to Exclude Opinions of Paul C. Benoit at 7, 9, *Geodynamics, Inc. v. Dynaenergetics US, Inc.*, 2:17-CV-00371-RSP, (E.D. Tex. Sept. 30, 2018), ECF No. 227 (finding that the expert "analyzed all of the deposition testimony and performed an analysis of the parties' sales data and third-party market data... [T]his is a case where the expert acknowledged other metrics, utilized the metric that he felt was the most relevant given the existing data, and provided a reasonable explanation for utilizing that metric

over other relevant metrics").

Because Cisco does not keep Webex usage data older than ████,[2] Ms. Kindler details

two separate methodologies that she uses to conservatively estimate a range for the share of Webex

meeting minutes from 2015 through July 2021 for conferences with both VoIP and PSTN users.[3]

Kindler Report ¶¶ 192–95; Ex. A, 33:10–34:2; 114:10–115:5. Each approach goes far beyond the

threshold of reliability under *Daubert*, and together they resolve any potential uncertainty. Paltalk

may cross examine Ms. Kindler, and the jury can evaluate her conclusions based on the weight of

the evidence.

        **a.**      **Ms. Kindler's ████ Model is reasonable.**

Paltalk claims that Ms. Kindler "relies on the testimony of Cisco's Mr. Barave to estimate

that the PSTN-to-VoIP conference usage stayed constant from 2015 to 2020 at ████." Mot. at 4.

But that is not accurate. Ms. Kindler starts with Mr. Barave's testimony that there was roughly

████ usage in 2015 and creates a model using the most conservative approach available to estimate

the usage between that point in time and the earliest exact data point that Cisco could provide

(from August 2021). Kindler Report ¶ 194(b)(i). To ensure that this approach is conservative, she

does not attribute any of the PSTN users described by Mr. Barave as PSTN only (i.e., as non-

infringing calls). Kindler Report ¶194(b)(i). She also holds the ████ usage flat for the entire period

between 2015 to August 2021 even though Mr. Barave testified that it was decreasing. *Id.*; *see also*

Ex. B, at 211:3–212:15. She then uses actual data from August 2021 until August 2022, which

results in a conservative average of ████ for the overall VoIP & PSTN Share during the 2015 to

---

[2] Cisco produced usage data from August 1, 2021–August 31, 2022, including the number of
Webex meetings and meeting minutes for conferences involving PSTN only users, VoIP only
users, and both VoIP and PSTN users. ECF No. 55-06.

[3] It is undisputed that when Webex conferences with either only PSTN users or only VoIP users
do not infringe the '858 Patent. *See* ECF No. 59-10, ¶¶ 257–58; ECF No. 55-02 ¶¶ 217–41; 250.
The only category of conferences that could possibly infringe are those that include at least one
VoIP user and one PSTN user.  *See* ECF 59-10, ¶¶ 260, 262; ECF No. 55-02 ¶¶ 206, 233.

August 2022 damages period. Kindler Report ¶ 194(b)(i) & Ex. 5.

Ms. Kindler offers quantitative support for her conclusion, based on data and witness observations, and takes a conservative approach that can only benefit Paltalk. She also notes multiple *additional* non-infringing uses that she has not factored in,[4] making her analysis even more conservative and favorable to Paltalk. Ex. A, 33:19–34:2, 114:6–23; Kindler Report ¶ 35. Ms. Kindler explains, step-by-step, each calculation she performs and the source of her assumptions. *See Barry v. Medtronic, Inc.*, No. 1:14-CV-104, 2016 WL 7665773, at *11 (E.D. Tex. July 19, 2016) ("[The expert] shows how she calculated each of the values in her calculation …. Her estimates appear to be based on facts that are related to this case. [Party's] dispute with the facts on which she relied in reaching her opinion goes to the weight of her testimony, not admissibility."). This detailed accounting of her reasonable methodology is reliable and admissible.

