—1—

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                        WACO DIVISION

 3   PALTALK HOLDINGS, INC.  *    August 26, 2024
                            *
 4   VS.                    *  CIVIL ACTION NO. 6:21-CV-757
                            *
 5   CISCO SYSTEMS, INC.    *

 6         BEFORE THE HONORABLE ALAN D ALBRIGHT
                   TRIAL PROCEEDINGS
 7                  Volume 1 of 4

 8   APPEARANCES:

 9   For the Plaintiff:   Max L. Tribble, Jr., Esq.
                          Ryan V. Caughey, Esq.
10                        Amber Brianna Magee, Esq.
                          Susman Godfrey LLP
11                        1000 Louisiana Street, Suite 5100
                          Houston, TX 77002
12
                          Kalpana Srinivasan, Esq.
13                        Susman Godfrey LLP
                          1900 Avenue of the Stars, Ste 1400
14                        Los Angeles, CA 90067-6029

15                        Mark Siegmund, Esq.
                          Cherry Johnson Siegmund James, PLLC
16                        The Roosevelt Tower
                          400 Austin Avenue, 9th Floor
17                        Waco, Texas 76701

18   For the Defendant:   Sarah E. Piepmeier, Esq.
                          Elise Edlin, Esq.
19                        Nate Sabri, Esq.
                          Karl Johnston, Esq.
20                        Perkins Coie LLP
                          505 Howard Street
21                        San Francisco, CA 94117

22                        Ryan Hawkins, Esq.
                          Abigail Ann Gardner, Esq.
23                        Perkins Coie LLP
                          11452 El Camino Real, Suite 300
24                        San Diego, CA 92130

25
```

2

```
 1                        Jessica J. Delacenserie, Esq.
                          Perkins Coie LLP
 2                        1201 Third Ave., Suite 4900
                          Seattle, WA 98101
 3
                          Andrew T. Dufresne, Esq.
 4                        Perkins Coie LLP
                          33 E. Main Street, Suite 201
 5                        Madison, WI 53703

 6                        Michael E. Jones, Esq.
                          Shaun William Hassett, Esq.
 7                        Potter Minton PC
                          102 North College, Suite 900
 8                        Tyler, TX 75702

 9                        Jonathan Irvin Tietz, Esq.
                          Perkins Coie LLP
10                        700 13th St. NW, Suite 800
                          Washington, DC 20005
11
      Court Reporter:     Kristie M. Davis, CRR, RMR
12                        PO Box 20994
                          Waco, Texas 76702-0994
13                        (254) 340-6114

14      Proceedings recorded by mechanical stenography,

15    transcript produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 08:21 | 1 | (Hearing begins.) |
| 08:36 | 2 | THE BAILIFF:  All rise. |
| 08:36 | 3 | THE COURT:  Good morning, everyone.  You |
| 08:36 | 4 | may be seated. |
| 08:36 | 5 | DEPUTY CLERK:  Court calls Case |
| 08:36 | 6 | 6:21-CV-757, Paltalk versus Cisco.  Case called for a |
| 08:37 | 7 | jury trial proceeding. |
| 08:37 | 8 | THE COURT:  Announcements from counsel, |
| 08:37 | 9 | please. |
| 08:37 | 10 | MR. SIEGMUND:  Good morning, Your Honor. |
| 08:37 | 11 | Mark Siegmund on behalf of the plaintiff.  And we're |
| 08:37 | 12 | ready to proceed. |
| 08:37 | 13 | MR. JONES:  Your Honor, Mike Jones on |
| 08:37 | 14 | behalf of Cisco, and we're ready. |
| 08:37 | 15 | THE COURT:  And this seems as good a time |
| 08:37 | 16 | as any to remind everyone how closing arguments work |
| 08:37 | 17 | here, which -- by which I mean if in the mornings I |
| 08:37 | 18 | have to deal with exciting things like slides and other |
| 08:37 | 19 | objections, that's fine.  You get 30 minutes for |
| 08:37 | 20 | closing arguments, but in the event that I don't have |
| 08:37 | 21 | to do a lot of things in the morning, then you get |
| 08:37 | 22 | 45 minutes per side.  But that's entirely up to you all |
| 08:37 | 23 | to deal with that. |
| 08:37 | 24 | Having said that, what issues do you have |
| 08:37 | 25 | for me to take up this morning? |

4

08:37    1                    MR. TRIBBLE:  Your Honor, we have

08:37    2    objections to some of their slides, and I believe they

08:37    3    may have some objections to our slides.

08:38    4                    MR. SIEGMUND:  Judge, can I approach and

08:38    5    hand them to you?

08:38    6                    THE COURT:  Sure.

08:38    7                    MR. TRIBBLE:  Thank you, Your Honor.  Max

08:38    8    Tribble for the plaintiff.

08:38    9                    We object to Slide 8 in Cisco's opening

08:38   10    slide deck.  And this slide is titled Paltalk Rewrites

08:38   11    the Patent.  And then they proceed to write in and

08:39   12    change where the word "each" appears to "one or more."

08:39   13    And it's clear that they're going to argue that each

08:39   14    cannot mean one or more, and this Court has ruled a

08:39   15    couple of times to the opposite effect.

08:39   16                    In other words, we don't have to rewrite

08:39   17    anything.  The plain and ordinary meaning of "each" can

08:39   18    be "one or more," as this Court has found.  And so

08:39   19    that's why we object to this slide that we're rewriting

08:39   20    the language.

08:39   21                    THE COURT:  A response?

08:39   22                    MR. JONES:  Your Honor, may I hand up

08:39   23    some slides to Your Honor?

08:39   24                    THE COURT:  Uh-huh.

08:39   25                    MR. JONES:  And they are opening slides.

08:39  1                    Your Honor, I -- considering the Court's

08:40  2       admonishment, I think you can make one ruling here with

08:40  3       regard to Slide 8, and you will also take care of the

08:40  4       issues concerning Paltalk's opening Slide 25, Cisco's

08:40  5       opening Slide 30, and the Paltalk Scott Schaefer slide,

08:40  6       which is 34.  And I'll try to do this very

08:40  7       expeditiously.

08:40  8                    Your Honor, with regard to "each," where

08:40  9       I understand we are is that we lost a hearing with

08:40  10      regard to a motion for summary judgment, and the Court

08:40  11      said in denying that motion that "each" could mean one

08:40  12      or more, but did not make a claim construction but

08:40  13      expressly told us that it was a term that would be

08:40  14      given as plain and ordinary meaning to a POSITA.

08:40  15                    Thereafter, there was a dispute between

08:40  16      the parties as to whether or not that meant we could do

08:40  17      exactly what we're doing now, and we made a motion to

08:41  18      clarify and the Court said he had not -- excuse me.

08:41  19      The Court said that a claim construction had not been

08:41  20      issued, and that was an issue that could be argued.  In

08:41  21      other words, where we were was the Court had not

08:41  22      construed the term "each."  "Each" would get its plain

08:41  23      and ordinary meaning.

08:41  24                    And as I understand the law -- and the

08:41  25      Court knows much better than I do.  You've been through

08:41  1    many more patent trials than I have.  But my

08:41  2    understanding was that at that point, "each" had its

08:41  3    plain and ordinary meaning.  That experts, based upon

08:41  4    their reports, could testify as to how a person of

08:41  5    ordinary skill in the art would interpret "each" as it

08:41  6    was used in the claims.

08:41  7            And that is exactly what we are doing.

08:41  8    We are taking the position that a person of ordinary

08:41  9    skill in the art, based upon our expert's report, would

08:41  10   look at "each" there, and, as the Court told us with

08:42  11   regard to our motion for clarification, would interpret

08:42  12   it to mean "all" and "every."

08:42  13           They are taking a different position.

08:42  14   They are going to take the position that it could be

08:42  15   interpreted one or more.  But that's where we are.

08:42  16           Now, they want -- and this is where

08:42  17   you'll get to Schaefer's Slide 34.  They want to tell

08:42  18   the jury that the Court has ruled that they're right,

08:42  19   that it can include "one or more" -- excuse me -- that

08:42  20   it can include "one or more."  We think that's a claim

08:42  21   construction which the Court said it was not doing.  It

08:42  22   was not making a claim construction.

08:42  23           We even asked for a Markman at one point.

08:42  24   Court said, no, I'm not going to give a Markman, and

08:42  25   that it is going to be a fact issue, is what we

7

08:42  1  understood it to be.

08:42  2          We understood that from the Court's

08:42  3  original ruling.  We understood that to be where we

08:42  4  were after the motion to clarify after the last

08:43  5  pretrial conference, and we think what we're doing is

08:43  6  very consistent with the Court's ruling.  We think what

08:43  7  they're trying to do in their slide when they cite the

08:43  8  Court, when they cite the Court's ruling with regard to

08:43  9  the motion for summary judgment, is a violation of your

08:43  10  Motion in Limine No. 17, which says the parties shall

08:43  11  be precluded from introducing evidence, testimony and

08:43  12  arguments relating to the Court's claim construction

08:43  13  order other than the actual adopted constructions.

08:43  14          We have your constructions.  That was not

08:43  15  part of your constructions.  That was part of your

08:43  16  reasoning for overruling our motion for summary

08:43  17  judgment.  Their Slide 34 shouldn't come in.  We think

08:43  18  if you do that, Judge, it's like you've made a claim

08:43  19  construction.  We think if you do that with regard to

08:43  20  this fact issue, that it's almost like -- you know,

08:43  21  with regard to this particular fact issue, we think

08:43  22  they're encouraging the Court to put its thumb on the

08:43  23  weight and say, well, one party or the other is right

08:43  24  about this.  So we believe --

08:44  25          THE COURT:  I got it.

08:44  1              MR. JONES:  Thank you.

08:44  2              THE COURT:  So what -- let me hear from

08:44  3  plaintiff.  What do you intend to say about "each"

08:44  4  during your opening argument, and maybe that'll help

08:44  5  inform me what I should permit the defendant to...

08:44  6              MR. TRIBBLE:  We're planning to tell the

08:44  7  jury that the term "each" has its plain and ordinary

08:44  8  meaning but not to you or me, to a person of ordinary

08:44  9  skill in the art in light of reading the patent

08:44  10  specification and claims.  It's as simple as that.

08:44  11              THE COURT:  Do you intend to tell them,

08:44  12  to say anything about it being one or more or not one

08:44  13  or more?

08:44  14              MR. TRIBBLE:  Yes.  I do.

08:44  15              THE COURT:  Well, in that case, I'm going

08:44  16  to overrule your objection on their slide.

08:44  17              What else do you have?

08:44  18              MR. TRIBBLE:  We object to Cisco's --

08:44  19              THE COURT:  And, Mr. Jones, does that

08:44  20  take care of your problems with theirs as well?

08:44  21              MR. JONES:  I think it does.  If you

08:45  22  overruled objections to ours, I believe you're

08:45  23  sustaining our objections to their Slide 8, Slide 30,

08:45  24  and Schaefer's Slide 34.

08:45  25              THE COURT:  I don't think I am.  So I'm

9

08:45   1    glad I asked.

08:45   2                    MR. JONES:  I'm sorry, Your Honor.  I

08:45   3    didn't mean to be smart with the Court.

08:45   4                    THE COURT:  I think I'm going with the

08:45   5    hallowed good for the goose, good for the gander

08:45   6    ruling, which is, I'm going to let them talk about it

08:45   7    in opening, and we'll let you all talk about it in

08:45   8    opening.

08:45   9                    MR. JONES:  Could I ask one point on

08:45   10   that?

08:45   11                   THE COURT:  Sure.

08:45   12                   MR. JONES:  And it particularly relates

08:45   13   to Slide 34 because I think that's where we really

08:45   14   joined this issue.  Can they refer to what the Court

08:45   15   said at the hearing on the motion for summary judgment

08:45   16   and say that the Court has said that "each" can

08:45   17   include?

08:45   18                   THE COURT:  Yes.

08:45   19                   MR. JONES:  They can?

08:45   20                   THE COURT:  That's why I said it.

08:45   21                   MR. JONES:  Just for the purposes of the

08:45   22   record, Your Honor, we would object to that.  I

08:45   23   understand you're overruling my objection.  We believe

08:45   24   that's a claim construction.  We would ask that a

08:45   25   Markman hearing take place and that "each" be given a

08:46   1   claim construction, Your Honor.

08:46   2                   THE COURT:  I think I've done that.  And

08:46   3   I'm -- I've stated -- that's why I stated at the

08:46   4   hearing that "each" can include that.

08:46   5                   MR. JONES:  Thank you, Your Honor.

08:46   6                   THE COURT:  So if I didn't make that

08:46   7   clear at the time, that's why I was taking the time to

08:46   8   say it.

08:46   9                   Here are my rulings.  I'm going to start

08:46  10   with the first motion.

08:46  11                   I'm going to find the plain and ordinary

08:46  12   meaning "each," "each" has a plain and ordinary meaning

08:46  13   which can include one or more.  That was the purpose of

08:46  14   me saying that.

08:46  15                   MR. JONES:  Okay.  Thank you, Your Honor.

08:46  16   I'm sorry for the misunderstanding.

08:46  17                   THE COURT:  Mr. Tribble, anything else?

08:46  18                   MR. TRIBBLE:  I believe this may already

08:46  19   be covered by your ruling, but if you look at Slide 30.

08:46  20                   THE COURT:  Okay.

08:46  21                   MR. TRIBBLE:  We just think it overstates

08:46  22   it in a misleading way because it's titled Specific

08:46  23   Requirements of the '858 Patent.  And what they've done

08:46  24   is they've summarized -- in the right-hand column,

08:46  25   they've summarized the claim language.

08:47  1          And so they say it's a specific
08:47  2  requirement and that it -- for example, the system
08:47  3  creates a multiplexed stream in 5 and 6 of all active
08:47  4  speakers.  It sends it to all users' devices.
08:47  5          I mean, if they want to say this is how
08:47  6  our expert interprets it, I think that would be
08:47  7  consistent with the Court's ruling.  But to put it up
08:47  8  there as a requirement of the patent, it just seems
08:47  9  overstated.
08:47  10          THE COURT:  Got it.
08:47  11          How is that slide going to be presented?
08:47  12  Because I agree with Mr. Tribble that -- well, I feel
08:47  13  like you all -- the defense is certainly able to make
08:47  14  an argument that that's what you're going to argue, as
08:47  15  long as you're not going to say that I've -- that I've
08:47  16  construed it that way.  If you're simply going to argue
08:47  17  that that's what you're arguing, then I'm fine with it.
08:48  18          MS. PIEPMEIER:  Your Honor, good morning.
08:48  19  Sarah Piepmeier.  Good to see you again.
08:48  20          That's exactly what I'm going to do,
08:48  21  Your Honor.  I'm not going to mention a claim
08:48  22  construction ruling.  I'm just going to walk through
08:48  23  the claim and I'm going to say:  The words of the claim
08:48  24  are what govern.  Here's a summary.  But the words of
08:48  25  the claim govern.

08:48  1              THE COURT:  Here's our position.

08:48  2              MS. PIEPMEIER:  Yes.  Thank you.

08:48  3              THE COURT:  That's fine.

08:48  4              Anything else?

08:48  5              MR. TRIBBLE:  No, Your Honor.

08:48  6              THE COURT:  And anything else?

08:48  7              MR. JONES:  Thank you.  I think there are

08:48  8    some objections from us, Your Honor.

08:48  9              THE COURT:  Yes.

08:48  10             MR. JONES:  And this objection.  And if I

08:48  11   would, I'd hand this up to Your Honor.

08:48  12             This objection is really very simple,

08:48  13   Your Honor.  There are certain licenses that Paltalk

08:48  14   has with Microsoft, Activision, and Sony.  These

08:48  15   licenses include the '858 patent.

08:48  16             Both experts have said they are not

08:48  17   comparable, they are not relevant, they are not

08:48  18   probative.

08:48  19             Usually in my experience, those type of

08:48  20   licenses come in.  They want to refer to those licenses

08:48  21   I really think to just show Paltalk has some licenses

08:49  22   with regard to patents.

08:49  23             We have told them that's great.  If y'all

08:49  24   want to refer to them, good.  But if you refer to them,

08:49  25   then we get to talk about them in the evidence and talk

08:49   1   about their terms, talk about their amounts, talk about

08:49   2   how they treat the '858 patent and in circumstances

08:49   3   through which they were entered into.

08:49   4            Our position is just if y'all get to use

08:49   5   them and y'all get to use them to bolster your client,

08:49   6   then we get to explain the terms of them.  And

08:49   7   either -- we think they should either stay out

08:49   8   completely or come in completely.

08:49   9            Thank you, Your Honor.

08:49   10            THE COURT:  A response?

08:49   11            MR. SIEGMUND:  Yes, Your Honor.

08:49   12            As Mr. Jones said, they are considered in

08:49   13   the expert reports by both experts.  They are

08:49   14   technically comparable, although both experts said they

08:49   15   are not economically comparable.  And we are not going

08:49   16   to talk about the circumstances of the licenses, if

08:49   17   they were the litigation or anything like that, but

08:49   18   Cisco has a big slide that says "the '858 patent" going

08:50   19   across the top of their timeline; we didn't derive

08:50   20   anything from this patent at all.  Well, that's plainly

08:50   21   not true.  There's licenses to that.

08:50   22            So we were just going to simply say, you

08:50   23   know, Paltalk has received licenses for its technology.

08:50   24   Here they are:  Microsoft, Activision, Sony.  And

08:50   25   that's it, Your Honor.

```
08:50   1                        THE COURT:  Well, but I think what
08:50   2   Mr. Jones is saying is that if you talk -- you say
08:50   3   that, then they get to tell -- talk to the jury about
08:50   4   that.
08:50   5                        MR. SIEGMUND:  Understood.
08:50   6                        THE COURT:  And so that which is my --
08:50   7   the way I see the world too.
08:50   8                        So if the plaintiff wants to discuss in
08:50   9   opening argument that Microsoft, Activision, and Sony
08:50  10   licenses for some reason -- is this -- then they get to
08:50  11   talk about them during trial.  I'm not excluding -- I'm
08:50  12   not going to prohibit you from talking about them
08:51  13   during opening argument, but then they're in.
08:51  14                        MR. SIEGMUND:  Understood.
08:51  15                        THE COURT:  Okay.  Does that satisfy you?
08:51  16                        MR. JONES:  Yes, Your Honor.  I
08:51  17   understand.
08:51  18                        THE COURT:  Any other issues?
08:51  19                        MR. JONES:  Just two more.  I think
08:51  20   they'll be rather brief.
08:51  21                        This deals with Slides 32, 33, and 34,
08:51  22   and if you'll look at 34, sir, I think you'll
08:51  23   understand exactly what we're talking about here.  And
08:51  24   this is clearly a discovery issue.
08:51  25                        In discovery in Interrogatory 17, we
```

| | | |
|---|---|---|
| 08:51 | 1 | asked whether they knew of any embodiments of the |
| 08:51 | 2 | patent, and they said they did not by either them or |
| 08:51 | 3 | anyone else.  HearMe, the predecessor owner of the |
| 08:51 | 4 | patent, was expressly dealt with in the interrogatory |
| 08:51 | 5 | answer and they did not know. |
| 08:51 | 6 | Mr. Katz is their 30(b)(6) deponent.  He |
| 08:51 | 7 | also did not know of any products that avoid -- embody |
| 08:52 | 8 | the patent when he was deposed. |
| 08:52 | 9 | What they are doing here is they're |
| 08:52 | 10 | taking an exhibit from the prior owner of the patent, |
| 08:52 | 11 | HearMe, Plaintiff's Exhibit 9, and they are comparing |
| 08:52 | 12 | it to the patent.  The middle bar is comparing it to |
| 08:52 | 13 | the patent and then comparing it to a Cisco product. |
| 08:52 | 14 | Here, the implication is clearly that |
| 08:52 | 15 | it's an embodiment, and they're using it for that |
| 08:52 | 16 | purpose.  There'll be no expert that says it's an |
| 08:52 | 17 | embodiment, and the discovery we have has denied that |
| 08:52 | 18 | any embodiments existed. |
| 08:52 | 19 | And even further than that, worse than |
| 08:52 | 20 | that, is when their corporate representative was asked |
| 08:52 | 21 | about this particular document, he said he didn't know |
| 08:52 | 22 | anything. |
| 08:52 | 23 | And he could read it, say what was on it, |
| 08:52 | 24 | but he didn't know anything about it and couldn't |
| 08:52 | 25 | authenticate it.  He certainly couldn't tell us that |

08:52   1    the product worked the way they said in the document.

08:52   2    And for that reason, we believe it should not be used,

08:52   3    Your Honor.

08:52   4                THE COURT:  A response?

08:52   5                MR. SIEGMUND:  Your Honor, we think this

08:53   6    is kind of a nonissue, and we are not going to argue

08:53   7    that what is depicted on Slide 30 and 31 was

08:53   8    practicing -- sorry -- was practicing the patent.  We

08:53   9    aren't going to make that argument whatsoever.

08:53   10               We're simply saying, hey, we bought this

08:53   11   company.  This is the technology that they had.  And

08:53   12   this is kind of how hybrid systems came to be evolved.

08:53   13   So it's more of a proffer.

08:53   14               THE COURT:  What I have -- I think

08:53   15   Mr. Jones is unhappy about on 32 and 33, it looks like

08:53   16   it came from a patent.  So I'm not sure how that lines

08:53   17   up with what you just argued.

08:53   18               MR. SIEGMUND:  So just to be clear,

08:53   19   Your Honor, you're talking about Slide 32?

08:53   20               THE COURT:  I am.

08:53   21               MR. SIEGMUND:  Okay.  And -- okay.  We

08:53   22   aren't trying to compare it and say that this practiced

08:53   23   the patent, Judge.  We're just --

08:53   24               THE COURT:  Well, what is the purpose of

08:54   25   having the -- what's in this middle of the -- what is

—17—

| | | |
|---|---|---|
| 08:54 | 1 | the purpose of having this here? |
| 08:54 | 2 | MR. SIEGMUND:  The evolution and |
| 08:54 | 3 | chronology of how hybrid technology has come about. |
| 08:54 | 4 | THE COURT:  By showing out of the -- out |
| 08:54 | 5 | of this -- I mean, this looks like it's out of the |
| 08:54 | 6 | patent. |
| 08:54 | 7 | MR. SIEGMUND:  Oh, that's Slide 30, |
| 08:54 | 8 | Judge? |
| 08:54 | 9 | THE COURT:  That's Slide 32. |
| 08:54 | 10 | MR. JONES:  Your Honor, if I -- |
| 08:54 | 11 | THE COURT:  Maybe I'm just not -- |
| 08:54 | 12 | MR. JONES:  Maybe I wasn't clear. |
| 08:54 | 13 | THE COURT:  Maybe I'm having a hard time. |
| 08:54 | 14 | MR. JONES:  If you'll go to 34, what's |
| 08:54 | 15 | out of the patent, middle line of 34, those -- and it's |
| 08:54 | 16 | the comparison of those -- that document which is |
| 08:54 | 17 | Plaintiff Exhibit 9 of the patent that we're objecting |
| 08:54 | 18 | to. |
| 08:54 | 19 | THE COURT:  I'm going to keep 34 out. |
| 08:54 | 20 | Now, I think 34 -- sorry.  I wasn't |
| 08:54 | 21 | following.  I think 34 is the prior two slides and then |
| 08:55 | 22 | it adds Cisco. |
| 08:55 | 23 | MR. JONES:  Right.  It adds the patent. |
| 08:55 | 24 | Yes.  That's correct, Your Honor. |
| 08:55 | 25 | THE COURT:  I'm going to exclude that. |

08:55   1                        MR. SIEGMUND:  And that's this slide

08:55   2   right here, Your Honor?

08:55   3                        THE COURT:  Right.

        4                        MR. SIEGMUND:  Got it.  Understood.

08:55   5                        THE COURT:  Do you have an objection to

08:55   6   the other two slides?

08:55   7                        MR. JONES:  No.

08:55   8                        THE COURT:  Okay.  And that -- I didn't

08:55   9   understand why you had --

08:55   10                       MR. JONES:  As long as they're not going

08:55   11  to refer to it as "preferred embodiment," and counsel's

08:55   12  told me he will not.

08:55   13                       THE COURT:  I was on the wrong slide.

08:55   14                       Yes, ma'am.

08:55   15                       MS. PIEPMEIER:  May I make one point

08:55   16  about that?  Not to step on my colleague's toes.

08:55   17                       We're fine with that with regard to those

08:55   18  two slides.  We will have an issue with regard to the

08:55   19  underlying document, which I believe is PX-9, which I

08:55   20  assume they intend to introduce with Mr. Katz.

08:55   21                       So I just want to make it clear, we don't

08:55   22  have a problem for demonstrative purposes, but I don't

08:55   23  want that to be seen as waiving an objection to PX-9,

08:55   24  which we will have.

08:55   25                       THE COURT:  What is the objection you're

08:55    1    going to have?

08:55    2                    MS. PIEPMEIER:  The objection that we're

08:55    3    going to have -- pardon me, Your Honor.

08:56    4                    The objection that we're going to have to

08:56    5    PX-9, Your Honor, is that the witness has absolutely no

08:56    6    idea what it is.  Mr. Katz was not able to answer any

08:56    7    questions about it in deposition.  He was designated as

08:56    8    the person to talk about this and had no idea what it

08:56    9    was.

08:56    10                    And for them to now admit that through

08:56    11   him -- when I asked him, I believe he said he'd never

08:56    12   seen it before.  And so now two years later, he's the

08:56    13   only person who's going to be able to put it in.

08:56    14   They've put it on the exhibit list for him.  And

08:56    15   there's a whole bunch of other documents that are in a

08:56    16   similar vein to PX-9.

08:56    17                    But when you're designated on that topic,

08:56    18   when you say you've never spoken to anyone from HearMe

08:56    19   and then you've never seen a document and then you're

08:56    20   the one who brings it in two years later at trial, that

08:56    21   feels like a violation of Rule 26.

08:56    22                    THE COURT:  Well -- and again, I'm a

08:56    23   little bit at a loss here because I don't really know

08:56    24   what this document is yet and y'all lived with it.

08:56    25                    But it appears to me to be, I mean, just

08:57   1   a document produced by HearMe from May of 2000.  I get

08:57   2   that this guy may or may not know.

08:57   3                   Mr. Siegmund, can you sit down?

08:57   4                   MR. SIEGMUND:  Yes.

08:57   5                   MS. PIEPMEIER:  I have the document,

08:57   6   Your Honor, if you'd like to see it, and I can give you

08:57   7   just a very brief summary.

08:57   8                   THE COURT:  I don't want them talking

08:57   9   about it if it's not going to come in.

08:57   10                  MS. PIEPMEIER:  Yeah.  May I approach,

08:57   11  Your Honor?

08:57   12                  THE COURT:  Of course.

08:57   13                  MS. PIEPMEIER:  This is PX-9.  I believe

08:57   14  this is the one where there's a picture on the back.

08:57   15  Just the PX-9.

08:57   16                  THE COURT:  And let me ask this:  I mean,

08:57   17  it seems to me this would be a relatively easy

08:57   18  document, just a document to get in.  But is your

08:57   19  problem with the document coming in at all or the fact

08:57   20  that they don't have anyone who -- did the person that

08:58   21  they're going to put up here, that there's no one they

08:58   22  can put on to explain what's in the document any better

08:58   23  than I could do, you know, if I read it and tried to

08:58   24  explain it?  Or is it both?

08:58   25                  MS. PIEPMEIER:  So, Your Honor, it's

08:58  1    both.  And let me just set the stage very, very

08:58  2    briefly.

08:58  3              HearMe was the prior company, the assets

08:58  4    were acquired by Paltalk.  The only Paltalk witness

08:58  5    who's going to testify, Mr. Katz, testified he never

08:58  6    spoke to anyone at HearMe and knew nothing about it.

08:58  7    He was designated on these topics, which is why I put

08:58  8    these documents in front of him during his deposition.

08:58  9    And when I put PX-9 in front of him during his

08:58  10   deposition, I asked him, you know:

08:58  11             Can you see this document?

08:58  12             Well, it looks like the HearMe website.

08:58  13             Is there a date?

08:58  14             Yeah.  There's a date on the document.

08:58  15             Do you have any knowledge at all of what

08:58  16   types of products or services are depicted in that

08:58  17   diagram?  That is the diagram they put on the slide.

08:58  18             Only to the extent I can read it.

08:59  19   VoiceNETWORK host live voice services for your network

08:59  20   application servers.

08:59  21             So he reads from the document.

08:59  22             And do you know if at the time that this

08:59  23   document I guess was printed in 2000, if one of the

08:59  24   products or services that HearMe was offering permitted

08:59  25   a user or users to participate in an audioconference

08:59  1    that included both computer and telephone connections?

08:59  2                    Answer:  I don't know.

08:59  3                    I can only see the picture has a plain

08:59  4    old telephone plus computers that seem to indicate

08:59  5    that, but I don't know.

08:59  6                    So the picture on the HearMe document

08:59  7    from May 15th appears to indicate that the HearMe

08:59  8    VoiceNETWORK permitted users to have a combined

08:59  9    audioconference using phone and computer; is that

08:59  10   right?

08:59  11                   That's what it looks like.  But again,

08:59  12   I'm no expert, and I'm not an engineer.

08:59  13                   Your Honor, I put those in front of him

08:59  14   because he was designated on whether any products

08:59  15   practiced the patent.  He didn't know.  And for them to

08:59  16   now come back and suggest to the jury that HearMe had

09:00  17   products that looked like the patent, were part of the

09:00  18   evolution towards the patent is -- Your Honor, that's

09:00  19   just completely inappropriate.

09:00  20                   And I don't know how to cross-examine him

09:00  21   on that because if he says, oh, yeah.  I didn't know at

09:00  22   my deposition, but I spent the past two years studying

09:00  23   it, that's completely inappropriate, Your Honor.

09:00  24                   So I guess I don't have a problem with

09:00  25   him showing a slide, but I do have a problem with PX-9

09:00  1   and its progeny.  There's about five more of these same

09:00  2   documents where I went through the exact same exercise

09:00  3   with Mr. Katz.

09:00  4                Your Honor, I very, very carefully

09:00  5   questioned Mr. Katz in deposition to find out what he

09:00  6   would say here at trial today, and it really is

09:00  7   manifestly improper for him to know nothing about it

09:00  8   and then to sponsor those same exhibits at trial.

09:00  9                Thank you, Your Honor.

09:00  10                THE COURT:  Mr. Siegmund?

09:00  11                MR. SIEGMUND:  Yes, Your Honor.

09:00  12                Mr. Katz did talk to people at HearMe.

09:01  13   Otherwise, he wouldn't have been able to buy the

09:01  14   assets, for one.

09:01  15                And two, I think there's a little bit of

09:01  16   confusion on the deposition exhibit and the trial

09:01  17   exhibit because the question was not asked if he had

09:01  18   seen this document.

09:01  19                But regardless, Your Honor, I think this

09:01  20   is a perfect time where we try to lay the foundation of

09:01  21   the document, offer it into evidence, and if you don't

09:01  22   agree that we have done that or there's no exception to

09:01  23   a rule of evidence, then it doesn't come in.

09:01  24                I mean, that's how we handle that, and I

09:01  25   think it'd be helpful for the Court to see the context

```
09:01    1    in which we sponsor the document.  And that's -- I
09:01    2    think that's pretty much our position on that,
09:01    3    Your Honor.
09:01    4                 THE COURT:  Okay.
09:01    5                 MS. PIEPMEIER:  I'm so sorry, Your Honor.
09:01    6    Just one point.
09:01    7                 If he lays a foundation based on work
09:01    8    that he did after I took his deposition when he was the
09:01    9    30(b)(6) on that, that is a violation of Rule 26,
09:01   10    Your Honor.
09:01   11                 THE COURT:  Well, so I'm old-fashioned.
09:01   12    I get it.  So the way I would do it -- and I anticipate
09:01   13    it's probably the way you'll do it too -- they can lay
09:02   14    the foundation for it, and if you'd like to take him on
09:02   15    voir dire to ask him those type of questions to see
09:02   16    whether or not the information -- when the information
09:02   17    was obtained, you're welcome to do that.
09:02   18                 MS. PIEPMEIER:  Okay.  Thank you,
09:02   19    Your Honor.
09:02   20                 THE COURT:  Okay.
09:02   21                 Anything else?
09:02   22                 MR. JONES:  It's very brief, Your Honor.
09:02   23    I apologize for imposing on the Court so much.  And
09:02   24    this one is very similar, and I think you can make a
09:02   25    decision for us quickly.
```

09:02  1              This slide deals with this.  They start

09:02  2    out with revenues for the product they don't accuse of

09:02  3    infringing.  They're not the accused infringing

09:02  4    functionality.

09:02  5              As you see here, the 1.27 billion,

09:02  6    they -- in their damages expert's calculation, he

09:02  7    starts out at 1.3 billion, which I would think might be

09:02  8    enough, but they want to put in 4.2 billion, which is

09:03  9    for Webex itself, when the accused functionality is

09:03  10   Webex Audio.  Webex itself is 4.2 billion; the other is

09:03  11   1.3.

09:03  12             Their justification for doing so is they

09:03  13   say it's some kind of check.  Our position is that the

09:03  14   evidence that our expert submitted as the total amount

09:03  15   of revenue should be what's attributable to everybody

09:03  16   is attributable to the accused functionality, Webex

09:03  17   Audio.  And we would just say, let's remove that top

09:03  18   line.

09:03  19             Thank you, Your Honor.

09:03  20             MR. SIEGMUND:  And I can be brief, Judge.

09:03  21             This is used in Mr. Bratic's

09:03  22   apportionment.  The 4.2 billion is the product revenue;

09:03  23   that is the product we are accusing.  This is an odd

09:03  24   situation because the Webex Audio revenue is the line

09:03  25   item for --

—26—

```
09:03   1                    THE COURT:  If this is what -- if we're
09:03   2   going to hear this from an expert, I'll allow --
09:03   3                    MR. SIEGMUND:  You are.
09:03   4                    THE COURT:  -- these to come in.
09:03   5                    Anything else?
09:03   6                    MR. JONES:  No.  Thank you, Your Honor.
09:03   7                    THE COURT:  Are you all ready to do
09:03   8   opening arguments?
09:03   9                    MR. TRIBBLE:  We're ready, Your Honor.
09:03  10                    THE COURT:  And do y'all intend to do
09:03  11   your opening argument after theirs?
09:04  12                    MR. TRIBBLE:  Excuse me, Your Honor.  I
09:04  13   didn't hear.
09:04  14                    THE COURT:  I'm wondering, do y'all want
09:04  15   to do it immediately after theirs, or are you going to
09:04  16   reserve?
09:04  17                    MR. JONES:  Yes, Your Honor.  We're going
09:04  18   to do it immediately after.
09:04  19                    THE COURT:  Okay.  Very good.  We'll be
09:04  20   back in about five minutes.
09:04  21                    MR. JONES:  Thank you, Your Honor.
09:04  22                    THE BAILIFF:  All rise.
09:04  23                    (Recess taken.)
09:09  24                    THE BAILIFF:  All rise.
09:09  25                    THE COURT:  Please remain standing for
```

| | | |
|---|---|---|
| 09:09 | 1 | the jury. |
| 09:09 | 2 | (Jury entered the courtroom.) |
| 09:10 | 3 | THE COURT:  Thank you.  You may be |
| | 4 | seated. |
| 09:10 | 5 | Jen, would you call the case, please? |
| 09:10 | 6 | DEPUTY CLERK:  A civil action in Case |
| 09:10 | 7 | 6:21-CV-757, Paltalk versus Cisco.  Case called for a |
| 09:10 | 8 | jury trial proceeding. |
| 09:10 | 9 | THE COURT:  Could I have announcements |
| 09:10 | 10 | starting -- I'd like the plaintiff's lawyer to |
| 09:10 | 11 | go -- the plaintiff to go first, introduce everyone at |
| 09:10 | 12 | your table, and then I'll go to Mr. Jones and ask the |
| 09:10 | 13 | defendants to do the same. |
| 09:10 | 14 | MR. TRIBBLE:  Thank you, Your Honor. |
| 09:10 | 15 | THE COURT:  Mr. Tribble? |
| 09:10 | 16 | MR. TRIBBLE:  Max Tribble for the |
| 09:10 | 17 | plaintiff Paltalk.  With me today is my partner Kalpana |
| 09:10 | 18 | Srinivasan and the CEO of Paltalk, Mr. Jason Katz. |
| 09:10 | 19 | THE COURT:  Thank you. |
| 09:10 | 20 | MR. JONES:  Your Honor, Mike Jones for |
| 09:11 | 21 | Cisco.  Our lead counsel Sarah Piepmeier, Nathan Sabri, |
| 09:11 | 22 | and our corporate representative is Xiao Chang.  And |
| 09:11 | 23 | also I guess Mr. James over here, he's our technical |
| 09:11 | 24 | wizard. |
| 09:11 | 25 | THE COURT:  He's the most important on |

| | | |
|---|---|---|
| 09:11 | 1 | your side in a lot of ways. |
| 09:11 | 2 | MR. JONES:  He certainly is, Your Honor. |
| 09:11 | 3 | THE COURT:  Thank you. |
| 09:11 | 4 | Ladies and gentlemen of the jury, let me |
| 09:11 | 5 | introduce myself to you formally.  My name is Alan |
| 09:11 | 6 | Albright.  I'm the United States District Judge |
| 09:11 | 7 | for -- we're in the Western District of Texas, which, |
| 09:11 | 8 | if you want an idea of how large it is, we |
| 09:11 | 9 | are -- San Antonio is in it, El Paso's in it.  L.A. is |
| 09:11 | 10 | closer to El Paso than San Antonio, so you have an |
| 09:11 | 11 | idea. |
| 09:11 | 12 | And some of you may have driven pretty |
| 09:11 | 13 | far.  There are 11 counties in our division, so it's |
| 09:11 | 14 | quite something to expect people to be here and serve |
| 09:11 | 15 | as jurors.  And I will say in advance for the lawyers |
| 09:11 | 16 | and their clients how grateful we are that you're |
| 09:11 | 17 | taking the time. |
| 09:11 | 18 | We will go relatively long days here so |
| 09:12 | 19 | that we can finish this week.  But that doesn't mean |
| 09:12 | 20 | you won't have some relief.  I'll have a morning break. |
| 09:12 | 21 | I'll have an afternoon break.  I can't read your mind. |
| 09:12 | 22 | If you all need a break sooner than I need a break, |
| 09:12 | 23 | hand William, or whoever's sitting down there, a note |
| 09:12 | 24 | or catch my -- just do something, I will certainly |
| 09:12 | 25 | accommodate you if you need a break sooner than you |

09:12  1    need one.

09:12  2              We're about to hear the opening arguments

09:12  3    for both sides.  And they're important.  I like to

09:12  4    think of them as the roadmap the lawyers anticipate

09:12  5    that the trial will take.  But they're only arguments;

09:12  6    they're not evidence yet.

09:12  7              The evidence won't come until the -- I'm

09:12  8    not sure -- either ladies or gentlemen, I'm not sure

09:12  9    who's speaking on either side yet, but when they finish

09:12  10   their opening arguments, Mr. Tribble will call his

09:12  11   first witness and that's when the evidence will

09:12  12   actually begin.

09:12  13             So Mr. Tribble?

09:12  14             MR. TRIBBLE:  Thank you, Your Honor.

09:13  15             THE COURT:  Would you like any warning

09:13  16   before 30 minutes?

09:13  17             MR. TRIBBLE:  I would.  Maybe a

09:13  18   ten-minute warning?

09:13  19             THE COURT:  Surely.

09:13  20             MR. TRIBBLE:  And, Your Honor, I should

09:13  21   also introduce Ms. Srinivasan in front of them at

09:13  22   trial, our partner Ryan Caughey and our future partner

09:13  23   Amber Magee.  And Matt Boles is, of course, our

09:13  24   graphics viewer.

09:13  25             THE COURT:  Okay.

<pre>
09:13    1           OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

09:13    2                MR. TRIBBLE:  Well, good morning,

09:13    3    everybody.  My name is Max Tribble.  And I'm honored to

09:13    4    represent the plaintiff in this case, Paltalk.  This is

09:13    5    the CEO of Paltalk, Mr. Jason Katz.

09:13    6                Mr. Katz, would you stand?

09:13    7                This case is about using someone else's

09:13    8    property without paying for it.  That's exactly what

09:14    9    Cisco did here.  Cisco generated billions of dollars of

09:14   10    revenue using technology owned by Paltalk and contained

09:14   11    in this patent.

09:14   12                Now, during the trial, I think everyone

09:14   13    will refer to this patent by the last three digits of

09:14   14    the patent number, which is the '858.  You will see it

09:14   15    referred to as the '858.

09:14   16                And I apologize.  We're going to walk

09:14   17    through a number of things.  I have a very limited

09:14   18    amount of time, and so I'm going to try to be as quick

09:14   19    as possible.  I have a lot of things to talk about.

09:14   20    But you're going to hear a lot more about all of this

09:14   21    from the witnesses during the trial in this case.

09:14   22                So first let me tell you about Paltalk.

09:15   23    Paltalk is an innovative company that hosts

09:15   24    videoconferencing.  It was founded and home grown by

09:15   25    Mr. Katz.  And they have a number of related products.
</pre>

09:15    1    The main one is Paltalk.com, but they have these other

09:15    2    products here shown on the screen that are related to

09:15    3    videoconferencing, communications over the Internet.

09:15    4           Now, Paltalk was a pioneer in this

09:15    5    industry.  Here is a Forbes article back in May of 2003

09:15    6    featuring Paltalk and Jason Katz back in the early

09:15    7    days.

09:15    8           And since its founding, Paltalk has tried

09:15    9    to develop and also to acquire intellectual property

09:16    10    related to its videoconferencing field.

09:16    11           And so I want to be clear.  Paltalk was

09:16    12    not the original inventor on this patent.  Paltalk

09:16    13    bought the patent from a company named HearMe.  HearMe

09:16    14    was another pioneer in both videoconferencing, Internet

09:16    15    communications, and a number of fields.

09:16    16           And in December of 2001, HearMe was

09:16    17    selling and liquidating some of its intellectual

09:16    18    property assets, not just patents, but also computer

09:16    19    code and other things.  And Mr. Katz had the foresight

09:16    20    to recognize the enormous value of the application for

09:16    21    the '858 patent.  It hadn't issued yet, but it had been

09:17    22    filed with the Patent and Trademark Office.  And so he

09:17    23    was able to acquire the patent when nobody else would

09:17    24    pay the asking price.

09:17    25           And so here's the timeline.  You see that

09:17  1    February of '98, Paltalk was founded.

09:17  2                    And then certainly May of 2000, HearMe

09:17  3    was working on developing what is called a "hybrid

09:17  4    audio system."  We'll -- I'll explain that in a second.

09:17  5                    And in June of 2000, HearMe filed the

09:17  6    application for the '858 patent.

09:17  7                    And then Paltalk purchased that and other

09:17  8    IP assets in December of 2001.

09:17  9                    And eventually, the patent at issue

09:17  10   issued in January of 2004, and it was after that, years

09:18  11   after that, that Cisco bought the Webex company, and

09:18  12   the Webex products are the products being accused of

09:18  13   infringement in this case.

09:18  14                    Cisco acquired Webex in May of 2007.  And

09:18  15   as you'll see in a minute, it wasn't until after that

09:18  16   that the Webex subsidiary or Webex after had been

09:18  17   bought by Cisco.  It was only after that that it began

09:18  18   developing a hybrid audio system.

09:18  19                    This slide lists some of the Webex

09:18  20   products that are accused of infringement here.  They

09:18  21   do various things.  Most of them do videoconferencing,

09:18  22   but they all have one thing in common.  They all use a

09:18  23   functionality called Webex Audio.  You'll hear a lot of

09:18  24   testimony about that.

09:18  25                    And so Webex Audio, the ability for

09:19   1   people to participate in audio- or videoconference

09:19   2   together, this technology, think about it.  Even for

09:19   3   videoconferences, the audio piece is absolutely

09:19   4   essential because if you have a conference -- and their

09:19   5   main product is this Cisco Webex.  But if you can have

09:19   6   a videoconference, I suppose, where you saw everybody,

09:19   7   but if you didn't hear what they were saying, it

09:19   8   wouldn't be a very productive videoconference and

09:19   9   nobody would buy that product.

09:19   10          And in particular, Cisco Webex uses the

09:19   11  patented technology.  And I'll explain more and our

09:19   12  experts will explain later, but by a hybrid system,

09:19   13  what we're referring to is some of these users are

09:19   14  connecting by computer.  Okay?

09:19   15          So you can see the computers connecting.

09:20   16  They would be connecting over the Internet.  But you

09:20   17  see that some people are connecting over the phone

09:20   18  lines.  In fact, an iPhone, it's a phone and a computer

09:20   19  you can connect over the Internet, or if you were

09:20   20  somewhere or maybe you were driving -- but if you were

09:20   21  somewhere where you didn't have a good Internet

09:20   22  connection, it's absolutely essential that for you to

09:20   23  participate in the conference, you have to be able to

09:20   24  dial in over the phone lines.  That's what we mean by a

09:20   25  "hybrid system," that you can actually have both, over

```
09:20   1    the phone lines, by dialing in, or over the Internet or
09:20   2    some other network.
09:20   3              And let's talk a little bit about
09:20   4    patents.  The -- you know, our founding fathers thought
09:21   5    that patent rights were so important to incentivize
09:21   6    people to invest in research, new inventions, new
09:21   7    technologies, that in order to incentivize that, the
09:21   8    creation of the Patent and Trademark Office, the
09:21   9    protection of the patent rights is actually a right
09:21   10   spelled out in our -- the U.S. Constitution.  In fact,
09:21   11   Thomas Jefferson was the first commissioner of the
09:21   12   United States Patent and Trademark Office.
09:21   13             And in some ways, patents are kind of
09:21   14   like other property.  Patents are intellectual
09:21   15   property, but, you know, like real property, like land
09:21   16   or a house.  That belongs to whoever owns it.  They can
09:21   17   buy it and sell it.  And if someone uses your property
09:22   18   without your permission, then that person has to pay
09:22   19   for using your property.
09:22   20             And so as I've said, the patent's
09:22   21   intellectual property, but in the case of land, suppose
09:22   22   somebody had drilled an oil or gas well on your
09:22   23   property.  Naturally they would owe you a royalty
09:22   24   interest.  They would have to pay you for their use of
09:22   25   your property.
```

09:22  1            And by the way, they have to pay a

09:22  2    reasonable royalty even if they didn't know it was your

09:22  3    property, even if they didn't know of the patent.  If

09:22  4    they didn't know of the land or even thought it was

09:22  5    theirs, they're still required to pay a reasonable

09:22  6    royalty for their use of your property.

09:22  7            And in this case, the patent has a number

09:23  8    of benefits that you'll hear testimony about that make

09:23  9    it an important feature for doing the kind of

09:23  10   conferencing that Webex does.

09:23  11           The main one or one of the main ones is

09:23  12   that both computer users and phone users can

09:23  13   participate together, and that's absolutely essential.

09:23  14           Think about it.  If you were a chief

09:23  15   technology officer of L3Harris, when you were picking

09:23  16   which system to use, you would absolutely require that

09:23  17   the system allow access both over phone lines and over

09:23  18   the Internet or a network.  I mean, Webex's competitors

09:23  19   offer that.  So why would you settle for anything else?

09:24  20           But moreover, it just makes sense.  Not

09:24  21   everybody all the time is going to have access to the

09:24  22   Internet, or maybe their bandwidth is slow.  And in

09:24  23   those cases, they can call in over the phone lines.

09:24  24           You'll hear testimony about the

09:24  25   computational efficiency of the inventions in this

09:24   1   patent give the system -- allowing the servers to

09:24   2   offload some of the workload onto the users' computers.

09:24   3   And it results in an improvement of the sound quality

09:24   4   of the conference.

09:24   5           Okay.  And so as Mr. Siegmund told you in

09:24   6   jury selection, we're going to talk about three things,

09:24   7   the first of which is infringement.  And on

09:24   8   infringement, you're going to hear from Dr. Scott

09:24   9   Schaefer.

09:24   10          Dr. Schaefer, will you stand up?

09:24   11          Dr. Schaefer, I've got some resume points

09:24   12   on the slide.  I don't have time to go over all of it,

09:25   13   but let me just say, he's a professor of computer

09:25   14   science at A&M.  And in fact, he is head of the Texas

09:25   15   A&M computer science department.

09:25   16          And he has numerous degrees and awards.

09:25   17   You know, he was a member of the DARPA computer science

09:25   18   study panel.  DARPA is a defense agency, stands for

09:25   19   Defense Advanced Research Product -- Research Product

09:25   20   Agency.

09:25   21          And you'll hear about those and the other

09:25   22   important work he's done with other institutions.  And

09:25   23   he will explain to you how that Webex Audio and the

09:25   24   Webex products accused in this case all infringe Claims

09:25   25   1 through 5.  And he'll walk you through that.

09:25  1          So here is the claim language.  This is

09:25  2    important.  This is Claim 1.  And we've broken it out

09:26  3    into separate elements.  And you'll see Dr. Schaefer

09:26  4    will explain to you how the accused products of Cisco

09:26  5    Webex satisfy each and every one of these limitations

09:26  6    that are in the claim language.

09:26  7          But this is very important.  Look at the

09:26  8    wording.  Look at the words in this claim.  It has a

09:26  9    lot of jargon in it that to you and me, this would be

09:26  10   impossible to understand and -- such as active speaker,

09:26  11   active speaker list, multiplexed stream.  These terms

09:26  12   like that.

09:26  13         This is something that have meaning to an

09:27  14   expert in the field who has studied the entire patent,

09:27  15   including what's called "the specification."  It's the

09:27  16   six-page narrative description and the figures that are

09:27  17   in the patent.  Even an expert has to study that in

09:27  18   order to understand exactly what these terms mean.

09:27  19         And I believe that the Court will

09:27  20   instruct you that this type of expert is called a

09:27  21   "person of ordinary skill in the art."  And you see on

09:27  22   the bottom of the pages of the patent.  It's not enough

09:27  23   to be an expert in the field.  You also have to read

09:27  24   the entire patent and study it in order to understand

09:27  25   the context to know exactly what each of the terms in

```
09:27   1    the claim language mean.
09:27   2                  And so you'll hear testimony.  There's a
09:28   3    disagreement between Paltalk and Cisco.  And
09:28   4    Dr. Schaefer will testify that when the word "each"
09:28   5    occurs in the claim language, it doesn't mean what you
09:28   6    might think it means if someone walked up to you.
09:28   7                  So like you've heard, you might hear an
09:28   8    analogy from the other side that says, well, I promise
09:28   9    to give a cookie to each of my children, and I gave the
09:28  10    first two a cookie and then I didn't give any cookie to
09:28  11    the third one.  And you'll say, that's not "each."
09:28  12                  But in fact, the Court is going to
09:28  13    instruct you that the word "each" has -- to be given
09:28  14    the plain and ordinary meaning that it would mean to an
09:29  15    expert in this field, a person of ordinary skill in the
09:29  16    art, like Dr. Schaefer, who has to have the plain and
09:29  17    ordinary meaning that it would have to an expert in
09:29  18    this field after reading the patent to understand it.
09:29  19                  And in fact, take a look from the patent.
09:29  20    Here's some language.  This is at Column 5 of the
09:29  21    patent.  And it's describing one of the embodiments of
09:29  22    the invention.  And it says specifically that active
09:29  23    speaker audio data for each and every active speaker is
09:29  24    multiplexed.  And you'll hear more about that.
09:29  25                  But look at this.  Because at back, it
```

| | | |
|---|---|---|
| 09:29 | 1 | says:  However, as will be apparent to those skilled in |
| 09:29 | 2 | the relevant arts -- that means an expert in this field |
| 09:29 | 3 | like Dr. Schaefer -- if Party J is an active speaker, |
| 09:29 | 4 | then that step will not include Party J's own audio |
| 09:30 | 5 | data in the multiplexed packets. |
| 09:30 | 6 | And again, you'll hear testimony about |
| 09:30 | 7 | how this plays into what the word "each" means to a |
| 09:30 | 8 | person of ordinary skill in this art. |
| 09:30 | 9 | And it spells it out further.  It says: |
| 09:30 | 10 | This is in essence an echo suppression function so that |
| 09:30 | 11 | Party J will not hear themselves speak. |
| 09:30 | 12 | So when people are talking on the |
| 09:30 | 13 | conference, the audio streams of the active speakers, |
| 09:30 | 14 | the people speaking, or at least some of them, are |
| 09:30 | 15 | combined together and sent out. |
| 09:30 | 16 | And what this says, even though it's |
| 09:30 | 17 | "each," the speaker doesn't need to receive back his |
| 09:30 | 18 | own audio because he's the one who said it.  It's |
| 09:30 | 19 | called "echo suppression."  The invention wouldn't |
| 09:31 | 20 | really work very well if he kept getting this echo. |
| 09:31 | 21 | And so you'll hear more about that. |
| 09:31 | 22 | And so when you hear argument or |
| 09:31 | 23 | testimony by Cisco in this case that, oh, "each" means |
| 09:31 | 24 | what it always does.  You don't need to consider what |
| 09:31 | 25 | the patent teaches or consider how it's using it. |

09:31  1    That's a red flag.  And you need to ask yourself:  Is

09:31  2    that really what's going on here?

09:31  3              In addition, Cisco Webex infringes the

09:31  4    other four claims, Claims 2 through 5.  And each of

09:31  5    these claims begins with "the method of Claim 1 further

09:31  6    comprising the step of" and then it has an additional

09:31  7    step.

09:31  8              And that means that each of these claims,

09:31  9    that invention, has all of the steps of Claim 1 plus

09:32  10   something in addition that's spelled out in these.

09:32  11             And look at it.  This is an engineering

09:32  12   design document of Cisco Webex.  And in here, the

09:32  13   engineer literally recognizes that it is impossible to

09:32  14   broadcast all speakers' voice packages to all

09:32  15   listeners.

09:32  16             Not only does Cisco do it in the same way

09:32  17   that is spelled out in the patent, but they recognize

09:32  18   that it would be impossible to have a working invention

09:32  19   where everyone was getting their own voice sent back to

09:32  20   them.

09:32  21             This is Figure 1 in the patent.  And

09:32  22   we'll walk through this.  The patent has figures that

09:32  23   show diagrams of a preferred embodiment of the

09:32  24   invention.

09:33  25             You'll see here that in Figure 1, it

09:33  1    clearly shows a hybrid architecture for the

09:33  2    conferencing system, where you had both phones and

09:33  3    computers connecting over a network.

09:33  4                PSTN right here, that is the phone lines,

09:33  5    saying that you can connect over the phone lines or

09:33  6    over a network.  And it's hybrid because it can do

09:33  7    both.

09:33  8                And then this is the same figure.  We've

09:33  9    just kind of spread it out so that it's horizontal.

09:33  10               And then on the other hand, this is a

09:33  11   Cisco system.  And the point here is that Cisco Webex

09:33  12   is clearly a hybrid architecture.  It allows connection

09:33  13   both by computers over the Internet or a network and by

09:33  14   phones or cell phones connecting over phone lines.

09:34  15   Keep in mind, it's not enough to compare the pictures

09:34  16   to each other.  It's the claim language that has to be

09:34  17   met, and Dr. Schaefer will walk you through that.

09:34  18               This -- remember we bought the patent and

09:34  19   other intellectual property from HearMe, and this is a

09:34  20   document that shows a HearMe hybrid architecture that

09:34  21   the company was working on back in 2000.

09:34  22               Okay.  So you heard Cisco's lawyer in

09:34  23   jury selection talk about, you know, something along

09:34  24   the lines of it's not just the patent, you know, who

09:34  25   invented it first, who used it first and so forth.

09:35  1    Well, I just want to be very clear on the date that

09:35  2    Webex started even thinking or planning to adopt a

09:35  3    hybrid architecture like that in the patent.

09:35  4                THE COURT:  Counsel, you have ten

09:35  5    minutes.

09:35  6                MR. TRIBBLE:  Ten minutes?  Thank you,

09:35  7    Your Honor.

09:35  8                And so this is a Cisco internal document

09:35  9    dated July 7, 2007, and it's a Revision 1.0, so it's

09:35  10   the very first version, and the title is Hybrid Audio

09:35  11   Architecture Design.  Which is amazingly similar to the

09:35  12   title of our patent, the '858 patent, which refers to a

09:35  13   hybrid server architecture, which the application was

09:35  14   filed years earlier in June of 2000.  Patent issued in

09:35  15   2004, years before Webex even considered adding a

09:35  16   hybrid architecture.

09:35  17                And the very first sentence says:  The

09:36  18   hybrid audio service is a new service that this

09:36  19   engineering release will introduce.  The service will

09:36  20   offer user the capability to join audioconference via

09:36  21   voice over Internet protocol -- that's over the

09:36  22   Internet -- or PSTN.  That's the phone lines.  And

09:36  23   that's something that Webex didn't even begin planning

09:36  24   to do until years after the patent had issued.

09:36  25                And it recognizes some of the benefits of

09:36  1   this hybrid architecture, improving usability, and it

09:36  2   offers Webex a competitive advantage over their

09:36  3   competitors.

09:36  4            And so again, we'll walk you through this

09:36  5   timeline about what happened when in detail.

09:36  6            And keep this in mind.  As this document

09:36  7   shows, back in April of 2001, Cisco was actually a

09:37  8   customer or a partner of HearMe.  And in weighing all

09:37  9   this to determine whether we've met our burden of proof

09:37  10  on infringement -- our burden is called a preponderance

09:37  11  of the evidence.

09:37  12           And so there's going to be evidence on

09:37  13  both sides, and if the scales of justice -- if the

09:37  14  evidence that Paltalk shows ever so slightly, ever so

09:37  15  slightly outweighs any opposing evidence, then we've

09:37  16  met our burden of proof and there is infringement.

09:37  17           Now, let's contrast that with Cisco's

09:37  18  burden of proof to try and prove that the patent is

09:37  19  invalid.  Their burden is much higher.  It's something

09:38  20  called clear and convincing evidence.

09:38  21           Now, I'm not going to go over it now.

09:38  22  The Court will instruct you on what the burdens are.

09:38  23  But the point is, Cisco bears a much higher burden to

09:38  24  prove invalidity than we do to prove infringement.  And

09:38  25  the reason for that is because patents issued by the

09:38  1    United States Patent Office are presumed to be valid.

09:38  2    You saw the video before jury selection about the

09:38  3    process an inventor has to go through to file their

09:38  4    patent and get it approved by the Patent Office.

09:38  5                As to the validity of the patents, they

09:38  6    have experts.  But you'll hear from Dr. Madisetti.

09:38  7    Again, I'm not going to go over his resume here.  Just

09:38  8    let's say he is a full professor at Georgia Tech, which

09:38  9    is one of the top engineering schools in the world.

09:38  10   And he will explain -- these are a bunch of books he's

09:39  11   written and textbooks, but he will explain that the

09:39  12   prior art that Cisco relies upon that said, oh, the

09:39  13   HearMe patent, they -- those inventors weren't first is

09:39  14   this reference called Botzko.

09:39  15               And he will walk you through this and

09:39  16   explain why the claims covered in the patent don't

09:39  17   meet -- excuse me -- that the disclosures in the Botzko

09:39  18   reference do not satisfy all elements of Claim 1 or any

09:39  19   of the other claims, and therefore, Cisco has failed to

09:39  20   prove invalidity.

09:39  21               Finally, you'll hear about damages,

09:39  22   Mr. Walter Bratic.

      23               Mr. Bratic, can you stand?

09:39  24               Mr. Bratic, again, a very impressive

09:39  25   resume.  You know, he's been a CPA licensed in Texas

09:39  1    for decades and went to The Wharton School of Business,

09:40  2    and has specialized in analyzing patent licenses, in

09:40  3    valuing patents in his career.

09:40  4              And keep in mind, the patent statute

09:40  5    specifically says that if there's infringement, the

09:40  6    Court shall award the claim of damages that are in no

09:40  7    event less than a reasonable royalty for the use made

09:40  8    by the invention by the infringer.  It's not whether

09:40  9    Paltalk used the invention.  They didn't.  What they

09:40  10   did was they recognized the great value of this patent.

09:40  11   It was in a field that they were already in, and they

09:41  12   bought the patent.  The question is how much did Cisco

09:41  13   use the invention?

09:41  14             And this is kind of a summary of the

09:41  15   analysis for damages, the total Webex revenues during

09:41  16   the damages period.  The damages period has stopped

09:41  17   because the patent expired, and so the royalties

09:41  18   stopped back in -- I think it was 2022.

09:41  19             But the total Webex revenues were

09:41  20   $4.2 billion.  The amount that Cisco itself attributed

09:41  21   to Webex Audio was $1.27 billion.  That was adjusted

09:41  22   down by Mr. Bratic to obtain the Webex Audio gross

09:41  23   profits.  And it was apportioned to be just a fraction

09:41  24   of that because it was apportioned according to the

09:41  25   technical benefits of the Paltalk patent versus other

09:42  1    features that are in Webex.

09:42  2                    And finally, the ultimate

09:42  3    calculation -- again, Mr. Bratic will walk you through

09:42  4    this -- the total damages owed by Cisco for its use,

09:42  5    and for the billions of dollars that it generated using

09:42  6    the patented invention is $102 million.  And we're

09:42  7    going to talk a lot more about that later.

09:42  8                    Again, as the Court instructed you,

09:42  9    nothing I say is evidence.  Wait and you'll see the

09:42  10   documents.  You'll hear the witnesses.  Nothing that

09:42  11   Cisco's lawyer says is evidence either.  And I look

09:42  12   forward to presenting the witnesses and the documents

09:42  13   and the actual evidence at trial.

09:42  14                    Thank you.

09:42  15                    THE COURT:  Thank you, sir.

09:43  16        OPENING STATEMENT ON BEHALF OF THE DEFENDANT

09:43  17                    MS. PIEPMEIER:  Good morning, ladies and

09:43  18   gentlemen of the jury.  I haven't had a chance to

09:43  19   introduce myself to you yet.  My name is Sarah

09:43  20   Piepmeier.  And I'm honored to be here on behalf of

09:43  21   Cisco.  We appreciate each of you and respect your

09:43  22   time, so let me just jump right in.

09:43  23                    I'm going to cover five main topics in my

09:43  24   30 minutes with you this morning.  And they go in

09:43  25   order.  Why are we here?  Cisco and its witnesses, the

—47—

09:43  1    '858 patent and what came before the '858 patent, why

09:43  2    Webex is different, and Paltalk's $102 million damages

09:43  3    demand which you just heard about from Mr. Tribble.

09:43  4                So let's start with why are we here?

09:43  5    Let's start with the basics, and we'll just kind of

09:43  6    orient ourselves.  Now, I agree with Mr. Tribble, what

09:43  7    I am saying is not evidence, and I hope to guide you

09:43  8    through what the evidence will be this week.  But I

09:44  9    want to start by setting the stage.

09:44  10               So Paltalk asserts the '858 patent

09:44  11   against Cisco; you've heard about that patent a little

09:44  12   bit.  And Mr. Tribble explained that this patent

09:44  13   originated with a now-defunct company called HearMe.

09:44  14   And the '858 patent covers a specific method of hosting

09:44  15   an audioconference, that -- this is one thing he didn't

09:44  16   say, no one has used and no one would use because the

09:44  17   technology is almost 25 years old.

09:44  18               Now, you heard a little bit about

09:44  19   Paltalk's history and various Paltalk products.  You're

09:44  20   going to hear more about them this morning, I suspect,

09:44  21   from Mr. Katz.

09:44  22               And I want to note one thing.  Despite

09:44  23   offering audio-videoconferencing products, even Paltalk

09:44  24   doesn't use the '858 patent.  Why?  Because it's

09:44  25   obsolete technology.  In fact, from the time that it

| | | |
|---|---|---|
| 09:44 | 1 | issued until it expired, no one has ever put the |
| 09:45 | 2 | '858 patent into a product and it has never been |
| 09:45 | 3 | licensed other than part of a large portfolio.  It |
| 09:45 | 4 | simply hasn't been used. |
| 09:45 | 5 | Now, here's the other fundamental issue, |
| 09:45 | 6 | and my -- both my analogy and my fundamental issue have |
| 09:45 | 7 | been jumped a little bit by Mr. Tribble, but that's |
| 09:45 | 8 | fine.  I'm still going to tell the story, the analogy |
| 09:45 | 9 | story because I think, respectfully, I tell it just a |
| 09:45 | 10 | little bit better than Mr. Tribble does.  So I'm going |
| 09:45 | 11 | to go through that. |
| 09:45 | 12 | Now, it is our position -- and again, |
| 09:45 | 13 | the -- both sides have different arguments on this.  It |
| 09:45 | 14 | is our position that the only way that Paltalk can have |
| 09:45 | 15 | an infringement read is by essentially having a |
| 09:45 | 16 | tortured read of the English language. |
| 09:45 | 17 | Now, as a former English major, sort of a |
| 09:45 | 18 | closet English major because I'm a high-tech lawyer, |
| 09:45 | 19 | that offends me deeply.  But in the context of this |
| 09:45 | 20 | patent, "each" takes its plain and ordinary meaning, |
| 09:45 | 21 | which is "all" or "every." |
| 09:45 | 22 | So let me tell you a little bit about |
| 09:46 | 23 | what I mean.  Let me tell you how this breaks down. |
| 09:46 | 24 | And this is the analogy that has been pre-staged a |
| 09:46 | 25 | little bit. |

09:46  1                    So I live in San Francisco.  I have a

09:46  2     niece and a nephew who live in Connecticut, Maggie and

09:46  3     John; they're 9 and 11.  And whenever I go to visit

09:46  4     them, which I like to do a lot because, of course, we

09:46  5     all like to go see our nieces and nephews, especially

09:46  6     at their age -- they're 9 and 11 right now.  It's a

09:46  7     pretty cool age.  Before I go visit them, I text them

09:46  8     and I say, Auntie Sarah's going to bring each of you a

09:46  9     present.  Now, it's not a cookie, like that would not

09:46  10    be enough to fly all the way from California, right?

09:46  11    It's like a real present.

09:46  12                   So I text them and I say, Auntie Sarah's

09:46  13    going to bring you a little present.  And don't you

09:46  14    know, when I show up at that airport in Hartford,

09:46  15    Connecticut, I better have a present for Maggie, and I

09:46  16    better have a present for John.  Because I made that

09:46  17    mistake once before, and let me tell you, I have not

09:46  18    heard the end of it.  Everyone knows what the word

09:46  19    "each" means.

09:46  20                   And what I find so telling about

09:46  21    plaintiff's presentation just now is that they admitted

09:46  22    that they have to change the meaning of the word

09:47  23    "each."  They admitted that.  You heard that from

09:47  24    Mr. Tribble.

09:47  25                   He told you, he put a red flag up and

09:47  1    said, essentially, ignore what counsel is going to tell

09:47  2    you.  In a sense he's saying ignore common sense.

09:47  3    Ignore the English language.  He is admitting that they

09:47  4    are changing the meaning of "each."  And what they are

09:47  5    changing it to is "one or more."  And why are they

09:47  6    doing that?  They are doing that because that is the

09:47  7    only way that they can find a read on Webex.

09:47  8                So with that in mind, let's turn briefly

09:47  9    to Cisco.  And I should say, I don't want to get into

09:47  10   specifics too much here, but the way they do this is

09:47  11   essentially rewriting the patent.  They're literally

09:47  12   scratching out the word "each" and writing in "one or

09:47  13   more."  I don't want to get too far into the specifics

09:47  14   of the patent at this point.

09:47  15               So Cisco -- let's talk about them for the

09:47  16   moment.  Let's talk about my client that I'm honored to

09:47  17   be here to represent.  They are a true American success

09:47  18   story.  Cisco was founded in 1984 by Sandy Lerner and

09:48  19   Len Bosack; you see them there on the slide.  They met

09:48  20   in the 1970s at Stanford as students.  They fell in

09:48  21   love, they got married, that whole story, and then they

09:48  22   worked in the early '80s as Stanford University

09:48  23   scientists.  And they were in different labs.  And

09:48  24   picture this, this is the early '80s and they're in

09:48  25   different labs.  And they're trying to find a way to

09:48    1    talk between the labs.

09:48    2                    And so what do they do as innovators?

09:48    3    They create the first local area network; it's called a

09:48    4    LAN.  They created a local area network so that the

09:48    5    different labs at Stanford could talk to each other.

09:48    6                    And LANs are everywhere now, right?

09:48    7    There's a LAN in this courtroom.  There's probably a

09:48    8    LAN in your workplace.  Some of us have LANs in our

09:48    9    homes.

09:48    10                    Cisco's foundational networking

09:48    11    innovations are kind of like the hidden pipes

09:48    12    underlying the Internet.  You don't always see them,

09:48    13    but you certainly know if they failed.

09:48    14                    Now, today, after 40 years of steady

09:48    15    growth, Cisco employs tens of thousands of people

09:48    16    throughout the United States, and it makes products and

09:48    17    services used all over the world, some of which you see

09:49    18    here on Slide 11.

09:49    19                    I asked -- you can say Cisco's history of

09:49    20    innovation is perhaps best showed most clearly by the

09:49    21    fact that it has 14,000 issued U.S. patents of its own.

09:49    22    As you'll hear, more than 700 of those patents relate

09:49    23    to Webex.  That's the technology that we're talking

09:49    24    about here.

09:49    25                    And of those 740 patents that Cisco has

09:49  1    on Webex, it has 412 patents of its own on audio.  Now,

09:49  2    audio is what Mr. Tribble just talked about.  That is

09:49  3    what they are accusing here.  Cisco has its own 412

09:49  4    patents on audio features.  There are so many

09:49  5    innovations within Cisco's audio that they have

09:49  6    patented that.  And that tells you what drives demand

09:49  7    to our Cisco products.

09:49  8              Now, you're going to hear from Cisco

09:49  9    witnesses.  It's not just about how great their

09:49  10   products are.  You know, everyone's going to say their

09:49  11   products are good.

09:49  12             You're going to hear from Cisco witnesses

09:50  13   who share their experience working for a company named

09:50  14   the best place to work year after year by Fortune

09:50  15   Magazine.  In fact, in 2022, Cisco was voted the number

09:50  16   one best place to work in the United States by Fortune.

09:50  17             And that success, again, isn't because of

09:50  18   great products, the power of the Internet.  You will

09:50  19   hear from Cisco witnesses about how Cisco invests

09:50  20   millions every year in giving back to their local

09:50  21   communities.  And this People magazine article that I

09:50  22   have here on Slide 14 shows Cisco as number one in an

09:50  23   article on 100 employers who put their communities

09:50  24   first.

09:50  25             Now, I talked a bit about Cisco.  Let's

09:50  1   turn back to Webex.  The product that's -- that Paltalk

09:50  2   accuses of infringement.

09:50  3          Webex was founded as a company in 1995,

09:50  4   long before HearMe applied for the '858 patent.  Cisco

09:50  5   acquired Webex in 2007, and you just saw a document a

09:50  6   moment ago that came right after that acquisition.

09:51  7          Now, we know, of course, Webex was

09:51  8   innovating and had its own products and technology

09:51  9   before that acquisition.  2007 is when Cisco acquired

09:51  10  it.  But Cisco brought Webex into the Cisco fold, kept

09:51  11  those products, enhanced them, and it has become a core

09:51  12  part of Cisco's products offerings.

09:51  13         Now, Webex is award-winning.  Whether you

09:51  14  like using it, if you've used it or not, Webex

09:51  15  certainly has won a lot of awards.  I put those up on

09:51  16  Slide -- or some of them, I should say.  They didn't

09:51  17  all fit.  But I should put them up on Slide 16 so that

09:51  18  you can see what drives demand for Webex.

09:51  19         Now, Paltalk accuses a specific method of

09:51  20  hosting an audioconference, and you heard a little bit

09:51  21  about it just a moment ago.  It's with participants who

09:51  22  dial in using a plain old telephone and those who use a

09:51  23  computer to join.

09:51  24         We sometimes call the plain old telephone

09:51  25  method PSTN.  We sometimes call the computer method --

09:51  1    excuse me -- VoIP.

09:52  2                Now, here's the important part.  The

09:52  3    evidence will show that that ability to join an

09:52  4    audioconference using a plain old telephone in a

09:52  5    computer has been around for decades.  If that's what

09:52  6    the invention is, that's not what here we invented.

09:52  7    And it's important to keep that in mind as we go

09:52  8    through this.

09:52  9                What they actually accuse is a very

09:52  10   specific way of doing that, and we'll talk about that a

09:52  11   little bit more later.

09:52  12               Now, I've done a lot of talking here,

09:52  13   obviously.  But I'm not the important person here.  And

09:52  14   what I say, again, is not evidence.

09:52  15               Who's important?  The Cisco witnesses are

09:52  16   important.  And I want to introduce them to you.

09:52  17               This week you'll hear from Mr. Amit

09:52  18   Barave.  Mr. Barave has a master's from the University

09:52  19   of California and is a vice president of product

09:52  20   management at Cisco.

09:52  21               He's been the product manager of Webex

09:52  22   for the past ten of his 23 years at Cisco.  And he's

09:53  23   actually currently on a plane from California.  And

09:53  24   he'll testify about the Webex products and the various

09:53  25   features that drive demand for Webex.

09:53  1                Next, you'll hear from Mr. Nathan

09:53  2    Buckles.  Now, he lives just a couple of hours north of

09:53  3    Waco in McKinney.  He has a computer science degree

09:53  4    from the University of Texas at Dallas, and he is a

09:53  5    distinguished engineer who has worked at Cisco for a

09:53  6    quarter of a century.  And he might not have known that

09:53  7    I was going to describe it that way, because it does

09:53  8    sound like a long time.

09:53  9                But for the last decade, he has worked at

09:53  10   Webex, and he is the lead engineer responsible for how

09:53  11   Webex transmits and receives audio and video.

09:53  12               Next, you'll hear from Mr. Aaron Belcher.

09:53  13   He is a principal engineer and the head architect for

09:53  14   Webex.  He has been with Cisco for over two decades and

09:53  15   has been working on Webex specifically for the last ten

09:53  16   years.  He came in from Washington State and is going

09:53  17   to explain how Webex processes audio.

09:53  18               Now, let me take a step back before I

09:53  19   introduce the three industry experts.

09:53  20               It occurred to me, as I was preparing

09:54  21   these little blurbs, that each of these fact witnesses

09:54  22   from Cisco has been at Cisco over two decades and has

09:54  23   ten years of experience on Webex or more.

09:54  24               Now, I think that says something about

09:54  25   Cisco, that you've got these senior engineers and

09:54  1   executives who have spent 20 years at Cisco, who have

09:54  2   stayed there for 20 years, which is somewhat unusual in

09:54  3   this day and age, who are coming to Waco to explain to

09:54  4   you how Webex works.

09:54  5              And who better to do that than somebody

09:54  6   who lived and breathed Webex either on the technical

09:54  7   side or the product management side for ten years?

09:54  8   They're the right people to tell you how Webex works.

09:54  9              Now, you'll also hear from these -- our

09:54  10  industry experts.

09:54  11             Mr. Dean Willis earned his undergrad and

09:54  12  master's in computer science from A&M, and he is a

09:54  13  renowned leader in the area of Voice over IP, which is

09:54  14  VoIP, conferencing and multimedia systems.

09:54  15             Since the early '90s, he's worked with

09:54  16  numerous companies in that field, and he's going to

09:54  17  explain why Webex does not infringe.

09:55  18             You'll also hear from Mr. James Bress, an

09:55  19  electrical engineer with over 40 years of experience in

09:55  20  the relevant technology.  He's designed relevant

09:55  21  systems and tested them throughout the years.

09:55  22             He has traveled from Florida to explain

09:55  23  the technology that came before the '858 patent and why

09:55  24  that that patent was known to those in the art before

09:55  25  it was filed.

09:55  1          Last, but not least, you'll hear from

09:55  2  Ms. Lauren Kindler.  She has a bachelor's in economics

09:55  3  from Tulane and a master's from SMU.  And she's an

09:55  4  expert in the area of economics and patent valuation

09:55  5  for the past two decades.

09:55  6          She's come down from Dallas, and she's

09:55  7  going to explain how the market would value the

09:55  8  '858 patent.  And in addition, the errors, the

09:55  9  fundamental errors in Mr. Bratic's calculation.

09:55  10         So let's turn to the moment for -- to

09:55  11  Paltalk and the '858 patent and what came before.

09:55  12  We're going to shift gears for a moment.

09:55  13         So as you know, the plaintiff here is

09:55  14  Paltalk Holdings, but as Mr. Tribble explained, the

09:56  15  '858 patent came from a company called HearMe.

09:56  16         Now, HearMe was, like many Silicon Valley

09:56  17  startups, a company that rose real fast and fell real

09:56  18  hard in the late '90s and early 2000s.

09:56  19         Paltalk bought the assets of HearMe,

09:56  20  which included everything from servers to patents to

09:56  21  applications to trademarks with domain name for a very

09:56  22  small sum that we'll discuss later because it's

09:56  23  confidential.

09:56  24         Paltalk has been around for 20 years, and

09:56  25  it has acquired a series of companies during that time.

```
09:56   1    I'm sure you'll hear a lot about that.
09:56   2              But here's one thing you won't hear from
09:56   3    Mr. Katz.  You won't hear how Paltalk has used the
09:56   4    patent in any way.  In fact, from the time it was
09:56   5    acquired until Paltalk used it to sue in 2021, the
09:56   6    patent essentially sat on a shelf.
09:56   7              Now, I want to note -- in fact, I should
09:57   8    go back one.  You see five inventors here on the slide.
09:57   9    These are inventors with HearMe.  And none of those
09:57   10   inventors joined Paltalk when they came over.
09:57   11             The inventors didn't come over.  We'll
09:57   12   hear about how they shelved the products.  They had no
09:57   13   role with Paltalk at all going forward.
09:57   14             In fact, no one used the '858 patent at
09:57   15   all, at all until Paltalk pulled it down, dusted it off
09:57   16   in 2021, and asserted it against Cisco.
09:57   17             And speaking of Paltalk's lawsuit, y'all
09:57   18   remember the analogy that Mr. Siegmund used during jury
09:57   19   selection about someone who's using your land?  And you
09:57   20   heard it a little bit again today.
09:57   21             But during jury selection, Mr. Siegmund
09:57   22   said if someone is using your land without permission,
09:57   23   you can go try to talk to them.  You can reason with
09:57   24   them.  And if that doesn't work, then maybe you have to
09:57   25   sue.
```

09:57  1              He contrasted that to a patent case, and

09:57  2    what he said, well, in a patent case, there's no patent

09:58  3    to lease.  You have to sue.

09:58  4              But here's the fact that he glossed over

09:58  5    in that explanation.  He glossed over one key fact.

09:58  6    Paltalk never reached out to Cisco before suing.

09:58  7    Paltalk never sent Cisco a letter.  Paltalk never tried

09:58  8    to negotiate.  Paltalk never picked up the phone.

09:58  9              The first thing that Paltalk did, their

09:58  10   first step, as soon as they dusted off the '858 patent

09:58  11   was run to court, pay the couple-hundred-dollar filing

09:58  12   fee and filed this lawsuit.  It was right as the patent

09:58  13   was about to expire.

09:58  14             Paltalk has never once offered Cisco a

09:58  15   license, but today Paltalk is asking you to award it

09:58  16   $100 million.

09:58  17             So we talked a bit about how the

09:58  18   '858 patent came to be, as much as we know anyway,

09:58  19   because we're not going to hear from the HearMe

09:58  20   inventors.  They're not coming here this week.

09:58  21             But let's talk about what was happening

09:58  22   in the industry before the '858 patent and why that

09:58  23   patent is invalid.

09:59  24             Now, I recall you saw the patent video

09:59  25   earlier.  You've heard about the role of the USPTO and

| | | |
|---|---|---|
| 09:59 | 1 | the examining patent applications. |
| 09:59 | 2 | So you may wonder, as I would if I were |
| 09:59 | 3 | in your shoes, how is it that the USPTO can issue a |
| 09:59 | 4 | patent -- it's that nice stamp, that gold stamp that |
| 09:59 | 5 | people hang on the wall -- and then a jury comes in and |
| 09:59 | 6 | invalidates that patent.  How could that happen? |
| 09:59 | 7 | Well, that's why we have jury trials. |
| 09:59 | 8 | That is the job of the jury.  A defendant who's accused |
| 09:59 | 9 | of infringement has the right by law to come to a jury |
| 09:59 | 10 | and say, this patent shouldn't have issued in the first |
| 09:59 | 11 | place. |
| 09:59 | 12 | And why might that happen?  Well, that |
| 09:59 | 13 | might happen because people make mistakes.  You've got |
| 09:59 | 14 | a human being, an examiner.  It's not AI.  It's not a |
| 09:59 | 15 | bot.  You've got a human being sitting there examining |
| 09:59 | 16 | the patent, and they make mistakes.  They overlook |
| 09:59 | 17 | things.  No process is perfect.  And so that is why we |
| 09:59 | 18 | have a system where the jury takes another look. |
| 09:59 | 19 | Now, you also might remember from the |
| 09:59 | 20 | patent video that you can't just -- the patent can't |
| 10:00 | 21 | just be something that's obvious to people of skill in |
| 10:00 | 22 | the art.  Right?  It can't be something that was |
| 10:00 | 23 | already known. |
| 10:00 | 24 | And I mentioned Mr. Bress earlier.  He's |
| 10:00 | 25 | been in this industry for decades.  And he will tell |

10:00   1   you that what Paltalk claims was new was already new in

10:00   2   the industry before HearMe filed this application.

10:00   3                   And he's going to talk to you about

10:00   4   Mr. Botzko and Mr. Botzko's team and this patent right

10:00   5   here, the Botzko patent.

10:00   6                   Now, there's no dispute that the Botzko

10:00   7   came almost three years before the '858 patent.  That's

10:00   8   just not something that can -- it came way before.

10:00   9                   And so the question is:  What did the

10:00   10   Botzko patent disclose?  And as you'll hear from

10:00   11   Mr. Bress, what the Botzko patent did is it talked

10:00   12   about having a call with devices like telephones and

10:00   13   computers on a local area network at the same time.

10:00   14                   And it also talked -- and I don't want to

10:00   15   get too far in the weeds here -- about how you process

10:00   16   the data to allow those two things to happen

10:01   17   simultaneously.  That is what you're going to hear from

10:01   18   Mr. Bress, and you're going to hear how Botzko came

10:01   19   first.

10:01   20                   Now, let's turn to the '858 patent,

10:01   21   stepping away from Botzko a minute.  Let's go to the

10:01   22   '858 patent.

10:01   23                   Paltalk's counsel described that to you a

10:01   24   moment ago, and you heard a lot about using computers

10:01   25   and telephones to participate in an audioconference.  I

10:01   1   think he used the term "VoIP" and "PSTN."

10:01   2              You may have the impression that the

10:01   3   invention at issue is simply allowing an

10:01   4   audioconference with computers and telephones.  But

10:01   5   that -- that idea, allowing a telephone conference with

10:01   6   telephones and computers, was known long before the

10:01   7   '858 patent.  The '858 patent is something much more

10:01   8   specific than that.  They did not get a patent on just

10:01   9   allowing a phone and a computer to have an

10:01   10  audioconference.

10:01   11             And so before I walk through the patent,

10:01   12  I want to show you a little animation that I prepared

10:02   13  that I think explains it.

10:02   14             Now, I want to be clear here.  Again, as

10:02   15  we've said, these are my words.  You should look at the

10:02   16  patent claim.  I prepared this animation because I

10:02   17  think it helps explain what's going on because the

10:02   18  claim, as Mr. Tribble said, is a mouthful.  But

10:02   19  obviously the words of the patent are what govern here.

10:02   20             So what do I have here on Slide 27?  I

10:02   21  have an animation that shows two users at the top in

10:02   22  green on the left and the right who are what we call

10:02   23  VoIP users.  They've got some kind of a computing

10:02   24  device, whether it's a computer, computer phone,

10:02   25  et cetera.  And then on the bottom, I have two PSTN

| | | |
|---|---|---|
| 10:02 | 1 | users.  They're using the old-school telephones.  In |
| 10:02 | 2 | fact, one of those is like a rotary phone that has that |
| 10:02 | 3 | super satisfying, you know, noise when you slam it down |
| 10:02 | 4 | back when you could hang up on people. |
| 10:02 | 5 | Now, let's walk through what the patent |
| 10:02 | 6 | is talking about.  This is an overview of Claim 1.  For |
| 10:02 | 7 | the users that are participating by VoIP, what's |
| 10:02 | 8 | happening -- and this is a summary.  This is not the |
| 10:02 | 9 | language of the claim -- is that the patent's saying |
| 10:03 | 10 | you multiplex all active speakers' data into a |
| 10:03 | 11 | multiplexed stream.  I understand that's a mouthful. |
| 10:03 | 12 | What does that mean? |
| 10:03 | 13 | When you think about multiplexing, one |
| 10:03 | 14 | way to think about it -- and again, you could view the |
| 10:03 | 15 | words of the patent, but one way to think about that is |
| 10:03 | 16 | coupling together multiple audio streams into a flow of |
| 10:03 | 17 | data.  You can think of it that way.  But again, the |
| 10:03 | 18 | claim words are what matter. |
| 10:03 | 19 | So the claim is telling us, multiplex all |
| 10:03 | 20 | active speakers into a multiplexed stream and then send |
| 10:03 | 21 | that to all VoIP users.  That's Claim 1. |
| 10:03 | 22 | It is the same process for users who are |
| 10:03 | 23 | participating by telephone, except it's called a |
| 10:03 | 24 | combined packet.  It's, you know, a different technical |
| 10:03 | 25 | formulation, but that's the process.  Is you gather |

—64—

10:03  1    together all the audio from the active speakers, you

10:03  2    put it in a stream, you send it to all of the VoIP

10:03  3    users.  Same thing on the bottom.

10:03  4            So why is this old patent that nobody's

10:03  5    ever used relevant to Webex?  Well, the short answer is

10:04  6    it's not, but let me share with you why.  And Cisco

10:04  7    witnesses will explain and the evidence will

10:04  8    demonstrate, Webex just doesn't work in the specific

10:04  9    way claimed by the patent.

10:04  10           Now, that brings me to the burden of

10:04  11   proof.  You saw a scale with a feather on it.  I would

10:04  12   submit that you should listen to the Judge's

10:04  13   instruction on what the preponderance of the evidence

10:04  14   means and not be overly influenced by an animation with

10:04  15   a feather on it.  But Paltalk's counsel did tell you

10:04  16   about the preponderance of the evidence.

10:04  17           Now, this is important.  What that does

10:04  18   not mean is that you can simply show more than half the

10:04  19   claim elements are met.  You saw Claim Elements No. 1

10:04  20   through 8 in Mr. Tribble's presentation.  Preponderance

10:04  21   of the evidence doesn't mean there's five of them.

10:04  22           What preponderance of the evidence means

10:04  23   is that you have to believe it is more likely or not

10:04  24   that Webex has every single one of those eight claim

10:04  25   elements in Claim 1.  That is what this means.  The law

| 10:04 | 1 | requires Paltalk to prove that for every single |
| 10:05 | 2 | element. |
| 10:05 | 3 | So I'm going to -- that's an abstract |
| 10:05 | 4 | concept. I'm a very visual person, as you may have |
| 10:05 | 5 | been able to tell. So I'm going to show you what I |
| 10:05 | 6 | mean with a sample claim. |
| 10:05 | 7 | So we've got a sample claim up here on |
| 10:05 | 8 | Claim -- on Slide 29. Somebody's got a patent on a |
| 10:05 | 9 | soccer ball. There are four elements on that. There's |
| 10:05 | 10 | eight elements in Claim 1 that we're talking about |
| 10:05 | 11 | here, but in this sample there's four. It is made of |
| 10:05 | 12 | leather, it is stitched together, it is filled with |
| 10:05 | 13 | compressed air, and it is spherical. That is your |
| 10:05 | 14 | patent on a soccer ball. |
| 10:05 | 15 | THE COURT: Counsel, you've got ten |
| 10:05 | 16 | minutes left. |
| 10:05 | 17 | MS. PIEPMEIER: Thank you, Your Honor. |
| 10:05 | 18 | Now, they're trying to sue a football |
| 10:05 | 19 | company, makes a football and the football might have |
| 10:05 | 20 | three of those elements, right? It's made of leather, |
| 10:05 | 21 | it's stitched together, and it's filled with compressed |
| 10:05 | 22 | air. But it's oval. In that situation, that is not |
| 10:05 | 23 | the preponderance of the evidence. That is no |
| 10:05 | 24 | infringement. |
| 10:05 | 25 | And I want to be clear here. What I am |

| | | |
|---|---|---|
| 10:05 | 1 | saying -- you should listen to Judge Albright's |
| 10:05 | 2 | instructions, but what I am saying here is not attorney |
| 10:05 | 3 | argument.  That is what the law requires.  You have to |
| 10:06 | 4 | prove by a preponderance of the evidence for each of |
| 10:06 | 5 | the elements of the claim. |
| 10:06 | 6 | Now, here is Claim 1.  I've color-coded |
| 10:06 | 7 | it a little bit.  I want to be clear:  My summary is |
| 10:06 | 8 | not the claim language.  It is for convenience. |
| 10:06 | 9 | But what Claim 1 is talking about here, |
| 10:06 | 10 | just at the highest level, is that the system is |
| 10:06 | 11 | receiving audio from each client.  The system is |
| 10:06 | 12 | determining which clients are kind of the old-school |
| 10:06 | 13 | telephone ones and which ones are the computer ones. |
| 10:06 | 14 | The system is determining which of them are active |
| 10:06 | 15 | speakers.  And then the system is creating -- we saw |
| 10:06 | 16 | that multiplexed stream earlier -- and sending it to |
| 10:06 | 17 | all users' devices that connects audio, and then it's |
| 10:06 | 18 | doing the same thing for the devices that cannot |
| 10:06 | 19 | use audio, plain old telephones, but it's putting them |
| 10:06 | 20 | into a packet. |
| 10:06 | 21 | That is essentially what's happening in |
| 10:06 | 22 | Claim 1.  So again, look at the claim language.  My |
| 10:07 | 23 | summary is for convenience and just to make it easier. |
| 10:07 | 24 | But here's the problem for Paltalk. |
| 10:07 | 25 | Webex never sends a multiplexed stream to all clients |

—67—

| | | |
|---|---|---|
| 10:07 | 1 | who can mix, as required by Limitation 6.  They also |
| 10:07 | 2 | don't do the combined packet for Limitation 8.  And for |
| 10:07 | 3 | good reason.  That may have worked 25 years ago, but |
| 10:07 | 4 | Webex has a much more advanced way of doing it.  Now, |
| 10:07 | 5 | the Cisco witnesses I just spent all this time bragging |
| 10:07 | 6 | on, they're going to explain it better because this is |
| 10:07 | 7 | what they do.  Here's a quick summary. |
| 10:07 | 8 | Instead of creating a multiplexed stream |
| 10:07 | 9 | and sending it to everyone, Webex creates a unique |
| 10:07 | 10 | stream for each participant, and that allows Webex to |
| 10:07 | 11 | optimize the audio for everyone.  You couldn't do that |
| 10:07 | 12 | 20 years ago.  20 years ago we had dial-up modems. |
| 10:07 | 13 | This is a whole different situation.  Webex shouldn't |
| 10:07 | 14 | and doesn't want to operate the way things could have |
| 10:07 | 15 | been 20 years ago. |
| 10:07 | 16 | Now, I want to mention one other thing, |
| 10:07 | 17 | which is, that I just talked about Claim 1.  I'm |
| 10:08 | 18 | obviously running out of time, as Judge Albright just |
| 10:08 | 19 | mentioned, so I'm not going to go through the dependent |
| 10:08 | 20 | claim.  I'm just going to mention one thing about them. |
| 10:08 | 21 | The way -- you will be instructed by |
| 10:08 | 22 | Judge Albright and you should listen to him, but the |
| 10:08 | 23 | way this works is if a defendant, if Cisco does not |
| 10:08 | 24 | infringe Claim 1, they cannot as a matter of law |
| 10:08 | 25 | infringe the dependent claims. |

| | | |
|---|---|---|
| 10:08 | 1 | So I've just demonstrated quickly why I |
| 10:08 | 2 | believe and why Cisco believes it doesn't infringe |
| 10:08 | 3 | Claim 1.  If it doesn't infringe Claim 1, as a matter |
| 10:08 | 4 | of law, it can't infringe Claims 2 through 5. |
| | 5 | In the interest of time, because I'm |
| 10:08 | 6 | running out of time, I will talk about that here, and |
| 10:08 | 7 | I'm sure you guys are not going to be upset to hear a |
| 10:08 | 8 | little bit less from me.  But I wanted to just make |
| 10:08 | 9 | that point that the same argument will hold for the |
| 10:08 | 10 | dependent claims. |
| 10:08 | 11 | Now, I want to address one other thing, |
| 10:08 | 12 | and this goes back to the red flag.  Paltalk's counsel |
| 10:08 | 13 | told you that you should ignore our evidence because |
| 10:08 | 14 | we're essentially contorting the patent in some way. |
| 10:08 | 15 | I want to be clear.  HearMe is the one |
| 10:09 | 16 | who wrote this patent.  HearMe decided what words to |
| 10:09 | 17 | put in the patent.  HearMe chose the word "each."  It's |
| 10:09 | 18 | not Cisco's burden to transform that claim into |
| 10:09 | 19 | something that works.  Paltalk is asserting the patent; |
| 10:09 | 20 | it's their burden.  But what Paltalk doesn't get to do |
| 10:09 | 21 | is change 25 years later the words of that patent. |
| 10:09 | 22 | They don't get to redefine the word "each." |
| 10:09 | 23 | Now, you recall that Paltalk's counsel |
| 10:09 | 24 | put up a slide.  It had an oil rig and "Webex" on it. |
| 10:09 | 25 | You heard this, in fact, at the jury selection as well. |

| | | |
|---|---|---|
| 10:09 | 1 | And they suggest that Cisco is in a sense building its |
| 10:09 | 2 | house, which is Webex, on the Paltalk lot, which is the |
| 10:09 | 3 | '858 patent.  But what's actually going on here is |
| 10:09 | 4 | Paltalk is rewriting the patent.  It's changing the |
| 10:09 | 5 | meaning of a common word in the English language.  And |
| 10:09 | 6 | it's simply building its fence around Webex. |
| 10:09 | 7 | Now, I don't get to move my fence around |
| 10:09 | 8 | someone else's house, accuse them of building on my |
| 10:10 | 9 | lot, and then kick them off their own land.  HearMe |
| 10:10 | 10 | made a contract.  It negotiated the claims with the |
| 10:10 | 11 | U.S. government through the patent prosecution process, |
| 10:10 | 12 | and more than 20 years later, Paltalk doesn't get a |
| 10:10 | 13 | redo on those terms because they don't capture Webex. |
| 10:10 | 14 | Now, let's talk about the 102 million |
| 10:10 | 15 | that brings me to today.  The evidence will show that |
| 10:10 | 16 | Cisco does not infringe Paltalk's patents.  So it's our |
| 10:10 | 17 | hope that you don't reach the issue of damages.  But |
| 10:10 | 18 | this is a large damages ask, and I think it's important |
| 10:10 | 19 | to address it at least briefly. |
| 10:10 | 20 | Ms. Kindler's going to explain to you why |
| 10:10 | 21 | this large demand simply doesn't reflect the market |
| 10:10 | 22 | value of this antiquated technology, this old-school |
| 10:10 | 23 | technology from the days of dial-up modems.  As I |
| 10:10 | 24 | mentioned, Paltalk bought the assets of an entire |
| 10:10 | 25 | company, HearMe, for a very small amount, and we'll |

10:10  1    discuss that later.  We're all very familiar with

10:10  2    property that depreciates in value and certainly with

10:11  3    inflation these days.

10:11  4              But the evidence will show that 102

10:11  5    million is simply not a realistic market value for a

10:11  6    license to a patent that Paltalk bought as just one of

10:11  7    a part of a portfolio along with source codes,

10:11  8    trademark, and computer equipment.  The expired patent

10:11  9    simply didn't contribute anything valuable.  It's not a

10:11  10   coincidence that it sat on the shelf for more than

10:11  11   15 years.

10:11  12             And so Ms. Kindler will walk you through

10:11  13   her analysis which demonstrates what the market would

10:11  14   have valued the specific invention of the '858 patent

10:11  15   to arrive at a fair license.  She will also explain in

10:11  16   detail why Mr. Bratic's analysis grossly inflates any

10:11  17   negligible value of this whole technology.

10:11  18             So that brings me to my summation.  And I

10:11  19   want to thank you for your attention during the last

10:11  20   30 minutes.  I want to thank you for serving and doing

10:11  21   your civic duty this week.  I'm going to close here

10:11  22   with three thoughts that I hope to revisit with you

10:11  23   when the evidence closes.

10:11  24             First, the evidence will show that Cisco

10:12  25   does not infringe the asserted patent because Webex is

—71—

| | | |
|---|---|---|
| 10:12 | 1 | missing two key elements, at least two key elements. |
| 10:12 | 2 | But I didn't have a chance to cover all of them this |
| 10:12 | 3 | morning. |
| 10:12 | 4 | Second, Cisco will show by clear and |
| 10:12 | 5 | convincing evidence that the asserted claims are |
| 10:12 | 6 | invalid because they were obvious in light of the |
| 10:12 | 7 | Botzko reference.  And for these reasons, Paltalk |
| 10:12 | 8 | should not be awarded any damages. |
| 10:12 | 9 | Thank you very much for listening. |
| 10:12 | 10 | THE COURT:  Thank you, ma'am. |
| 10:12 | 11 | First witness? |
| 10:12 | 12 | MR. TRIBBLE:  Your Honor, Paltalk calls |
| 10:12 | 13 | Mr. Jason Katz. |
| 10:12 | 14 | Oh, Your Honor, at this time we would |
| 10:12 | 15 | like to invoke the rule. |
| 10:12 | 16 | THE COURT:  It'll be done. |
| 10:12 | 17 | (The witness was sworn.) |
| 10:13 | 18 | DIRECT EXAMINATION |
| 10:13 | 19 | BY MS. MAGEE: |
| 10:13 | 20 | Q.   Good morning, sir. |
| 10:13 | 21 | Please introduce yourself to the jury. |
| 10:13 | 22 | A.   Good morning, everybody.  My name's Jason |
| 10:13 | 23 | Katz.  I'm the chairman and CEO of Paltalk. |
| 10:13 | 24 | Q.   Mr. Katz, have you been with us since opening? |
| 10:13 | 25 | A.   I have. |

| | | |
|---|---|---|
| 10:13 | 1 | Q.    Okay.  And where do you currently live? |
| 10:13 | 2 | A.    I live in Long Island, New York. |
| 10:13 | 3 | Q.    Have you been to Texas before? |
| 10:13 | 4 | A.    Many times.  Yes. |
| 10:13 | 5 | Q.    Okay.  Tell the jury a little bit about your |
| 10:14 | 6 | background. |
| 10:14 | 7 | A.    My background is I was born and raised in |
| 10:14 | 8 | New York City, not a great place, for me, anyway.  I |
| | 9 | like the suburbs better. |
| 10:14 | 10 | My education, I went to high school, public |
| 10:14 | 11 | high school in Long Island. |
| 10:14 | 12 | I then went to the University of Pennsylvania |
| 10:14 | 13 | in Philadelphia. |
| 10:14 | 14 | After that I went to law school, New York |
| 10:14 | 15 | University Law School. |
| 10:14 | 16 | Got married 1992.  Been married 32 years.  I |
| 10:14 | 17 | have three kids and a new grandson. |
| 10:14 | 18 | And then I started Paltalk in 1998, and I've |
| 10:14 | 19 | been working on that earnestly ever since. |
| 10:14 | 20 | Q.    Okay.  Mr. Katz, you mentioned that you went |
| 10:14 | 21 | to law school. |
| 10:14 | 22 | Are you currently a practicing attorney? |
| 10:14 | 23 | A.    I am not. |
| 10:14 | 24 | Q.    Did you take the bar exam after law school? |
| 10:14 | 25 | A.    I took the bar exam.  I passed the bar exam. |

—73—

10:14  1    I was admitted to practice in New York but then retired

10:14  2    from the law.

10:14  3        Q.    Okay.  And what did you do after graduating

10:15  4    from law school?

10:15  5        A.    After law school, I had -- I had an economics

10:15  6    degree in college.  So I was sort of business-facing.

10:15  7    I went to law school.  For me, I thought it was a great

10:15  8    education.  My father had done that also.  And he was a

10:15  9    nonpracticing attorney.  So I thought it'd be a great

10:15  10   background.

10:15  11       I had a chance to go into business with sort

10:15  12   of someone I knew in New York.  And we formed a small

10:15  13   company.  It's here on the screen called M.J. Capital.

10:15  14   It was a commodity and stock brokerage company.  I did

10:15  15   that for five years.

10:15  16       Q.    Okay.  And why did you leave M.J. Capital,

10:15  17   sir?

10:15  18       A.    In 1993, I mentioned I was married in '92, and

10:15  19   we had a child in 1993.  She was born quite ill.  Ill

10:15  20   and spending time in ICU for a period of time, which

10:16  21   had a huge impact on me personally and sort of didn't

10:16  22   feel like I could go back to doing what I was doing

10:16  23   before.

10:16  24       I actually considered going to medical school,

10:16  25   if you can believe that, after all of that, watching

—74—

10:16  1    what the doctors did with those, you know, newborns.

10:16  2            So ultimately, M.J., J, that's me, and M went

10:16  3    his way, the one other person we employed.  And then I

10:16  4    moved on to something else.

10:16  5    Q.    Okay.  What did you do next?

10:16  6    A.    Well, next, I actually got a job taking care

10:16  7    of a computer network.  And in 1993, I mentioned my

10:16  8    daughter was born in 1993, in April.  So after she came

10:16  9    home finally and was settled, I went to work for the

10:16  10   small company.  And I took -- I actually -- you know, I

10:16  11   liked personal computers.

10:16  12           I liked the Internet in the very early days.

10:17  13   And I took care of the computer network.  You know, it

10:17  14   was newly connected.  It was sort of an antiquated

10:17  15   network, but it needed printers.  It needed software on

10:17  16   everybody's computer.  It needed to be backed up.  And

10:17  17   it even needed to be connected to the Internet for

10:17  18   various updates to the hardware and everything and

10:17  19   software.  And that's what I did.

10:17  20   Q.    Okay.  And what interested you about those

10:17  21   early computers, Mr. Katz?

10:17  22   A.    Yeah.  I was in college when the first PC

10:17  23   arrived in 1984.  Very rudimentary, floppy disks, very

10:17  24   large five-and-a-quarter floppy disks.  Didn't do much.

10:17  25           But I thought it was very interesting.  I got

10:17  1    into spreadsheets early on.  So I just -- I thought

10:17  2    that the technology was really advancing, and I saw the

10:17  3    Internet come and sort of led me along the way to end

10:17  4    up starting Paltalk.

10:17  5        Q.    Mr. Katz, what was your experience with

10:18  6    computers in your personal life at this time?

10:18  7        A.    I got -- I got a computer when I went to law

10:18  8    school actually in 1985.  That was the first one I had.

10:18  9    Before that I was typing papers on a typewriter.  I'm

10:18  10   sure a lot of people were.  So that was a leap forward

10:18  11   for me.  So I always had a personal computer after

10:18  12   that.

10:18  13            And then, you know, at M.J. we had computers

10:18  14   as well, and I had facility with them.  And then, you

10:18  15   know, the job from 1993 to 1998, constantly upgrading

10:18  16   the hardware and software that was at my job.

10:18  17       Q.    Did you use computers to communicate in any

10:18  18   way?

10:18  19       A.    Yeah.  We did.  I did.  So I was an AOL

10:18  20   customer.  I guess a lot of people were, America

10:18  21   Online.  It feels like some people thought AOL was the

10:18  22   Internet.  You know, they sent the CDs around.  I don't

10:18  23   know if anybody remembers that.  But they would mail

10:19  24   them to your house literally.

10:19  25            So that's the way I connected initially, and

—76—

10:19  1   they had a really cool feature which was called AOL IM.

10:19  2   So you could instant-message people.  You got a little

10:19  3   buddy list.  You could define who was on it, friends,

10:19  4   family, whoever.

10:19  5        And it was, to me, pretty revolutionary.  I

10:19  6   didn't have to coordinate talking to a cousin that was

10:19  7   in another country or friends and family.  And if they

10:19  8   were online, we could -- you could chat.  So I did

10:19  9   that.

10:19  10      Q.    Okay.  Mr. Katz, were you able to

10:19  11  voice-communicate at this time?

10:19  12      A.    Well, so AOL certainly didn't have the

10:19  13  capacity to do that, and so one particular day I was

10:19  14  text-chatting and it was 1998.  My -- I have -- we have

10:19  15  three kids.  So my bigger son was two years old, and I

10:19  16  was typing, texting, by AOL IM.  And my two-year-old --

10:20  17  and we all know two-year-olds.  He just jumped on me,

10:20  18  and I literally couldn't type.

10:20  19        I'm like trying to type and I couldn't, and I

10:20  20  had sort of a eureka moment, was, why am I not talking

10:20  21  instead of typing?

10:20  22        And, you know, I was surprised.  I researched

10:20  23  that idea and nobody was doing it.  There was no

10:20  24  product that -- the big presence of that instant

10:20  25  messaging is important because there was a presence

10:20  1   manager.  You knew when someone was talking.

10:20  2          So there weren't -- nobody was doing it.  I

10:20  3   decided to try and do it myself.  And I was 35 years

10:20  4   old.  I just had -- we had our third child who was just

10:20  5   born, and I've been working at this ever since.

10:20  6   Q.    Okay.  And, sir, did these ideas lead to the

10:20  7   formation of Paltalk?

10:20  8   A.    100 percent they did.  So, you know, when that

10:20  9   happened and I did the research, I decided to start a

10:20  10  company to produce my software that basically looked

10:21  11  just like that AOL Instant Messenger, but the deep

10:21  12  thought would be to talk to someone you clicked on.

10:21  13         Of course you need a microphone.  Of course

10:21  14  you need speakers.  I heard that it was a dial-up

10:21  15  world.  That's true.  That's how we all connected, with

10:21  16  that screechy sound.  But what was great about it was

10:21  17  it enabled you to talk to people worldwide for free.

10:21  18         Okay.  Everybody knows just how expensive long

10:21  19  distance is, international calling.  If you go online

10:21  20  with the Internet, you could talk to anybody in the

10:21  21  world worldwide.

10:21  22         So fortunately for me, I knew somebody who

10:21  23  produced some coding.  I don't do any coding.  I don't

10:21  24  know how to code.  And then he knew somebody who also

10:21  25  knew.  And basically, I had three people.  One to do

—78—

10:21  1   the service side of the software, one person to do the

10:21  2   client side of the software, and one person to make a

10:22  3   web page.  And we worked that way, you know, through

10:22  4   1998 and launched the first version of the software in

10:22  5   January 1999.

10:22  6      Q.   Okay.  Mr. Katz, I'm going to back up for a

10:22  7   second.

10:22  8           When did you form the Paltalk company?

10:22  9      A.   Yeah.  1998.  Sort of right after my son

10:22  10  jumped on me, I knew that it would be a good idea to

10:22  11  make it a corporation.  And, you know, I didn't raise

10:22  12  money from anybody.

10:22  13          And people didn't work full time either.  They

10:22  14  all had full-time jobs.  Everybody that was working on

10:22  15  this project with me in 1998 had a day job, and they

10:22  16  worked on this at night.  And we'd meet once a week to

10:22  17  do it.

10:22  18          So I started and I formed the company in '98.

10:22  19  First software was January of 1999.

10:22  20     Q.   Okay.  Mr. Katz, how many employees did you

10:22  21  start out with in 1998?

10:22  22     A.   Zero.  Just self -- I was -- as I just

10:22  23  described, everybody had a job.  They were just working

10:23  24  and paying them literally by the hour as an extra

10:23  25  moneymaker for them.

10:23   1       Q.    And how many employees does Paltalk have

10:23   2   today?

10:23   3       A.    We have 17 right now.

10:23   4       Q.    Is Paltalk profitable?

10:23   5       A.    Paltalk's -- I mean, I've been in business

10:23   6   since 1999.  So Paltalk has historically been

10:23   7   profitable.  Otherwise, I wouldn't be here, is what I

10:23   8   would say.  It's not easy running a business.

10:23   9              In 2016, after, you know, 18 years of this, we

10:23  10   decided to merge the company into a small public

10:23  11   company.  The biggest reason for that was people had

10:23  12   invested in 1999 and 2000, after we grouped and we

10:23  13   really didn't talk about it, but I put the software on

10:23  14   the Internet.

10:23  15              There's a website called download.com.  People

10:23  16   could go there and download software.  It was free.  So

10:23  17   I have to say, I was mildly surprised.  A lot of people

10:23  18   did download the software, and it just started to

10:24  19   spread because they realized they could talk for free

10:24  20   worldwide using their Internet connection.

10:24  21              So off of that, I did raise some money and the

10:24  22   next year raised some money again.  And all those

10:24  23   investors from 1999, which is thousands, they never

10:24  24   were able to sell any shares to the company even though

10:24  25   I'd been around such a long time.

10:24  1          So we merged into a public company.  It was a

10:24  2    small public company.  We were 80 percent of a new

10:24  3    company, so I could control it.  They had their own

10:24  4    business, very -- it was a dating business, very

10:24  5    complicated, convoluted, bad business, honestly.

10:24  6          So I worked through the problems of trying to

10:24  7    merge the companies, and eventually we did -- I just

10:24  8    sold off that dating business.  Those people went their

10:24  9    own way.  And then we -- what's called up-listed to the

10:24  10   NASDAQ.  So we were in a -- sort of a bulletin board

10:24  11   listing, and we up-listed to the NASDAQ, which is a

10:25  12   national exchange which is where we are now.

10:25  13   Q.    And, Mr. Katz, have the last three quarters

10:25  14   been different with respect to Paltalk's profitability?

10:25  15   A.    Yeah.  They've been difficult.  You know --

10:25  16   you know, I think I pride myself on I'm conservative.

10:25  17   I think that's how we lasted all these years.

10:25  18          I think, you know, as we'll see and we'll talk

10:25  19   about it, you heard and saw in opening, I saw it too,

10:25  20   you know, HearMe was a tremendously successful company.

10:25  21   It had raised ridiculous amounts of money.  Over

10:25  22   $270 million went into HearMe.  They were sort of

10:25  23   the -- you know, the -- by far the industry leader in

10:25  24   what I was trying to do.

10:25  25          And I was -- you know, I was aware of them,

10:25  1   but we were in a different sort of space.  They weren't

10:25  2   doing exactly what I was doing.  It was

10:25  3   audioconferencing related to videoconferencing by

10:25  4   acquiring Webex.

10:25  5        So it's been more difficult, but we have a

10:25  6   good balance sheet.  We have money on our balance

10:26  7   sheet.  So we think with the NASDAQ listing, we're in a

10:26  8   good position moving forward.

10:26  9   Q.   Okay.  Mr. Katz, you saw in opening a slide

10:26  10  with various Paltalk products.

10:26  11       Of these products, which product has the

10:26  12  largest amount of users?

10:26  13  A.   Oh, Paltalk is by far the biggest one.  So

10:26  14  that's the one I started.  And then each of the other

10:26  15  four are other products that I bought over time and

10:26  16  then grew.

10:26  17  Q.   And are these products conferencing products?

10:26  18  A.   So Paltalk and Camfrog and Tinychat are all

10:26  19  videoconferencing products, but they're consumer based.

10:26  20  It's more like people can meet each other around

10:26  21  interests on the Internet, sort of like Facebook groups

10:26  22  but with audio and video.

10:26  23       Vumber is a calling product.  It allows you to

10:26  24  have another phone number on your cell phone, if you

10:27  25  want one, without a SIM, without an extra chip or

10:27    1    anything.  I bought that 12 or 14 years ago.

10:27    2            And ManyCam is a neat one; we bought that a

10:27    3    couple of years ago.  It enables you to just change the

10:27    4    background on your camera.  So say you're at work and

10:27    5    you want to have your work background.  Say you're at

10:27    6    home and you have a different background.  Say you

10:27    7    don't want any of those backgrounds you just want to

10:27    8    show mountains behind you, you can do all of that.  And

10:27    9    that was a very good fit for our other video chat

10:27    10   products.

10:27    11   Q.    Okay.  Mr. Katz, I want to take a look at the

10:27    12   Paltalk product in particular.

10:27    13           Is this an image of a Paltalk chat room?

10:27    14   A.    It is.

10:27    15   Q.    Okay.  Walk me through this image.

10:27    16   A.    So the way we implemented this, again,

10:27    17   very -- you know, it's different.  It's a consumer

10:27    18   product.  It's where people are sort of meeting each

10:27    19   other.  And they can do it with voice, they can do it

10:27    20   with video.  And they can do it in much larger groups.

10:28    21   So I think 50, even 100, 150 can be in a conference.

10:28    22           People choose if they want to be on camera;

10:28    23   they don't have to be.  People choose if they want to

10:28    24   view other people; they don't have to.  And then you

10:28    25   can type.  So there's a text scroll that runs through

10:28  1    the product; you can see that sort of in the middle.

10:28  2    And, you know, that's sort of the way it works.

10:28  3         And it has worked more or less that way for a

10:28  4    long time.  Difference is, we've been -- really

10:28  5    improved the quality of the audio, the quality of the

10:28  6    video.  The hands-free.  You can hands-free now; you

10:28  7    don't have to touch any buttons.  And yeah, it's a

10:28  8    pleasant -- it's a pleasant way to interact with it.

10:28  9         We also introduced a few games, so if you want

10:28  10   to play backgammon with somebody, you can play

10:28  11   backgammon.  If you want to play chess.  So honestly,

10:28  12   I'm very proud of it.  It's been around 25 years, and

10:28  13   it came out of my head.

10:29  14   Q.    Okay.  And how do users join a Paltalk chat

10:29  15   room?

10:29  16   A.    They go to the website, Paltalk.com.  They

10:29  17   download the piece that accompanied our software, and

10:29  18   then they have to install that program on their

10:29  19   computer.  They can also do it with a smartphone, with

10:29  20   an Android or an Apple phone and go to the App Store.

10:29  21   Q.    And how many people use Paltalk chat rooms in

10:29  22   a given year?

10:29  23   A.    Total across everything is probably a million,

10:29  24   million and a half now.  But it's -- you know, I've

10:29  25   been -- I've been around a long time.  It's been

| | | |
|---|---|---|
| 10:29 | 1 | downloaded more than 200 million times and in 150 |
| 10:29 | 2 | countries.  We vocalized the software into other |
| 10:29 | 3 | languages.  When we started, I didn't think -- really |
| 10:29 | 4 | didn't think about it.  It just was English.  The world |
| 10:29 | 5 | doesn't only speak English; the world speaks a lot of |
| 10:29 | 6 | things.  So unless you show it to them in their |
| 10:29 | 7 | language, they're never going to use the software.  But |
| 10:29 | 8 | that's why we have people, users all over the world. |
| 10:30 | 9 | THE COURT:  Counsel, would this be a good |
| 10:30 | 10 | time to break? |
| 10:30 | 11 | MS. MAGEE:  Yes, Your Honor. |
| 10:30 | 12 | THE COURT:  Ladies and gentlemen of the |
| 10:30 | 13 | jury, we're going to take our morning recess. |
| 10:30 | 14 | I have a couple of instructions for you |
| 10:30 | 15 | that I'm going to spell out now.  And from now on, |
| 10:30 | 16 | after now I'm going to say, just remember my |
| 10:30 | 17 | instructions, what they are. |
| 10:30 | 18 | Number one, you're not to talk about the |
| 10:30 | 19 | case with each other or anyone else.  When you get home |
| 10:30 | 20 | tonight, obviously, if your spouse says where were you, |
| 10:30 | 21 | you were in court.  But we want you to come to the |
| 10:30 | 22 | resolution of this case only after you've heard all the |
| 10:30 | 23 | evidence.  So this week, you can talk about college |
| 10:30 | 24 | football or whatever it is you all talk about -- I've |
| 10:30 | 25 | never been on a jury -- but not the case. |

| | |
|---|---|
| 10:30 | 1 |
| 10:30 | 2 |
| 10:30 | 3 |
| 10:30 | 4 |
| 10:30 | 5 |
| 10:30 | 6 |
| 10:31 | 7 |
| 10:31 | 8 |
| 10:31 | 9 |
| 10:31 | 10 |
| 10:31 | 11 |
| 10:31 | 12 |
| 10:31 | 13 |
| 10:31 | 14 |
| 10:31 | 15 |
| 10:31 | 16 |
| 10:31 | 17 |
| 10:31 | 18 |
| 10:31 | 19 |
| 10:31 | 20 |
| 10:31 | 21 |
| 10:32 | 22 |
| 10:32 | 23 |
| 10:32 | 24 |
| 10:32 | 25 |

Number two, I understand from my college-aged sons there's something called social media.  I'm unfamiliar with it myself.  But if you're on it, that's fine.  Please don't post anything about the trial while you're sitting on the jury.

Finally, we've already heard some interesting information.  We want you to formulate your decisions based on what you hear in the courtroom.  Please don't do any independent research on someone you may see on the witness stand or something you may hear about.  You've heard about VoIP, and you say, I need to know more about VoIP.  The lawyers are going to do a very good job of explaining what that means, so please don't do any independent research.

And I'm done preaching to you.

So we'll be in recess for 10 to 15 minutes, and then we'll come back in and we'll resume with this witness.

THE BAILIFF:  All rise.

(Jury exited the courtroom.)

THE COURT:  Anything we need to take up?

MR. TRIBBLE:  Not right now, Your Honor.

MS. PIEPMEIER:  Not at this time, Your Honor.

(Recess taken.)

10:48  1                    THE BAILIFF:  All rise.

10:48  2                    THE COURT:  Please remain standing for

10:48  3    the jury.

10:48  4                    (Jury entered the courtroom.)

10:48  5                    THE COURT:  Thank you.  You may be

10:48  6    seated.

10:48  7                    Thank you.  You may be seated.

10:49  8    BY MS. MAGEE:

10:49  9        Q.    Mr. Katz, are you ready to resume?

10:49  10       A.    Yes.

10:49  11       Q.    Before the break, you took us through the

10:49  12   early days of Paltalk.

10:49  13             Who funded the development of the first

10:49  14   Paltalk product?

10:49  15       A.    I did for that first year.

10:49  16       Q.    And once Paltalk launched its initial

10:49  17   software, was that product successful?

10:49  18       A.    I think it was successful.  As I said, it

10:49  19   was -- we put it on the site called download.com, which

10:49  20   was a free software site that anyone could go to and

10:49  21   was downloaded, I think, 20,000 times in the first

10:49  22   couple of months it was available.

10:49  23       Q.    And did Paltalk add video capabilities at some

10:49  24   point?

10:49  25       A.    We did.  We -- I always imagined video.  As I

—87—

10:50  1    pointed out, it was a dial-up world.  Cameras weren't

10:50  2    available very much, not a lot of bandwidth.  But by

10:50  3    2001, so two and a half, two years after I launched a

10:50  4    first version, we put video in.

10:50  5         Q.    Okay.  And why the addition of the video?

10:50  6         A.    I think most people would agree it's just nice

10:50  7    to be able to see people as well as hear them.

10:50  8         Q.    Okay.  And since the initial product, has

10:50  9    Paltalk revised its product offering?

10:50  10        A.    Constantly.  We've had to do that.  Obviously

10:50  11   it's a competitive world, so many other softwares out

10:50  12   there, so many other things to do.  So we've made the

10:50  13   audio better and better, and we've made video better

10:50  14   and better.  The initial video was like cartoon frames

10:50  15   refreshing literally.  I mean, you could see something,

10:50  16   but it wasn't like it is now, which is, you know, a

10:50  17   very nice image.

10:50  18             We also made it hands free so you don't have

10:50  19   to touch any buttons.  And we put the games in as well

10:51  20   so you could play games with other people.  So at that

10:51  21   point...

10:51  22        Q.    Okay.  Mr. Katz, who is the plaintiff in this

10:51  23   case?

10:51  24        A.    Paltalk Holdings, Inc.

10:51  25        Q.    And what's the relationship between Paltalk

| 10:51 | 1 | Holdings, Inc. and Paltalk, Inc.? |
| 10:51 | 2 | A.    So Paltalk, Inc. is the parent company, and |
| 10:51 | 3 | Paltalk Holdings is a subsidiary that I formed when I |
| 10:51 | 4 | bought the patents and patent applications in 2001. |
| 10:51 | 5 | Q.    And who manages Paltalk Holdings? |
| 10:51 | 6 | A.    I do. |
| 10:51 | 7 | Q.    How many patents does Paltalk Holdings have? |
| 10:51 | 8 | A.    Currently nine. |
| 10:51 | 9 | Q.    Okay.  And which Paltalk entity owned the |
| 10:51 | 10 | '858 patent? |
| 10:51 | 11 | A.    Say again? |
| 10:51 | 12 | Q.    Which Paltalk entity owned the '858 patent? |
| 10:51 | 13 | A.    Paltalk Holdings. |
| 10:51 | 14 | Q.    Okay.  Mr. Katz, please turn to the PX-16 tab |
| 10:51 | 15 | in your witness binder, sir. |
| 10:52 | 16 | A.    Okay. |
| 10:52 | 17 | Q.    Have you seen this document before? |
| 10:52 | 18 | A.    Yes. |
| 10:52 | 19 | Q.    What is this document? |
| 10:52 | 20 | A.    This is the '858 patent. |
| 10:52 | 21 | Q.    Okay.  Did the PTO award this patent to |
| 10:52 | 22 | Paltalk Holdings, Inc.? |
| 10:52 | 23 | A.    Yes. |
| 10:52 | 24 | Q.    And does this document set out the PTO's |
| 10:52 | 25 | activities? |

10:52  1         A.    Yes.

10:52  2         Q.    And how do you know that the PTO awarded

10:52  3    Paltalk this patent?

10:52  4         A.    It says United States Patent, and it's got a

10:52  5    number and it's got the date on the patent,

10:52  6    January 27th, 2004.

10:52  7                   MS. MAGEE:  Your Honor, plaintiff offers

10:52  8    PX-16.

10:52  9                   MS. PIEPMEIER:  No objection.

10:52  10                  THE COURT:  Admitted.

10:52  11   BY MS. MAGEE:

10:52  12        Q.    Okay.  Mr. Katz, what's the title of the

10:52  13   '858 patent?

10:52  14        A.    I don't know.  I have to put on my glasses.

10:52  15   Sorry.  Let's see.

10:52  16              Hybrid Server Architecture for Mixing and

10:53  17   Non-mixing Client Conferencing.

10:53  18        Q.    And do you have a general understanding of

10:53  19   what the '858 patent relates to?

10:53  20        A.    I do generally.

10:53  21        Q.    And what is that understanding, sir?

10:53  22        A.    As the patent points out -- and I think you

10:53  23   saw a lot of this morning too -- it is an architecture

10:53  24   whereby computers and phones can interact in the same

10:53  25   conference.  Obviously it's a lot more than that, but,

10:53  1    you know, I'm not a super expert on this.

10:53  2        Q.    Okay.  Sir, please turn to PX-17 in your

10:53  3    witness binder.

10:53  4        A.    Okay.

10:53  5        Q.    Have you seen this document before?

10:53  6        A.    Yes.

10:53  7        Q.    And what is it?

10:53  8        A.    It's an Assignment of title for the

10:53  9    application that was the '858 patent application, and

10:54  10   this was the assignment that came from HearMe to

10:54  11   Paltalk Holdings after we bought the patent and patent

10:54  12   applications.

10:54  13              MS. MAGEE:  Okay.  Plaintiff offers

10:54  14   PX-17.

10:54  15              MS. PIEPMEIER:  No objection.

10:54  16              THE COURT:  Admitted.

10:54  17   BY MS. MAGEE:

10:54  18       Q.    Mr. Katz, does this assignment give Paltalk

10:54  19   the rights to the '858 patent application?

10:54  20       A.    Yes.

10:54  21       Q.    Okay.  And does this document make the

10:54  22   '858 patent the property of Paltalk Holdings, Inc.?

10:54  23       A.    Yes.

10:54  24       Q.    Okay.  And who did Paltalk acquire the

10:54  25   '858 patent application from?

10:54  1      A.     HearMe, Inc.

10:54  2      Q.     And what was HearMe, Inc.?

10:54  3      A.     HearMe, Inc. was a public company in the late

10:54  4  '90s that I was aware of.  As I said, I launched

10:54  5  Paltalk, the first version in the beginning of 1999,

10:55  6  and HearMe was I think already a public company with a

10:55  7  very large amount of investment and a very valuable

10:55  8  market cap in the late '90s, and they were in

10:55  9  audioconferencing.

10:55  10          So I was quite aware of them since I was doing

10:55  11  basically a similar thing.  Not exactly the same thing

10:55  12  but similar.

10:55  13     Q.     Okay.  And did Paltalk have a general

10:55  14  understanding of what HearMe was prior to buying some

10:55  15  of HearMe's assets?

10:55  16     A.     Absolutely.  Yes.

10:55  17     Q.     Okay.  Did you have an understanding of the

10:55  18  kind of products that HearMe offered prior to buying

10:55  19  any of its assets?

10:55  20     A.     Yes.

10:55  21     Q.     And what kind of products did HearMe offer

10:55  22  generally?

10:55  23     A.     They were voice-conferencing products.  So

10:55  24  they had a module that they sold to websites.  So

10:55  25  ESPN -- I'm just making up -- ESPN, CNN, whatever.  And

10:55  1    if you put their module -- installed their module on

10:56  2    your website, the user could come to the website,

10:56  3    download some software, and then you could talk to

10:56  4    other users who had done that.

10:56  5             So it was sort of like we -- what we were

10:56  6    doing, but we were doing it at Paltalk.com.  They were

10:56  7    actually bringing the functionality to the other

10:56  8    website.  They also had other conferencing,

10:56  9    voice-conferencing solutions that they offered.

10:56  10   Q.    Okay.  And, Mr. Katz, how common were these

10:56  11   voice-conferencing solutions in the late '90s?

10:56  12   A.    Very uncommon.  I mean, as I said, computers

10:56  13   were not really ready for audio.  You know, you had to

10:56  14   get a microphone, sort of like this one, plug it into a

10:56  15   sound card.  Lots of computers didn't even have sound

10:56  16   cards.  Most of them came with speakers.  So that meant

10:56  17   they had a sound card.  You could get on a microphone.

10:56  18   They definitely didn't have cameras.  So it was quite

10:56  19   uncommon.

10:56  20   Q.    Okay.  Mr. Katz, you heard in opening that the

10:57  21   HearMe patent, the '858 patent, was some sort of an

10:57  22   old, antiquated technology.

10:57  23             Was that, in your view of the '858 patent,

10:57  24   when you acquired it?

10:57  25   A.    It was an application.  When I acquired the

| | | |
|---|---|---|
| 10:57 | 1 | patents, they were four issued patents.  There were |
| 10:57 | 2 | eight pending patents.  They were principal assets I |
| 10:57 | 3 | was interested in.  I was interested in them because I |
| 10:57 | 4 | started this company.  And, you know, we were doing |
| 10:57 | 5 | well.  But we didn't have any patents. |
| 10:57 | 6 | So I was aware of HearMe.  I was aware of how |
| 10:57 | 7 | much funding they had.  I was aware that they were very |
| 10:57 | 8 | smart people.  And when the opportunity came to buy |
| 10:57 | 9 | that property, I thought it was literally once in a |
| 10:57 | 10 | lifetime. |
| 10:57 | 11 | Q.   Mr. Katz, did you agree with the |
| 10:57 | 12 | characterization that the HearMe technology patents are |
| 10:57 | 13 | old, antiquated technology? |
| 10:57 | 14 | A.   Totally the opposite.  It was cutting edge, |
| 10:57 | 15 | innovative, incredibly -- they were very smart people. |
| 10:57 | 16 | I don't think you get to be a public company worth a |
| 10:58 | 17 | billion dollars unless you're doing something pretty |
| 10:58 | 18 | special. |
| 10:58 | 19 | Q.   Okay.  And, Mr. Katz, are you aware that |
| 10:58 | 20 | HearMe had customers and partners in the early 2000s? |
| 10:58 | 21 | A.   Yes. |
| 10:58 | 22 | Q.   And was Cisco one of those customers and |
| 10:58 | 23 | partners? |
| 10:58 | 24 | A.   I believe so. |
| 10:58 | 25 | MS. PIEPMEIER:  Objection, Your Honor.  I |

10:58  1    apologize.  I move to strike that answer.

10:58  2                    THE COURT:  On what basis?

10:58  3                    MS. PIEPMEIER:  Your Honor, he has

10:58  4    absolutely no foundation whatsoever to provide that

10:58  5    testimony regarding HearMe.

10:58  6                    THE COURT:  Overruled.

10:58  7    BY MS. MAGEE:

10:58  8    Q.    Okay.  Mr. Katz, I'd now like to step back

10:58  9    into the year 2000, if you will.

10:58  10             What was the landscape like of technology

10:58  11   companies in 2000?

10:58  12   A.    So 2000 was sort of the turning point.

10:58  13   Technology was completely the rage in the late '90s.

10:59  14   Yahoo was blowing up.  AOL was blowing up.  Everything

10:59  15   was blowing up in a good way.

10:59  16             And then into the end of 2000, beginning 2001,

10:59  17   the public markets just were, you know, mercilessly

10:59  18   negative.  Everything was bad.  Everything was down.

10:59  19   So it was a really, really difficult environment in

10:59  20   2001, and then later 2001, even worse.

10:59  21   Q.    Okay.  And what is that later 2001 period

10:59  22   called?

10:59  23   A.    Well, the sort of prior period would have been

10:59  24   called the Internet boom.  I call it Internet 1.0

10:59  25   because that was the first rise.  And that was the --

| | | |
|---|---|---|
| 10:59 | 1 | you know, bubble bursting on the Internet at the end of |
| 10:59 | 2 | 2001. |
| 10:59 | 3 | Q.   And how was Paltalk doing during this time? |
| 10:59 | 4 | A.   Well, that's interesting.  Again, we were a |
| 10:59 | 5 | smaller company.  I'm conservative.  I was always about |
| 10:59 | 6 | making money.  I think honestly, that's why I made it |
| 10:59 | 7 | through that period of time, 2008, '9.  Again, it was a |
| 11:00 | 8 | tough time in the world, and we've always made it |
| 11:00 | 9 | through. |
| 11:00 | 10 | So I was on the notion that we had to make |
| 11:00 | 11 | money.  So when -- I describe we launched the video in |
| 11:00 | 12 | Paltalk in 2001 and we started charging a subscription |
| 11:00 | 13 | for it. |
| 11:00 | 14 | So the software was still free.  You could use |
| 11:00 | 15 | everything, but if you wanted to do other people's |
| 11:00 | 16 | video, you paid a small monthly or annual fee.  And |
| 11:00 | 17 | just by doing that, we started making money. |
| 11:00 | 18 | Q.   Mr. Katz, do you have a general understanding |
| 11:00 | 19 | of how HearMe fared during this same time period? |
| 11:00 | 20 | A.   I do. |
| 11:00 | 21 | Q.   What is that understanding, sir? |
| 11:00 | 22 | A.   So HearMe was like one of the high fliers of |
| 11:00 | 23 | the late '90s into 2000s, and then they hit a really |
| 11:00 | 24 | hard time, as most other technology companies did.  And |
| 11:00 | 25 | in 2001, later in 2001, they announced they were |

11:00    1    liquidating all of their assets.

11:01    2          Rather than file for bankruptcy, they did

11:01    3    still have cash.  I think they wanted to just produce

11:01    4    as much cash as they could, pay off everything they

11:01    5    could, and then actually, the shareholders could get

11:01    6    some money back too.

11:01    7    Q.    And in 2001, was Paltalk interested in buying

11:01    8    any of HearMe's assets?

11:01    9    A.    We were.

11:01    10   Q.    And why?

11:01    11   A.    As I said, I knew it was the very smart

11:01    12   people.  I am sort of a financially-facing person.  So

11:01    13   I was very aware of the public company HearMe as well.

11:01    14   I knew how much money had been invested.  So I

11:01    15   approached them sometime earlier in 2001, probably the

11:01    16   first half of 2001, to see if we could buy any of their

11:01    17   IP.

11:01    18   Q.    And did Paltalk buy HearMe's IP at that point?

11:01    19   A.    No.

11:01    20   Q.    Okay.  Why not?

11:01    21   A.    Because they -- they said, basically, unless

11:01    22   you are making an offer that starts with seven figures,

11:02    23   we're not even talking to you and you're not worth our

11:02    24   time.

11:02    25         And we sort of had -- you know, we had seven

11:02  1    figures, but we were just starting to make money.  So

11:02  2    I -- I made a decision early not to pay that much money

11:02  3    at that time.

11:02  4        Q.    And did Paltalk ultimately purchase some of

11:02  5    HearMe's assets later on?

11:02  6        A.    We did.

11:02  7        Q.    Okay.  Mr. Katz, find tab PX-12 in your

11:02  8    witness binder, please, sir.

11:02  9        A.    I have it.

11:02  10       Q.    Okay.  Have you seen this document before?

11:02  11       A.    Yes.

11:02  12       Q.    And what is this document?

11:02  13       A.    This is the actual asset purchase agreement

11:02  14   that was executed when Paltalk bought the HearMe assets

11:02  15   at the end of 2001.

11:02  16                MS. MAGEE:  Plaintiff offers PX-12.

11:03  17                MS. PIEPMEIER:  No objection.

11:03  18                THE COURT:  Admitted.

11:03  19   BY MS. MAGEE:

11:03  20       Q.    Mr. Katz, did Paltalk purchase all of HearMe's

11:03  21   assets under this agreement?

11:03  22       A.    No.

11:03  23       Q.    Okay.  Find Index D, Mr. Katz.  Skip back.

11:03  24       A.    D?

11:03  25       Q.    Yes, sir.  D as in door.

11:03  1          And, sir, it's actually up on the screen for

11:03  2    you.

11:03  3      A.    Oh, better.  Thank you.  Much better.  I see

11:03  4    it.

11:03  5      Q.    Okay.  Mr. Katz, what kind of assets did

11:03  6    Paltalk acquire from HearMe?

11:03  7      A.    So, you know, the principal thing I was

11:03  8    interested in were the patents and the patent

11:03  9    applications.  HearMe literally said, we'll give you

11:03  10   the source code.  That is the code that the -- you

11:03  11   know, enabled you to build the software programs that I

11:03  12   was talking about before.

11:03  13         So they included some source code as well.

11:04  14   And they were literally trying to get rid of their

11:04  15   computers, server computers.  We were using significant

11:04  16   numbers of server computers to do the audio and video

11:04  17   for Paltalk.

11:04  18         So actually, we got those machines and put

11:04  19   them right into service, you know, in the data center.

11:04  20   They also gave us the HearMe name and the trademark,

11:04  21   which I thought was valuable, because they had so much

11:04  22   traffic to it.  It's hard to generate traffic, you

11:04  23   know, to a website.  Also a couple of other domains.

11:04  24     Q.    How much did Paltalk pay HearMe under its

11:04  25   asset purchase agreement?

11:04  1        A.    145,000.

11:04  2        Q.    And were there risks to Paltalk associated

11:04  3    with this transaction?

11:04  4        A.    Definitely.

11:04  5        Q.    And what were some of those risks, Mr. Katz?

11:04  6        A.    You know, any of the patents could end up

11:04  7    being invalidated.  All of the applications could have

11:04  8    not actually been granted.

11:04  9              You know, we continued to prosecute.  When you

11:05  10   get a patent application, you interact with the Patent

11:05  11   Office.  You're prosecuting them.  So there were no

11:05  12   guarantees of anything.

11:05  13       Q.    And did the $145,000 purchase price reflect

11:05  14   those risks?

11:05  15       A.    Oh, it was -- you know, it was a very -- it

11:05  16   was a fire sale.  I mean, they were going out of

11:05  17   business.  And they were just selling for whatever, you

11:05  18   know, they could get.  And notice the date on the

11:05  19   document, December the 19th.

11:05  20             I remember finishing that deal right at the

11:05  21   end of December.  It was just nuts.  So yeah.  The

11:05  22   price was cheap.  Very inexpensive.

11:05  23       Q.    Did Paltalk value the assets purchased from

11:05  24   HearMe at more than $445,000?

11:05  25       A.    145.

1    Q.    Sorry.

11:05  2    A.    Yeah.  I valued them -- I mean, it's hard to

11:05  3    say this, but they were of extreme value to me because

11:05  4    I had a public -- not public -- a private company at

11:06  5    that point, public company now, that didn't have any

11:06  6    patents.  And this was not only patents, but they were

11:06  7    patents in our area.  They were similar to what we were

11:06  8    doing as a competitor that I was aware of.  So it was a

11:06  9    unique singular opportunity to do something, and that's

11:06  10   why we did it.

11:06  11   Q.    Why did Paltalk pay $145,000?

11:06  12   A.    As I said, they asked for seven figures, you

11:06  13   know, some months before.  And then I think that the

11:06  14   fire sale was just getting to the end.  They were just

11:06  15   selling off everything.  And I'm sure they asked me for

11:06  16   more, and I'm sure I offered less.

11:06  17         And I was going to pay as little as I could

11:06  18   pay for it because, you know, the cash was dear to me,

11:06  19   and we needed it to pay our own employees and run our

11:06  20   own business.

11:06  21   Q.    And would you have paid more than $145,000?

11:06  22   A.    Definitely.

11:06  23   Q.    Why?

11:06  24   A.    Because it was invaluable property.  It was --

11:06  25   they were extremely smart people.  They had four issued

11:07  1    patents.  I knew it was expensive just to -- if you go

11:07  2    through the process of just trying to get your own

11:07  3    patent, it takes years and it takes a lot of money.

11:07  4    Because there's a back-and-forth with the Patent

11:07  5    Office.  You're paying lawyers.  So it was worth -- you

11:07  6    know, I couldn't even put a price on what it was worth

11:07  7    to us to own that.

11:07  8        Q.    Was the patent application associated with the

11:07  9    '858 patent part of the assets Paltalk acquired from

11:07  10   HearMe?

11:07  11       A.    It was.

11:07  12       Q.    Did Paltalk ever perform any sort of

11:07  13   evaluation for that patent application?

11:07  14       A.    Valuation or evaluation?

11:07  15       Q.    Valuation.

11:07  16       A.    No.  We didn't -- we didn't perform valuations

11:07  17   on anything.  I knew I was getting a ridiculous deal,

11:07  18   and I was happy to get it.

11:07  19       Q.    Okay.  What did Paltalk do to the assets it

11:07  20   acquired from here?

11:07  21       A.    Well, as I said, it's a lot of work.  Once you

11:08  22   get the patents, you've got to stay up with filings,

11:08  23   issued patents.  And then if you have applications, you

11:08  24   have to have, you know, a patent attorney do the

11:08  25   back-and-forth with the Patent Office.  So we continued

11:08   1   to -- to make sure that all the patents were paid up

11:08   2   and the fees associated with them ongoing.  We

11:08   3   continued to prosecute all the other applications.

11:08   4       Q.   Did Paltalk offer any HearMe products after

11:08   5   the acquisition?

11:08   6       A.   We did.

11:08   7       Q.   Which products are those?

11:08   8       A.   So we didn't take their source code.  We

11:08   9   decided because of the HearMe name, a lot of money

11:08   10  behind it, and there'd been a lot of traffic to it to

11:08   11  relaunch a videoconferencing solution at HearMe.com.

11:08   12  So unlike the Paltalk software which was the software

11:08   13  download, you go to the website, you download it and

11:08   14  install it, this was web based.  So you just went to

11:09   15  HearMe.com.

11:09   16        But it was in 2000 -- we launched out I think

11:09   17  in around 2006, and the Internet still wasn't ready to

11:09   18  do video- and audioconferencing very well.  So we did

11:09   19  get customers that was a different, very different

11:09   20  product from Paltalk.  Paltalk was a consumer product,

11:09   21  not really facing for businesses.  This was really sort

11:09   22  of like what Webex was doing and the other softwares

11:09   23  that do that now.  It was pointed at people who would

11:09   24  pay to videoconference.

11:09   25      Q.   Mr. Katz, we heard in opening that the

11:09  1   '858 patent allows computers and phones to join an

11:09  2   audioconference.  Does Paltalk offer any products that

11:09  3   allow computers and plain old telephones to join an

11:09  4   audioconference?

11:09  5         A.    No.

11:09  6         Q.    Why not?

11:09  7         A.    Because -- and really, again, it's my

11:10  8   judgment.  People who use Paltalk are online.  You

11:10  9   know, we like large screens because you're seeing a lot

11:10  10  of video.  We enable you to blow up the video too so if

11:10  11  you want to see something larger than those little

11:10  12  boxes, you can do that, don't move them around and

11:10  13  shuffle them.  And therefore it's -- the video is

11:10  14  really critical in that sort of scenario.  Someone's

11:10  15  not calling in from another country to do -- to be in a

11:10  16  conference like that because they can't see what's

11:10  17  going on.

11:10  18         Also say you're playing a game.  If you're

11:10  19  playing chess, you're playing cards, you have to see.

11:10  20  So I just made the judgment that wasn't something to

11:10  21  put in there.

11:10  22              MS. MAGEE:  Your Honor, may we approach?

11:10  23              THE COURT:  Sure.

11:10  24              (Bench conference.)

11:10  25              MS. MAGEE:  Your Honor, ordinarily the

11:11  1    Court's MIL No. 13 would preclude mentioning any

11:11  2    party's other litigations.  However, in opening,

11:11  3    Ms. Piepmeier consistently raised the theme that

11:11  4    Paltalk did not contact Cisco before filing this

11:11  5    lawsuit.

11:11  6              If asked, this witness will testify that

11:11  7    he didn't do that because he's aware of the risks of

11:11  8    Cisco filing declaratory judgment actions when parties

11:11  9    reach out to them about, you know, potential

11:11  10   infringement.  So I'm asking to broach the subject with

11:11  11   Mr. Katz because they opened the door.

11:11  12             MS. PIEPMEIER:  I'm sorry.  I'm not sure

11:11  13   I'm following what you are asking to...

11:11  14             MS. MAGEE:  I mean...

11:11  15             THE COURT:  She's going to ask him why he

11:11  16   didn't contact you, and his response is going to be he

11:11  17   was afraid you would file -- Cisco would file a

11:11  18   declaratory judgment action.

11:11  19             MS. MAGEE:  They put in a slide in

11:11  20   opening and everything else --

11:11  21             MS. PIEPMEIER:  Your Honor, I think

11:11  22   that's completely inconsistent with what he said.  I

11:11  23   think that's completely inconsistent with what he said

11:11  24   in deposition, and that's a totally different thing.

11:11  25   And I also don't think I opened the door at all.  It's

11:11   1   just a fact that he never filed.

11:11   2               That is just a fact in the case.  It is

11:12   3   not an argument about you should have done it or you

11:12   4   shouldn't have done it.  It's literally just a fact in

11:12   5   the case that they didn't do it.  This is the date that

11:12   6   they filed suit.  I don't know how else to show a

11:12   7   timeline other than to show the date that the suit was

11:12   8   filed.

11:12   9               THE COURT:  You can have him explain why

11:12   10  he did not give them notice.

11:12   11              MS. MAGEE:  Thank you, sir.

11:12   12              (Bench conference concludes.)

11:12   13  BY MS. MAGEE:

11:12   14     Q.    All right.  Mr. Katz, you heard in opening

11:12   15  this idea that Paltalk did not reach out to anyone at

11:12   16  Cisco before filing this lawsuit.

11:12   17              Do you recall hearing that, sir?

11:12   18     A.    Yes.

11:12   19     Q.    And did Paltalk reach out to Cisco before

11:12   20  filing this lawsuit?

11:12   21     A.    No.

11:12   22     Q.    Why not, sir?

11:12   23     A.    Because I was aware of the risks of doing

11:12   24  that.  If I reached out to Cisco, they very well could

11:12   25  have just sued us.  So -- and again, my judgment, it

11:12   1    was better to do it the way we did it because if we got

11:13   2    sued, it was a different set of risks.

11:13   3        Q.    And, Mr. Katz, why did Paltalk ultimately file

11:13   4    this lawsuit?

11:13   5        A.    Well, because we believed that the '858 patent

11:13   6    was being infringed.

11:13   7        Q.    And what are you seeking if in fact Cisco is

11:13   8    using Paltalk's patent?

11:13   9        A.    A reasonable royalty which is I think what the

11:13   10   law is.

11:13   11              MS. MAGEE:  Okay.  Thank you.

11:13   12              I pass the witness.

11:13   13                        CROSS-EXAMINATION

11:13   14   BY MS. PIEPMEIER:

11:13   15       Q.    Good morning, Mr. Katz.  We're just going to

11:13   16   hand out the binders.

11:14   17       A.    Thank you.

11:14   18       Q.    Everyone has what they need?  Okay, great.

11:14   19              Good morning.  I think it's still morning.  My

11:14   20   name is Sarah Piepmeier, and it is good to see you

11:14   21   again.  I have some questions regarding your testimony

11:14   22   just now.

11:14   23              You introduced your background earlier, but I

11:14   24   want to confirm, you don't have an engineering degree,

11:14   25   correct?

11:14   1      A.    Correct.

11:14   2      Q.    And you have no training at all in computer

11:14   3  programming?

11:14   4      A.    Correct.

11:14   5      Q.    You testified a moment ago on direct

11:14   6  examination about how hard it is to get a patent or

11:14   7  keep up with the filings or something like that.

11:14   8           Do you recall that?

11:14   9      A.    Yes.

11:14   10     Q.    Okay.  But you're not a named inventor on any

11:14   11  patent?

11:14   12     A.    No.

11:14   13     Q.    So you've actually never done that yourself?

11:14   14     A.    My company has.

11:14   15     Q.    Sir, I'm sorry.  I asked you a question.  If

11:14   16  you could listen to my question, I'd appreciate that.

11:14   17           THE COURT:  Counsel, counsel, I know a

11:14   18  lot of different ways of doing this.  If I think he

11:15   19  needs to be more direct in his response, I can assure

11:15   20  you, I will take care of that.

11:15   21           MS. PIEPMEIER:  Thank you, Your Honor.

11:15   22  BY MS. PIEPMEIER:

11:15   23     Q.    Let me ask my question again.

11:15   24           You personally, Mr. Katz, have never filed for

11:15   25  a patent application as an inventor, correct?

```
11:15    1        A.    I haven't, but again, my company has with

11:15    2   people who work for me.  So I guess I could have been

11:15    3   on that patent, but I wasn't.  I wasn't involved

11:15    4   with -- I was involved at a high level in the

11:15    5   invention, but -- so my name isn't on it, but I was

11:15    6   involved in the process of it.

11:15    7        Q.    I'm sorry.  I'm confused as to what patent

11:15    8   we're talking about here.  The question -- so let me

11:15    9   try to ask you a very clear question here.

11:15   10        You, Jason Katz, are not a named inventor on

11:15   11   any patent; is that right?

11:15   12        A.    That is correct.

11:15   13        Q.    Thank you.

11:15   14        Now, you testified on direct that you came up

11:15   15   with the idea to add the ability to communicate via

11:16   16   audio to kind of a buddy list with AOL as an

11:16   17   inspiration; is that right?

11:16   18        A.    Correct.

11:16   19        Q.    And you're proud of that invention?

11:16   20        A.    I'm very proud of it.  Yes.

11:16   21        Q.    I could tell.

11:16   22        A.    Yeah.

11:16   23        Q.    Yeah.

11:16   24        But you never filed a patent on that idea?

11:16   25        A.    I didn't.
```

11:16  1      Q.    And to be clear, the buddy list concept that

11:16  2   you spoke about, speaking to somebody on the buddy

11:16  3   list, that's not the invention of the '858 patent,

11:16  4   correct?

11:16  5      A.    That's correct.

11:16  6      Q.    And you testified a moment ago you considered

11:16  7   intellectual property that Paltalk acquired, that it

11:16  8   bought, to be a valuable asset?

11:16  9      A.    Correct.

11:16  10     Q.    You agree with that.

11:16  11          But you would agree that in the whole history

11:16  12  of Paltalk, Inc., Holdings, whatever, it has never

11:16  13  offered a product that used the '858 patent?

11:16  14     A.    That's correct.

11:16  15     Q.    It could have done so?

11:17  16     A.    I think it could have done so.

11:17  17     Q.    But you didn't?

11:17  18     A.    We didn't.

11:17  19     Q.    And you think the '858 patent is valuable,

11:17  20  though?

11:17  21     A.    Yes.

11:17  22     Q.    Okay.  But you never put out a product using

11:17  23  it?

11:17  24     A.    Yes.

11:17  25          MS. PIEPMEIER:  Now, I'd like to bring up

—110—

11:17   1    on the screen DX -- I think it's DDX-2.  If we may.

11:17   2                    Thank you.

11:17   3    BY MS. PIEPMEIER:

11:17   4        Q.   I am a chronological learner.  That's the way

11:17   5    I think -- I even read legal cases in a chronological

11:17   6    order.  So I'd like to go through kind of a timeline.

11:17   7    You just put one up.  It may be kind of similar to what

11:17   8    you put up.

11:17   9                So Paltalk's products launch in 1999; is that

11:17   10   correct?

11:17   11       A.   Correct.

11:17   12       Q.   Okay.

11:17   13                MS. PIEPMEIER:  And of course I left the

11:17   14   clicker.  Let me grab it.  Excuse me.

11:17   15   BY MS. PIEPMEIER:

11:18   16       Q.   And the product that you launched allowed

11:18   17   audio- and videoconferencing for free on the Internet,

11:18   18   correct, in 1999?

11:18   19       A.   Audio.

11:18   20       Q.   Audio.  Video was added later?

11:18   21       A.   Correct.

11:18   22       Q.   And you testified -- we've already gone

11:18   23   through this -- in 2001, Paltalk, Inc. purchases

11:18   24   HearMe?

11:18   25       A.   HearMe assets.  Yeah.

11:18  1        Q.    The HearMe assets.  Thank you for that

11:18  2   correction.  That's right.

11:18  3            Now, you testified on direct that you thought

11:18  4   the assets were valuable, including the intellectual

11:18  5   property.  You used the servers, all of that; you

11:18  6   thought they were valuable, right?

11:18  7        A.    Correct.

11:18  8        Q.    And at the time, you testified that they

11:18  9   were -- before the fire sale, they were asking for

11:18  10  seven figures?

11:18  11       A.    Correct.

11:18  12       Q.    And you thought it was valuable assets?

11:18  13       A.    Correct.

11:18  14       Q.    You had seven figures?

11:18  15       A.    Correct.

11:18  16       Q.    You did not pay seven figures?

11:18  17       A.    I did not.

11:18  18       Q.    You paid 145 --

11:19  19       A.    Correct.

11:19  20       Q.    -- thousand.

11:19  21            And for the 145,000, in addition to pages of

11:19  22  appendices of servers, et cetera, that we saw a moment

11:19  23  ago, Paltalk acquired four issued patents and eight

11:19  24  pending patent applications?

11:19  25       A.    Correct.

11:19  1      Q.    One of those applications ultimately issued as

11:19  2  the '858 patent?

11:19  3      A.    That's correct.

11:19  4      Q.    And the HearMe patents and patent

11:19  5  applications, you put those in a subsidiary, Paltalk

11:19  6  Holdings?

11:19  7      A.    Correct.

11:19  8      Q.    You talked about on your direct a moment ago

11:19  9  the risks of acquiring patent applications.

11:19  10          Do you remember that?

11:19  11     A.    Yes.

11:19  12     Q.    And one of those risks is that -- or strike

11:19  13  that.

11:19  14          There's also risks to acquiring patents,

11:19  15  correct?

11:19  16     A.    Can you say that again?  I'm sorry.

11:19  17     Q.    So there's risks to acquiring patent

11:19  18  applications.

11:20  19          Wouldn't you agree there's also risks to

11:20  20  acquiring patents?

11:20  21     A.    Yes.

11:20  22     Q.    And one of those risks is that they could

11:20  23  later be invalidated, right?

11:20  24     A.    Yes.

11:20  25     Q.    Now, HearMe had a set of products at the time

113

| | | |
|---|---|---|
| 11:20 | 1 | of the acquisition: VoiceCREATOR, VoiceNETWORK, and |
| 11:20 | 2 | VoiceSERVER; is that correct? |
| 11:20 | 3 | A.    I believe so.  Yes. |
| 11:20 | 4 | Q.    And you talked about HearMe products on direct |
| 11:20 | 5 | just a moment ago? |
| 11:20 | 6 | A.    Yes. |
| 11:20 | 7 | Q.    You would agree with me that Paltalk, Inc. |
| 11:20 | 8 | basically shelved those products after invention? |
| 11:20 | 9 | A.    I disagree with that. |
| 11:20 | 10 | Q.    And have you ever testified the opposite of |
| 11:20 | 11 | that? |
| 11:20 | 12 | A.    I had a deposition in this case, for example. |
| 11:20 | 13 | Q.    Okay.  And I'd like to show you your testimony |
| 11:20 | 14 | in your deposition.  You have it in your binder.  There |
| 11:20 | 15 | should be a deposition transcript.  We'll also put it |
| 11:20 | 16 | up on the screen, but I want to make sure you have the |
| 11:21 | 17 | cite before we go anywhere.  On Page 125, starting at |
| 11:21 | 18 | Lines 21 to 126, Line 7. |
| 11:21 | 19 | And I want to give you a chance to look at it |
| 11:21 | 20 | before I read it. |
| 11:21 | 21 | Question:  After the acquisition to the |
| 11:21 | 22 | extent that VoiceCREATOR, VoiceNETWORK, and VoiceSERVER |
| 11:21 | 23 | products still existed, neither Paltalk, Inc. nor |
| 11:21 | 24 | Paltalk Holdings put forth those products in any form. |
| 11:21 | 25 | I asked you that question.  Oh, I said: |

11:21   1    Is that right?

11:21   2                Do you see that?

11:21   3    A.    That's right.

11:21   4    Q.    And you answered, let's follow along:  That's

11:21   5    right.  We never did.

11:21   6                Did you say that?

11:21   7    A.    Yes.  And then I answered --

11:21   8    Q.    And then I asked you a question:  You shelved

11:21   9    them essentially?

11:21   10               And then you answered:  Basically.  My memory

11:21   11   was that they were CDs that were conveyed, and they

11:22   12   went into storage somewhere.  And we certainly never

11:22   13   used them.

11:22   14               You testified that, correct?

11:22   15   A.    That's correct.

11:22   16   Q.    So you shelved the HearMe products that

11:22   17   Paltalk acquired:  VoiceCREATOR, VoiceNETWORK, and

11:22   18   VoiceSERVER?

11:22   19   A.    I said I disagree with that characterization

11:22   20   of what I did.  We received source code.  We never

11:22   21   reconstituted the source code.  We didn't have any of

11:22   22   the server -- we didn't have anything to do that.  It

11:22   23   would have been a monumental task to try and do that.

11:22   24               The $250 million investment company that had

11:22   25   tons and tons of engineers, we were a little company.

11:22  1    So I couldn't do that really.  I didn't have the money.

11:22  2        Q.    Thank you, sir.

11:22  3            Now, let's refer back to the deposition you

11:22  4    just gave, the deposition we just looked at.

11:22  5                MS. PIEPMEIER:  If we could put it back

       6    on the screen.

       7    BY MS. PIEPMEIER:

11:22  8        Q.    I asked you, speaking about these products:

11:23  9    You shelved them essentially?  And you -- let me

11:23  10   finish, sir.

11:23  11           You answered:  Basically.  My memory was they

11:23  12   were CDs that were conveyed, and they went into storage

11:23  13   somewhere.  And we certainly never used them.

11:23  14       A.    Correct.

11:23  15       Q.    Okay.  Thank you.

11:23  16           Now, you never spoke to a single person who

11:23  17   created any of that IP or any of those products,

11:23  18   correct?

11:23  19       A.    I spoke to Jim Schmidt, who was the active

11:23  20   CEO.  I don't know if he ever created anything.  I

11:23  21   didn't speak to anybody else.

11:23  22       Q.    You would agree with me that Jim Schmidt was

11:23  23   the guy liquidating the company?

11:23  24       A.    Correct.

11:23  25       Q.    You never spoke to a HearMe employee or patent

—116—

11:23  1    inventor other than Jim Schmidt?

11:23  2        A.    I didn't.

11:23  3        Q.    And Jim Schmidt was the guy liquidating the

11:23  4    company, not the guy who created those valuable

11:23  5    products or the IP, correct?

11:23  6        A.    To my knowledge, that's right.

11:23  7        Q.    The only person you spoke to was the person

11:23  8    who you were going to write a check to?

11:24  9        A.    Correct.

11:24  10               MS. PIEPMEIER:  Let's go back to DX-2, if

11:24  11   we may, please.

11:24  12   BY MS. PIEPMEIER:

11:24  13       Q.    Now, let's move forward on the timeline.

11:24  14               In 2004, the '858 patent issues; is that

11:24  15   correct?

11:24  16       A.    Correct.

11:24  17       Q.    And that's the first time that you recall

11:24  18   reading the '858 patent, correct?

11:24  19       A.    Correct.

11:24  20       Q.    Jumping forward 12 years, in 2016, Paltalk,

11:24  21   Inc. merged with Snap Interactive, correct?

11:24  22       A.    Correct.

11:24  23       Q.    And Snap was an Internet dating service, kind

11:24  24   of like match.com, right?

11:24  25       A.    Correct.

11:24   1          Q.    Through that merger, Paltalk gets 80 percent

11:24   2    of the stock?

11:24   3          A.    Correct.

11:24   4          Q.    And you sold the product off?

11:25   5          A.    In 2019.  Yes.

11:25   6          Q.    The people went their own way.  That's what

11:25   7    you testified?

11:25   8          A.    Correct.

11:25   9          Q.    Now, 2020 is the next time that you recall

11:25   10   reading the '858 patent, correct?

11:25   11         A.    Yes.  I think that's right.

11:25   12         Q.    So the patent issues in 2004, and you don't

11:25   13   look at it again until 2020?

11:25   14         A.    I think that's correct.

11:25   15         Q.    And in 2021, 17 years after the patent issues,

11:25   16   Paltalk first begins investigating Cisco?

11:25   17         A.    Approximately, you know, in that time period

11:25   18   as you said, 2020 to 2021.  That's right.

11:25   19         Q.    Well, it's 2021.  That's -- is when you

11:25   20   first -- sometime in 2021 is when you began

11:25   21   investigating Cisco, correct?

11:25   22         A.    I don't agree precisely with that.  It was

11:25   23   sometime in that period, though.

11:26   24         Q.    Okay.  Could you please turn to Page 36 of

11:26   25   your deposition to Line 16 to 23?  I'll give you a

—118—

11:26  1    minute to look at it.  And then follow along and tell

11:26  2    me if I read this right.

11:26  3            When did you -- you, as Mr. Katz -- and/or

11:26  4    Paltalk first begin investigating bringing a suit

11:26  5    against Cisco?  Again, I am looking for a date -- I'm

11:26  6    just looking for a date or a ballpark, not any

11:26  7    communications with counsel.

11:26  8            Answer:  Sometime in 2021 is what I could

11:26  9    say.  I don't have a firm date.

11:26  10           So did I read that correctly?

11:26  11   A.    Correct.

11:26  12   Q.    So in your deposition, your answer was that

11:26  13   you began investigating Cisco in 2021?

11:26  14           MS. MAGEE:  Objection, Your Honor,

11:26  15   improper impeachment.  Mr. Katz' answers are

11:26  16   consistent.

11:26  17           THE COURT:  Overruled.

11:26  18   BY MS. PIEPMEIER:

11:26  19   Q.    Could you answer the question?

11:26  20   A.    Sure.  I said there in my deposition, I don't

11:26  21   have a precise date, but it was somewhere in that

11:26  22   neighborhood.

11:26  23   Q.    Of 2021?

11:26  24   A.    Sure.

11:26  25   Q.    That's what we're looking at on the screen

11:27  1    highlighted in yellow, correct?

11:27  2        A.    Yes.

11:27  3        Q.    That's what you told me then?

11:27  4              Right?

11:27  5        A.    Yes.

11:27  6        Q.    Not 2020.

11:27  7              Thank you.  Let's move on.

11:27  8              Now, you testified on direct examination that

11:27  9    Paltalk never sent a letter to Cisco before it filed

11:27  10   this suit, correct?

11:27  11       A.    Correct.

11:27  12       Q.    And you testified that you were afraid --

11:27  13   strike that.

11:27  14             You testified that the reason that you didn't

11:27  15   send the letter is that you were afraid Cisco would

11:27  16   file what you -- I believe you referred to it as a DJ;

11:27  17   is that right?

11:27  18       A.    I don't think I said a DJ.

11:27  19       Q.    Filed suit?

11:27  20       A.    Yeah.  That they were suing.

11:27  21       Q.    So you were afraid that Cisco -- and let me be

11:27  22   clear about this.  Your concern, if you sent Cisco a

11:27  23   letter saying, hey, look at this '858 patent, can we

11:27  24   come to a deal, is that Cisco would go to a venue,

11:27  25   whatever venue, and file an action saying, no.  We

11:28  1   don't infringe.  And your patent's invalid, correct?

11:28  2       A.    Correct.

11:28  3       Q.    So you thought that Cisco would file a

11:28  4   defensive action to defend its rights after being

11:28  5   accused of infringement.

11:28  6             That was your concern?

11:28  7       A.    Beyond that or anything else.  You know, as I

11:28  8   said, little company, very expensive litigation.  So my

11:28  9   judgment was it was best to do what we did.

11:28  10      Q.    Now, you're a lawyer?

11:28  11      A.    I am trained as a lawyer.

11:28  12      Q.    Yeah.  You're retired, though?

11:28  13      A.    Retired from the law.

11:28  14      Q.    And you never practiced as a patent litigator?

11:28  15      A.    Oh, no.  I didn't.

11:28  16      Q.    So you're not familiar, if I understand or I

11:28  17  assume, with the fact that just sending somebody a

11:28  18  letter saying, hey, we have a patent, can we talk about

11:28  19  it, doesn't give them the ability to run to court and

11:28  20  file another action.

11:28  21            You're not -- you're just not familiar with

11:28  22  that, correct?

11:28  23      A.    You know, I disagree with that.

11:28  24      Q.    You disagree with my statement of it?  You

11:29  25  disagree -- or you disagree with your familiarity?

—121—

11:29   1          A.    I disagree with your characterization of what

11:29   2    I know and I don't know.

11:29   3          Q.    Okay.  So let me phrase that a different way

11:29   4    then.  You believe that if Paltalk sent Cisco a letter

11:29   5    saying, hey, can we talk?  Can we come to a deal here?

11:29   6    I've got some intellectual property that I think is

11:29   7    super valuable, and I think we should talk about it.

11:29   8    You might be interested in it.  It's your legal

11:29   9    judgment as a lawyer and a former member of the bar

11:29   10   that that would give Cisco the ability to run to court

11:29   11   and file a lawsuit against Paltalk?  That's your --

11:29   12   that's what you're telling the jury, right?

11:29   13         A.    I'm not saying it would give them the ability.

11:29   14   I don't know that one way or the other, but I do know I

11:29   15   believe that I could be sued, so that's why we didn't

11:29   16   do that.

11:29   17         Q.    But you don't know?

11:29   18         A.    I don't know; not precisely I don't.

11:30   19         Q.    And you didn't tell me that in your

11:30   20   deposition?

11:30   21         A.    If you can point me to it, I'm happy to look

11:30   22   at it.  I don't remember; it was a long day.

11:30   23         Q.    Right.

11:30   24               You would agree with me, though, that

11:30   25   Paltalk's first communication to Cisco was simply

                                                                122

11:30    1    filing the lawsuit?

11:30    2        A.    That's correct.

11:30    3        Q.    Because it was your judgment that you didn't

11:30    4    want to try to have a negotiation, you didn't want to

11:30    5    sit down with Cisco at a table?

11:30    6        A.    I believe there were risks in that.  So that's

11:30    7    why we took the action that we took.

11:30    8        Q.    And in all of your time as an executive at

11:30    9    a -- at a tech company and currently a public tech

11:30   10    company, you're aware that many companies sit down at a

11:30   11    table and negotiate and come to a license, right?

11:30   12        A.    In the way you described it, I'm not aware.

11:31   13        Q.    You're not.  You've never seen it?

11:31   14        A.    I've never seen a little company like us go to

11:31   15    a big company and say, hey, we have patents.  You might

11:31   16    want them, and the other big company say, yeah, oh,

11:31   17    great.  Yeah.  Sure.  No.  That's not --

11:31   18        Q.    You've never seen that?

11:31   19        A.    Never seen it.

11:31   20        Q.    But you're not a patent litigator?

11:31   21        A.    I'm not.

11:31   22        Q.    And you don't represent companies as a patent

11:31   23    litigator?

11:31   24        A.    I don't.

11:31   25        Q.    Right.  And you don't, you know, obsessively

11:31  1    follow patent litigation news like some of us who are

11:31  2    patent litigators, right?

11:31  3        A.   No, but I --

11:31  4        Q.   So you don't know whether that happens; you

11:31  5    simply don't know?

11:31  6        A.   I don't know, but I'd just like --

11:31  7        Q.   You don't know, correct?  Yes or no?

11:31  8        A.   Can I answer?

11:31  9             THE COURT:  Counsel, again, let him

11:31  10   answer the question.  And if he isn't being responsive,

11:31  11   I'll take care of it.

11:31  12       A.   As we all know, I bought four patents in 2001

11:31  13   and many pending patents.

11:31  14             THE COURT:  Okay.  You've answered the

11:31  15   question.

11:31  16             THE WITNESS:  Okay.

11:31  17   BY MS. PIEPMEIER:

11:31  18       Q.   Now, let's move on to July 26, 2022.  That's

11:32  19   the date that the '858 patent expired, correct?

11:32  20       A.   Correct.

11:32  21       Q.   And today in 2024, Paltalk has a suite of

11:32  22   products.  I couldn't fit them all in that tiny area,

11:32  23   so I apologize; I picked three of them.

11:32  24             But you have a suite of products today, right?

11:32  25       A.   Correct.

11:32  1      Q.   And you would agree -- and I think you

11:32  2  testified this on direct, but I just want to make

11:32  3  sure -- that of all the companies that Paltalk has

11:32  4  acquired, of all the products it's acquired, Paltalk

11:32  5  has never offered a product allowing the use of a phone

11:32  6  and a computer in audioconferencing, correct?

11:32  7      A.   To dial in; we did offer one to dial out.

11:32  8      Q.   But you never offered a -- strike that.

11:32  9           Paltalk has never offered a product that you

11:32  10  believe practices the invention of the '858 patent?

11:32  11      A.   That's correct.

11:32  12      Q.   And you gave an example on your direct of the

11:32  13  importance using, you know, your Paltalk itself product

11:33  14  as an example of why you wouldn't want to do that,

11:33  15  because the video's so important, essentially; is that

11:33  16  right?

11:33  17      A.   I said to Paltalk.

11:33  18      Q.   Correct.  And that's not Paltalk's only

11:33  19  product, though, correct?

11:33  20      A.   Sorry?

11:33  21      Q.   The product that you discussed with your

11:33  22  counsel with the big video, how you could make things

11:33  23  bigger, and you said, you know, I don't need the

11:33  24  invention for that, that was one of the products that

11:33  25  you offered, correct?

11:33  1      A.    Correct.  Paltalk.

11:33  2      Q.    Okay.

11:33  3      A.    The Paltalk product.

11:33  4      Q.    That's the Paltalk product?

11:33  5      A.    Correct.

11:33  6      Q.    And over the course of the past 20 years since

11:33  7  the patent has issued, Paltalk has had numerous other

11:33  8  products, but none of them have used the '858 patent

11:33  9  here, correct?

11:33  10     A.    That's correct.

11:33  11     Q.    Now, during the life of the '858 patent,

11:33  12  Paltalk has never sought to license that patent itself,

11:33  13  correct?

11:34  14     A.    Correct.

11:34  15     Q.    And the first lawsuit that Paltalk ever filed

11:34  16  on the '858 patent was against Cisco?

11:34  17     A.    Correct.

11:34  18     Q.    And you didn't testify on direct about anyone

11:34  19  who's ever asked Paltalk for a license to the

11:34  20  '858 patent other than as a part of the large

11:34  21  portfolio, part of the large portfolio?

11:34  22     A.    Correct.

11:34  23     Q.    So during the entire life of the '858 patent,

11:34  24  no person or entity has ever come to Paltalk and

11:34  25  requested a license to the '858 patent?

11:34   1    A.    Correct.

11:34   2    Q.    And in the years that Paltalk was in this

11:34   3  business and had this patent, the '858 patent, you

11:34   4  would agree that Paltalk never generated any revenue or

11:34   5  other benefit from the '858 patent?

11:34   6    A.    I would disagree with that.

11:34   7    Q.    Could you please turn to Page 205 of your

11:34   8  deposition, Lines 13 through 16?

11:34   9          Question:  Has Paltalk ever generated any

11:34  10  revenue or other benefit from the '858 patent?

11:35  11          Answer:  No.  I don't believe.

11:35  12          You gave that answer when I deposed you;

11:35  13  isn't that correct?

11:35  14    A.    I did.

11:35  15    Q.    And so let me ask again.

11:35  16          In the years that Paltalk has been in

11:35  17  business, has Paltalk ever generated any revenue or

11:35  18  other benefit from the '858 patent?

11:35  19    A.    We have.

11:35  20    Q.    But that's not what you told me at deposition?

11:35  21    A.    That's true.  I refreshed my recollection, as

11:35  22  you've just pointed out and asked me a question.  It

11:35  23  was part of other licenses, and I had forgotten that.

11:35  24    Q.    So -- so when I deposed you, you were the

11:35  25  corporate representative for Paltalk and we

—127—

11:35  1    discussed -- strike that.

11:35  2            And you were disclosed as the person who was

11:35  3    going to provide Paltalk's answers and describe what

11:35  4    Paltalk was going to say at trial.

11:35  5            Do you remember that?

11:35  6        A.    Yes.

11:35  7        Q.    Okay.  And I asked you questions, and you

11:35  8    answered them under oath and truthfully?

11:35  9        A.    Yes.

11:35  10       Q.    And now sitting here today, two years later,

11:36  11   you are giving me a different answer because you simply

11:36  12   remembered something different?

11:36  13       A.    That's right.  I had forgotten they were part

11:36  14   of the other licenses that we had done.

11:36  15       Q.    Has Paltalk -- but you would agree with me

11:36  16   that Paltalk has never generated any revenue or benefit

11:36  17   from the '858 patent standing alone?

11:36  18       A.    That is correct.

11:36  19              MS. PIEPMEIER:  Now, we can take down the

11:36  20   timeline.

11:36  21   BY MS. PIEPMEIER:

11:36  22       Q.    You testified earlier about the '858 patent.

11:36  23   And there's five named inventors on that patent,

11:36  24   correct?

11:36  25       A.    I believe that's right.

11:36  1              MS. PIEPMEIER:  And let's pull up PX-16,

11:36  2  please.  And let's -- got that on the screen.  Thank

11:36  3  you.

11:36  4  BY MS. PIEPMEIER:

11:36  5      Q.    Now, you see the five named inventors listed

11:36  6  there, right?

11:36  7      A.    Yes.

11:36  8      Q.    Okay.

11:36  9              MS. PIEPMEIER:  And actually, let's take

11:36 10  off the -- thank you very much.

11:36 11  BY MS. PIEPMEIER:

11:36 12      Q.    Let's start -- let's go down the list.

11:37 13            You've never spoken to Frank Chu?

11:37 14      A.    No.

11:37 15      Q.    You've never spoken to Virgil Patrick

11:37 16  Dobjanschi?

11:37 17      A.    No.

11:37 18      Q.    You've never spoken to Corey Gates?

11:37 19      A.    No.

11:37 20      Q.    You've never spoken to Katherine Kwan?

11:37 21      A.    No.

11:37 22      Q.    You've never spoken to Daniel Wright?

11:37 23      A.    No.

11:37 24      Q.    In fact, you're sure that no Paltalk employee

11:37 25  has ever communicated with any of those inventors,

| | | |
|---|---|---|
| 11:37 | 1 | right? |
| 11:37 | 2 | A.    I think that's right. |
| 11:37 | 3 | Q.    And the inventors of the '858 patent, none of |
| 11:37 | 4 | them are here to speak with the jury this week in Waco? |
| 11:37 | 5 | A.    If you say so; I don't know that. |
| 11:37 | 6 | Q.    And you don't care what their opinion is of |
| 11:37 | 7 | this lawsuit, correct? |
| 11:37 | 8 | A.    No.  I care whether there's infringement by |
| 11:37 | 9 | Cisco of this patent that Paltalk Holdings owns. |
| 11:37 | 10 | Q.    You would agree with me -- my question is a |
| 11:37 | 11 | little more specific. |
| 11:37 | 12 | You agree with me you don't care what their |
| 11:37 | 13 | opinion is of this lawsuit? |
| 11:37 | 14 | A.    No.  I don't.  That's right. |
| 11:37 | 15 | Q.    And sitting here today, Mr. Katz, beyond the |
| 11:38 | 16 | fact that the PTO issued the lawsuit and your |
| 11:38 | 17 | discussions with your lawyers which are privileged, you |
| 11:38 | 18 | can't say if the '858 patent is valid? |
| 11:38 | 19 | A.    I think I saw Mr. Tribble earlier say there's |
| 11:38 | 20 | a presumption of it being valid once you get a patent |
| 11:38 | 21 | from the Patent Office. |
| 11:38 | 22 | Q.    Understood.  And you personally can't say |
| 11:38 | 23 | beyond the presumption that Mr. Tribble talked about |
| 11:38 | 24 | that the '858 patent is valid? |
| 11:38 | 25 | A.    No.  Not beyond that. |

130

11:38  1      Q.    And you don't know whether Claim 1 of the

11:38  2   '858 patent, you don't know whether there was any prior

11:38  3   art to Claim 1?

11:38  4      A.    I'm not -- you know, I'm not a person of skill

11:38  5   in the -- in the art.  So no.  I don't know.

11:38  6      Q.    You don't know whether Claim 2 was known in

11:38  7   the prior art?

11:38  8      A.    I don't know.

11:38  9      Q.    And because nobody at Paltalk has ever spoken

11:39  10  to the inventors, it's fair to say that none of them,

11:39  11  nobody at Paltalk has ever asked the inventors if this

11:39  12  patent is valid?

11:39  13     A.    I haven't.  That's true.  But their names are

11:39  14  on the patent that submitted to the Patent Office, and

11:39  15  it was granted.

11:39  16     Q.    And no one at Paltalk has ever asked any of

11:39  17  the five inventors if they searched for prior art

11:39  18  before they filed for the patent?

11:39  19     A.    Never talked to them.

11:39  20     Q.    No one at Paltalk has ever asked them what

11:39  21  they invented?

11:39  22     A.    Never talked to them.

11:39  23     Q.    No one at Paltalk has ever asked any of the

11:39  24  five inventors if they meant one or more when they

11:39  25  wrote the word "each"?

11:39   1      A.    Correct.

11:39   2      Q.    Paltalk relies exclusively on its paid experts

11:39   3    to tell the jury what this patent covers, correct?

11:39   4      A.    Correct.

11:39   5      Q.    Now, you consider the intellectual property

11:39   6    that Paltalk owns to be a valuable asset; I think you

11:39   7    said that a few times on direct.  I assume you agree

11:39   8    with that?

11:39   9      A.    I agree.

11:39  10      Q.    Okay.  And please turn to in your binder

11:40  11    DX-296.

11:40  12      A.    Okay.

11:40  13      Q.    And do you recognize this document?

11:40  14      A.    Yes.

11:40  15      Q.    Is it Paltalk's 2021 Form 10-K filed with the

11:40  16    SEC?

11:40  17      A.    Yes.

11:40  18      Q.    And you were president and CEO of Paltalk

11:40  19    during that year, correct?

11:40  20      A.    Yes.

11:40  21      Q.    You provided information that was used in that

11:40  22    filing to the SEC?

11:40  23      A.    Yes.

11:40  24      Q.    And to the extent you saw anything inaccurate,

11:40  25    you corrected it before it got filed?

| | | |
|---|---|---|
| 11:40 | 1 | A.    I would hope so if I saw it. |
| 11:40 | 2 | Q.    At least as of 2022, you were not aware of |
| 11:40 | 3 | anything inaccurate? |
| 11:40 | 4 | A.    No.  I'm not aware of anything inaccurate. |
| 11:40 | 5 | MS. PIEPMEIER:  Okay.  Your Honor, at |
| 11:40 | 6 | this time I'd like to admit DX-296 and publish it. |
| 11:40 | 7 | MS. MAGEE:  No objection. |
| 11:40 | 8 | THE COURT:  Admitted. |
| 11:40 | 9 | BY MS. PIEPMEIER: |
| 11:40 | 10 | Q.    Now, we have up here on the screen the cover |
| 11:40 | 11 | page that you were just looking at. |
| 11:40 | 12 | MS. PIEPMEIER:  Let's go to Page 54, Page |
| 11:40 | 13 | F4, and we can blow up the table at the top.  Thank |
| 11:41 | 14 | you. |
| | 15 | BY MS. PIEPMEIER: |
| 11:41 | 16 | Q.    Now, in 2022 -- I'm sorry.  Strike that. |
| 11:41 | 17 | In 2021, the year it filed suit against Cisco, |
| 11:41 | 18 | Paltalk filed a form with the SEC stating that the |
| 11:41 | 19 | value of its entire patent portfolio was 50K. |
| 11:41 | 20 | Do you see that? |
| 11:41 | 21 | A.    Well, that's not what that means, but -- |
| 11:41 | 22 | THE COURT:  You need to answer her |
| 11:41 | 23 | question.  She asked you a yes or no question about |
| 11:41 | 24 | what it states.  Answer her question. |
| 11:41 | 25 | A.    I don't -- I'm just saying, I don't think that |

133

```
11:41   1    I can respond to the question the way you phrased it
11:41   2    because this has to do with something else.
11:41   3    BY MS. PIEPMEIER:
11:41   4        Q.    You can say no to it.
11:41   5        A.    So say the question again so I can be precise,
11:41   6    please.
11:41   7        Q.    Let me restate the question.
11:41   8            In this SEC filing, Paltalk told the United
11:41   9    States Securities and Exchange Commission that the
11:41  10    carrying amount, that is the value of its patents, was
11:41  11    $50,000; is that right?
11:41  12        A.    Carrying amount I think is correct.
11:41  13        Q.    Now, let's shift gears again.
11:42  14            You would describe Paltalk --
11:42  15            MS. PIEPMEIER:  We can take that down.
11:42  16    BY MS. PIEPMEIER:
11:42  17        Q.    You can describe Paltalk as a
11:42  18    videoconferencing company, right?  You would say that?
11:42  19        A.    Correct.
11:42  20        Q.    And as the CEO of a videoconferencing company,
11:42  21    you have probably viewed just about every
11:42  22    videoconferencing platform that there is out there,
11:42  23    right?
11:42  24        A.    Many of them.
11:42  25        Q.    And you'd agree that all videoconferencing
```

11:42  1  products you use are pretty good?

11:42  2      A.    Yes.  Most of them are pretty good.

11:42  3      Q.    Aside from this lawsuit, you're generally

11:42  4  familiar with Cisco, correct?

11:42  5      A.    Generally familiar, yes.  Correct.

11:42  6      Q.    You've used Webex.  You just can't remember

11:42  7  when?

11:42  8      A.    Correct.

11:42  9      Q.    And because you don't remember when, you don't

11:42  10  know if Webex offered the ability to host an audio

11:42  11  conference with a plain old telephone and a computer on

11:42  12  the same audio conference before Cisco acquired Webex.

11:42  13  You have no idea?

11:42  14      A.    I don't know that.

11:42  15      Q.    Could be that it did?

11:43  16      A.    Could be.

11:43  17      Q.    You don't see Cisco's Webex as competing with

11:43  18  any products or service that Paltalk offers today,

11:43  19  right?

11:43  20      A.    I don't agree fully with that.

11:43  21      Q.    Well, you think you're in a different niche?

11:43  22      A.    A little bit of a different niche, so more

11:43  23  indirectly than directly.

11:43  24              MS. PIEPMEIER:  Could we please put up --

11:43  25  BY MS. PIEPMEIER:

135

11:43  1        Q.    Or please turn to your deposition, Page 106,

11:43  2   Lines 13 to 18.

11:43  3              I asked you:  So as the president and CEO of

11:43  4   Paltalk, Inc., you don't see Cisco's Webex as competing

11:43  5   with the products and services that Paltalk, Inc.

11:43  6   offers today?

11:43  7                   Answer:  No.  I think we are in a

11:43  8   different niche.

11:43  9        A.    Correct.

11:43  10       Q.    And you would agree with me that nobody from

11:43  11  Paltalk itself will speak as to why Paltalk believes

11:43  12  Cisco infringes its patent?

11:43  13       A.    Nobody from Paltalk, Inc.  That's correct.

11:43  14       Q.    Nobody from Paltalk Holdings?

11:43  15       A.    Nobody.

11:43  16       Q.    Paltalk will leave explanation of why it

11:44  17  believes Cisco infringes to lawyers and paid experts?

11:44  18       A.    Correct.

11:44  19       Q.    You would also agree with me that nobody at

11:44  20  Paltalk knows what a reasonable royalty percentage

11:44  21  could be?

11:44  22       A.    Correct.

11:44  23       Q.    Again, you'll leave that to Paltalk's paid

11:44  24  experts?

11:44  25       A.    Correct.

11:44   1          Q.    Paltalk has no patent -- no policies on patent

11:44   2    licensing?

11:44   3          A.    Correct.

11:44   4          Q.    No practices or conventions for licensing

11:44   5    patents?

11:44   6          A.    Correct.

11:44   7          Q.    Now, during your direct, you testified, I

11:44   8    believe, about PX-208 -- or actually, I can't

11:44   9    believe -- remember if you actually testified about it,

11:44   10   but it was in your direct binder.

11:44   11               MS. PIEPMEIER:  Can we pull up --

        12   BY MS. PIEPMEIER,

11:44   13         Q.    Or actually, can you turn to that in your

11:44   14   direct binder if you don't have it in front of you?

11:45   15         A.    In my direct binder.  Sure.

11:45   16         Q.    And with apologies, I can't remember if you've

11:45   17   already discussed this, but it's in your direct binder.

11:45   18         A.    208, correct?

11:45   19         Q.    Yes.  Tab 10 it looks like, maybe.

11:45   20         A.    Yeah.  I have it.

11:45   21         Q.    And do you recognize this document?

11:45   22         A.    Yes.

11:45   23               MS. PIEPMEIER:  I can't recall,

11:45   24   Your Honor, if this is already admitted, but if not, I

11:45   25   would like to publish it and admit it.

—137—

| | | |
|---|---|---|
| 11:45 | 1 | MS. MAGEE:  No objection, Your Honor. |
| 11:45 | 2 | THE COURT:  Did you say no objection? |
| 11:45 | 3 | MS. MAGEE:  No objection. |
| 11:45 | 4 | THE COURT:  It'll be admitted. |
| 11:45 | 5 | MS. PIEPMEIER:  Let's go to Slide 3 -- |
| 11:45 | 6 | strike that. |
| 11:45 | 7 | Actually, let's stay on this Slide 1. |
| | 8 | BY MS. PIEPMEIER: |
| 11:45 | 9 | Q.   So this is an investor presentation from |
| 11:45 | 10 | Paltalk on about October 2023, just about ten months |
| 11:46 | 11 | ago. |
| 11:46 | 12 | A.   Correct. |
| 11:46 | 13 | Q.   And you were involved in giving this -- |
| 11:46 | 14 | preparing this presentation? |
| 11:46 | 15 | A.   Yes. |
| 11:46 | 16 | MS. PIEPMEIER:  Let's turn to Slide 3. |
| | 17 | BY MS. PIEPMEIER: |
| 11:46 | 18 | Q.   Paltalk's entire market cap you see on Slide 3 |
| 11:46 | 19 | is 18 million; is that right? |
| 11:46 | 20 | A.   As of that date.  Correct. |
| 11:46 | 21 | Q.   As of that date, that was the market's best |
| 11:46 | 22 | estimate of what your entire company is worth? |
| 11:46 | 23 | A.   Correct. |
| 11:46 | 24 | Q.   And that is a fraction of what you're asking |
| 11:46 | 25 | Cisco for in this lawsuit; is that correct? |

138

| 11:46 | 1 | A.    That's correct. |

11:46  2              MS. PIEPMEIER:  Thank you.

11:46  3              I pass the witness.

11:46  4                     REDIRECT EXAMINATION

11:46  5  BY MS. MAGEE:

11:47  6      Q.    Okay.  Mr. Katz, do you recall giving

11:47  7  testimony a little while ago that no one at Paltalk is

11:47  8  going to offer opinions about the infringement of the

11:47  9  '858 patent?

11:47  10              Do you remember that line of questioning?

11:47  11      A.    Yes.

11:47  12      Q.    Okay.  Did Cisco give you or anyone else at

11:47  13  Paltalk the documents to be able to evaluate whether

11:47  14  Cisco infringes?

11:47  15      A.    No.  They didn't give me anything.

11:47  16      Q.    Do you recall a similar line of questioning

11:47  17  about whether anyone at Paltalk would be able to speak

11:47  18  to the reasonable royalty?  Do you remember those

11:47  19  questions?

11:47  20      A.    Yes.

11:47  21      Q.    Did Cisco give you any documents to be able to

11:47  22  discuss what a reasonable royalty might be?

11:47  23      A.    No.

11:47  24      Q.    Cisco did not -- did Cisco give you such

11:47  25  confidential documents?

| | | |
|---|---|---|
| 11:47 | 1 | A.    No. |
| 11:47 | 2 | Q.    And, Mr. Katz, you recall both in opening and |
| 11:48 | 3 | a minute ago questions about whether or not Paltalk |
| 11:48 | 4 | reached out to Cisco about negotiating a license. |
| 11:48 | 5 | Do you remember that? |
| 11:48 | 6 | A.    Yes. |
| 11:48 | 7 | Q.    Okay.  And since you filed this lawsuit in |
| 11:48 | 8 | July of 2021, has Cisco taken a license to the |
| 11:48 | 9 | '858 patent? |
| 11:48 | 10 | A.    No. |
| 11:48 | 11 | MS. MAGEE:  Your Honor, may I approach? |
| 11:48 | 12 | (Bench conference.) |
| 11:48 | 13 | MS. MAGEE:  Your Honor, ordinarily the |
| 11:48 | 14 | Court's MIL No. 6 would preclude any reference of any |
| 11:48 | 15 | IPRs or re-exams.  But Ms. Piepmeier -- |
| 11:48 | 16 | THE COURT:  Not coming in. |
| 11:48 | 17 | MS. MAGEE:  Okay. |
| 11:48 | 18 | (Bench conference concludes.) |
| 11:48 | 19 | BY MS. MAGEE: |
| 11:49 | 20 | Q.    Lastly, Mr. Katz, do you recall being asked |
| 11:49 | 21 | questions about the $145,000 you paid for the -- for |
| 11:49 | 22 | obtaining the assets?  Do you recall? |
| 11:49 | 23 | A.    Yes. |
| 11:49 | 24 | Q.    Okay.  And again, Mr. Katz, what went into |
| 11:49 | 25 | that purchase price? |

```
11:49  1        A.    Which assets?

11:49  2        Q.    I'll ask a better question, Mr. Katz.

11:49  3              Did that purchase price reflect how Paltalk

11:49  4    valued the HearMe assets?

11:49  5        A.    No.  I said that a bunch of times.  I think it

11:49  6    was just an extreme fire sale based on the way the

11:49  7    world was and where HearMe was, and their liquidation

11:49  8    was a once-in-a-lifetime sort of opportunity.

11:49  9        Q.    And lastly, Mr. Katz, back on the subject of

11:49  10   Paltalk not having to reach out to Cisco, do you recall

11:49  11   those questions?

11:49  12       A.    Yes.

11:49  13       Q.    Okay.  Mr. Katz, it is your belief that there

11:49  14   would have been -- is it your belief that there would

11:49  15   have been consequences for Paltalk had they reached out

11:49  16   to Cisco initially?

11:49  17       A.    Yes.  Negative consequences for Paltalk.

11:50  18              MS. MAGEE:  Okay.  I pass the witness.

11:50  19              MS. PIEPMEIER:  No further questions.

11:50  20              THE COURT:  You may step down, sir.

11:50  21              Ladies and gentlemen of the jury, we'll

11:50  22   go ahead and take our lunch break.  If you all would be

11:50  23   back by 1:15, we'll get started again.

11:50  24              Unfortunately, for some reason, a lot of

11:50  25   things are closed on Mondays for lunch near the
```

| | | |
|---|---|---|
| 11:50 | 1 | courthouse.  So you're sort of on your own.  After |
| 11:50 | 2 | today, there's a food court right across the street |
| 11:50 | 3 | that's pretty convenient that you can get to pretty |
| 11:50 | 4 | quickly. |
| 11:50 | 5 | So please do your best to be back by |
| 11:50 | 6 | 1:15.  Please remember my instructions about not |
| 11:50 | 7 | discussing the case with anyone. |
| 11:50 | 8 | THE BAILIFF:  All rise. |
| 11:50 | 9 | (Jury exited the courtroom.) |
| 11:50 | 10 | THE COURT:  Thank you.  You may be |
| 11:51 | 11 | seated. |
| 11:51 | 12 | Who do we -- who will we be seeing this |
| 11:51 | 13 | afternoon from the plaintiff? |
| 11:51 | 14 | MR. SIEGMUND:  Your Honor, after this, we |
| 11:51 | 15 | have I believe four depositions that we're going to |
| 11:51 | 16 | play.  I believe will take about an hour, and then |
| 11:51 | 17 | it'll be -- |
| 11:51 | 18 | THE COURT:  Juries love long depositions. |
| 11:51 | 19 | MR. SIEGMUND:  I know they do, Judge. |
| 11:51 | 20 | Luckily, it's not too bad. |
| 11:51 | 21 | And then after that, it'll be our |
| 11:51 | 22 | technical expert. |
| 11:51 | 23 | THE COURT:  Okay.  Very good. |
| 11:51 | 24 | So no chance we'll finish your case |
| 11:51 | 25 | today. |

142

| | | |
|---|---|---|
| 11:51 | 1 | MR. SIEGMUND:  No, Your Honor. |
| 11:51 | 2 | THE COURT:  So this may or may not hold. |
| 11:51 | 3 | Typically the way it's -- |
| 11:51 | 4 | This doesn't need to be on the record. |
| 11:51 | 5 | (Off-the-record discussion.) |
| 11:53 | 6 | (Recess taken.) |
| 01:28 | 7 | THE BAILIFF:  All rise. |
| 01:28 | 8 | THE COURT:  Please remain standing for |
| 01:28 | 9 | the jury. |
| 01:28 | 10 | (Jury entered the courtroom.) |
| 01:28 | 11 | THE COURT:  Thank you.  You may be |
| 01:28 | 12 | seated. |
| 01:28 | 13 | Counsel? |
| 01:28 | 14 | MR. SIEGMUND:  Yes, Your Honor.  Paltalk |
| 01:28 | 15 | calls Nathan Buckles by video deposition.  He's a Cisco |
| 01:29 | 16 | engineer, and his testimony is relevant to |
| 01:29 | 17 | infringement. |
| 01:29 | 18 | THE COURT:  Ladies and gentlemen of the |
| 01:29 | 19 | jury, let me explain to you how our system works.  When |
| 01:29 | 20 | you're preparing a case to get it ready to come to |
| 01:29 | 21 | trial, you have the opportunity to ask people to take a |
| 01:29 | 22 | deposition. |
| 01:29 | 23 | A deposition is where the lawyers for |
| 01:29 | 24 | both sides show up.  There's a court reporter -- |
| 01:29 | 25 | probably not as great as my court reporter, but a court |

01:29  1    reporter.  And the witness is sworn, and then each side

01:29  2    gets to ask them questions and they are under oath.

01:29  3                That's the most important part, is just

01:29  4    like the witnesses who are here in person are under

01:29  5    oath, the next four witnesses you see by deposition

01:29  6    will also be under oath.  But we're in Waco.  You know,

01:29  7    there are folks who can't get to Waco for a trial.  And

01:29  8    so the lawyers can provide you with their video --

01:29  9                By video?

01:29  10               MR. SIEGMUND:  Yes, Your Honor.

01:29  11               THE COURT:  Okay.  They'll show you the

01:29  12   videotaped depositions.  The most important thing for

01:29  13   you to remember, and I'll give you an instruction to

01:29  14   remind you of this at the end of the trial, the fact

01:30  15   that the witness is not here should play no role in the

01:30  16   amount of credibility you give the witness or witnesses

01:30  17   because they have been sworn.

01:30  18               Now, again, I'm not telling you to

01:30  19   believe them, I'm not telling you not to believe them.

01:30  20   That's why y'all are here as judges with each witness.

01:30  21   Just don't hold it against them that they're here by

01:30  22   video and not in person.

01:30  23               Counsel?

01:30  24   (Video deposition of Nathan Buckles played as follows:

01:30  25       Q.    First of all, could you state your full name

01:30  1    for the record?

01:30  2        A.    Sure.  My full legal name is Carl Nathan

01:30  3    Buckles.

01:30  4        Q.    Who's your employer?

01:30  5        A.    My employer is Cisco Systems.

01:30  6        Q.    You've been working with Cisco for almost

01:30  7    25 years?

01:30  8        A.    Yes.  It's about 23.  Yeah.

01:30  9        Q.    And your title is distinguished engineer; is

01:30  10   that right?

01:30  11       A.    That's correct.

01:30  12       Q.    You understand that you are testifying as a

01:31  13   corporate representative of Cisco's on certain topics,

01:31  14   right?

01:31  15       A.    That's correct.  I do understand that.  Yeah.

01:31  16       Q.    Do you see Topic 20 on the screen, sir?

01:31  17       A.    I do.

01:31  18       Q.    20(a) -- or Topic 20 says:  The defense has

01:31  19   asserted in this case by Cisco, including but not

01:31  20   limited to, A, Cisco's basis or bases for denying

01:31  21   infringement of the patent-in-suit.

01:31  22             Do you see that?

01:31  23       A.    Yes.

01:31  24       Q.    And you are prepared to give testimony on that

01:31  25   topic, right?

01:31    1        A.    That's correct.

01:31    2        Q.    What did you do to prepare to give testimony

01:31    3    on Cisco's behalf on this Topic 20(a)?

01:31    4        A.    I met with Cisco counsel as well as Brick

01:31    5    Zhang and Wilford Wang.

01:31    6        Q.    The source code that you reviewed in

01:31    7    preparation for this deposition was a set of source

01:31    8    code that was presented to you for -- for review.

01:32    9              Is that -- is that fair to say?

01:32   10        A.    That's correct.

01:32   11        Q.    Okay.  It wasn't source code that you on your

01:32   12    own volition went out and identified for review from

01:32   13    the source code repository, right?

01:32   14        A.    That's correct.

01:32   15        Q.    Certain Webex products include

01:32   16    audioconferencing functionality, right?

01:32   17        A.    We should be -- probably be specific about

01:32   18    what you mean by audioconferencing.

01:32   19        Q.    Let me ask the question in the converse.

01:32   20              Are there any Webex products that do not

01:32   21    include audioconferencing functionality?

01:32   22        A.    Yeah.  Again, I'm not sure we have the same

01:32   23    understanding of what you mean by audioconferencing.

01:32   24    So it's a bit hard to give an accurate answer.

01:32   25        Q.    Do you have any understanding of what the term

01:32  1  "audioconferencing functionality" means as Nathan

01:32  2  Buckles?

01:32  3      A.    I do.

01:33  4      Q.    And what does it mean to you?

01:33  5      A.    So to me, an audioconference is the exchange

01:33  6  of audio information between two or more parties in

01:33  7  a -- in a online meeting.

01:33  8      Q.    You've seen this document before, right,

01:33  9  Mr. Buckles?

01:33  10     A.    I've seen parts of it, yes.

01:33  11     Q.    You've not seen the entire '858 patent?

01:33  12     A.    No.

01:33  13     Q.    You've never read the '858 patent from start

01:33  14  to finish?

01:33  15     A.    That's correct.

01:33  16     Q.    What parts have you seen and what parts have

01:33  17  you not seen?

01:33  18     A.    That's a difficult question to answer because

01:33  19  I haven't heard -- or the latter part is difficult to

01:34  20  answer because I haven't seen the whole thing.  It's

01:34  21  hard to say what I haven't seen.  I have seen the

01:34  22  claims section, I believe, is what it's called --

01:34  23     Q.    Okay.

01:34  24     A.    -- where the claims are enumerated, and I've

01:34  25  seen some of the diagrams.  I don't know where in the

147

01:34  1    document those come from necessarily.

01:34  2        Q.    So you reviewed the claims of the patent and

01:34  3    you reviewed certain of the diagrams.

01:34  4            Is this the first time you're seeing the

01:34  5    patent itself?

01:34  6        A.    Do you mean this particular, like, title page

01:34  7    or --

01:34  8        Q.    Yeah.

01:34  9        A.    I can't say for sure.  I may have seen the

01:34  10   abstract before, but it's hard to be sure, because

01:34  11   since I've seen the claims, I can kind of -- they're

01:34  12   very similar to the abstract.  So I can't be sure if

01:34  13   I've actually seen the abstract before or if it's just

01:34  14   familiar.

01:34  15       Q.    You have no basis to believe that the

01:35  16   '858 patent is invalid, right?

01:35  17       A.    As I said, I haven't read the entire patent,

01:35  18   and I don't know what legal sort of requirements have

01:35  19   to be met or not met for a patent to be valid.  So I

01:35  20   don't hold any personal opinion about its invalidity.

01:35  21       Q.    And I would like for you to identify for me

01:35  22   which of the patent drawings you've reviewed before

01:35  23   today, to the best of your recollection.

01:35  24            Did you review these two drawings on Page 1?

01:35  25       A.    No.

01:35  1      Q.    Did you review this drawing on Page 2?

01:35  2      A.    No.

01:35  3      Q.    Did you review this drawing on Page 3?

01:35  4      A.    No.

01:35  5      Q.    Did you -- before sitting here today, had you

01:35  6  reviewed Figure 3 on Page 4 of the patent?

01:36  7      A.    No.

01:36  8      Q.    Before sitting here today, have you reviewed

01:36  9  Figure 4, which is on Page 5 of the patent?

01:36  10     A.    No.

01:36  11     Q.    Okay.  So you actually haven't reviewed any of

01:36  12  the drawings or figures on the '858 patent; isn't that

01:36  13  right?

01:36  14     A.    If that's all of them, yes.  I thought there

01:36  15  was a different one maybe on the first page that looked

01:36  16  familiar, but perhaps I was misremembering.

01:36  17     Q.    Sir, do you recognize the text beginning on

01:36  18  Page 6 and then continuing to Page 9 to be a

01:36  19  specification of the patent?

01:36  20     A.    Yeah.  I have -- I have not reviewed all of

01:36  21  this, but I have seen some of it.

01:36  22     Q.    Okay.  Are there any parts that you recall

01:36  23  reviewing from Columns 1, 2, 3, 4, 5, 6, or 7 of the

01:37  24  '858 patent?

01:37  25     A.    We went -- we went through those fairly

01:37  1    quickly, but at the bottom of Column 7, where it states

01:37  2    "what is claimed is" --

01:37  3        Q.    Yep.

01:37  4        A.    -- that's the part that I know for sure that I

01:37  5    have reviewed.

01:37  6        Q.    From Column 1, which is on the left there,

01:37  7    that starts with background of the invention, all the

01:37  8    way through the "what is claimed is" language on Page 9

01:37  9    in Column 7, what parts of that portion of the patent,

01:37  10   if any, have you read and reviewed?

01:37  11       A.    I don't think I've read or reviewed anything

01:37  12   in that -- in that section you just identified.

01:37  13       Q.    Okay.  Have you in connection with -- or did

01:37  14   you ever ask to review anything in the '858 patent

01:37  15   except for the claims?

01:37  16       A.    I have -- I have not.

01:38  17       Q.    And you're aware that this '858 patent is a

01:38  18   public document, right?

01:38  19       A.    Yes.

01:38  20       Q.    You have not gone, then, on your own volition

01:38  21   and pulled up the '858 patent and read anything other

01:38  22   than the claims which begin on Page 9, right?

01:38  23       A.    I have not gone and retrieved this packet --

01:38  24   or sorry -- this patent document or read through it.

01:38  25   No.

150

01:38   1      Q.    Is it your testimony on behalf of Cisco today

01:38   2    that this '858 patent is not infringed by Cisco's Webex

01:38   3    products?

01:38   4      A.    Yeah.  Sorry.  I can't provide you with a

01:38   5    legal opinion on that, but I can provide facts around

01:38   6    the behaviors of -- of Cisco's Webex systems related to

01:38   7    this patent.

01:38   8      Q.    Webex Meetings allows users to participate

01:39   9    either with a computerized device, like a smartphone or

01:39   10   a PC, or alternatively, with a standard telephone, like

01:39   11   a PSTN telephone.  Isn't that right?

01:39   12     A.    That's not a -- that's not a complete list,

01:39   13   but yes.  All of those are capable of participating in

01:39   14   Webex Meetings.  Yeah.

01:39   15     Q.    Webex Meetings allow various types of devices

01:39   16   to participate in the meeting, right?

01:39   17     A.    That's correct.

01:39   18     Q.    And a PC can participate in a Webex meeting,

01:39   19   right?

01:39   20     A.    Yes.

01:39   21     Q.    PSTN telephones that cannot do mixing

01:39   22   themselves are able to participate in Webex Meeting

01:39   23   audioconferences, right?

01:39   24     A.    That's correct.

01:39   25     Q.    Well, Webex Meetings servers do have the

01:39  1    capability to mix audio, right?

01:40  2        A.    That's correct.  Some of -- some of them do.

01:40  3        Q.    You use the word "multiplexing" or "multiplex"

01:40  4    in your business, right?

01:40  5        A.    Yes.  We sometimes use that term.

01:40  6        Q.    What do you understand it to mean?

01:40  7        A.    Even within Cisco, it has had different

01:40  8    meanings over time.  So we'd have to talk about a

01:40  9    specific situation to sort of have a firm definition.

01:40  10       Q.    In what instances would a PC-based client

01:40  11   require mixing?

01:40  12       A.    So the -- the determination to -- to use

01:40  13   mixing or not is based on multiple factors, including

01:40  14   the capabilities of the physical client itself, the

01:40  15   networks and systems in between that client and Webex,

01:40  16   and the overall user experience that we want to deliver

01:40  17   to that particular client.  All of those are factors in

01:41  18   determining -- sort of mixing and non-mixing isn't

01:41  19   really a standalone factor itself.

01:41  20       Q.    Can you confirm, sir, that Webex Meetings is

01:41  21   capable of determining, in at least some instances,

01:41  22   which clients have the capability to mix multiple audio

01:41  23   streams and which do not?

01:41  24       A.    Yeah.  In some but not all instances.

01:41  25       Q.    You reviewed this Claim 1 to the '858 patent,

01:41  1    right, Mr. Buckles?

01:41  2        A.    Yes.

01:41  3        Q.    Is it -- is it Cisco's position that Webex

01:41  4    Meetings does not infringe Claim 1 of the '858 patent?

01:41  5        A.    Yes.

01:41  6        Q.    What are the bases of that contention?

01:41  7        A.    Yeah.  So I can't provide the -- the legal

01:41  8    basis, but I can answer -- you know, provide facts

01:41  9    about the way that Webex Meetings behaves relative to

01:41  10   what's described in the claim.

01:42  11       Q.    So you're not prepared to provide the bases

01:42  12   why Cisco believes Claim 1 is not infringed?

01:42  13       A.    Yeah.  I believe that's best presented by

01:42  14   Cisco counsel.

01:42  15       Q.    So the preamble to Claim 1 says:  A method of

01:42  16   providing audioconferencing for a plurality of clients

01:42  17   using varying equipment and protocols.

01:42  18             Do you see that?

01:42  19       A.    Yes.

01:42  20       Q.    You would agree that Webex Meetings does

01:42  21   provide via conferencing -- or is capable of providing

01:42  22   audioconferencing for a plurality of clients using

01:42  23   varying equipment and protocols?

01:42  24       A.    Yeah.  I think that's a somewhat vague

01:42  25   description, I think.  So it's hard to be definitive.

153

01:42  1    Q.    And there are also some situations that I'm
01:42  2  looking at now, Part 1 here or the first clause here,
01:43  3  where Cisco Webex Meetings receives an audio packet
01:43  4  from each of the plurality of clients who are
01:43  5  participating in an audioconference; isn't that right?
01:43  6    A.    Just to be clear, the question was Cisco Webex
01:43  7  Meetings receives audio package from each of the
01:43  8  plurality of clients?
01:43  9    Q.    Yes.  There are situations where that happens.
01:43  10    A.    Yes.
01:43  11    Q.    Okay.  And there are situations where Cisco
01:43  12  Webex Meetings then determines which of the plurality
01:43  13  of clients participating in an audioconferencing
01:43  14  session is an active speaker, right?
01:43  15    A.    We should probably discuss what we mean by
01:43  16  "active speaker."
01:43  17    Q.    Okay.  Do you have any testimony on behalf of
01:43  18  Cisco as to whether Cisco Webex Meetings in any
01:43  19  instances determines which of the plurality of clients
01:44  20  in an audioconferencing session is an active speaker?
01:44  21    A.    Yes.  With the caveat that "active speaker"
01:44  22  can mean different things to different people.  Some
01:44  23  people define it as very clearly being speech, and
01:44  24  other people would define it perhaps more as any form
01:44  25  of noise.  So there is some -- some ambiguity there.

01:44   1       Q.    Well, as Cisco uses the term.  There are

01:44   2   instances where Webex Meetings determines which of the

01:44   3   plurality of clients in an audioconference is an active

01:44   4   speaker, right?

01:44   5       A.    Yeah.  I think that -- that's reasonable to

01:44   6   say.

01:44   7       Q.    And there are also circumstances where Cisco

01:45   8   Webex Meetings determines which of the plurality of

01:45   9   clients in an audioconference is an active speaker and

01:45  10   forms an active speaker list; is that right?

01:45  11       A.    There are -- there are instances where, yes,

01:45  12   clients who are determined to be active speakers are

01:45  13   grouped together in some way.

01:45  14       Q.    Are there any instances where Cisco Webex

01:45  15   Meetings determines that a plurality of the clients in

01:45  16   an audioconferencing system has the capability to mix

01:45  17   multiple audio streams?

01:45  18       A.    So again, we do use the capability of client

01:45  19   mixing multiple audio streams in some scenarios, but

01:46  20   it's not based strictly on the capability of those

01:46  21   clients to do so.

01:46  22       Q.    Are there any instances where Cisco Webex

01:46  23   Meetings makes a determination of whether one or more

01:46  24   clients in an audioconference has the capability to mix

01:46  25   multiple audio streams?

01:46  1        A.    Yeah.  Again, that -- that determination is

01:46  2   based on multiple factors.

01:46  3        Q.    What determination?

01:46  4        A.    The determination of whether the client should

01:46  5   be delivered mixed or unmixed audio streams.

01:46  6        Q.    Understood.  And one of those factors is the

01:46  7   physical capabilities or characteristics of the client

01:46  8   device, right?

01:46  9        A.    In some cases, but not in others.

01:46  10       Q.    No. 5 says:  Multiplexing said packets of

01:46  11  audio data received from each client on said active

01:46  12  speakers list into a multiplexed stream.

01:47  13             Do you see that?

01:47  14       A.    Yes.

01:47  15       Q.    Do you understand what that means?

01:47  16       A.    Again, I think there are multiple different

01:47  17  versions or meanings behind the use of the term

01:47  18  "multiplexing."  So we'd have to discuss it, what --

01:47  19  what it means in this context.

01:47  20       Q.    Do you have any testimony about whether Cisco

01:47  21  Webex Meetings infringes Claim 5 of the patent?  The

01:47  22  answer can be no.  I'm just trying to understand your

01:47  23  testimony for trial.

01:47  24       A.    No.  In terms of infringement, I don't -- I'm

01:47  25  not going to offer a legal opinion on that, but I can

01:47  1    answer specific questions about the way the system

01:47  2    behaves.

01:47  3        Q.    And you didn't consult any other parts of this

01:47  4    patent, including the patent specifications, to try to

01:47  5    get a better understanding of what Claim Element [5]

01:47  6    means, right?

01:47  7        A.    I think, yeah, like I said earlier, I have

01:48  8    only seen the claim section for the most part.

01:48  9        Q.    Do you have any understanding, based on how

01:48  10   you've used the words "multiplexing" and "multiplexed"

01:48  11   and "stream" in the ordinary course of your business,

01:48  12   whether Cisco Webex Meetings multiplexes packets of

01:48  13   audio data received from clients in an audioconference

01:48  14   on the active speaker list into a multiplexed stream,

01:48  15   whether that ever occurs?

01:48  16       A.    Based on how I would define the terms

01:48  17   "multiplexing" and "multiplexed stream," I would not

01:48  18   describe the behavior of Webex -- Cisco Webex Meetings

01:48  19   in that way.

01:48  20       Q.    Could you elaborate?

01:48  21       A.    So again, a stream is a very particular

01:48  22   concept within the realtime media standards.  It has --

01:49  23   it determines certain aspects of the way the media is

01:49  24   transmitted, like the way the security is done, the way

01:49  25   that, like, you determine whether packets are lost in a

01:49   1   network and things like that.  And the way that Webex

01:49   2   Meetings uses multiplexing does not leverage the

01:49   3   multiplexed stream concept, as I would define it.

01:49   4       Q.   But Cisco Webex Meetings does have

01:49   5   multiplexing capabilities with respect to audio

01:49   6   conferences, right?

01:49   7       A.   Yes.  I think that -- that's fair to say with

01:49   8   the caveat that, again, multiplexing can take many

01:49   9   different potential forms.

01:49   10      Q.   Do you have a description in the way -- of the

01:50   11  way that Cisco Webex Meetings delivers multiplexed

01:50   12  audio to clients?  Can you describe that for me?

01:50   13      A.   Sure.  There's multiple levels of multiplexing

01:50   14  in a Webex meeting.  We -- for example, we multiplex

01:50   15  the audio and video delivered to a client onto the same

01:50   16  network.  So those are sent across the same network

01:50   17  between the server and the client.

01:50   18           And we also multiplex multiple audio streams

01:50   19  to -- again, to a receiving client.  We also

01:50   20  multiplex -- in some cases, video being sent from a

01:50   21  client is multiplexed onto the network towards the

01:50   22  server.  So there are a lot of different usages of

01:50   23  multiplexing.  That's why it's a bit difficult to

01:50   24  always have a common understanding.  It's a very

01:50   25  overloaded term.

01:50  1        Q.    There are instances where Cisco Webex Meetings
01:51  2    does mix audio before transmitting the audio in a
01:51  3    packet back to some or all clients in a conference,
01:51  4    right?
01:51  5        A.    Yes.  I think that's an accurate answer.
01:51  6        Q.    Yeah.  And my microphone.  And then there's --
01:51  7    I assume that Webex has a feature to eliminate that
01:51  8    echo from the conference?
01:51  9        A.    Yeah.  To the -- to the question of does Webex
01:51 10    have a feature to eliminate that echo, yes.  We do.
01:51 11    It's called audio echo cancellation, or AEC, a typical
01:51 12    abbreviation for it.
01:51 13        Q.    When there's a determination at the server
01:51 14    level of who the active speaker is, how is that
01:51 15    determination made?
01:51 16        A.    It does vary a little bit from server to
01:51 17    server and has varied over time.  There's lots of
01:51 18    tuning of those sorts of parameters, how fast it should
01:51 19    react, how long it should stay, different things like
01:51 20    that.
01:51 21              But essentially, the system is examining the
01:52 22    audio that it's receiving, and it is looking as best as
01:52 23    it can for whether that audio contains useful noise,
01:52 24    and within the context of a meeting useful noise is
01:52 25    largely people talking, although not exclusively.

159

01:52   1            And then if -- if a person is talking, then

01:52   2    the server will, again, do that correlation of audio to

01:52   3    video and try to draw that blue or green box around

01:52   4    that portion of the video.

01:52   5        Q.   And talking now about Webex Meetings, there

01:52   6    are instances where audio clients use SIP to connect

01:52   7    with Webex Meetings, right?

01:52   8        A.   Yes.  Audio clients, audio/video clients,

01:52   9    different -- yeah.  Clients have different levels of

01:52   10   capability.

01:52   11       Q.   You would agree that a client using a

01:52   12   telephone and the H.323 protocol is capable of

01:53   13   participating in a Webex Meetings audioconference,

01:53   14   right?

01:53   15       A.   Yes.  With the -- with the caveats that I

01:53   16   described earlier.

01:53   17       Q.   Does Webex Meetings use a metric of loudest

01:53   18   audio to determine the active speakers?

01:53   19       A.   In combination with -- with some other

01:53   20   factors.  So the determination of loudest audio can be

01:53   21   quite complex.

01:53   22            For example, you can imagine that someone has

01:53   23   a noisy fan in their home office, right?  Now,

01:53   24   that's -- that's loud, but it's not useful loud.  So

01:53   25   there is some devil in the details in terms of the

01:53  1    determination of loudest and what we -- what we intend

01:54  2    to deliver.  But at a high level, you could best

01:54  3    describe the goal as saying if someone is making --

01:54  4    speaking within a meeting, you want to be able to hear

01:54  5    them.

01:54  6        Q.    And does the CMS server store an active

01:54  7    speaker list in connection with an audioconference?

01:54  8        A.    I don't know the full details of the CMS code,

01:54  9    but in terms of a -- or how those -- that sort of

01:54  10   concept is tracked.  But at a high level, it would

01:54  11   have, again, the notion of wanting to deliver the most

01:54  12   relevant or most useful audio to the clients that are

01:54  13   connected to it.

01:54  14       Q.    Has Cisco made any efforts to design around or

01:54  15   otherwise avoid infringement of the '858 patent?

01:54  16       A.    No.

01:54  17               (End of video deposition.)

01:55  18               MR. SIEGMUND:  Thank you, Your Honor.

01:55  19               Paltalk next calls Mr. Aaron Belcher,

01:55  20   another Cisco engineer.  And his testimony's relevant

01:55  21   to infringement by video deposition.

       22   (Video deposition of Aaron Belcher played as follows:

01:55  23       Q.    As you heard from your counsel, my name is

01:55  24   Bryce Barcelo, and I represent Paltalk in this case.

01:55  25               Would you mind stating your full name for the

161

01:55  1    record?

01:55  2        A.    My name is Aaron James Belcher.

01:55  3        Q.    Okay.  And have you reviewed the

01:55  4    patent-in-suit?

01:55  5        A.    I have reviewed the claims in the

01:55  6    patent-in-suit.  Not -- yes.

01:55  7        Q.    And so did you actually look at the actual

01:55  8    patent-in-suit?

01:55  9        A.    The claims of the patent-in-suit.  I focused

01:55  10   specifically on the claim.  I didn't read every word in

01:55  11   the rest of the document.

01:55  12       Q.    What did you do to prepare for today?

01:56  13       A.    I mean, nothing specific related to this

01:56  14   topic.  I mean, I'm the head architect for the Webex

01:56  15   Meetings and messaging BU.  So as part of my daily job,

01:56  16   I pay attention to changes that are made.

01:56  17       Q.    And when was the last major change to the UX

01:56  18   in this area?

01:56  19       A.    Yeah.  When was the last major change in the

01:56  20   UX in this area?  Yeah.  I mean, the -- the product's

01:56  21   been basically functioning the same in this area for as

01:56  22   long as I can remember.  We -- we have always been an

01:56  23   audioconferencing, you know, application that supports

01:56  24   PSTN.

01:57  25       Q.    And how would you describe or define

01:57    1    multiplexing?

01:57    2        A.    So multiplexing is a pretty vague term.

01:57    3    Multicast is a standard.  You know, there is an RFC

01:57    4    describing it.  Cisco is very involved in that.

01:57    5    Multiplexing is a more generic term.  It's a lot

01:57    6    vaguer.  So I need -- need some context where you want

01:57    7    to define multiplexing in.

01:57    8        Q.    So with -- with regards to audioconferencing,

01:57    9    how would you define multiplexing?

01:57   10        A.    So with regard to audioconferencing, how would

01:57   11    you define multiplexing?  So yeah.  I -- we do have a

01:58   12    product that multiplexes video, and it might be helpful

01:58   13    for me to describe that and then go from there, and

01:58   14    then describe how -- yeah.  So we have a product that

01:58   15    has two video streams -- screens, and the -- what

01:58   16    happens is the server detects that the client has two

01:58   17    video streams, and instead of sending that one video

01:58   18    stream, the server does a composed video that has a

01:58   19    complete layout on both video streams.  And over that

01:58   20    one connection to the -- that video device, we send two

01:58   21    video streams, and we call that multiplexing.

01:58   22            But it's -- it's all -- it's done in a

01:58   23    transcoder, where the transcoder knows it's talking to

01:58   24    a device that has two screens, and it's, you know,

01:59   25    creating two separate video screens -- the things for

01:59  1    it.  So that duplex video is the way we think about it.

01:59  2    "Multiplex video" is a term we use to describe that

01:59  3    specific thing.  We don't have anything similar to that

01:59  4    for audio, so, you know, it's hard to -- to describe

01:59  5    what...

01:59  6        Q.    And what role does H.323 play in

01:59  7    audioconferencing for Webex?

01:59  8        A.    It's a very small role.  There's some older

01:59  9    clients that still talk about protocol.

01:59  10       Q.    And so it's a legacy compatibility protocol?

01:59  11   Would that be fair to say?

01:59  12       A.    Correct.

01:59  13       Q.    Do the Webex products receive audio packets

01:59  14   from clients?

01:59  15       A.    Yeah.  It's vague.  Do the Webex products

02:00  16   receive audio packets from clients?  Yes.  It's vague.

02:00  17   But yes.  We do.

02:00  18       Q.    And what is -- what does the term "mux" mean

02:00  19   to you?

02:00  20       A.    Context?

02:00  21       Q.    Sure.  You can go to the next slide if you

02:00  22   need context for the term "mux."

02:00  23       A.    Oh, next slide, Slide 4?

02:00  24       Q.    Yes.

02:00  25       A.    I don't know what that means for sure.  I

02:00  1    don't want to speculate in that context.

02:00  2       Q.    Do you know what the term "mux" means in any

02:00  3    context?

02:00  4       A.    So -- so I have heard it before, I think.

02:00  5    I -- you know, if I saw it in context, I would

02:01  6    understand what it means.  But I can't think of like a

02:01  7    definition of what mux means.

02:01  8       Q.    So you are not familiar with mux as a

02:01  9    shorthand term for multiplex?

02:01  10      A.    No.

02:01  11      Q.    You've never -- you've never seen that

02:01  12   association between those two terms?

02:01  13      A.    No.  I mean -- yeah.  It could be used that

02:01  14   way, but I have never seen that association.

02:01  15      Q.    Okay.  Does the CMS mix audio streams before

02:01  16   sending them to the phones?

02:01  17      A.    Yes.

02:01  18              (End of video deposition.)

02:01  19              MR. SIEGMUND:  Paltalk next calls

02:02  20   Mr. Steven Boyles.  He's a principal at Five Corners,

02:02  21   and his testimony is relevant to damages by video

02:02  22   deposition.

02:02  23    (Video deposition of Steven Boyles played as follows:

02:02  24      Q.    Mr. Boyles, do you understand today that

02:02  25   you're appearing as Cisco's corporate representative

02:02  1    for a number of topics?

02:02  2        A.    I do.

02:02  3        Q.    Now find Topic 30.  I'll read this one and let

02:02  4    you take the heavy lifting there, but Topic 30 says:

02:02  5    Sales of software incorporating the accused

02:02  6    functionalities and attendant sales data.

02:02  7            Did I read that correctly?

02:02  8        A.    I believe so.

02:02  9        Q.    Mr. Boyles, do you have an understanding of

02:02  10   what is meant by accused functionalities as it appears

02:02  11   in Topic 30?

02:02  12       A.    Again, I have a broad understanding as to what

02:02  13   it relates to.

02:02  14       Q.    And what is that broad understanding?

02:02  15       A.    That it pertains to the audio portion of the

02:02  16   sales.

02:03  17       Q.    What do you mean by "audio portion,"

02:03  18   Mr. Boyles?

02:03  19       A.    Well, when referring to, I guess, Webex

02:03  20   products, it's the audio portion of the product

02:03  21   functionality as opposed to the meetings or polling or

02:03  22   visual portions or anything else that's not related to

02:03  23   sound.

02:03  24       Q.    Mr. Boyles, do you know if Cisco keeps track

02:03  25   of the number of users of its Webex products?

02:03  1    A.    I have seen no indication that within at least

02:03  2  the finance group, there's any tracking mechanism of

02:03  3  number of users.

02:03  4    Q.    Mr. Boyles, do you know how much revenue Cisco

02:03  5  earned from the Webex Meetings meet option in 2021?

02:04  6    A.    I have not analyzed the data that's been

02:04  7  produced or tried to break it down between meet,

02:04  8  enterprise, or other.

02:04  9    Q.    And, Mr. Boyles, you don't know how many users

02:04  10  Cisco has for Webex Calling basic, do you?

02:04  11    A.    I have not seen -- I have not seen any

02:04  12  documents reflecting the number of users.

02:04  13    Q.    You haven't seen any documents reflecting the

02:04  14  number of users for any Webex product; is that correct?

02:04  15    A.    Correct.

02:04  16    Q.    And, Mr. Boyles, I'm looking now at B-13 which

02:04  17  says U.S. Revenue.  I don't see any U.S. revenue listed

02:04  18  until we get to Q1 of fiscal year 2018.

02:05  19         Do you know why those rows are blank for

02:05  20  fiscal years '15 through '17?

02:05  21    A.    I do.

02:05  22    Q.    And why is that?

02:05  23    A.    The Cisco data that anybody has access to is

02:05  24  purged after a certain number of years.  And so the

02:05  25  U.S. portion of the Webex revenue, we only have access

02:05  1    to it back to fiscal year 2018.  Prior to that, someone

02:05  2    at Cisco's going to have to go into some sort of

02:05  3    archive.  We have to first of all identify where the

02:05  4    archive might be attributed to the U.S. only revenue

02:05  5    and try to extract that information.  It just hasn't

02:05  6    been able to be done yet because there isn't specific

02:05  7    IT support available to do that any longer.

02:05  8         Q.    Mr. Boyles, have you ever seen any surveys

02:06  9    completed by Cisco or Webex customers about how much

02:06  10   they value Webex Calling, for example?

02:06  11        A.    I have not.

02:06  12        Q.    Mr. Boyles, have you ever seen any financial

02:06  13   analyses or reports that Cisco uses to measure the

02:06  14   performance of Webex?

02:06  15        A.    Beyond what we have reviewed today, I'm not

02:06  16   aware of anything additional.

02:06  17        Q.    Does Cisco track revenue at a more granular

02:06  18   level than that, like with respect to revenue from

02:06  19   Webex Events, Webex Calling?  Do you know the answer to

02:06  20   that question one way or the other?

02:06  21        A.    Well, the information in Exhibit 16 and

02:06  22   related exhibits is the most granular level you could

02:07  23   imagine reporting this information.  It's -- not only

02:07  24   is it by product, sometimes it's by elements of a

02:07  25   product.

02:07  1       Q.    And, Mr. Boyles, you previously discussed that

02:07  2  Cisco does not track, for example, its R&D expenses by

02:07  3  product; is that right?

02:07  4       A.    Correct.  That's my understanding.

02:07  5                  (End of video deposition.)

02:07  6                  MR. SIEGMUND:  And, Your Honor, plaintiff

02:07  7  would move to admit PX-139 and PX-154.

02:07  8                  MR. SABRI:  No objection, Your Honor.

02:07  9                  THE COURT:  Admitted.

02:07  10                  MR. SIEGMUND:  That's all the video

02:07  11  depositions, Your Honor.

02:07  12                  THE COURT:  Thank you.

02:07  13                  Who will your next witness be?

02:07  14                  MR. CAUGHEY:  Plaintiff calls Dr. Scott

02:07  15  Schaefer.

02:07  16                  (The witness was sworn.)

02:08  17                  DIRECT EXAMINATION

02:08  18  BY MR. CAUGHEY:

02:08  19       Q.    Good afternoon.

02:08  20       A.    Good afternoon.

02:08  21       Q.    Could you please state your name for the

02:08  22  record?

02:08  23       A.    Sure.  My name is Scott Schaefer.

02:08  24       Q.    How are you doing today?

02:08  25       A.    Okay.

02:08  1      Q.    I see on the screen and I think it's probably

02:08  2  on the jurors' screen the cover slide.  Have you put

02:08  3  together a slide deck to assist with your testimony

02:08  4  today?

02:08  5      A.    Yes.

02:08  6      Q.    Okay.  And we will walk through this over the

02:08  7  next while.

02:08  8              MR. CAUGHEY:  And if we could go -- I

02:08  9  don't have the clicker.  Hold on, I'm sorry, that's

02:09 10  going to be useful --

11  BY MR. CAUGHEY:

02:09 12      Q.    More than one slide, right?

02:09 13      A.    It is.

02:09 14      Q.    Okay.  Now, this is the first slide of the

02:09 15  deck with Dr. Scott Schaefer.

02:09 16              Would you tell the jury a little bit about

02:09 17  yourself?

02:09 18      A.    Sure.  So I grew up around San Antonio, Texas,

02:09 19  and for my undergraduate, I went to Trinity University,

02:09 20  which is a small school in San Antonio, and I got a

02:09 21  bachelor of science in computer science and mathematics

02:09 22  from there.

02:09 23              After that, I went to Rice University in

02:09 24  Houston, Texas, and I got a master's of science in

02:09 25  computer science as well as Ph.D. in computer science

02:09  1    from there.

02:09  2              After I left Rice, I went to Texas A&M in

02:09  3    College Station.  And I became assistant professor

02:09  4    there.  And I was promoted to associate professor,

02:09  5    eventually full professor and became the associate

02:09  6    department head, and I've been department head of

02:09  7    computer science and engineering the last five years

02:10  8    now.

02:10  9         Q.   Let's add a little daylight to a little bit of

02:10  10   that.  Could you tell the jury what's involved or what

02:10  11   was involved in your working toward and receiving a

02:10  12   Ph.D. in computer science from Rice?

02:10  13        A.   Yes.  Well, I guess I could talk about degree

02:10  14   requirements and so forth.  I've taken a set of

02:10  15   graduate classes and so forth to all factors of the

02:10  16   academic aspect, but I also had to do original research

02:10  17   and computer science.  I had to publish that research,

02:10  18   within that research.  And I guess those were some of

02:10  19   the main qualifications, but there were other aspects

02:10  20   to the degree as well.

02:10  21        Q.   You mentioned that you're the department head

02:10  22   at Texas A&M in computer science.  What

02:10  23   responsibilities does that entail?

02:10  24        A.   Well, I basically run the department.  So I

02:10  25   have to do things like hiring faculty.  For example, I

02:10  1    get to evaluate faculty candidates and hire them.  I'm

02:10  2    responsible for the budget of the department.

02:10  3    Responsible for the overall strategic directory of the

02:11  4    department.

02:11  5         I have to evaluate faculty on an annual basis,

6    and I have to evaluate them for promotion and tenure

02:11  7    and things of that nature as well.  Those are I guess

02:11  8    just some of the things that you have to do as the

02:11  9    department head, but basically I'm responsible for the

02:11  10   entire department.

02:11  11        Q.    Do you teach?

02:11  12        A.    I do, although not right now this semester.

02:11  13        Q.    What -- can you give us -- the jury some

02:11  14   examples of classes you've taught as the computer

02:11  15   science professor at Texas A&M?

02:11  16        A.    Sure.  I taught a bunch of classes, I guess,

02:11  17   at A&M.  I taught an introduction to computing class

02:11  18   for like just starting out students in their major.  I

02:11  19   taught a data structures and algorithms class.  I

02:11  20   taught -- let's see.  A computer graphics class.  I

02:11  21   taught an upper-level seminar class for our more

02:11  22   advanced students.  I taught some graduate classes in

02:11  23   geometric modeling and so forth at the graduate level

02:11  24   as well.

02:11  25        Q.    And the last box here, that reflects an award

02:11  1   you've won for teaching?

02:11  2       A.    Right.  Yeah.  I won actually several awards

02:12  3   for teaching, but that one I think is maybe referring

02:12  4   to the Association of Former Students Distinguished

02:12  5   Teaching Award at the university.  It's one of the

02:12  6   highest awards actually given by the university for

02:12  7   teaching.

02:12  8       Q.    Now, on this next slide, it's fairly dense

02:12  9   with information.

02:12  10          But have you ever done any private sector work

02:12  11  in addition to your faculty position at Texas A&M?

02:12  12      A.    Yeah.  I actually worked for a bunch of

02:12  13  different companies.

02:12  14      Q.    Could you give some examples to the jury of

02:12  15  some of the computer science-oriented work in the

02:12  16  private sector?

02:12  17      A.    Sure.  So I guess the ones that are listed

02:12  18  here, I worked at Microsoft Research for a little bit.

02:12  19  And I also worked at -- let's see.  This one's

02:12  20  Southwest Research Institute in -- it's a place in

02:12  21  San Antonio, Texas, where I did radio direction finding

02:12  22  algorithms.

02:12  23      Q.    And we heard that acronym DARPA before.

02:12  24          What sort of work did you do for that defense

02:13  25  research agency?

02:13  1      A.    So that was the department -- DARPA computer

02:13  2  science study panel.  We went to various -- we went to

02:13  3  various military agencies.  Sorry.  I had to think

02:13  4  about it.  I had to get clearance to do this and I had

02:13  5  to think what I can talk about.

02:13  6           Basically, we were trying to help aspects of

02:13  7  the U.S. military solve technological problems.  I

02:13  8  think that's how I can put it.

02:13  9      Q.    And now, probably right on the other end of

02:13 10  the spectrum, I see a cartoon mouse in the third row

02:13 11  which my children would be much more interested in.

02:13 12           What's the story with Ratatouille?

02:13 13      A.    Yeah.  That's a picture from one of the Pixar

02:13 14  movies.  Some of the research I did was about ways of

02:13 15  animating and forming shapes, basically, and Pixar

02:13 16  implemented a variation of that technique actually as

02:13 17  part of their animation pipeline.  And Ratatouille was

02:13 18  the first movie that it actually got used on.

      19      Q.    And it says you've published papers in the

      20  field of computer science.

      21           You just gave a couple of examples of your

02:13 22  scholarship and published work.

02:13 23      A.    Well, I don't know how much you really want to

02:13 24  get into it.

02:13 25      Q.    Not too much.

02:14   1      A.    Not too much.  I published a lot in different

02:14   2    areas.  One actually was that technique that got used

02:14   3    in Ratatouille, for example.  But I've published other

02:14   4    stuff that's been used in a variety of different

02:14   5    products that you actually might have come across.

02:14   6      Q.    And I think the jury heard in one of the

02:14   7    opening statements that you've been retained and are

02:14   8    presented as an expert here to offer some testimony on

02:14   9    the topic largely of infringement and technical issues.

02:14   10          What are the questions that you considered in

02:14   11   connection with your analysis on this case?

02:14   12     A.    Right.  So the questions that you see there

02:14   13   really is does Webex infringe upon the '858 patent?

02:14   14   And what is the importance of Webex's infringing and

02:14   15   noninfringing features?

02:14   16     Q.    In addressing those questions, what materials

02:14   17   did you consider?

02:14   18     A.    I looked at a lot of stuff, actually.  So I

02:14   19   looked at the patent and its file history, claim

02:14   20   constructions, the plain and ordinary meaning of claim

02:14   21   terms in light of the patent specification.  I looked

02:14   22   at a lot of source code in this case, the accused

02:15   23   products, documents that were provided by Cisco,

02:15   24   documents provided by Paltalk, other publicly available

02:15   25   material like the websites and so forth, the pleadings,

175

02:15  1    discovery responses.  I read lots of depositions, and I

02:15  2    had interviews with Dr. Madisetti and Dr. Bratic as

02:15  3    well.

02:15  4        Q.    We've heard and seen, I think, some images of

02:15  5    the Webex audio conferencing product itself.

02:15  6            Have you used that product?

02:15  7        A.    Yes.  I have.

02:15  8        Q.    Have you brought those -- that -- those

02:15  9    experiences using the product to bear on your opinion

02:15  10   in this case?

02:15  11       A.    Yeah, of course.

02:15  12       Q.    And could you -- we'll get into it in more

02:15  13   detail, but could you just give the jury just a couple

02:15  14   of sentences on what Webex is from the user's

02:15  15   perspective?

02:15  16       A.    Yeah.  So Webex is a product that allows you

02:15  17   to have videoconferences with a number of users.  You

02:15  18   can join in from maybe a computer or you can call in

02:15  19   with a phone, and you can talk to each other.  And at

02:15  20   least the ones that are connected via a computer can

02:15  21   see each other, if they have audio or video cameras and

02:15  22   so forth that are connected.  It lets them meet

02:16  23   together, basically.

02:16  24       Q.    All right.  Can you -- in case folks have used

02:16  25   other ones, can you give another example or two maybe

02:16 1    about similar platforms?

02:16 2        A.    So other ones that you may have seen or heard

02:16 3    of or something are things like Microsoft Teams, for

02:16 4    example, or Zoom.  Those are fairly popular ones that

02:16 5    people also use.

02:16 6                MR. CAUGHEY:  At this time, Your Honor, I

02:16 7    move to qualify Dr. Schaefer as an expert in computer

02:16 8    science and engineering.

02:16 9                MR. SABRI:  No objection.

02:16 10               THE COURT:  Admitted.

02:16 11               (Clarification by Reporter.)

02:16 12   BY MR. CAUGHEY:

02:16 13       Q.    Now, we're going to start on your slides I see

02:16 14   with the first question.  Does Cisco infringe the

02:16 15   '858 patent?  And therefore, we'll start naturally with

02:16 16   the '858 patent.

02:16 17               What do you see on the screen here, sir?

02:16 18       A.    This looks like the first part of the

02:16 19   '858 patent as well as Claim 1 of the '858 patent.

02:16 20       Q.    And what do you understand these sort of

02:16 21   claims of the '858 patent to be?

02:16 22       A.    I understand the Claims 1, 2, 3, 4, and 5 are

02:17 23   asserted.

02:17 24       Q.    Okay.  And the 2, 3, 4, and 5 aren't on the

02:17 25   screen, but you've analyzed those claims?

02:17   1        A.    That's correct.

02:17   2        Q.    In -- in addition to the claims which we see

02:17   3   here, what -- what else is contained in a patent?

02:17   4   We'll look at some of that now, but what are the other

02:17   5   parts of the patent?

02:17   6        A.    So there's lots of different parts of a

02:17   7   patent.  I guess you can see the abstract here, for

02:17   8   example, on the first page.  It's sort of a small

02:17   9   summary of the patent.  That's usually followed by a

02:17   10  list of figures.  There's some of them on this page

02:17   11  that you see.  After that there's usually a

02:17   12  description --

02:17   13       Q.    Could I pause you for one second here?

02:17   14             MR. CAUGHEY:  Mr. Boles, can you pull up

02:17   15  PX-16 so the jurors can kind of follow along with this

02:17   16  description?

02:17   17       A.    Okay.

02:17   18  BY MR. CAUGHEY:

02:17   19       Q.    There we go.

02:17   20       A.    Correct.  So there's --

02:17   21       Q.    There's the first page, right?

02:17   22       A.    There's the first page, abstract and images.

02:17   23  That's usually followed by several more images, for

02:17   24  example.  And then after that, there's usually a

02:17   25  description of background of the invention.  I guess

02:18    1    you can see here would be a summary of the invention

02:18    2    and a description of the figures.

02:18    3         And this is what we get as the preferred

02:18    4    embodiments.  So it's a description of one way that you

02:18    5    might interpret the claims of the invention, one or

02:18    6    more of the ways, I suppose, that you might implement

02:18    7    the claimed invention in this case.  It's not the only

02:18    8    way to do it, but it's an example.

02:18    9         And then after that, it would be followed by a

02:18    10   list of claims.

02:18    11   Q.    And the claims start at the bottom there of

02:18    12   this, I guess, last page or second-to-last page.

02:18    13   A.    Yes.  That's correct.

02:18    14   Q.    With the number 1?

02:18    15   A.    Usually they start at No. 1.  Yes.

02:18    16   Q.    Excellent.  Good place to start.

02:18    17         MR. CAUGHEY:  You can pull that down,

02:18    18   Mr. Boles.

         19   BY MR. CAUGHEY:

02:18    20   Q.    So with that in mind -- there we go.

02:18    21         Now, I understand your slides march through a

02:18    22   whole bunch of analysis in this regard, but for the

02:18    23   jury's help, I think you start at the conclusion.

02:18    24         What is your conclusion?

02:19    25   A.    Sure.  My conclusion was that Claims 1

02:19   1   through 5 are infringed by Cisco's Webex.

02:19   2       Q.   And before we get to the details of those

02:19   3   Claims 1 through 5, I see you prepared something with a

02:19   4   background of the invention.  It looks like we start

02:19   5   right where we left off of the patent a little bit.

02:19   6            Could you describe in light of this background

02:19   7   of the invention, PX-16, the patent, some of the

02:19   8   background of what this patent was dealing with?

02:19   9       A.   Right.  So the background here's talking about

02:19  10   sort of traditional audio conference.  So it's talking

02:19  11   about utilizing telephones, so like regular telephone

02:19  12   to dial into this server to have an audioconference

02:19  13   over what's referred to as the public -- I guess here

02:19  14   it says public service telephone network, which is

02:19  15   often abbreviated as PSTN, actually.  So you kind of

02:19  16   see like that as PSTN probably a lot throughout this

02:20  17   case.

02:20  18       Q.   And it says also Plain Old Telephone System.

02:20  19            Is that like the traditional telephone, the

02:20  20   rotary phone, something like that?

02:20  21       A.   A traditional phone, yes.  Connecting through

02:20  22   the phone network.

02:20  23       Q.   And when I -- for example, on my iPhone, if I

02:20  24   dial a phone number, can that connect to the PSTN

02:20  25   network as well?

180

02:20  1    A.    Right.  Yes.  So cellular provider but yes.

02:20  2    Q.    So the next slide shows something starting

02:20  3  with kind of a grainy big old box up to a computer from

02:20  4  a little bit later probably.

02:20  5        What are you depicting here?

02:20  6    A.    So this is looking at some of the -- I guess

02:20  7  the evolution basically of phones and audio products

02:20  8  and so forth starting with various sort of simplistic

02:20  9  versions of a wireless phone to like a video phone, for

02:20  10  example, to a phone that -- I had one of these phones

02:20  11  actually in my house.  And eventually getting towards

02:20  12  like computers to do audioconferencing.

02:20  13    Q.    In the patent we saw the term "PSTN," or plain

02:21  14  old telephone service.  And I think you mentioned there

02:21  15  was a rotary phone -- could you describe -- or just a

02:21  16  traditional phone.

02:21  17        Could you describe for the jury what you're

02:21  18  depicting here with this slide?

02:21  19    A.    Right.  So this is connecting over like the

02:21  20  regular telephone network.  Right?  So we talked about

02:21  21  the PSTN.  That's the telephone network in this case.

02:21  22  Phones would connect across this network in order to

02:21  23  talk to one another.

02:21  24        But there's downsides of doing things this

02:21  25  way.  So it's expensive, the way that this network is

02:21  1  set up.  I remember having long-distance fees, for

02:21  2  example.  And so, you know, communicating over long

02:21  3  distance or geographically disparate regions was

02:21  4  difficult, expensive, and things like the speed of this

02:21  5  network was not super great either.

02:21  6      Q.   This slide mentions expense, speed and long

02:21  7  instance.  The next slide talks -- jumps forward back

02:21  8  to the '858 patent and the problem that you said

02:21  9  solving it, what you called hybrid audio.

02:22  10         Can you first explain to the jury what you

02:22  11  mean -- or what the patent means, I suppose, by hybrid

02:22  12  audio?

02:22  13      A.   Right.  So in this picture that you see

02:22  14  here --

02:22  15      Q.   There you go.

02:22  16      A.   So there's like telephones connecting through

02:22  17  the PSTN.  We talked about that.  That was the phone

02:22  18  network from before.  But computers connect through a

02:22  19  different type of network.  And you can use a different

02:22  20  type of communication, actually.  So this wide area

02:22  21  network here is really just another word to substitute

02:22  22  the word "Internet" here, right, so this is the

02:22  23  Internet.

02:22  24         And it's showing these things connecting to

02:22  25  this server over here, and it's allowing these phone

02:22  1   clients and these computer clients to all participate

02:22  2   in the same audioconference together.

02:22  3      Q.   And could you describe what the mixer is and

02:22  4   what the hybrid MCU is?

02:22  5      A.   The hybrid MCU server is going to be a lot of

02:23  6   what the patent's talking about in this case, but the

02:23  7   mixer is going to be something that takes in audio

02:23  8   signals, and it's called mixing, mixes them together in

02:23  9   this case.  Basically it's taking two different audio

02:23  10  signals, two or more audio signals and combining them

02:23  11  together to form a single audio signal.  So that's what

02:23  12  mixing is.

02:23  13     Q.   And one thing, to follow up from your answers.

02:23  14  A lot of what the patent is directed to is over here at

02:23  15  the hybrid server on this, on this diagram.

02:23  16          And first, this is a diagram from the patent?

02:23  17     A.   This is Figure 1 of the patent.

02:23  18     Q.   Okay.  And the hybrid MCU server, that's --

02:23  19  you said "server."  What do you mean by that?  How

02:23  20  would that compare to, for example, Cisco's Webex

02:23  21  server?  I know we're going to get into more detail on

02:23  22  this, but...

02:23  23     A.   They're basically referring to similar things

02:23  24  here.  So one or more devices, that's representing the

02:23  25  sort of -- well, we would call these sort of backside

02:23    1    processing or backhand processing happening.

02:24    2        Q.    And then the clients, the folks that log on to

02:24    3    the conference, they're over here on the left with

02:24    4    their computers and phones?

02:24    5        A.    Yes.  That's right.

02:24    6        Q.    Okay.  Next you have included in your slides

02:24    7    another figure from the specification.

02:24    8                MR. SABRI:  Your Honor, I'm going to

02:24    9    object.  This is outside the scope of his report.  This

02:24   10    section isn't discussed.

02:24   11                MR. CAUGHEY:  The patent is discussed

02:24   12    obviously throughout his report.  But in Paragraphs 24

02:24   13    and 34, Dr. Schaefer discusses how he reviews the

02:24   14    patent and all its claims in light of the review of the

02:24   15    specification.  And additionally, in his multiple

02:24   16    depositions, he was asked at extraordinary length about

02:24   17    Column 5 and other aspects of the specification.

02:24   18                MR. SABRI:  He never cites Column 5 in

02:24   19    his report a single time, Your Honor.  Just saying he

02:24   20    talks about the patent doesn't cut it.

02:24   21                THE COURT:  Is he saying anything you

02:24   22    haven't heard at the deposition?

02:24   23                MR. SABRI:  I suspect he is.  Of course,

02:25   24    I can't know till he says it, but I do think he's going

02:25   25    to get into what was not in his report and was not in

184

02:25    1    his deposition.

02:25    2                    THE COURT:  Could you ask the question

02:25    3    again?

02:25    4                    MR. CAUGHEY:  Sure.  I think the

02:25    5    first -- the question pending was just whether this was

02:25    6    a figure from the patent, but...

02:25    7                    THE COURT:  I'll overrule the objection

02:25    8    to that question.

02:25    9        A.    Can I answer it?

02:25    10   BY MR. CAUGHEY:

02:25    11       Q.    Yes.

02:25    12       A.    This is Figure 3 from the patent.

02:25    13       Q.    And what is this figure depicting?

02:25    14       A.    This figure is depicting -- well, it's what

02:25    15   would be called a flowchart.  So if I can explain a

02:25    16   flowchart very briefly.

02:25    17            So a flowchart would start at the top here,

02:25    18   and it has different elements associated with it.  And

02:25    19   those are statements, things that you should do.  But

02:25    20   some of them might be questions like the diagrams that

02:25    21   you see.  And so when you see a question, depending on

02:25    22   the outcome of that question, you might go down the

02:25    23   "yes" branch or the "no" branch that comes out of that

02:25    24   particular diamond.

02:25    25            So, for example, where it says time to update

185

02:26  1   active speakers right here, if the answer is yes, you

02:26  2   would go to the right; if the answer's no, you would go

02:26  3   down here.

02:26  4       Q.    And on the right, that's text taken from the

02:26  5   patent specification?

02:26  6       A.    Yes.  This is Column -- part of Column 5.

02:26  7       Q.    And does that describe how to navigate this

02:26  8   flowchart?

02:26  9       A.    Yes.

02:26  10      Q.    Now, you've highlighted the first sentence as

02:26  11  well as the diamond marked 310.  Could you help walk

02:26  12  the jury through how the flowchart works in this

02:26  13  patent?

02:26  14      A.    Sure.  So what it's doing here is it's

02:26  15  asking -- it starts at J is equal to 1, you see it on

02:26  16  top, and it's going through all of the clients

02:26  17  connected here.  And it's asking whether you're done

02:26  18  processing all of the clients.  In other words, you've

02:26  19  gone through all of them at this point.  If the answer

02:26  20  is yes, you just stop.

02:26  21      Q.    And so the server's received the audio at that

02:26  22  point?

02:26  23      A.    Yes.  That's actually up here.  It's at the

02:26  24  top.

02:26  25      Q.    Okay.  Keep going.  I'm sorry.

02:26  1      A.    So we received audio from different clients,

02:27  2  potentially updated an active speaker list, as was

02:27  3  shown here.  We're down here.  So it's done sending to

02:27  4  all parties.  If the answer is no, then it goes through

02:27  5  this process in here.  You can see it's happening in a

02:27  6  loop.  So it's going to go through all of these

02:27  7  different clients here.

02:27  8      Q.    Now, the highlighting moves down to diamond

02:27  9  312 which says Party J mixing client.

02:27  10      Would you continue your progression through

02:27  11  this?

02:27  12      A.    Right.  So this here is asking whether the

02:27  13  party that we're about to send to Party J, it is

02:27  14  sending there, so if it's a mixing client or not.  We

02:27  15  haven't talked about mixing or non-mixing clients here,

02:27  16  but maybe at this point, I think simply is the mixing

02:27  17  client would be like a computer connecting over the

02:27  18  Internet, whereas a non-mixing client would be like a

02:27  19  phone connecting over the telephone network.

02:27  20      Q.    And maybe it would be helpful to say what the

02:27  21  mixing means just for a second.  I know we'll get into

02:28  22  it, but if you said a mixing client might be a

02:28  23  computer, what is that mixing?

02:28  24      A.    Well, I think we just talked about it briefly,

02:28  25  but it would be -- mixing is the act of taking the

02:28  1    multiple audio signals and combining them together to

02:28  2    form a single audio signal.  That's mixing.

02:28  3       Q.   And then from Box 312, we go to a different

02:28  4    part of Column 5 in the specification.  And here, you

02:28  5    highlight the next box down 314?

02:28  6       A.   Right.  So this is -- if it is a mixing

02:28  7    client, it goes down via the guess arrow there.  And

02:28  8    then it says Mux active speaker data, and the patent

02:28  9    here says in Step 314, you can control flow

02:28  10   multiplexes.  Mux is just short for multiplex -- the

02:28  11   audio stream data for all active speakers.  And it says

02:28  12   in this step, active speaker audio data for each and

02:28  13   every active speaker is multiplexed.

02:29  14           However, as will be apparent to those skilled

02:29  15   in the relevant arts, if Party J is an active speaker,

02:29  16   this step will not include Party J's own audio data in

02:29  17   the multiplexed packets.  And it's talking about it

02:29  18   being a form of echo suppression so you won't hear

02:29  19   yourself speak.

02:29  20           I probably should explain multiplexing a

02:29  21   little bit here at this point.

02:29  22      Q.   Why don't we give it a shot?

02:29  23      A.   Okay.  So multiplexing is -- you have

02:29  24   different streams of data, so we just have pieces of

02:29  25   data basically over time, something to this effect.

—188—

02:29    1    Multiplexing is just taking the multiple streams of

02:29    2    data and combining them together to transmit down, say,

02:29    3    a single connection.  But at the end, you need to be

02:29    4    able to separate out those streams of data into their

02:29    5    individual components at the other side.  Okay.

02:29    6              So that's different than mixing that we talked

02:29    7    about before which is just producing a single audio

02:29    8    signal.  Multiplexing puts them together, and then you

02:29    9    can take them apart on the other side.

02:30    10    Q.    And here we have, again, another part of the

02:30    11    patent specification.  Now we've taken a right -- a

02:30    12    right turn over here to Box 316.

02:30    13              What's happening now?

02:30    14    A.    Right.  So this is -- let's see.  If they are

02:30    15    not a mixing client, right, it says, decode the active

02:30    16    speaker data, and it describes that here.  Decodes all

02:30    17    the active speaker into raw, uncompressed data.  As in

02:30    18    the step we just looked at, 314, it will decode all

02:30    19    active speaker audio data for each and every active

02:30    20    speaker.  However, as will be apparent to those skilled

02:30    21    in the relevant arts, if it's an active speaker, then

02:30    22    Step 316 will not include Party J's own audio data in

02:30    23    the decoded data.  This is going to, again, act as an

02:30    24    audio suppression feature so that you'll not hear

02:30    25    themself speak.

02:30  1       Q.    And now the highlighting continues down to

02:30  2    Box 318.

02:30  3       A.    Right.  So then it says the data's being

02:31  4    mixed.  And so the results of this and the results are,

02:31  5    I guess, of previous processes as well is going to be

02:31  6    that we're going to get sort of different audio streams

02:31  7    going to different clients.  And that's talking about

02:31  8    the echo suppression.  If you were to get back your own

02:31  9    audio, you would hear yourself on the other end and

02:31  10   that would be annoying.  And so it's producing

02:31  11   different streams.  It's mixing and multiplexing.

02:31  12            MR. CAUGHEY:  And, actually, Mr. Boles,

02:31  13   can you go back to Slide 19 just momentarily before we

02:31  14   proceed?

       15   BY MR. CAUGHEY:

02:31  16      Q.    I just want to put -- there was a lot of

02:31  17   technical matter in that specification and a lot of

02:31  18   right turns and left turns down the flowchart.  Could

02:31  19   you kind of reassemble those pieces for the jury in

02:31  20   terms of how the overall system is depicted in Figure 1

02:31  21   of the '858 patent?

02:31  22      A.    So those mixing clients were these over here

02:31  23   connected over through the Internet, computers going

02:31  24   through the Internet.  The non-mixing clients of these

02:32  25   phones connected through the phone network from before.

02:32   1   And what we were talking about, the stuff really that

02:32   2   was happening here on the server side, getting audio

02:32   3   from these clients, deciding whether to mix or

02:32   4   multiplex the data and sending back to those clients.

02:32   5        Q.    Great.

02:32   6             MR. CAUGHEY:  Now let's go back to Slide

02:32   7   23, Mr. Boles.

02:32   8   BY MR. CAUGHEY:

02:32   9        Q.    Now, what are the benefits of this hybrid

02:32   10  audio system that's described in the '858 patent?

02:32   11       A.    Well, there's a number of advantages.  So one,

02:32   12  both computer and phone users can participate together

02:32   13  in the same audioconference.  It's different networks

02:32   14  could communicate, but this sort of puts them all

02:32   15  together in the same audioconference.

02:32   16            There's also computational efficiency.  That

02:32   17  mixing action that's happening on the server, it's only

02:32   18  doing that mixing for the clients that are not going to

02:32   19  be able to mix.  So for the other clients, it's sending

02:32   20  the multiplex audio.  It's not doing mixing for them.

02:32   21  It's sending the multiplexed audio and making those

02:33   22  clients, those other computers do the mixing instead of

02:33   23  the server doing it.  So it's distributing the

02:33   24  computational work basically between these different

02:33   25  devices.

02:33   1          And the other thing that happens is that you
02:33   2   can get better sound quality with this as well.  So
02:33   3   when you multiplex, you're just sending these audio
02:33   4   packets to the clients and making them do mixing.  On
02:33   5   the server, if you were to do this, you would have to
02:33   6   decode the audio data, mix it, recode it, send it.  It
02:33   7   would have to be decoded again and played, and all of
02:33   8   these different actions can cause artifacts to appear.
02:33   9   So it affects the quality of the sound data at the
02:33  10   other end.  So by multiplexing the data, making it done
02:33  11   at the client's side, you can get higher-quality audio.
02:33  12      Q.    And just momentarily on the second benefit,
02:33  13   computational efficiency, certainly you'd understand
02:33  14   why the server companies, someone like Cisco, would
02:33  15   want their computers to be efficient.
02:33  16          What sort of benefits would the end user gain
02:33  17   from having the more efficient hybrid audio system?
02:34  18      A.    Well, you could have a larger conference, for
02:34  19   example.  I guess you might be able to use less server
02:34  20   hardware to have the same size conference, for example.
02:34  21      Q.    Okay.  Now, the next number of slides in
02:34  22   particular deal with what are called "accused
       23   products."
02:34  24          We've been spending a fair amount of time on
02:34  25   the patent and the intellectual property, but as I

02:34  1    understand, infringement involves a comparison -- I

02:34  2    think we've heard this in opening -- of the accused

02:34  3    products with what's claimed in the patent.

02:34  4          What's your understanding with the -- with

02:34  5    the caveat there's a lot of words on this slide -- of

02:34  6    what the accused Cisco Webex products are in this case?

02:34  7    A.    Right.  So there's a lot of products that I

02:34  8    think are being used, and you're going to have to bear

02:34  9    with me because I'm supposed to read all of these, I

02:34  10   think, here.

02:34  11         So Webex App, Webex Suite, Webex Meetings,

02:34  12   Webex Messaging, Webex Events, Webex Training, Webex

02:34  13   iOS App, Webex Android app, Webex Meetings for iOS,

02:35  14   Webex Meetings for Android, Webex Teams, Webex Meetings

02:35  15   for MS Teams.

02:35  16   Q.    Thank you.

02:35  17         I'm the one who made him do it.

02:35  18         So is there a common thread among these dozen

02:35  19   Webex products that you've analyzed as the accused

02:35  20   products?

02:35  21   A.    Right.  So these all use the same server back

02:35  22   and forth, the audio processing, this thing called

02:35  23   Webex Audio.

02:35  24   Q.    And the '858 patent is focused on a server?

02:35  25   A.    That's right.

02:35    1          Q.    So here's -- you mentioned this before, but

02:35    2    just to help the jurors get an understanding of what

02:35    3    we're talking about, what is this next slide, 26,

02:35    4    depicting?

02:35    5          A.    This is just a demonstration of what Webex

02:35    6    looks like, I guess, if you use it on a computer.

02:35    7    There's four different people that joined into this

02:35    8    conference here.  Some of them are computer users.  And

02:35    9    you can tell some of them have video on, for example.

02:35   10    One of them is a phone user that's called in.

02:36   11          Q.    And now we're going to start diving into your

02:36   12    binder.  Could you please turn to PX-144?

02:36   13          A.    Yes.  Yes.

02:36   14          Q.    Can you identify this document?

02:36   15          A.    Yes.  This is a public Cisco document.

02:36   16          Q.    Did you review this document in forming your

02:36   17    opinions in this case?

02:36   18          A.    Yes.  I did.

02:36   19                MR. CAUGHEY:  Paltalk offers PX-144.

02:36   20                MR. SABRI:  No objection.

02:36   21                THE COURT:  Admitted.

02:36   22    BY MR. CAUGHEY:

02:36   23          Q.    Now, in the next slide, we see PX-144, and

02:36   24    you've given this slide the title How Webex Works.

02:36   25    Server side.

02:36    1            So you just saw -- or the prior slide, let's

02:36    2    go back there just for a second.

02:36    3            This is the perspective of a user of Webex,

02:36    4    right?

02:36    5        A.    Yes.  That's right.

02:36    6        Q.    And this slide shows a number of arrows sort

02:36    7    of striking out from a cloud.

02:37    8            Can you describe what you're depicting with

02:37    9    this image here?

02:37   10        A.    Well, this is basically what I was just

02:37   11    showing before really.  It's a variety of different

02:37   12    types of devices and products, all kind of sort of

02:37   13    connecting through this Webex -- Cisco Webex cloud.

02:37   14    This is the audio servers, basically.

02:37   15        Q.    And just over -- it says PSTN on the right.

02:37   16    Do you see it?

02:37   17        A.    Yes.  That's right.

02:37   18        Q.    And what does it read below that?

02:37   19        A.    It says:  Webex hybrid VoIP and

02:37   20    cloud-connected audio.

02:37   21        Q.    And it says on the right -- or what does the

02:37   22    sort of teal box on the right say?

02:37   23        A.    On the right side?

02:37   24        Q.    Yeah.

02:37   25        A.    It's talking about up to 1,000 participants

02:37  1    with Cisco's Webex with 500 video and 500 audio.  It's

02:37  2    talking about the size of one of these meetings.

02:37  3        Q.    Could you now turn to PX-37 in your binder?

02:38  4        A.    Yes.

02:38  5        Q.    And can you identify this document?

02:38  6        A.    This is an internal Cisco technical document.

02:38  7        Q.    Did you review this document in forming your

02:38  8    opinions?

02:38  9        A.    Yes.  I did.

02:38  10                MR. CAUGHEY:  Plaintiffs offer PX-37.

02:38  11                MR. SABRI:  No objection.

02:38  12                THE COURT:  Admitted.

02:38  13   BY MR. CAUGHEY:

02:38  14       Q.    Now, we see PX-37.  There's a lot going on

02:38  15   here.

02:38  16             But could you tell the jury -- and I think as

02:38  17   a preview, we're going to see more of this document,

02:38  18   but tell the jury initially at a high level what this

02:38  19   is showing?

02:38  20       A.    Yeah.  So just at a high level, this is

02:38  21   showing some of the audio processing flow between

02:38  22   different types of clients and these boxes on the

02:38  23   inside which make up the Webex servers, Webex Audio.

02:38  24       Q.    And we'll return to the text later.  I'll have

02:38  25   questions about that, but I know you prepared a sort of

02:39   1   easier-to-view version without some of the noise around

02:39   2   it.

02:39   3           So if you could just -- maybe starting at

02:39   4   12 o'clock on the top -- help the jury understand what

02:39   5   this is depicting and what these various letters and

02:39   6   boxes mean to you.

02:39   7       A.    Well, so first, this is the Webex Audio that

02:39   8   we're talking about.  We're talking about these little

02:39   9   boxes refer to sort of pieces of Webex Audio.  And

02:39   10  maybe I should start over here on the side and say that

02:39   11  this is grayed out because this is not part of the

02:39   12  accused functionality here.  So we're not -- I'm not

02:39   13  going to be talking about that an awful lot here.

02:39   14          These pieces here, this is showing different

02:39   15  types of clients connecting to this piece of Webex

02:39   16  Audio called MMP, multimedia platform.  And so this M1,

02:39   17  M2, and M3 are tablets or computers or something

02:39   18  connecting to this piece.

02:39   19          And then these here, P1, P2, P3, these are

02:40   20  phones connecting to a phone network to this piece of

02:40   21  Webex, which is the CMS, and it stands for Cisco Media

02:40   22  Server.

02:40   23      Q.    And what this -- or I just want to make sure

02:40   24  you're done with this slide, or do you have more

02:40   25  explanation?

197

02:40   1        A.    I mean, we could talk about audio being sent

02:40   2   from these clients and then the sent -- but I think

02:40   3   we're going to talk about this document more.

02:40   4        Q.    Okay.  Great.  Whet your appetite for some

02:40   5   audio flow diagrams.

02:40   6              So with that background in mind, I think the

02:40   7   next portion of our presentation is this walks through

02:40   8   the individual claim elements.  We heard in opening

02:40   9   this exercise is a comparison of claims with the

02:40   10  accused products.

02:40   11             And have you done that analysis of comparing

02:40   12  the claims to the accused products?

02:40   13       A.    Yes.  I have.

02:40   14       Q.    And is that what the next number of slides

02:40   15  show?

02:40   16       A.    Yes.

02:40   17       Q.    In Slide 31, we see something that's becoming

02:41   18  familiar, which is the asserted claims in the patent.

02:41   19             Is this where you started with your

02:41   20  infringement analysis?

02:41   21       A.    Well, I certainly looked at the claims, but I

02:41   22  also read the patent as well and analyzed all of the

02:41   23  documents.

02:41   24       Q.    And this slide is just an easier-to-read

02:41   25  version of Claim 1 of the patent, right?

198

02:41  1       A.    Yes.  This is breaking out the different

02:41  2    limitations of Claim 1, and we're going to process them

02:41  3    sort of one by one.

02:41  4       Q.    And the next slide is titled Person of

02:41  5    Ordinary Skill in the Art.

02:41  6             Do you see that?

02:41  7       A.    Yes.

02:41  8       Q.    Is that synonymous with "expert in the field"

02:41  9    to you?

02:41  10      A.    Yeah.

02:41  11      Q.    And did you review this patent as just a

02:41  12   normal layperson, or did you apply your knowledge as an

02:41  13   expert in the field or a person of ordinary skill in

02:41  14   the art?

02:41  15      A.    I applied my knowledge as an expert in this

02:41  16   field.

02:41  17      Q.    And what -- could you just read for the jury

02:41  18   what your understanding of who an expert in this field

02:42  19   would be?

02:42  20      A.    Sure.  So an expert would be a person with a

02:42  21   bachelor's degree in computer science, computer

02:42  22   engineering, or a related field with two years of

02:42  23   experience working in the field of communication and

02:42  24   networking.  Of course if you have maybe more

02:42  25   experience in the industry, that might make up for less

02:42    1   formal education or formal education, might make up for

02:42    2   less industry experience.

02:42    3      Q.    And I see below -- are those all the pages of

02:42    4   the '858 patent?

02:42    5      A.    I believe so.

02:42    6      Q.    And did you -- how did you bring your

02:42    7   expertise as an expert in the field as a computer

02:42    8   scientist to bear as you interpreted this patent?

02:42    9      A.    Yeah. I used my experience in the field when

02:42   10   I was reading this patent and interpreting the terms of

02:42   11   the patent.

02:42   12      Q.    And just going back to the language of the

02:42   13   patent, I think you saw in one of the opening

02:42   14   statements that there's a fair bit of technical

02:42   15   language in here: mixing, multiplexing, and so on and

02:42   16   so forth.

02:43   17      Does your computer science background and

02:43   18   expertise help you decipher the meaning and application

02:43   19   of these claims as you do your infringement analysis?

02:43   20      A.    Of course.

02:43   21      Q.    And I think I also heard in opening a

02:43   22   reference to an English major.

02:43   23      It is specifically with respect to your

02:43   24   computer science background and skill in the field that

02:43   25   you read this patent, right?

02:43   1      A.      That's right.

02:43   2      Q.      It's not an ordinary layperson reading it?

02:43   3      A.      My understanding is you're supposed to read

02:43   4   this as an expert in the field.

02:43   5              MR. CAUGHEY:  And could you pull up the

02:43   6   materials considered slide?

02:43   7   BY MR. CAUGHEY:

02:43   8      Q.      Now, as you look through your lens as an

02:43   9   expert in the field, I think you mentioned right at the

02:43   10  outset all these different materials you considered,

02:43   11  right?

02:43   12     A.      Yes.

02:43   13     Q.      And one of those or was one of those rulings

02:43   14  of this Court?

02:43   15     A.      Yes.

02:43   16             MR. CAUGHEY:  All right.  You can go back

02:43   17  to where we were in the slides.

02:44   18  BY MR. CAUGHEY:

02:44   19     Q.      And one more thing on the patents.  I think we

02:44   20  heard discussion in the opening statements about this

02:44   21  term "each" right there.  I tried to circle it.

02:44   22  Hopefully I did so effectively.  And it appears a few

02:44   23  times.

02:44   24             Is that one of the words in this patent that

02:44   25  you interpreted through this lens of being a person of

02:44  1    ordinary skill in the art?

02:44  2        A.    Yes.

02:44  3        Q.    Were there any rulings of the Court that were

02:44  4    relevant to that analysis?

02:44  5        A.    Yes.

02:44  6        Q.    And I'd just like you to -- or what do you

02:44  7    understand this to be on Slide 34?

02:44  8        A.    My understanding is this was the ruling of the

02:44  9    Court.

02:44  10       Q.    So could you just read from:  So here are my

02:44  11   rulings?

02:44  12       A.    Sure.  So I guess after that, it says:  I'm

02:44  13   going to start with the first motion we had.  I'm going

02:44  14   to find that the plain and ordinary meaning of

02:45  15   "each" -- "each" has a plain and ordinary meaning which

02:45  16   can include "one or more."

02:45  17       Q.    Okay.  And was that ruling material to your

02:45  18   infringement analysis?

02:45  19       A.    Yes.

02:45  20       Q.    Okay.  Now, we're going to start -- as I said,

02:45  21   we're going to break this patent up into lots of

02:45  22   pieces.  This is a very precise exercise.  And it

02:45  23   starts with a preamble.

02:45  24             What does the preamble say?

02:45  25       A.    So the preamble says:  A method of providing

—202—

02:45  1  audioconferencing for a plurality of clients using

02:45  2  varying equipment and protocols.  And then it says

02:45  3  comprising the steps of, but we're going to go through

02:45  4  those in a minute.

02:45  5       Q.   What are varying equipment and protocols?

02:45  6       A.   Clients might use different equipment and

02:45  7  protocols.  In the example we saw previously, it was

02:45  8  like, say, computers and phones.  Protocols might be

02:45  9  like through the Internet or through the phone network.

02:45  10      Q.   Could you please turn to your binder to PX-62?

02:45  11      A.   Yes.

02:45  12      Q.   Can you identify that document?

02:45  13      A.   Yes.  This is another Cisco document.

02:46  14      Q.   Did you review PX-62 in forming your opinions?

02:46  15      A.   Yes.

02:46  16           MR. CAUGHEY:  Plaintiffs offer PX-62.

02:46  17           MR. SABRI:  No objection.

02:46  18           THE COURT:  Admitted.

02:46  19  BY MR. CAUGHEY:

02:46  20      Q.   PX-62 is now published on the screen.

02:46  21           You said this is a Cisco document?

02:46  22      A.   Yes.

02:46  23      Q.   And it's titled Webex Audio Supported

02:46  24  Platforms.  And then the first sentence is highlighted.

02:46  25  Could you read that first sentence into the record for

02:46  1  the jury?

02:46  2     A.    Yes.  It says:  Webex Audio, also known as

02:46  3  hybrid audio, provides flexibility for attendees to

02:46  4  join an audioconference using their computer, VoIP or a

02:46  5  phone.

02:46  6         Maybe I should explain that term "VoIP."

02:46  7     Q.    Yeah.  Let's -- I think it was mentioned

02:46  8  before, but we haven't -- we haven't paused on it yet.

02:46  9  So why don't you -- why don't you help the jury

02:46  10  understand what VoIP is?

02:46  11    A.    So VoIP is just a shortening of the term

02:46  12  "Voice over IP," so basically using a computer to, you

02:47  13  know, send all your data basically over the Internet.

02:47  14  So Voice over IP is VoIP.

02:47  15    Q.    And why is this mention or discussion of

02:47  16  hybrid audio in this Webex Audio document relevant to

02:47  17  whether there's infringement of this preamble?

02:47  18    A.    Well, it's talking about using varying

02:47  19  equipment and protocols as well because they'll be

02:47  20  connecting through different networks.

02:47  21    Q.    And it says a computer or a phone?

02:47  22         See that?

02:47  23    A.    Yes.  Computer or a phone.

02:47  24    Q.    Now, this is a document we've seen before,

02:47  25  PX-144.  I think the jury probably understands it, but

02:47  1    could you just match up PX-144 with the claim language?

02:47  2        A.    Sure.  So this is, again, talking about using

02:47  3    a variety of different equipment, and you can see

02:47  4    different equipment on this document here.  So, for

02:47  5    example, the computers or phones connecting all to the

02:48  6    Cisco Webex cloud here or audioconferencing and through

02:48  7    a variety of different protocols, whether that be

02:48  8    through a telephone network or through the Internet.

02:48  9        Q.    So in light of the materials you've reviewed,

02:48  10   Cisco documents we've seen and the analysis you've done

02:48  11   in this case, what is your conclusion with respect to

02:48  12   whether this first part of Claim 1 is infringed?

02:48  13       A.    Well, based on the documents that we've seen,

02:48  14   my conclusion is that this limitation is met.

02:48  15       Q.    Now, the next limitation is this 11, and I

02:48  16   know these are broken out here, but does the text here

02:48  17   match what's in the claims of the patent?

02:48  18       A.    Yes.  It's just a copy.

02:48  19       Q.    What does this first subelement of Claim 1

02:48  20   require?

02:48  21       A.    It says:  Receiving an audio packet from each

02:48  22   of the plurality of clients.

02:48  23       Q.    And you mentioned this, but these are very

02:48  24   technical, so maybe you can remind the jury of what an

02:48  25   audio packet is.

02:48  1        A.    We probably haven't talked about packets.  So

02:49  2    packets is just a -- sort of a chunk of data,

02:49  3    basically.  So the way that the Internet works is that

02:49  4    you break data into subpieces called packets.  You send

02:49  5    them to the Internet, and those get routed through

02:49  6    various places over the Internet before they get to

02:49  7    their final destination.

02:49  8              This is different conceptionally from how like

02:49  9    a telephone network works, which is a service which

02:49  10   network -- you build a path basically between two

02:49  11   points to communicate.  So it's fundamentally just a

02:49  12   different way to communicate.

02:49  13       Q.    And we've seen this document in preview.

02:49  14   We'll see it again.  But where does -- or how is this

02:49  15   audio flow active speaker document relevant to this

02:49  16   element of receiving audio packet?

02:49  17       A.    Right.  So this document here is showing some

02:49  18   of the audio processing that's happening.  And let's

02:49  19   see here.  I don't know if I can have the mouse.

02:50  20              So here, for example, you can see that the

02:50  21   different clients are speaking.  So you remember M1,

02:50  22   M2, M3?  We talked about those from before.  Those are

02:50  23   those machines, the, you know, the tablets in this

02:50  24   picture here.  Then we have P1, P2, P3, and it says

02:50  25   they're speaking.  And it actually depicts the -- oh,

—206—

02:50  1    now I got the red thing here.

02:50  2            So now it depicts them sending audio data here

02:50  3    and it being received by these various components of

02:50  4    Webex.  And those are the circled arrows that you see

02:50  5    there.

02:50  6        Q.    And the M1, M2, M3, P1 through P3, are those

02:50  7    the clients?

02:50  8        A.    Yes.  Those are the clients.

02:50  9        Q.    Okay.  And now we come to the first instance

02:50  10   of looking at some of Cisco's source code.  We're going

02:50  11   to do this source code presentation because it's in

02:50  12   hard copy on the video device or the document camera

02:50  13   device.

02:50  14           MR. CAUGHEY:  Because you haven't seen it

02:50  15   before, the first time it's shown, I'm going to ask,

02:51  16   with Your Honor's permission, for Dr. Schaefer to come

02:51  17   down and work the device himself.

02:51  18           THE COURT:  Response?

02:51  19           MR. SABRI:  No objection to that,

02:51  20   Your Honor.  I only stand because when we're talking

02:51  21   about source code, we will just go on the confidential

02:51  22   record and --

02:51  23           (Clarification by Reporter.)

02:51  24           MR. SABRI:  I apologize.  We'll need to

02:51  25   go on confidential record to discuss the source code,

—207—

02:51  1    and I need the public to leave the courtroom for that,

02:51  2    of course.

02:51  3                    THE COURT:  And that's fine.  I just want

02:51  4    to let you know, it's your burden to make sure within

02:51  5    reason when he stops talking about things that are on

02:51  6    the private record, if you'll make sure because I won't

02:51  7    know.  And I want to keep the courtroom as open as

02:51  8    possible.

02:51  9                    That being said, if anyone in the

02:51  10   audience is not under the protective order in this

02:51  11   case, if you would excuse yourself for the next set of

02:51  12   questions, please.

02:51  13                    And, Doctor, you're welcome to...

02:51  14                    THE WITNESS:  Can I go up there now?

02:51  15                    MR. CAUGHEY:  Come on up.

02:51  16                    MR. SABRI:  I would add, Cisco -- it's

02:51  17   fine for Cisco to state it on the record?

02:51  18                    THE COURT:  Yes, absolutely.

02:52  19                    (Clarification by Reporter.)

       20                    (Sealed proceedings.)

02:52  21

02:52  22

02:52  23

02:52  24

02:52  25



209







212







|       |    |                                      |
|-------|----|--------------------------------------|
| 02:59 | 1  |                                      |
| 02:59 | 2  |                                      |
| 02:59 | 3  |                                      |
| 02:59 | 4  |                                      |
| 02:59 | 5  |                                      |
| 02:59 | 6  |                                      |
| 02:59 | 7  |                                      |
| 02:59 | 8  |                                      |
| 02:59 | 9  |                                      |
| 03:00 | 10 |                                      |
| 03:00 | 11 |                                      |
| 03:00 | 12 |                                      |
| 03:00 | 13 |                                      |
| 03:00 | 14 |                                      |
| 03:00 | 15 |                                      |
| 03:00 | 16 |                                      |
| 09:42 | 17 | (Sealed proceedings end.)            |
| 03:00 | 18 | BY MR. CAUGHEY:                       |
| 03:00 | 19 | Q.    And just to close the loop here, what's your |
| 03:00 | 20 | overall conclusion with respect to whether source code |
| 03:00 | 21 | supports that Cisco Webex products receives an audio |
| 03:00 | 22 | packet from each of a plurality of clients? |
| 03:00 | 23 | A.    So in my opinion, the source code supports |
| 03:00 | 24 | this limitation. |
| 03:00 | 25 | Q.    And this -- we actually saw Mr. Buckles' |

03:00   1   deposition I think a few moments ago, but you've also

03:00   2   created a slide with testimony from Cisco's corporate

03:00   3   representative Mr. Buckles.

03:00   4          How was Mr. Buckles' testimony relevant and

03:01   5   work with this receiving an audio packet limitation?

03:01   6   A.   So he's confirming the information that we've

03:01   7   seen previously, I suppose.  So he was asked -- and

03:01   8   there are some situations that I'm looking at now:

03:01   9   Part 1 here, or the first clause here, where Cisco

03:01   10  Webex Meetings receives an audio packet from each of

03:01   11  the plurality of clients who are participating in an

03:01   12  audioconferencing; isn't that right?

03:01   13         To which he responded:  Just to be clear, the

03:01   14  question was Cisco Webex Meetings receives audio

03:01   15  packets from each of the plurality of clients?

03:01   16         Question:  Yes.  There are situations

03:01   17  where that happens?

03:01   18         And the answer was:  Yes.

03:01   19  Q.   So in light of your review of the materials,

03:01   20  consideration as an expert in the field, what's your

03:01   21  conclusion with respect to whether sub Element [1] has

03:01   22  been infringed?

03:01   23  A.   Right.  So based off of all the information

03:01   24  that we've just seen, it's my conclusion that this

03:01   25  limitation is met.

—216—

03:01  1        Q.    Now, can you turn in your binder to PX-206?

03:02  2        A.    Yes.

03:02  3        Q.    Can you identify this document?

03:02  4        A.    Yes.  This is another Cisco document.

03:02  5        Q.    Did you rely on PX-206 in forming your

03:02  6   opinions?

03:02  7        A.    Yes.

03:02  8              MR. CAUGHEY:  Plaintiffs offer PX-206.

03:02  9              MR. SABRI:  No objection.

03:02  10              THE COURT:  Admitted.

03:02  11   BY MR. CAUGHEY:

03:02  12        Q.    And the -- we'll take a look at PX-206 in a

03:02  13   moment, but first, I want to isolate this next Element

03:02  14   [2] of Claim 1.  It says:  Determining which of the

03:02  15   plurality of clients is an active speaker and forming

03:02  16   an active speakers list.

03:02  17              What -- can you explain to the jury what you

03:02  18   understand this element to mean?

03:02  19        A.    Well, so the idea behind this element here is

03:02  20   that we need to -- there's several clients that are

03:02  21   connected to this thing.  We have to identify some of

03:02  22   them that have active speakers and formed an active

03:02  23   speaker list.  So that's what it says.

03:02  24        Q.    Now we see PX-206, and there's a Cisco

03:03  25   document on the left and some images on the right.

03:03    1           How is this relevant to this active speaker

03:03    2    question you just put forth to the jury?

03:03    3        A.    So this is showing the client's side view of

03:03    4    Webex, like what you would see utilizing these things.

03:03    5    And it's showing here, for example, that you can

03:03    6    specify an active speaker video view, an active speaker

03:03    7    thumbnail view, and a grid view.  So there's an

03:03    8    identification of an active speaker happening in this

03:03    9    case.

03:03   10        Q.    But you said the patent and the infringement

03:03   11    analysis is focused mostly on the server.

03:03   12           How is this sort of client-focused or

03:03   13    user-focused view interactive?  How is that relevant?

03:03   14        A.    Yeah.  So the data that the client and the

03:03   15    user is getting here is coming from the server.  So

03:03   16    this idea that it's identifying this active speaker

03:03   17    means that this data's available on the server as well.

03:03   18        Q.    Could you now turn to PX-228 in your binder?

03:04   19        A.    Yes.

03:04   20        Q.    Can you identify this document?

03:04   21        A.    Yes.  This is another Cisco document.

03:04   22        Q.    And did you rely on this document in forming

03:04   23    your opinions?

03:04   24        A.    Yes.  I did.

03:04   25               MR. CAUGHEY:  Plaintiffs offer PX-228.

218

03:04   1           MR. SABRI:  No objection.

03:04   2           THE COURT:  Admitted.

03:04   3   BY MR. CAUGHEY:

03:04   4       Q.   Now -- whoops.  Too far.

03:04   5           Now we see PX-228.  I see a similar Hollywood

03:04   6   Squares type diagram here and then some text at the

03:04   7   top.

03:04   8           Walk the jury through how this is relevant to

03:04   9   your analysis.

03:04   10      A.   So again, this is similar to the previous

03:04   11  document.  You can see here, it's talking about

03:04   12  different layouts.  And in particular, it says:  Switch

03:04   13  between grid and active speaker layout.

03:04   14          And if you look a little bit further down this

03:04   15  document.  Yes.  It says:  Use the grid layout to see

03:04   16  more participants at the same time and switch to the

03:05   17  active speaker layout when you want to focus on the

03:05   18  person speaking.

03:05   19      Q.   Now, that was, again, the user side here, we

03:05   20  see another server diagram.

03:05   21          Where on this audio flow document does it

03:05   22  discuss this concept of determining active speakers?

03:05   23      A.   Right.  So here, you can see that it's talking

03:05   24  about these different pieces here.  It says:  The top

03:05   25  three loud will be switched to all clients, the piece

| | | |
|---|---|---|
| 03:05 | 1 | on top there.  So the top three loud is identifying |
| 03:05 | 2 | loudest speakers, active speakers.  And it's saying the |
| 03:05 | 3 | same thing here.  CMS, it says:  CMS selects the top |
| 03:05 | 4 | three as well. |
| 03:05 | 5 | MR. CAUGHEY:  And we again have some |
| 03:05 | 6 | source code.  This time I'm going to try to do my best |
| 03:05 | 7 | to walk Dr. Schaefer through it from here so he doesn't |
| 03:05 | 8 | have to get up and down, but I also suspect counsel |
| 03:05 | 9 | wants to go on the confidential record. |
| 03:06 | 10 | MR. SABRI:  That's right.  We would need |
| 03:06 | 11 | to go back on the confidential record. |
| 03:06 | 12 | THE COURT:  Will do. |
| 03:06 | 13 | (Sealed proceedings.) |
| 03:06 | 14 | |
| 03:06 | 15 | |
| 03:06 | 16 | |
| 03:06 | 17 | |
| 03:06 | 18 | |
| 03:06 | 19 | |
| 03:06 | 20 | |
| 03:06 | 21 | |
| 03:06 | 22 | |
| 03:06 | 23 | |
| 03:06 | 24 | |
| 03:06 | 25 | |









224





03:12  1

03:12  2

03:12  3

03:12  4

03:12  5

03:13  6

03:13  7

03:13  8

03:13  9

03:13  10

03:13  11

03:13  12

03:13  13

09:42  14          (Sealed proceedings end.)

03:13  15    BY MR. CAUGHEY:

03:13  16        Q.    And from your review of Cisco's source code,

03:13  17    what is your conclusion with respect to whether the

03:13  18    Webex products determine or perform this element?

03:13  19        A.    As we've just seen, it's determining and

03:13  20    forming an active speaker list.

03:13  21        Q.    Now, Mr. Buckles reappears.  Again, we saw him

03:13  22    on video.  Mr. Buckles asked about this determining

03:13  23    with respect to active speakers.

03:13  24        A.    Yes.  So he was asked, well, as Cisco uses the

03:13  25    term, there are instances where Webex Meetings

03:13  1    determines which of the plurality of clients in an

03:13  2    audioconference is an active speaker, right?

03:13  3              To which he responded, yeah.  I think that --

03:13  4    that's reasonable to say.

03:13  5         Q.    And here, he was asked additional questions

03:13  6    about the active speaker list.

03:14  7              What did he say in this testimony?

03:14  8         A.    So here he was asked:  And there are also

03:14  9    circumstances where Cisco Webex Meetings determines

03:14  10   which of the plurality of clients in an audioconference

03:14  11   is an active speaker and forms an active speaker list;

03:14  12   is that right?

03:14  13             And the answer was there are -- there are

03:14  14   instances where, yes, clients who are determined to be

03:14  15   active speakers are grouped together in some way.

03:14  16        Q.    And so what is your overall conclusion with

03:14  17   respect to whether the Cisco Webex products infringe

03:14  18   Element 2?

03:14  19        A.    Well, based on all the information that we've

03:14  20   just seen, my conclusion is this limitation is met.

03:14  21        Q.    Now on to Limitation 3.

03:14  22             We see the word "determining" again.  What

03:14  23   does Limitation 3 talk about, from your perspective?

03:14  24        A.    So Limitation 3 is determining a first subset

03:14  25   of the plurality of clients that has the capability to

—227—

03:14  1    mix multiple audio streams.

03:15  2        Q.    And what does it mean to mix multiple audio

03:15  3    streams?

03:15  4            Let me step back.

03:15  5            There's a demonstrative on the screen.  Can

03:15  6    you describe what's being shown?

03:15  7        A.    This is just a bunch of computers basically

03:15  8    that are connecting through the Internet.  It looks

03:15  9    like we have two talking.  One is sending blue data.

03:15  10   Those are those little square things you see.  Those

03:15  11   are the packets that we were talking about.  Remember

03:15  12   how I said we break it up into different pieces and

03:15  13   send?

03:15  14           So these are packets going to the Internet.

03:15  15   The yellow is packets going into the Internet, and

03:15  16   those are being delivered to the server here.  The

03:15  17   server is multiplexing this data and it's sending it

03:15  18   back to the clients.  And you can see that it's putting

03:15  19   these sort of two streams of data into a single stream,

03:15  20   if you will, right?  It goes back.

03:15  21           So, for example, the listener that's in the

03:15  22   middle is getting these boxes that are green on the

03:15  23   outside, and they have this alternating moving yellow,

03:15  24   for example.

03:15  25       Q.    And then these multiplexed streams are being

228

03:16  1   mixed by the clients?

03:16  2       A.   Right.  You see the mixer on the different

03:16  3   clients, so they're getting these individual audio

03:16  4   streams.  And they're the ones that have to do the

03:16  5   mixing.

03:16  6       Q.   But to know whether to send the multiplexed

03:16  7   streams in the packet, the server has to determine

03:16  8   which of those clients are capable of doing that, I

03:16  9   assume?

03:16  10      A.   That's what this limitation is about.

03:16  11      Q.   And we see here the audio flow diagram, and

03:16  12  this is a Cisco document.

03:16  13           Where is the determining occurring here?

03:16  14      A.   So the determining is actually happening at

03:16  15  the connection between the clients and the servers.

03:16  16  The phone-based clients, the ones that you see on this

03:16  17  audio flow document, P1, P2, P3, those devices are

03:16  18  connecting through the phone network to the CMS, so

03:16  19  those devices won't have the capability of mixing,

03:16  20  okay?  The ones that you see on top are the

03:16  21  computerized twice, right, like the M1, M2, M3 tablets

03:16  22  in this case.  And those are connecting through the

03:17  23  Internet for Webex's protocols and so forth to this MMP

03:17  24  server.

03:17  25           So it's how clients are connecting.  It's not

03:17    1    just the device, okay, because a client is -- you've

03:17    2    seen varying equipment and protocols.  So different

03:17    3    devices, but also different ways of connecting to this

03:17    4    Webex server.  So depending on how they connect, this

03:17    5    is the determining step.  And you might ask, for

03:17    6    example, like what about an iPhone?

03:17    7         Q.    We might even see that on the next slide,

03:17    8    so --

03:17    9         A.    All right.

03:17   10         Q.    -- don't spoil the surprise.

03:17   11         Could you turn in your binder to PX-154?

03:17   12         A.    Yes.

03:17   13         Q.    And can you identify PX-154?

03:17   14         A.    This is an internal Cisco technical document.

03:17   15         Q.    Have you reviewed this document in connection

03:17   16    with forming your opinions?

03:17   17         A.    Yes.  I have.

03:17   18             MR. CAUGHEY:  Paltalk offers PX-154.

03:17   19             MR. SABRI:  No objection.

03:18   20             THE COURT:  Admitted.

03:18   21    BY MR. CAUGHEY:

03:18   22         Q.    All right.  PX-154 is a Cisco slide

03:18   23    presentation.  There's an excerpt from it on the

03:18   24    screen.

03:18   25         First, can you describe what's being depicted?

03:18  1      A.    So this is showing some audio moving between

03:18  2  different parts of Webex servers and devices.  So on

03:18  3  this slide here, you have these computerized devices

03:18  4  connecting through the Internet.  Opus is an

03:18  5  audio -- we call it an audio codec.  It's just the way

03:18  6  of coding and decoding audio here.  So these

03:18  7  connections are going to the MMP server that we've seen

03:18  8  previously.  These pieces of Webex Audio are

03:18  9  communicating with each other at CMS, and you also see

03:18  10  audio going through different audio codec to these

03:18  11  phone-based devices.

03:18  12      Q.    A few questions.

03:18  13          So on the left here, we have the computers.

03:19  14  There's some lines going down.  I just circled them in

03:19  15  green.

03:19  16          Are those the multiplexed streams going?

03:19  17      A.    Right.  So over -- I guess over here, you see

03:19  18  the mixing happening.  You see multiple arrows coming

03:19  19  in and one arrow going out.  This is like multiple

03:19  20  audio streams coming in, and a single one coming out.

03:19  21  And that's what's being sent to these phones over here.

03:19  22  Okay.  But on the other side here, we actually have

03:19  23  multiple streams of videos, this multiplexed data

03:19  24  across these connections to the computer devices.

03:19  25      Q.    And then the computers mix those multiple

231

03:19  1    points of data into usable audio, essentially?

03:19  2        A.    That's the idea, yes.

03:19  3        Q.    And on the right, we see an iPhone or some

03:19  4    sort of smartphone.

03:19  5        A.    Uh-huh.

03:19  6        Q.    Could that device go on either side of this

03:19  7    diagram?

03:19  8        A.    Right.  So this -- the iPhone, for example,

03:19  9    could connect to the MMP.  Say you have a Webex iPhone

03:19  10   app installed on your phone.  You can connect through

03:20  11   the Internet to the MMP in this case.  And so that

03:20  12   would be a client that would have the capability of

03:20  13   mixing.

03:20  14        If instead that phone were to dial in through

03:20  15   the phone network, PSTN in this case, it would connect

03:20  16   to the CMS.  And in that case, it would not have the

03:20  17   capability of mixing.  It's not just about the device

03:20  18   but also remember protocol as well.  So how it's

03:20  19   connecting to the network and through what network it's

03:20  20   connecting makes a difference here.

03:20  21        Q.    Now, would you please turn in your binder to

03:20  22   PX-86?

03:20  23        A.    Yep.

03:20  24        Q.    What is this document?

03:20  25        A.    This is another internal Cisco document.

232

03:20   1        Q.    Did you rely on PX-86 in forming your

03:20   2   opinions?

03:20   3        A.    Yes.  I did.

03:20   4              MR. CAUGHEY:  Paltalk offers PX-86.

03:21   5              MR. SABRI:  No objection.

03:21   6              THE COURT:  Admitted.

03:21   7   BY MR. CAUGHEY:

03:21   8        Q.    Now we have PX-86 on the screen.  See it

03:21   9   titled Design Architecture Overview and then some

03:21  10   neon-looking contraptions.

03:21  11              But we've pulled out some bullet points.  And

03:21  12   the bottom one says:  Mixing of VoIP and PSTN audio is

03:21  13   performed on the client side.

03:21  14              And I see you've highlighted the term

03:21  15   "capability to mix" up in the claim term of the

03:21  16   '858 patent.

03:21  17              Could you describe the relationship here?

03:21  18        A.    So this is talking about the MMP server

03:21  19   previously that we discussed, and it's saying that

03:21  20   these clients are going to mix audio -- well, both the

03:21  21   VoIP audio that we talked about, Voice over IP, if you

03:21  22   remember, and PSTN, which is phone audio at the client.

03:21  23   So it's these clients have the capability of mixing all

03:21  24   the audio.

03:21  25        Q.    And can you now turn to PX-26 in your binder?

03:21  1      A.    Yes.

03:22  2      Q.    Can you identify this document?

03:22  3      A.    It's another internal Cisco document.

03:22  4      Q.    Did you review this document in forming your

03:22  5  opinions?

03:22  6      A.    Yes.  I did.

03:22  7              MR. CAUGHEY:  Paltalk offers PX-26.

03:22  8              MR. SABRI:  No objection.

03:22  9              THE COURT:  Admitted.

03:22 10  BY MR. CAUGHEY:

03:22 11      Q.    PX-26 is a Cisco document titled Webex Media

03:22 12  Conference System, Revision History.  You've excerpted

03:22 13  I guess Section 3.2.5 VoIP source selection and so on.

03:22 14        And why did you highlight the sentence that

03:22 15  you did?

03:22 16      A.    Yeah.  This is just another reference showing

03:22 17  that for the servers, that audio mixing's happening at

03:22 18  the client side.

03:22 19      Q.    And is their Cisco corporate representative

03:22 20  testimony on this determining step?

03:22 21      A.    Yes.  So Mr. Buckles was asked:  In what

03:22 22  instances would a PC-based client require mixing?

03:22 23        He said:  So the -- the determination to -- to

03:23 24  use mixing or not is based on multiple factors,

03:23 25  including the capabilities of the physical client

03:23    1    itself, the networks and systems in between that

03:23    2    client, and Webex and the overall user experience that

03:23    3    we want to deliver to that particular client.

03:23    4        Q.    And you've mentioned this several times.  I

03:23    5    think we saw it in the patent itself, the notion of

03:23    6    varying protocols.

03:23    7            Is that varying relationships between networks

03:23    8    and systems that Mr. Buckles described?

03:23    9        A.    Yes.  That's right.

03:23   10        Q.    And what's that relationship?  Can you just

03:23   11    build that out in two sentences?

03:23   12        A.    Well, it's basically the same thing,

03:23   13    basically.  Right?  The networks and protocols are

03:23   14    different depending on what network and how you

03:23   15    communicate.

03:23   16        Q.    And based on your review of these materials

03:23   17    and working the case, what's your conclusion with

03:23   18    respect to Element [3] of Claim 1?

03:23   19        A.    Based on all this information, my conclusion

03:23   20    is the limitation's met.

03:23   21        Q.    Now, Claim 1(4) is another determining claim.

03:23   22    Do you see that?

03:23   23        A.    Yes.

03:23   24        Q.    And what's the difference between Claim 1(4)

03:24   25    and Claim 1(3)?

03:24  1      A.     So Claim 1(3) was determining a set that had

03:24  2  the capability of mixing.  This is essentially the

03:24  3  opposite, determining the set of clients that do not

03:24  4  have the capability of mixing.

03:24  5      Q.     And I'm actually going to start here because I

03:24  6  think it might depict it even easier.

03:24  7             So before Claim 1(3) was focused on those over

03:24  8  here on the left that do have the capability to mix?

03:24  9      A.     That's right.  So that was the connections to

03:24 10  the MMP that we were talking about previously.

03:24 11      Q.     And now we're focused on 1(4) and those on the

03:24 12  right.  Is that --

03:24 13      A.     Right.  Now the connection's to the CMS.

03:24 14      Q.     And is your analysis essentially the same to

03:24 15  Claim 1(4) as it was with 1(3)?

03:24 16      A.     Yes.

03:24 17      Q.     And just to go back for -- oh, I got to get

03:24 18  rid of these.  Someone else did it.

03:24 19             With respect to patent Claim 1(4), you've also

03:24 20  put this audio flow diagram on the screen?

03:24 21      A.     That's right.

03:24 22      Q.     And it supports your analysis?

03:24 23      A.     Right.  Showing the connections of those

03:24 24  devices to the various servers.

03:25 25      Q.     And PX-154, does that also show those

03:25  1    connections?

03:25  2        A.    Again, the connections to the various servers.

03:25  3        Q.    And here we have additional testimony from

03:25  4    Cisco's own engineer and corporate representative.

03:25  5             What did Mr. Buckles say about this claim

03:25  6    limitation?

03:25  7        A.    So he was asked:  I'm just asking, are there

03:25  8    any instances where Cisco Webex Meetings makes a

03:25  9    determination of whether one or more clients in the

03:25  10   audioconference has the capability to mix multiple

03:25  11   audio streams?

03:25  12            To which he responded:  Yeah.  Again, that --

03:25  13   that determination is based on multiple factors.

03:25  14            And question was:  What determination?

03:25  15            And the answer was:  The determination of

03:25  16   whether the client should be delivered mixed or unmixed

03:25  17   audio streams.

03:25  18       Q.    Based on this evidence and your work in the

03:25  19   case, what's your conclusion with respect to whether

03:25  20   this Element [4] has been infringed?

03:25  21       A.    Again, based on all things we've seen, my

03:25  22   conclusion is the limitation's met.

03:25  23       Q.    Now, Claim 1(5) reintroduces some terms we've

03:25  24   heard about.  Multiplexing, multiplexed stream, active

03:26  25   speaker list.

03:26    1          What -- could you describe the best you can

03:26    2    for this jury what Claim 5 requires?

03:26    3      A.    Well, that -- you can just read it there.  We

03:26    4    talked about multiplexing, right, some multiplexing

03:26    5    said packets of audio received from each client on said

03:26    6    active speakers list -- we talked about the active

03:26    7    speakers list in forming that previously -- into a

03:26    8    multiplexed stream.  And we talked about that, I think,

03:26    9    as well, right?

03:26    10      Q.    And here's a -- I think it's actually the same

03:26    11    demonstrative we saw before.  We talked before about

03:26    12    the capability of mixing there on the left, but now I

03:26    13    want to focus on this multiplexer over here.

03:26    14          What is this demonstrative depicting?

03:26    15      A.    Right.  So this is the actual act of

03:26    16    multiplexing, taking those different streams of audio

03:26    17    and putting them together into sort of a -- it's called

03:26    18    multiplexing, putting them together into a single sort

03:26    19    of network connection, if you will, and so that they

03:26    20    can actually be separated out on the other side.

03:26    21      Q.    And the next slide shows PX-154.

03:27    22          Could you describe here where this

03:27    23    multiplexing is occurring and where the stream is being

03:27    24    sent?  And this is from a Cisco document?

03:27    25      A.    Yes.  We've seen it multiple times.

03:27  1      Q.    And -- sorry.  Go ahead.

03:27  2      A.    The multiplexing in this case is happening

03:27  3  inside the server here, the MMP, which is sort of

03:27  4  depicted as multiple lines going back.

03:27  5      Q.    And is this another page from the same

03:27  6  document?

03:27  7      A.    Same document.

03:27  8      Q.    And what do you take from this page with

03:27  9  respect to this multiplexing of active speakers into a

03:27  10  multiplexed stream?

03:27  11      A.    So here, it's talking about multiplexing.  And

03:27  12  it says:  Support RTP.  That's -- we've seen RTP

03:27  13  before, right?  We were talking about it with respect

03:27  14  to audio data.  Stream multiplexing in a single port

03:27  15  connection, it's talking about selecting the top three

03:27  16  streams or less and multiplexing those streams with

03:28  17  either connection.  There's that word "mux" that we

03:28  18  saw.  And remember that was just short for "multiplex"

03:28  19  previously.

03:28  20              THE COURT:  Counsel, are you at a place

03:28  21  where you can take a break?

03:28  22              MR. CAUGHEY:  Absolutely.

03:28  23              THE COURT:  Ladies and gentlemen of the

03:28  24  jury, we're going to take our afternoon recess.  If you

03:28  25  would please remember my instructions not to discuss

239

| | | |
|---|---|---|
| 03:28 | 1 | the case.  We'll be back in 10 to 15 minutes. |
| 03:28 | 2 | THE BAILIFF:  All rise. |
| 03:28 | 3 | (Jury exited the courtroom.) |
| 03:29 | 4 | THE COURT:  You may be seated. |
| 03:29 | 5 | We're going off of the confidential |
| 03:29 | 6 | record.  Is there -- that's what Jen said, that we were |
| 03:29 | 7 | on it. |
| 03:29 | 8 | And so is there anything we need to take |
| 03:29 | 9 | up? |
| 03:29 | 10 | We're going to go till 6:00 today.  Do we |
| 03:29 | 11 | think Dr. Schaefer will be on direct or cross through |
| 03:29 | 12 | then?  I'm not holding you to it.  I'm just -- |
| 03:29 | 13 | MR. CAUGHEY:  We will certainly finish |
| 03:29 | 14 | his direct exam well before 6:00.  I don't know how |
| 03:29 | 15 | long -- |
| 03:29 | 16 | THE COURT:  Who do you have after he's |
| 03:29 | 17 | done? |
| 03:29 | 18 | MR. CAUGHEY:  We have a depo deposition |
| 03:29 | 19 | to be played and then Mr. Bratic. |
| 03:29 | 20 | THE COURT:  Okay.  Very good. |
| 03:29 | 21 | THE BAILIFF:  All rise. |
| 03:29 | 22 | (Recess taken.) |
| 03:48 | 23 | THE BAILIFF:  All rise. |
| 03:48 | 24 | THE COURT:  Please remain standing for |
| 03:48 | 25 | the jury. |

240

03:48  1                    (Jury entered the courtroom.)

03:48  2                    THE COURT:  Thank you.  You may be

03:48  3     seated.

03:48  4     BY MR. CAUGHEY:

03:48  5        Q.    Dr. Schaefer, where we left off, we were at

03:49  6     Slide 62, and PX-154.  I think we actually already

03:49  7     covered that.  Whoops -- but not that.

03:49  8              We're now on Page 6 of PX-154.  And here we

03:49  9     see some little Tetris-looking blocks down here.  And

03:49  10    it -- actually, you're much better off deciphering this

03:49  11    than I am, truth be told.  So why don't you tell us

03:49  12    what we're looking at, and I can ask follow-up

03:49  13    questions.

03:49  14       A.    Right.  So this is actually sort of a visual

03:49  15    depiction of what was on the previous slide here.  It's

03:49  16    talking about multiplexing multiple streams.  So it's

03:49  17    the multiple streams here over a single port or

03:49  18    connection.  Actually, it's a decent description of how

03:49  19    you might actually do multiplexing.  There's many ways

03:49  20    you can multiplex, but this is one way.

03:49  21              And so you see all the orange, yellow, and the

03:49  22    green boxes moving over the server.  And then it says:

03:49  23    The CMS needs to demultiplex into individual streams.

03:49  24    And we can see the individual streams that it breaks it

03:50  25    down into.

03:50    1        So multiplexing, remember, was taking multiple

03:50    2   streams, putting them over a single connection such

03:50    3   that you could actually pull them apart in the end.  So

03:50    4   that's that demux, demultiplexing.

03:50    5        Q.    And "mux," which we saw that, was that a term

03:50    6   that appeared in the patent too?

03:50    7        A.    Yeah.  That's right.  It appeared in the

03:50    8   patent.  If you remember when we went through Column 5,

03:50    9   it said mux and multiplex interchangeably.

03:50   10        Q.    Is that a known term to experts in the field?

03:50   11        A.    Yes.

03:50   12        Q.    Now, so we see our handy diagram again, and

03:50   13   just to orient everybody, we're still at this

03:50   14   multiplexing Element 5 to a multiplexed stream, and I

03:50   15   see a couple of callouts.  Here, it talks about

03:50   16   switching audio to the clients.  MMP switches audio

03:50   17   from CMS to all mobile clients.

03:50   18        How does this concept of switching relate to

03:51   19   the multiplexing or muxing that we saw on the prior

03:51   20   slide?

03:51   21        A.    So this is the multiplexing streams that are

03:51   22   going to be sent to the different clients.  He's

03:51   23   talking about switching.  It's really talking about

03:51   24   this combined operation of multiplexing and sending.

03:51   25        MR. CAUGHEY:  And next we have our next

242

03:51  1    frolic into source code.  I assume counsel would want

03:51  2    to seal the courtroom.

03:51  3              MR. SABRI:  That's right.  We would

03:51  4    request to seal the courtroom for this and go on the

03:51  5    confidential record, Your Honor.

03:51  6              (Sealed proceedings.)

03:51  7

03:51  8

03:51  9

03:51  10

03:51  11

03:51  12

03:51  13

03:51  14

03:52  15

03:52  16

03:52  17

03:52  18

03:52  19

03:52  20

03:52  21

03:52  22

03:52  23

03:52  24

03:52  25

03:52  1          THE COURT:  Granted.



—244—

| 03:53 | 1 | ▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ |
| 03:53 | 2 | ▆▆▆▆▆ |
| 03:53 | 3 | ▆ ▆▆▆▆▆▆ |
| 03:53 | 4 | ▆▆▆▆ ▆▆▆▆ |
| 03:53 | 5 | ▆▆▆▆▆▆▆ |
| 03:53 | 6 | ▆▆▆ ▆▆ ▆▆▆ |

09:42   7                    (Sealed proceedings end.)

03:53   8                    MR. CAUGHEY:  If you could pull back up

03:53   9    the slide, Mr. Boles.

03:54  10    BY MR. CAUGHEY:

03:54  11         Q.    And what conclusion do you draw from this

03:54  12    combining of, I guess, audio data that you referred to

03:54  13    in the source code?

03:54  14         A.    That it's multiplexing the audio data from the

03:54  15    active speakers into a multiplexed stream.

03:54  16         Q.    And was Cisco's corporate representative asked

03:54  17    about how Webex multiplexes?

03:54  18         A.    Yes.  So he was asked:  Do you have a

03:54  19    description in the way -- of the way that Cisco Webex

03:54  20    Meetings delivers multiplexed audio to clients?  Can

03:54  21    you describe that for me?

03:54  22                 And the answer was:  Sure.  There's multiple

03:54  23    levels of multiplexing in a Webex meeting.  We, for

03:54  24    example, we multiplex the audio and video delivered to

03:54  25    a client on the same network.  So those are sent across

```
03:54   1    the same network between the server and the client.
03:54   2    And we also multiplex multiple audio streams to --
03:54   3    again, to a receiving client.
03:54   4        Q.    So in light of your work review of these
03:54   5    materials, what is your conclusion with respect to
03:55   6    Element [5]?
03:55   7        A.    That the limitation is met.
03:55   8        Q.    So we arrive at Element [6].  We've now seen
03:55   9    the multiplexing and the sending of the multiplexed
03:55   10   stream.  Now we have -- or at least now we have the
03:55   11   sending, Claim 1(6), what we've all been waiting for.
03:55   12            So explain what Claim 1(6) covers.
03:55   13       A.    So this is -- remember we were multiplexing on
03:55   14   the previous one.  Now we have send.  Those are two
03:55   15   steps.  So I think if you go to the very next
03:55   16   slide -- yeah, there -- it shows the top 3 loud being
03:55   17   switched to all clients, and you can see the clients
03:55   18   here getting the multiplexed stream.
03:55   19       Q.    So multiplexes around here and then sends them
03:55   20   out to the clients?
03:55   21       A.    Correct.  Exactly.
03:55   22       Q.    And then the clients ultimately, that's folks
03:55   23   who are participating in Webex?
03:55   24       A.    Yes.
03:55   25       Q.    And allows them to hear the audio?
```

03:55    1              MR. SABRI:  Objection, Your Honor.  This

03:55    2    is getting leading.

03:55    3              THE COURT:  I couldn't understand.

03:55    4              MR. SABRI:  Objection.  This is getting

03:56    5    leading now, Your Honor.

03:56    6              THE COURT:  Overruled.

03:56    7    A.    Yes.  It does allow them to hear the audio.

03:56    8    BY MR. CAUGHEY:

03:56    9    Q.    And for the clients who have -- just as a

03:56   10    clarification, for the clients who are on computers or

03:56   11    mixing devices versus the PSTN telephone devices, is

03:56   12    there a material difference in how they experience the

03:56   13    audio coming to them?

03:56   14    A.    It's not necessarily a material difference,

03:56   15    right, getting those multiplexed streams that we talked

03:56   16    about.  They have to demultiplex that demux that we

03:56   17    talked about into the individual pieces, and then

03:56   18    actually perform the mixing.  So those are different

03:56   19    audio signals, and they have to be combined together so

03:56   20    that you can hear multiple people at the same time

03:56   21    really coming out of the speaker.  That's the mixing

03:56   22    aspect, but it's happening with ease.  It's happening

03:56   23    at the device.

03:56   24    Q.    And the next slide shows a familiar diagram

03:56   25    from PX-154.  Could you just explain briefly where the

03:56  1    sending's occurring here?

03:56  2        A.    Right.  I think we talked about this.  So the

03:57  3    multiplexing was happening in this MMP.  And you see

03:57  4    the multiple streams being multiplexed across a single

03:57  5    connection back to those clients.

03:57  6        Q.    And I -- oh, goodness.

03:57  7            And I think I mentioned before or probably

03:57  8    jumped the gun in asking you before about how users

03:57  9    experience this, but this is the demo we saw before, I

03:57  10   think.

03:57  11           What does this depict about the multiplexed

03:57  12   stream that's been sent?

03:57  13       A.    So this has got -- it looks like there's three

03:57  14   clients that are talking at the same time, so it's

03:57  15   saying multiplexed stream.  And again, you would have

03:57  16   to mix it at the clients so that you could hear it,

03:57  17   that you would hear all these people talking.

03:57  18                MR. CAUGHEY:  And now we have a little

03:57  19   bit of additional source code.  And I assume counsel

03:57  20   would want to go on the confidential record.

03:57  21                MR. SABRI:  That's right.  We should go

03:57  22   back on the confidential record, please, sir.

03:58  23                THE COURT:  Okay.

03:58  24                (Sealed proceedings.)

03:58  25   ████████████████        ██████████████████████

248



| 03:59 | 1 | |
| 03:59 | 2 | |
| 03:59 | 3 | |
| 03:59 | 4 | |
| 03:59 | 5 | |
| 03:59 | 6 | |
| 03:59 | 7 | |
| 03:59 | 8 | |
| 03:59 | 9 | |
| 03:59 | 10 | |
| 09:42 | 11 | |
| 09:42 | 12 | (Sealed proceedings end.) |
| 03:59 | 13 | BY MR. CAUGHEY: |
| 03:59 | 14 | Q.    And so, Dr. Schaefer, what is your conclusion |
| 03:59 | 15 | with respect to Element [6]? |
| 03:59 | 16 | A.    Based on all the evidence we've seen, the |
| 03:59 | 17 | limitation's met. |
| 04:00 | 18 | Q.    Now, we've just spent considerable time |
| 04:00 | 19 | talking about multiplexing.  Now we move on to my |
| 04:00 | 20 | second favorite topic, mixing. |
| 04:00 | 21 | What does Element [7] focus on? |
| 04:00 | 22 | A.    So this is very similar to what we just saw |
| 04:00 | 23 | for multiplexing but now for mixing.  So |
| 04:00 | 24 | we're -- it's -- instead of multiplexing from the |
| 04:00 | 25 | active speakers list, we're going to be mixing.  In the |



04:00  1    next limitation, we'll send it to the non-mixing

04:00  2    clients.

04:00  3        Q.    And so were you referring to a parallel as in

04:00  4    between Elements [5] and [6] on the one hand and [7]

04:00  5    and [8] on the other?

04:00  6        A.    That's right.

04:00  7        Q.    Okay.  Now, here's a demonstrative.  And I see

04:00  8    on -- why don't you walk the jury through how this

04:00  9    demonstrative reflects a mixing aspect that we talked

04:01  10   about?

04:01  11       A.    Right.  So we've got some people speaking like

04:01  12   the blue one here and the yellow one here.  It's going

04:01  13   through the phone network to the server which is

04:01  14   actually performing the mixing; that's the green that's

04:01  15   coming out.  So it's taking -- blue plus yellow is

04:01  16   green, I guess, right.  And so it's making a mixed

04:01  17   audio signal.  And like, for example, this one here is

04:01  18   receiving the green signal, and it's hearing both

04:01  19   people at the same time.  Right.  So two people

04:01  20   talking.  They'd be able to hear both of them, but it's

04:01  21   in a single audio signal.

04:01  22       Q.    And now we have the audio flow --

04:01  23   whoops -- diagram.  Before we were focused up here.

04:01  24   Where can we find the mixing on this document?

04:01  25       A.    Now we're looking at the CMS here.  And you

04:01  1    can see here it says the CMS selects the top 3 and

04:01  2    mixes them.

04:02  3         Q.    And this is a Cisco document?

04:02  4         A.    Yes.  It is.

04:02  5         Q.    Now, on Slide 75.  We have -- we have PX-154.

04:02  6         A.    This is another depiction of what's going on

04:02  7    here.  So you can see right here this is a mixer.  It's

04:02  8    got three arrows indicating that there's multiple audio

04:02  9    signals going in and then one coming out.  Except I

04:02  10   guess it's going this way to the phone.  So...

04:02  11        Q.    And now we're going to see how source code is

04:02  12   relevant to mixing in PX-245.

04:02  13             MR. SABRI:  I do think that means we need

04:02  14   to go back on the confidential record and seal the

04:02  15   court.

04:02  16             THE COURT:  Okay.

04:02  17             (Sealed proceedings.)

04:02  18   ███████████████

04:03  19   █  ████  █████████████████████████████

04:03  20     █████████████████████████

04:03  21   █  ██

04:03  22   █  ███████████████

04:03  23   █  ████  ████

04:03  24         ██████████  █████████████

04:03  25         ██████████  ████████████████████



253



04:04    1

04:04    2

04:04    3

04:04    4

04:04    5

04:05    6

04:05    7

04:05    8

04:05    9

04:05    10

04:05    11

04:05    12

04:05    13

04:05    14

04:05    15

04:05    16

04:05    17

04:05    18

04:05    19

04:05    20

04:05    21

09:42    22          (Sealed proceedings end.)

04:05    23    BY MR. CAUGHEY:

04:05    24        Q.    And what conclusion did you draw from review

04:05    25    of the source code with respect to Element [7]?

04:05  1       A.    That it's met.

04:05  2       Q.    And what did Cisco's corporate representative

04:05  3  say that you found important with respect to this

04:05  4  Element [7]?

04:05  5       A.    So he was asked -- and there are -- just to be

04:05  6  clear, and I think this is one -- this one is probably

04:05  7  asked and answered:  But there are instances where

04:06  8  Cisco's Webex Meetings does mix audio before

04:06  9  transmitting the audio in a packet back to some or all

04:06  10  clients in a conference, right?

04:06  11       And the answer was:  Yes.  I think that's an

04:06  12  accurate answer.

04:06  13       Q.    And based on that and everything else you've

04:06  14  seen in the work you did, what was your conclusion

04:06  15  about whether Cisco Webex, the accused products mix

04:06  16  audio packets in the manner described in Element [7]?

04:06  17       A.    That the limitation was met.

04:06  18       Q.    I see a check next to Element [7].  We're now

04:06  19  on Element [8].  Whereas we just saw I guess in 5 and

04:06  20  6, we saw multiplexing and sending.  And 7 we saw

04:06  21  mixing.  And now 8, we're back to sending.

04:06  22       Could you explain to the jury what this

04:06  23  Element [8] covers?

04:06  24       A.    So this is taking that mixed audio that was

04:06  25  just created and sending it to the clients that don't

04:06    1    have the capability of mixing.

04:06    2        Q.    And here we have this familiar document, and I

04:07    3    think you've explained how this depicts sending, but

04:07    4    why don't you do so briefly once more for the jury?

04:07    5        A.    Right.  So we talked about the mixing that was

04:07    6    happening here and then the audio data being sent to

04:07    7    the phones.

04:07    8        Q.    And how about here as well on the audio flow

04:07    9    diagram?  PX-37?

04:07    10        A.    Can you click one more?

04:07    11        Q.    Oh, yes.  Of course.

04:07    12        A.    There you go.

04:07    13            So it says:  Step 8, that's CMS, that piece

04:07    14    we've been looking at, sends mixed audio to phones.

04:07    15            And we can see that happening right here with

04:07    16    the phones receiving the audio.

04:07    17        Q.    And just to be clear, the claim here doesn't

04:07    18    use the word "mixing."

04:07    19            How is the concept of mixing incorporated in

04:07    20    Element [8]?

04:07    21        A.    Sorry.  It says "combined packet."  And that

04:07    22    was the result of mixing the previous limitation.

04:07    23        Q.    Thank you, sir.

04:07    24            And we have I think our perhaps second-to-last

04:08    25    source code moment.  So we may need just a couple more

```
04:08   1    times to go on the confidential record.

04:08   2                MR. SABRI:  That's right.  Request to go

04:08   3    on confidential and clear the courtroom.

04:08   4                THE COURT:  Okay.

04:08   5                (Sealed proceedings.)
```



257

09:42  1              (Sealed proceedings end.)

04:09  2  BY MR. CAUGHEY:

04:09  3      Q.    And, Dr. Schaefer, so what conclusion did you

04:09  4  draw with respect to Element [8] of Claim 1?

04:09  5      A.    That limitation's met.

04:09  6      Q.    And Element [9] starts with "whereby."  And

04:09  7  it's -- this kind of brings us right back to the

04:09  8  beginning.  Whereby said plurality of clients can

04:09  9  simultaneously participate in a single audioconference

04:09  10 application.

04:09  11             What's being shown here in this demonstrative?

04:10  12     A.    This is the multiple people participating in

04:10  13 that single audioconference.  We have a phone user and

04:10  14 other computer users at home participating in an

04:10  15 audioconference.

04:10  16     Q.    And we see PX-144 again.  I think, again, the

04:10  17 symmetry.  We saw this with the preamble.  We see it

04:10  18 again with the end of Claim 1.

04:10  19             What's this depicting?

04:10  20     A.    Again, multiple devices with computer-based

04:10  21 devices or phone-based devices participating in a

04:10  22 single audioconference.

04:10  23     Q.    And here, we now come to the end of Claim 1.

04:10  24             What is your conclusion with respect to this

04:10  25 last "whereby" clause in Claim 1?

04:10  1      A.    That it -- the limitation's met.

04:10  2      Q.    And so what is your conclusion with respect to

04:10  3  Claim 1, whether Claim 1 as a whole has been infringed

04:10  4  by the Cisco Webex accused products?

04:10  5      A.    Well, we've gone through all the limitations

04:10  6  and shown they've all been met.  So my conclusion is

04:10  7  that Claim 1 is -- that Webex infringes Claim 1.

04:11  8      Q.    And we're going to move on.  And you've heard

04:11  9  this 2 through 5 infringed.

04:11  10             MR. CAUGHEY:  Charitably, that analysis

04:11  11  is much, much shorter, but before we get there, I do

04:11  12  want to pause for a second.  Because I think it was

04:11  13  very sharply presented in the opening statements a

04:11  14  dispute about how each works and each of these -- in

04:11  15  every one of these claims.

04:11  16             And it appears a number of times.  And

04:11  17  Dr. Schaefer mentioned it previously, but I just --

04:11  18  given the issue raised in opening, I do want to pause

04:11  19  on it for Dr. Schaefer here.

04:11  20  BY MR. CAUGHEY:

04:11  21      Q.    And, Dr. Schaefer, could you remind the jury

04:11  22  of the lens you applied as you looked at each -- and

04:11  23  with respect to the other language in the claims as

04:11  24  well?

04:11  25      A.    Right.  So I'm looking at this as an expert in

04:12  1    the field, essentially, as I'm reading the patent and

04:12  2    looking at it in light of the specification of the

04:12  3    patent.

04:12  4        Q.   And I'd also like to -- there was a suggestion

04:12  5    that this is a nonsensical interpretation by the other

04:12  6    side.  I think you mentioned before that you also

04:12  7    relied on some guidance from the Court on this issue.

04:12  8                MR. CAUGHEY:  Could you put the Court's

04:12  9    ruling back up, Mr. Boles?

04:12  10   BY MR. CAUGHEY:

04:12  11       Q.   And just again, start with "I'm going to," if

04:12  12   you don't mind, sir.  Dr. Schaefer.

04:12  13       A.   You want me to read that?

04:12  14       Q.   Yes, if you don't mind.

04:12  15       A.   Oh, sorry.  It says:  Each has plain and

04:12  16   ordinary meaning which can include "one or more."

04:12  17       Q.   And now I'd love for you to explain a little

04:12  18   bit more -- well, before we do that, I suppose, why was

04:12  19   it that you relied on this ruling as called in forming

04:13  20   your infringement analysis?

04:13  21       A.   Well, one, I'm supposed to interpret it in

04:13  22   terms as an expert in the field but also utilizing the

04:13  23   Court's claim constructions.

04:13  24       Q.   Now, we just looked at the ruling from the

04:13  25   Court.  Now I'd like to hear your understanding in

04:13    1    light of what you said is an expert in the field, a

04:13    2    person of ordinary skill.  And I think you mentioned

04:13    3    before you read the patent claim language in light of

04:13    4    the specification.

04:13    5            What did you mean by that?

04:13    6            MR. SABRI:  Object, Your Honor.  This is

04:13    7    getting into something not addressed in this expert's

04:13    8    report.

04:13    9            MR. CAUGHEY:  I would refer Your Honor to

04:13   10    what I referred to before, which is that Dr. Schaefer

04:13   11    says explicitly in Paragraphs 24 and 34 of his report

04:13   12    that he interprets all claim language in light of the

04:13   13    specification.

04:13   14            He specifically references Your Honor's

04:13   15    ruling, and he specifically says that he interprets

04:14   16    "all" to mean "one or more."  And then counsel in

04:14   17    deposition questioned Dr. Schaefer at length about this

04:14   18    Column 5.

04:14   19            MR. SABRI:  Your Honor, he presents no

04:14   20    opinion in his report in how a POSITA would interpret

04:14   21    the term "each" or why, much less cites this column.

04:14   22    There's just nothing in there.

04:14   23            THE COURT:  If you can bring his report

04:14   24    up here and show me where he discusses this specific

04:14   25    issue.

| | | |
|---|---|---|
| 04:14 | 1 | MR. CAUGHEY: Yes, Your Honor. |
| 04:14 | 2 | (Bench conference.) |
| 04:14 | 3 | MR. CAUGHEY: So I'll try to be a little |
| 04:14 | 4 | quieter. |
| 04:14 | 5 | Your Honor, so -- Your Honor, first, in |
| 04:14 | 6 | Paragraph 21, he references Your Honor's ruling. |
| 04:15 | 7 | THE COURT: Okay. Got it. |
| 04:15 | 8 | MR. CAUGHEY: It has been shown. And |
| 04:15 | 9 | then I believe he mentions Paragraph 34 at the end |
| 04:15 | 10 | of -- hold on. I apologize. Where he discusses his |
| 04:15 | 11 | method of construing the claims. There certainly was |
| 04:15 | 12 | reliance on Your Honor's ruling. |
| 04:15 | 13 | In addition, Your Honor, I did bring up |
| 04:15 | 14 | his deposition with one example of where he was asked |
| 04:15 | 15 | specifically about Column 5, which is what's on the |
| 04:15 | 16 | screen in light of this "each," "one or more." And |
| 04:15 | 17 | there's more examples from his deposition, but that's |
| 04:15 | 18 | one of them. |
| 04:15 | 19 | MR. SABRI: Your Honor, the issue is in |
| 04:15 | 20 | his report, he actually applied Your Honor's language |
| 04:15 | 21 | as a construction. He didn't say P&O, which |
| 04:15 | 22 | means -- and I can show you. He said court's |
| 04:15 | 23 | constructions. And he listed as a construction "each," |
| 04:15 | 24 | which can include "one or more." And then in the body |
| 04:15 | 25 | of his report, he just substitutes "one or more" in for |

| | | |
|--|--|--|
| 04:15 | 1 | "each" a few times, which he would do if it were a |
| 04:15 | 2 | construction. |
| 04:15 | 3 | But of course, as Your Honor clarified, |
| 04:16 | 4 | it's not. And he presents zero opinion in the report |
| 04:16 | 5 | on how a POSITA would interpret it, why that's what the |
| 04:16 | 6 | P&O is, citing Column 5 none of that. So the most he |
| 04:16 | 7 | does at the depo, you know, he says a couple of times, |
| 04:16 | 8 | what's one or more, I applied the Court's construction. |
| 04:16 | 9 | I applied one or more. So we know that. He can, of |
| 04:16 | 10 | course, say that and he said it already. |
| 04:16 | 11 | What he can't do now is go outside the |
| 04:16 | 12 | four corners of the report and say, well, now I'm going |
| 04:16 | 13 | to teach you what a POSITA would think when in his |
| 04:16 | 14 | report, he just applied it as a construction. |
| 04:16 | 15 | MR. CAUGHEY: Your Honor, first of all, |
| 04:16 | 16 | we were not sure when the report was issued that it was |
| 04:16 | 17 | going to be such an argument to the jury about what |
| 04:16 | 18 | this term was meaning. And there was a clarification |
| 04:16 | 19 | just a couple of weeks ago, long after expert reports |
| 04:16 | 20 | were closed. We think if they're going to present |
| 04:16 | 21 | expert testimony, which they are, about the meaning of |
| 04:16 | 22 | this term, we should be allowed to as well, |
| 04:16 | 23 | particularly in light of the disclosure, realizing -- |
| 04:16 | 24 | THE COURT: Is what they're going to say |
| 04:16 | 25 | in a report? |

04:16   1           MR. CAUGHEY:  It is, Your Honor.  It's in

04:16   2   Mr. Willis' report.  And at this most recent hearing,

04:17   3   you may recall you asked Paltalk if they needed to

04:17   4   adjust their reports, and Mr. Tribble said no.  We

04:17   5   don't.

04:17   6           So Mr. Willis did explicitly address,

04:17   7   here's what it means to a POSITA.  Dr. Schaefer decided

04:17   8   not to, and then at the recent hearing, he doubled down

04:17   9   and said, I don't need to revise it.

04:17   10          MR. SABRI:  And I would just say in

04:17   11  response, his entire -- I mean, entire report obviously

04:17   12  relies on the patent.  He recites specifically to the

04:17   13  specification in Your Honor's ruling.  And they asked

04:17   14  him in two depositions, including a second seven-hour

04:17   15  deposition, had an opportunity to ask him questions

04:17   16  about this.  And I do think it's helpful to the jury.

04:17   17          THE COURT:  Did the second deposition

04:17   18  take place after my recent ruling?

04:17   19          MR. SABRI:  No.  Let me show you, just if

04:17   20  I could, Your Honor.  Here is what he said in the

04:17   21  supplemental report.  You've got Court's construction.

04:17   22  He's got P&O on a couple of them, which is right, and

04:17   23  then "each," he says "each which can include."  So he

04:17   24  doesn't even say it's P&O.

04:17   25          Then, of course, that means in his report

| | | |
|---|---|---|
| 04:17 | 1 | he doesn't say what that means to a POSITA as P&O |
| 04:17 | 2 | because in his report, it wasn't P&O; it was in |
| 04:18 | 3 | construction.  He chose not to address it, not to |
| 04:18 | 4 | disclose it as Mr. Willis did, and then not to try to |
| 04:18 | 5 | take another shot until after August 1 of this year, |
| 04:18 | 6 | which Your Honor gave him the chance to do. |
| 04:18 | 7 | MR. CAUGHEY:  And at the risk of |
| 04:18 | 8 | repeating, I would say there is a very clear disclosure |
| 04:18 | 9 | in a part of what he's relying on, which is the patent |
| 04:18 | 10 | specification and Your Honor's order, and -- I'm |
| 04:18 | 11 | sorry -- in the infringement opinions, in light of his |
| 04:18 | 12 | reliance on the specification in the patent and |
| 04:18 | 13 | Your Honor's order, and then testified about his views |
| 04:18 | 14 | in light of the patent, the specification and |
| 04:18 | 15 | Your Honor's order. |
| 04:18 | 16 | And we ask only that he be allowed to |
| 04:18 | 17 | testify to this jury about his view of the patent claim |
| 04:18 | 18 | language, as he's frankly done already today in light |
| 04:18 | 19 | of Your Honor's order, the patent and the |
| 04:18 | 20 | specification. |
| 04:18 | 21 | MR. SABRI:  Your Honor, I think the most |
| 04:18 | 22 | he can say is, I applied "any," and "each" is "one or |
| 04:18 | 23 | more," and I did that by looking at the specification |
| 04:18 | 24 | of the claims.  I don't think he can explain what a |
| 04:18 | 25 | POSITA means I think through the specification explain |

04:18  1  this when he didn't do it in his report, and he didn't

04:18  2  do it in the depo.  But the real important thing here

04:18  3  is the report because that's what we had when we

04:19  4  deposed him.  And if he had said what Mr. Willis said,

04:19  5  I think its P&O is this, here's why, we would have

04:19  6  asked him questions on that, but he didn't.

04:19  7              THE COURT:  Well, here's the problem.  It

04:19  8  is the P&O because that's what I said.  So your

04:19  9  argument's a little circumvent isn't to say that I

04:19  10  don't think he has anything in his report where he

04:19  11  explains how he did the analysis under what P&O meant.

04:19  12  So to the extent he is parroting what I said and what

04:19  13  that means, he can talk about that.  But beyond that,

04:19  14  and I think because of this language in the deposition,

04:19  15  I think to the extent he asks if he wants to parrot

04:19  16  what he said there about Column 5, he can do that too.

04:19  17              I'll give you a little leeway in terms

04:19  18  of -- because someone's got to explain to the jury or

04:20  19  it doesn't make any sense -- him explaining what it

04:20  20  means for one to be a person of skill in the art the

04:20  21  plain and ordinary meaning.  But he needs to make clear

04:20  22  that his analysis relies primarily, if not exclusively

04:20  23  on my Court instruction and not any analysis that he

04:20  24  did because you didn't provide any of that in his

04:20  25  report.

04:20  1                    MR. CAUGHEY:  So just to make absolutely

04:20  2    sure I do this properly.

04:20  3                    THE COURT:  Right.

04:20  4                    MR. CAUGHEY:  Your Honor can make that

04:20  5    clear, what you just said that his analysis relies

04:20  6    principally on -- I mean, I think I've done that.

04:20  7                    THE COURT:  My construction is my

04:20  8    construction.  And he can talk about that.

04:20  9                    MR. CAUGHEY:  Exactly.

04:20  10                   THE COURT:  But he can explain because he

04:20  11   knows -- and the jury needs to understand what it

04:20  12   is -- what a person of ordinary skill in the art is.

04:20  13   And also what he explained what plain and ordinary

04:20  14   meaning is, so that he can lay a groundwork for the

04:21  15   jury to understand what he's saying when he's saying

04:21  16   what I said.  Underline of what I said though.

04:21  17   Hopefully properly.

04:21  18                   What you can't do is give the impression

04:21  19   to the jury that he did some analysis himself of

04:21  20   whether or not this meant the plain and ordinary

04:21  21   meaning, why it would, other than if he wants to -- I

04:21  22   can't tell -- y'all wouldn't know what's in Column 5.

04:21  23   If he needs to talk about what's in Column 5 --

04:21  24                   MR. CAUGHEY:  That's all I want to talk

04:21  25   about is what's in -- a snippet of Column 5 around

| | | |
|---|---|---|
| 04:21 | 1 | Lines 40 through -- |
| 04:21 | 2 | THE COURT:  I'm going to allow him to do |
| 04:21 | 3 | that too.  But beyond that, he can't talk about |
| 04:21 | 4 | anything else that he did. |
| 04:21 | 5 | MR. CAUGHEY:  That's all I'm going to do |
| 04:21 | 6 | is Column 5. |
| 04:21 | 7 | MR. SABRI:  Well, that's not talking |
| | 8 | about yours.  This is talking about a particular |
| | 9 | limitation, Your Honor. |
| | 10 | THE REPORTER:  I can't understand you |
| | 11 | because you're talking so fast. |
| 04:21 | 12 | MR. SABRI:  I'm sorry. |
| 04:21 | 13 | THE COURT:  Anything else? |
| | 14 | MR. CAUGHEY:  No, Your Honor.  Thank you. |
| 04:21 | 15 | MR. SABRI:  I just want to make clear. |
| 04:21 | 16 | Does this mean he can use this slide where he's walking |
| 04:22 | 17 | through Column 5 to explain why in his view this is |
| 04:22 | 18 | what it means? |
| 04:22 | 19 | THE COURT:  He can explain -- he needs to |
| 04:22 | 20 | go back through and explain what the basis was.  And if |
| 04:22 | 21 | he wants to show in Column 5 there's support for that |
| 04:22 | 22 | opinion, then he can do that. |
| 04:22 | 23 | MR. CAUGHEY:  Excellent.  Thank you. |
| 04:22 | 24 | (Bench conference concludes.) |
| 04:22 | 25 | MR. CAUGHEY:  Can we back up to the |

| | | |
|---|---|---|
| 04:22 | 1 | Court's ruling one more time? |
| 04:22 | 2 | BY MR. CAUGHEY: |
| 04:22 | 3 | Q.    And I think you mentioned before we spoke with |
| 04:22 | 4 | the Judge that you rely on the Court's claim |
| | 5 | construction. |
| 04:22 | 6 | Did you say that? |
| 04:22 | 7 | A.    Yes. |
| 04:22 | 8 | Q.    And if this assertion where it says each has a |
| 04:22 | 9 | plain and ordinary meaning which can include one or |
| 04:22 | 10 | more is something that you relied on in reaching your |
| 04:23 | 11 | conclusion, then in the '858 patent, "each" means one |
| 04:23 | 12 | or more? |
| 04:23 | 13 | A.    That's correct. |
| 04:23 | 14 | Q.    Okay.  Did you also review the patent's |
| 04:23 | 15 | specification with respect to your understanding of the |
| 04:23 | 16 | word "each"? |
| 04:23 | 17 | A.    Yes.  I did. |
| 04:23 | 18 | MR. CAUGHEY:  Can we go to the slide we |
| 04:23 | 19 | were before? |
| | 20 | BY MR. CAUGHEY: |
| 04:23 | 21 | Q.    Okay.  And so first we see this magnifying |
| 04:23 | 22 | glass or lens where, at the risk of telling the jury |
| 04:23 | 23 | something they've already heard before, but you applied |
| 04:23 | 24 | a particular approach to analyzing the patent claim |
| 04:23 | 25 | language; is that right? |

269

04:23    1       A.    Right.  I did so as, one, as an expert in the

04:23    2    field, and I did so in light of the specification of

04:23    3    the patent.

04:23    4       Q.    And here we have Column 5, and this language

04:23    5    was on the screen before.  And it's, I think, Lines 44

04:24    6    to 52.

04:24    7             Is this language taken from the specification

04:24    8    of the '858 patent?

04:24    9       A.    That's right.

04:24   10       Q.    And how is this relevant to your reading of

04:24   11    "one or more" as a person of ordinary skill in the art?

04:24   12       A.    It's talking about the multiplexing that we

04:24   13    were previously discussing in terms of limitations

04:24   14    here.  So it says in Step 314, the active speaker data

04:24   15    for each and every active speaker is multiplexed.  And

04:24   16    if you remember, we looked at the limitation that

04:24   17    looked pretty similar to that.

04:24   18             The next line that's highlighted, yep, says:

04:24   19    As will be apparent to those skilled in the relevant

04:24   20    arts, if the one you're sending it to is an active

04:24   21    speaker, then the multiplexed stream, the multiplexed

04:24   22    packets will not include the speaker's own data, right.

04:24   23    And that's that echo suppression that we talked about

04:24   24    there.

04:24   25             So what does that mean?  It's going through a

04:25  1    loop.  Okay?  Every time it goes through this loop,

04:25  2    it's checking to see if it's an active speaker.  If

04:25  3    it's an active speaker, it's building a different

04:25  4    multiplexed stream for all of those active speakers.

04:25  5    So Speaker 1 would get something different than Speaker

04:25  6    2 and Speaker 3 in that case.

04:25  7        Q.    And as a person of ordinary skill in the art,

04:25  8    how do you draw the relationship between the sort of

04:25  9    teal or green sentence in the yellow one?

04:25  10       A.    Right.  So when it says each speaker is

04:25  11   multiplexed and then it says the result of that will

04:25  12   not include if it's different for the different

04:25  13   speakers that are on here, then each needs to be one or

04:25  14   more in that case.  It's not the same thing that you

04:25  15   sent to all the speakers.  It's not including, as it

04:25  16   says here, the speaker's own data, so it's not

04:25  17   including all of the data.

04:25  18       Q.    Do these sentences make sense if each means

04:25  19   all?

04:25  20       A.    I mean, each can include one or more, but it's

04:26  21   not going to -- the "however" line makes -- it would be

04:26  22   difficult to do.

04:26  23       Q.    Let me ask the question in the opposite.

04:26  24            Do these sentences make sense if each can't

04:26  25   mean one or more?

04:26  1     A.    No.  It doesn't.

04:26  2     Q.    And what does the last sentence say here?

04:26  3     A.    So this is talking about the -- you know, how

04:26  4  the active speaker's data that they're sending it to is

04:26  5  not being included in multiplexed packets.  This is the

04:26  6  echo suppression so that their audio data is not sent

04:26  7  to themselves.  So they don't hear themselves.  You

04:26  8  want to hear the other people, not yourself.  You can

04:26  9  already hear yourself.  You're in the room with

04:26  10  yourself.

04:26  11    Q.    And so when you saw "each" in these patent

04:26  12  elements, you took them to mean one or more?

04:26  13    A.    That's correct.

04:26  14    Q.    As a person of ordinary skill in the art?

04:26  15    A.    That's right.

04:26  16    Q.    In light of the Court's ruling?

04:26  17    A.    Yes.

04:26  18    Q.    Now, on to Claim 2.  Now, once again, try to

04:26  19  make this a touch more readable.  And this says --

04:27  20  starts off with saying something we haven't seen.  It

04:27  21  says:  The method of Claim 1.

04:27  22          How does Claim 2 relate to Claim 1?

04:27  23    A.    So this is a dependent claim.  So what that

04:27  24  means is that it says method of Claim 1.  So all the

04:27  25  limitations of Claim 1 need to be met as well as the

04:27  1    limitation of Claim 2.

04:27  2        Q.    Okay.  And what -- could you describe for

04:27  3    me -- we'll get a look at some source code in a minute.

04:27  4    But actually, don't describe for me, describe for the

04:27  5    jury what is encompassed or being taught here by this

04:27  6    Claim 2.

04:27  7        A.    Well, this is talking about before sending,

04:27  8    okay, to the people who can mix removing from the

04:27  9    multiplexed stream said packets of audio data received

04:27  10   from the -- one of the people on the active speakers

04:27  11   list, right?  So it's related to that phrase that we

04:27  12   were just looking at in Column 5 of the patent, right,

04:27  13   where it's saying you won't be able to hear yourself.

04:28  14              MR. CAUGHEY:  And now I think we have our

04:28  15   last but possibly somewhat more extended source code

04:28  16   for it.  So I might ask Dr. Schaefer again to come down

04:28  17   and get a little closer to the jury.  And I think we're

04:28  18   also going to need to go on the confidential record.

04:28  19              MR. SABRI:  Yes.  I would request that we

04:28  20   go on the confidential record.

04:28  21              THE COURT:  Sure.

04:28  22              (Sealed proceedings.)

04:28  23   ███████████  ████████████████

04:28  24   ███████████████████████████

04:28  25   ██████████  █████

273



274





276





04:34  1  ███████████████

04:34  2  ██  ████████████████████████████

04:34  3  █████████████████

04:34  4  ███████████  ██████████████

04:34  5  ██████████████

09:42  6                    (Sealed proceedings end.)

04:34  7  BY MR. CAUGHEY:

04:34  8      Q.    And in light of the source code, I think we

04:34  9  already covered Claim 2.

04:35  10           But now for Claim 3, in light of the review of

04:35  11  Cisco Webex source code, what did you conclude with

04:35  12  respect to whether Claim 3 has been infringed?

04:35  13      A.    Well, that Webex, it infringes Claim 3.

04:35  14      Q.    And we have a checkmark.

04:35  15           Claim 4, our shortest yet.  This one starts:

04:35  16  The method of Claim 1.  And then we'll make it easier

04:35  17  to read.  And then this mentions a session initiation

04:35  18  protocol.

04:35  19           Could you please tell the jury what this claim

04:35  20  element -- or I guess this claim covers?

04:35  21      A.    Well, it's talking about PC-based equipment

04:35  22  and utilizing a particular way of transmitting data

04:35  23  called the SIP protocol.

04:35  24      Q.    Could you please turn in your binder to PX-55?

04:35  25      A.    Yes.

04:35  1      Q.    And can you identify PX-55?

04:35  2      A.    Yes.  This is another Webex document.

04:35  3      Q.    Did you rely on this document in forming your

04:35  4  opinions?

04:36  5      A.    Yes.

04:36  6              MR. CAUGHEY:  Paltalk offers PX-55.

04:36  7              MR. SABRI:  No objection, Your Honor.

04:36  8              THE COURT:  Admitted.

04:36  9  BY MR. CAUGHEY:

04:36  10     Q.    PX-55 is Webex SIP addresses and control hub

04:36  11  is on the screen.

04:36  12          Does that SIP refer to in a Cisco document the

04:36  13  same SIP that's in the claim?

04:36  14     A.    Yes.  That's correct.

04:36  15     Q.    And what is the significance of the

04:36  16  highlighted text that you called out?

04:36  17     A.    Well, it's indicating that it utilizes the SIP

04:36  18  protocol here.

04:36  19     Q.    And could you just put a little more meat on

04:36  20  the bone of what it means to connect using the SIP

04:36  21  protocol?

04:36  22     A.    Well, it's just a way of communicating,

04:36  23  basically, in that case.  So it's -- as I said

04:36  24  previously, it's transmitting data, utilizing a

04:36  25  particular way of doing that that's defined by this

04:36  1   protocol.

04:36  2       Q.   And can you go to PX-229 in your binder?

04:36  3       A.   Yes.

04:36  4       Q.   Can you identify this document?

04:37  5       A.   This is another Cisco document.

04:37  6       Q.   You relied on this document?

04:37  7       A.   Yes.

04:37  8            MR. CAUGHEY:  Paltalk offers PX-229.

04:37  9            MR. SABRI:  No objection.

04:37 10            THE COURT:  Admitted.

04:37 11   BY MR. CAUGHEY:

04:37 12       Q.   PX-229 is displayed on the screen.

04:37 13            Why was this document relevant to your

04:37 14   analysis of Claim 4?

04:37 15       A.   Right.  So here, you see a variety of

04:37 16   endpoints.  Think of endpoints as clients using the SIP

04:37 17   protocol.  See a computer here, for example, and

04:37 18   linking to Webex.

04:37 19       Q.   And so your conclusion is with respect to --

04:37 20   oh, no.  We have Mr. Buckles again.  I apologize.

04:37 21            What did Cisco's corporate representative say

04:37 22   about SIP?

04:37 23       A.   So he was asked -- and talking now about Webex

04:37 24   Meetings, there are instances where audio clients use

04:37 25   SIP to connect with Webex Meetings, right?

04:37  1          And he responded:  Yes.  Audio clients,

04:37  2   audio/video clients, different.  Yeah.  Clients have

04:37  3   different levels of capability.

04:37  4      Q.    So your conclusion on Claim 4?

04:38  5      A.    That Webex infringes on Claim 4.

04:38  6      Q.    And at last, we hit Claim 5, which also begins

04:38  7   the method of Claim 1.  And we see again PX-229.

04:38  8   Before we were focused on SIP, but what does this claim

04:38  9   cover?

04:38  10     A.    Well, it's talking about telephone equipment

04:38  11  and H.323.  And you can see H.323 in parallel to what

04:38  12  we saw previously to SIP.

04:38  13     Q.    And now we see, I think -- or I guess we now

04:38  14  see the summary.  And what's your conclusion with

04:38  15  respect to Claim 5 then?

04:38  16     A.    That Webex infringes Claim 5.

04:38  17     Q.    And we've now reached the end of the asserted

04:38  18  claims, Claims 1 through 5, and just -- we hit a slide

04:38  19  that we hit before.

04:38  20          What is your conclusion and summary of your

04:38  21  opinions with respect to infringement?

04:38  22     A.    That Cisco directly infringes Claims 1

04:39  23  through 5 of the '858 patent.

04:39  24     Q.    We've now arrived at the second question.

04:39  25          Now that you found infringement, there's a

04:39    1    second question that says:  What are the benefits of

04:39    2    the invention?

04:39    3            And then in quotes you have "apportionment."

04:39    4            Can you explain to the jury, I guess, first

04:39    5    what this inquiry was, what you were getting at here?

04:39    6        A.    Right.  So we just looked at whether Webex

04:39    7    infringes on the '858 patent.  But we want to look

04:39    8    at -- you know, there's -- Webex has features that

04:39    9    infringe upon the '858 patent and features also that

04:39    10   don't infringe on the '858 patent.  And so this is

04:39    11   looking at what's called apportionment.

04:39    12       Q.    Dividing between infringing features and

04:39    13   noninfringing features?

04:39    14       A.    Correct.

04:39    15       Q.    Why did you undertake this analysis, to the

04:39    16   best of your knowledge, or why were you asked to

04:39    17   undertake this analysis?

04:39    18       A.    I think it's used in damages.  But I don't

04:40    19   think --

04:40    20       Q.    You're not a damages expert?

04:40    21       A.    No.

04:40    22       Q.    You're not the royalty and damages guy?

04:40    23       A.    No.  I'm not.

04:40    24       Q.    Okay.  You're a computer scientist?

04:40    25       A.    Yes.

283

04:40    1        Q.    Okay.  And you have a number of steps you took

04:40    2   to perform this exercise.  Can you -- and we'll march

04:40    3   through them, but could you tell the jury a little bit

04:40    4   about how you performed this division of infringing

04:40    5   functionalities as a benefit versus noninfringing

04:40    6   functionalities?

04:40    7        A.    Sure.  So the first part was really isolating

04:40    8   what is this Webex Audio.  Then it was identifying the

04:40    9   key features of Webex.  Those features, I looked at the

04:40   10   novelty, design-around potential workings.  And then

04:40   11   for Step 4, I looked at the weighting of those

04:40   12   features, based off of novelties designed around

04:40   13   potential and importance.

04:40   14            Then for those features, I took -- for all

04:41   15   those features, I computed a percentage of that feature

04:41   16   that would be attributable to the '858 patent.  And

04:41   17   then the last step was to sort of add it all up

04:41   18   together, and I compute the relative contribution of

04:41   19   the '858 patent to Webex Audio.

04:41   20        Q.    You mentioned before, I think we saw that

04:41   21   Webex has video and maybe some other features that are

04:41   22   not audio.  You mentioned that Step 1 was pinpointing

04:41   23   the audio functionality.

04:41   24            Was that a challenging step for you?

04:41   25        A.    No.  It was not.

284

04:41  1    Q.    Why?

04:41  2    A.    Because Cisco has evidently already done this

04:41  3    and separated out the piece that is Webex Audio.

04:41  4    Q.    And we heard from Mr. Boyles, who's a

04:41  5    corporate representative of Cisco's, a moment ago.  And

04:41  6    what did Mr. Boyles say about this?

04:41  7    A.    Okay.  So he was asked:  Mr. Boyles, do you

04:41  8    have an understanding of what topic is meant by accused

04:41  9    functionalities as it appears in Topic 30?

04:41  10          And he responded:  Again, I have a broad

04:41  11   understanding as to what it relates to.

04:41  12          And the question was:  And what is that broad

04:42  13   understanding?

04:42  14          He answered:  That it pertains to the audio

04:42  15   portion of sales.

04:42  16          And the question was:  What do you mean by

04:42  17   audio portion, Mr. Boyles?

04:42  18          Then he responded:  Well, when referring to, I

04:42  19   guess, Webex products, it's the audio portion of the

04:42  20   product functionality as opposed to the meetings or

04:42  21   polling or visual portions or anything else that's not

04:42  22   related to sound.

04:42  23   Q.    And in Step 2, once you sort of pinpointed

04:42  24   audio, what was the next task?

04:42  25   A.    So the next task was identifying the key

04:42  1    features of Webex Audio.

04:42  2        Q.    And as was done, I think, a couple other

04:42  3    times, we're going to start at the end.

04:42  4             Is this the list of key features you

04:42  5    identified?

04:42  6        A.    That's correct.

04:42  7        Q.    Okay.  And now I think you put together some

04:42  8    examples of where you found these features in Cisco

04:42  9    documents, but could you tell the jury just generally

04:42  10   how you went about determining that hybrid audio,

04:42  11   global access, scalability, conference management,

04:43  12   compatibility with other Webex products and remaining

04:43  13   features were key features relevant to your analysis?

04:43  14       A.    So I looked at a lot of different documents.

04:43  15   Some of them were public; some of them were internal

04:43  16   Cisco documents.  I looked at technical documents,

04:43  17   source code and so forth to come up with this list of

04:43  18   features.

04:43  19       Q.    And the first one is support for hybrid audio.

04:43  20   Could you turn to PX-109 and -- or, I'm sorry.  I

04:43  21   jumped the gun here.

04:43  22             First we're going to start at PX-62 which is

04:43  23   already in evidence.  Slide 109 -- and then it says

04:43  24   Slide 109, PX-109.  That was confusing.  But PX-62

04:43  25   talks about hybrid audio in the first sentence, right?

04:43   1    A.    That's right.

04:43   2    Q.    And what was the significance of this document

04:43   3    identifying hybrid audio as a key feature?

04:43   4    A.    So it's talking about Webex support for hybrid

04:43   5    audio.  It provided these flexibilities for people to

04:43   6    join the audioconference; it's a computer or a phone in

04:44   7    this case.

04:44   8    Q.    You can now turn to PX-109 in your binder.

04:44   9    A.    Yes.

04:44   10   Q.    Can you identify this document?

04:44   11   A.    This is a survey of a -- sort of a -- it was

04:44   12   conducted by a third-party company on the app of Cisco.

04:44   13           MR. CAUGHEY:  Paltalk offers PX-109.

04:44   14           MR. SABRI:  No objection.

04:44   15           THE COURT:  Admitted.

04:44   16   BY MR. CAUGHEY:

04:44   17   Q.    And you mentioned PX-109 is a survey.  You

04:44   18   said it's relevant to hybrid audio.  Why is that?

04:44   19   A.    Right.  So it's talking here about native

04:44   20   audio calling through VoIP or PSTN.  And it's looking

04:44   21   at the support compared to various different platforms

04:44   22   indicating that Webex has better support than the rest

04:44   23   of the platforms.

04:44   24   Q.    And the next feature's global access.  What

04:44   25   features are encompassed within global access?

04:44  1     A.    So global access is really the ability to join

04:45  2  these audio conferences using different types of

04:45  3  equipment like, you know, phones, voice, but also sort

04:45  4  of in a global sense.  So to connect globally.  You

04:45  5  know, there's 1-800 numbers that are provided so that

04:45  6  people -- well, the equivalent of 1-800 numbers perhaps

04:45  7  so that people can join this from this audioconference

04:45  8  from all over the world really.  So it's the ability to

04:45  9  connect.  And that can be important because, you know,

04:45  10  some countries might restrict Voice over IP or not have

04:45  11  good telephone service or something like that.

04:45  12     Q.    And could you please turn to PX-145 in your

04:45  13  binder?

04:45  14     A.    Yes.

04:45  15     Q.    And now identify the document.

04:45  16     A.    This is another Cisco document.

04:45  17     Q.    Did you rely on it in forming your opinions in

04:45  18  this case?

04:45  19     A.    Yes.

04:45  20         MR. CAUGHEY:  Paltalk offers PX-145.

04:45  21         MR. SABRI:  No objection.

04:45  22         THE COURT:  Admitted.

04:46  23  BY MR. CAUGHEY:

04:46  24     Q.    PX-145 is now on the screen.  And you've

04:46  25  called out part of the text on Page 5 of this Cisco

04:46  1    document.  What's -- why did this speak to you?

04:46  2        A.    So it's talking about part of this global

04:46  3    access feature.  It says:  Only Cisco offers a global

04:46  4    architecture.  Some providers only support a specific

04:46  5    country or region which affects the video and meeting

04:46  6    quality for remote team members.  Others only support

04:46  7    certain video devices, restricting who can join or how

04:46  8    they can participate.

04:46  9        Q.    The next feature is scalability.  What is

04:46  10   that?

04:46  11       A.    It's the ability to support larger audio

04:46  12   conferences to scale.

04:46  13       Q.    More people in an audioconference?

04:46  14       A.    Yeah.

04:46  15       Q.    And if you could turn to PX-129.

04:46  16       A.    Yes.

04:46  17       Q.    And can you identify this document?

04:46  18       A.    This is another Cisco document.

04:46  19       Q.    You relied on it?

04:47  20       A.    Yes.

04:47  21             MR. CAUGHEY:  Paltalk offers PX-129.

04:47  22             MR. SABRI:  No objection.

04:47  23             THE COURT:  Admitted.

04:47  24   BY MR. CAUGHEY:

04:47  25       Q.    And you say your key feature is scalability,

04:47  1    and then you've called out a portion of this document

04:47  2    that mentions scalability.

04:47  3         Could you explain for the jury what you've

04:47  4    called out here?

04:47  5    A.    Right.  It's talking about the number of

04:47  6    people that can be part of the single meeting, 1,000

04:47  7    participants, up to 1,000 on phones and 1,000 on Voice

04:47  8    over IP, VoIP.

04:47  9    Q.    And the next feature is conference management.

04:47  10   And what is conference management?

04:47  11   A.    So conference management is the ability to

04:47  12   join different conferences, to mute people, to make

04:47  13   breakout rooms.  It's also described as the ability to

04:47  14   identify an active speaker.

04:47  15   Q.    And we see PX-109, again, a different portion

04:47  16   of this -- well, I guess, here with respect to

04:47  17   conference management, you called out a different

04:48  18   portion.  What's the relevance of this portion of the

04:48  19   third-party survey?

04:48  20   A.    So it's talking about meeting and session

04:48  21   management, conference management, audience management,

04:48  22   having breakout rooms and so forth, managing the

04:48  23   conference.

04:48  24   Q.    The next feature's compatibility with other

04:48  25   Webex products.  What does this refer to?

290

04:48  1        A.    So we saw very early on that there's lots of

04:48  2   different Webex products all utilizing the same sort of

04:48  3   back end as Webex Audio that we've been talking about,

04:48  4   this time able to communicate with one another.  That's

04:48  5   the compatibility that we're talking about.

04:48  6        Q.    And we return to PX-129 which refers to

04:48  7   compatibility.  Is this a Cisco document?

04:48  8        A.    Yes.

04:48  9        Q.    And what is this Cisco document referring to?

04:48 10        A.    So it's talking about compatibility as one of

04:48 11   the features, benefits, works with all Cisco Webex

04:49 12   services, mobility clients, network-based recording and

04:49 13   so forth.

04:49 14        Q.    And then we reach remaining features.  What's

04:49 15   the significance of the remaining features in your

04:49 16   analysis?

04:49 17        A.    So there's other features that are identified

04:49 18   in the documents, and so the idea is to -- you know, I

04:49 19   tried to create a set of features, but I recognized

04:49 20   that there's some features that I'm just not going to

04:49 21   capture with these different categories.  And that's

04:49 22   the idea behind the remaining features, things like,

04:49 23   you know, talk about TCP and -- support or having a

04:49 24   chime that played when someone enters a conference or

04:49 25   exits a conference and so forth.  So this is a category

291

04:49  1    basically to encompass those remaining features.

04:49  2        Q.    And once you identified those features, what

04:49  3    was -- what did you do next?

04:49  4        A.    So I started with sort of a simple model which

04:49  5    is just having them all equal, for example.

04:49  6        Q.    Did you stop there?

04:49  7        A.    No.  I then adjusted those percentages.

04:50  8        Q.    And how did you adjust those percentages

04:50  9    initially?

04:50  10       A.    So I looked at the novelty of different

04:50  11   features.  Is this a novel feature or not?  The

04:50  12   design-around potential.  In other words, were there

04:50  13   multiple ways of implementing this, you know, at a low

04:50  14   cost?

04:50  15             And then I really looked at the importance of

04:50  16   Webex -- the feature to Webex's overall function.  And

04:50  17   so a critical piece of Webex Audio or something more

04:50  18   optional, for example.

04:50  19       Q.    And for novelty and design-around, what did

04:50  20   you rely on?

04:50  21       A.    I talked with Dr. Madisetti, who we're going

04:50  22   to hear from, I think, later, and I also looked at his

04:50  23   report as well.

04:50  24       Q.    And for importance to Webex's overall

04:50  25   function, what's the basis of your analysis there?

292

04:50  1      A.    Documents again and, you know, related to the

04:50  2  documents that we've seen so far, more documents, other

04:50  3  technical documents, that source code and so forth.

04:50  4      Q.    And we just see a demonstrative here, those

04:51  5  that we've seen, and some fake, non-Cisco confidential

04:51  6  source code, just an image of -- I think we got it from

04:51  7  Google or something.

04:51  8            But how did your review of technical materials

04:51  9  contribute to your assessment of the importance of

04:51  10  these features?

04:51  11      A.    Well, it's helping me to adjust these

04:51  12  different categories in terms of reports, Webex.

04:51  13      Q.    And now could you turn to PX-145?

04:51  14      A.    Yes.

04:51  15      Q.    Can you identify this document?

04:51  16      A.    This is a Cisco document.  I think we've seen

04:51  17  it before.

04:51  18      Q.    All right.  Maybe we have.

04:51  19            You're right.  It's already admitted.

04:51  20            And here you've underlined:  Connect any time,

04:51  21  anywhere on any device and meetings for up to 1,000

04:51  22  attendees.

04:51  23            Can you tell the jury how these align with the

04:51  24  categories you've identified?

04:51  25      A.    Right.  So this is getting meetings for up to

293

04:51  1    1,000 attendees, is getting a scalability.  It's one of

04:52  2    the things being advertised here:  Connect any time,

04:52  3    anywhere on any device related to global access.

04:52  4        Q.    And now could you go to PX-149 in your binder?

04:52  5        A.    Yes.

04:52  6        Q.    All right.  You're there.  Thank you.

04:52  7              Can you identify this document?

04:52  8        A.    It's another Cisco document.

04:52  9        Q.    And did you rely on this document?

04:52  10       A.    Yes.

04:52  11             MR. CAUGHEY:  Plaintiffs offer PX-149.

04:52  12             MR. SABRI:  No objection.

04:52  13             THE COURT:  Admitted.

04:52  14   BY MR. CAUGHEY:

04:52  15       Q.    PX-149 is a Cisco document titled Webex For

04:52  16   Government -- whoops.  Too fast.  It says:  Global

04:52  17   Access.

04:52  18             What did you take from this material?

04:52  19       A.    So this is specifically marketing global

04:52  20   access to, I guess, governments in this case and

04:52  21   providing different ways to call in.  And it's talking

04:52  22   about Voice over IP available where regulators allow.

04:53  23   I guess where they don't allow, you could use phones to

04:53  24   connect.  It's also talking about the scalability of

04:53  25   the conference, audio capacities up to 1,000 in a

04:53    1    single meeting.

04:53    2        Q.    And I think you mentioned before that this --

04:53    3    the purpose of this analysis was to adjust this equal

04:53    4    weighting.

04:53    5        Could you describe for the jury the way that

04:53    6    you ended up, which I think is in the technical weight

04:53    7    on the right-hand side?

04:53    8        A.    Well, and you can see the numbers here, but

04:53    9    basically, things that were more novel and less

04:53   10    design-around potential and more importance to Webex

04:53   11    Audio received greater adjustments up.  And the things

04:53   12    that were less important, more adjustments down.

04:53   13        So things like hybrid audio and global access

04:53   14    are getting that sort of very core functionality of

04:53   15    Webex Audio, and they received the biggest movement

04:53   16    upwards.

04:53   17        Scalability is very important, which in many

04:53   18    documents as well, the ability to host these different

04:53   19    conferences.  And that was moved up.

04:53   20        Conference management, something that has

04:54   21    lower -- more design-around potential and less critical

04:54   22    connection importance to Webex Audio, received the

04:54   23    greatest movement downward.

04:54   24        Compatibility with other Webex products is

04:54   25    important but maybe not the most core functionality of

04:54    1    what is Webex Audio in the end.  So that was the

04:54    2    remaining features set to be 15 percent.

04:54    3        Q.    And I apologize to do this for the record, but

04:54    4    I don't know that you read each of those percentages

04:54    5    in.

04:54    6            Can you just read the final technical weights

04:54    7    you assigned these different features?

04:54    8        A.    So hybrid audio's 25 percent.  Global access,

04:54    9    25 percent.  Scalability, 20 percent.  Conference

04:54   10    management, 5 percent.  Compatibility with other Webex

04:54   11    products, 10 percent.  And remaining features,

04:54   12    15 percent.

04:54   13        Q.    Did you stop there?

04:54   14        A.    No.

04:54   15        Q.    What did you do next?

04:54   16        A.    So next, I looked for these different

04:54   17    categories, how much of these categories were

04:55   18    attributable to the patents-in-suit.

04:55   19        Q.    And describe that analysis.

04:55   20        A.    So hybrid audio is -- well, it's what this

04:55   21    patent is about.  I was trying to be quite conservative

04:55   22    here.  You can argue that hybrid audio should be more

04:55   23    towards the patent itself, but this is a recognition

04:55   24    that there may be some features in this category that

04:55   25    are not covered by the '858 patent.  But again, this

04:55  1    is, you know, what the patent is really about.  So

04:55  2    that's why it received the largest contribution there

04:55  3    at 75 percent.

04:55  4            Global access, we have connections, maybe PSTN

04:55  5    to PSTN or VoIP to VoIP happening in different

04:55  6    countries.  There's an infrastructure needed to make

04:55  7    that happen.

04:55  8            There's some aspect of the '858 patent being

04:55  9    used here.  It talks about being connected through a

04:55  10   variety of different types of devices together.  And if

04:55  11   you can't connect in one way in one country, you can

04:55  12   connect maybe through another in that case.  So there's

04:55  13   some contribution of the '858 patent here, but it's not

04:55  14   the majority.  And so that's why I set it to be

04:56  15   20 percent.

04:56  16           Scalability, the '858 patent talks as one of

04:56  17   its benefits is scalability, right, the ability to host

04:56  18   larger conferences to distribute that computational

04:56  19   workload to different devices, but it's also about

04:56  20   quality.

04:56  21           So when we talked about quality from before,

04:56  22   it's improved quality on some devices, which actually

04:56  23   may allow it to reduce the amount of bandwidth that's

04:56  24   extending audio.  It's actually maybe lowering the

04:56  25   quality, knowing that it's going to be better at the

04:56  1  endpoint in that case.

04:56  2          So those all factor into scalability, but

04:56  3  there's other things that go into scalability as well.

04:56  4  And so this was set to be less than a half, which is

04:56  5  why you received the 45 percent.

04:56  6          Conference management, most of these features

04:56  7  are not related to the '858 patent, but conference

04:56  8  management does talk about the ability to identify

04:56  9  active speakers, which is something that we talked

04:56  10 about in the '858 patent.  And that's why I gave it 20

04:56  11 percent.

04:56  12         Compatibility with other Webex products, I set

04:56  13 that to zero.  The '858 patent didn't really talk about

04:57  14 that.

04:57  15         And the remaining features, there might be

04:57  16 something from the '858 patent in there, but I just

04:57  17 conservatively set it to zero.

04:57  18     Q.    And it sounds like part of this analysis was

04:57  19 an analysis of the patent itself.  Is that fair?

04:57  20     A.    Yes.  Yes.

04:57  21     Q.    And so I just -- I think you pulled one

04:57  22 example.  Here's Column 2 and 3 from -- or I guess this

04:57  23 cuts over Columns 2 to 3 in the '858 patent.

04:57  24         Is this an excerpt from the specification of

04:57  25 the patent?

04:57  1      A.    Yes.

04:57  2      Q.    And what is this describing and how is it

04:57  3  relevant -- I guess let's start one question at a time.

04:57  4           What is this describing?

04:57  5      A.    This is talking about one of the advantages of

04:57  6  the patent itself.  And it's talking about distributing

04:57  7  what it calls a computational burden.  I called it

04:57  8  workload, but, you know, the amount of work that you

04:57  9  have to do of mixing audio streams to the active

04:57  10  speakers themselves, reducing the workload on the

04:57  11  server.

04:57  12     Q.    Is that relevant to scalability?

04:57  13     A.    Yes.

04:57  14     Q.    Now, Step 6, why don't you explain for the

04:58  15  jury what Step 6 involves in this effort enlarging

04:58  16  table we're looking at?

04:58  17     A.    Yes.  So we're almost done here.  How to read

04:58  18  this.  So this is just a simple computation.  Take the

04:58  19  weight on the left-hand column, multiply it by the

04:58  20  middle column.  That's equal to the right column.

04:58  21           So 25 percent times 75 percent is

04:58  22  18.75 percent.  25 percent times 20 percent is

04:58  23  5 percent.  Okay.  And repeat for all of the columns

04:58  24  there.  And adding up those columns, the 18.75, 5, 9,

04:58  25  1, and then let's say 0 and 0 gets you 33.75 percent.

04:58    1          Q.    And what does the 33.75 percent represent?

04:58    2          A.    That's the total contribution of the

04:58    3    '858 patent to Webex Audio.

04:58    4          Q.    And what we didn't talk about was an analysis

04:58    5    of usage data, how often folks are using Webex.

04:59    6                Did you have any Webex usage data available to

         7    you?

04:59    8          A.    I was provided some Webex data.  It went from,

04:59    9    I think, August 2021 to August '22.

04:59   10          Q.    And what did that data refer to?  What was

04:59   11    that data?

04:59   12          A.    I have to think back.  I think it was number

04:59   13    of minutes that were in conference between VoIP and

04:59   14    PSTN users versus the total number of minutes.

04:59   15          Q.    And there's a portion in this slide that's

04:59   16    green.  I guess it looks like between 2021 and 2022.

04:59   17                What does that represent?

04:59   18          A.    So that's the -- the green is where we had

04:59   19    data for.

04:59   20          Q.    And what does the red represent?

05:00   21          A.    The red is the rest of the relevant period

05:00   22    that we're supposed to be looking over.  There was no

05:00   23    data available at all.

05:00   24          Q.    And this is Cisco data?

05:00   25          A.    I believe so.

05:00  1        Q.    Is it publicly available?

05:00  2        A.    No.  I don't think it's publicly available.

05:00  3        Q.    And did you analyze the data that you did have

05:00  4   and come to any conclusions about whether it would have

05:00  5   been helpful for your analysis?

05:00  6        A.    Well, I did look at the data.  Having one year

05:00  7   of data at the end of this period and over -- it would

05:00  8   have even went beyond the period that we're interested

05:00  9   in this case.  It wasn't super useful.  It -- it

05:00  10  doesn't necessarily represent the ability for clients

05:00  11  to make other connections.

05:00  12        So, you know, if I can't call someone, right,

05:00  13  then that -- that makes the system much less useful in

05:00  14  that case.

05:00  15        So there are calls that I don't make on a

05:00  16  daily basis, for example, right?  And so those calls

05:00  17  might still be important for me to make, but they

05:01  18  wouldn't show up in just regular usage data in this

05:01  19  case.

05:01  20        And this is related to a concept, actually,

05:01  21  called Metcalfe's law.  It's a well-known way,

05:01  22  actually, of valuing a network so effectively that the

05:01  23  value of the network is proportional to the number of

05:01  24  connections that you could possibly make, not the

05:01  25  number of connections that we typically make on a

301

05:01   1   day-to-day basis.

05:01   2           And so, you know, it may be very important to

05:01   3   call someone that you don't normally call, for example,

05:01   4   you know, your doctor or something like that.

05:01   5           I don't normally call my doctor, but it's

05:01   6   important for me to make that call.  I just don't do it

05:01   7   very frequently.  So the value of the network is really

05:01   8   proportional to the number of connections that are

05:01   9   possible.

05:01   10   Q.    How -- do you recall, Dr. Schaefer,

05:01   11   approximately the -- what this data showed with respect

05:01   12   to how many -- I guess, the proportion of conferences

05:01   13   had a VoIP to PSTN hybrid aspect of it?

05:02   14   A.    Yes.  I believe it was 22 percent and -- if

05:02   15   you go to the minutes where VoIP to PSTN minutes for

05:02   16   this green data that we have out here.

05:02   17   Q.    And your technical apportionment was

05:02   18   33.75 percent, so was it your conclusion that that

05:02   19   22 percent wasn't, didn't fully represent the value of

05:02   20   these functionalities that you have found to be

05:02   21   accused?

05:02   22   A.    Well, I -- I looked at a more holistic view of

05:02   23   the Webex product when I did my apportionment.  This

05:02   24   data is only for a very small time period.  And so I

05:02   25   was looking at it more as a whole as opposed to this

05:02   1   little piece.

05:02   2       Q.    And finally, there's an end piece to your

05:02   3   apportionment analysis.  Did you do a separate

05:02   4   apportionment analysis as well?

05:02   5       A.    I did.  An alternative apportionment.

05:02   6       Q.    This mentions Webex, but I don't see Webex

05:03   7   Audio.  What was this alternative apportionment?

05:03   8       A.    So this one is now looking at just the Webex.

05:03   9   We looked at Webex Audio previously.  This is looking

05:03   10  at the entire Webex system.

05:03   11      Q.    And explain for the jury what is being

05:03   12  depicted on top here where it says Webex

05:03   13  Videoconferencing, Webex Audioconferencing, and

05:03   14  remaining features.

05:03   15      A.    So again, following like the exact same type

05:03   16  of thing that we did previously, I'm coming up with

05:03   17  list of features.  This is a video- and

05:03   18  audioconferencing product, and so the features were

05:03   19  videoconferencing, audioconferencing, and then the

05:03   20  remaining features.  Started off with all of them being

05:03   21  equal, but, of course, for me features cannot possibly

05:03   22  be the same way as the individual and audioconferencing

05:03   23  that are listed here.

05:03   24           So I had to break down video- and

05:03   25  audioconferencing into different pieces, you know, what

05:04  1    are the weights associated with them?  And given that

05:04  2    it's a video/audio conferencing product, set that

05:04  3    weight to be 90 percent.  And then how I partitioned

05:04  4    it, I partitioned it equally.  You could actually argue

05:04  5    that audioconferencing is more important than

05:04  6    videoconferencing because a videoconference without

05:04  7    audio is not super useful.  But conservatively, I set

05:04  8    them to be the same value, which is the 45 percent,

05:04  9    each one.

05:04  10       Q.    And then what did you do next?

05:04  11       A.    So then I looked at the percent that is

05:04  12   attributable to the patents-in-suit, and the

05:04  13   videoconferencing, I conservatively just set that to

05:04  14   zero.  The audioconferencing is 33.75 percent.  That's

05:04  15   actually the number we just generated from the previous

05:04  16   analysis, 33.75.  So I put it in there.  And all of

05:04  17   the, you know, remaining features and so forth, I set

05:04  18   those to zero.  And then I multiplied, that gave me 0,

05:04  19   15.18 and 0, and I added those three numbers together,

05:04  20   and that gave me 15.18 percent.

05:05  21       Q.    Even I can do that math, I think.

05:05  22             And why -- and so whereas I think you

05:05  23   explained the 33.75 related to the audio

05:05  24   functionalities specifically, this 15.18, what does

05:05  25   that relate to?

—304—

05:05  1      A.    That relates to Webex as a whole.

05:05  2      Q.    And we have reached the conclusion of my

05:05  3  examination, but if you could, just so the jury is left

05:05  4  with a bow on the present, could you explain and

05:05  5  summarize your three opinions you've offered today?

05:05  6      A.    Right.  So as we talked about in the No. 1,

05:05  7  the Cisco Webex products infringe upon Claims 1

05:05  8  through 5 of the '858 patent.

05:05  9            No. 2, the relative contribution of the

05:05  10  infringing functionalities of Webex Audio is

05:05  11  33.75 percent.

05:05  12            And then No. 3, the contributions of the

05:05  13  infringing functionalities to Webex as a whole is

05:05  14  15.18 percent.

05:06  15            MR. CAUGHEY:  Thank you very much for

05:06  16  your time, Professor.

05:06  17            THE WITNESS:  No problem.

05:06  18            MR. CAUGHEY:  Pass the witness.

05:06  19                  CROSS-EXAMINATION

05:06  20  BY MR. SABRI:

05:06  21      Q.    Good afternoon, Dr. Schaefer.

05:06  22      A.    Good afternoon.

05:06  23      Q.    It's good to meet you.  I don't think we've

05:06  24  met before.  My name's Nathan Sabri, and I'll be

05:06  25  questioning you on behalf of Cisco this afternoon.

05:06  1          I'd like to start with the meaning of words.

05:06  2  So I'm going to put the claim language back up and walk

05:07  3  through some of this with you.

05:07  4          Do you agree with me that you're not

05:07  5  interpreting all the words in this claim under their

05:07  6  normal reading, right?

05:07  7      A.    I'm not sure what you mean by that.

05:07  8      Q.    Well, let's start from the top.  Let's start

05:07  9  with "each," so the very first element, [1].  Sometimes

05:07  10  we'll call it 1[A]; the first line, receiving an audio

05:07  11  packet from each of a plurality of clients.

05:07  12          Your view of the term "each" is that it does

05:07  13  not require "every," right?

05:07  14      A.    It could include, but "one or more" I think

05:07  15  was the way I was interpreting it.

05:07  16      Q.    Right.  Your view is that it does not require

05:07  17  "every," right?

05:07  18      A.    Not require.

05:07  19      Q.    And you cited some language from the Court on

05:07  20  your direct examination, right?

05:07  21      A.    Yes.

05:07  22      Q.    Let's bring that back up, if we could.  It was

05:07  23  your Slide 34.

05:07  24          So you said that you relied on this.  Pointed

05:08  25  out that it says, "each" has a plain and ordinary

05:08  1    meaning which can include "one or more."  Right?

05:08  2        A.    That's correct.

05:08  3        Q.    The Court didn't say "each" means one or more,

05:08  4    you'd agree with me, right?

05:08  5        A.    I said can include.

05:08  6        Q.    The Court didn't say "each" means one or more,

05:08  7    right?

05:08  8        A.    Right.  It didn't.  No.  Not in those words.

05:08  9        Q.    You also didn't address the Court's more

05:08  10   recent statements on this issue, did you?

05:08  11       A.    I don't think so.

05:08  12       Q.    Let's pull that up.  This is from the

05:08  13   August 1st, 2024 pretrial conference.

05:08  14             You didn't consider this transcript in

05:08  15   evaluating what "each" means, right?

05:08  16                 MR. CAUGHEY:  Your Honor, I object.

05:08  17                 MR. SABRI:  May we approach, Your Honor?

05:08  18                 THE COURT:  You bet.

05:08  19                 (Bench conference.)

05:09  20                 MR. SABRI:  Your Honor, this is goose for

05:09  21   the gander stuff, as you were saying this morning.  If

05:09  22   they can stand up there and put up --

05:09  23                 THE COURT:  You're not going to use what

05:09  24   I said at a hearing.

05:09  25                 MR. SABRI:  This was -- so the problem

05:09   1   right now is they got a thumb on the scale.

05:09   2                   THE COURT:  Let me be clear.  You're not

05:09   3   going to -- I was just waiting.  If he hadn't objected,

05:09   4   I would have told you you can't do it.  So what I said

05:09   5   at the hearing was to clarify a Markman construction.

05:09   6   That's all that's coming in from that hearing.

05:09   7                   MR. SABRI:  Right.  So can I show you

05:09   8   what I'd like to -- the problem right now is it's --

05:09   9                   THE COURT:  There's nothing --

05:09  10                   MR. SABRI:  -- very prejudicial.

05:09  11                   THE COURT:  -- from that hearing coming

05:09  12   in.

05:09  13                   MR. SABRI:  So the statement's saying it

05:09  14   can but it doesn't have to.  That's all I'm going for

05:09  15   is that it's a dispute here because right now this jury

05:09  16   thinks that is what it means and that their expert's

05:09  17   blessed and ours isn't.

05:09  18                   THE COURT:  I said very clearly what it

05:09  19   means.  He's within what it means, and that's what

05:09  20   we're going with.  If you all wanted to fight over this

05:10  21   sooner, you could have, but for right now where we're

05:10  22   at is you're not going to use what's in there.  He's

05:10  23   been faithful to the sentence that I used, and that's

05:10  24   what we're going to do.

05:10  25                   MR. SABRI:  Okay.  So nothing from the

—308—

05:10  1   August 1st.  I'm clarifying here.

05:10  2              THE COURT:  I don't know how I can be any

05:10  3   clearer.

05:10  4              MR. SABRI:  I understand, Your Honor.

05:10  5   Thank you.  I appreciate it.

05:10  6              (Bench conference concludes.)

05:10  7   BY MR. SABRI:

05:10  8       Q.   I might refer to your reports in this case a

05:10  9   couple of times, so I just want to make sure everyone

05:10 10   knows what I mean when I refer to those.

05:10 11              You wrote a couple of reports in connection

05:10 12   with this case, right?

05:10 13       A.   That's correct.

05:10 14       Q.   And those reports set out the opinions that

05:10 15   you then came to your conclusions and how you arrived

05:10 16   at those opinions in this case, right?

05:10 17       A.   I think that's the idea.  Yes.

05:10 18       Q.   You didn't provide any opinion in your reports

05:10 19   as to why, in your opinion, a person of skill would

05:11 20   view "each" as meaning one or more in this patent, did

05:11 21   you?

05:11 22       A.   Well, I did refer to what you were just

05:11 23   talking about, the claim construction.

05:11 24       Q.   Right.  But you've got your report there,

05:11 25   Tab 3.  Right?  You didn't provide any explanation in

05:11    1    your report about why, in your opinion, a person of

05:11    2    ordinary skill would view "each" in the context of this

05:11    3    patent as meaning one or more, correct?

05:11    4        A.    I don't think it's in the report.

05:11    5        Q.    So let's turn back to the claim language

05:11    6    starting on 1.  Let's look at Element [3].  Determining

05:11    7    that a first subset of a plurality of clients has the

05:11    8    capability to mix multiple audio streams.

05:11    9              You think first subset can consist of no

05:11   10    clients, right?

05:11   11        A.    I mean, a subset could consist of no clients.

05:12   12        Q.    Right.  So in this limitation, you think it's

05:12   13    possible for the first subset to consist of no clients,

05:12   14    right?

05:12   15        A.    Well, it has to do with the term.  It could be

05:12   16    empty.

05:12   17        Q.    Sorry.  I just want to make sure I'm clear.

05:12   18              You agree your opinion is that in that

05:12   19    limitation, a first subset can consist of no one,

05:12   20    right?

05:12   21        A.    Right.  In this limitation, the subset could

05:12   22    be in there.

05:12   23        Q.    And the first subset consists of clients with

05:12   24    a capability of mix, right?

05:12   25        A.    Yes.

310

05:12  1      Q.    So it's your view that it's possible for this

05:12  2    limitation to be met given that there are no clients

05:12  3    capable of mixing on a call, right?

05:12  4      A.    For the determining, yes.

05:12  5      Q.    And the next element, [4], determining that a

05:12  6    second subset of the plurality of clients does not have

05:12  7    the capability to mix multiple audio streams.

05:12  8            Do you see that?

05:12  9      A.    Yes.

05:12  10     Q.    You think this limitation can be met where a

05:13  11   second subset also includes no one, right?

05:13  12     A.    That's right.  It's still determining.

05:13  13     Q.    And so to be clear, if the second subset

05:13  14   includes no clients, that would mean there are no

05:13  15   non-mixing clients on the call, right?

05:13  16     A.    For this step, yes.  That's what it would

05:13  17   mean.

05:13  18     Q.    Your opinion is that the '858 patent teaches a

05:13  19   method to allow mixing and non-mixing clients to

05:13  20   participate in a single audioconference, right?

05:13  21     A.    That's what it says.  Yes.

05:13  22     Q.    Let's go on to Elements [5] and [6].  Let's

05:13  23   kind of group these together.  You've got multiplexing

05:13  24   said packets of audio data received from each client on

05:13  25   said active speakers list into a multiplexed stream.

311

05:13  1                You analyzed that element, right?

05:13  2        A.    Yes.

05:13  3        Q.    And sending said multiplexed stream to each of

05:13  4  said first subset of a plurality of clients.

05:13  5                You see that, right?

05:13  6        A.    Yes.

05:13  7        Q.    And you understand that in order to show

05:14  8  infringement, Paltalk has to show that Webex performs

05:14  9  every one of these elements, right?

05:14  10       A.    Yes.

05:14  11       Q.    That's a requirement of the law, right?

05:14  12       A.    As I understand it.

05:14  13       Q.    And you agree, though, that in Webex, if a

05:14  14  client is an active speaker that has a capability to

05:14  15  mix audio, it does not receive the same multiplexed

05:14  16  stream as the other mixing clients.

05:14  17                You agree with that, right?

05:14  18       A.    Could you repeat that?  That was complicated.

05:14  19       Q.    Sure.

05:14  20                You'd agree that if you have a client who's

05:14  21  both an active speaker and can mix audio, that client

05:14  22  does not receive the same multiplexed stream as the

05:14  23  other clients that can mix audio.

05:14  24                You agree with that, right?

05:14  25       A.    Right.

312

| | | |
|---|---|---|
| 05:14 | 1 | Q.    You agree that Webex does not send the same |
| 05:14 | 2 | multiplexed stream to all clients, right? |
| 05:14 | 3 | A.    Right. |
| 05:14 | 4 | Q.    For listeners, in your opinion, the same |
| 05:14 | 5 | multiplexed stream is sent to each listener, right? |
| 05:15 | 6 | A.    I'm sorry.  The same for the listeners? |
| 05:15 | 7 | Q.    Right. |
| 05:15 | 8 | A.    Yes.  It is sent to those. |
| 05:15 | 9 | Q.    However, for endpoints on the speaker list, so |
| 05:15 | 10 | the active speakers, their packets are admitted for |
| 05:15 | 11 | multiplexed stream, right? |
| 05:15 | 12 | A.    Which multiplexed stream? |
| 05:15 | 13 | Q.    Well, the multiplexed we were just talking |
| 05:15 | 14 | about, right?  You said for the listeners, you agree |
| 05:15 | 15 | that the same multiplexed stream is sent to each |
| 05:15 | 16 | listener, right? |
| 05:15 | 17 | A.    Yes. |
| 05:15 | 18 | Q.    However, from that multiplexed stream, |
| 05:15 | 19 | speakers' packets are admitted, right? |
| 05:15 | 20 | A.    Right. |
| 05:15 | 21 | Q.    So in other words, in Webex, each active |
| 05:15 | 22 | speaker receives a unique multiplexed stream, right? |
| 05:15 | 23 | A.    Yes. |
| 05:15 | 24 | Q.    With the interpretation you used to determine |
| 05:15 | 25 | infringement is that "each" does not require "all," |

313

05:15  1  right?

05:15  2      A.    One or more.

05:15  3      Q.    "Each" in your mind means one or more,

05:15  4  correct?

05:15  5      A.    That's correct.

05:15  6      Q.    You'd agree with me that if "each" means "all"

05:15  7  in Claim 1, Webex does not infringe, right?

05:16  8      A.    I'd have to think about it, but I was using

05:16  9  "one or more."  So --

05:16  10      Q.    So I guess I can put it this way:  You did not

05:16  11  provide an opinion in your reports that Webex meets

05:16  12  these claim elements by sending a set of multiplexed

05:16  13  stream to all clients with a capability to mix audio,

05:16  14  right?

05:16  15      A.    I don't believe I did.

05:16  16      Q.    And you provided the jury with no opinion

05:16  17  today that Webex meets these elements by sending a said

05:16  18  multiplexed stream to all clients with the capability

05:16  19  to mix audio, right?

05:16  20      A.    Well, we just talked about the listeners.

05:16  21      Q.    Right.

05:16  22      A.    In that case, they do do the same.

05:16  23      Q.    Well, listeners do, right?

05:16  24      A.    That's right.

05:16  25      Q.    You'd agree with me that the -- half the

05:16  1  speakers are getting a unique multiplexed stream as we

05:16  2  said a moment ago, right?

05:16  3      A.    Well, with the caveat the active speaker has

05:16  4  to be one of the multiplexed, the clients that can mix.

05:17  5      Q.    I'm not sure I understand.  I'll just try to

05:17  6  ask it as directly as I can.

05:17  7            You agree with me that at Webex, each active

05:17  8  speaker receives a unique multiplexed stream, right?

05:17  9      A.    Yes.

05:17  10     Q.    I'd like to move to the code you discussed

05:17  11  during the direct examination, and I'm not going to

05:17  12  pull it back up.  We don't have to close the courtroom

05:17  13  for this.

05:17  14            You had access to Cisco's source code and

05:17  15  confidential documents, right?

05:17  16     A.    Yes.

05:17  17     Q.    You'd agree that on your direct examination,

05:17  18  you talked about a lot of code, right?

05:17  19     A.    Not nearly as much as I reviewed.

05:17  20     Q.    You talked about a lot of code in connection

05:17  21  with receiving audio packet, right?

05:17  22     A.    I talked about some code.

05:17  23     Q.    You talked about code in connection with

05:17  24  determining an active speaker in forming an active

05:17  25  speaker list?

315

05:17  1        A.    Yes.

05:17  2        Q.    I just want to highlight one of the files you

05:17  3   called out.  So I -- when it came to multiplexing into

05:17  4   a multiplexed stream, I think you discussed with the

05:17  5   jury MmMixer.Api.h.

05:18  6              Does that sound right?

05:18  7        A.    Sounds right.

05:18  8        Q.    In case you want to double-check, I'm not

05:18  9   trying to catch you here.  I'm looking at Paragraph 86

05:18  10  of your supplemental report at Tab 3.

05:18  11       A.    What was the paragraph, 86?

05:18  12       Q.    86.  That's right.

05:18  13       A.    Thank you.  Yes.

05:18  14       Q.    So fair to say that for the multiplexing into

05:18  15  a multiplexed stream, you said to the jury MmMix.Api.h,

05:18  16  right?

05:18  17       A.    That was one of the things listed.  The one we

05:18  18  talked about here.

05:18  19       Q.    And in your reports, you also cited an

05:18  20  Mm.Mix.Api.cpp, right?

05:18  21       A.    That's correct.

05:18  22       Q.    Those two files?

05:18  23       A.    Yes.

05:18  24       Q.    Let's pull the claim back up and look at Claim

05:18  25  2 now.  Claim 2 adds, among other things, the language:

316

| 05:18 | 1 | Removing from said multiplexed stream. |
| 05:19 | 2 | Do you see that? |
| 05:19 | 3 | A. That's correct. |
| 05:19 | 4 | Q. And then if we can move that up, please, so |
| 05:19 | 5 | it'll be -- and pull up Claim 3 just to deal with them |
| 05:19 | 6 | together. |
| 05:19 | 7 | Claim 3 adds: Removing from said combining |
| 05:19 | 8 | packets at packets of audio data? |
| 05:19 | 9 | A. That's correct. |
| 05:19 | 10 | Q. You think the plain meaning of "removing" |
| 05:19 | 11 | includes "not including," right? |
| 05:19 | 12 | A. In light of the specification of the patent, |
| 05:19 | 13 | yes. |
| 05:19 | 14 | Q. Let's go ahead and take this down. I'd like |
| 05:19 | 15 | to turn to the second part of your direct examination, |
| 05:19 | 16 | talking about opinions you -- opinions you came to |
| 05:19 | 17 | support the damages expert. |
| 05:19 | 18 | A. Yes. |
| 05:19 | 19 | Q. You attempted to determine what you called the |
| 05:19 | 20 | date of first infringement in this case, right? |
| 05:19 | 21 | A. I did in my second report. Yes. |
| 05:19 | 22 | Q. That would be the first date when the accused |
| 05:19 | 23 | functionality was implemented in Cisco's products? |
| 05:19 | 24 | A. That's my understanding. |
| 05:19 | 25 | Q. And you ran searches in an attempt to |

317

05:19  1    determine the dates of individual files, right?

05:20  2        A.    Approximate dates of infringing files.  Yes.

05:20  3        Q.    And your best estimate after that was that the

05:20  4    functionality you accused of infringing was in Webex in

05:20  5    2010, right?

05:20  6        A.    That was my estimate based off that data.

05:20  7        Q.    And then you spent a fair amount of time on

05:20  8    your direct talking about apportionment, right?

05:20  9        A.    Well, I spent time talking about it.  Sure.

05:20 10        Q.    And you attempted to apportion the allegedly

05:20 11    infringing features from what you would agree are

05:20 12    noninfringing functionalities from Webex, right?

05:20 13    Correct?

05:20 14        A.    That's correct.

05:20 15        Q.    Because you agree that Webex has some things

05:20 16    that you accuse of infringement but then other features

05:20 17    that you do not accuse of infringement, right?

05:20 18        A.    Of course.

05:20 19        Q.    You never performed this sort of apportionment

05:20 20    before, right?

05:20 21        A.    When I did it for this case?

05:20 22        Q.    Right.

05:20 23        A.    Yeah.  No.  I've not.

05:20 24        Q.    This was the first time?

05:20 25        A.    This was my first time.  Yes.

318

05:20  1      Q.    You didn't use any sort of guide or treatise

05:20  2  to help you with the analysis, right?

05:20  3      A.    No.

05:20  4      Q.    Let's talk about what you attempted to

05:21  5  devalue.  You attempted to devalue the ability to join

05:21  6  a conference through a telephone or desktop-based VoIP,

05:21  7  right?

05:21  8      A.    I tried to -- I'm not sure what phrasing you

05:21  9  just used.  The amount attributable to the '858 patent.

05:21  10     Q.    Well, let me walk through it this way:  You

05:21  11  took the view that Cisco's support for the Webex Audio

05:21  12  feature coincided with the exact scope and teachings of

05:21  13  the '858 patent, right?

05:21  14     A.    The -- which feature?

05:21  15     Q.    Cisco's support for Webex Audio, hybrid audio.

05:21  16     A.    Oh, hybrid audio.  I did say that, but I did

05:21  17  not assign 100 percent.

05:21  18     Q.    Right.  But you expressed the view that that

05:21  19  feature, support for Webex Audio feature, coincides

05:21  20  with the exact scope and teachings of the '858 patent,

05:21  21  right?

05:21  22     A.    I did say that.  Yes.

05:21  23     Q.    And you also described Cisco's hybrid audio

05:22  24  feature as the flexibility to join the conference

05:22  25  through telephone or desktop-based VoIP, right?

05:22  1        A.    Yes.

05:22  2        Q.    So in other words, you took the view that

05:22  3   flexibility to join a conference through telephone or

05:22  4   desktop-based VoIP was the exact scope and teachings of

05:22  5   the '858 patent, right?

05:22  6        A.    It fell within the scope, yes.

05:22  7        Q.    You also said in your report that at the time

05:22  8   of the '858 patent, there were no readily available

05:22  9   alternatives.

05:22  10             THE COURT:  Counsel, can I have y'all up

05:22  11  here a second?

05:22  12             (Bench conference.)

05:22  13             THE COURT:  He may do it in other courts.

05:22  14  That's not the way we do it here.  Just ask him a

05:22  15  question.  You go to church on Sunday.  Whatever he

05:22  16  says, that's it.  If it's not somewhere in his report,

05:22  17  use it to impeach him.

05:22  18             MR. SABRI:  Got it.

05:22  19             THE COURT:  It's not a quiz over what he

05:22  20  said.

05:22  21             MR. SABRI:  Understood, your Honor.

05:22  22             THE COURT:  The report doesn't come up

05:22  23  again unless --

       24             (Simultaneous speakers.)

05:22  25             THE COURT:  And it's not in the report or

```
05:23   1    it's inconsistent.
05:23   2                MR. SABRI:  Understood, Your Honor.
05:23   3                (Bench conference concludes.)
05:23   4    BY MR. SABRI:
05:23   5        Q.    You take the view, Dr. Schaefer, that there
05:23   6    were no readily available alternatives to the
05:23   7    '858 patent that taught this support for Webex Audio
05:23   8    hybrid audio features, right?
05:23   9        A.    That's -- yes.
05:23   10       Q.    But you would agree that there are, in fact,
05:23   11   ways to do hybrid calls, VoIP to PSTN calls, without
05:23   12   infringing the '858 patent, right?
05:23   13       A.    There are -- there are ways.
05:23   14       Q.    You agree that it was possible prior to the
05:23   15   '858 patent to have a VoIP and PSTN call?
05:23   16       A.    I believe so.
05:23   17       Q.    And it's your understanding that prior to the
05:23   18   '858 patent, there were ways to have VoIP and PSTN
05:23   19   calls that wouldn't have infringed the '858 patent,
05:23   20   right?
05:23   21       A.    Right.
05:23   22       Q.    On direct examination, you discussed usage
05:24   23   data.  Do you remember that?
05:24   24       A.    Yes.
05:24   25       Q.    And you said that if Webex only offered VoIP
```

05:24  1    or only offered PSTN, it would be less valuable, right?

05:24  2        A.    Uh-huh.

05:24  3        Q.    But again, you agree there were other ways

05:24  4    prior to the '858 patent to offer VoIP -- VoIP and PSTN

05:24  5    calls, right?

05:24  6        A.    Yes.

05:24  7        Q.    Let's talk now about how you apportioned

05:24  8    value.

05:24  9             You identified what you considered to be six

05:24  10   categories of key features in Webex Audio, right?

05:24  11       A.    That's correct.

05:24  12       Q.    You explained -- on direct examination, you

05:24  13   started with the assumption that each of those six

05:24  14   categories had more importance, so --

05:24  15            THE COURT:  Counsel, maybe it's just me.

05:24  16   But when you read, you're going really fast.  And I

05:24  17   don't know if -- are you having a problem? -- but I'm

05:24  18   having a problem keeping up with you.

05:24  19            MR. SABRI:  I understand.  I apologize,

05:24  20   Your Honor.

05:24  21            THE COURT:  I want to make sure the jury

05:24  22   hears you, so -- and maybe it's just me.

05:25  23            MR. SABRI:  I appreciate it.

05:25  24   BY MR. SABRI:

05:25  25       Q.    You started with an assumption that the six

05:25   1    features had equal value, right?

05:25   2        A.    Yes.

05:25   3        Q.    But then as you discussed, you adjusted some

05:25   4    up and you adjusted some down, right?

05:25   5        A.    That's correct.

05:25   6        Q.    For example, you increased global access on

05:25   7    your categories from 16.7 percent to 25, right?

05:25   8        A.    That's correct.

05:25   9        Q.    You didn't base that change on any math or

05:25   10   calculation, right?

05:25   11       A.    Nothing.

05:25   12       Q.    And you didn't show the jury why you decided

05:25   13   to make it 25 as opposed to 27 percent, right?

05:25   14       A.    No.

05:25   15       Q.    Or 23?

05:25   16       A.    No.

05:25   17       Q.    Let's take another example.  Scalability.

05:25   18            You adjusted that category from 16.7 to

05:25   19   20 percent, right?

05:25   20       A.    That's correct.

05:25   21       Q.    And again, you didn't show the jury a

05:25   22   calculation of why you ended up at 20, fair?

05:26   23       A.    Not in the calculation.

05:26   24       Q.    And you also presented an alternative

05:26   25   apportionment section, right?

05:26  1      A.    Yes.  I did.

05:26  2      Q.    And you'd agree that the same six factors you

05:26  3  discussed in connection with your -- the first part of

05:26  4  your opinion, those were also part of your alternative

05:26  5  apportionment, right?

05:26  6      A.    That's correct.

05:26  7      Q.    And in your opinion, they retained their

05:26  8  relative importance to each other?

05:26  9      A.    I just used the same apportionment number.

05:26  10      Q.    All right.  Now, as part of your apportionment

05:26  11  analysis, you considered each feature's novelty,

05:26  12  design-around potential, and importance to Webex's

05:26  13  overall function, right?

05:26  14      A.    That's correct.

05:26  15      Q.    Let's talk about those three factors.  First,

05:26  16  novelty.

05:26  17            You did not determine novelty yourself, right?

05:26  18      A.    That's right.

05:26  19      Q.    You relied on Dr. Madisetti?

05:26  20      A.    That's correct.

05:27  21      Q.    You're not personally versed in all of the

05:27  22  prior art in this case, right?

05:27  23      A.    I hadn't done the analysis.

05:27  24      Q.    You haven't done an in-depth analysis of what

05:27  25  technologies existed prior to the '858 patent, right?

05:27  1         A.    No.

05:27  2         Q.    In the audioconference field, you did not do

05:27  3    an analysis of what technologies existed prior to the

05:27  4    '858 patent, right?

05:27  5         A.    That's right.

05:27  6         Q.    So you relied on a phone call with

05:27  7    Dr. Madisetti, right?

05:27  8         A.    And his report.  Yes.

05:27  9         Q.    You don't remember when you had that call,

05:27  10   right?

05:27  11        A.    Sometime before my supplemental report, but

05:27  12   that was some time ago.

05:27  13        Q.    Let's focus on your global access category for

05:27  14   a moment.  Like we just discussed a moment ago, that

05:27  15   was one of the categories you gave the highest

05:27  16   importance to, right?

05:27  17        A.    Yes.  That's right.

05:27  18        Q.    The 25 percent?

05:27  19        A.    That's right.

05:27  20        Q.    And you relied on Dr. Madisetti to determine

05:27  21   the novelty of your global access category, right?

05:27  22        A.    That's right.

05:28  23        Q.    But you don't know if you described to him the

05:28  24   feature of global access, right?

05:28  25        A.    I don't know that I described verbally to him.

325

05:28  1      Q.   You don't know if you provided a description

05:28  2  that you used in your report, for example, right?

05:28  3      A.   He may have had a copy of my report, but I

05:28  4  don't know.

05:28  5      Q.   You don't know if you talked about it with him

05:28  6  on the phone call, right?

05:28  7      A.   I don't remember.

05:28  8      Q.   And you don't know if Dr. Madisetti's entire

05:28  9  understanding of what global access means came from you

05:28  10  or not, right?

05:28  11      A.   I don't know.

05:28  12      Q.   You don't know what he was defining as a

05:28  13  "mean" when he told you it was a novel feature, right?

05:28  14      A.   I thought we were talking about the same

05:28  15  thing, but I don't know what he thinks.

05:28  16      Q.   And if the global access category was not in

05:28  17  fact novel at the time of the invention, you don't know

05:28  18  how that would impact your total contribution number,

05:29  19  right?

05:29  20      A.   Well, it could lower the contribution of that

05:29  21  particular category.

05:29  22      Q.   Let's talk about the second of those three

05:29  23  factors, design-around potential.  You said on direct

05:29  24  examination that you relied on Dr. Madisetti to form

05:29  25  the opinion as to whether or not there was

05:29    1    design-around potential for each of those categories,

05:29    2    right?

05:29    3        A.    That's correct.

05:29    4        Q.    And you relied on Dr. Madisetti rather than

05:29    5    your own opinion because you believed he was more

05:29    6    versed in that particular area?

05:29    7        A.    He'd done the analysis.

05:29    8        Q.    You hadn't done the analysis like he had,

05:29    9    right?

05:29    10       A.    I wasn't looking at prior art.

05:29    11       Q.    So we're not evaluating design-around

05:29    12   potential based on your own technical experience?

05:29    13       A.    I was relying on Dr. Madisetti for that

05:30    14   aspect.

05:30    15       Q.    You weren't evaluating the design-around

05:30    16   potential based on your role as a person of ordinary

05:30    17   skill?

05:30    18       A.    Not at the time that -- the time period you

05:30    19   were looking at.

05:30    20       Q.    And you were not evaluating design-around

05:30    21   potential yourself using testimony from Cisco's

05:30    22   witnesses?

05:30    23       A.    No.

05:30    24       Q.    Or publicly available and pre-asserted?

05:30    25       A.    Not for design-around potential.

—327—

05:30   1        Q.    Marketing documents?

05:30   2        A.    Not that particular one.  No.

05:30   3        Q.    And you didn't use technical documents to

05:30   4   evaluate design-around potential yourself?

05:30   5        A.    I relied on Dr. Madisetti.

05:30   6        Q.    That's not what you said in your report, is

05:30   7   it?

05:30   8        A.    I'm not sure I agree.

05:30   9        Q.    Let's take a look.  Let's pull up

05:30   10  Paragraph 198 of your supplemental report.  We can get

05:30   11  it on the screen.

05:30   12           So in your report, you wrote:  Based on my

05:31   13  technical experience, role as a POSITA, testimony from

05:31   14  Cisco's witnesses, and publicly available and produced

05:31   15  surveys, marketing documents, and technical documents,

05:31   16  I have evaluated the design-around potential.

05:31   17           That's what you wrote in your report, right?

05:31   18       A.    It does say that.

05:31   19       Q.    Let's look at Paragraph 158.

05:31   20           Based on my technical experience, role as a

05:31   21  POSITA, testimony from Cisco's witnesses, and publicly

05:31   22  available and produced surveys, marketing documents and

05:31   23  technical documents, I have evaluated the design-around

05:31   24  potential.

05:31   25           That's what you said in your reports, right?

05:31  1        A.    It does say that.  Yes.

05:31  2        Q.    You didn't present any such analysis to the

05:31  3   jury today, did you?

05:31  4        A.    No.  I actually relied on Dr. Madisetti here.

05:31  5              MR. SABRI:  No further questions,

05:31  6   Your Honor.

05:31  7                    REDIRECT EXAMINATION

05:31  8   BY MR. CAUGHEY:

05:32  9        Q.    Dr. Schaefer, we spent several hours talking

05:32  10  about infringement today.

05:32  11       A.    Yeah.

05:32  12       Q.    You talked about source code with the jury.

05:32  13             Do you recall that?

05:32  14       A.    Yes.

05:32  15       Q.    We saw -- give your best guess of how many

05:32  16  internal Cisco documents we talked about today during

05:32  17  your presentation.

05:32  18       A.    That we talked about today?

05:32  19       Q.    Uh-huh.

05:32  20       A.    I don't know.  Maybe 30 or 40.  I don't know,

05:32  21  something like that.

05:32  22       Q.    You used internal Cisco -- did you use

05:32  23  internal Cisco technical materials and source code to

05:32  24  evaluate whether Cisco's Webex servers infringe the

05:32  25  '858 patent?

| | | |
|---|---|---|
| 05:32 | 1 | A.    Yes. |
| 05:32 | 2 | Q.    Did Cisco's lawyers show you a single Cisco |
| 05:32 | 3 | document during their cross-examination? |
| 05:32 | 4 | A.    I don't believe so. |
| 05:32 | 5 | Q.    Not one, right? |
| 05:32 | 6 | A.    No. |
| 05:32 | 7 | MR. CAUGHEY:  No further questions. |
| 05:32 | 8 | MR. SABRI:  No further questions, |
| 05:33 | 9 | Your Honor. |
| 05:33 | 10 | THE COURT:  You may step down, sir. |
| 05:33 | 11 | Next witness, please?  I know it's a |
| 05:33 | 12 | deposition.  How long is the deposition? |
| 05:33 | 13 | MR. SIEGMUND:  It'll be |
| 05:33 | 14 | our -- Your Honor, Mr. Bratic will be our next -- |
| 05:33 | 15 | THE COURT:  I thought you had a |
| 05:33 | 16 | deposition next. |
| 05:33 | 17 | MS. SRINIVASAN:  No, Your Honor.  We do |
| 05:33 | 18 | not have another deposition. |
| 05:33 | 19 | MR. JONES:  May we approach, Your Honor? |
| 05:33 | 20 | THE COURT:  Sure. |
| 05:33 | 21 | (Bench conference.) |
| 05:33 | 22 | MR. JONES:  I would just note, we haven't |
| 05:33 | 23 | exchanged.  He was -- |
| 05:33 | 24 | THE COURT:  Just make sure you speak in |
| 05:33 | 25 | the mic. |

| | | |
|---|---|---|
| 05:33 | 1 | MR. JONES:  I apologize to the Court. |
| 05:33 | 2 | And I'm not being critical of anybody.  He was not |
| 05:33 | 3 | designated for today.  We haven't exchanged |
| 05:33 | 4 | demonstratives.  So... |
| 05:33 | 5 | MS. SRINIVASAN:  I could present his |
| 05:33 | 6 | qualifications.  I'm assuming there wouldn't be |
| 05:33 | 7 | objections to those slides anyway.  Get through that, |
| 05:33 | 8 | and then we could serve the rest of his slides and |
| 05:33 | 9 | continue his testimony in the morning. |
| 05:33 | 10 | THE COURT:  Is he your last live witness? |
| 05:34 | 11 | MS. SRINIVASAN:  Yes. |
| 05:34 | 12 | THE COURT:  Then let's do that then. |
| 05:34 | 13 | We'll just qualify him up and then we'll go home for |
| 05:34 | 14 | the day.  And then after him, we'll have a deposition |
| 05:34 | 15 | from whom? |
| 05:34 | 16 | MS. SRINIVASAN:  We're not going to play |
| 05:34 | 17 | the deposition given the time we've expended. |
| 05:34 | 18 | THE COURT:  That's fine.  So... |
| 05:34 | 19 | MS. SRINIVASAN:  So we will rest. |
| 05:34 | 20 | THE COURT:  That'll be your last witness? |
| 05:34 | 21 | MS. SRINIVASAN:  Yes, Your Honor. |
| 05:34 | 22 | THE COURT:  So we're running ahead. |
| 05:34 | 23 | That's great.  Let's go ahead and qualify him up. |
| 05:34 | 24 | MS. SRINIVASAN:  Okay. |
| 05:34 | 25 | THE COURT:  And then, like I said, let's |

```
05:34    1   go ahead and get that done and start fresh tomorrow.

05:34    2                 MS. SRINIVASAN:  Yes.  I imagine you've

05:34    3   seen those slides before, so you'll be fine.  It's in

05:34    4   his background.

05:34    5                 MR. JONES:  I trust you.  Don't worry

05:34    6   about it.

05:34    7                 (Bench conference concludes.)

05:35    8                 MS. SRINIVASAN:  Paltalk calls Mr. Walter

05:35    9   Bratic.

05:35   10                 (The witness was sworn.)

05:35   11                 MS. SRINIVASAN:  Thank you.

05:35   12                      DIRECT EXAMINATION

05:35   13   BY MS. SRINIVASAN:

05:35   14       Q.   Good afternoon, Mr. Bratic.

05:35   15            Could you please introduce yourself to the

05:35   16   jury?

05:35   17       A.   Sure.  My name's Walt Bratic.  And my last

05:35   18   name is spelled B-r-a-t-i-c.

05:35   19       Q.   Mr. Bratic, where do you live?

05:35   20       A.   I live in Houston.

05:35   21       Q.   And where do you work?

05:35   22       A.   I work for a consulting firm, an accounting

05:35   23   consulting firm called Whitleypenn.

05:35   24       Q.   What is Whitleypenn?  What does it do?

05:35   25       A.   So they're a Texas-based accounting and
```

05:35  1    consulting firm.  They do auditing, books and records

05:35  2    for companies.  They do issue annual reports for

05:36  3    companies.  They do tax returns for companies'

05:36  4    partnerships and individuals, and they do a variety of

05:36  5    strategic consulting and consulting like the type of

05:36  6    consulting I do.

05:36  7        Q.    And what's your role at Whitleypenn,

05:36  8    Mr. Bratic?

05:36  9        A.    So what I do at Whitleypenn is I provide a

05:36  10   variety of accounting, economic, financial, statistical

05:36  11   consulting services.  They can be for a wide variety of

05:36  12   clients.  Can be large corporations, could be

05:36  13   partnerships, could be individuals.

05:36  14        So my analysis involves looking at different

05:36  15   aspects of businesses.  Some of that involves strategic

05:36  16   analysis, marketing analysis, financial projections for

05:36  17   different kinds of companies in different industries.

05:36  18   For example, offshore drilling, as an example, to

05:36  19   medical devices.  There's a lot of medical technology.

05:36  20   Houston is the largest hospital complex in the world.

05:36  21   So that's part of what I do.

05:37  22        And part of that analysis, of course, involves

05:37  23   coming to court and testifying in a lawsuit and in

05:37  24   patent lawsuits, like the one I'm here to testify about

05:37  25   today and tomorrow.

```
05:37   1        Q.    Now, before we get to the substance of your
05:37   2   testimony, I just want to talk a little bit about your
05:37   3   qualifications in this area.
05:37   4              For purposes of your testimony, did you
05:37   5   prepare some slides for us to talk about with the jury?
05:37   6        A.    I did.
05:37   7        Q.    Okay.  All right.  Mr. Bratic, can you tell
05:37   8   the jury about your educational background?
05:37   9        A.    Yes.  So I have two formal college degrees.
05:37  10   They're both from the same school, the University of
05:37  11   Pennsylvania.  Like Mr. Katz, I also went to the
05:37  12   University of Pennsylvania.
05:37  13              I have an undergraduate degree there, and I
05:37  14   have an MBA, or master's of business administration,
05:37  15   degree from The Wharton School of Business.
05:37  16        Q.    Following your time there, can you tell us
05:37  17   about your work experience?
05:37  18        A.    Yes.  So a significant portion of my career
05:38  19   has been spent in public accounting working for some of
05:38  20   the world's largest accounting firms.  For example, I
05:38  21   spent a few years at a firm called Ernst, Ernst in the
05:38  22   old days, which eventually became known today as Ernst
05:38  23   and Whinney.
05:38  24              Then I went into industry.  I was a chief
05:38  25   financial officer of a company that made equipment for
```

05:38  1  the energy industry, and that's where I started doing

05:38  2  work on licensing technology, including patents and

05:38  3  trade secrets.  That's the primary focus of the

05:38  4  technology, that company, when I worked there back in

05:38  5  the early '80s.

05:38  6          And then after that, I joined Pricewaterhouse.

05:38  7  And I was there for about 23 years, Pricewaterhouse and

05:38  8  PricewaterhouseCoopers, where I was a partner.  And for

05:38  9  the last few years before I left, my time was global

05:38  10 director of intellectual property consulting for the

05:38  11 entire firm worldwide.

05:38  12         And I had over 500 people.  I was working

05:39  13 within different offices around the world.  Mostly in

05:39  14 Europe, some in Asia, and in the United States and

05:39  15 Canada.  Oh, and Australia.  Can't forget Australia.

05:39  16    Q.   Now, Mr. Bratic, do you have any credentials

05:39  17 that are relevant to your work in licensing?

05:39  18    A.   Yes.  So I have several certifications.  First

05:39  19 of all, I'm a certified public accountant.  I've been

05:39  20 licensed by the State of Texas since 1981 as a CPA.  So

05:39  21 that's a long time.  So over 40 years.

05:39  22         I also am a Certified Licensing Professional.

05:39  23 That's a designation I obtained from the Licensing

05:39  24 Executive Society of the United States and Canada,

05:39  25 involving about 8- or 9,000 members.  The focus of the

| | | |
|---|---|---|
| 05:39 | 1 | Licensing Executive Society is really to promote |
| 05:39 | 2 | knowledge and skills in the area of licensing of |
| 05:39 | 3 | technology, largely patents, trade secrets, sometimes |
| 05:40 | 4 | copyrights and trademarks.  But the main focus is |
| 05:40 | 5 | patents and trade secrets. |
| 05:40 | 6 | And I didn't normally have to take an exam, |
| 05:40 | 7 | but I was given a document from them for many years of |
| 05:40 | 8 | licensing I've been doing in intellectual property |
| 05:40 | 9 | going back to the early 1980s when I was chief |
| 05:40 | 10 | financial officer of a company called Advanced Energy |
| 05:40 | 11 | Supply Company. |
| 05:40 | 12 | And so I received that certification by being |
| 05:40 | 13 | able to document all my years of experience in |
| 05:40 | 14 | licensing of patents and trade secrets primarily. |
| 05:40 | 15 | Q.    And -- |
| 05:40 | 16 | A.    I'm sorry. |
| 05:40 | 17 | Q.    Go ahead. |
| 05:40 | 18 | A.    I have other certificates, certifications. |
| 05:40 | 19 | I'm certified in financial forensics, which |
| 05:40 | 20 | you can only get if you're a licensed CPA.  That's a |
| 05:40 | 21 | designation you receive by the American Institute of |
| 05:40 | 22 | Certified Public Accountants. |
| 05:40 | 23 | And then finally, I'm a certified fraud |
| 05:40 | 24 | examiner, which is an organization -- national |
| 05:40 | 25 | organization based out of Austin, Texas. |

—336—

05:41  1          And every year, just like for my CPA, I have

05:41  2   to take courses to get my license renewed.  For a CPA

05:41  3   in Texas, you need 40 hours.  And for the certified

05:41  4   fraud examination, you need ten hours.

05:41  5      Q.    Thank you, Mr. Bratic.

05:41  6          I've been about to ask you because you sort of

05:41  7   mentioned it, that you've been the chief financial

05:41  8   officer for a company, and I see on your slide you

05:41  9   talked about your real-world licensing experience.

05:41  10          If you could tell the jury a little bit about

05:41  11   that.

05:41  12      A.    Well, yes.  So going back to Advanced Energy

05:41  13   Supply Company, so we had somewhere on the order of 30

05:41  14   to 40 engineers and draftsmen.  We were designing

05:41  15   equipment for the energy industry, everything from gear

05:41  16   boxes to torque drives and so forth, so on, that were

05:41  17   being used in the energy industry.

05:41  18          We weren't a manufacturer, though.  We were a

05:41  19   design company.  What we did is we contracted out the

05:41  20   manufacturer to put our logo on it.  It's what they

05:41  21   call the white-labeling products.

05:42  22          But because we had this group of engineers and

05:42  23   designers, draftsmen designing our equipment, we came

05:42  24   to learn that we needed to license in technology from

05:42  25   other people, because they had things we need and it

337

05:42  1   was cheaper for us to get their technology than spend

05:42  2   years trying to figure it out on our own.

05:42  3          So I cut my teeth learning how to negotiate

05:42  4   licenses for intellectual property back in 1982, for

05:42  5   example.

05:42  6          Now, we also -- some -- as we grew as a

05:42  7   company, as people got to know us, some people came and

05:42  8   knocked on our doors and said they thought we had some

05:42  9   interesting technology and would we like to license it

05:42  10  to them.

05:42  11         And so during my tenure at Advanced Energy

05:42  12  Supply Company, I worked on somewhere between 10 and 15

05:42  13  licenses and then patents and trade secrets.

05:42  14         And then I joined Pricewaterhouse.  And I was

05:42  15  one of the only people there who was doing intellectual

05:43  16  property.  Of course, that was the early days where

05:43  17  people were being focused on intellectual property in

05:43  18  the early 1980s.

05:43  19         And so I was the go-to person at

05:43  20  Pricewaterhouse on licensing of intellectual property,

05:43  21  dealing with clients.  Mostly at that time in the

05:43  22  energy sector because Pricewaterhouse had a huge

05:43  23  footprint.  Exxon, Chevron were big clients.  Shell.

05:43  24  Pricewaterhouse.

05:43  25         And then we -- you know, then Pricewaterhouse

338

05:43  1    started getting large clients like Intel, out in

05:43  2    California, some other very, very large technology

05:43  3    companies.  So I started gravitating towards that and

05:43  4    towards pharmaceuticals and medical devices.

05:43  5        Q.    And I'm going to ask you about one last thing

05:43  6    on this slide here.  It references that you have been a

05:43  7    court-appointed expert and examiner.

05:43  8              Can you tell the jury about that?

05:43  9        A.    Yeah.  So I've been hired by judges here in

05:43  10   the State of Texas, where -- as a court-appointed

05:43  11   expert and examiner.  And the difference between the

05:44  12   two is sometimes there are issues that come before the

05:44  13   Court, and there's not enough evidence to put before

05:44  14   the Court.

05:44  15             So basically, I go to get hired.  I've been

05:44  16   hired to go out and do a quest to go out and find this

05:44  17   information for the Court as an examiner and report my

05:44  18   findings to the Court of the missing information.

05:44  19             And then as a court-appointed expert, for

05:44  20   example, I've been involved in disputes involving

05:44  21   software where two companies are -- have been suing

05:44  22   each other over the value of their stock in the

05:44  23   software company and they both hire experts to give --

05:44  24   determine the value of the software.  And there's a

05:44  25   dispute about that, so the Court would hire me as an

| 05:44 | 1 | independent expert by the Court. |
| 05:44 | 2 | I would determine what the value of the |
| 05:44 | 3 | software company was, and then a client -- the Court |
| 05:44 | 4 | would accept my findings, and it was binding on all the |
| 05:44 | 5 | parties.  So that's an example of the type of courts. |
| 05:44 | 6 | MS. SRINIVASAN:  And at this time, I'd |
| 05:44 | 7 | like to offer Mr. Bratic as an economic expert on |
| 05:45 | 8 | damages analysis in patent cases. |
| 05:45 | 9 | MR. JONES:  No objection, Your Honor. |
| 05:45 | 10 | THE COURT:  He'll be admitted as such. |
| 05:45 | 11 | Ladies and gentlemen of the jury, I think |
| 05:45 | 12 | this is a good time for us to take a break because he's |
| 05:45 | 13 | about to get into more substantive information.  If you |
| 05:45 | 14 | all would be here by -- can everyone get here by 8:15? |
| 05:45 | 15 | Does that work? |
| 05:45 | 16 | Okay.  If you all will be here by 8:15 in |
| 05:45 | 17 | the morning, we'll get started by 8:30.  And plan on |
| 05:45 | 18 | going tomorrow evening till about 5:30.  I think we're |
| 05:45 | 19 | going to do fine in this case getting it to you by |
| 05:45 | 20 | either Thursday or Friday.  So be safe out there, and |
| 05:45 | 21 | we'll see you. |
| 05:45 | 22 | THE BAILIFF:  All rise. |
| 05:45 | 23 | (Jury exited the courtroom.) |
| 05:45 | 24 | THE COURT:  Okay.  So we'll finish with |
| 05:46 | 25 | Mr. Bratic tomorrow and the plaintiff will rest? |

05:46  1                    MS. SRINIVASAN:  Yes, Your Honor, subject

05:46  2    to our rebuttal.

05:46  3                    THE COURT:  You may be seated.

05:46  4                    I'm sorry?

05:46  5                    MS. SRINIVASAN:  Subject to our rebuttal

05:46  6    case, Your Honor.

05:46  7                    THE COURT:  So what's going to happen, I

05:46  8    know Mr. Jones knows this, but someone can speak for

05:46  9    the defendants for a second.  But when the plaintiff

05:46  10   finishes, we'll break and I'll ask for a Rule 50

        11   motion.

05:46  12                   And so if you want, we'll do it orally.

05:46  13   And if you want to submit something in writing, that's

05:46  14   fine too.  Then I'll say, who's your next witness?  And

05:46  15   the answer will be?  Tomorrow?

05:46  16                   Yes, ma'am?

05:46  17                   MS. PIEPMEIER:  Your Honor, it will be

05:46  18   Mr. Amit Barave.

05:46  19                   THE COURT:  Who could we expect tomorrow?

05:46  20   If you could kind of give me a lineup.

05:46  21                   MS. PIEPMEIER:  Sure thing, Your Honor.

05:46  22                   We will have Mr. Amit Barave, and we will

05:46  23   have Mr. Nathan Buckles.  We will have Mr. Aaron

05:46  24   Belcher.  And then I believe, assuming there's time, we

05:46  25   would have Mr. Dean Willis.

| | | |
|---|---|---|
| 05:47 | 1 | THE COURT:  Okay.  I can't imagine that |
| 05:47 | 2 | we would finish before the end of the day Wednesday, |
| 05:47 | 3 | but if we do, we do that, I can't imagine.  So for |
| 05:47 | 4 | right now -- and we'll see tomorrow how we go at the |
| 05:47 | 5 | end of the day, but I'll plan on -- we'll plan on |
| 05:47 | 6 | Wednesday evening at around this time, 5:00 or 5:30, |
| 05:47 | 7 | doing the charge conference. |
| 05:47 | 8 | Where are you all at in terms of working |
| 05:47 | 9 | on the jury charge?  Are there problems?  Not problems? |
| 05:47 | 10 | I haven't heard anything about the case that would lead |
| 05:47 | 11 | me to believe y'all should be having difficulties. |
| 05:47 | 12 | MR. SIEGMUND:  We just have a few things, |
| 05:47 | 13 | Your Honor, but it's pretty manageable. |
| 05:47 | 14 | THE COURT:  Okay.  I'm thinking very |
| 05:47 | 15 | seriously this time -- I haven't had the energy to do |
| 05:47 | 16 | it, but I regret it every time.  I'm thinking very |
| 05:47 | 17 | seriously this time about maybe going through and |
| 05:47 | 18 | crossing out some of the things I say 16 times and |
| 05:47 | 19 | getting you all -- it would be a change in the charge, |
| 05:48 | 20 | but it would make it shorter.  And, you know, they only |
| 05:48 | 21 | need to hear -- I think I say what preponderance of the |
| 05:48 | 22 | evidence is at least 33 times, and I don't think they |
| 05:48 | 23 | need to hear it 33 times. |
| 05:48 | 24 | But if someone's unhappy, we'll talk |
| 05:48 | 25 | about it.  But I'm -- actually, if someone could |

05:48  1   tomorrow morning get me -- I'm not going to be judging

05:48  2   on, you know, accepting or not accepting, but if you

05:48  3   would get me the draft of where we are at, and I may go

05:48  4   through tomorrow and actually line through some stuff,

05:48  5   redline through some stuff and see if you all will

05:48  6   agree to let me not say it.

05:48  7             And, for example, if there aren't any

05:48  8   stipulations, you can leave out the page on

05:48  9   stipulations.  It's that type of stuff I'm trying to

05:48  10  accomplish.

05:48  11            So it seems to me that we're in good

05:48  12  shape, though, in getting the trial done.

05:48  13            Any issues to take up?

05:48  14            MR. TRIBBLE:  Nothing from plaintiff,

05:48  15  Your Honor.

05:48  16            MS. PIEPMEIER:  Nothing from us at this

05:48  17  time, Your Honor.

05:48  18            THE COURT:  Very good.  I will see you

05:48  19  all tomorrow morning at about 8:15.

05:49  20            THE BAILIFF:  All rise.

05:49  21            (Hearing adjourned.)

        22

        23

        24

        25

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS      )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10              I certify that the transcript fees and

11    format comply with those prescribed by the Court and

12    Judicial Conference of the United States.

13              Certified to by me this 6th day of

14    September 2024.

15

16                        /s/ Kristie M. Davis
                         KRISTIE M. DAVIS
                         Official Court Reporter
17                        PO Box 20994
                         Waco, Texas 76702
18                        (254) 666-0904
                         kmdaviscsr@yahoo.com
19

20

21

22

23

24

25

05:49