> **b.    Ms. Kindler's Declining Usage Model is also reasonable and tied to the facts of the case.**

Ms. Kindler's second model also begins with Mr. Barave's ███ usage estimate in 2015, but she uses this testimony in combination with the ███ of actual data to extrapolate the percentage of PSTN and VoIP Share. This time, she distinguishes PSTN-only calls from PSTN-and-VoIP calls based on the proportion in the data and a downward slope from 2015 until August 2021, when Cisco's available data begins. This comports with Mr. Barave's testimony that Cisco observed a downward trend in PSTN users. Although this approach is likely more accurate given the underlying facts and evidence, Ms. Kindler explains that it is still a conservative estimate as it

---

[4] As Mr. Willis explains, non-infringing uses include scenarios in which there are only two devices or users on a call or when no one speaks at the same time because no mixing or multiplexing occur in those situations. Furthermore, no infringement occurs if not everyone on the call speaks during the meeting, as clients would not receive an audio packet "from each of the plurality of clients." ECF No. 59-10, ¶ 262.

does not take into account the numerous other non-infringing conferences that Cisco's data does not account for. Ms. Kindler's Declining Usage Model resulted in an overall estimated VoIP & PSTN Share of ████ between 2015 and August 2022. Kindler Report ¶ 194(b)(ii), Exhibit 5.1.

Again, this methodology is thoroughly explained in Ms. Kindler's report, supported by Mr. Barave's testimony, and supported by data produced by Cisco. *See i4i*, 598 F.3d at 852 ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."). Ms. Kindler's well documented approach far exceeds the standard required for admissibility.

In arguing otherwise, Paltalk cites only *Voxer, Inc. v. Meta Platforms, Inc.*, No. A-20-CV-00655-LY-SH, 2022 WL 3371634 (W.D. Tex. Aug. 16, 2022). Mot. at 6-7.  But in *Voxer*, the court ***denied*** the motion to exclude plaintiff's expert's testimony. *Id.* at *2. In *Voxer,* the expert "had to make such computations using [expert's] own model, which was based on the evidence produced during discovery," because the defendant did not track that data. *Id.* The court held that it was an issue for the factfinder to assess and that "[c]ross-examination and the presentation of contrary evidence are the traditional and appropriate means of addressing what one side may believe to be shaky evidence." *Id.* at *4. Similarly, because Cisco does not keep usage data dating back to 2015, Ms. Kindler uses a model and well-explained assumptions based on the evidence that was produced during discovery. As such, her opinions based on these assumptions are admissible, and any concerns Paltalk has with Ms. Kindler's assumptions are at most fodder for cross-examination. *CliniComp*, 507 F. Supp. 3d at 856.

### B.  Ms. Kindler's Opinions That Relate to the Documents Paltalk Complains About Should Be Admissible.

Paltalk next seeks to exclude Ms. Kindler's opinions that rely on two documents Cisco

produced after the last day of scheduled fact discovery (a license agreement with NCR Corporation (the "NCR Agreement" or "Agreement") and a spreadsheet related to Webex Audio revenues (Ex. C, "Spreadsheet 2, CISCO-PAL-00003857")), claiming Paltalk "did not have a reasonable opportunity to test during the discovery period." Mot. at 7. The Fifth Circuit applies a four-factor test to determine the propriety of the exclusion of evidence under Rule 37(c): "(1) the party's explanation for its failure to disclose evidence; (2) the prejudice, if any, to the party opposing the admission of the evidence; (3) the possibility of curing any prejudice with a continuance; and (4) the importance of the evidence." *Langley v. Intl. Bus. Machs. Corp.*, No. A-18-CV-443-DAE, 2019 WL 7284946, at *3 (W.D. Tex. Dec. 23, 2019) (citing *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996)); *S.W. Refrigerated Warehousing Servs. Jt. Venture v. M.A. & Sons, Inc.*, No. EP-16-CV-00421-DCG, 2017 WL 8777393, at *2 (W.D. Tex. Sept. 21, 2017) (finding defendant's failure to disclose evidence was not intentional because defendant "disclosed the existence of the evidence when questioned about it in a deposition."); *see also Charles v. Sanchez*, No. EP-13-CV-00193-DCG, 2015 WL 1345385, at *5 (W.D. Tex. Mar. 23, 2015) ("[Party's] oversight was harmless. Therefore, [the] evidence regarding damages calculations should be admitted into the record as evidence."). Paltalk's complaints about these documents are inconsequential as it suffers no prejudice, and all four factors favor admitting the documents and Ms. Kindler's related opinions.

### 1.    Spreadsheet 2, and Ms. Kindler's related opinions, are admissible.

Paltalk claims it suffered prejudice because Cisco produced Spreadsheet 2 after the close of discovery and after refusing to re-present its corporate representative on financial topics, Mr. Steven Boyles. Mot. at 9. What Paltalk ignores is that this "late-produced spreadsheet" is *substantively identical* to the one that was produced previously, during discovery (Ex. D, "Spreadsheet 1"; CISCO-PAL-00003132), and on which Paltalk's damages expert relied.

Spreadsheet 2 contains the exact same list of product IDs ("PIDs"), quarters, invoice gross revenues, identification of product families by PID, and product family descriptions as Spreadsheet 1. Moreover, all pivot table values and categories remain the same. The only difference is that Spreadsheet 2 corrected a formula in the "Product Description" column that was previously inadvertently duplicative of another column.[5] To be clear, no new data was added to the spreadsheet—it was simply "fixed to display missing product description fields, but is otherwise identical," which Cisco explained in the cover letter accompanying the production. *See* Ex. E.

Paltalk also neglects to mention that its counsel ***used Spreadsheet 2 to question Mr. Barave in a deposition that it requested to have after the close of fact discovery.*** Paltalk had the opportunity to question a witness about this information and did just that—it was not denied the ability to test its veracity as it claims. Mr. Barave's deposition occurred after the close of discovery and after opening expert reports because ***Paltalk*** requested to push the deposition past the deadline, and Cisco agreed. Paltalk refused to extend the expert report deadline despite knowing that Mr. Barave's deposition would come later. *See* Ex. F at 2.

Paltalk's complaints about Cisco refusing an additional deposition of Mr. Boyles are baseless, and Paltalk was not prejudiced anyway.[6] Cisco had already reassigned Topic 30, which covered "[s]ales of software incorporating the Accused Functionalities and attendant sales data" to Mr. Barave, Cisco's VP of Product Management, instead of Mr. Boyles, who is Cisco's corporate representative on financial topics and an external financial consultant. Ex. G, 105:20–106:25. Paltalk did not ask Mr. Barave how to identify add-on features or products containing the

---

[5] The corrected formula simply pulls in the product descriptions listed in the second tab of the spreadsheet so that they now appear on the first tab with the product family data aligned.
[6] Paltalk also claims Ms. Kindler's interview of Mr. Boyles should be excluded. Mot. at 11. But Mr. Boyles had no new information from Spreadsheet 2, and Paltalk had the opportunity to question both Mr. Boyles and Mr. Barave about the data. The interview was not prejudicial.

accused functionality, which relates to Topic 30. There was no need to re-depose Mr. Boyles about "the specific product IDs, product descriptions, product families, and product family types," as he answered Paltalk's questions on those issues. Ex. G, 53:4–25; 54:12–16; 107:24–111:9. Cisco presented Mr. Barave for Topics 30, 37, and 38, and as VP of Product Management he is more equipped to address functionality of the products. Paltalk had ample opportunity in Mr. Barave's deposition to "test" the information about the add-on features, and counsel in fact used Spreadsheet 2 to do so.[7] Mr. Barave was prepared to discuss the information that Paltalk complains about and provided that testimony during the discussion of Revenue Spreadsheet 2. *See* ECF No. 59-04 at 4; Ex. B, 62:1–78:8. Paltalk did not then, and does not now, seek to cure Mr. Bratic's report by providing an analysis of the add-on features, despite insisting that it reserved its right to do so when it scheduled Mr. Barave's deposition after the expert report deadline. *See* Ex. F at 2. *See e.g., Charles*, 2015 WL 1345385, at *5 (denying a motion to exclude evidence in part because "Defendants are not requesting a continuance to allow an opportunity to cure any alleged prejudice."). Paltalk's attempt to exclude this spreadsheet, and therefore all of Ms. Kindler's revenue data and Exhibit 7 and 7.1, even though the revenues she extracts from it are identical to the data used by Mr. Bratic, demonstrates the importance of the information. If the Court decides to exclude Spreadsheet 2, Ms. Kindler should be allowed to supplement her report to instead reference Spreadsheet 1 and resolve Paltalk's complaints. Her add-on analysis and revenues used would be the same since the spreadsheets contain the same data.

In short, Paltalk suffered no prejudice because it (1) already had the information in a substantively identical format, (2) already requested to reschedule Mr. Barave's deposition for

---

[7] Counsel even explained to Mr. Barave that it is an updated spreadsheet and specifically noted that "all the edits are contained in this column," referring to the product descriptions. Ex. B, 61:20–24.

after the close of discovery and after its opening expert reports were due, and (3) actually did question Mr. Barave about Spreadsheet 2 and Topic 30, the information it complains it was unable to question Mr. Boyles about. Unsurprisingly, Paltalk did not try to cure Mr. Bratic's report to analyze the add-on features and reduce his revenue base. Ms. Kindler's add-on analysis is not dependent on the content or timing of Spreadsheet 2, but since it is the only document she cites for her figures, it is important. All four factors favor admissibility.

2.      **Cisco's production of the NCR Agreement was justified and harmless.**

Claiming it suffered prejudice because Cisco produced the NCR Agreement after close of fact discovery, Paltalk now seeks to strike Ms. Kindler's opinion relying on that license. Mot. at 11–12. But Ms. Kindler does not rely on this agreement for any part of her damages analysis—she addresses it only in response to Mr. Bratic's improper use of it to justify a running royalty. ECF No. 55-01, ¶¶ 89, 145; Kindler Report ¶¶138–41, 185–88. Again, all factors weigh in favor of Cisco, and Paltalk will suffer no prejudice.

Paltalk first asserts that Cisco had no reasonable justification or explanation for its untimely production of the NCR Agreement. Mot. at 11. But Cisco disclosed the existence of the NCR Agreement during the September 22, 2022 deposition of Mr. Rob Hamilton, which occurred before fact discovery closed. Mr. Hamilton testified that the license "is imminently going to be disclosed, but we had to give notice. We just realized we had it. And outside counsel, I think, will be sending it shortly." Ex. H, 45:2–7. Cisco promptly produced the license on September 26, 2022 (within four days of close of fact discovery) and noted in an email that "Cisco planned to produce it after the notice period to NCR expired" and that "Paltalk is receiving this in advance of its opening expert reports." *See* Ex. I. Cisco diligently produced the NCR Agreement three days before opening expert reports were due (not one day before opening reports were due, as Paltalk contends (Mot. at 12)). And Mr. Bratic provided opinions about the NCR Agreement in his report.

Paltalk next claims prejudice because it did not have the document during Mr. Hamilton's deposition. But Paltalk does not explain what testimony it needed from Mr. Hamilton about the Agreement and did not request to depose Mr. Hamilton again after receiving it. The Agreement speaks for itself, and the lack of testimony did not prevent Mr. Bratic from using the Agreement to justify a running royalty in his report. Ms. Kindler should not be precluded from rebutting this incorrect analysis when Paltalk opened the door to the use of the Agreement. Paltalk's complaint also does not justify the prejudice to *Cisco* if Cisco's expert is not allowed to rebut Paltalk's expert's testimony about the document. Mot. at 12. Both experts agree that the agreement is not a comparable license—Mr. Bratic uses it only to support his claim that the parties would have agreed to a running-royalty *format*. Kindler Report ¶ 141; ECF No. 55-01, ¶ 89. All factors weigh in favor of admitting the Agreement and Ms. Kindler's opinions rebutting Mr. Bratic's reliance on the Agreement in his opening report.

### C.    Ms. Kindler's Use of Non-infringing Alternatives is Admissible.

Paltalk argues that Ms. Kindler's analysis of non-infringing alternatives is unreliable because (according to Paltalk) "no facts or data are present and there is no indication that Mr. Willis or Ms. Kindler are providing their opinions on a supportable assumption." Mot. at 13. But Paltalk ignores that Cisco's non-infringement expert, Mr. Willis, says that the cost would be insignificant and also ignores Ms. Kindler's explanation that the exact amount of money and time to implement was minimal and would not affect her analysis. The record supports these assumptions, and this is an issue that can be tested on cross-examination.

*First*, Mr. Willis states in his report that the non-infringing alternatives "could have [been] easily and inexpensively implemented at least as early as January 2004." ECF No. 59-10 at ¶ 254. As to his first example of a non-infringing alternative (only one user's audio is sent to clients at a time), he also states that "[t]his change would be extremely easy to implement in terms of cost and

manpower." *Id.* ¶ 255. For his second non-infringing alternative (all clients receive mixed audio), he states that it "would be easy for Webex to implement both in terms of cost and manpower as it would simply involve using functionality that is currently present." *Id.* ¶ 257. When asked in deposition, he testified that he told Ms. Kindler a non-infringing alternative would be "relatively easy" to implement. ECF No. 54-07 at 202:4–13. He further explained it would be easy because "the amount of code that would need to be changed would be fairly minimal, and to say maybe a couple lines [of] code in the CMS and probably about the same in the MCS, probably." *Id.* at 202:14–20. Ms. Kindler confirmed she based her analysis on Mr. Willis's opinions. Ex. A, 117:3–6 ("…he didn't quantify the amount of time, but, again, said it very– would be very easy to implement in terms of both time, cost, and– and resources."), 116:6–14 ("And then in terms of inexpensive, I think it's very easy to implement, and the only potential impact would be this - this minor increase in bandwidth usage."), 118:2–6 ("But my– the information I got from him would – was that would be very easy, meaning that it wouldn't cost much of anything."), 118:23–119:9 ("I can't imagine if it was in the millions, he would have told me that it would be virtually costless …. He said it wouldn't cost much of anything and it would be easy to implement.").

An exact analysis of costs to implement is not required when factoring non-infringing alternatives in a reasonable royalty analysis under the qualitative *Georgia Pacific* factors. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2012 WL 3686736, at *5 (W.D. Pa. Aug. 24, 2012) (agreeing with defendant, which argued that the analysis under *Georgia-Pacific* Factor 9 is "qualitative," and "it would have been 'able to use the simple existence of multiple [alternatives] to negotiate lower royalty rates during the hypothetical negotiation,'" and finding that it was not defendants burden to establish damages.) (internal citations omitted). Ms. Kindler agreed that the exact cost details were not necessary to her analysis of the hypothetical negotiation

when the minimal and insignificant cost is clearly less than ███████████ range that she explains would have been the result of the hypothetical negotiation. Ex. A, 117:22–119:22. Thus, existence of a non-infringing alternative at the hypothetical negotiation is "relevant because at that point in time, they [Cisco] would be debating between spending potentially ████████ for this minor improvement versus doing something an alternative way that has minimal impact." *Id.* at 109:9-110:5. Ms. Kindler even agreed that her analysis would be the same in the absence of non-infringing alternatives, as her "opinions [are] coming from other market-based value indicators." *Id.* at 120:14-121:14. Ms. Kindler's use of non-infringing alternatives in her analysis is supported by the record and based on sufficient facts to sustain Paltalk's challenge. If Paltalk disputes the factual basis, it can cross-examine her and the jury can evaluate the issue.

Paltalk cites no case where this type of evidence has been excluded. Both cases Paltalk cites  find that the expert testimony is admissible and hold that "[a]lternative or opposing facts, data, and assumptions do not preclude admission of expert testimony" and "substantial evidence sufficiently tied to deposition testimony" is sufficient to survive a *Daubert* challenge. Mot. at 13; *see CliniComp*, 507 F. Supp. 3d at 779; *Via Vadis, LLC v. Blizzard Entm't, Inc.*, No. 1:14-CV-00810, 2021 WL 5908599, at *4 (W.D. Tex Dec. 14, 2021). As in those cases, Ms. Kindler's analysis is sufficiently tied to the testimony of Mr. Willis and the facts in the record, and it should be left to the jury to determine the credibility of her assessment.

## III.    CONCLUSION

For the reasons discussed above, Cisco respectfully requests that the Court deny Paltalk's motion to strike opinions of Ms. Kindler.

Dated: December 15, 2022                    Respectfully submitted,


_/s/ Sarah E. Piepmeier_
Sarah E. Piepmeier (SBN 227094)
Elise Edlin (admitted _pro hac vice_)
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA  94105
SPiepmeier@perkinscoie.com
EEdlin@perkinscoie.com
Telephone: (415) 344-7000
Facsimile: (415) 344-7050

Ryan Hawkins (admitted _pro hac vice_)
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, CA 92130-2080
RHawkins@perkinscoie.com
Telephone: (858) 720-5709
Facsimile: (858) 720-5809

Jessica J. Delacenserie (admitted _pro hac vice_)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
JDelacenserie@perkinscoie.com
Telephone: (206) 359-3644

Michael E. Jones (SBN: 10929400)
Shaun W. Hassett (SBN: 24074372)
POTTER MINTON
110 North College
500 Plaza Tower
Tyler, TX 75702
mikejones@potterminton.com
shaunhassett@potterminton.com
Telephone: (903) 597.8311
Facsimile: (903) 593.0846

ATTORNEYS FOR DEFENDANT
CISCO SYSTEMS, INC.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on December 15, 2022.

I also hereby certify that all counsel of record who have consented to electronic service are being served with a notice of filing of this document, under seal, pursuant to L.R. CV-5(a)(7) on December 15, 2022.

*/s/ Sarah E. Piepmeier*
Sarah E. Piepmeier

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order in this case and Judge Albright's Amended Standing Order Regarding Filing Documents Under Seal in patent Cases and Redacted Pleadings.

*/s/ Sarah E. Piepmeier*
Sarah E. Piepmeier

-16-