—344—

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3    PALTALK HOLDINGS, INC.   *    August 27, 2024
                               *
 4    VS.                      *  CIVIL ACTION NO. 6:21-CV-757
                               *
 5    CISCO SYSTEMS, INC.      *

 6            BEFORE THE HONORABLE ALAN D ALBRIGHT
                      TRIAL PROCEEDINGS
 7                    Volume 2 of 4

 8    APPEARANCES:

 9    For the Plaintiff:   Max L. Tribble, Jr., Esq.
                           Ryan V. Caughey, Esq.
10                         Amber Brianna Magee, Esq.
                           Susman Godfrey LLP
11                         1000 Louisiana Street, Suite 5100
                           Houston, TX 77002
12
                           Kalpana Srinivasan, Esq.
13                         Susman Godfrey LLP
                           1900 Avenue of the Stars, Ste 1400
14                         Los Angeles, CA 90067-6029

15                         Mark Siegmund, Esq.
                           Cherry Johnson Siegmund James, PLLC
16                         The Roosevelt Tower
                           400 Austin Avenue, 9th Floor
17                         Waco, Texas 76701

18    For the Defendant:   Sarah E. Piepmeier, Esq.
                           Elise Edlin, Esq.
19                         Nate Sabri, Esq.
                           Karl Johnston, Esq.
20                         Perkins Coie LLP
                           505 Howard Street
21                         San Francisco, CA 94117

22                         Ryan Hawkins, Esq.
                           Abigail Ann Gardner, Esq.
23                         Perkins Coie LLP
                           11452 El Camino Real, Suite 300
24                         San Diego, CA 92130

25
```

345

```
 1                    Jessica J. Delacenserie, Esq.
                      Perkins Coie LLP
 2                    1201 Third Ave., Suite 4900
                      Seattle, WA 98101
 3
                      Andrew T. Dufresne, Esq.
 4                    Perkins Coie LLP
                      33 E. Main Street, Suite 201
 5                    Madison, WI 53703

 6                    Michael E. Jones, Esq.
                      Shaun William Hassett, Esq.
 7                    Potter Minton PC
                      102 North College, Suite 900
 8                    Tyler, TX 75702

 9                    Jonathan Irvin Tietz, Esq.
                      Perkins Coie LLP
10                    700 13th St. NW, Suite 800
                      Washington, DC 20005
11
   Court Reporter:    Kristie M. Davis, CRR, RMR
12                    PO Box 20994
                      Waco, Texas 76702-0994
13                    (254) 340-6114

14     Proceedings recorded by mechanical stenography,

15  transcript produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

08:34

346

08:34   1                    (Hearing begins.)

08:34   2                    THE BAILIFF:  All rise.

08:34   3                    THE COURT:  Please remain standing for

08:34   4   the jury.

08:34   5                    (Jury entered the courtroom.)

08:34   6                    THE COURT:  Thank you.  You may be

08:34   7   seated.

08:34   8                    Counsel?

        9                    MS. SRINIVASAN:  Thank you.

08:35   10                   DIRECT EXAMINATION CONTINUED

08:35   11   BY MS. SRINIVASAN:

08:35   12       Q.    Good morning, Mr. Bratic.

08:35   13       A.    Good morning.

08:35   14       Q.    Yesterday we had the opportunity to hear about

08:35   15   your qualifications.  This morning I'd like to pick up

08:35   16   with your assignment here.

08:35   17             What were you asked to do in this case,

08:35   18   Mr. Bratic?

08:35   19       A.    I was asked to determine the amount of

08:35   20   royalties that would be due and owing Paltalk assuming

08:35   21   that Cisco had infringed the '858 patent.

08:35   22       Q.    And at a high level, how did you go about

08:35   23   making that determination, Mr. Bratic?

08:35   24       A.    Well, I followed the guidance from the federal

08:35   25   patent statute dealing with damages.

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

08:35  1       Q.    And let me go to that.

08:35  2             Is this the statute that you're referring to

08:35  3   here, Mr. Bratic?

08:35  4       A.    Yes.  This is a quote from the statute.

08:35  5       Q.    What guidance did you take from this?

08:35  6       A.    Well, you can see in highlighted language, but

08:35  7   look at the first row first.  It says at the very top:

08:36  8   Upon finding for the claimant.  That's the owner of the

08:36  9   patent.

08:36  10            And jump down.  It says:  In no event less

08:36  11  than a reasonable royalty for the use made of the

08:36  12  invention by the infringer.

08:36  13      Q.    And you've highlighted and underlined "use

08:36  14  made of the invention by the infringer" there.

08:36  15            Why did you do that, Mr. Bratic?

08:36  16      A.    Well, because that's the focus of the patent

08:36  17  statute, is to determine what's the benefit that the

08:36  18  infringer obtained by infringing the patent.  That's

08:36  19  part of the investigation.

08:36  20      Q.    Mr. Bratic, you were here for the opening

08:36  21  statements that were delivered yesterday?

08:36  22      A.    I was.

08:36  23      Q.    And you were also here for the examination of

08:36  24  Paltalk's CEO, Mr. Katz?

08:36  25      A.    Yes.

—348—

08:36  1    Q.    There were statements and arguments by Cisco's

08:36  2    counsel and questions to Mr. Katz about whether Paltalk

08:36  3    practiced the patent.

08:36  4         Is that relevant at all to your analysis of

08:36  5    patent damages owned by Cisco whether or not Paltalk

08:37  6    practiced the '858 patent?

08:37  7    A.    Yeah.  It's completely irrelevant to the issue

08:37  8    of damages owed to Paltalk assuming the '858 patent's

08:37  9    valid and has been infringed.

08:37  10   Q.    And why is it not relevant to your assessment

08:37  11   of damages?

08:37  12   A.    Well, there are two reasons.  One, Paltalk is

08:37  13   not seeking lost profits.  Secondly, if you look at the

08:37  14   patent statute here, it says nothing about the patent

08:37  15   owner having -- being required to practice a patent in

08:37  16   order for the patent owner to be compensated for

08:37  17   infringement of its patent.

08:37  18   Q.    Okay.  I'd like to just talk about a few

08:37  19   background factors on the '858 patent that we're here

08:37  20   about.

08:37  21        Can you describe for the jury some of the

08:37  22   background factors that you considered about the

08:37  23   patent?

08:37  24   A.    Well, so here's a copy of the first page of

08:37  25   the patent.  And so I considered, of course, the date

349

08:37    1    the patent issued, which is January 27, 2004.  And an

08:37    2    important date I considered was the date the patent

08:38    3    expired, which was July 26, 2022.

08:38    4        Q.    And to be clear, are you calculating any

08:38    5    damages for the period after the patent expired?

08:38    6        A.    No.  The damages I calculated stop on July 26,

08:38    7    2022.

08:38    8        Q.    What is the damages period in this case?

08:38    9        A.    So it's a seven-year -- roughly a seven-year

08:38   10    period.  It goes from July 23rd, 2015, which -- and the

08:38   11    reason that's the start date is because I understand

08:38   12    from the patent statute, Paltalk is entitled to collect

08:38   13    reasonable royalties going back six years from when it

08:38   14    filed suit.

08:38   15            So if you go back in a calendar six years from

08:38   16    when suit was filed, damages would start July 23rd,

08:38   17    2015, and the endpoint of damages is July 26, 2022, as

08:38   18    shown on the screen.

08:38   19        Q.    Did you have to make any assumptions about the

08:39   20    '858 patent to perform your analysis?

08:39   21        A.    Yes.  I made two assumptions.

08:39   22        Q.    What are those?

08:39   23        A.    One is the '858 patent is in fact a valid

08:39   24    patent; and, two, that Cisco infringed the '858 patent.

08:39   25        Q.    Now, we're going to hear from Cisco's damages

```
                    1    expert.
08:39               2              Are those the same two assumptions that
08:39               3    Cisco's expert is required to make in coming up with a
08:39               4    damages analysis in this case?
08:39               5         A.    Yes.
08:39               6         Q.    And, Mr. Bratic, we're obviously going to
08:39               7    spend time walking through it, but what are the royalty
08:39               8    damages you determined were owed by Cisco for
08:39               9    infringement of the '858 patent?
08:39              10         A.    It's -- well, the total amount is here on the
08:39              11    screen.  It's $102,581,465.  So rounded, it's
08:39              12    $102.6 million.
08:39              13         Q.    Mr. Bratic, can you explain what this slide is
08:40              14    that you prepared?
08:40              15         A.    Yeah.  So there's a common and well-accepted
08:40              16    formula for determining reasonable royalties in a
08:40              17    patent case.  And this is a description of the formula.
08:40              18    There are three boxes here.
08:40              19              The first box is a royalty base.  The royalty
08:40              20    base is the extent of use made by the '858 patent under
08:40              21    the patent statute.  So that's the first box.  You
08:40              22    multiply that by the contribution that the patent has
08:40              23    made to the accused products and the standard of the
08:40              24    use made of the invention.
08:40              25              That middle box is the technical apportionment
```

08:40  1    that Dr. Schaefer talked about yesterday.

08:40  2            And then finally, you've got to figure out --

08:40  3    once you figure out what the benefit is in the formula

08:40  4    attributed solely to the patented invention, you've got

08:40  5    to then carve out or split out how Paltalk and Cisco

08:40  6    would share in the benefit attributed to the '858

08:40  7    patent.

08:40  8        Q.    Okay.  And we didn't put it in the slide here,

08:41  9    but in the first box where it says "extent of use,"

08:41  10   whose use is that?

08:41  11       A.    That would be Cisco.

08:41  12       Q.    What products did you consider in calculating

08:41  13   the damages?

08:41  14       A.    So here's a list of products I considered.

08:41  15   This was the same list that Dr. Schaefer showed the

08:41  16   products being their products.  So that -- I began with

08:41  17   that list.

08:41  18       Q.    Was there any particular guidelines that you

08:41  19   followed in calculating the reasonable royalties owed

08:41  20   for infringement of the patent?

08:41  21       A.    Yes.  There was.

08:41  22       Q.    All right.  And can you tell the jury about

08:41  23   those guidelines?

08:41  24       A.    Yes.  So there's a very well-known case,

08:41  25   patent infringement case, from the very early 1970s.

352

08:41  1    And it was called Georgia-Pacific versus U.S. Plywood.

08:41  2    And like I said, I think it was tried in 1971 or 1972,

08:41  3    a long time ago.

08:41  4         And in that court -- in that court and in that

08:42  5    trial, the Court came down with a guideline or

08:42  6    methodology to evaluate and determine reasonable

08:42  7    royalties in a patent case.

08:42  8         As you can see in the heading here, it says

08:42  9    Georgia-Pacific factors.  So the Court came up with a

08:42  10   list of 15 factors to be considerable in a patent

08:42  11   infringement case to arrive at a reasonable royalty.

08:42  12        Now, the Court didn't say that every single --

08:42  13   of each of the 15 factors applies to every single case,

08:42  14   but it's your guideline, your guidepost to evaluate

08:42  15   royalty damages.

08:42  16   Q.    In this case, did you go through all these 15

08:42  17   factors?  Did you analyze all of them for your

08:42  18   calculation of damages?

08:42  19   A.    Yes.  I discussed them in all of my report.

08:42  20   Q.    Would you, in your expert view, give all of

08:42  21   these factors the same weight?

08:42  22   A.    No.  Because they're very fact dependent on

08:42  23   each case is different.  So you have to tailor-make the

08:42  24   facts of the case to the Georgia-Pacific analysis.

08:42  25   Q.    You highlighted one and italicized it at the

353

| | | |
|---|---|---|
| 08:43 | 1 | bottom, No. 15, hypothetical negotiation. |
| 08:43 | 2 | A.    Yes. |
| 08:43 | 3 | Q.    Can you explain to the jury what that is? |
| 08:43 | 4 | A.    Right.  So the parties, Georgia-Pacific and |
| 08:43 | 5 | U.S. Plywood, were working this patent lawsuit back in |
| 08:43 | 6 | the early 1970s, and they were there because there was |
| 08:43 | 7 | no license for the use of the patented technology at |
| 08:43 | 8 | the time. |
| 08:43 | 9 | So the Court came up with an idea to assume or |
| 08:43 | 10 | pretend that Georgia-Pacific and U.S. Plywood would |
| 08:43 | 11 | have sat down, would have negotiated, done a |
| 08:43 | 12 | hypothetical negotiation, a pretend negotiation, to |
| 08:43 | 13 | come up with a hypothetical license.  And from that |
| 08:43 | 14 | hypothetical license, you would know the amount of |
| 08:43 | 15 | royalties that were owed to Georgia-Pacific by U.S. |
| 08:43 | 16 | Plywood. |
| 08:43 | 17 | Q.    And in this case, did you consider what this |
| 08:43 | 18 | pretend negotiation would have looked like between the |
| 08:43 | 19 | parties in suit? |
| 08:43 | 20 | A.    Yes.  And I might add, the Court also said |
| 08:43 | 21 | when you have a hypothetical negotiation, take the |
| 08:43 | 22 | other 14 factors into account in the hypothetical |
| 08:44 | 23 | negotiation.  Yes.  They were considered. |
| 08:44 | 24 | Q.    Okay.  Can you explain for the jury what this |
| 08:44 | 25 | slide is that we have up? |

08:44  1        A.    So this is setting up some parameters or

08:44  2    guidelines for the hypothetical negotiation.  It takes

08:44  3    place in 2007 between, as you can see, Paltalk and

08:44  4    Cisco negotiating.

08:44  5            I mentioned earlier one of the most important

08:44  6    assumptions to make in the hypothetical negotiation is

08:44  7    that the '858 patent is valid and infringed, and that's

08:44  8    an assumption that both Cisco and Paltalk have to

08:44  9    accept in this negotiation.

08:44  10            Another guideline, if you will, framework for

08:44  11    the negotiation, is the negotiation is an open book.

08:44  12    So what I mean by that, there are no secrets in this

08:44  13    hypothetical negotiation.

08:44  14            In the real world, where I've dealt with a lot

08:44  15    of clients, sometimes parties don't share all the

08:44  16    information they have because it's part of their

08:44  17    negotiation strategy, but it doesn't work like that in

08:45  18    the hypothetical negotiation.  Everybody knows

08:45  19    everything.  No secrets.  And that's why I say cards

08:45  20    are face up.

08:45  21            The next thing is there's a concept called the

08:45  22    Book of Wisdom.  The parties can look at information

08:45  23    that occurred after the date of the hypothetical

08:45  24    negotiation in 2007 to inform them in their

08:45  25    hypothetical negotiation.

08:45  1          Q.    In this picture that you have in the slide

08:45  2    shown Paltalk and Cisco --

08:45  3          A.    Yes.

08:45  4          Q.    -- why would those be the parties to this

08:45  5    hypothetical negotiation that might have occurred in

08:45  6    2007?

08:45  7          A.    Well, Cisco's the party to this lawsuit or the

08:45  8    defendant in this lawsuit.  And 2007 is the year in

08:45  9    which they acquired Webex Communications.  And that's

08:45  10   briefly the explanation.

08:45  11         Q.    And just to be clear, this negotiation we're

08:45  12   depicting here, that negotiation never happened?

08:45  13         A.    Correct.

08:45  14         Q.    You draw a distinction here under the slide.

08:46  15   There's a hypothetical, the pretend negotiation, and

08:46  16   then a real-world negotiation.

08:46  17               Why did you do that?

08:46  18         A.    Well, because there are big differences

08:46  19   between what people do in the real world in negotiating

08:46  20   patent licenses and what happens in this hypothetical

08:46  21   negotiation.

08:46  22               For example, in a real-world negotiation, lots

08:46  23   of times they argue about -- parties argue about

08:46  24   whether or not the patent is valid, whether or not the

08:46  25   patent's even been infringed or used, but that doesn't

356

08:46  1    happen in the hypothetical negotiation.

08:46  2          The parties have to accept that the patent is

08:46  3    valid, and the '858 patent has been infringed by Cisco.

08:46  4    There's no dispute about that in the hypothetical

       5    negotiations.

08:46  6          And here, I have another bullet under

08:46  7    real-world negotiation.  This parties have different

08:46  8    information.  The cards aren't always up on the table.

08:46  9    So in a real world, people are posturing.  None of that

08:46 10    happens in the hypothetical negotiation.

08:46 11          And in contrast to a hypothetical negotiation,

08:46 12    in the real world, the parties don't agree to a

08:47 13    license.  They just walk away.  It happens a lot.  In

08:47 14    hypothetical negotiations, you know, the Court imposes

08:47 15    this assumption that the parties will stay and have to

08:47 16    hammer it out otherwise.

08:47 17    Q.    You mentioned that Cisco acquired Webex in

08:47 18    2007.

08:47 19          What was the value of that deal?

08:47 20    A.    I believe it was around $3.2 billion worth

08:47 21    that Cisco paid to acquire Webex Communications.

08:47 22    Q.    You assume here this negotiation would have

08:47 23    happened in 2007.

08:47 24    A.    Yes.

08:47 25    Q.    Cisco's damages expert had a different date

357

08:47  1    for when this negotiation would happen, the

08:47  2    hypothetical negotiation?

08:47  3        A.    Yes.

08:47  4        Q.    And what is the date that Cisco's damages

08:47  5    expert has provided?

08:47  6        A.    I believe it's January 2004, which is when the

08:47  7    '858 patent issued.

08:47  8        Q.    Do you think that's an appropriate date to use

08:47  9    for the hypothetical negotiation?

08:47 10        A.    No.

08:47 11        Q.    Why not?

08:47 12        A.    Well, first of all, Webex Communications is

08:48 13    not a part of this lawsuit.  Second of all, Cisco's

08:48 14    damages experts never identified a single Webex

08:48 15    communication product of -- again, by specifically the

08:48 16    name and practice, the teachings of the '858 patent.

08:48 17        Q.    Ultimately, though, for purposes of how you

08:48 18    got to your number, does it matter whether it was 2004

08:48 19    or 2007, whether this negotiation that you've

08:48 20    constructed, what year it occurred?

08:48 21        A.    No.

08:48 22        Q.    Why not?

08:48 23        A.    Well, because -- I'm going to use my hands

08:48 24    here.  You start to think of the timeline.  You've

08:48 25    got -- if you got January 2004 where the patent issued,

08:48  1    that should be the hypothetical negotiation.

08:48  2            Or over here, 2007, when Cisco acquired Webex

08:48  3    is the date of the hypothetical negotiation.  When you

08:48  4    look at the patent statute and it says, well, take a

08:48  5    look at use made of the invention, we know that time

08:48  6    period is July 23rd, 2015 to July 26, 2022.

08:48  7            So the damages period and the focus of the use

08:49  8    made of the invention occurs after 2004 and 2007.  So

08:49  9    whether you pick 2004 or 2007 as your hypothetical

08:49  10   negotiation dates, it wouldn't impact the telescoping

08:49  11   down and looking at the use made of the invention under

08:49  12   the patent statute.

08:49  13   Q.    Okay.  You talked a little bit about

08:49  14   Georgia-Pacific, and in this slide you presented those

08:49  15   factors in a different way.

08:49  16           Can you explain that to the jury?

08:49  17   A.    Yes.  So some of the Georgia-Pacific factors

08:49  18   have similar themes or topics.  So for me, it's easier

08:49  19   to read, organize them in different buckets based on

08:49  20   some common themes.

08:49  21           So I've organized some in the bucket of nature

08:49  22   and use of the invention here.  Another one is, of

08:49  23   course, licensing-related characteristics.  Another one

08:49  24   is commercial success.  Another one is the market and

08:50  25   comparative position, whether the parties are

08:50  1    competitors or whether they're a promoter and inventor.

08:50  2        And finally, experts and negotiation.  This

08:50  3    is, of course, dealing with the opinion of experts and

08:50  4    the hypothetical negotiation.

08:50  5        Q.   And I'd like to start by talking about the

08:50  6    licensing characteristics or the bucket, as we call it.

08:50  7        What factors did you consider here in forming

08:50  8    your damages analysis?

08:50  9        A.   So it deals with Georgia-Pacific Factors 1, 2,

08:50  10   3, 7, and 12.

08:50  11       Q.   And as part of this, did you look at

08:50  12   Paltalk -- how Paltalk came to own the '858 patent?

08:50  13       A.   I did.

08:50  14       Q.   And can you briefly describe what factors you

08:50  15   considered there?

08:50  16       A.   Well, Paltalk, as Mr. Katz explained and as he

08:50  17   told me when I interviewed him prior to preparation of

08:50  18   my report, that he had learned -- was familiar with

08:50  19   HearMe.  HearMe was one of these tech companies that

08:50  20   back in the -- before the 2000 crash -- bubble crash,

08:51  21   it was a robust company.  It had raised $270 million in

08:51  22   its market value.  At one time it was about a billion

08:51  23   dollars.  So it was -- in the old days, we called it a

08:51  24   high flier.  It was doing really well.

08:51  25       Then the stock market crash happened, and all

360

08:51  1    the tech companies, all their stock tanked.  And then

2    HearMe was in a position where basically they were

08:51  3    doing a fire sale and started getting rid of all its

08:51  4    assets.  And that's how Paltalk ended up acquiring some

08:51  5    of the assets out of the liquidation process of HearMe

08:51  6    basically going out of business.

08:51  7        Q.    The jury heard a lot of questions about the

08:51  8    purchase price, what Paltalk paid for the HearMe

08:51  9    patents and assets, that $145,000.

08:51  10       A.    Yes.

08:51  11       Q.    Was that relevant -- or did you look at that

08:51  12   and think that that was relevant to your ultimate

08:51  13   damages calculation?

08:51  14       A.    Well, I certainly analyzed it, but it had

08:52  15   nothing to do with the determination of reasonable

08:52  16   royalties in this case, in my opinion.

08:52  17       Q.    Okay.  Why is that?

08:52  18       A.    Well, first of all, the '858 patent didn't

08:52  19   even exist as a patent in late 2000 when the -- in

08:52  20   2001, sorry, when the purchase of the '858 patent

08:52  21   application -- or it was a patent application.

08:52  22             So there was no certainty that, one, the

08:52  23   '858 patent would even issue in January 2004.  And

08:52  24   there was certainly no certainty that the patent

08:52  25   application as it existed at the time Paltalk made the

08:52  1    acquisition would not be changed or modified in some

08:52  2    way to become a different patent than what the patent

08:52  3    application set out as its claims back at the time of

08:52  4    the Paltalk acquisition.

08:52  5        And the other point to be made is because it

08:52  6    was a patent application, there was no analysis done by

08:53  7    HearMe -- HearMe or Paltalk at the time of -- prior to

08:53  8    or at the time of the acquisition of the patent

08:53  9    application for the '858 patent, whether or not anybody

08:53  10   in the marketplace had been practicing the -- what came

08:53  11   to be some years later the '858 patent.

08:53  12       So there's no way to fake that information

08:53  13   into the purchase price that Paltalk paid for the

08:53  14   acquisition of the HearMe assets.

08:53  15   Q.    Mr. Bratic, you were here, as we mentioned

08:53  16   yesterday, for Mr. Katz' testimony.

08:53  17       Do you recall a line of questioning about an

08:53  18   SEC form that Paltalk had in 2021 for its 10-K?

08:53  19   A.    Yes.

08:53  20   Q.    And Mr. Katz was asked about a line item

08:53  21   related to carrying amount --

08:53  22   A.    Yes.

08:53  23   Q.    -- carrying amount of its patents.

08:53  24   A.    Yes.

08:53  25   Q.    And there was also a suggestion that the

08:53    1    carrying amount had something to do with the value of

08:54    2    the patents themselves.  That was a question that was

08:54    3    raised to him, the carrying amount that was shown on

08:54    4    that SEC statement of $50,000.

08:54    5         Obviously you have experience in this area as

08:54    6    a CPA, but what is a carrying amount?

08:54    7    A.    So under the -- what we call generally

08:54    8    accepted accounting principles and generally accepted

08:54    9    auditing procedures, you cannot take the market value

08:54    10   of your technology, whether it's patents or trademarks

08:54    11   or trade secrets.  You cannot put the market value of

08:54    12   your patents in other intellectual property on the

08:54    13   books of the company unless you did an acquisition and

08:54    14   gross up your assets for that.

08:54    15        When companies record their -- on their

08:54    16   balance sheet the value of the patents, on the balance

08:54    17   sheet and for accounting purposes, that's a reflection

08:54    18   of the money they spent to -- for patent lawyers and so

08:54    19   forth to prosecute the patent.

08:55    20        And to make patent maintenance fees, they have

08:55    21   to be at the Patent and Trademark Office, but that

08:55    22   $50,000 has nothing to do with the market value of the

08:55    23   patents.

08:55    24   Q.    Mr. Bratic, in the opening -- so let me ask

08:55    25   you, when there was a suggestion that carrying --

| | | |
|---|---|---|
| 08:55 | 1 | carrying amount in the SEC statements somehow reflects |
| 08:55 | 2 | how Paltalk is valuing its patents, you would not agree |
| 08:55 | 3 | with that from accounting principles? |
| 08:55 | 4 | A.    No.  Not at all.  It's forbidden. |
| 08:55 | 5 | Q.    In the opening statement, we saw a slide that |
| 08:55 | 6 | had a stack from Cisco -- had a stack of patents, Cisco |
| 08:55 | 7 | patents. |
| 08:55 | 8 | A.    Yes. |
| 08:55 | 9 | Q.    And there was some reference about it, but we |
| 08:55 | 10 | didn't go in a lot of detail on it.  And obviously |
| 08:55 | 11 | you've had a chance to study Cisco patents and licenses |
| 08:55 | 12 | in this case. |
| 08:55 | 13 | How did that impact your analysis -- |
| 08:55 | 14 | MR. JONES:  Your Honor, may we approach |
| 08:55 | 15 | the bench? |
| 08:55 | 16 | THE COURT:  Sure. |
| 08:55 | 17 | (Bench conference.) |
| 08:56 | 18 | MR. JONES:  Your Honor, there's no place |
| 08:56 | 19 | in his reports where he discusses the Cisco patents. |
| 08:56 | 20 | MS. SRINIVASAN:  Well, it's a lead-up to |
| 08:56 | 21 | his talking about the license agreements.  They |
| 08:56 | 22 | selected -- |
| 08:56 | 23 | THE COURT:  So tell me what you -- what |
| 08:56 | 24 | foundation you're laying. |
| 08:56 | 25 | MS. SRINIVASAN:  Well, he's -- in his |

08:56    1    report, he specifically addresses that they only

08:56    2    provided a certain group of license agreements.  None

08:56    3    of them relate to outbound patents.

08:56    4              So they have shown a bunch of outbound

08:56    5    patents for which they provided no license agreements.

08:56    6    He did review every license agreement Cisco provided to

08:56    7    him.

08:56    8              MR. JONES:  She's getting into Cisco's

08:56    9    patents.  We produced license agreements.  He can

08:56   10    certainly talk about that.  If he wants to say we

08:56   11    didn't produce any license agreements about patents

08:56   12    that Cisco owned that were outbound, she can certainly

08:56   13    say that.  But to go into the Cisco patents that he

08:56   14    just said he analyzed the Cisco patents, he --

08:56   15              MS. SRINIVASAN:  Let me rephrase the

08:56   16    question, because I think the point is that they have

08:56   17    suggested to the jury that these patents are relevant.

08:57   18    There's no Cisco outbound patent license agreement that

08:57   19    they even provided, let alone are saying are relevant

08:57   20    to the case.

08:57   21              MR. JONES:  Dr. Willis certainly said

08:57   22    they're relevant and will.  But this witness never

08:57   23    analyzed them.  And I'm going to get him to say that,

08:57   24    but I don't want him going in now to say that he did

08:57   25    analyze it when he hadn't given us a report on it.

08:57    1                    THE COURT:  Well, he can't say that he

08:57    2    analyzed them if he didn't analyze them.  So I don't

08:57    3    think that's your question, is it?

08:57    4                    MS. SRINIVASAN:  No.  No.

08:57    5                    MR. JONES:  They're public.

08:57    6                    THE COURT:  No.  I've got it.  I'm saying

08:57    7    I don't think she's going to ask him if he analyzed

08:57    8    them because he didn't analyze them.  To your point.

08:57    9                    MR. JONES:  Right.

08:57   10                    THE COURT:  And your objection will be

08:57   11    overruled.

08:57   12                    MR. JONES:  Thank you.  I understand,

08:57   13    sir.

08:57   14                    THE COURT:  But obviously -- so it's an

08:57   15    interesting situation where you -- if you've raised

08:57   16    something during trial, does he get to respond to it?

08:57   17                    MR. JONES:  Certainly.

08:57   18                    THE COURT:  But if he didn't prepare

08:57   19    himself -- I think the objection is less -- it might

08:57   20    not be in his report.  Does he have a foundation to

08:58   21    give an opinion?  And I'll hear the questions that you

08:58   22    ask --

08:58   23                    MS. SRINIVASAN:  Yes.

08:58   24                    THE COURT:  -- the plaintiff asks to

08:58   25    figure out whether or not he's entitled to give --

```
08:58   1    whether or not he actually has an opinion is okay would
08:58   2    be responsive to what you, the defendant has presented
08:58   3    during trial.
08:58   4              MR. JONES:  Thank you, Your Honor.
08:58   5              MS. SRINIVASAN:  Thank you.
08:58   6              (Bench conference concludes.)
08:58   7    BY MS. SRINIVASAN:
08:58   8        Q.    Mr. Bratic, during opening, you saw a stack of
08:58   9    patents that Cisco displayed?
        10       A.    Yes.
08:58   11       Q.    Over the course of this case, Cisco provided
08:58   12   to you certain license agreements that related to
08:58   13   patents.
08:58   14       A.    Yes.
08:58   15       Q.    They were produced to us.  They were provided
08:58   16   to you to analyze?
08:58   17       A.    Yes.  They were.
08:58   18       Q.    Did those license agreements have to do with
08:58   19   Cisco's own patents?
08:58   20       A.    No.
08:58   21       Q.    In fact, did Cisco experts identify a single
08:58   22   Cisco patent license agreement that was comparable to
08:59   23   the teachings of the '858 patent?
08:59   24       A.    No.
08:59   25       Q.    Did Cisco produce -- in your estimation from
```

08:59  1    the license agreements Cisco produced in this case,
08:59  2    which are not about Cisco patents --
08:59  3        A.    Right.
08:59  4        Q.    -- are any of them relevant to the damages
08:59  5    analysis that you performed?
08:59  6        A.    No.  They're not.
08:59  7        Q.    And why not?
08:59  8        A.    Well, first of all, Dr. Schaefer looked at
08:59  9    them and determined they did not involve technically --
08:59  10   the technology comparable to the '858 patent.
08:59  11           And then from an economic standpoint, not just
08:59  12   from a technological standpoint, they had different
08:59  13   circumstances which were very different than the
08:59  14   hypothetical negotiation.  For example, a purchase
08:59  15   transaction, another one a license, another one called
08:59  16   a cross-license.  We don't have a cross-license here
08:59  17   because Cisco has not given any license of any patents
08:59  18   back to Paltalk.  So why would it license to the '858
09:00  19   from Paltalk to Cisco?
09:00  20       Q.    Now, Cisco's damages expert has identified one
09:00  21   license agreement that she contends is relevant to
09:00  22   considering damages.
09:00  23           Is that -- is that a license agreement for
09:00  24   Cisco's patents?
09:00  25       A.    No.  It has nothing to do with Cisco patents.

```
09:00   1    It's a license of patents from the third party that
09:00   2    Cisco obtained.
09:00   3        Q.    And so that license agreement didn't come from
09:00   4    that stack of patents we saw in opening.  It's not a
09:00   5    license to one of Cisco's patents?
09:00   6        A.    That's correct.
09:00   7        Q.    Okay.  Let's talk about that one license
09:00   8    agreement that Cisco's damages expert said is relevant
09:00   9    to this case.
09:00   10           Can you describe briefly your conclusions
09:00   11   about that license agreement?
09:00   12       A.    Well, yes.  So --
09:00   13       Q.    And by the way, let me back up, Mr. Bratic.  I
09:00   14   put -- there's -- before we get into that, there's a
09:00   15   title there.  It says Cisco Meetrix.
        16       A.    Yes.
        17       Q.    Can you explain what that means?
09:01   18       A.    So Meetrix is a company that gave Cisco a
09:01   19   license to certain patents that it owned.  And that's
09:01   20   why it's -- Meetrix appears up here in the title.
09:01   21       Q.    Okay.  And you determined that it was not
09:01   22   relevant for your damages analysis?
09:01   23       A.    That's correct.
09:01   24       Q.    Why not?
09:01   25       A.    Well, as I state, one important factor is
```

09:01  1    here, it's not technologically comparable, according to

09:01  2    Dr. Schaefer's analysis.

09:01  3           And then secondly, from an economic

09:01  4    standpoint, in the agreement itself under Section 9.1

09:01  5    of the Cisco and Meetrix license, it says:  Neither the

09:01  6    negotiation, execution, nor performance of this

09:01  7    agreement, nor anything contained herein constitutes an

09:01  8    admission by Cisco, its affiliates, or authorized third

09:01  9    parties of liability, infringement, or validity of the

09:01  10   licensed patents.

09:01  11          And that's the complete opposite of what's

09:02  12   supposed to happen in a hypothetical negotiation.

09:02  13          So here, Cisco refused to acknowledge that the

09:02  14   Meetrix patents were valid or that they infringe those

09:02  15   patents.  In the hypothetical negotiation, Cisco has to

09:02  16   accept the premise that the '858 patent is a valid

09:02  17   patent and it has infringed that patent.

09:02  18          So for that reason as well, this -- this is

09:02  19   not a comparable license.

09:02  20      Q.    All right.  Let's move on to this other bucket

09:02  21   in the Georgia-Pacific factors.

09:02  22          Can you talk about commercial success?

09:02  23      A.    Yes.  This is looking at some financial

09:02  24   metrics regarding the sales made of the accused

09:02  25   products, profitability and so forth.

370

09:02   1        Q.    And what did you consider in terms of the

09:02   2   sales made of the accused products for your analysis?

09:02   3        A.    Well, Cisco provided financial information

09:02   4   regarding the time in July 2022, revenues from the

09:03   5   accused products and specifically within the accused

09:03   6   products, the revenues that were attributed to the

09:03   7   Webex Audio functionality, which is the allegedly

09:03   8   infringing functionality within the list of all these

09:03   9   Webex products we saw listed of the accused products.

09:03   10       Q.    You said Cisco provided financial information?

09:03   11       A.    Yes.

09:03   12       Q.    That's not something you went out and found on

09:03   13  the Internet or --

09:03   14       A.    No.  No.  It was produced -- these are

09:03   15  spreadsheets.  These were financial records produced by

09:03   16  Cisco.

09:03   17       Q.    Can you tell us a little bit about what you

09:03   18  got from them?

09:03   19       A.    Well, we basically received computer

09:03   20  spreadsheets that listed the revenues for various

09:03   21  products like Go Webex Meetings, Webex Training and so

09:03   22  forth, these various accused products.  And within

09:03   23  that, they also broke down and provided another

09:03   24  spreadsheet that said in these group of accused

09:03   25  products, here are the revenues related to Webex Audio.

09:04  1        Q.    I put up the next slide here.

09:04  2              Can you explain how that relates to what you

09:04  3   just testified about in terms of the data that you

09:04  4   received?

09:04  5        A.    Right.

09:04  6        Q.    From Cisco?

09:04  7        A.    So Cisco provided, if you will, two sets of

09:04  8   data.  This one I just explained.  The $4.2 billion is

09:04  9   revenues for the accused products.  Again, we're only

09:04  10  dealing with the period from July 2015 to July 2022.

09:04  11  But Cisco also provided information and said, well,

09:04  12  within this 4.2 billion of accused product revenues,

09:04  13  there's 1.27 billion of Webex Audio revenues.  So they

09:04  14  broke it down.  There's accused products, and then

09:04  15  within the accused products, here's the audio portion

09:04  16  of the accused product revenues.

09:04  17       Q.    Did that give you one indicator of use --

09:04  18       A.    Yes.

09:04  19       Q.    -- of the -- of the patent-in-suit?

09:04  20       A.    Yes.  Absolutely.

09:05  21       Q.    Okay.  Could you tell us a little bit about

09:05  22  some of the other factors you considered in terms of

09:05  23  Cisco's use of the invention?

09:05  24       A.    Well, I considered the profitability of the

09:05  25  product, and so again, Cisco produced sales and cost

372

09:05  1    information and so forth.  So I took that into account.

09:05  2        Q.   You testified about the source of that

09:05  3    information, and the jury heard or saw the video of

09:05  4    Mr. Boyles, who's Cisco's corporate representative on

09:05  5    financials.

09:05  6             What did you rely on from his testimony about

09:05  7    the financials you received?

09:05  8        A.   Right.  So he was asked:  Do you know what is

09:05  9    meant by accused functionalities?

09:05  10            And he said:  Well, that pertains to the audio

09:05  11   portion of the sales.

09:05  12            And he's down here and he's saying:  Well,

09:05  13   when referring to Webex products, it's the audio

09:05  14   portion of the product functionality as opposed to the

09:05  15   meetings, polling or visual portions that's not related

09:06  16   to sound.

09:06  17            So when you look at what I just showed you,

09:06  18   the $4.2 billion is this, the Webex products, the

09:06  19   1.27 billion we saw on the slide is just an audio

09:06  20   portion of that 4.2 billion in sales.

09:06  21       Q.   Here's some additional testimony from

09:06  22   Mr. Boyles.

09:06  23            Did you rely on this as well in your analysis?

09:06  24       A.   Yes.

09:06  25       Q.   And what did you rely on about Mr. Boyles'

09:06    1    statement as a corporate representative of Cisco?

09:06    2        A.    Well, again, he's just explaining that they

09:06    3    are product families because they are products we

09:06    4    looked at in Webex revenues, and that there's an audio

09:06    5    portion within them that's broken out and separately

09:06    6    attributed to audio.  And so that's how they produced

09:06    7    the information.

09:06    8        Q.    And that's not a determination you made about

09:06    9    I'm going to figure out how to get to audio from the

09:07   10    total amount of Webex products?

09:07   11        A.    No.  Fortunately, Cisco did that work for me.

09:07   12        Q.    Okay.  You understand that Cisco's damages

09:07   13    expert in this case is trying to reduce that revenue

09:07   14    base further?

09:07   15        A.    Yes.

09:07   16        Q.    Do you think that's appropriate to do here?

09:07   17    That $1.27 billion?

09:07   18        A.    No.  It's not appropriate.

09:07   19        Q.    Why not?

09:07   20        A.    Well, again, there's more testimony from

09:07   21    Mr. Boyles, and he talked about Cisco tracking revenue.

09:07   22    And the issue was how granular level, how detail level

09:07   23    do you have this information both for Webex revenues

09:07   24    and the Webex Audio portion of Webex revenues.

09:07   25            And he said -- the information was Exhibit 16.

```
09:07   1   That's one of the spreadsheets -- is the most granular
09:07   2   level you could imagine reporting that information.
09:07   3   It's not only product by product, but it's elements of
09:07   4   a product, the elements being the audio portion of the
09:08   5   Webex revenues which included, of course, in addition
09:08   6   to the audio portion, non-sound aspects of that
09:08   7   revenue.
09:08   8       Q.   Now, aside from the financials that we looked
09:08   9   at -- I want to keep working with those -- did you
09:08  10   consider other materials that show how Cisco used and
09:08  11   valued the invention?
09:08  12       A.   I'm sorry.  Could you repeat that?
09:08  13       Q.   Did you consider other material that showed
09:08  14   how Cisco valued the invention?
09:08  15       A.   Yes.
09:08  16       Q.   Can you describe that for the jury?
09:08  17       A.   Well, so this is information, a summary of
09:08  18   some of the benefits of the '858 patent.  You can see
09:08  19   based on the -- right here you see Dr. Schaefer, and he
09:08  20   testified to these yesterday.
09:08  21            Talking about a computer and his phone users,
09:08  22   and those phone users can be either picking up a good
09:08  23   old landline that they have to pick up and dial, or
09:08  24   using a cell phone to dial into a conference call as I
09:08  25   had to do many times because I wasn't seeing any desk
```

09:08    1    direct computer.

09:08    2         And then, you know, he pointed out that hybrid

09:09    3    systems for phones and PC-based clients talked about

09:09    4    the computational efficiency, practicing the

09:09    5    '858 patent, the improvement in sound quality and

09:09    6    finally a less bandwidth usage, meaning you chew up

09:09    7    less computers and resources and makes it efficient.

09:09    8    Q.    I'd like to look a little bit about

09:09    9    Cisco's --

09:09    10         MR. JONES:  Your Honor, at this time I

09:09    11   think we need to go on the confidential record.

09:09    12         MS. SRINIVASAN:  Oh, sure.

09:09    13         MR. JONES:  Thank you.

09:09    14         THE COURT:  If you're not under the

09:09    15   protective order or from Cisco, please exit the

09:09    16   courtroom.

09:09    17         (Sealed proceedings.)

09:09    18   

09:09    19   

09:09    20   

09:10    21   

09:10    22   

09:10    23   

09:10    24   

09:10    25



    Q.    And I put up here a slide that has another

Cisco Webex document that came from their files.

          Can you describe this document?

    A.    Yes.  This is where Cisco's talking about some

of the benefits of the Webex product.  They talk about

being able to -- it's already highlighted in

red -- accommodate every type of business,

collaboration use case, communication mode and work

style.  And Dr. Schaefer indicated that these are the

types of benefits you get from practicing the

'858 patent.

377



378

09:13   1   

09:13   2

09:13   3

09:13   4

09:13   5

09:13   6

09:13   7

09:13   8

09:13   9

09:13   10

09:13   11

09:13   12

09:13   13

09:42   14              (Sealed proceedings end.)

09:13   15   BY MS. SRINIVASAN:

09:13   16       Q.    Where we started with that $4.2 billion

09:13   17   revenue number, we looked at the audio portion of that,

09:13   18   and then this shows now what you've done with figuring

09:13   19   out the gross profits.

09:13   20              Is that what we see here?

09:13   21       A.    Yes.  So you see we shrank the $1.2 billion of

09:14   22   Webex Audio revenues down to profits of Webex Audio to

09:14   23   875 million.

09:14   24       Q.    All right.  And coming back to our royalty

09:14   25   formula, we now have the base that you were working

379

09:14  1    from, that 875 million.  There's another component to

09:14  2    that that you utilized to get to your damages.  What's

09:14  3    that?

09:14  4        A.    Well, the other point is now I can't stop at

09:14  5    the $875 million because that's the profits associated

09:14  6    with Webex Audio.  I then have to figure out, well,

09:14  7    what is the portion of those profits that are

09:14  8    attributed solely to the '858 patent?  And that's where

09:14  9    Dr. Schaefer's analysis came in to help me with

09:14 10    technical apportionment.

09:14 11        Q.    Obviously the jury heard at some length

09:14 12    yesterday about that technical apportionment.  How did

09:14 13    you utilize that in your damages calculation?

09:14 14        A.    So Dr. Schaefer determined that the

09:14 15    contribution of the '858 patent to these accused

09:14 16    functionalities in Webex Audio was 33.75 percent.  So I

09:15 17    plugged that into my formula.

09:15 18        Q.    Now, before I move on, just a preview,

09:15 19    something that may be coming down the line, and we

09:15 20    heard Dr. Schaefer be asked about it yesterday.  Cisco

09:15 21    produced some usage data in this case.

09:15 22              Are you familiar with that?

09:15 23        A.    Well, they produced under a limited use what

09:15 24    are called meeting minutes data.

09:15 25        Q.    And for what time period did they produce this

380

09:15   1    data?

09:15   2         A.    Well, there's one period from August 2001 to

09:15   3    August 2022 which, of course, is one day after the

09:15   4    damages stop and the patent expired.

09:15   5         Q.    And you looked at that data in the course of

09:15   6    preparing your opinions?

09:15   7         A.    Yes.  I looked at that data and discussed it

09:15   8    with Dr. Schaefer.

09:15   9         Q.    The usage data that was produced by Cisco, is

09:15   10   that accounted for already, Dr. Schaefer's

09:16   11   analysis -- or let me rephrase that.

09:16   12         The use made of the accused functionalities,

09:16   13   is that already accounted for in what Dr. Schaefer did

09:16   14   in his analysis?

09:16   15        A.    Yes.  It is because he identified the

09:16   16   hybrid audio teaching.  So he recognized that the

09:16   17   PTSN (sic) plus VoIP phone combination of callers, he

09:16   18   recognized that, identified that, and he included that

09:16   19   in his analysis.  So it's already accounted for.

09:16   20        Q.    In your view, would looking at the usage data

09:16   21   and applying another apportionment be appropriate?

09:16   22        A.    No.  Because it's already been taken into

09:16   23   account once, so you'd be double-counting and making

09:16   24   two adjustments when only one's necessary.

09:16   25        Q.    All right.  So let's look at what was done

09:16    1    with Dr. Schaefer's apportionment in your analysis.

09:16    2    Actually, can you describe how -- this slide that you

09:16    3    prepared about Dr. Schaefer's apportionment?

09:16    4         A.    Sure.  So here's Dr. Schaefer's apportionment,

09:16    5    33.75 percent relating to the benefits of the

09:17    6    '858 patent.  This 66.25 percent, two-thirds is all

09:17    7    attributed to Cisco and all the contributions Cisco has

09:17    8    made to the Webex Audio functionality.  So they get the

09:17    9    lion's share of the benefits that they contributed.

09:17    10    Dr. Schaefer carved out about one-third of the total

09:17    11    benefits attributed only to the '858 patent.

09:17    12         Q.    And that's just from the audio portion of the

09:17    13    functionality?

09:17    14         A.    Yes.  And just for the audio portion.

09:17    15         Q.    All right.  And, Mr. Bratic, what did you do

09:17    16    then with this technical apportionment that

09:17    17    Dr. Schaefer arrived at?

09:17    18         A.    Well, so I took the 33.75 percent.  When I

09:17    19    multiply that by the 875 million in profits, that gave

09:17    20    me the contribution related to the '858 patent of

09:17    21    approximately 295, $296 million.

09:17    22         Q.    And can you explain what's shown here as we

09:18    23    work our way down this funnel?

09:18    24         A.    Yes.  Well, you can see as we come down the

09:18    25    funnel here, I'm now taking the 875 million in profits,

09:18  1    and I've shrunk it and reduced it to $296 million,

09:18  2    which is just the benefits of the '858 patent based on

09:18  3    Dr. Schaefer's apportionment.

09:18  4         Q.   Okay.  Let's come back to the Georgia-Pacific

09:18  5    factors, one we haven't talked about yet, which is the

09:18  6    market competitive position.

09:18  7              Can you explain what that is?

09:18  8         A.   Yeah.  So you look at Georgia-Pacific Factors

09:18  9    No. 4 and 5, and GP Factor No. 4 deals with whether or

09:18  10   not Paltalk would agree to be a licensor.  And in a

09:18  11   hypothetical negotiation, they would be a licensor

09:18  12   because they recognize that by granting a license to

09:18  13   Cisco, they'd be obtaining royalty payments from Cisco.

09:18  14              Georgia-Pacific Factor No. 5 looks at the

09:18  15   issue of, well, what's the relationship in the

09:19  16   marketplace between Paltalk and Cisco?  Are they direct

09:19  17   competitors?  Or are they more akin to what's called in

09:19  18   Georgia-Pacific Factor No. 5 inventor and promoter?

09:19  19   The concept of inventor, of course, is that Paltalk is

09:19  20   the inventor here.  They're providing the technology to

09:19  21   Cisco.  So they'd be the inventor under Georgia-Pacific

09:19  22   No. 5.

09:19  23              They recognize that Paltalk is the promoter.

09:19  24   Paltalk's going to take the technology in the

09:19  25   '858 patent in this hypothetical negotiation, plug it

383

09:19  1   into its products.  And Cisco has to send money to get

09:19  2   those products and support those products in the

09:19  3   marketplace.

09:19  4              MR. JONES:  Excuse me again.  I think we

09:19  5   need to go on the confidential record.  It'll be very

09:19  6   brief, Your Honor, I believe, unless counsel tells me

09:19  7   different.

09:19  8              MS. SRINIVASAN:  It should be.

       9              THE COURT:  If you're not under the

      10   protective order, please exit the courtroom for a brief

      11   period of time.

      12              (Sealed proceedings.)

      13   BY MS. SRINIVASAN:

09:20 14      Q.   Mr. Bratic, you talked about this concept of

09:20 15   an inventor and a promoter and --

09:20 16      A.   Yes.

09:20 17      Q.   -- some of the work that Cisco would have to

09:20 18   do to bring this invention to market?

09:20 19      A.   Yes.

09:20 20      Q.   How did you account for that quantitatively

09:20 21   when you were doing your analysis?

09:20 22      A.   Well, this all has to do with how they would

09:20 23   share the benefit of the patented technology.  And so

09:20 24   the parties would recognize that Cisco spends money as

09:20 25   a company, and so they would look to how Cisco

384

09:20  1   internally spends money to either acquire or develop

09:20  2   technology.  That's their R&D spending research and

09:20  3   development spending, and then they would look to all

09:20  4   of their operating expenses, including R&D, these total

09:20  5   operating expenses.  And so that's an analogy to the

09:20  6   inventor-promoter relationship in Georgia-Pacific

09:20  7   Factor No. 5 because the parties are now looking, well,

09:21  8   how does Cisco spend money on technology, and then how

09:21  9   does it spend money to get that technology in the

09:21  10  marketplace?

09:21  11       So they would look at the ratio of R&D

09:21  12  spending and operating expenses as analogous to the

09:21  13  inventor-promoter relationship in Georgia-Pacific

09:21  14  No. 5.

09:21  15       And you can see down here, I got these

09:21  16  percentages by year taken from Cisco's annual reports

09:21  17  to give me what the ratio was of R&D spending each year

09:21  18  to total operating expenses, which include, you know,

09:21  19  sales and marketing, general administrative, even

09:21  20  included, again, out of the structuring charges, which

09:21  21  are -- really don't have anything to do with operating

09:21  22  the company.  They're just having to clean up their

09:21  23  balance sheet and income statement.

09:21  24       Q.   And by the way, where did you get this data on

09:21  25  research and development, costs, and the operating

385

09:21    1    expenses that you have here in this slide?

09:21    2        A.    Well, all this information came from their

09:22    3    annual reports in their Securities and Exchange

09:22    4    Commission filing.

09:22    5            So an SEC filing is a filing -- public

09:22    6    companies make a 10-K report every year on the

09:22    7    company's activities, including its financial

09:22    8    activities, its balance sheets, its revenues, its costs

09:22    9    and products.

09:22    10       Q.    Mr. Bratic, did you use the R&D spending just

09:22    11   for Webex radio?

09:22    12       A.    No.

09:22    13       Q.    Why not?

09:22    14       A.    Well, so two reasons.  One is although Cisco

09:22    15   did produce some information on R&D for Webex Audio,

09:22    16   that wasn't -- it was allocated to Webex Audio.  In

09:22    17   other words, it wasn't specific to Webex Audio.  It was

09:22    18   an accounting allocation.  So I didn't use that.

09:22    19       Q.    And I put up here a slide again, Mr. Boyles'

09:22    20   testimony.

09:22    21            MR. JONES:  Again, I apologize,

09:23    22   Counselor.  I think we're back off.

09:23    23            MS. SRINIVASAN:  We're ready to be off.

09:23    24            MR. JONES:  I apologize, Your Honor.

          25            THE COURT:  We'll go off the private

09:42  1    record.

09:42  2                    (Sealed proceedings end.)

09:23  3    BY MS. SRINIVASAN:

09:23  4        Q.    And can you describe, Mr. Bratic, what

09:23  5    Mr. Boyles has told us in his testimony about how Cisco

09:23  6    tracks R&D expenses at a product level?

09:23  7        A.    Well, he was asked if Cisco tracks, for

09:23  8    example, R&D expenses by product.  And he said that

09:23  9    Cisco was -- the question was:  Do you -- it is true

09:23  10   that Cisco does not track its R&D expenses by product?

09:23  11               And he said:  Correct.

09:23  12               So Cisco doesn't track R&D spending for Webex

09:23  13   Audio.  And although they gave some information about

09:23  14   it, it was allocated.  It wasn't specifically incurred

09:23  15   for that product.  And that's why I didn't consider it.

09:23  16               And the other point to point out is Cisco

09:23  17   never did provide any operating expenses for Webex

09:24  18   Audio.

09:24  19       Q.    Okay.  And can you explain to the jury how you

09:24  20   used this economic benefit, how you split that and then

09:24  21   used that in your formula?

09:24  22       A.    Yes.  So when you multiply, I took that

09:24  23   34.7 percent and I put it in the third box of the

09:24  24   formula because that deals with how you split the

09:24  25   economic benefit of the patent.

387

09:24  1        Q.    And what did that yield doing that?

09:24  2        A.    Oh, that gave me the amount of royalties.  You

09:24  3   see here, 102.5 -- 102.5, $102.6 million rounded.

09:24  4             So once you take all three boxes of the

09:24  5   formula and multiply them out, you'll get the royalties

09:24  6   that I talked about at the beginning of my testimony

09:24  7   this morning.

09:24  8        Q.    And I know we talked about this at the start

09:24  9   of the testimony --

09:24  10            MR. JONES:  Again, Your Honor, I think

09:24  11  we'll have to go on the confidential record again.

09:25  12            MS. SRINIVASAN:  Okay.

09:25  13            (Sealed proceedings.)

09:25  14

09:25  15

09:25  16

09:25  17

09:25  18

09:25  19

09:25  20

09:25  21

09:25  22

09:25  23

09:25  24

09:25  25

388

09:25  1  ▮ ▮ ▮▮▮▮▮▮▮▮▮▮

09:25  2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

09:25  3  ▮▮▮▮▮▮▮▮▮▮▮▮

09:26  4  ▮▮▮▮▮ ▮▮ ▮▮▮▮

09:26  5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

09:26  6  ▮▮▮▮▮ ▮▮▮▮▮▮

09:26  7  ▮▮▮▮▮

09:26  8  ▮▮▮ ▮▮▮▮▮▮

09:26  9  ▮▮

09:42  10          (Sealed proceedings end.)

09:26  11  BY MS. SRINIVASAN:

09:26  12      Q.    Mr. Bratic, I just want to come back to where

09:26  13  we started with the statute, and again, why that was

09:26  14  important for the ultimate conclusion you reached in

09:26  15  this case about damages.

09:26  16      A.    Sure.  Well, the patent statute talks about in

09:26  17  no event less than a reasonable royalty for use made of

09:26  18  the invention by the infringer.  So I looked at the use

09:26  19  made of the invention from July 2015 to July 2022.  And

09:26  20  that was the use made of the invention.

09:26  21          I looked at the revenues and costs and then

09:26  22  the split of the benefit associated to the patent, and

09:26  23  that's how I got to $102.5 million as the amount of

09:26  24  royalties.

09:26  25      Q.    And we used this demonstrative throughout your

| | | |
|---|---|---|
| 09:27 | 1 | examination to show how you arrived at the final |
| 09:27 | 2 | royalty number in this case. |
| 09:27 | 3 | If you could just walk us through it in |
| 09:27 | 4 | conclusion. |
| 09:27 | 5 | A.   Yes.   So we started with the -- just a recap, |
| 09:27 | 6 | we started with the product revenues way up here at |
| 09:27 | 7 | 4.2 billion.   We reduced it down to Webex Audio |
| 09:27 | 8 | revenues only, the accused functionality within the |
| 09:27 | 9 | accused products.   Then we determined what the profits |
| 09:27 | 10 | were of $875 million. |
| 09:27 | 11 | Then we split those profits to get to the |
| 09:27 | 12 | benefit associated only with the patented technology of |
| 09:27 | 13 | $296 million. |
| 09:27 | 14 | And then the last thing to do was, well, how |
| 09:27 | 15 | do the parties share in that benefit?   And Dr. -- well, |
| 09:27 | 16 | that was based on the R&D and operating expense |
| 09:27 | 17 | analysis, the inventor/promoter analysis I described. |
| 09:27 | 18 | And that ends up reducing or shrinking from the |
| 09:27 | 19 | 4.2 billion in revenues all the way down to a royalties |
| 09:28 | 20 | owed of $102.6 million. |
| 09:28 | 21 | Q.   Mr. Bratic, did you do anything in addition to |
| 09:28 | 22 | this analysis just as a cross-check of your |
| 09:28 | 23 | methodology? |
| 09:28 | 24 | A.   Yes. |
| 09:28 | 25 | Q.   And can you explain to the jury what you did? |

09:28    1        A.    Well, yes.  So Dr. Schaefer did an alternative

09:28    2    analysis that he explained yesterday, which is he

09:28    3    looked at it as opposed to just zeroing in on the

09:28    4    accused or on the Webex Audio functionality.

09:28    5            He did another scenario where he looked at the

09:28    6    Webex revenues of -- for the accused products at a

09:28    7    higher level and then looked at, well, what's the

09:28    8    contribution of the '858 patent based on that total

09:28    9    product grouping?

09:28   10            And this was the analysis he testified to

09:28   11    yesterday, that that was 15.18 percent using that

09:28   12    alternative analysis.  So I used that as a reasonable

09:28   13    check and applied it to the revenues and profits over

09:29   14    the entire -- for the higher-level products as opposed

09:29   15    to just Webex Audio.

09:29   16        Q.    Just to be clear, when you performed that

09:29   17    reasonableness check and you're looking at this

09:29   18    15.18 percent contribution, you're applying that

09:29   19    against the top number we saw, the 4.2 billion?

09:29   20        A.    Yes.

09:29   21        Q.    And what did that tell you up here, that 4.2?

09:29   22        A.    Well, that resulted in a -- what would have

09:29   23    been a royalties using that alternative, reasonableness

09:29   24    check for about $153 million.  So it was about

09:29   25    $15 million higher than the $102 million here.

391

09:29   1        Q.    And what did that tell you about your damages

09:29   2    in this case?

09:29   3        A.    Well, I believe they're very reasonable and

09:29   4    appropriate.

09:29   5        Q.    Mr. Bratic, just to conclude, based on

09:29   6    everything that you have studied in this case, your

09:29   7    analysis that you performed that we walked through

09:29   8    today, what is your determination of what Paltalk is

09:29   9    owed by Cisco for infringement of the '858 patent over

09:30   10   the damages period?

09:30   11       A.    It's the number shown on the screen,

09:30   12   $102,581,465.

09:30   13              MS. SRINIVASAN:   Thank you.  I'll pass

09:30   14   the witness.

09:30   15                     CROSS-EXAMINATION

09:30   16   BY MR. JONES:

09:30   17       Q.    For the record, my name is Mike Jones.  Good

09:30   18   morning again, Mr. Bratic.  It's good to see you again.

09:30   19   Welcome here from Houston.

09:30   20       A.    Good morning.

09:30   21       Q.    The first thing I would like to do is a bit of

09:30   22   a housekeeping matter.

09:30   23              You just got through talking about and

09:30   24   discussing and reading from DX-308, right, sir, the

09:31   25   Meetrix agreement?

09:31    1        A.    Yeah.  I don't know the exhibit number, but I

09:31    2    did talk about the Meetrix.

09:31    3                MR. JONES:  For purposes of the record, I

09:31    4    would like to move for the introduction of DX-308.

09:31    5                MS. SRINIVASAN:  No objection.

09:31    6                THE COURT:  Admitted.

09:31    7                MR. JONES:  Thank you.

09:31    8    BY MR. JONES:

09:31    9        Q.    Now, at the very beginning of your testimony,

09:31    10    you stated that you assumed the '858 patent was valid

09:31    11    and enforceable, right, sir?

09:31    12        A.    Valid and infringed.

09:31    13        Q.    Okay.  But you also said it's valid and

09:31    14    enforceable, correct?

09:31    15        A.    Yes.  Of course.

09:31    16        Q.    Certainly.  Certainly.

09:31    17                And again, you have no opinion on that

09:31    18    whatsoever?

09:31    19        A.    That's correct.

09:31    20        Q.    You can't help the jury on that subject,

09:31    21    right?

09:31    22        A.    That's correct.

09:31    23        Q.    And if in fact the patent is not valid and is

09:31    24    not enforceable, then of course damages are zero,

09:31    25    right, sir?

393

09:31  1       A.    There are no damages.

09:31  2       Q.    Right.  Right.

09:31  3             Now, as you just told me, you're assuming that

09:31  4       the patent is infringed, right, sir?

       5       A.    Yes.

09:31  6       Q.    And again, we have no opinion whatsoever on

09:31  7       that, right, sir?

09:31  8       A.    That's correct.

09:31  9       Q.    And you can't help the jury on that subject,

09:32  10      right?

09:32  11      A.    That's right.

09:32  12      Q.    And again, if the patent is not infringed,

09:32  13      then there are in fact no damages, in your own words,

09:32  14      right, sir?

09:32  15      A.    That's correct.

09:32  16      Q.    Thank you, sir.

09:32  17            Now, next, I'd like to ask you if you'd agree

09:32  18      with this statement.  Do you agree with the statement

09:32  19      that Paltalk has the burden to establish the amount of

09:32  20      damages by a preponderance of the evidence in this

09:32  21      case?

09:32  22      A.    I'm not a lawyer, but that's my understanding.

09:32  23      Q.    Great.

09:32  24            And do you agree that the jury can look at the

09:32  25      actual evidence submitted in this case and use that

394

```
09:32    1    evidence in order to make that determination?
09:32    2        A.   I assume so.
09:32    3        Q.   Thank you.
09:32    4             And in this case, the jury -- jurors are not
09:32    5    bound to accept any opinion of any expert really on
09:32    6    anything, particularly since you're talking about
09:32    7    damages on damages, right, sir?
09:32    8        A.   That would be my understanding.
09:33    9        Q.   And it's equally true, to be fair, about
09:33   10    Ms. Kindler.  They're not bound to take Ms. Kindler's
09:33   11    number.  They're not bound to take your number.
09:33   12             They're allowed to look at the evidence and
09:33   13    make their own determination; is that correct, sir?
09:33   14        A.   Yes.  That's my understanding.
09:33   15        Q.   Thank you, sir.
09:33   16             Now, in this particular case, with regard to
09:33   17    damages, the witnesses that will talk about damages on
09:33   18    behalf of Paltalk are yourself, Dr. Schaefer, and
09:33   19    Dr. Madisetti, correct, sir?
09:33   20        A.   Yes.
09:33   21        Q.   And all those are retained experts, right,
09:33   22    sir?
09:33   23        A.   Yes.  They are.
09:33   24        Q.   And you heard in this very courtroom
09:33   25    Mr. Katz' -- Mr. Katz' -- my mouth's not working today.
```

09:33  1    I apologize.  I don't mean to say anything not right.

09:33  2         Mr. Katz' testimony that he had no -- he did

09:33  3    not know what a reasonable royalty would be in this

09:34  4    case, right, sir?

09:34  5    A.   Yes.  I heard him say that.

09:34  6    Q.   Thank you.

09:34  7         Now, I'd like to turn your attention to the

09:34  8    hypothetical negotiation you discussed.

09:34  9         Now, as you described, this hypothetical

09:34  10   negotiation is a legal construct or a pretend

09:34  11   negotiation, right, sir?

09:34  12   A.   Yes.

09:34  13   Q.   And it assumes that Cisco went to Paltalk on

09:34  14   the day of the first infringement, immediately prior

09:34  15   thereto, and said, we are willing to take a license to

09:34  16   the '858 patent, right, sir?

09:34  17   A.   I'm not sure I understand, Cisco willing --

09:34  18   going to Paltalk.  The hypothetical negotiation doesn't

09:34  19   say who's going to go talk to who.  They're just going

09:34  20   to say, you're going to both sit down.

09:34  21   Q.   Fair enough.

09:34  22        It's going to assume that a willing Cisco sat

09:34  23   down with a willing Paltalk and they talked about what

09:34  24   would be the appropriate rate for a license to the

09:35  25   '858 patent, correct, sir?

396

09:35  1        A.    In part.

09:35  2        Q.    Okay.  Now, we know that didn't happen, right,

09:35  3    sir?

09:35  4        A.    Yes.

09:35  5        Q.    So we're going to pretend it happened, right,

09:35  6    sir?

09:35  7        A.    We're going to pretend it was a hypothetical

09:35  8    negotiation.

09:35  9        Q.    Right.

09:35  10             And we also know that in this particular case

09:35  11   with regard to the '858 patent, that there's no

09:35  12   evidence that that has ever happened between Paltalk

09:35  13   and another company or entity about -- specifically

09:35  14   about the '858 patent, right, sir?

09:35  15       A.    I'm not sure how to answer that question.

09:35  16       Q.    Okay.  Well, outside of litigation, I'm

09:35  17   talking about willing times.  Has there ever been a

09:35  18   time outside of litigation willingly where any party

09:35  19   has sat down with Paltalk to negotiate a license to the

09:36  20   '858 patent?

09:36  21       A.    Yeah.  Outside of litigation, I'm not aware of

09:36  22   any.

09:36  23       Q.    Thank you.

09:36  24             Now, what we are doing here when we look at

09:36  25   this with regard to the '858 patent --

09:36  1      A.    Yes.

09:36  2      Q.    -- we can't go back, and you don't cite us to

09:36  3  any evidence where it's happened before where there

09:36  4  have been willing negotiations outside of litigation

09:36  5  over the '858 patent, right, sir?

09:36  6      A.    I thought I just answered that question.

09:36  7      Q.    Okay.  I apologize.

09:36  8      A.    I'm sorry.  I must have misunderstood your

09:36  9  previous question.

09:36  10     Q.    Okay.  Well, I apologize that --

09:36  11     A.    No, no.  I just want to make sure I understand

09:36  12  what you're asking.

09:36  13     Q.    We're on the same page, right, sir?

09:36  14     A.    I think so.

09:36  15     Q.    Now, in this particular case, you testified

09:36  16  that the date of first infringement that you have used

09:36  17  is 2010, right, sir?

09:36  18     A.    Well, in my -- in my supplemental report, yes.

09:36  19  I used the date of 2010.

09:36  20     Q.    I appreciate the clarification.  In your

09:37  21  original report, you used 2015.

09:37  22     A.    Yes.

09:37  23     Q.    And in your second report, you used 2010,

09:37  24  right, sir?

09:37  25     A.    That's correct.

398

09:37  1       Q.    Okay.  And you get that information from
09:37  2    Dr. Schaefer, right, sir?
09:37  3       A.    I did.
09:37  4       Q.    Now, you talked about the fact that there was
09:37  5    a company called Webex that was acquired by Cisco in
09:37  6    2007, right?
09:37  7       A.    Yes.
09:37  8       Q.    And that company prior to its acquisition had
09:37  9    conferencing products on the marketplace in the years
09:37  10   prior to 2007, right, sir?
09:37  11      A.    They did.
09:37  12      Q.    And it is your understanding that Paltalk
09:37  13   alleges that only Cisco products infringe and that
09:37  14   there are no allegations whatsoever that Webex products
09:37  15   infringes, correct, sir?
09:37  16      A.    That's my understanding.
09:37  17      Q.    Now, you believe that Cisco's evidence does
09:37  18   not establish that Webex allowed PSTN and VoIP users to
09:37  19   use their products that were in place prior to the
09:38  20   '858 patent, right, sir?
09:38  21      A.    That's my understanding.
09:38  22      Q.    So your understanding is there were no Webex
09:38  23   products out there prior to 2007 that allowed for the
09:38  24   use of both telephone and computers on the same audio
09:38  25   phone, right?

399

| | | |
|---|---|---|
| 09:38 | 1 | A.    That's my understanding. |
| 09:38 | 2 | Q.    Thank you. |
| 09:38 | 3 | Now, if we could, let's go to Slide 30. |
| 09:38 | 4 | Now, Slide 30 is DX-068, and I think I have it |
| 09:38 | 5 | in your binder there, right, sir? |
| 09:38 | 6 | A.    You do have a copy in the binder. |
| 09:38 | 7 | Q.    Great.  And DX-068 is a document, a Webex |
| 09:38 | 8 | document about a product they had called MediaTone. |
| 09:39 | 9 | And you know about this document, right, sir? |
| 09:39 | 10 | A.    I've seen it before. |
| 09:39 | 11 | Q.    Thank you, sir. |
| 09:39 | 12 | And if we could, it's talking about a product |
| 09:39 | 13 | that was out in 2003.  And let's go to the next slide. |
| 09:39 | 14 | And you see here that it's dated 2003 when |
| 09:39 | 15 | it's talking about this MediaTone product? |
| 09:39 | 16 | A.    I see that. |
| 09:39 | 17 | Q.    And that would be one year before the |
| 09:39 | 18 | '858 patent came out and ten years before -- seven |
| 09:39 | 19 | years before the 2010 date of the hypothetical |
| 09:39 | 20 | negotiation, right, sir? |
| 09:39 | 21 | A.    I agree with the time periods. |
| 09:39 | 22 | Q.    Thank you. |
| 09:39 | 23 | And then if we could go to the next page which |
| 09:39 | 24 | would be our next slide which would be Slide 32, we see |
| 09:39 | 25 | that it talks about this particular product again in |

—400—

09:39  1    2003 for the '858 patent, comes out and it says:  The

09:40  2    Webex MediaTone platform positions Webex as the

09:40  3    technological leader in web communications services,

09:40  4    providing OEM -- and that would be original equipment

09:40  5    manufacturer services, right, sir?

09:40  6        A.    Yes.

09:40  7        Q.    -- to Webex partners and industry leading

09:40  8    meeting services to nearly 7,000 corporations.  Right,

09:40  9    sir?

09:40  10       A.    Yes.

09:40  11       Q.    And it says here:  The MediaTone architecture

09:40  12   provides ubiquitous access.

09:40  13           And ubiquitous would just mean access being

09:40  14   everywhere and being -- you know, access being

09:40  15   everywhere and being everything, right, sir?

09:40  16       A.    Well, I don't know about the everything, but

09:40  17   ubiquitous means widely used generally.

09:40  18       Q.    Thank you.

09:40  19           And then it says:  Regardless of the location,

09:40  20   hardware platform, operating system, browser and wired

09:40  21   or wired status enabling everyone to reap the benefits

09:41  22   of online meetings.

09:41  23           Now, this clearly is stating that this Webex

09:41  24   product, MediaTone, can use both telephone and

09:41  25   computers, doesn't it, sir?

401

09:41    1    A.    No.  I disagree.

09:41    2    Q.    Okay.  Well, then let's go to Slide 33, if we

09:41    3    could.

09:41    4          And here when it talks about access to

09:41    5    MediaTone, it says that you can gather access from, and

09:41    6    they've got pictures here, a computer, a PC tablet, a

09:41    7    palm pocket, a cell telephone, and I think that's meant

09:41    8    to be an old-fashioned telephone.  I'm old enough, I

09:41    9    remember those things.  I bet you do too?

09:41    10   A.    I do.

09:41    11   Q.    Yes, sir.  So that's what it says, so that's

09:41    12   the way you access it.

09:41    13         That's what it says here, doesn't it?

09:41    14   A.    That's what it says there.  Yes.

09:41    15   Q.    Okay.  And then if we go to Slide 34, it sits

09:41    16   here and it talks about the protocol supports.  And the

09:42    17   first protocol support it mentions -- and protocols are

09:42    18   just the way access is gained, the technique that is

09:42    19   used for various devices to gain access to a particular

09:42    20   audio product, right?

09:42    21   A.    Could you repeat that?

09:42    22   Q.    Yeah.  It's just the way, it's just the

09:42    23   standardization process that is used by people in order

09:42    24   to access the audioconference.  And there are certain

09:42    25   protocols that have been established by industry groups

-402-

09:42    1    so that's consistent or uniform, correct?

09:42    2        A.    I agree.

09:42    3        Q.    Thank you.

09:42    4              And here, it says that they used -- their

09:42    5    protocol support is H.323, which is the leading

09:42    6    protocol for VoIP.  So that would be for Voice over IP

09:42    7    or computers, they're able to use that protocol, right,

09:42    8    sir?

09:42    9        A.    That would be my understanding.

09:42   10        Q.    And then it also says that it's available

09:42   11    for -- and if you go to the top of the page there,

09:43   12    session in initiation protocol, SIP, which is the

09:43   13    protocol that's used for telephones, right, sir?

09:43   14        A.    Well, are you talking about session IP?

09:43   15        Q.    Yes.

09:43   16        A.    I'm sorry.  Are you asking me specifically?

09:43   17        Q.    Yeah.  That's the protocol that allows access

09:43   18    by telephones, right, sir?

09:43   19        A.    Well, by IP phone.

09:43   20        Q.    But also by other phones, correct, sir?

09:43   21        A.    It doesn't say that here.

09:43   22        Q.    Do you know one way or the other?

09:43   23        A.    No.  I'm not a technical expert.  So I

09:43   24    wouldn't know.

09:43   25        Q.    Thank you, sir.

—403—

| 09:43 | 1 | Now, what we see here when we look at this |
| 09:43 | 2 | document is that it describes access by both telephones |
| 09:43 | 3 | and by computers, right, sir? |
| 09:43 | 4 | A.   Well, I've seen that document, but my |
| 09:43 | 5 | understanding is that this does not relate to VoIP and |
| 09:44 | 6 | PSTN calling, according to Dr. Schaefer. |
| 09:44 | 7 | Q.   Okay.  Did Dr. Schaefer testify about this |
| 09:44 | 8 | document at all in his testimony? |
| 09:44 | 9 | A.   No.  I don't believe so. |
| 09:44 | 10 | Q.   Thank you, sir. |
| 09:44 | 11 | Now, on the opening, Paltalk showed us this |
| 09:44 | 12 | slide about the benefits of the '858 patent, right, |
| 09:44 | 13 | sir?  And go to Slide 53. |
| 09:44 | 14 | Do you recall this? |
| 09:44 | 15 | A.   I do -- well, generally, yes. |
| 09:44 | 16 | Q.   And it tells us that the three major benefits, |
| 09:44 | 17 | according to Paltalk in the opening, were computer and |
| 09:44 | 18 | phone users can participate in the same conference, |
| 09:44 | 19 | right, sir? |
| 09:44 | 20 | A.   That's -- yes.  That's what I understand. |
| 09:44 | 21 | Q.   Okay.  And you're saying despite what all the |
| 09:44 | 22 | evidence shows us, when we look at Defendant's |
| 09:45 | 23 | Exhibit 68, you still don't believe that MediaTone can |
| 09:45 | 24 | do that, right, sir? |
| 09:45 | 25 | A.   It's not that I believe or don't believe; it's |

09:45  1    my understanding it doesn't.

09:45  2        Q.    Sure.  And that's based upon what Dr. Schaefer

09:45  3    told you outside the courtroom because he certainly

09:45  4    didn't say that inside the courtroom, right, sir?

09:45  5        A.    It's based on my discussions with

09:45  6    Dr. Schaefer.

09:45  7        Q.    Right.  And you would agree with me he totally

09:45  8    ignored this document.  He didn't talk about it in his

09:45  9    testimony?

09:45  10        A.    Well, he didn't talk about it.  I don't know

09:45  11    that he ignored it.  I talked to him about it.

09:45  12        Q.    Okay.  But he didn't talk about it in his

09:45  13    testimony, right, sir?

09:45  14        A.    That's my understanding.

09:45  15        Q.    So you're saying disregard the evidence.

09:45  16    Disregard -- let's put it this way.  Let me be fair.

09:45  17    You're saying disregard Defendant's Exhibit 68.  It

09:45  18    doesn't really show that that particular product could

09:45  19    do both computers and phones, right?

09:45  20        A.    I'll tell you what my understanding is.

09:45  21        Q.    Thank you, sir.

09:45  22              Well, let's look at the next one, because the

09:46  23    next one is:  Computational efficiency - servers can

09:46  24    offload audio mixing to the users.

09:46  25              Do you see that?

405

09:46  1    A.    I do.

09:46  2    Q.    Now, let's go to Slide 41 and see what

09:46  3  MediaTone -- and again, we've established this is a

09:46  4  product that was out before the '858 patent, right,

09:46  5  sir?

09:46  6    A.    Yes.

09:46  7    Q.    And what does it say about MediaTone's

09:46  8  abilities?  It says:  The MediaTone network is a fully

09:46  9  redundant, high performance private global network

09:46  10  specifically designed to deliver web communications

09:46  11  services.  Created with a carrier class

09:46  12  information-switching architecture, the MediaTone

09:46  13  network delivers optimal performance by routing

09:46  14  communications across several Webex data centers.  The

09:46  15  result is a high performance network that is unmatched

09:46  16  for secure, reliable, fast, and realtime web

09:46  17  communications.

09:46  18        Right, sir?

09:47  19    A.    I see that.

09:47  20    Q.    And that statement is being made about a Webex

09:47  21  product that you understand there are no allegations of

09:47  22  infringements against, correct?

09:47  23    A.    That's my understanding.  Correct.

09:47  24    Q.    Thank you.

09:47  25        Now, better sound quality, if we could.  Let's

406

09:47  1  go to Slide 43.

09:47  2      A.    I'm sorry.

09:47  3              MR. JONES:  Let's do it the way -- thank

09:47  4  you, Mr. Beall.  That's fine.  But let's go to the

09:47  5  third one that's the benefit of the invention claimed

09:47  6  here by Paltalk.

       7  BY MR. JONES:

09:47  8      Q.    And look at it in connection with Slide 43.

09:47  9  Again, this is talking about the MediaTone product that

09:47  10  came out one year prior to the patent and that there's

09:47  11  no allegation of infringement against it.

09:47  12              It says this:  Webex MediaTone technology

09:47  13  enables Webex Meeting participants worldwide to enjoy

09:47  14  the richest set of data, voice, and video interactive

09:48  15  services together with unparalleled network performance

09:48  16  and reliability.

09:48  17              Do you see that?

09:48  18      A.    I do.

09:48  19      Q.    Okay.  And again, that is a document that

09:48  20  Dr. Schaefer did not discuss at all in his testimony,

09:48  21  correct?

09:48  22      A.    Not here in the courtroom.  Correct.

09:48  23              MR. JONES:  Now, if we could go to Slide

09:48  24  54.

       25  BY MR. JONES:

—407—

09:48   1       Q.    Dr. Schaefer told us that one of the key
09:48   2    benefits -- or excuse me.  Dr. Schaefer told us that
09:48   3    one of the key features of Webex Audio was scalability,
09:48   4    right, sir?
09:48   5       A.    Yes.
09:48   6       Q.    And he attributed --
09:48   7       A.    Sorry.
09:48   8       Q.    Please get a drink.
09:48   9       A.    Thank you.  Okay.
09:48  10       Q.    He attributed a large portion of this feature
09:49  11    to the '858 patent in his apportionment, right, sir?
09:49  12       A.    He treated it as an important feature.
09:49  13       Q.    Right.  And then he said this particular
09:49  14    feature, the '858 patent contributes to it very
09:49  15    significantly.  Right, sir?
09:49  16       A.    I don't remember the percentages.  I have to
09:49  17    look at his spreadsheet.  But it was one of the
09:49  18    products for sure, one of the features he said was the
09:49  19    benefit.
09:49  20       Q.    Okay.  And that was -- it was one of the
09:49  21    features that was contributed to by the '858 patent.
09:49  22    And you're just saying you can't remember off the top
09:49  23    of your head?
09:49  24       A.    No.  Not without looking at the spreadsheet.
09:49  25       Q.    All right.  Thank you.

```
09:49   1              Now, if we go back -- if we look at what he
09:49   2   told us and what he taught us in this slide, he said,
09:49   3   scalability.  He said the '858 patent was contributing
09:49   4   to total audio capacities are 1,000 total participants
09:49   5   in a single meeting up to 1,000 on phones and up to
09:50   6   1,000 on VoIP.  Right, sir?
09:50   7       A.   Yes.
09:50   8       Q.   And he threw that out from a Cisco document,
09:50   9   said this great scalability, we think that the
09:50  10   '858 patent contributes to it.  Fair enough?
09:50  11       A.   That'd be my understanding of what he said.
09:50  12              MR. JONES:  Okay.  Well, let's go to
09:50  13   Slide 43, if we could.
       14   BY MR. JONES:
09:50  15       Q.   And again, we're going to go back to
09:50  16   Defendant's Exhibit 68 and go back to this evidence
09:50  17   about the MediaTone product that is not accused of
09:50  18   infringing in this case.  And it says here:  The
09:50  19   secure, highly scalable MediaTone network can support
09:50  20   millions of simultaneous calls and as many as
09:50  21   50,000 (sic) individuals may attend one meeting.
09:50  22              Right, sir?
09:50  23       A.   I see that.
09:50  24       Q.   And that's the scalability that's talked about
09:50  25   in the MediaTone document, correct?
```

409

09:51    1        A.    Yes.  In the MediaTone document.

09:51    2        Q.    And here what we see is with regard to the

09:51    3    document about Webex that's cited to by Dr. Schaefer.

09:51    4    They're talking about 1,000 and 1,000.

09:51    5              Here we see talking about 5,000 and millions

09:51    6    of simultaneous calls, right?

09:51    7        A.    Yes.

09:51    8        Q.    Thank you, sir.

09:51    9              Now, in your direct testimony, you didn't talk

09:51   10    about this document at all.  And in Dr. Schaefer's

09:51   11    testimony, all of his testimony, he didn't talk about

09:51   12    it yesterday, right, sir?

09:51   13        A.    That's right.

09:51   14        Q.    But Georgia-Pacific Factor No. 9 tells us that

09:51   15    one of the things that needs to be considered by this

09:51   16    jury, when they look at what the appropriate damages

09:51   17    are, is the benefits of the invention over older modes

09:51   18    or devices, right?

09:51   19        A.    Yes.

09:51   20        Q.    And they can consider evidence like this about

09:52   21    products like MediaTone that came out before this

09:52   22    patent was ever in the marketplace when they look at

09:52   23    damages, right, sir?

09:52   24        A.    Well, this jury's free to evaluate everything

09:52   25    that they see.

410

09:52  1        Q.    Thank you, sir.

09:52  2              Now, you would agree with me, wouldn't you,

09:52  3    sir, that the license resulting from the hypothetical

09:52  4    negotiation between the parties should reflect the

09:52  5    economic value of the '858 patent in the marketplace?

09:52  6        A.    Yes.

09:52  7        Q.    And you have looked at marketplace evidence at

09:52  8    the time of the hypothetical negotiation in your

09:52  9    analysis, right, sir?

09:52  10       A.    Yes.

09:52  11       Q.    Now, with regard to the '858 patent, we see no

09:52  12   instances outside of litigation where it has been

09:52  13   licensed to anyone by itself, right, sir?

09:52  14       A.    Do you mean by "itself" being Paltalk?

09:52  15       Q.    Yes.

09:52  16       A.    Correct.

09:52  17       Q.    And we see that with regard to the

09:53  18   '858 patent, that there is one transaction out there

09:53  19   where it was sold by HearMe to Paltalk, right?

09:53  20       A.    That's not quite correct.

09:53  21       Q.    Well, wasn't the '858 patent sold to HearMe

09:53  22   together with four other patents, 8 patent

09:53  23   applications, 18 domain names, 13 trademarks, various

09:53  24   pieces of equipment and source code for $145,000?

09:53  25       A.    The reason I said it was not correct is

―411―

| | | |
|---|---|---|
| 09:53 | 1 | because the application for the '858 patent was sold to |
| 09:53 | 2 | Paltalk by HearMe.  It wasn't a patent, and it wouldn't |
| 09:53 | 3 | be a patent for another two and a half, three years. |
| 09:53 | 4 | Q.    Sure.  Okay.  So anyway -- |
| 09:53 | 5 | A.    It was a big distinction. |
| 09:53 | 6 | Q.    An application was sold? |
| 09:53 | 7 | A.    Yes. |
| 09:53 | 8 | Q.    Fair enough. |
| 09:53 | 9 | A.    Big distinction. |
| 09:53 | 10 | Q.    Thank you. |
| 09:53 | 11 | And you have come to the conclusion that -- |
| 09:54 | 12 | and I just make sure -- I got a note here.  I want to |
| 09:54 | 13 | make sure I had the record correct. |
| 09:54 | 14 | Did -- the '858 patent application was sold as |
| 09:54 | 15 | part of that transaction to Paltalk for $145,000, |
| 09:54 | 16 | right? |
| 09:54 | 17 | A.    Yes. |
| 09:54 | 18 | Q.    Together with all those other items? |
| 09:54 | 19 | A.    Correct. |
| 09:54 | 20 | Q.    Okay.  Thank you. |
| 09:54 | 21 | Now, Cisco produced -- and again, it's your |
| 09:54 | 22 | opinion that that particular transaction is not |
| 09:54 | 23 | probative of the issue of what a reasonable royalty |
| 09:54 | 24 | would be, fair enough? |
| 09:54 | 25 | A.    That's correct. |

-412-

09:54    1        Q.    Okay.  So then also Cisco produced ten

09:54    2    licenses that you've reviewed in this case, right?

09:54    3        A.    I believe that's the number.

09:54    4        Q.    And you have found that none of them were

09:54    5    economically comparable, and Dr. Schaefer said none of

09:55    6    them were technically comparable, right, sir?

09:55    7        A.    Correct.

09:55    8        Q.    So with regard to transactional evidence,

09:55    9    whatever's out there, that notice in this case, you

09:55   10    have found none of it to be probative, right, sir?

09:55   11        A.    We're talking about Cisco produced

09:55   12    transactions?

09:55   13        Q.    Yes.

09:55   14        A.    Yes.

09:55   15        Q.    Cisco produced certain agreements that were

09:55   16    looked at by yourself, right?

09:55   17        A.    Yes.

09:55   18        Q.    Okay.  So with regard to looking for

09:55   19    transactions in the marketplace, you have used none as

09:55   20    being probative, right, sir?

09:55   21        A.    Correct.  None were probative.

09:55   22        Q.    Right.  And again, the jury can look at the

09:55   23    transaction evidence and make its own decision, right,

09:55   24    sir?  They're not bound by your opinion?

09:55   25        A.    Of course.

413

09:55   1        Q.    Thank you.
09:55   2              They can look, for example -- the Meetrix
09:55   3   agreement has come into evidence, and they can look at
09:55   4   that, correct, sir --
09:55   5        A.    Yes.
09:55   6        Q.    -- and use it?
09:55   7        A.    I'm sorry.  Yes.  Of course.
09:55   8        Q.    Thank you.
09:55   9              MR. JONES:  At this time, Your Honor, I
09:55  10   think we'll have to go on the confidential record.
09:56  11              THE COURT:  Okay.  If you're not under
09:56  12   the protective order, please exit the courtroom.
       13              (Sealed proceedings.)
09:56  14
09:56  15
09:56  16
09:56  17
09:56  18
09:56  19
09:56  20
09:56  21
09:56  22
09:56  23
09:56  24
09:56  25

414



415



416

09:58  1  ██████████████████

09:58  2  ████    ██████████

09:58  3      Q.    Okay.  Now, next we go to the technological

09:59  4  apportionment percentage.

09:59  5           Now, you would agree with me that Cisco

09:59  6  incorporates a variety of technologies into its

09:59  7  audioconferencing functionality, right, sir?

09:59  8      A.    Yes.

09:59  9      Q.    And you would agree with me that the benefits

09:59  10 of Webex Audio are not solely attributable to

09:59  11 practicing the patent, right, sir?

09:59  12     A.    No.  I absolutely agree with that.  They get

09:59  13 two-thirds of the amount -- two-thirds of the

09:59  14 contributions to Webex Audio are from Cisco.

09:59  15     Q.    You're claiming one-third is from the

09:59  16 '858 patent, right, sir?

09:59  17     A.    That's right.

09:59  18     Q.    Okay.  And that's -- and to be fair, I think

09:59  19 that comes from Dr. Schaefer, fair?

09:59  20     A.    Oh, it does.

09:59  21           I'm sorry.  I didn't mean to speak over you.

09:59  22           I agree with you.  It came from Dr. Schaefer.

09:59  23     Q.    And you would also agree, would you not, sir,

09:59  24 that in determining damages, the jury needs to know

09:59  25 that any amount of damages must be based on the value

-417-

| | | |
|---|---|---|
| 10:00 | 1 | attributed to the patented invention, the '858 patent, |
| 10:00 | 2 | as distinct from features of Webex products provided by |
| 10:00 | 3 | Cisco technology, correct, sir? |
| 10:00 | 4 | A.    Yes.  Yes.  I agree with that. |
| 10:00 | 5 | Q.    Now, as of the day of your second deposition, |
| 10:00 | 6 | you had not discussed with any -- Dr. Schaefer any |
| 10:00 | 7 | explanation of his percentage, right, sir? |
| 10:00 | 8 | A.    As of the day of my second deposition? |
| 10:00 | 9 | Q.    Yes.  Prior to your second -- let me ask it |
| 10:00 | 10 | this way.  It may be simpler. |
| 10:00 | 11 | A.    Okay. |
| 10:00 | 12 | Q.    Prior to your second deposition, you had not |
| 10:00 | 13 | discussed with Dr. Schaefer an explanation of his |
| 10:00 | 14 | percentage, right? |
| 10:00 | 15 | A.    Not in any detail. |
| 10:00 | 16 | Q.    Thank you, sir. |
| 10:00 | 17 | And the first time you saw these percentages |
| 10:00 | 18 | or the percentage you used there was when you received |
| 10:00 | 19 | Dr. Schaefer's report, correct, sir? |
| 10:01 | 20 | A.    Are you asking about his supplemental report |
| 10:01 | 21 | or his first report? |
| 10:01 | 22 | Q.    I am asking about his supplemental report. |
| 10:01 | 23 | A.    Okay.  I'm sorry.  So can you re-ask your |
| 10:01 | 24 | question? |
| 10:01 | 25 | Q.    Sure. |

418

10:01  1                    MR. HASSETT:  Your Honor, I'm very, very

10:01  2    sorry to interrupt.  We had some folks come back in the

10:01  3    courtroom, but I think we're still on the confidential

10:01  4    record -- that shouldn't have come back in the

10:01  5    courtroom.

10:01  6                    THE COURT:  Yes.  We are still on the

10:01  7    confidential record.

10:01  8    BY MR. JONES:

10:01  9        Q.    The question is this:  You first saw

10:01  10   Dr. Schaefer's report with this percentage in it on the

10:01  11   day that your report was due.  That's the first time

10:01  12   you saw it and saw this percentage?

10:01  13       A.    I don't mean to quibble with you, but if

10:01  14   you're talking about his supplemental report and the

10:01  15   33.75 percent, then the answer is yes.  But it wasn't

10:01  16   the case with the first report.

10:01  17       Q.    Okay.  There were two reports done in this

10:01  18   case, but with regard to the percentage you're using,

10:02  19   you got that percentage on the same day your report was

10:02  20   due?

10:02  21       A.    Yes.

10:02  22       Q.    And you used it in your report that day,

10:02  23   right, sir?

10:02  24       A.    Yes.

10:02  25       Q.    Okay.

419

10:02  1      A.    That's correct.

10:02  2      Q.    Thank you, sir.

10:02  3            And you did not speak to him about the

10:02  4   analysis that he used to get the 33.75 percent until

10:02  5   the day before your second deposition, right, sir?

10:02  6      A.    That's right.

10:02  7      Q.    Now, by November the 17th, 2022, the time of

10:02  8   your first report, you had used Webex in the past but

10:02  9   not very often, right?

10:02  10     A.    Correct.

10:02  11     Q.    And as of that date, you were not generally

10:02  12  familiar with what Webex features were yourself,

10:02  13  correct, sir?

10:02  14     A.    Right.

10:02  15     Q.    And as of the date of your first report in

10:02  16  this case, you did not know whether or not

10:02  17  Dr. Schaefer's list of features was a complete list of

10:03  18  all functionality that is included in Webex Audio,

10:03  19  right, sir?

10:03  20     A.    Correct.  That's a technical matter.

10:03  21     Q.    Now, if we could, let's go to Slide 52.  It's

10:03  22  a slide that I think was mentioned in your direct

10:03  23  testimony by counsel.

10:03  24     A.    My direct?

10:03  25     Q.    I believe so.  She mentioned a slide in the

420

10:03    1    opening --

10:03    2        A.    Okay.

10:03    3        Q.    -- that Cisco had shown in its opening about

10:03    4    Cisco patents.

10:03    5            Do you recall that in your direct testimony?

10:03    6        A.    Oh, that.  I'm sorry.  About Cisco patents.

10:03    7    Yes.  I do recall that.

10:03    8        Q.    Okay.  So she mentioned it -- here it is.

10:03    9            And you saw it.  You were here for the

10:03   10    openings, I believe, right, sir?

10:03   11        A.    Yes.

10:03   12        Q.    Now, did the Paltalk technical expert,

10:03   13    Dr. Schaefer, at any time talk about any of the 412

10:04   14    Webex Audio-related patents in his testimony yesterday?

10:04   15        A.    Not that I recall.

10:04   16        Q.    And in either of their reports, Dr. Schaefer

10:04   17    or Dr. Madisetti that you relied upon, did any of those

10:04   18    reports contain any type of analysis of these patents

10:04   19    by name and number?

10:04   20        A.    That, I don't recall.  I'd have to look at the

10:04   21    reports.

10:04   22        Q.    Thank you, sir.

10:04   23            You would agree with me, certainly, sir, that

10:04   24    the plaintiff has the burden to apportion all other

10:04   25    patented technology that is included in Webex Audio

10:04  1    from damages that are awarded?

10:04  2        A.    I apologize.  I coughed at the beginning of

10:05  3    your question.

10:05  4        Q.    I'm sorry.  I didn't mean to talk to you while

10:05  5    you were coughing.

10:05  6        A.    No.  That's okay.  I missed part -- I missed

10:05  7    the very first part.

10:05  8        Q.    Sure.  You would agree with me that the

10:05  9    plaintiff has the burden to apportion all other

10:05  10   patented technology contributions to Webex Audio from

10:05  11   whatever is awarded to it as damages for patent

10:05  12   infringement of the '858 patent?

10:05  13       A.    Yes.  I agree that it's the Webex -- all the

10:05  14   technology other than the '858 patent is to be excluded

10:05  15   from consideration of the contribution by the

10:05  16   infringement.

10:05  17       Q.    And at the time of the hypothetical

10:05  18   negotiation, Cisco and Paltalk could talk about and

10:05  19   they could argue over whose patent contributes what and

10:05  20   the nature of each's contribution, right, sir?

10:05  21       A.    Yes.

10:05  22       Q.    And Dr. Schaefer, when he testified about his

10:06  23   apportionment, did not talk about these patents, right,

10:06  24   sir?

10:06  25       A.    Well --

422

10:06  1        Q.    His testimony?

10:06  2        A.    Are you asking about his testimony whether he

10:06  3   talked about the patents on the screen?

10:06  4        Q.    Exactly.

10:06  5        A.    Okay.

10:06  6        Q.    That's what I'm asking you about.

10:06  7              In his testimony, he did not talk about these

10:06  8   patents?

10:06  9        A.    No.   He didn't talk about what's on the

10:06  10  ████████████

10:06  11  ██      ████████████

10:06  12  ██████████████████████████████████████

10:06  13  ██████████████████████████████████████████

10:06  14  ████████████████████████████████

10:06  15  ██    ████

10:06  16  ██    ████████████████████████████████

10:06  17  ██    ████

10:06  18  ██    ████████████████████████████████████████

10:06  19  ██████████████████████████████████████████████

10:06  20  ██    ████    ██████████████████

10:06  21       Q.    And do you cite to any evidence in this case

10:06  22  where Cisco has ever based a royalty for patented

10:07  23  technology upon such a calculation?

10:07  24       A.    I don't know.   Cisco hasn't provided all of

10:07  25  its royalty information.

-423-

10:07   1       Q.    My question to you was not that, sir.  My

10:07   2   question to you is very specific.

10:07   3             Do you cite to any occasion in your work in

10:07   4   this case where there is evidence that Cisco has ever

10:07   5   based a royalty for patented technology upon such

10:07   6   calculation?

10:07   7       A.    Well, certainly not based on the licenses they

10:07   8   produced.

10:07   9       Q.    So I guess I'll go at it one more time.

10:07   10            Do you cite to anywhere in the evidence in

10:07   11  this case where Cisco has based a royalty for patented

10:07   12  technology upon such a calculation?

10:07   13      A.    Not based on the information Cisco produced.

10:07   14      Q.    Thank you.

10:07   15            Now, do you cite to any evidence where any of

10:08   16  the technological leaders in this field -- let me ask

        17  this question.

        18            You would agree with me that the technological

10:08   19  leaders in this field at the time of the hypothetical

10:08   20  negotiation would have been Adobe, Microsoft, IBM,

10:08   21  Alcatel, and Cisco, fair enough?

10:08   22      A.    At what time?  What year?

10:08   23      Q.    At the time of the hypothetical negotiation.

10:08   24      A.    Well, I know.  Are we talking about 2004?

10:08   25      Q.    I know we have a number to choose from, don't

—424—

10:08    1    we?  2004, 2007, 2010, and 2015.  Right?

10:08    2        A.    Well, based on the Cisco documents I reviewed,

10:08    3    my understanding is that the big hypothetical

10:08    4    negotiation as I've testified was in 2007.

10:08    5        Q.    Well, the one you used in your report is 2010,

10:08    6    right, sir?

10:08    7        A.    Correct.

10:08    8        Q.    And, in fact, the one -- the date that you

10:08    9    were told by Cisco's expert, Dr. Schaefer, you were

10:08   10    told by him that the date of first infringement claimed

10:08   11    by Paltalk is 2010, right, sir?

10:09   12        A.    Yes.  Based on the material he looked at.

10:09   13        Q.    And you would agree with me that it is a

10:09   14    principle of patent damages that the hypothetical

10:09   15    negotiation begins on the date of first infringement,

10:09   16    correct?  That is when it takes place?

10:09   17        A.    Well, it's not that simple.

         18        Q.    Okay.

10:09   19        A.    Because there's case law talking about when

10:09   20    the hypothetical negotiation occurs when the infringer

10:09   21    acquired the -- it became in possession of the company

10:09   22    and it is the accused party.

10:09   23                (Clarification by Reporter.)

10:09   24    BY MR. JONES:

10:09   25        Q.    In your -- let me ask you this:  When you

425

10:09  1    first did your work in this case, you assumed a

10:09  2    hypothetical negotiation date of 2015, right, sir?

10:09  3        A.    That's correct.

10:09  4        Q.    And your understanding of the fact that that

10:09  5    was the correct date, and you believed it at the time

10:09  6    to be the correct date, right, sir?

10:09  7        A.    Right.  Well, that was my understanding based

10:10  8    on the work Dr. Schaefer performed at that time.

10:10  9        Q.    Yes.  So Dr. Schaefer performed certain work,

10:10  10   and you used the date of 2015, fair enough?

10:10  11       A.    Yes.  That's correct.

10:10  12       Q.    Now, on another occasion, he did some more

10:10  13   analysis, and he determined in that analysis that the

10:10  14   date of first infringement was 2010, right, sir?

10:10  15       A.    Yes.

10:10  16       Q.    And you, when you formed your opinions again,

10:10  17   used the date of 2010 as the date of the hypothetical

10:10  18   negotiation, right, sir?

10:10  19       A.    Yes.

10:10  20       Q.    And now you're telling us that you're using a

10:10  21   date of the hypothetical negotiation of 2007; is that

10:10  22   right, sir?

10:10  23       A.    That's correct.

10:10  24       Q.    So you have moved from your first opinion with

10:10  25   regard to damages when you first did one and issued

```
10:10   1    them in this case in 2015.  You moved next to 2010.
10:11   2    And now your testimony today, you're moving to 2007,
10:11   3    right, sir?
10:11   4        A.    For the hypothetical negotiation.  That's
10:11   5    correct.
10:11   6        Q.    Thank you, sir.
10:11   7              Now, do you cite -- okay.  So would you agree
10:11   8    with me that in 2010, at the time of the hypothetical
10:11   9    negotiation, the industry leaders would have been
10:11   10   Adobe, Microsoft, IBM, Alcatel, and Cisco?
10:11   11       A.    Industry leaders in what?
10:11   12       Q.    In the field of audio -- audiovisual
10:11   13   conferencing like this in that technology area.
10:11   14       A.    That, I can't say.  I don't know.  I'd have to
10:11   15   go back and look.
10:11   16       Q.    So you don't know -- at the time of the
10:11   17   hypothetical negotiation, you don't know who would be
10:11   18   in the marketplace?
10:11   19       A.    Well, I hadn't made a detailed study, but no,
10:11   20   because the industry's evolved significantly over time.
10:11   21       Q.    Well, then just let me ask you this question.
10:11   22   I won't use the leaders.
10:11   23             Do you cite to any evidence where Cisco
10:11   24   competitors in the industry have used a royalty --
10:12   25   excuse me.  Strike that.
```

—427—

10:12  1          Do you cite to any evidence whatsoever where

10:12  2   Cisco competitors in this industry have based a royalty

10:12  3   for patented technology upon a percentage like this --

10:12  4          A.    No.

10:12  5          Q.    -- where it is -- again, if you'll let me

10:12  6   finish my question --

10:12  7          A.    Sure.  Sure.

10:12  8          Q.    -- where it is R&D expenses divided by

10:12  9   operating expenses?

10:12  10         A.    No.

10:12  11         Q.    Thank you, sir.

10:12  12         You've brought up this hypothetical

10:12  13  negotiation date movement.  I'd like to drill in on

10:12  14  that just a little bit more.

10:12  15         It's your opinion in this case that whether

10:12  16  the hypothetical negotiation took place on 2010 or 2007

10:12  17  or 2004, that the result is going to be the same, the

10:13  18  damage figure is the same, right, sir?

10:13  19         A.    That's correct.

10:13  20         Q.    Now, we know that in 2004 -- and I think you

10:13  21  brought this up in your direct testimony -- that the

10:13  22  parties to the negotiation wouldn't have been the same,

10:13  23  right?

10:13  24         A.    If there had been a hypothetical negotiation

10:13  25  in 2004, yes.  That's correct.

10:13  1      Q.    Because if it happened in 2004, the parties to

10:13  2   the hypothetical negotiation would have been Webex and

10:13  3   Paltalk, right?

10:13  4      A.    Correct.

10:13  5      Q.    So we're changing the licensee in that case

10:13  6   from Cisco to Paltalk, right, sir?

10:13  7      A.    Cisco to Webex Communications.

10:13  8      Q.    Cisco to Webex.  Thank you.  I appreciate the

10:13  9   correction.

10:13  10          Now, you would agree with me that Webex at

10:13  11  that time was a much smaller corporation than Cisco?

10:13  12     A.    Yes.

10:13  13     Q.    You would agree with me that Webex had much

10:13  14  less profits than Cisco, right, sir?

10:14  15     A.    Yes.

10:14  16     Q.    And you would agree with me that Webex had

10:14  17  much different products from Cisco, right, sir?

10:14  18     A.    Well, it was a company more focused on, you

10:14  19  know, web communications, conferencing communications.

10:14  20  Cisco does a lot of things.

10:14  21     Q.    And again, I think we're on the same page.  I

10:14  22  think we're going to the same place.

10:14  23          Cisco, writ large, Cisco was a corporation --

10:14  24     A.    Yes.

10:14  25     Q.    -- had many more products, many more diverse

429

| | | |
|---|---|---|
| 10:14 | 1 | products than Webex that created much larger revenues |
| 10:14 | 2 | than Webex had, fair enough? |
| 10:14 | 3 | A.    Yeah.  Absolutely.  I agree with that. |
| 10:14 | 4 | Q.    And you yourself have not done any specific |
| 10:14 | 5 | analysis of a comparison of Webex revenues to Cisco's, |
| 10:15 | 6 | right, sir? |
| 10:15 | 7 | A.    That's correct. |
| 10:15 | 8 | Q.    You have not done any specific analysis to |
| 10:15 | 9 | compare Webex's products as compared to Cisco, right? |
| 10:15 | 10 | A.    No.  Other than being generally familiar with |
| 10:15 | 11 | Cisco using their routers, servers, all kinds of |
| 10:15 | 12 | computing products like that, networking products. |
| 10:15 | 13 | Q.    But even with the changes in the corporations |
| 10:15 | 14 | at the time of the hypothetical negotiation, you do not |
| 10:15 | 15 | believe it changed the outcome of the reasonable |
| 10:15 | 16 | royalty? |
| 10:15 | 17 | A.    That's correct. |
| 10:15 | 18 | Q.    Now, again, if we could go back momentarily. |
| 10:15 | 19 | MR. JONES:  And I think we'll have to go |
| 10:15 | 20 | on the confidential record again just for a second. |
| 10:15 | 21 | |
| | 22 | |
| 10:15 | 23 | |
| 10:16 | 24 | |
| 10:16 | 25 | |

430



10:16  13          Now, at the time of the hypothetical

10:16  14  negotiation, is it your opinion that the parties at the

10:16  15  hypothetical negotiation, whether it was in 2004 or

10:16  16  2010 or 2007, would have been aware and anticipated

10:16  17  that there was going to be a global pandemic during the

10:17  18  years of the damages period?

10:17  19      A.    No.  Not necessarily.

10:17  20      Q.    So do you use the Book of Wisdom in a way that

10:17  21  results in you thinking that when that hypothetical

10:17  22  negotiation occurred -- let's just use 2010 -- that the

10:17  23  parties would have anticipated that there was a global

10:17  24  pandemic coming on?

10:17  25      A.    I don't have an opinion one way or the other

| | | |
|---|---|---|
| 10:17 | 1 | of whether they would have considered it.  They could |
| 10:17 | 2 | have considered.  I don't know that it would have |
| 10:17 | 3 | mattered. |
| 10:17 | 4 | Q.    Well, you would agree with me that as a result |
| 10:17 | 5 | of that global pandemic, it changed, particularly in |
| 10:17 | 6 | business, all of our lives, right, sir? |
| 10:17 | 7 | A.    It had a profound effect on everyone.  Yes. |
| 10:17 | 8 | Q.    And it had a huge effect on the |
| 10:17 | 9 | audioconferencing that was done in business, |
| 10:18 | 10 | audiovisual conferencing that was done in business, |
| 10:18 | 11 | using products like Webex Audio, right, sir? |
| 10:18 | 12 | A.    Yes.  But I don't have any after the damages |
| 10:18 | 13 | period expired in this case. |
| 10:18 | 14 | Q.    Okay. |
| 10:18 | 15 | A.    So it wouldn't have had any effect. |
| 10:18 | 16 | MR. JONES:  We could go back -- let's go |
| 10:18 | 17 | back to Slide 51. |
| | 18 | BY MR. JONES: |
| 10:18 | 19 | Q.    This is in '21, '20? |
| 10:18 | 20 | A.    I'm sorry.  I stand corrected.  Yeah.  Yeah. |
| 10:18 | 21 | Q.    I was about to say, I must have gone to sleep |
| 10:18 | 22 | and not remembered when we had a pandemic. |
| 10:18 | 23 | But it is -- |
| 10:18 | 24 | A.    Yeah.  No.  You're right.  I apologize.  Yes. |
| 10:18 | 25 | You are correct.  It -- the pandemic, I'd forgotten |

432

10:18    1    about it.  It seems like a long time ago, but it did

10:18    2    occur during the damages period.

10:18    3        Q.    Thank you, sir.

10:18    4            And in fact, the usage of Webex went up

10:18    5    tremendously due to the pandemic.  We know that, right,

10:18    6    sir?

10:18    7        A.    Correct.  Yes.  And Cisco made money as a

10:19    8    result.

10:19    9        Q.    Right.  And we know that the revenues went up

10:19   10    tremendously at that time, right?

10:19   11        A.    They did go up.  And Cisco made use of the

10:19   12    patented invention during that time period.

10:19   13        Q.    And we know that that has a dramatic effect?

10:19   14        A.    Can we put that screen back up?

10:19   15        Q.    Sure.  Whatever you want.

10:19   16        A.    There we go.  Thank you.

10:19   17            So you can see the revenues did go up from

10:19   18    2020, because the pandemic really hit March/April of

10:19   19    2020.  And so it had an impact in 2020 to 2021.

10:19   20        Q.    We'll -- I'll leave everybody else to remember

10:19   21    when the pandemic was.  Apparently you and I are not

10:19   22    having too much good luck at that.

10:19   23            But you would agree with me that the revenues

10:19   24    from Webex Audio went up significantly because of the

10:19   25    pandemic?  There's no doubt about that?

10:19   1      A.    No.   There's no doubt about it.   Cisco made

10:19   2   money doing that.

10:19   3      Q.    And that has an effect on your damages figure,

10:20   4   right, sir?

10:20   5      A.    It does.   Of course it does.

10:20   6      Q.    Now, you have told us that you're aware of

10:20   7   that you considered certain usage data that was

10:20   8   provided by Cisco, right, sir?

10:20   9      A.    Yes.

10:20   10     Q.    But that you don't think it's appropriate to

10:20   11  use it, right, sir?

10:20   12     A.    That's correct.

10:20   13     Q.    Now, Dr. Kindler used such data in forming her

10:20   14  opinions, right, sir?

10:20   15     A.    Yes.   She did.

10:20   16     Q.    And she calculated certain usage rates,

10:20   17  correct?

10:20   18     A.    Yes.   I don't know which damage model you're

10:20   19  talking about.

10:20   20     Q.    But she did calculate such rates, correct?

10:20   21     A.    Yeah.   She did.   Yeah.   She used usage rates

10:20   22  for the limited time period she had them.

10:20   23     Q.    Yeah.   But to be -- just to open things up,

10:20   24  make sure we know how evidence is being used, you

10:20   25  haven't calculated any usage rates, right, sir?

—434—

10:20    1        A.    I didn't need to.  Dr. Schaefer took that into

10:20    2    account.

10:20    3                    MR. JONES:  I would object to the answer

10:20    4    as being nonresponsive, Your Honor.

10:21    5                    THE COURT:  Sustained.

10:21    6                    The jury will disregard it.

10:21    7    BY MR. JONES:

10:21    8        Q.    You didn't calculate any usage rates, did you,

10:21    9    sir?

10:21   10        A.    No.  Not other than the ones that were already

10:21   11    calculated.

10:21   12        Q.    And Dr. Schaefer didn't calculate any usage

10:21   13    rates, right, sir?

10:21   14        A.    No.  Not specifically.

10:21   15                    MR. JONES:  Now, concluding, going back

10:21   16    to the hypothetical negotiation, if we could, could we

10:21   17    pull up Slide 49?

10:21   18    BY MR. JONES:

10:21   19        Q.    At the hypothetical negotiation, Paltalk is to

10:21   20    state their positions, and Cisco gets to state their

10:21   21    positions, right?

10:21   22        A.    Yes.

10:21   23        Q.    We're pretending that happened, right, sir?

10:21   24        A.    Correct.

10:21   25        Q.    Okay.  And you would agree with me that Cisco

435

10:21  1    should say, hey.  You know, this particular patent has

10:21  2    not been used by any owner of the patent, right?

10:21  3        A.    I'm sorry.  Would you repeat that?

10:21  4        Q.    This particular patent, the '858 patent, has

10:21  5    never been used by any owner of the patent, right, sir?

10:21  6        A.    Correct.

10:21  7        Q.    And it could also say because there's no

10:22  8    evidence or allegations in this case that any other

10:22  9    leaders in the conferencing marketplace have ever used

10:22  10   it, they could point that out.  They could say there's

10:22  11   no evidence that anybody else is using it in their

10:22  12   product, right, sir?

10:22  13       A.    I don't -- I don't know how to answer the

10:22  14   question.

10:22  15       Q.    Okay.  Well, they could point out, couldn't

10:22  16   they, that there's no evidence that anybody else is

10:22  17   using it?  The only allegations that we have before us

10:22  18   in this case, the only evidence that's been presented

10:22  19   in this case is that Cisco is using it.  And they're

10:22  20   going to have to assume that's true, right, sir?

10:22  21       A.    Yes.  That's correct.

10:22  22       Q.    But Cisco could point out that there are no

10:22  23   allegations, there's no evidence that anybody else is

10:22  24   using it, correct, sir?

10:22  25       A.    I would agree that Cisco can point out there

436

10:22  1    are no other allegations.

10:22  2        Q.   Okay.  And with regard to -- outside of

10:22  3    litigation, with regard to just the '858 patent, they

10:22  4    could point out that it had never been licensed before.

10:22  5    This would be the first time it would be licensed by

10:22  6    itself outside of litigation, right, sir?

10:22  7        A.   Yes.

10:22  8        Q.   And they could point out that the only

10:23  9    transaction in the marketplace with regard to the

10:23  10   '858 patent was when it sold as an application with

10:23  11   four patents and seven other patent applications for

10:23  12   $145,000, right, sir?

10:23  13       A.   Yes.

10:23  14       Q.   And they could point out that Webex has many

10:23  15   features that are in no way related to the '858 patent,

10:23  16   right, sir?

10:23  17       A.   They could.

10:23  18       Q.   And they could point out that, as we've seen

10:23  19   from DTX-068, MediaTone, a product not accused of

10:23  20   infringement which came out before the patent, allowed

10:23  21   conferencing between many types of devices, had been

10:23  22   used by 7,000 corporations, supported millions of

10:23  23   simultaneous calls, allowed rich data voice and

10:23  24   interactive services, and had unparalleled network

10:23  25   performance reliability.

437

10:23   1            And it had done this in the early 2000s,
10:23   2   right, sir?
10:23   3       A.   Well, they could point that out.
10:23   4       Q.   And they could also point out that they had
10:24   5   412 patents related to Webex Audio, and argue about the
10:24   6   contribution those patents were making to the Webex
10:24   7   profits, right, sir?
10:24   8       A.   Yes.
10:24   9       Q.   And you're stating that despite all of these
10:24   10  arguments, at the end of the day, in connection with
10:24   11  the hypothetical negotiation, Cisco willingly agreed to
10:24   12  give 11 percent of all of their gross profits, not net
10:24   13  profits, all their gross profits to Webex -- to
10:24   14  Paltalk, right, sir?
10:24   15      A.   Yes.
10:24   16           MR. JONES:  I pass the witness,
10:24   17  Your Honor.
10:24   18                    REDIRECT EXAMINATION
10:24   19  BY MS. SRINIVASAN:
10:25   20      Q.   Mr. Bratic, can you see that?
10:25   21      A.   Yes.
10:25   22      Q.   Okay.  There was a lot of discussions about
10:25   23  dates, so I want to be very clear.
10:25   24           MS. SRINIVASAN:  We're off the
10:25   25  confidential record.

438

| 09:42 | 1 | (Sealed proceedings end.) |

10:25   2   BY MS. SRINIVASAN:

10:25   3       Q.    2015 -- and pardon my penmanship.  I apologize

10:25   4   in advance.

10:25   5             2022:  This is the damages period in this

10:25   6   case.  Is there any disagreement among anybody that

10:25   7   that is the relevant damages period in this case?

10:25   8       A.    No.

10:25   9       Q.    This is the separation of the patent, correct?

10:26  10       A.    Correct.

10:26  11       Q.    And what does 2015 represent?

10:26  12       A.    Well, that's the -- July 23rd, 2015 is the

10:26  13   date damages started because that's six years prior to

10:26  14   when the lawsuit was filed in 2021.

10:26  15       Q.    And when Cisco's expert gets up here, she's

10:26  16   not going to tell us any other different dates about

10:26  17   when damages started and when damages ended, correct?

10:26  18       A.    Correct.

10:26  19       Q.    All right.  This is the damages period in the

10:26  20   case, and it ends with the expiration of the patent.

10:26  21             Now, for purposes of figuring out how the

10:26  22   parties would have in this hypothetical construct come

10:27  23   up with a license, you looked at dates when that

10:27  24   discussion would have occurred.  A discussion that

10:27  25   didn't occur but would have occurred?

439

10:27  1          A.    Correct.

10:27  2          Q.    And you have determined that that discussion

10:27  3   would have occurred in 2007?

10:27  4          A.    Correct.

10:27  5          Q.    And Cisco's expert says that discussion would

10:27  6   have occurred in 2004, right?

10:27  7          A.    Yes.

10:27  8          Q.    Your testimony earlier was that it didn't

10:27  9   matter whether ultimately we used her date or your

10:27  10  date.  Can you explain again for the jury why that

10:27  11  would be in terms of reaching your damages number?

10:27  12         A.    Yes.  If you look at your chart, both the 2004

10:27  13  and 2007 dates are well before the limited damages

10:27  14  period of seven years from July 2015 to July 2022.

10:27  15  That never changes even though there are hypothetical

10:27  16  negotiation dates earlier than that.

10:27  17             And under the patent statute, where you look

10:28  18  to the extent of use made of the invention by the

10:28  19  infringer, that occurs from July 2015 to July 2022,

10:28  20  which is unaffected by the date of the hypothetical

10:28  21  negotiation which precedes the beginning date of

10:28  22  damages.

10:28  23         Q.    And what happened in 2007 that you considered

10:28  24  important for this hypothetical negotiation?

10:28  25         A.    Well, Webex acquired -- Cisco acquired Webex

440

| | |
|---|---|
| 10:28 | 1 |
| 10:28 | 2 |
| 10:28 | 3 |
| 10:28 | 4 |
| 10:28 | 5 |
| 10:28 | 6 |

10:28  1    Communications.

10:28  2        Q.    Now, you were asked by Cisco's counsel about

10:28  3    analyses that had been done in this time frame in 2010

10:28  4    by Dr. Schaefer about infringement and evidence of

10:28  5    infringement.  And you testified about that in response

10:28  6    to Cisco's counsel's questions?

10:28  7        A.    Yes.

10:28  8        Q.    Does the fact that there's analysis of

10:29  9    infringing activities in this period change the damages

10:29  10   period in this case?

10:29  11       A.    No.  It never changes the damages period.

10:29  12       Q.    This damages period remains the same?

10:29  13       A.    It's static; it never changes.

10:29  14       Q.    And in this case, you based your damages

10:29  15   analysis on revenue that covered what period?

10:29  16       A.    July 2015 to July 2022.

10:29  17       Q.    You are analyzing Cisco's use during that

10:29  18   damages period, correct?

10:29  19       A.    Correct.

10:29  20       Q.    And you're doing so looking at the revenues

10:29  21   from 2015 through 2022?

10:29  22       A.    Yes.

10:29  23       Q.    And so when you say that there are different

10:29  24   hypothetical negotiation dates that have been discussed

10:29  25   but they don't change your ultimate damages analysis,

441

10:29  1    is this why?

10:29  2        A.    Yes.  Absolutely.  That's the reason.

10:29  3        Q.    And the use that is made of a patented

10:29  4    invention that you analyzed, is all of that use

10:30  5    happening in this 2015 to 2022 time frame that you're

10:30  6    evaluating for damages?

10:30  7        A.    Yes.

10:30  8        Q.    Okay.  I want to talk to you about these

10:30  9    patents.  Counsel said there are 412 Webex patents.

10:30  10            You were asked about that?

10:30  11       A.    Right.

10:30  12       Q.    Do you have an understanding that Cisco is

10:30  13   claiming that even one of those patents, even one

10:30  14   teaches what is in the '858 patent?

10:30  15       A.    My understanding is they've never made that

10:30  16   claim.

10:30  17       Q.    And you were here in opening.  Cisco never

10:30  18   said we have a patent that does what the '858 patent

10:30  19   does, did they?

10:30  20       A.    No.

10:30  21       Q.    So for purposes of your analysis, you didn't

10:30  22   consider and didn't have any basis to consider any

10:30  23   particular Webex patent doing something that is in the

10:31  24   '858 Paltalk patent, correct?

10:31  25       A.    That's right.

—442—

```
10:31   1        Q.    There was a lot of time spent asking you about
10:31   2   this document DX-68, MediaTone.  Now, Dr. Schaefer was
10:31   3   on the stand yesterday for many hours.  He was never
10:31   4   cross-examined about this document by Cisco.  I know
10:31   5   they asked you that he didn't testify about it in his
10:31   6   direct --
10:31   7        A.    Right.
10:31   8        Q.    -- but did they ask him about it on
10:31   9   cross-examination?
10:31  10        A.    No.
10:31  11        Q.    And he is the technical expert for Paltalk?
10:31  12        A.    Correct.
10:31  13        Q.    And you're not here to offer technical
10:31  14   opinions?
10:31  15        A.    Correct.
10:31  16        Q.    But this document, DX-68 -- let's be clear
10:31  17   first.
10:31  18              This document came out after the patent
10:31  19   applications were filed, correct?
10:31  20        A.    Yes.
10:31  21        Q.    In this document -- and counsel was trying to
10:31  22   suggest that MediaTone -- in this document Webex was
10:32  23   talking about concepts that were in the '858 patent
10:32  24   when he asked you questions.
10:32  25              Do you recall that?
```

443

| | | |
|---|---|---|
| 10:32 | 1 | A.    I do. |
| 10:32 | 2 | Q.    This document which came after the Paltalk |
| 10:32 | 3 | patent was filed, does it say anything anywhere about |
| 10:32 | 4 | hybrid audio? |
| 10:32 | 5 | A.    No. |
| 10:32 | 6 | Q.    Does it say anything anywhere about |
| 10:32 | 7 | multiplexing? |
| 10:32 | 8 | A.    No. |
| 10:32 | 9 | Q.    Does it talk about mixing? |
| 10:32 | 10 | MR. JONES:  Objection, leading, |
| 10:32 | 11 | Your Honor. |
| 10:32 | 12 | THE COURT:  Sustained. |
| 10:32 | 13 | BY MS. SRINIVASAN: |
| 10:32 | 14 | Q.    Mr. Bratic, do you have the document before |
| 10:32 | 15 | you in your binder?  Have you seen the document before? |
| 10:32 | 16 | A.    I have. |
| 10:32 | 17 | Q.    Can -- did counsel -- have you seen anywhere |
| 10:32 | 18 | where this document talks about mixing? |
| 10:32 | 19 | A.    No. |
| 10:32 | 20 | Q.    Counsel pointed you to a graphic that showed |
| 10:32 | 21 | some phone users and some computer users.  Have you |
| 10:32 | 22 | seen in this document anywhere where it talks about |
| 10:32 | 23 | those phone users and computer users being able to |
| 10:33 | 24 | communicate at the same time? |
| 10:33 | 25 | A.    No. |

444

10:33   1          Q.    And counsel didn't ask you or point you to

10:33   2    anywhere in this document that talked about

10:33   3    multiplexing, correct?

        4          A.    No.

10:33   5          Q.    All right.  This document was in 2004.

10:33   6                Is that your understanding, Mr. Bratic?

10:33   7          A.    Copyright's 2003, I think.

10:33   8          Q.    And that's still after the application of the

10:33   9    patent?

10:33   10         A.    It is.

10:33   11         Q.    But it does not talk about the concepts that

10:33   12   are in the '858 patent?

10:33   13               MR. JONES:  Objection, leading,

10:33   14   Your Honor.

10:33   15               THE COURT:  Sustained.

10:33   16   BY MS. SRINIVASAN:

10:33   17         Q.    Let me ask you this way:  Mr. Bratic, based on

10:33   18   your review of the document, do you see that it talks

10:33   19   about the patent Cisco -- the concepts disclosed in the

10:33   20   '858 patent?

10:33   21         A.    Not based on my understanding with my

10:33   22   interviews with Dr. Schaefer.

10:33   23               MS. SRINIVASAN:  I'd like to pull up

10:34   24   PX-213.

        25   BY MS. SRINIVASAN:

445

10:34  1          Q.    You don't have that in your binder,

10:34  2    Mr. Bratic.  And you may follow along with me on the

10:34  3    screen.

10:34  4          A.    Sure.

10:34  5          Q.    You see this document.  This is a document --

10:34  6    you see the date on this document?

10:34  7          A.    Yes.

10:34  8          Q.    What's the date of that document?

10:34  9          A.    It's July 2nd, 2007.

10:34  10         Q.    And you see below it.  What does it say?  Does

10:34  11   it identify where this --

10:34  12                MR. JONES:  Your Honor, I think this is

10:34  13   way outside the scope of cross, and this is also a

10:34  14   document --

10:34  15                THE COURT:  I couldn't hear you at the

10:34  16   end.

10:34  17                MR. JONES:  I think this is way outside

10:34  18   the scope of the direct.  It's cross-examination.  And

10:34  19   that it's also a document not in evidence.

10:34  20                MS. SRINIVASAN:  Your Honor, this is

10:34  21   responsive to an issue that counsel cross-examined

10:34  22   Mr. Bratic on about the MediaTone document, and it's

10:34  23   opened the door.

10:34  24                THE COURT:  Overruled.

10:34  25                But if you're talking about a document

446

```
10:35   1    that's not in evidence, you should move for it into

10:35   2    evidence.

        3    BY MS. SRINIVASAN:

10:35   4        Q.    Mr. Bratic, have you seen --

10:35   5                MS. SRINIVASAN:  Your Honor, may I

10:35   6    approach and give the witness a hard copy?

10:35   7                THE COURT:  Sure.  Of course.

10:35   8    BY MS. SRINIVASAN:

10:35   9        Q.    Mr. Bratic, have you seen PX-213 before?

10:35   10       A.    I have.

10:35   11       Q.    Do you have an understanding of where this

10:35   12   document came from?

10:35   13       A.    It's a Webex -- it's a Cisco document.

10:35   14       Q.    And where was it produced from?

10:35   15       A.    I'm sorry?

10:35   16       Q.    Where did it come from?

10:35   17       A.    It came from Cisco in this lawsuit.

10:35   18       Q.    And did you look at this document before

10:35   19   coming to court to testify?

10:35   20       A.    I did.

10:35   21               MS. SRINIVASAN:  Your Honor, we'd like to

10:35   22   seek admission of PX-213.

10:35   23               MR. JONES:  Your Honor, we would object

10:35   24   to it.  And also, this document was never mentioned in

10:35   25   any of his report.
```

—447—

| | | |
|---|---|---|
| 10:35 | 1 | THE COURT:  This is -- this is in |
| 10:35 | 2 | response to something that you raised.  I'll overrule |
| 10:35 | 3 | the objection. |
| 10:35 | 4 | MR. JONES:  Thank you. |
| 10:35 | 5 | MS. SRINIVASAN:  And, Your Honor, may we |
| 10:35 | 6 | admit? |
| 10:36 | 7 | THE COURT:  Yes.  I'm sorry.  It's |
| 10:36 | 8 | admitted. |
| 10:36 | 9 | I overruled the objection, which I think |
| 10:36 | 10 | means it's admitted.  If that wasn't clear, it's |
| 10:36 | 11 | admitted. |
| 10:36 | 12 | And let me ask the -- ladies and |
| 10:36 | 13 | gentlemen of the jury, I've tried not to break this one |
| 10:36 | 14 | so we can finish with Mr. Bratic.  But if you all need |
| 10:36 | 15 | a break, let me know.  I think we're close to the end, |
| 10:36 | 16 | but if you need a break now, we'll break now, or we'll |
| 10:36 | 17 | keep going, whichever you want. |
| 10:36 | 18 | JUROR:  Keep going. |
| 10:36 | 19 | THE COURT:  Okay.  Very good. |
| 10:36 | 20 | BY MS. SRINIVASAN: |
| 10:36 | 21 | Q.    Okay.  Thank you. |
| 10:36 | 22 | Mr. Bratic, what is the date on this document? |
| 10:36 | 23 | A.    It's July 2nd, 2007. |
| 10:36 | 24 | Q.    And is there -- underneath the box, it |
| 10:36 | 25 | describes what this document is or what the information |

10:36   1    is.

10:36   2              Can you read that for the jury?

10:36   3       A.    Well, it says:  Webex confidential

10:36   4    information.  It says:  This document contains

10:36   5    confidential information belonging to Webex

10:37   6    Communications, Inc.

10:37   7              It says:  (Webex) you cannot access this

10:37   8    document unless you are a Webex employee and have been

10:37   9    expressly authorized by your supervisor to have access.

10:37  10    You cannot disclose, copy, display, or otherwise

10:37  11    communicate the contents of this document except to

10:37  12    other Webex employees who have been authorized to

10:37  13    access this document.

10:37  14       Q.    What is the title of this document?

10:37  15       A.    It says:  Hybrid Audio Architecture Design,

10:37  16    two places, all on the same document.

10:37  17       Q.    All right.  Mr. Bratic, if you could look --

10:37  18    we're going to go past the table of contents.  If you

10:37  19    could look at Page 3.  And the introduction.

10:37  20       A.    Yes.

10:37  21       Q.    And what does it state in the introduction in

10:37  22    this Webex document related to hybrid audio

10:37  23    architecture?

10:37  24       A.    It says:  The hybrid audio service is a new

10:37  25    service that this engineering release will introduce.

449

10:38    1    The service will offer user the capability to join

10:38    2    audioconference via VoIP or PSTN.

10:38    3        Q.    All right.  And you see there it's described

10:38    4    as a new service?

10:38    5        A.    Yes.

10:38    6                MS. SRINIVASAN:  And, Mr. Boles, if you

10:38    7    could pull that chart from the first page, the revision

10:38    8    history.  And put that over the introduction.

10:38    9    BY MS. SRINIVASAN:

10:38   10        Q.    What version -- of this version history, what

10:38   11    version is this?

10:38   12        A.    This is the very first version.

10:38   13        Q.    Version 1.0; is that correct?

10:38   14        A.    Yes.

10:38   15        Q.    Okay.  And the introduction says that this is

10:38   16    a new service that the engineering release will

10:38   17    introduce.  You read the second sentence.

10:39   18            What is the capability that's being referenced

10:39   19    there?

10:39   20        A.    As I understand it, the ability to join in an

10:39   21    audioconference, both VoIP and PSTN callers.

10:39   22        Q.    And what is the year in which this new service

10:39   23    is being offered?

10:39   24        A.    In 2007, after the -- well, this is July 2007,

10:39   25    several months after Cisco acquired Webex.

450

| | | |
|---|---|---|
| 10:39 | 1 | Q.    So Cisco acquires Webex.  And then after that, |
| 10:39 | 2 | it says that it is going to release a new service for |
| 10:39 | 3 | hybrid audio. |
| 10:39 | 4 | Is that your understanding? |
| 10:39 | 5 | A.    Yes. |
| 10:39 | 6 | Q.    Let's go down to Section 1.1, the purpose. |
| 10:39 | 7 | And what does it say there the purpose for |
| 10:39 | 8 | introducing this new hybrid audio service is in 2007? |
| 10:39 | 9 | A.    It's got three bullets.  The first one says: |
| 10:39 | 10 | Improving the audioconference usability of the Webex |
| 10:40 | 11 | Audio system. |
| 10:40 | 12 | The second is:  Offer a competitive advantage |
| 10:40 | 13 | over traditional audioconference provider. |
| 10:40 | 14 | And the third bullet is:  Enhance MMP to |
| 10:40 | 15 | support hybrid audioconference. |
| 10:40 | 16 | Q.    And based on the first bullet, does that |
| 10:40 | 17 | demonstrate that Cisco viewed this audio hybrid server |
| 10:40 | 18 | as being a benefit to their Webex Audio system? |
| 10:40 | 19 | A.    Yes. |
| 10:40 | 20 | Q.    And did they view the addition of the Webex to |
| 10:40 | 21 | the Webex Audio system of this hybrid audio |
| 10:40 | 22 | architecture in 2007 as offering a competitive |
| 10:40 | 23 | advantage? |
| 10:40 | 24 | A.    Yes. |
| 10:40 | 25 | Q.    In 2007, that's the same year that you're |

| | | |
|---|---|---|
| 10:40 | 1 | using for the hypothetical negotiation, correct? |

10:40   1   using for the hypothetical negotiation, correct?

10:40   2       A.    Yes.

10:40   3       Q.    You are -- and in that year, the year you're

10:40   4   using, Webex recognized a competitive advantage over

10:41   5   traditional audioconferencing to have this hybrid audio

10:41   6   capability?

10:41   7               MR. JONES:  Objection, leading,

10:41   8   Your Honor.

10:41   9               THE COURT:  Sustained.

10:41   10   BY MS. SRINIVASAN:

10:41   11       Q.    Mr. Bratic, looking at this document, what do

10:41   12   you take away about the competitive advantages that

10:41   13   Webex saw in adding the hybrid audio feature?

10:41   14       A.    Clearly showed they have a competitive

10:41   15   advantage over traditional audioconference providers by

10:41   16   implementing the hybrid audio -- new hybrid audio

10:41   17   architecture design.

10:41   18       Q.    And I just want to come back to our chart

10:41   19   here.  PX-213.  Implement hybrid audio.

10:41   20          And based on this document that came from

10:42   21   Cisco's file, does that support your view that 2007 is

10:42   22   the right date to use for the hypothetical negotiation?

10:42   23       A.    Yes.

10:42   24       Q.    How so?

10:42   25       A.    Well, because it's clearly showing that this

452

10:42  1    is a new product that they're going to release, and

10:42  2    it's just after -- shortly after Cisco acquired Webex

10:42  3    Communications.  And it's going to involve this hybrid

10:42  4    audio architecture, which is one of the key benefits

10:42  5    Dr. Schaefer discussed as attributed to the

       6    '858 patent.

10:42  7                    MS. SRINIVASAN:  Thank you.

10:42  8                    Pass the witness.

10:42  9                    RECROSS-EXAMINATION

10:42  10   BY MR. JONES:

10:42  11      Q.    I'll try to be brief.  I want to be very clear

10:42  12   about this.

10:42  13          You do recall in my questioning that when we

10:42  14   talk about MediaTone, you and I both agree there are no

10:43  15   allegations in this case that it infringes the

10:43  16   '858 patent, correct?

10:43  17      A.    That was my understanding.

10:43  18      Q.    Okay.  And you would agree with me too, sir,

10:43  19   that with regard to MediaTone, nobody here -- nobody

10:43  20   here is taking any position that the benefits of the

10:43  21   '858 patent are in MediaTone, right?

10:43  22      A.    I don't understand the question.

10:43  23      Q.    Okay.  The '858 patent, nobody is alleging

10:43  24   that it contributes to MediaTone, right, sir?

10:43  25      A.    No.  I don't believe so.

10:43   1       Q.    Yeah.  Thank you, sir.  We're both on the same

10:43   2   page.

10:43   3                   MR. JONES:  Could we go to Slide 53?

        4   BY MR. JONES:

10:43   5       Q.    And when I discussed MediaTone, I was

10:43   6   discussing the analysis of the benefits of the

10:43   7   invention, the benefits of the '858 patent that were

10:43   8   claimed in opening statement, right, sir?

10:44   9       A.    You were.

10:44  10       Q.    And what I did is I compared it to what

10:44  11   Defendant's Exhibit 68 said about the benefits of

10:44  12   MediaTone which is not accused of infringement, right,

10:44  13   sir?

10:44  14       A.    You compared it.

10:44  15       Q.    Yes, sir.  Thank you.

10:44  16             Now, in this case, I want to make sure I

10:44  17   understand.

10:44  18             When you first did your work in this case, you

10:44  19   relied upon the fact that you believed in good faith

10:44  20   that the appropriate date of the hypothetical

10:44  21   negotiation was 2015, right?

10:44  22       A.    Well, I wouldn't say I believed.  I

10:44  23   understood.

10:44  24       Q.    Okay.  Understood.

10:44  25             Then when you did it again, you issued another

454

10:44    1    report, you understood in good faith and told us the

10:44    2    appropriate date of the hypothetical negotiation was

10:44    3    2010, right, sir?

10:44    4        A.    Yes.

10:44    5        Q.    And then in trial, we're moving to 2007,

10:45    6    right, sir?

10:45    7        A.    Yes.

10:45    8        Q.    Now, at the time you used 2015, you had done a

10:45    9    lot of work in this case, right, sir?

10:45    10        A.    A fair amount.

10:45    11        Q.    And so when you came to that conclusion, I

10:45    12    think you bill at $870 per hour, and your staff bills

10:45    13    at other rates, right, sir?

10:45    14        A.    Yes.

10:45    15        Q.    And I think you'd already at that point in,

10:45    16    about $200,000 worth of work at that time, right, sir?

10:45    17        A.    By the time of my deposition, yes.

10:45    18        Q.    Okay.

10:45    19                MR. JONES:  Thank you, Your Honor.  I

10:45    20    pass the witness.

10:45    21                THE COURT:  Thank you, sir.

10:45    22                Ladies and gentlemen, we'll take our

10:45    23    recess this morning.  Thank you for going a little

10:45    24    long.  I think it's best to get witnesses all at one

        25    time if we can get away with it.

455

10:45 1                    Please remember my instructions not to
10:45 2    discuss the case amongst yourselves.
10:45 3                    THE BAILIFF:  All rise.
10:45 4                    (Jury exited the courtroom.)
10:46 5                    THE COURT:  Mr. Bratic, you may step
      6    down.
10:46 7                    You may be seated.
10:46 8                    Let's go ahead, and if you'll rest on the
10:46 9    record, and then I'll hear the motions from the
10:46 10   defendant, any Rule 50 motions you have.  And then when
10:46 11   we come back out, I'll have you rest in front of the
10:46 12   jury.
10:46 13                   MS. SRINIVASAN:  Your Honor, before we
10:46 14   rest, I'd like to submit two documents --
10:46 15                   THE COURT:  Please do.
10:46 16                   MS. SRINIVASAN:  -- into evidence.
10:46 17   PX-116 and PX-117, those were the financials that were
10:46 18   part of the demonstratives that I used with Mr. Bratic.
10:46 19                   THE COURT:  That's fine.
10:46 20                   MS. SRINIVASAN:  They're source
10:46 21   materials.
10:46 22                   THE COURT:  Mr. Jones?
10:46 23                   MR. JONES:  No objection, Your Honor.
10:46 24                   THE COURT:  They'll be admitted.
10:46 25                   MS. SRINIVASAN:  And with that, we rest.

456

```
10:46   1              THE COURT:  Mr. Jones, do you have a
10:46   2    motion to make?
10:46   3              MR. JONES:  I believe we do have a motion
10:46   4    to make, Your Honor.  My colleague will make it, if
10:46   5    it's all right with the Court.
10:46   6              THE COURT:  That's absolutely fine.
10:47   7              And if anyone else wants to get to work
10:47   8    on going -- taking their break, you're welcome to stay.
10:47   9    I just need the lawyers who are going to make their
10:47  10    argument, and I'm not going to need a response.
10:47  11              MR. TRIBBLE:  Apologies, Your Honor.
10:47  12              THE COURT:  That's what I'm saying.
10:47  13    Everyone's free to go.
10:47  14              MR. DUFRESNE:  Good morning, Your Honor.
10:47  15    Andrew Dufresne for Cisco.  I'll try to make this
10:47  16    brief.  We have a few motions for you today.
10:47  17              The first one is for JMOL of
10:47  18    noninfringement on the basis that Paltalk did not
10:47  19    present any evidence that Cisco actually performed any
10:47  20    claim method.
10:47  21              Now, Paltalk initially asserted system
10:47  22    and method claims in this case but made a choice to
10:47  23    narrow that only to method claims.  And the law says
10:47  24    that selling software capable of practicing the patent
10:47  25    method does not directly infringe a method claim.  It's
```

```
10:48   1   not enough to simply show that the product itself is
10:48   2   capable of infringement but must be a showing of actual
10:48   3   specific instances of direct infringement.
10:48   4            Now, Dr. Schaefer did not cite any
10:48   5   instance of Cisco actually performing a claim method,
10:48   6   much less during the enforceable term of the
10:48   7   '858 patent.  And Paltalk asked Cisco's witnesses only
10:48   8   about Webex's capabilities with respect to individual
10:48   9   limitations with regard to no evidence of actual use of
10:48  10   the method.
10:48  11            So we respectfully request judgment as a
10:48  12   matter of law of noninfringement on that basis,
10:48  13   Your Honor.
10:48  14            THE COURT:  Overruled.
10:48  15            Anything else?
10:48  16            MR. DUFRESNE:  Yes.  We have one more on
10:48  17   noninfringement and then a few on damages.
10:48  18            Also on noninfringement, we move for
10:48  19   judgment as a matter of law on the basis that Paltalk
10:48  20   presented no evidence that Webex determines that a
10:48  21   subset of clients does not have the capability to mix
10:49  22   as recited in Limitation [14] of Claim 1.  That
10:49  23   limitation requires an active step of determining that
10:49  24   a subset of clients does not have the capability to mix
10:49  25   multiple audio streams.  And Paltalk provided no
```

```
10:49   1    evidence that that limitation was met.
10:49   2                    Dr. Schaefer's limited discussion of that
10:49   3    limitation referred only to a figure showing the
10:49   4    connections of devices to various servers without
10:49   5    explaining how those connections show that Webex Audio
10:49   6    was actively determining that a subset of clients do
10:49   7    not mix.  And the cited testimony from Mr. Buckles went
10:49   8    only to whether the client should be delivered a mix or
10:49   9    unmixed audio, not whether the client lacks the
10:49  10    capability to mix.  We move for judgment on that basis.
10:49  11                    THE COURT:  That's overruled.
10:49  12                    Anything else?
10:49  13                    Damages?
10:49  14                    MR. DUFRESNE:  Yes.  I have one on
10:49  15    damages, then my colleague will have a few on damages
10:49  16    as well, Your Honor.
10:50  17                    On damages, we move for judgment as a
10:50  18    matter of law because Paltalk presented no legally
10:50  19    sufficient apportionment evidence.  Dr. Schaefer's
10:50  20    assignment, technical weighting, was arbitrary,
10:50  21    substantively unexplained, and not rooted in any
10:50  22    similar methodology.  He simply pulled numbers out of
10:50  23    the air without performing any calculation or otherwise
10:50  24    explaining why he chose the percentages he presented.
10:50  25                    In addition to the apportionment
```

459

10:50  1    analysis, attributed significant technical weight to

10:50  2    the Webex Audio products' capability to support hybrid

10:50  3    audioconferences.  That analysis assumed, based on

10:50  4    undisclosed conversations, that support for everybody

10:50  5    was both novel and lacked design-around potential.  But

10:50  6    Dr. Schaefer admitted during his cross-examination that

10:50  7    support for hybrid audio calls was available before the

10:50  8    '858 patent and that there are noninfringing ways to

10:51  9    support hybrid audio calls.

10:51  10              In addition, for another functional

10:51  11   category, global access, Dr. Schaefer could not even

10:51  12   confirm whether he and Dr. Madisetti shared the same

10:51  13   understanding of global access.  And Dr. Schaefer

10:51  14   acknowledged that any misunderstanding on

10:51  15   Dr. Madisetti's part lowered his technical contribution

10:51  16   numbers.

10:51  17              As a result of these fatal flaws in the

10:51  18   apportionment analysis, Cisco requests JMOL rejecting

10:51  19   the damages analysis.

10:51  20              THE COURT:  It's overruled.

10:51  21              MR. DUFRESNE:  Thank you, Your Honor.

10:51  22              MR. TIETZ:  Hello, Your Honor.  John

10:51  23   Tietz on behalf of Cisco.

       24              Just a couple more JMOL motions on

10:51  25   damages.  One, Paltalk failed to present substantial

| | | |
|---|---|---|
| 10:51 | 1 | evidence of justifying using the entire market value of |
| 10:51 | 2 | Webex or Webex Audio to derive its damages analysis. |
| 10:51 | 3 | It based its royalty calculations starting from the |
| 10:52 | 4 | entire market value of Webex, 4.52 billion, and the |
| 10:52 | 5 | market value of Webex Audio. |
| 10:52 | 6 | Bratic testified that the base of his |
| 10:52 | 7 | calculation was all of Webex Audio products.  That's |
| 10:52 | 8 | contrary to the market value rule which only required, |
| 10:52 | 9 | which only allows a patentee to assess damages based on |
| 10:52 | 10 | the entire market value where the patented |
| 10:52 | 11 | feature creates a basis for consumer demand.  Paltalk |
| 10:52 | 12 | introduced no evidence whatsoever that the specific |
| 10:52 | 13 | audioconferencing methods recited in '858 Claims 1 |
| 10:52 | 14 | through 5 created customer demand for Webex Audio, much |
| 10:52 | 15 | less for Webex itself. |
| 10:52 | 16 | Under controlling precedent, that renders |
| 10:52 | 17 | Paltalk's use of the entire market value legally |
| 10:52 | 18 | impermissible, so we move for JMOL on that basis. |
| 10:52 | 19 | THE COURT:  Overruled. |
| 10:52 | 20 | MR. TIETZ:  Next, Cisco moves for JMOL on |
| 10:52 | 21 | damages because Paltalk's damages case depended on but |
| 10:52 | 22 | it had to prove the absence of noninfringing |
| | 23 | alternatives. |
| 10:52 | 24 | The testimony we heard was about benefits |
| 10:53 | 25 | of the technology in the abstract, not incremental |

461

```
10:53   1    benefits over other noninfringing alternatives.  We

10:53   2    heard no evidence of comparison to noninfringing

10:53   3    alternatives even though prior systems exhibited each

10:53   4    of the three benefits that Dr. Bratic ascribed.

10:53   5              Dr. Schaefer assigned the hybrid audio

10:53   6    category the most significant weight in his technical

10:53   7    analysis and agreed that prior systems could do that,

10:53   8    but still failed to account for noninfringing

10:53   9    alternatives with that optionality.  Dr. Bratic brought

10:53   10   in Dr. Madisetti, but Dr. Madisetti did not testify and

10:53   11   that evidence is not in the record.

10:53   12             Additionally, Dr. Bratic did not consider

10:53   13   Webex MediaTone even though it presented the ability to

10:53   14   do phone VoIP calls, hybrid audio functionality.

10:53   15             The only evidence is from Dr. Schaefer,

10:53   16   who admitted that there were noninfringing ways both

10:53   17   before and after the '858 patent to support hybrid

10:53   18   conferencing.  So we move for JMOL on that basis.

10:54   19             THE COURT:  Overruled.

10:54   20             MR. TIETZ:  Next, Cisco moves for JMOL on

10:54   21   damages because Paltalk's damages case is not based on

10:54   22   the extent of use of the claimed methods.  Paltalk's

10:54   23   damages case was based on products with the alleged

10:54   24   capability to perform the accused methods.  But these

10:54   25   are method claims and an asserted system, and a
```

462

10:54  1    reasonable royalty for infringing a method claim must

10:54  2    be based on use of the method.

10:54  3              Damages need to be apportioned to

10:54  4    separate out noninfringing uses, and patentees cannot

10:54  5    recover damages based on sales of products with mere

10:54  6    capability.

10:54  7              We've heard no evidence of the extent of

10:54  8    use from Paltalk and admitted that they do not use such

10:54  9    data.  Bratic equated the extent of use with Webex

10:54  10   Audio's revenue in full.

10:54  11             And so for that reason, we move for JMOL

10:54  12   on that ground too.

10:54  13             THE COURT:  Overruled.

10:54  14             MR. TIETZ:  Finally, Cisco moves for JMOL

10:55  15   on the basis that there's no substantial --

10:55  16             THE COURT:  Do you guys get paid by the

10:55  17   motion?

10:55  18             (Laughter.)

10:55  19             MR. TIETZ:  We're just building a record.

10:55  20             We move for JMOL on damages on the basis

10:55  21   that there's no sufficient evidence of Paltalk's

10:55  22   hypothetical negotiation case.  Dr. Bratic's

10:55  23   opinion --

10:55  24             THE COURT:  I don't even understand what

10:55  25   that means.

| | | |
|---|---|---|
| 10:55 | 1 | MR. TIETZ:  Dr. Bratic's opinion was that |
| 10:55 | 2 | the hypothetical negotiation date didn't matter because |
| 10:55 | 3 | it was before the damages period.  But that's contrary |
| 10:55 | 4 | to controlling law like Wang versus Toshiba that says |
| 10:55 | 5 | that the hypothetical negotiation's date matters and |
| 10:55 | 6 | even if it's before the infringement period. |
| 10:55 | 7 | Moreover, Bratic -- |
| 10:55 | 8 | THE COURT:  I don't think -- I didn't |
| 10:55 | 9 | hear him say it didn't matter.  I think -- I know |
| 10:55 | 10 | there's a question, a dispute over when it was.  I |
| 10:55 | 11 | didn't hear him say it didn't matter. |
| 10:55 | 12 | I mean, I think ultimately if there's a |
| 10:55 | 13 | dispute over when it is, he has to give an opinion. |
| 10:56 | 14 | And I think that may wind up being it doesn't matter. |
| 10:56 | 15 | I have to give an opinion. |
| 10:56 | 16 | I didn't hear -- I don't think Mr. Bratic |
| 10:56 | 17 | would have been doing what he's been doing -- he was |
| 10:56 | 18 | kind today.  He said 40 years; it's been longer than |
| 10:56 | 19 | that.  I don't think any skilled expert would say it |
| 10:56 | 20 | doesn't matter. |
| 10:56 | 21 | MR. TIETZ:  Understood, Your Honor. |
| 10:56 | 22 | Our view is that the record does reflect |
| 10:56 | 23 | that he said that the royalty rate would be the same |
| 10:56 | 24 | under any hypothetical negotiation dates. |
| 10:56 | 25 | THE COURT:  Well, I think that's right. |

```
10:56   1                   MR. TIETZ:  All because they're before
10:56   2    the damages period.
10:56   3                   THE COURT:  Okay.  If that's your motion,
10:56   4    it's overruled.
10:56   5                   MR. TIETZ:  Thank you, Your Honor.
10:56   6                   THE COURT:  I may not have understood it,
10:56   7    but as I understand it now, it's overruled.
10:56   8                   So thank you.
10:56   9                   Now, I didn't anticipate this.  When I
10:56  10    got the draft of the jury charge -- I'm glad I got it
10:57  11    early.  A couple of comments on it, if you all would
10:57  12    take them down.
10:57  13                   With regard to instruction -- the
10:57  14    instruction on interrogatories, if no interrogatory is
10:57  15    used, that should be dropped.  If interrogatory is used
10:57  16    during trial, then keep it.
10:57  17                   The one on stipulations, same.  So far I
10:57  18    haven't heard any.
10:57  19                   However, I -- on No. 14, burden of proof
10:57  20    on clear and convincing evidence, I think I'm up to
10:57  21    having given that 41 times now.  I'm not open to
10:57  22    debating what that says.
10:57  23                   I'm going to say what I said on Friday
10:57  24    last on clear and convincing evidence and what I said
10:57  25    the time before and the time before and the time
```

465

10:57　　1　before.

10:57　　2　　　　　　　Y'all are welcome -- let me make clear,

10:57　　3　y'all are welcome to make any objections you want, but

10:57　　4　I've given an instruction on clear and convincing

10:58　　5　evidence.  I'm really not going to entertain debate

10:58　　6　about that.

10:58　　7　　　　　　　On summary of contentions on No. 15,

10:58　　8　Cisco's added -- Cisco asserts it does not infringe,

10:58　　9　and I can't imagine why the plaintiff would be

10:58　　10　objecting to that.  That makes sense to me that it

10:58　　11　should be in there.

10:58　　12　　　　　　　With regard to Instruction No. 16 on

10:58　　13　patent claims, again, I've given this.  I don't know --

10:58　　14　I can't imagine why I would have to deal with that.

10:58　　15　　　　　　　So with regard to 19, invalidity,

10:58　　16　generally where someone is unhappy with the fact that

10:58　　17　there is a paragraph -- if you decide that any claim

10:58　　18　has da-da-da-da, you'll need to decide any money or

10:59　　19　damages, I'm going to eliminate that paragraph.

10:59　　20　　　　　　　I agree with whoever's unhappy that

10:59　　21　there's a paragraph in there about damages under

10:59　　22　invalidity generally because that will be taken up

10:59　　23　during damages.

10:59　　24　　　　　　　Now, that -- the paragraph that is on --

10:59　　25　currently in 19 needs to be given somewhere, and I will

| 10:59 | 1 | give that -- that needs to be said somewhere.  And I |
| 10:59 | 2 | say it in my instructions somewhere.  But I agree that |
| 10:59 | 3 | it's not -- should not be in the section on invalidity. |
| 10:59 | 4 | With regard to prior art, I can't tell |
| 10:59 | 5 | what's going on there.  But again, I've given the |
| 10:59 | 6 | instruction on prior art.  Other than replacing the |
| 10:59 | 7 | prior art that was in last week's instruction with the |
| 10:59 | 8 | prior art that is in this week's instruction, that's |
| 10:59 | 9 | what I'm going to give. |
| 10:59 | 10 | With regard to obviousness, I gave an |
| 10:59 | 11 | instruction Friday on obviousness.  That's the one I'm |
| 11:00 | 12 | going to give this week. |
| 11:00 | 13 | And I think -- whoops.  And then -- oh, |
| 11:00 | 14 | with regard to apportionment, I actually will take this |
| 11:00 | 15 | up at our charge conference.  However, again, we had |
| 11:00 | 16 | apportionment last Friday.  I gave an instruction on |
| 11:00 | 17 | apportionment.  I don't know -- I haven't heard |
| 11:00 | 18 | anything in this case about why the apportionment |
| 11:00 | 19 | instruction as a matter of law would be any different |
| 11:00 | 20 | in this case.  I didn't hear anything in Mr. Bratic's |
| 11:00 | 21 | testimony that would make me believe it's different. |
| 11:00 | 22 | It's apportionment. |
| 11:00 | 23 | So whoever comes in -- whoever comes in |
| 11:00 | 24 | saying, we want you to give what you gave last week and |
| 11:00 | 25 | you have given 40 times is probably going to win.  But |

```
11:00   1    if there's a reason, there's something unique about the
11:00   2    case with regard to apportionment, I'll be happy to
11:01   3    take it up when we have our conference on the charge.
11:01   4              So hopefully by reading all that out --
11:01   5    and thank you for providing this to me early -- that
11:01   6    will make our charge conference much shorter.
11:01   7              Again, let me make clear.  The charge
11:01   8    conference is to persuade me what ought to be in it.
11:01   9    It is not the time to protect your record.  The time to
11:01  10    protect your record will be at the time I ask for the
11:01  11    final Rule 50 motion at the close of the plaintiff's
11:01  12    rebuttal case.
11:01  13              And when those directed verdicts are
11:01  14    taking place, if I don't think to say, are there
11:01  15    objections to the jury charge, Mr. Siegmund or
11:01  16    Mr. Jones or someone needs to say politely, Judge, with
11:01  17    respect -- I always like it when they do that -- we
11:01  18    still need to make our objections because that's when
11:01  19    the objections need to be made on the record, if you
11:01  20    have any.
11:01  21              So I'll be back in just a couple of
11:01  22    minutes.
11:02  23              THE BAILIFF:  All rise.
11:07  24              (Recess taken.)
11:11  25              THE BAILIFF:  All rise.
```

468

```
11:11   1                   (Jury entered the courtroom.)
11:12   2                   THE COURT:  Thank you.  You may be
11:12   3    seated.
11:12   4                   Who is the plaintiff's next witness?
11:12   5                   MS. SRINIVASAN:  Your Honor, the
11:12   6    plaintiff rests.
11:12   7                   THE COURT:  Defendants?  Or defendant.
11:12   8    Sorry.
11:12   9                   MS. PIEPMEIER:  Thank you, Your Honor.
11:12  10                   Cisco calls Mr. Amit Barave as its first
11:12  11    witness.
11:12  12                   (The witness was sworn.)
11:12  13                      DIRECT EXAMINATION
11:12  14    BY MS. PIEPMEIER:
11:13  15       Q.    Good morning, Mr. Barave.
11:13  16             Could you please introduce yourself to the
       17    jury?
11:13  18       A.    Good morning.  My name is Amit Barave.  I'm a
11:13  19    vice president of product management at Cisco Systems.
11:13  20       Q.    Can you please tell the jury a little bit
11:13  21    about your background?
11:13  22       A.    Sure.  I grew up in Mumbai, India.  I did my
11:13  23    undergraduate in electronics and telecommunications
11:13  24    engineering over there.  I came to the Silicon Valley
11:14  25    for work, and I have been working for Cisco Systems
```

11:14   1    over 23 years.

11:14   2        Q.    What were you doing a couple of years before

11:14   3    you joined Cisco in the United States?

11:14   4        A.    I was working in Silicon Valley with a couple

11:14   5    of early-stage networking and communications startups.

11:14   6    And after a couple of years, I started working for

11:14   7    Cisco Systems.

11:14   8        Q.    Why did you join Cisco in 2001?

11:14   9        A.    Cisco back then and even now is considered the

11:14   10   networking pioneer and giant.  So it was one of the

11:14   11   coveted jobs.  And also, the opportunity presented

11:14   12   itself.  That was very good to hear.

11:14   13       Q.    Now, let's talk about Cisco for just a moment

11:14   14   before we dive into Webex.

11:14   15             Can you tell the jury a little bit more about

11:14   16   Cisco and how it was founded?

11:14   17       A.    Sure.

11:14   18             Cisco was founded in 1984 by a couple of

11:15   19   Stanford students.  And the first couple of products,

11:15   20   Cisco is widely credited with pioneering the Internet

11:15   21   working equipment, so routers and switches as people

11:15   22   describe it.

11:15   23             But for the first couple of decades, that was

11:15   24   the primary product portfolio for Cisco, networking

11:15   25   equipment.  And then on -- Cisco has brought in the

470

11:15  1    products into security area, collaboration and

11:15  2    communications area.

11:15  3         Q.    Shifting forward to today, what sort of

11:15  4    products does Cisco offer?

11:15  5         A.    The core business, if you will, the areas of

11:15  6    technologies are still the same in that networking

11:15  7    security and communications and collaboration, but the

11:15  8    number of products within each other is -- businesses

11:15  9    has grown significantly.

11:15  10        Q.    What was your first position at Cisco?

11:15  11        A.    Software engineer.

11:16  12        Q.    And what did you do as a software engineer at

11:16  13   Cisco?

11:16  14        A.    I was involved in writing software for a

11:16  15   product that was called Internet protocol-based contact

11:16  16   center, or IPPC.

11:16  17        Q.    And tell me a little bit about that.

11:16  18        A.    So contact center typically is the customer

11:16  19   service numbers that people call.  The product and

11:16  20   software that's behind it is called the contact center

11:16  21   product, and I was involved in the development of that

11:16  22   product.

11:16  23        Q.    Tell us about your next role.

11:16  24        A.    So I grew in terms of my roles and

11:16  25   responsibility as a software engineer.  Along the way,

11:16  1    I also got my master's in business administration at

11:16  2    University of California at Berkeley.

11:16  3            And along the way, I was setting myself up for

11:16  4    a role in product management.  So I worked in the

11:17  5    product called IPICS Mobile.  I don't remember the

11:17  6    formal acronym anymore, but it is again a

11:17  7    communications product, and I was the product manager

11:17  8    for it, for the mobile application.

11:17  9        Q.    How did it work that you got your MBA while

11:17  10   you're working at Cisco?

11:17  11       A.    Oh, Cisco was extremely supportive in that

11:17  12   they routinely supported their employees getting

11:17  13   additional education and oftentimes encouraged them to

11:17  14   keep the job and get the education part time, which is

11:17  15   the option I took.

11:17  16       Q.    Turning back to IPICS, I-P-I-C-S, what, if

11:17  17   anything, did you like about working on that product in

11:17  18   your first product management role?

11:17  19       A.    I'll mention three things that have me really

11:17  20   excited about working on IPICS.

11:17  21           First of all, it was a role transitioning to

11:17  22   product management that I was aspiring.

11:17  23           Second, it was a very innovative product, and

11:18  24   that product actually spoke to a mission a lot of us

11:18  25   shared at Cisco in terms of helping save lives.

472

| | | |
|---|---|---|
| 11:18 | 1 | The way I would describe the product is the |
| 11:18 | 2 | good old telephone systems, you may remember the |
| 11:18 | 3 | long-distance phone calls used to be very expensive, |
| 11:18 | 4 | and then the Internet technologies came about, and that |
| 11:18 | 5 | started playing a part in telephony networks and made |
| 11:18 | 6 | it very reachable and cheap. |
| 11:18 | 7 | A similar sort of thing was yet to happen to |
| 11:18 | 8 | the radio networks, and by radio networks, I mean the |
| 11:18 | 9 | hand-held walkie-talkies that typically emergency |
| 11:18 | 10 | responders use, the police agencies, the fire agencies. |
| 11:18 | 11 | And without that technology, the distance or |
| 11:18 | 12 | the reach they can have is limited.  When you bring the |
| 11:18 | 13 | Internet technologies to it, it will do -- expand a |
| 11:18 | 14 | reach by quite a bit, and that really helps them when |
| 11:18 | 15 | they're responding to emergency.  And that's why it was |
| 11:18 | 16 | about making lives better, and it was very motivating. |
| 11:19 | 17 | It was a product I joined in a very early stage. |
| 11:19 | 18 | Q.   Thank you for that. |
| 11:19 | 19 | What product do you work on today? |
| 11:19 | 20 | A.   Webex. |
| 11:19 | 21 | Q.   And what is your role on Webex today? |
| 11:19 | 22 | A.   I'm the vice president of product management |
| 11:19 | 23 | for Webex. |
| 11:19 | 24 | Q.   Do you have a team that works for you? |
| 11:19 | 25 | A.   Yes. |

11:19   1      Q.    And can you tell the jury a bit about your
11:19   2   responsibilities as a vice president of product
11:19   3   management for Webex?
11:19   4      A.    Sure.  So as a vice president of product
11:19   5   management, my responsibilities really span across four
11:19   6   areas, first of which is customers.  Second is product.
11:19   7   Third is business, and fourth is people.
11:19   8            And I will elaborate what each of these
11:19   9   categories mean.
11:19  10            When I say "customers," it is about
11:19  11   maintaining customer engagements, understanding what
11:19  12   they need, how they use our products, what we could do
11:20  13   better, and also meet customers who are prospects or
11:20  14   potential customers.
11:20  15            When I say "product," all the intelligence we
11:20  16   gather from the customers, all the intelligence we
11:20  17   gather from engineering and technology innovation.  How
11:20  18   do we shape our product roadmaps?  What do we build
11:20  19   next?  How can we improve our next product?
11:20  20            Business is when we're doing these things,
11:20  21   ultimately this has to contribute towards the company's
11:20  22   financial goals, the revenue, margins, and so on.  How
11:20  23   do we make sure we ensure we accomplish that?
11:20  24            And lastly, this becomes possible to the teams
11:20  25   we have.  So it's incredibly important that we invest

474

11:20  1    in growing, mentoring, and hiring the right teams.

11:20  2        Q.   Thank you, Mr. Barave.

11:20  3             Let's shift gears and talk specifically about

11:20  4    Webex.  You haven't been here in the courtroom, but for

11:20  5    the past couple of days, we heard a lot of people talk

11:20  6    about Webex.

11:20  7             I'd like to hear from the product manager of

11:20  8    Webex at a high level what it is.

11:21  9        A.   Okay.  At a high level, I started work -- some

11:21  10   of you or maybe many of you would have heard of Webex

11:21  11   and thought of it as the conferencing or video meetings

11:21  12   service.  And that is the primary part of Webex, but

11:21  13   over the years it has grown into offering a lot more of

11:21  14   the -- what we call as collaboration and communication

11:21  15   services.

11:21  16            So aside from video meetings, Webex offers

11:21  17   messaging, calling, as in making phone calls.  Webex

11:21  18   also offers hardware gear, that is video systems and

11:21  19   conference rooms or headsets.  So all in all, Webex is

11:21  20   turning to a collaboration product portfolio.

11:21  21       Q.   Were you familiar with Webex Communications,

11:21  22   the company before it was acquired by Cisco in 2007?

11:21  23       A.   Yes.

11:21  24       Q.   When did you become familiar with Webex, the

11:21  25   company?

11:21  1        A.    So as -- I was working in the Silicon Valley

11:22  2   in the years 1999 and 2001.  Webex was on the

11:22  3   billboards.  As we would drive on the freeways, it was

11:22  4   on the billboards, and my startups, the startups I

11:22  5   worked for were in the networking and communication

11:22  6   space, so we were aware of other companies doing

11:22  7   similar things.

11:22  8        Q.    So do you know when or when do you first

11:22  9   believe -- or strike that.  That was a terrible

11:22  10  question.  Let me start over.

11:22  11        When did you first see Webex offering

11:22  12  conferencing?  What time period?

11:22  13             MS. SRINIVASAN:  Objection, foundation.

11:22  14             THE COURT:  Could I hear the question

11:22  15  again?

11:22  16             MS. PIEPMEIER:  Sure.  If I can restate

11:22  17  it.  It was a terrible question the first time.  I'll

11:22  18  try to make it better.

11:22  19             THE COURT:  Okay.

11:22  20  BY MS. PIEPMEIER:

11:22  21        Q.    When did you observe, based on your having

11:22  22  seen it during commutes, et cetera, the first time that

11:22  23  Webex was offering conferencing?

11:22  24             MS. SRINIVASAN:  Objection, Your Honor.

11:22  25  No foundation.  He wasn't at the conference -- he

11:23  1    testified that he was just familiar with Webex from

11:23  2    seeing the billboards at that time.  So I don't believe

11:23  3    that lays a foundation for what counsel had asked.

11:23  4              THE COURT:  Perhaps you could lay a

11:23  5    foundation before that question.

11:23  6              MS. PIEPMEIER:  Let me rephrase the

11:23  7    question and see if that solves the problem.

11:23  8    BY MS. PIEPMEIER:

11:23  9        Q.   Mr. Barave, you testified earlier that you saw

11:23  10   billboards advertising Webex during your commute in

11:23  11   Silicon Valley in the 1999 to 2001 time frame; is that

11:23  12   correct?

11:23  13       A.   Yes.

11:23  14       Q.   And what, if anything, do you recall those

11:23  15   billboards promoting or advertising regarding the Webex

11:23  16   communication product in that time period?

11:23  17       A.   They used to use the term "web conferencing"

11:23  18   and "conferencing."

11:23  19       Q.   Now, during that time period of '99 to 2001,

11:23  20   what field were you working in before you joined Cisco?

11:24  21       A.   Networking and communications.

11:24  22       Q.   And how, if at all, were you aware of what was

11:24  23   going on in the marketplace during that time period?

11:24  24       A.   So my experience working with or in the

11:24  25   startup environments, there would be a lot of

477

11:24  1    discussions around competitors or other innovations

11:24  2    happening around us.  And Internet communications was a

11:24  3    really booming thing.  We heard a number of different

11:24  4    companies were doing similar things, and by "similar,"

11:24  5    I mean things within conferencing space.  Webex was one

11:24  6    of them.

11:24  7        Q.    Okay.  Thank you.

11:24  8              Did you prepare any slides to aid your

11:24  9    testimony this morning?

11:24  10       A.    Yes.

11:24  11       Q.    I'd like to pull up your slides.  And let's go

11:24  12   to -- before we go to a specific slide, I want to ask

11:24  13   you a question.

11:25  14             Are you personally aware of any other

11:25  15   companies offering web-based conferencing during that

11:25  16   time period of late '99, early 2000s?

11:25  17       A.    Two names come to mind.  One was called

11:25  18   NetMeeting and the other was called Latitude

11:25  19   Communications.

11:25  20       Q.    Okay.  Thank you.

11:25  21             MS. PIEPMEIER:  I'd like to go to Slide

11:25  22   4, please, of DDX-5.

11:25  23   BY MS. PIEPMEIER:

11:25  24       Q.    And, Mr. Barave, you provided me with this

11:25  25   information to put on a slide.  Can you describe for

478

| | | |
|---|---|---|
| 11:25 | 1 | the jury what it is? |
| 11:25 | 2 | A.   Oh, yes.  This is a Form 10Q from |
| 11:25 | 3 | September 30th, 1999.  It's a public disclosure filed |
| 11:25 | 4 | by Latitude Communications.  And what it is referring |
| 11:25 | 5 | to is what the products built by Latitude |
| 11:26 | 6 | Communications were saying to the world -- they're |
| 11:26 | 7 | referring to MeetingPlace as their enterprise product. |
| 11:26 | 8 | How with MeetingPlace, participants can schedule and |
| 11:26 | 9 | attend meeting, share, edit documents, using the |
| 11:26 | 10 | technologies such as telephones, cellular phones, and |
| 11:26 | 11 | personal computers. |
| 11:26 | 12 | Q.   And was Latitude Communications, Inc. at some |
| 11:26 | 13 | point acquired by another company? |
| 11:26 | 14 | A.   It was acquired by Cisco later on. |
| 11:26 | 15 | Q.   And are you aware of another company that was |
| 11:26 | 16 | offering this type of technology in that 1999 to 2001 |
| 11:26 | 17 | time frame? |
| 11:26 | 18 | A.   Yes.  NetMeeting is the other one I recall. |
| 11:26 | 19 | Q.   And was NetMeeting ultimately acquired by |
| 11:26 | 20 | somebody? |
| 11:26 | 21 | A.   NetMeeting -- |
| 11:26 | 22 | Q.   Or -- strike that. |
| 11:26 | 23 | By whom was NetMeeting offered ultimately? |
| 11:26 | 24 | A.   Microsoft. |
| 11:27 | 25 | MS. PIEPMEIER:  Let's go to Slide 5, |

| 11:27 | 1 | please. |
| 11:27 | 2 | BY MS. PIEPMEIER: |
| 11:27 | 3 | Q.   And can you please explain for the jury what |
| 11:27 | 4 | we see on Slide 5, which is an article that you |
| 11:27 | 5 | provided to me? |
| 11:27 | 6 | A.   So this is a product availability announcement |
| 11:27 | 7 | published by Microsoft in 1996.  They're essentially |
| 11:27 | 8 | announcing NetMeeting conferencing software and how it |
| 11:27 | 9 | provides easy voice, data, Internet communications. |
| 11:27 | 10 | And if you look at the highlighted part of the |
| 11:27 | 11 | application or service overview, it says:  NetMeeting |
| 11:27 | 12 | allows two or more people to simultaneously share |
| 11:27 | 13 | virtually any existing Windows operating system-based |
| 11:27 | 14 | applications across the Internet, a corporate LAN or |
| 11:27 | 15 | public telephone network.  So that's the PSTN phone. |
| 11:27 | 16 | Q.   To the best of your knowledge -- strike that. |
| 11:27 | 17 | Do you have any knowledge as to what problem |
| 11:28 | 18 | these companies were attempting to solve in that time |
| 11:28 | 19 | period? |
| 11:28 | 20 | MS. SRINIVASAN:  Objection, foundation. |
| 11:28 | 21 | MS. PIEPMEIER:  I'm asking a foundational |
| 11:28 | 22 | question, Your Honor, whether he has any knowledge. |
| 11:28 | 23 | THE COURT:  I agree.  The objection's |
| 11:28 | 24 | overruled. |
| 11:28 | 25 | A.   The problem as it was widely -- |

480

```
11:28    1   BY MS. PIEPMEIER:
11:28    2       Q.    I apologize, sir.  Let me stop you and let
11:28    3   you -- just because there was an objection.  I'm so
11:28    4   sorry for interrupting you, but let me ask you first if
11:28    5   you have knowledge of what the problem was, and then
11:28    6   you'll answer that, just so we lay the foundation that
11:28    7   counsel has objected to.  And then we'll go on and talk
11:28    8   about it, if you have knowledge.  Is that okay?
11:28    9       A.    Sure.
11:28   10       Q.    I'm so sorry for interrupting you, so let me
11:28   11   ask that question again.
11:28   12           Do you have knowledge of what the problem is
11:28   13   that those companies were attempting to solve in that
11:28   14   1999 to 2000 time frame?
11:28   15       A.    Yes.
11:28   16       Q.    What is that knowledge based on?
11:28   17       A.    That is based on reading about the products
11:28   18   and being involved in the startup that was working on a
11:29   19   similar or -- problem.
11:29   20       Q.    Thank you so much.  And I apologize very much
11:29   21   for interrupting your answer on that.
11:29   22           What was the problem that these companies were
11:29   23   attempting to solve in the late '90s and early 2000s?
11:29   24           MS. SRINIVASAN:  Objection, Your Honor,
11:29   25   lack of foundation.  He's not a -- he's just saying --
```

481

| | |
|---|---|
| 11:29 | 1 |

```
11:29  1              THE COURT:  I can't hear you, ma'am.

11:29  2              MS. SRINIVASAN:  Objection, lack of

11:29  3   foundation.  He said it's based on reading about the

11:29  4   products of other companies.  I don't think he can

11:29  5   testify about what problems they were trying to solve,

11:29  6   the companies that he was not working at.

11:29  7              MS. PIEPMEIER:  If I may respond,

11:29  8   Your Honor.  He not only testified about reading.  He

11:29  9   testified that it was his job to know that because it

11:29  10  was a competitive landscape in the specific area that

11:29  11  he was working in, so he was aware of it personally.

11:29  12             THE COURT:  Overruled.  You can take it

11:29  13  up on cross.

11:29  14  BY MS. PIEPMEIER:

11:29  15    Q.   So let's ask the question again so we have a

11:29  16  clean record.

11:29  17             What was the problem that these companies were

11:29  18  trying to solve with Latitude and NetMeeting in the

11:30  19  late '90s and early 2000s?

11:30  20    A.   The typical problem people were running into

11:30  21  is when people are working from different locations and

11:30  22  trying to collaborate with each other, they would need

11:30  23  to share documents, screens, and still be able to talk

11:30  24  to each other.  So being able to do audio and what used

11:30  25  to be described as data or web conferencing, doing that
```

482

11:30  1    together from their PCs or phones was the product

11:30  2    space.

11:30  3        Q.    Did these two products that we just looked at

11:30  4    on Slides 4 and 5 from Latitude Communications and

11:30  5    Microsoft allow people to connect to the conferences

11:30  6    you just discussed via VoIP and PSTN?  In other words,

11:30  7    via computer and plain old telephone?

11:30  8        A.    In answering that, I'm just going to refer to

11:30  9    what they claim their products would be doing, which

11:30  10   they seemed to be claiming.

11:30  11       Q.    And what are you pointing to when you say

11:31  12   that?  You're pointing to the screen.  So I just want

11:31  13   to make sure the record's clear.

11:31  14       A.    I'm sorry.  I'll be more clear.  Their product

11:31  15   announcement that we just saw from Microsoft and the

11:31  16   10Q disclosure we saw from Latitude Communications,

11:31  17   they both claim their products to be doing that.

11:31  18       Q.    Thank you.

11:31  19            MS. PIEPMEIER:  You can take the slides

11:31  20   down.

11:31  21   BY MS. PIEPMEIER:

11:31  22       Q.    Now, you testified that Cisco acquired Webex

11:31  23   in 2007.  What did Cisco do with Webex after that

11:31  24   acquisition?

11:31  25       A.    Well, that was a strategic acquisition for

483

```
11:31   1   Cisco.  By that, I mean Cisco doubled down on the Webex
11:31   2   platform and the team that was acquired.  And in the
11:31   3   decade that followed, all the cloud-based
11:31   4   collaboration, capabilities, and services Cisco built
11:31   5   were essentially built on the Webex platform, or a form
11:31   6   of the Webex platform from there.
11:31   7        Q.   Do you prepare videos as part of your
11:31   8   responsibility as product manager at Cisco?
11:31   9        A.   Our marketing teams produce the videos.  We're
11:32  10   involved as product managers in there in terms of
11:32  11   creating the outlines and relaying the key messages
11:32  12   that need to get communicated in those videos.
11:32  13        Q.   Did you select a video specifically for this
11:32  14   case?
11:32  15        A.   Yes.
11:32  16        Q.   And in the video that you -- but in the video
11:32  17   that you specifically selected for this case, were you
11:32  18   personally involved in developing the substance in the
11:32  19   messaging in that video?
11:32  20        A.   By "substance," I would say the key
11:32  21   capabilities that are highlighted in the videos and the
11:32  22   matter around those, yes.  I was involved in building
11:32  23   out that one outline.
11:32  24             MS. PIEPMEIER:  At this time, Your Honor,
11:32  25   we would like to play a very short -- I believe it's
```

—484—

```
11:32   1    less than one minute -- video concerning Webex, which
11:32   2    is on our demonstratives.  I believe it is Slide 1, I
11:32   3    think, on our DDX-5.
11:32   4               MS. SRINIVASAN:  No objection.
11:33   5               (Video played.)
11:34   6               MS. PIEPMEIER:  Thank you.  We can take
11:34   7    down the slide.
11:34   8    BY MS. PIEPMEIER:
11:34   9       Q.   I'd like to talk about some of the features
11:34  10    highlighted in the video that your team helped create.
11:34  11    We saw the example audio intelligence in the video.
11:34  12               Can you please tell us what that is?
11:34  13       A.   Specifically about the audio intelligence
11:34  14    feature?
11:34  15       Q.   Let's start with that.
11:34  16       A.   Okay.  We call it intelligence because we
11:34  17    leverage some of the artificial intelligence
11:34  18    technologies in it.  But what it really does is makes
11:34  19    the speech within meetings much better audible.  By
11:34  20    that, I mean a number of times you see people joining
11:34  21    meetings and there's something going on in the
11:34  22    background, like dogs barking or a lawnmower goes off.
11:34  23    And that creates a disruption for everyone on the other
11:35  24    end.
11:35  25               (Clarification by Reporter.)
```

11:35  1    A.    So our technology is capable of taking out the

11:35  2  nonhuman voice or audio at the source, which means

11:35  3  people on the other side only hear the person that is

11:35  4  speaking.  That's where -- when the lady said, "I only

11:35  5  hear you," that's what it meant.

11:35  6           And we've made some improvements on it where

11:35  7  you could have a handful of people in a conference

11:35  8  room.  At that point, we need the ability to clear out

11:35  9  all the nonhuman audio but preserve the multiple human

11:35  10  voices.  So we can optimize from multiple voices.

11:35  11           And even within that setup, if someone said

11:35  12  that, I don't want to capture the whisper sidebar

11:35  13  conversations going through, then you can only pick up

11:35  14  the active speaker's voice.  So that's the audio

11:36  15  intelligence.

11:36  16  BY MS. PIEPMEIER:

11:36  17    Q.    Thank you for that.

11:36  18           Now, there's a lot of things shown in that

11:36  19  video.  We started with audio intelligence.

11:36  20           Can you recap some of the other notable things

11:36  21  that were displayed in that video?

11:36  22    A.    That's all my teams' work.  I could go on and

11:36  23  on about that.

11:36  24    Q.    We're only here this week.

11:36  25           (Laughter.)

11:36  1        A.    I'm going to be cognizant of time here, but

11:36  2   let me recap some of the interesting ones.  And I will

11:36  3   say we chose these features because this is where it

11:36  4   seems to matter to our customers.

11:36  5             There are a number of other products out

11:36  6   there.  So when we build the marketing videos, the goal

11:36  7   is you get across what people seem to value, use a lot,

11:36  8   and choose our product for.  And some of those

11:36  9   capabilities, you have caught the terms "realtime

11:36  10  translation."

11:36  11            So we were the first ones to introduce closed

11:37  12  captioning when you're in a meeting.  So as if I was in

11:37  13  a meeting right now, you would see realtime closed

11:37  14  captions.

11:37  15            And then some of the people, if they chose to

11:37  16  see translation into another language of those

11:37  17  captions, they'd be able to see that in realtime as

11:37  18  well.

11:37  19            You might have caught on to a feature called

11:37  20  immersive share.  If you -- if anyone who has used a

11:37  21  meeting like this, you would see that when you share a

11:37  22  screen, it's just a screen that gets shared.  But how

11:37  23  about the ability to put the speaker in front of the

11:37  24  share?

11:37  25            And the screen is -- the shared screen is the

487

11:37  1    full screen as the background.  So you can point to it

11:37  2    as if this is what's going on.  So that's immersive

11:37  3    share.

11:37  4           We saw some of the hardware products we've

11:37  5    built in there, whiteboard.  So we can do whiteboards

11:37  6    in our applications on PCs and big digital whiteboard

11:37  7    together.

11:37  8           There was the PC-based application, mobile

11:38  9    phone-based application.

11:38  10          There's a product called Webex Desk Pro, which

11:38  11   is a video system that you can use in your desk or a

11:38  12   room.

11:38  13          There's a few features that we didn't talk

11:38  14   about there because they're difficult to show.  Those

11:38  15   are about security, so I won't talk about those, but

11:38  16   those are equally valuable.

11:38  17   BY MS. PIEPMEIER:

11:38  18      Q.   Let's shift gears to I think something we

11:38  19   actually saw in the video, but I'm not sure that we

11:38  20   heard these words.

11:38  21          What, if anything, does "seamless transition"

11:38  22   mean to you in the context of Webex?

11:38  23      A.   So seamless transition is a descriptor we use

11:38  24   to describe users' experience when they -- when they go

11:38  25   from one device to another while on a Webex Meeting.

11:38   1           And here's what I mean by that.  For a lot of

11:38   2   our customers, it is common for their users that they

11:38   3   start or they join a meeting just as they are heading

11:38   4   to work, as they get into the car.

11:39   5           Then when they reach their office, they open

11:39   6   their PC, and they would like to continue that meeting,

11:39   7   but this time they would like to use the PC, if it's

11:39   8   available.

11:39   9           And then maybe they have to go to a conference

11:39  10   room and they would take the PC to the conference room.

11:39  11   And the conference room could have a dedicated Webex

11:39  12   video system over there.  And you don't want five, six

11:39  13   laptops creating echos with each other in there.  So

11:39  14   you would want to then move the meeting to the PC.

11:39  15           So what I described is transition points from

11:39  16   car from a mobile app to PC to video systems.  And the

11:39  17   ability for the same meeting along with that user to

11:39  18   just move onto those devices without any friction is

11:39  19   what we mean by seamless transition.

11:39  20      Q.   Do you have a sense of how many different

11:39  21   technologies are involved in the ability to seamlessly

11:39  22   transition the examples that you just gave us?

11:39  23      A.   I wouldn't be able to give a number, but there

11:40  24   are many, many things involved in there.  For example,

11:40  25   when you're going into the car, detecting the Bluetooth

11:40  1    pairing with that, moving the audio there, then moving

11:40  2    it back.

11:40  3        Then you take your mobile phone where your app

11:40  4    is running, Webex App is running, to a PC where your

11:40  5    Webex App is running, detecting that, transitioning the

11:40  6    meeting over there.  In the background, verifying the

11:40  7    identity of the same user.

11:40  8        And then when you go to the conference room,

11:40  9    where somebody with maybe Bluetooth in terms of the car

11:40  10   radio, but when you go to the video system, you use a

11:40  11   different technology called ultrasound pairing to move

11:40  12   the meeting to the video system.  So quite a few

11:40  13   technologies.

11:40  14   Q.    Now, using your example of going from the

11:40  15   house to the car to your office or your cube to a

11:40  16   conference room, if I were to make that transition but

11:41  17   I had dialed into the Webex conference using my

11:41  18   telephone over PSTN not using the app, would that

11:41  19   transition that you just described, that series of

11:41  20   transitions, be available to me?

11:41  21   A.    Not in the seamless transition way that I

11:41  22   described.

11:41  23   Q.    And can you elaborate a little bit on what you

11:41  24   mean by that?

11:41  25   A.    Yes.  The seamless, that was because the user

490

```
11:41   1   was in the app.  The user didn't have to do much.  It
11:41   2   was able to detect a move.
11:41   3          In the case where you described where you had
11:41   4   dialed in using a phone, that would not work.
11:41   5   Q.    What kind of customers use Webex?
11:41   6   A.    Primarily businesses, and when I say
11:41   7   "businesses," medium sized all the way to the largest
11:41   8   Fortune 500 businesses.  And they are typically in
11:41   9   the -- when we say "verticals," what businesses are
11:41  10   they in, right?  The dominant ones are health care,
11:42  11   educational institutions, financial services, retail,
11:42  12   and manufacturing.
11:42  13          And outside of these businesses, the other big
11:42  14   customer base Webex has is in the federal and public
11:42  15   sector domain.  So a lot of the governments, defense,
11:42  16   and military institutions also use Webex.
11:42  17   Q.    Can you tell me more about the security
11:42  18   features within Webex?
11:42  19   A.    Yes.  The security applies to a few different
11:42  20   aspects of the product.  Let's first talk about the
11:42  21   traffic.  By "traffic," I mean the audio, video, and
11:42  22   screen sharing that goes between participants.
11:42  23          That -- Webex uses the strongest possible
11:42  24   encryption, very strong encryption.  Webex supports a
11:42  25   solution that is called end-to-end encrypted meetings,
```

491

| | | |
|---|---|---|
| 11:43 | 1 | which means at no point in between is it in a |
| 11:43 | 2 | nonencrypted form. |
| 11:43 | 3 | And our latest innovation has been zero-trust |
| 11:43 | 4 | meetings.  When we say zero-trust, it means the |
| 11:43 | 5 | customer doesn't have to at any point take Webex's word |
| 11:43 | 6 | for it that they're encrypted.  The customers actually |
| 11:43 | 7 | own their own encryption keys and they can be certain |
| 11:43 | 8 | about it. |
| 11:43 | 9 | We also have security features that apply to |
| 11:43 | 10 | just the access to meetings.  So when you are in a |
| 11:43 | 11 | meeting or someone starts a meeting, the host, who can |
| 11:43 | 12 | be admitted into the lobby, what are the settings to |
| 11:43 | 13 | allow or disallow people. |
| 11:43 | 14 | There are a couple of innovations we have |
| 11:43 | 15 | where because we can integrate with calendars and |
| 11:43 | 16 | invites, meeting invites, we're able to prevent |
| 11:43 | 17 | scenarios like Zoom bombing, which is unwanted or |
| 11:43 | 18 | unknown users just show up in a call.  We're able to |
| 11:44 | 19 | prevent that to a great degree as well. |
| 11:44 | 20 | The other consideration -- and some of these |
| 11:44 | 21 | military, defense, and financial services-like |
| 11:44 | 22 | customers, they allow a lot on recordings as well.  So |
| 11:44 | 23 | to be able to keep the recordings secure and be able to |
| 11:44 | 24 | trace if they were leaked. |
| 11:44 | 25 | So we have audio watermarking and video |

492

11:44  1    watermarking technologies that prevent that.  So these

11:44  2    are -- these are all capabilities that customers really

11:44  3    choose us for.

11:44  4        Q.    Does Webex have any security certifications?

11:44  5        A.    Yes.  Quite a few.

11:44  6        Q.    Can you describe a few of those?

11:44  7        A.    Sure.  There's one called FedRAMP, and that is

11:44  8    a certification.  Any vendor that wants to operate and

11:44  9    service federal -- U.S. federal customers needs to meet

11:44  10   and adhere to.  So Webex has that certification.

11:44  11        Then, when it comes to health care, Webex has

11:44  12   the HIPAA, the health care standard compliance.  We

11:44  13   operate globally.  So when we think about European

11:45  14   countries, we are certified for and adhere to a

11:45  15   compliance standard called GDPR.  These are the few I

11:45  16   can name off the top of my head.

11:45  17        Q.    Are any of the security features that you just

11:45  18   mentioned applicable to audio?

11:45  19        A.    Yes.  The entering encryption and audio

11:45  20   watermarking are both applicable to audio.

11:45  21        Q.    Mr. Barave, can you break down a bit of what

11:45  22   we saw in the video and show how the features we saw

11:45  23   come together during a Webex Meeting?  And I'm going to

11:45  24   ask you --

11:45  25        A.    Oh, sure.  Yeah.

493

| 11:45 | 1 | MS. PIEPMEIER: With permission, |

```
11:45    1              MS. PIEPMEIER:  With permission,

11:45    2    Your Honor, may we have the witness come up to the

11:45    3    easel and just walk through the demonstrative of a --

11:45    4    I'll let him describe what the picture is.

11:45    5              THE COURT:  Sure.

11:45    6    BY MS. PIEPMEIER:

11:45    7       Q.    Okay.  Mr. Barave, please come down.  And you

11:45    8    can walk through -- we'll get you a microphone, and you

11:45    9    can just describe what's going on.

11:45   10       A.    Sure.

11:46   11       Q.    I'm going to stand out of the way so the jury

11:46   12    can see you.

11:46   13              If you could just please -- I'll stand at the

11:46   14    mic.  If you could just describe for the jury, just

11:46   15    kind of walk through what we're seeing here briefly.

11:46   16       A.    Sure.  The share challenge, I could go on and

11:46   17    on, but I will try to bring up the key sets of

11:46   18    features.

11:46   19              First off, what we are seeing here is what a

11:46   20    typical user that has joined a Webex Meeting would see.

11:46   21    Maybe not -- you see probably 25 people on video over

11:46   22    here.  That's probably not a common scenario.  It might

11:46   23    be more like five.

11:46   24              But I'm showing 25 because for so many people

11:46   25    or so many of our customers, it is important for them
```

11:47  1   to be able to capture as many people on video.  So we

11:47  2   can go up to 80, 81 of those at the same time as well.

11:47  3       When I describe the features, let's think of

11:47  4   these as a few categories.  The very first -- I will

11:47  5   describe some of the video capabilities.  Then I will

11:47  6   describe some of the capabilities that you see here in

11:47  7   the bottom bar.  We call this the control bar.  And

11:47  8   then we will describe some of the security features.

11:47  9       So video, the very first you see a layout

11:47  10  button here.  We don't always want to see all the

11:47  11  people in this large grid.  It's one person that is

11:47  12  doing most of the talking.  Is this okay?

11:47  13  Q.    Yeah.

11:47  14  A.    And instead of looking at everybody, you just

11:47  15  want to be able to have the person that is speaking in

11:47  16  focus.  And the users can select the layout for that.

11:48  17  Sometimes it's actually important to focus on a few

11:48  18  named users to just watch their reactions and cues,

11:48  19  even if they're not speaking.  If you are the speaker,

11:48  20  you would want to know how they are responding to what

11:48  21  you're speaking.

11:48  22      So you have a layout where we can create a

11:48  23  stage, and we can affix certain users that people would

11:48  24  want to focus on.  We could split the screen between

11:48  25  videos and share.  So that's the layout capabilities.

```
11:48    1              We then move to the control bar down here.
11:48    2    You see the closed captions button there.  If you click
11:48    3    that, that's where it starts, showing the closed
11:48    4    captions.  And there's a few other options embedded in
11:48    5    there that will allow people to see translation into
11:48    6    different languages or their native language.
11:48    7              That icon here is the icon for our assistant
11:48    8    so you can speak, and it's a bit like Alexa or Siri.
11:49    9    You can ask it to do things.
11:49   10              There is clearly the mute/unmute controls, but
11:49   11    some of those controls are so sophisticated that if I
11:49   12    was a host of the meeting, let's say, sometimes I want
11:49   13    to be able to control whom I can mute or unmute to be
11:49   14    able -- if it is a highly moderated meeting.  So people
11:49   15    can have those controls.
11:49   16              There's the ability to record the meeting,
11:49   17    that record button or share screens or applications.
11:49   18              Last one I will talk about is although this
11:49   19    screenshot says beta -- now that feature is actually
11:49   20    available to everyone -- you see apps.  And that is
11:49   21    another one that our users have loved, that you are in
11:49   22    a meeting, but sometimes you want to get other
11:49   23    applications, like you may just want a timer.  Like
11:49   24    someone might want to time me if I am going over time
11:49   25    right now.
```

496

| | | |
|---|---|---|
| 11:49 | 1 | And those are the kinds of applications we can |
| 11:49 | 2 | bring inside the meeting. |
| 11:50 | 3 | The last would be security.  There are a |
| 11:50 | 4 | couple of icons up here that you can go and see what |
| 11:50 | 5 | sort of encryption is being used and the things I |
| 11:50 | 6 | mentioned, such as watermarking, if that's applicable |
| 11:50 | 7 | or not. |
| 11:50 | 8 | Q.    Thank you very much. |
| 11:50 | 9 | A.    Thank you. |
| 11:50 | 10 | Q.    Mr. Barave, you can take the witness stand |
| 11:50 | 11 | again.  Thank you.  And don't trip.  Watch the stairs. |
| 11:50 | 12 | THE COURT:  Would this be an okay place |
| 11:50 | 13 | to break? |
| 11:50 | 14 | MS. PIEPMEIER:  Yes, Your Honor. |
| 11:50 | 15 | THE COURT:  Ladies and gentlemen of the |
| 11:50 | 16 | jury, we'll take our lunch recess.  If you'd be back by |
| 11:50 | 17 | 1:15, we'll get started shortly thereafter. |
| 11:50 | 18 | THE BAILIFF:  All rise. |
| 11:50 | 19 | (Jury exited the courtroom.) |
| 11:50 | 20 | THE COURT:  You may be seated. |
| 11:51 | 21 | Is there anything we need to take up? |
| 11:51 | 22 | MS. SRINIVASAN:  Not from plaintiff, |
| 11:51 | 23 | Your Honor. |
| 11:51 | 24 | MS. PIEPMEIER:  And not that I'm aware |
| 11:51 | 25 | of, Your Honor. |

497

| | |
|---|---|
| 11:51 | 1 |
| 11:51 | 2 |
| 11:51 | 3 |
| 11:51 | 4 |

11:51  1          MR. JONES:  I had one question,

11:51  2  Your Honor.

11:51  3          THE COURT:  Sure.

11:51  4          MR. JONES:  You told me this rule many

11:51  5  times, but I wanted to make sure I know it.  Since he's

11:51  6  on direct, is it okay for us to talk when he goes off

11:51  7  on cross?

11:51  8          THE COURT:  Let me ask you this.  Is he

11:51  9  your corporate -- no, he's not your corporate rep; he's

11:51  10  just a witness, right?

11:51  11          MR. JONES:  Yes.

11:51  12          THE COURT:  As long as he's on direct,

11:51  13  you can chat with him.

11:51  14          MR. JONES:  Thank you.

11:51  15          MS. PIEPMEIER:  Thank you.

11:51  16          MR. JONES:  I just wanted to make sure.

11:51  17          THE COURT:  And before you get away,

11:51  18  either of you, who are the Cisco witnesses this

11:51  19  afternoon?

11:51  20          MS. PIEPMEIER:  So after Mr. Barave,

11:51  21  we'll hear from --

11:51  22          THE COURT:  I think I have this.

11:51  23          MS. PIEPMEIER:  -- Mr. Buckles and

11:51  24  Mr. Belcher.  It's the Bs.

11:51  25          THE COURT:  Okay.  And we might get to

```
11:51   1   Willis?
11:51   2                   MS. PIEPMEIER:  Perhaps.
11:51   3                   THE COURT:  Okay.  And I assume -- is it
11:51   4   Dr. Willis?
11:51   5                   MS. PIEPMEIER:  Mr. Willis.
11:51   6                   THE COURT:  Okay.  Is Mr. Willis here?
11:51   7                   MS. PIEPMEIER:  He is.
11:51   8                   THE COURT:  Okay.  All good.  Then I plan
11:51   9   to go till about 5:30 this evening.
11:52  10                   MS. PIEPMEIER:  Thank you, Your Honor.
11:52  11                   THE COURT:  Now, here's what I'm planning
11:52  12   to do tomorrow.  I have sentencings in the morning.
11:52  13   And we have a lot.  So we're going to have the jury
11:52  14   come in at 11:30 and have lunch ready for them.  As
11:52  15   soon as I can be ready to go after sentencings and grab
11:52  16   something quick to eat, we'll get started here and
11:52  17   we'll go at noon, 12:15 or something like that, 12:30
11:52  18   and we'll go till 6:00 or 6:30 tomorrow.
11:52  19                   And so I don't think we're going to have
11:52  20   very much to do on the jury charge, having looked at it
11:52  21   now and given you my thoughts on it.  My clerks have
11:52  22   gotten you -- the last time we gave an apportionment
11:52  23   instruction.  You all should have that from us.  So
11:52  24   you'll know -- if someone doesn't want that, you'll at
11:52  25   least know what we've given in the past.
```

| | | |
|---|---|---|
| 11:52 | 1 | So I'll see you back a little after 1:15. |
| 11:53 | 2 | MS. PIEPMEIER:  Thank you, Your Honor. |
| 11:53 | 3 | THE BAILIFF:  All rise. |
| 11:53 | 4 | (Recess taken.) |
| 01:30 | 5 | THE BAILIFF:  All rise. |
| 01:30 | 6 | THE COURT:  Please remain standing for |
| 01:30 | 7 | the jury. |
| 01:30 | 8 | (Jury entered the courtroom.) |
| 01:31 | 9 | THE COURT:  Thank you.  You may be |
| 01:31 | 10 | seated. |
| 01:31 | 11 | If you would recall the witness, please. |
| 01:31 | 12 | MS. PIEPMEIER:  Thank you, Your Honor. |
| 01:31 | 13 | Mr. Barave will take the stand again. |
| 01:31 | 14 | BY MS. PIEPMEIER: |
| 01:31 | 15 | Q.   Welcome back, Mr. Barave.  You understand |
| 01:31 | 16 | you're still under oath, right? |
| 01:31 | 17 | A.   Yep. |
| 01:31 | 18 | Q.   Thank you.  Let's talk about Webex innovations |
| 01:31 | 19 | from a slightly different angle. |
| 01:31 | 20 | Mr. Barave, are you the named inventor on any |
| 01:31 | 21 | patents? |
| 01:31 | 22 | A.   I am. |
| 01:31 | 23 | Q.   Do you know approximately how many patents you |
| 01:31 | 24 | are a named inventor on? |
| 01:31 | 25 | A.   17 or 18. |

500

01:31  1      Q.    Does that include patents and pending
01:32  2   applications?
01:32  3      A.    No.
01:32  4      Q.    And are all of those patents assigned to
01:32  5   Cisco?
01:32  6      A.    Yes.
01:32  7      Q.    Did those inventions arise out of your work at
01:32  8   Cisco?
01:32  9      A.    Yes.
01:32 10      Q.    Do any of your inventions relate to
01:32 11   functionality that can be used by Webex?
01:32 12      A.    Some of them could.  They are in the radio,
01:32 13   audio, and video communications space.
01:32 14      Q.    Setting aside your own Cisco patents that
01:32 15   you've just talked about, as the product manager of
01:32 16   Webex, are you aware of whether there are Cisco patents
01:32 17   from others that relate to Webex Audio functionality?
01:32 18      A.    There are hundreds of Cisco patents related to
01:32 19   Webex.  Some of them would be about audio as well.
01:32 20      Q.    Thank you.
01:32 21            I'd like to turn now to a new topic.  I'd like
01:32 22   to talk about the ability to join a Webex Audio or
01:33 23   videoconference using a phone over the PSTN.
01:33 24            Are you aware of that functionality?
01:33 25      A.    Yes.  I am.

501

```
01:33    1        Q.    Does Cisco collect data about how its users
01:33    2    connect to Webex Meetings?
01:33    3        A.    Yes.
01:33    4        Q.    How do engineers and product managers like
01:33    5    yourself view data like that at Cisco, in what form?
01:33    6        A.    We use data and analytics tools.  So we look
01:33    7    at them in the form of dashboards.
01:33    8        Q.    Why do you look at this data?
01:33    9        A.    As product managers, we need to understand how
01:33   10    users are using the product, what works or gets used
01:33   11    more often.  So we try to glean insight from the data
01:33   12    along those lines.  And our customers also like reports
01:33   13    of how their users are using the product, so we also
01:34   14    generate reports for them.
01:34   15        Q.    How long does Cisco keep this data that you've
01:34   16    been referring to?
01:34   17        A.    13 months.
01:34   18        Q.    Why does Cisco keep 13 months worth of data?
01:34   19        A.    Okay.  This one's going to be a bit of a long
01:34   20    answer.
01:34   21              I think short answer would have been
01:34   22    compliance and policy.  But I can elaborate where that
01:34   23    comes from.
01:34   24        Q.    Please.
01:34   25        A.    Because there are millions and millions of
```

502

01:34  1    these meetings happening with millions and millions of

01:34  2    people joining.  It generates a lot of data.  So if we

01:34  3    had our own way, then we would try to keep as little as

01:34  4    possible for the cost and storage reasons, just enough

01:34  5    for us to be able to look at the data, get the transit

01:34  6    insights we need.

01:34  7         But a lot of our customers are under their own

01:34  8    domain-specific compliance and regulation requirements,

01:34  9    example being financial services have their

01:34  10   restrictions on how long such data should be kept

01:35  11   around.  Health care has their own restrictions on how

01:35  12   that data should be kept around.

01:35  13        So when we take all of those inputs from our

01:35  14   customers, the company came to a policy decision of

01:35  15   13 months.

01:35  16   Q.   Have you looked at the percentage of how many

01:35  17   Webex conferences include at least one PSTN connection

01:35  18   at any point during 2024?

01:35  19   A.   Yes.  I have.

01:35  20   Q.   What month range during 2024 have you looked

01:35  21   at the data regarding Webex conferences that have at

01:35  22   least one PSTN connection?

01:35  23   A.   Yes.  So we've looked at the first calendar

01:35  24   quarter, January through March, in terms of conferences

01:35  25   where people have VoIP or bits of VoIP and PSTN.

503

01:35  1      Q.   And in that time period, the first quarter of

01:35  2  2024, what was the percentage of how many Webex

01:36  3  conferences involved at least one PSTN and one VoIP

01:36  4  user?

01:36  5      A.   It was -- beginning January, it was

01:36  6  19-point-some percent, under 20 percent, and then the

01:36  7  next two months were 19, 18-point-some percent.

01:36  8      Q.   Have you also had occasion in the course of

01:36  9  your responsibilities as project manager for Webex to

01:36 10  look at that same data for mid-2022, like July 2022?

01:36 11      A.   Yes.   July, August, yep.

01:36 12      Q.   And what do you recall that percentage being

01:36 13  in July, August 2022?

01:36 14      A.   August would be in the 24 percent range.

01:36 15      Q.   Okay.   Are there any other ways besides

01:36 16  looking at usage data that you monitor usage trends

01:36 17  regarding Webex?

01:36 18      A.   Yes.   So usage data give us quantitative, as

01:37 19  in the specific numbers, but we also collect input from

01:37 20  our customers and their users, qualitative input in

01:37 21  terms of what they like using, what they would like to

01:37 22  use more, or what's not being useful.

01:37 23      Q.   So let's talk about that a little bit.

01:37 24           Have you noticed any trends in PSTN usage

01:37 25  based on the qualitative information that you have

504

01:37  1    observed as product manager of Webex for the past

01:37  2    decade?

01:37  3        A.    Yes.    The usage has been steadily declining

01:37  4    and consistently declining.

01:37  5        Q.    When you say "usage," what do you mean by

01:37  6    that?

01:37  7        A.    The usage of PSTN along with VoIP, or Voice

01:37  8    over IP, as ways to get into the meeting.

01:37  9        Q.    And let's drill down on that a little bit.

01:37  10             Do you have an understanding of why that trend

01:37  11   has been declining?  And by that I mean the trend of

01:38  12   conferences that include at least one PSTN user with at

01:38  13   least one VoIP user.

01:38  14       A.    A few factors have influenced that.  The one

01:38  15   factor being the sort of features that we just looked

01:38  16   at, the things I showed on video or sharing content.

01:38  17   The virtual backgrounds and closed captions, those are

01:38  18   all available when you join via the Webex App on your

01:38  19   mobile or on your PC.

01:38  20             When you just dial from the phone, you don't

01:38  21   get any of it, and your participation is not as rich as

01:38  22   the others.  So people don't prefer that mode.  It's

01:38  23   become a bit of a last resort if nothing else worked.

01:38  24             But the two other factors that have played

01:38  25   into this is beginning 2007 to the next seven or eight

505

01:38   1    years, two things happened.  The smartphone, where the

01:38   2    apps started to become available.  So people didn't

01:38   3    have these apps before then.

01:39   4             And the app became -- apps became available

01:39   5    and the connectivity, whether it was 3G, 4G, or 5G, the

01:39   6    data plans, those were available widely, and WiFi was

01:39   7    available widely.

01:39   8             So when you had the rich connectivity

01:39   9    available and you could experience a full featured

01:39   10   meeting, people started preferring that.

01:39   11            And the third factor playing into that is when

01:39   12   you can just join from the app, you don't have to pay

01:39   13   for the PSTN connectivity charges.  A lot of the times

01:39   14   customers will have to pay for PSTN connectivity

01:39   15   charges.  So some of our competitors even advocated to

01:39   16   our customers that use the Meetings over VoIP so your

01:39   17   total costs will go down.  So a lot of these factors

01:39   18   have been in place since the mid-2010s.

01:39   19       Q.   And you mentioned the mid-2010s in your answer

01:39   20   just now.

01:39   21            Do you have an understanding, based on your

01:40   22   ten years as a product manager of Webex, of when VoIP

01:40   23   usage started surpassing PSTN?

01:40   24       A.   It would be pre-'15 or '16.

01:40   25       Q.   And in 2015 or 2016, what was the usage

506

| | | |
|---|---|---|
| 01:40 | 1 | between VoIP and PSTN? |
| 01:40 | 2 | A.    So that was the time when it was split |
| 01:40 | 3 | comparably even.  We could approximate it to 50/50. |
| 01:40 | 4 | Q.    What are you basing that estimate on just now, |
| 01:40 | 5 | or that approximation, I should say? |
| 01:40 | 6 | A.    Oh, as product managers, we have been looking |
| 01:40 | 7 | at this data all the while.  As part of our jobs, we |
| 01:40 | 8 | have to understand how people are joining and how |
| 01:40 | 9 | they're using the product. |
| 01:40 | 10 | So as -- my association with the product, I |
| 01:40 | 11 | think my association with Webex was in 2013 for the |
| 01:40 | 12 | first time.  So since then, me or my teams have been |
| 01:41 | 13 | looking at this data. |
| 01:41 | 14 | Q.    Mr. Barave, before I let you go, I have just a |
| 01:41 | 15 | few final questions. |
| 01:41 | 16 | Do you like working at Cisco? |
| 01:41 | 17 | A.    Oh, I love working for Cisco. |
| 01:41 | 18 | Q.    Why? |
| 01:41 | 19 | A.    First, the culture of innovation, lots of |
| 01:41 | 20 | opportunity and focus there. |
| 01:41 | 21 | Second, the company is very focused on |
| 01:41 | 22 | empowering the employees and employee well-being and |
| 01:41 | 23 | creating a supportive environment.  I mentioned how |
| 01:41 | 24 | they supported my MBA education. |
| 01:41 | 25 | And while we focus on the business growth, |

```
01:41   1    there is a broad-based commitment within the company to
01:41   2    giving back to the community.
01:41   3                   MS. PIEPMEIER:  Thank you.
01:41   4              I pass the witness.
01:41   5                        CROSS-EXAMINATION
01:41   6    BY MS. SRINIVASAN:
01:42   7         Q.    Good afternoon, Mr. Barave.
01:42   8         A.    Good afternoon.
01:42   9         Q.    I just wanted to clarify a few things about
01:42   10   the scope of what you're here to do today.
01:42   11             Is it fair to say you're not here to give a
01:42   12   reason why Cisco does not infringe the '858 patent?
01:42   13   That's not what you're here to do today?
01:42   14        A.    I'm not sure how to interpret that question.
01:42   15   I'm sorry.
01:42   16        Q.    Let me ask a different way.
01:42   17             You're not here to give the jury any
01:42   18   information about whether Cisco infringes or does not
01:42   19   infringe the '858 patent.  That wasn't the subject of
01:42   20   your testimony with counsel today?
01:42   21        A.    This is a patent infringement case, and I'm
01:42   22   here as a witness for that case.  So I'm providing
01:42   23   information pertaining to that based on the questions
01:42   24   asked.
01:42   25        Q.    And you're not here to talk about infringement
```

01:43   1    of the '858 patent, correct?

01:43   2        A.    Again, as the questions being asked to me, if

01:43   3    they are being used to determine any of that, I don't

01:43   4    know.

01:43   5        Q.    During the course of your testimony, did you

01:43   6    look at any internal Cisco technical documents?  Were

01:43   7    you shown any by your counsel?

01:43   8        A.    When you say Cisco internal technical

01:43   9    documents, no.

01:43   10       Q.    You didn't testify about anything that Cisco

01:43   11   does internally, technically based on documents that

01:43   12   you presented to the jury.

01:43   13             You didn't present that to the jury, correct?

01:43   14       A.    The documents that I presented to the jury are

01:43   15   not technical documents, and they are Cisco internal

01:43   16   documents we have shared.

01:43   17       Q.    You didn't talk about any Cisco source code

01:43   18   during your testimony today?

01:43   19       A.    I did not.

01:43   20       Q.    Fair to say that you're not here to tell the

01:44   21   jury that Cisco does not infringe the '858 patent?

01:44   22   That's not your role; is that fair?

01:44   23       A.    Again, I would rely on the counsel and the

01:44   24   attorneys to determine that.  I'm being questioned in

01:44   25   relation to the infringement case, and I'm answering to

01:44  1    the best of my ability.

01:44  2        Q.    During the course of your examination by your

01:44  3    lawyer, did you look at the '858 patent?

01:44  4        A.    When you say "during the course," you mean the

01:44  5    days leading up to today, right?

01:44  6        Q.    No.  Let me clarify my question.  That's fair.

01:44  7              So in today's presentation, your testimony to

01:44  8    the jury, did you talk at all about the '858 patent

01:44  9    which is the subject of this lawsuit?

01:44  10       A.    I did not talk about it today.

01:44  11       Q.    Have you read the '858 patent besides the

01:44  12   claims of the patent?  Have you read the '858 patent?

01:44  13       A.    I have.

01:44  14       Q.    Have you read it in its entirety?

01:44  15       A.    I have.

01:44  16       Q.    Including the specification?

01:44  17       A.    Yes.

01:45  18       Q.    And you thought it was important to do that,

01:45  19   to read the entire patent, not just the claims,

01:45  20   correct?

01:45  21       A.    That's correct.

01:45  22       Q.    You yourself, you're an inventor on the

01:45  23   patents.  You testified 17 or 18 patents, right?

01:45  24       A.    Yes.

01:45  25       Q.    And when you developed those patents, you

510

01:45  1    assigned them to your employer, Cisco, correct?

01:45  2        A.    Yes.

01:45  3        Q.    And before you do that, you read the entirety

01:45  4    of those patents.  Is that fair to say?

01:45  5        A.    As a contributor, I am contributing, writing,

01:45  6    and reading to the work that goes into coming up with

01:45  7    that patent submission.

01:45  8        Q.    And so you would read the entire patent before

01:45  9    it was assigned to Cisco.  That would be something you

01:45  10   would do if you were a named inventor on a patent?

01:45  11       A.    Yes.

01:45  12       Q.    And you do that because it would be important

01:45  13   to understand the patent as a whole, correct?

01:45  14       A.    That's correct.

01:45  15       Q.    What is the earliest date, if you know, on

01:46  16   your patent that you talked about?  Do you know the

01:46  17   earliest patent date that -- the earliest date of

01:46  18   patent that you have was issued?

01:46  19       A.    I do not remember it precisely, but I can use

01:46  20   a time frame, if that's okay.

01:46  21       Q.    Sure.

01:46  22       A.    Some of my early submissions would have come

01:46  23   around 2004 or '5, thereabouts, but I can't be

01:46  24   100 percent certain.

01:46  25       Q.    Does it sound correct to say your first issued

—511—

01:46   1    patent would have been in 2006, the first issued one?

01:46   2        A.    That's possible.

01:46   3        Q.    During the course of your testimony today here

01:46   4    in court with the jury, Mr. Barave, you didn't talk

01:46   5    about multiplexing; is that fair?

01:46   6        A.    That's correct.

01:46   7        Q.    You didn't talk about mixing.  Is that fair as

01:46   8    well?

01:46   9        A.    That's correct.

01:46   10       Q.    I'd like to just talk a little bit about your

01:47   11   demonstrative here that you have up.

01:47   12             Can you tell me where -- the jury, when --

01:47   13   when this was -- this call?

01:47   14       A.    This user interface?

01:47   15       Q.    Yes.

01:47   16       A.    It would be sometime during 2021.

01:47   17       Q.    And is it fair to say that this is from the

01:47   18   perspective of a Webex user?

01:47   19       A.    Yes.

01:47   20       Q.    You didn't give us a demonstrative or a slide

01:47   21   that shows us from the perspective of the server, the

01:47   22   Cisco server?

01:47   23       A.    I did not because we showed the user

01:47   24   experience, what the end user experience is.

01:47   25       Q.    Do you understand that the '858 patent relates

512

01:47  1    to the functioning of a hybrid audio server?  Do you

01:47  2    understand that?

01:47  3        A.    I'm not sure what the hybrid audio server is.

01:48  4        Q.    Okay.  Fair to say if you're not sure what it

01:48  5    is, you didn't testify about that today?

01:48  6        A.    I did not testify about hybrid audio server.

01:48  7        Q.    I'd like to talk a little bit about the data

01:48  8    that you referenced earlier, the usage data.  I want to

01:48  9    be sure I understand your testimony.

01:48  10            Your testimony is that Cisco only keeps

01:48  11   13 months of data; is that correct?

01:48  12       A.    That's correct.

01:48  13       Q.    And is it your testimony that Cisco doesn't

01:48  14   keep data further back because it doesn't have room in

01:48  15   its servers?

01:48  16       A.    It is not about having room on the servers.

01:48  17   It is the cost, maintenance, and the operation of

01:48  18   overheads that go into maintaining that large of data

01:49  19   sets.

01:49  20       Q.    Is there --

01:49  21       A.    May I elaborate?

01:49  22       Q.    Uh-huh.

01:49  23       A.    So there is that consideration.  At the same

01:49  24   time, we also make sure we are keeping it too for the

01:49  25   duration that our customers and the compliance or legal

513

01:49  1   policies that they are under are satisfied.

01:49  2        As I mentioned, it would be easy for us to

01:49  3   keep it for a short period and minimize our costs, but

01:49  4   to the extent that policies and compliance requirements

01:49  5   need us to keep it, we do that.

01:49  6   Q.   I want to be clear, because in the course of

01:49  7   your direct testimony, you said that people -- you and

01:49  8   people on your team have been looking at this data.

01:49  9        This data would only be data going back to

01:49  10  2021.  That's the data that you have, correct?

01:49  11  A.   So when I said looking at the data, we would

01:49  12  have had data up to 13 months prior to that point, and

01:50  13  that's the data we would have looked at in our

01:50  14  analytics tools.

01:50  15  Q.   So -- and let me ask you, Mr. Barave, you

01:50  16  understand the damages period in this case goes from

01:50  17  2015 to 2022, correct?

01:50  18  A.   I wasn't sure that's the period, but it is

01:50  19  possible.

01:50  20  Q.   And it's -- Cisco does not have any data for

01:50  21  2020 usage data?

01:50  22  A.   We do not have it available anymore.

01:50  23  Q.   Cisco does not have usage data for 2019?

01:50  24  A.   Correct.  So past the 13 months from 2019,

01:50  25  Cisco has not had it.

514

01:50  1    Q.   And the same for 2018 and 2017 and 2016 and

01:50  2  2015, when the damages period started in those -- in

01:50  3  this case.

01:51  4         For all of those years, Cisco has no data; is

01:51  5  that correct?

01:51  6    A.   It would be correct for all of those time

01:51  7  periods Cisco would have had the data for 13 months.

01:51  8    Q.   So if we wanted to today go look at the data

01:51  9  from 2015 to 2021 -- and you've kept -- and you've

01:51 10  shown us the 2021 data or you've talked about it -- we

01:51 11  would not be able to see any data between 2015 and

01:51 12  2021; is that correct?

01:51 13    A.   That's correct.  We would not be able to see

01:51 14  it today.

01:51 15    Q.   Mr. Barave, Cisco does not have data that can

01:51 16  be used to rank the importance of certain features to

01:51 17  customers, correct?

01:51 18    A.   May I request clarification?  When you say

01:51 19  data to rank importance, I'm not sure how to interpret.

01:51 20    Q.   Well, let me ask you this way.  Cisco -- you

01:52 21  testified at some length about what customers might say

01:52 22  or things they liked, and I'm asking you about data.

01:52 23    A.   Yeah.

01:52 24    Q.   You didn't show us any data about what

01:52 25  customers' preferences are.  Does -- and that's because

515

01:52  1    Cisco doesn't have data that can be used to rank the

01:52  2    importance of certain features to customers; is that

01:52  3    fair?

01:52  4        A.    I'll answer that in two parts, if that's okay.

01:52  5            We do have the data between now and 13 months

01:52  6    prior about various feature usage for us.  And we are

01:52  7    able to look at that usage data and interpret and

01:52  8    derive insights for us to determine what's important

01:52  9    and how important.  We don't necessarily rank it as

01:52  10   such.

01:52  11       Q.    All right.  And, Mr. Barave, do you have a

01:52  12   copy of your deposition up there?

01:52  13       A.    Let me check.

01:53  14            MS. SRINIVASAN:  Your Honor, may I

01:53  15   approach?

01:53  16       A.    Thank you.

01:53  17   BY MS. SRINIVASAN:

01:53  18       Q.    Mr. Barave, you recall being deposed in this

01:53  19   case as a corporate representative for Cisco, correct?

01:53  20       A.    I do.

01:53  21       Q.    And at that time you were asked about whether

01:53  22   or not -- can I -- I asked you just now about whether

01:53  23   Cisco has data that can be used to rank the importance

01:53  24   of certain specific features to customers, correct?

01:53  25       A.    That's correct.

516

| | | |
|---|---|---|
| 01:53 | 1 | Q.   All right.  And I'd like you to look at your |
| 01:53 | 2 | deposition at Page 86 from Lines 12 to 15. |
| 01:54 | 3 |      Sorry, from -- starting at Line 6. |
| 01:54 | 4 | A.   Page 86? |
| 01:54 | 5 | Q.   Yes.  It would be in the upper right-hand |
| 01:54 | 6 | corner, if you can see those page numbers. |
| 01:54 | 7 | A.   Is it the line that starts with:  That I don't |
| 01:54 | 8 | know if I can do that? |
| 01:54 | 9 |      Is that -- am I looking at the right one? |
| 01:54 | 10 | Q.   It starts with:  Effectively you are asking. |
| 01:54 | 11 |      Do you see that? |
| 01:55 | 12 |           MS. PIEPMEIER:  Your Honor, I would like |
| 01:55 | 13 | to lodge an -- |
| 01:55 | 14 | A.   Can I -- can I show what I see as 86 here? |
| 01:55 | 15 |           THE COURT:  Yes, ma'am. |
| 01:55 | 16 |           MS. PIEPMEIER:  Your Honor, this is |
| 01:55 | 17 | improper impeachment.  That's not an inconsistent |
| 01:55 | 18 | statement. |
| 01:55 | 19 |           MS. SRINIVASAN:  Your Honor, he says we |
| 01:55 | 20 | are not in a position to have data or metrics that can |
| 01:55 | 21 | allow us to rank the importance feature-wise. |
| 01:55 | 22 |           MS. PIEPMEIER:  Your Honor, that's |
| 01:55 | 23 | consistent. |
| 01:55 | 24 |           THE COURT:  I can't hear you. |
| 01:55 | 25 |           MS. PIEPMEIER:  Apologies.  Your Honor, |

—517—

01:55  1    that's consistent with his testimony just now.

01:55  2                    THE COURT:  I think the jury will decide

01:55  3    that.

01:55  4                    Go ahead, please.

01:55  5    BY MS. SRINIVASAN:

01:55  6        Q.    Mr. Barave, are you --

       7        A.    Can you make sure we are looking at the right

01:55  8    page?

01:55  9                    MS. SRINIVASAN:  Your Honor, may I

01:55  10   approach?

01:55  11                    THE COURT:  Sure.

01:56  12   BY MS. SRINIVASAN:

01:56  13       Q.    And, Mr. Barave, you see your deposition

01:56  14   transcript there?

01:56  15       A.    I do.

01:56  16       Q.    And you see you were asked a question, which

01:56  17   you rephrased.  And you said:  You are asking does

01:56  18   Cisco have data that can be used to rank the importance

01:56  19   of certain specific features to our customers or

01:56  20   buyers?  Yes, sir.  That's a good paraphrase.

01:56  21                    Is that the question?  Okay.

01:56  22                    And your response was:  Given the maturity of

01:56  23   our platform and the industry in general, we are not in

01:56  24   a position to simply have data or metrics that can

01:56  25   allow us to rank importance feature-wise.

518

01:56  1              Do you see that testimony?

01:56  2      A.    I do.

01:56  3      Q.    And that's the testimony you gave under oath

01:56  4  in your deposition, correct?

01:56  5      A.    I did.

01:56  6      Q.    For the -- you testified earlier today about

01:56  7  data from 2024.  2024 is not a damages period at issue

01:57  8  in this case, correct?

01:57  9      A.    Correct.

01:57  10     Q.    Nonetheless, you told the jury that the

01:57  11  percentage of calls that had both a phone user and a

01:57  12  computer user was 18 percent in 2024?

01:57  13     A.    Yep.  I said 19 percent in one month, and

01:57  14  19-some and 18-some in the next two.

01:57  15     Q.    And we can agree that's not part of the

01:57  16  damages period in that case.  That's just data you

01:57  17  collected from earlier this year?

01:57  18     A.    Yes.

01:57  19     Q.    In 2022, for a period that was part of this

01:57  20  cause, it was 24 percent, right?

01:57  21     A.    That's -- that's right.

01:57  22     Q.    And we can't know what that percentage would

01:57  23  have been three years earlier?

01:57  24     A.    We know what that was in '21, and we do not

01:57  25  have that data anymore for the prior years.  But during

519

01:58    1    those times for a period of 13 months, we've always had

01:58    2    that data so we've been able to look at it and know

01:58    3    what it is.

01:58    4        Q.    Well, at that time.  But as you sit here

01:58    5    today, you can't tell me in 2018 what the percentage

01:58    6    was, right?

01:58    7        A.    I cannot right now.  But if I remembered it,

01:58    8    like at some points in 2015 or '16 or '17, I would be

01:58    9    able to give those numbers based on having looked at

01:58    10    that data for about a year during those times.

01:58    11        Q.    I understand.  And really what we're trying to

01:58    12    figure out is is this something we can tell the jury

01:58    13    today.

01:58    14            Because as I understand it, what you've told

01:58    15    us is that it was 2024 -- beginning of this year, it

01:58    16    was 18 percent.  In 2022, it was 24 percent?

01:58    17        A.    Yep.

01:58    18        Q.    And we can't know if in 2016 or '17 it was

01:58    19    40 percent, 35 percent.  We don't have the data for

01:58    20    that as we sit here today?

01:58    21        A.    We don't have that data today.

01:58    22        Q.    I'd like to look at DX-421, which I believe

01:59    23    should be in the binder that you had from your

01:59    24    examination for your -- do you see that there, the

01:59    25    data?

520

01:59  1    A.    I have DX-237 and 308.  Oh, no, 208.

01:59  2    Q.    I have an Excel version of this, so I'd like

01:59  3  to be able to put it up as a demonstrative.

01:59  4          Is there any -- it is a -- the data that you

01:59  5  were testifying about in a native form.

01:59  6    A.    Okay.

01:59  7          MS. PIEPMEIER:  May I clarify?  I'll call

01:59  8  it an objection but just a clarification.

01:59  9          I don't think that is in the witness'

01:59  10  binder because I believe that exhibit was withdrawn.

02:00  11  So he doesn't have it in front of him.

02:00  12          MS. SRINIVASAN:  Your Honor, I believe he

02:00  13  has foundation for it.  It's the usage data.

02:00  14          THE COURT:  You can use it.

02:00  15          MS. PIEPMEIER:  I just want to make sure

02:00  16  he has it in front of him.

02:00  17          That's fine.  That's my only --

02:00  18          Which number is it?

02:00  19          (Conference between counsel.)

02:00  20          MS. SRINIVASAN:  Your Honor, may I

02:00  21  approach?

02:00  22          THE COURT:  Yes.

02:00  23  BY MS. SRINIVASAN:

02:00  24    Q.    And, Mr. Barave, I'm going to do this with an

02:00  25  Excel version so that we can look at the numbers and do

02:00  1    some work with them.  I know you have a hard copy with

02:00  2    you.

02:00  3              So first, in the month of August 2021, which

02:00  4    was within the damages period in this case, how many

02:00  5    meetings were there where there was a participant by

02:01  6    phone and a participant by computer over the Internet

02:01  7    by VoIP?

02:01  8    A.    It would be the cell that is highlighted,

02:01  9    selected right now.  It shows 14,731,891.

02:01  10   Q.    So in one month, there were in excess of 14

02:01  11   million calls in which there was a participant by phone

02:01  12   and a participant by computer?

02:01  13   A.    Yes.

02:01  14   Q.    At least one?

02:01  15   A.    Yes.  We get a bit specific about that in

02:01  16   calling them meetings and not calls because that tends

02:01  17   to distort the picture.  But yes.

02:01  18   Q.    Did I say call or meeting?

02:01  19         How would you prefer?

02:01  20   A.    We -- we refer to them as meetings, but I'm

02:01  21   okay if you refer to them as calls.

02:01  22   Q.    Okay.  All right.  There were 14 million, just

02:01  23   in that month alone?

02:01  24   A.    Yes.

02:01  25   Q.    And how many minutes were spent on those calls

522

02:01  1    in that -- in that month between -- in a call that had

02:02  2    both phone users and computer users just in the month

02:02  3    of August of 2021?

02:02  4        A.    Again, that is the cell selected right now.

02:02  5    It shows 791,448,149.

02:02  6        Q.    So in August of 2021, there were 791 million

02:02  7    minutes of meetings that took place on Webex servers in

02:02  8    which there were participants who were calling in by

02:02  9    phone and utilizing the computer?

02:02  10       A.    Yes.  These are such that these are minutes

02:02  11   spent on meetings that had at least one participant

02:02  12   from phone and one from Voice over IP or computer.

02:02  13       Q.    And I know we don't have data going beyond

02:02  14   August of 2021 backward in time, but I would like to

02:02  15   look at that last year of the damages period from

02:03  16   August 2021 through July of 2022.

02:03  17            How many meetings were there in which there

02:03  18   was a participant joining by phone and one joining by

02:03  19   computer?

02:03  20       A.    I presume you've just summed that and pasted

02:03  21   the total in G27 red font cell.

02:03  22       Q.    We did do that with the native data from

02:03  23   Cisco, yes.

02:03  24       A.    So that would make it 137,424,249 minutes --

02:03  25   sorry -- meetings.

523

02:03  1        Q.    So in that one-year period, there were in

02:03  2    excess of 137 million meetings in which somebody was

02:03  3    calling in on a phone and there was other participants

02:03  4    who were on by computer, correct?

02:03  5        A.    That's correct.

02:03  6        Q.    And in that same one-year time period, how

02:03  7    many minutes of meetings were there in which there was

02:04  8    a user by phone and somebody who joined by computer?

02:04  9        A.    I see that you have pasted the sum in red

02:04  10   font.  That looks like 7,501,432,536 minutes.

02:04  11       Q.    So in that one-year period, there were

02:04  12   7.5 billion minutes of meetings in which there was

02:04  13   somebody calling in from a phone and somebody on a

02:04  14   computer?

02:04  15       A.    That's correct.

02:04  16       Q.    And, again, based on your understanding,

02:04  17   that's not the full damages period in this case.

02:04  18   That's one year of data, correct?

02:04  19       A.    That's correct.

02:04  20       Q.    And, Mr. Barave, you're not here suggesting to

02:04  21   the jury that if Cisco couldn't provide 137 million of

02:05  22   these meetings, that that would not be an important

02:05  23   issue for the company?

02:05  24             Let me ask it a different way.

02:05  25             You're not here suggesting that the 137

524

02:05  1   million meetings is not a big deal for Cisco.  If Cisco

02:05  2   was unable to provide the capability for these 137

02:05  3   million meetings, that would be something Cisco would

02:05  4   be concerned about?

02:05  5       A.    It's a part of the product capability.  So we

02:05  6   have to be able to serve that.  If it wasn't, then we

02:05  7   would have addressed that need another way.

02:05  8       Q.    And you would be able -- you would want to

02:05  9   make sure that those 137 million meetings could be

02:05 10   facilitated, that people could be able to join those,

02:05 11   correct?

02:05 12       A.    All meetings in our world held on our

02:05 13   platform, we want to be able to have those.  This is no

02:06 14   different.

02:06 15       Q.    And these meetings in particular involve

02:06 16   individuals who even in 2021 and 2022 are still

02:06 17   participating by phone, correct?

02:06 18       A.    Yes.

02:06 19               MS. SRINIVASAN:  All right.  Thank you.

02:06 20               I'll pass the witness.

02:06 21                    REDIRECT EXAMINATION

02:06 22   BY MS. PIEPMEIER:

02:06 23       Q.    Just a few questions.  First of all, I want to

02:06 24   start with the demonstrative that you looked at a

02:06 25   moment ago.

525

02:06  1          You testified, I think, that that was the

02:06  2   version of the -- I guess it looks like a desktop app

02:06  3   from 2021?

02:06  4      A.    I did.

02:06  5      Q.    Okay.

02:06  6      A.    And can I add a qualifier there?  When we take

02:06  7   this, it is impossible for me to, based on this, know

02:06  8   the precise month and version.  So take it with a bit

02:06  9   of an approximation in 2021.

02:07  10     Q.    I understood.  We won't hold it against you.

02:07  11         You testified when you walked through it, I

02:07  12  believe, that there were 25 participants.  That's five

02:07  13  by five, right?

02:07  14     A.    Yes.

02:07  15     Q.    Do you see any participants dialed in by phone

02:07  16  on that?

02:07  17     A.    Not on this one.

02:07  18     Q.    Okay.  And I wanted to ask you about the

02:07  19  historical data.  You had some questions on that on

02:07  20  cross-examination.  And let me just make sure I

02:07  21  understand the framework, because to be honest, I got a

02:07  22  little confused following that.  But it may just be

02:07  23  because I'm slow.

02:07  24         So today, you, meaning Cisco, does not have

02:07  25  the data going back further than 13 months, correct?

526

| | | |
|---|---|---|
| 02:07 | 1 | A.    That's correct. |
| 02:07 | 2 | Q.    Okay.  In, let's say, 2021, what data did you |
| 02:07 | 3 | have available to you? |
| 02:07 | 4 | A.    What data would we have available in 2021? |
| 02:07 | 5 | Q.    Yeah.  Let's say it's 2021. |
| 02:07 | 6 | What data in your usage dashboard would you be |
| 02:08 | 7 | able to look at?  What period of time? |
| 02:08 | 8 | A.    13 months prior to that. |
| 02:08 | 9 | Q.    What about in 2018? |
| 02:08 | 10 | A.    The same. |
| 02:08 | 11 | Q.    What about in 2017? |
| 02:08 | 12 | A.    The same. |
| 02:08 | 13 | Q.    Okay.  In the course of your job duties as |
| 02:08 | 14 | product manager of Webex at Cisco, how frequently do |
| 02:08 | 15 | you review that usage data? |
| 02:08 | 16 | A.    I personally do that a few times a month.  My |
| 02:08 | 17 | team, some of the individual product managers, do that |
| 02:08 | 18 | on a weekly basis. |
| 02:08 | 19 | Q.    How long has that been true? |
| 02:08 | 20 | A.    Oh, this has always been true for as long as I |
| 02:08 | 21 | have been a product manager on Webex, that people have |
| 02:08 | 22 | been looking at it periodically.  Whether it was weekly |
| 02:08 | 23 | or biweekly or monthly might have changed from what |
| 02:08 | 24 | stage the product was in, but it was always looked at |
| 02:08 | 25 | periodically. |

—527—

02:08  1     Q.   So if you don't have the data today, what is
02:08  2   your bases for saying what the usage would have been
02:09  3   in, let's say, 2015?
02:09  4     A.   Having looked at the data in 2015 is my basis.
02:09  5     Q.   Let's talk a little bit about usage during the
02:09  6   pandemic.
02:09  7          Can you tell me what occurred during the
02:09  8   pandemic and how, if at all, there was an effect on
02:09  9   usage?  And I mean usage broadly, not necessarily VoIP
02:09  10   versus PSTN.
02:09  11     A.   Okay.  Pandemic was a sudden and unforeseen
02:09  12   phenomenon, and we saw all of a sudden the usage grow
02:09  13   three, four times of what it used to be just prior.
02:09  14   And when I say "just prior," sometime in early 2020,
02:09  15   when everyone -- or most people went into a lockdown
02:09  16   and people started working remotely, that's when the
02:09  17   massive surge happened and the usage on a platform went
02:10  18   three or four times.
02:10  19     Q.   I'd like to turn now to DX-421, which was the
02:10  20   Excel that you were looking at.
02:10  21          MS. PIEPMEIER:  I don't know if one of
02:10  22   our wonderful hot seat gentlemen can pull that up.
02:10  23          Okay.  Thank you very much.  Yes.
02:10  24          So this is the same spreadsheet we were
02:10  25   looking at.  It doesn't have the calculation that

528

02:10  1   plaintiff's counsel added.  But just for the record,

02:10  2   this is DX-421.  I'd like to move that into evidence.

02:10  3              MS. SRINIVASAN:  No objection.

02:10  4              THE COURT:  It'll be admitted.

02:10  5              MS. PIEPMEIER:  Thank you, Your Honor.

02:10  6   BY MS. PIEPMEIER:

02:10  7        Q.    Now, you had some questions from counsel

02:10  8   specifically about the number of meetings that had VoIP

02:10  9   and a PSTN participant, correct?

02:10  10       A.    Correct.

02:10  11       Q.    Okay.  Now, looking at this spreadsheet, how

02:10  12  would you determine how many meetings there were total

02:10  13  for any given month?

02:10  14       A.    So when we -- can I explain by an example

02:11  15  here?

02:11  16       Q.    Of course.

02:11  17       A.    If we looked at the second row, which is

02:11  18  August of 2021, you will see -- let's take our

02:11  19  attention to three columns:  C, Column E, and Column G.

02:11  20  These are the three categories.

02:11  21            Column C says meetings where we had only Voice

02:11  22  over IP participants.  Column E says meetings where we

02:11  23  only had PSTN participants.  And Column G says meetings

02:11  24  where we had a mix of VoIP and PSTN participants.

02:11  25            So the sum of those three is the total

529

02:11  1    meetings we had on the platform.

02:11  2        Q.    Now, I don't know if you were able to see the

02:11  3    very, very bottom of the screen.  I'm able to see it

02:11  4    here.  It may be cut off for you.

02:11  5        But when those three rows are selected, Excel

02:11  6    magically sums those up for me.  And what I wrote down

02:12  7    is the sum of the total number of meetings of those

02:12  8    three cells is 58,507,239.

02:12  9        Do you see that?

02:12  10       A.    I see that.

02:12  11       Q.    So is -- how would you perform the procedure

02:12  12   for finding out the total number of meetings for every

02:12  13   month in this spreadsheet?

02:12  14       A.    I would use the formula to sum up Column C, E,

02:12  15   and G for every row to say total number of meetings

02:12  16   during that month.

02:12  17       Q.    So how about if we wanted to get the

02:12  18   percentage of meetings that had one VoIP versus one

02:12  19   PSTN participant over the total number, how would you

02:12  20   make that determination?

02:12  21       A.    When we are determining the percentage, we

02:12  22   would actually go by usage, which means we would go by

02:13  23   the minutes column.  So instead of C, E, and G, we

02:13  24   would go by D, F, and H, because it includes the

02:13  25   minutes.

530

```
02:13   1              And then if I wanted to say, okay.  What
02:13   2    percent of the usage was meetings where you had PSTN
02:13   3    and VoIP together, I would compute that as Column H
02:13   4    divided by sum of Column D, F, and H, expressed as a
02:13   5    percentage.
02:13   6         Q.   And that way -- so the number -- strike that.
02:13   7              The numbers that counsel went over with you a
02:13   8    moment ago on cross-examination were absolute numbers,
02:13   9    correct?
02:13  10         A.   Correct.
02:13  11         Q.   Okay.  They were not expressed as a percentage
02:13  12    of total numbers of either minutes or meetings?
02:13  13         A.   Correct.
02:13  14         Q.   Okay.  And counsel also asked you -- and I
02:13  15    didn't write down the number, but said something like,
02:14  16    you know, there's this number of meetings in this month
02:14  17    where there was one PSTN participant; is that right?
02:14  18         A.   That's right.
02:14  19         Q.   Okay.  And for any one of those meetings, you
02:14  20    don't know -- sitting here, you have no way of
02:14  21    knowing -- strike that.
02:14  22              For any one of those meetings, do you have any
02:14  23    way of knowing whether the people who dialed in by PSTN
02:14  24    could have joined in a different way?
02:14  25         A.   I have no way of knowing that looking at this
```

02:14  1    data.

02:14  2              MS. PIEPMEIER:  Okay.  Pass the witness.

02:14  3              MS. SRINIVASAN:  Your Honor, may I

02:14  4    approach?

02:14  5              (Bench conference.)

02:15  6              MS. SRINIVASAN:  Your Honor, the witness

02:15  7    has said at any given point in time, they would have

02:15  8    data 13 months prior.  I'd like to ask him of when this

02:15  9    case was brought in 2021.

02:15  10             THE COURT:  You can do that.

02:15  11             MS. SRINIVASAN:  Okay.  All right.  Thank

02:15  12   you.  I have a couple of questions.

02:15  13             (Bench conference concludes.)

02:15  14                  RECROSS-EXAMINATION

02:15  15   BY MS. SRINIVASAN:

02:15  16      Q.   Mr. Barave, you were asked by your counsel

02:15  17   that your basis for what usage might have been back in

02:15  18   2015 would have been based on having looked at the data

02:15  19   in 2015.

02:15  20             But you can't, as you sit here today, tell us

02:15  21   what that data says, can you?

02:15  22      A.   Not beyond what I remember.

02:15  23      Q.   You can't tell us what percentage of meetings

02:16  24   had PSTN and VoIP users like all the other data we've

02:16  25   seen.  You can't tell us that?

532

02:16  1          A.    I cannot.

02:16  2          Q.    You were asked a number of questions related

02:16  3    or some questions related to COVID and how that

02:16  4    impacted use of Webex by both PSTN and VoIP users.

02:16  5                You recall those questions?

02:16  6          A.    Yes.  The question was what happened during

02:16  7    COVID to the usage.

02:16  8          Q.    And what happened to Cisco's revenues during

02:16  9    that same time period?

02:16  10         A.    Overall, Cisco's revenue -- I'm sorry.  I'm

02:16  11   not in a position to comment.

02:16  12         Q.    That's fair.  Let me rephrase that.

02:16  13               What happened to Cisco's revenue for Webex

02:16  14   during that same time period?

02:16  15         A.    I'm not sure I can comment on that either

02:16  16   because we don't break down product-wise revenue that

02:16  17   way.

02:16  18         Q.    Are you familiar with what happened with the

02:16  19   Webex Audio revenue during the same time frame you were

02:17  20   asked about, the COVID time frame?

02:17  21         A.    Not in a position to comment on that either.

02:17  22         Q.    Would you have any reason to dispute that

02:17  23   those revenues increased during the same time period

02:17  24   that you were asked about, about increased use of the

02:17  25   Webex Audio hybrid servers?

533

02:17  1       A.    The increased use, it is logical to say that

02:17  2    some of it could have resulted in increased revenue,

02:17  3    but a couple of clarifications I think are important to

02:17  4    know, that Webex is sold as a subscription service.    A

02:17  5    lot of the times it means you've paid the monthly

02:17  6    charge and you use what you use.    So instead of having

02:17  7    ten meetings, you had 100 meetings during that time,

02:17  8    you still paid the same.

02:17  9            In some cases more people, people who did not

02:17  10   need Webex, became new buyers, and that contributed to

02:17  11   increased revenue.

02:17  12           And the other factor in play was our CEO has

02:18  13   been on record during the early -- some parts of the

02:18  14   pandemic.    Because of the surge, our CEO actually

02:18  15   stopped charging for Webex to some customers,

02:18  16   particularly in health care, EDU, and public services

02:18  17   segment.    We just did not bill them for a few months.

02:18  18           So the net result of all of this, this is why

02:18  19   I'm not trying to avoid the question.    This is why it

02:18  20   is a little hard for me to say exactly what happened to

02:18  21   the revenues then.

02:18  22      Q.    Well, let me ask it this way:    When there is

02:18  23   an increased use of the Webex Audio functionality, that

02:18  24   normally would translate into increased revenue for

02:18  25   Cisco, correct?

02:18  1          A.    If a customer who has bought the monthly

02:18  2   subscription plan, flat fee plan, it will not result in

02:18  3   increased revenue.  They will just use it more for the

02:18  4   same price.

02:19  5          Q.    And if it draws new users who are going to be

02:19  6   using it either to dial in or to be on their computer,

02:19  7   that would lead to an increase in revenue?

02:19  8          A.    That's correct.

02:19  9                MS. SRINIVASAN:  All right.  Thank you.

02:19 10                MS. PIEPMEIER:  Your Honor, may I ask one

02:19 11   clarifying question?

02:19 12                THE COURT:  Of course.

02:19 13                FURTHER REDIRECT EXAMINATION

02:19 14   BY MS. PIEPMEIER:

02:19 15          Q.    Never trust a lawyer who says she has one

02:19 16   question, but I'm going to try.

02:19 17                You testified a moment ago on recross that you

02:19 18   didn't have the data from 2015.  You can't restate it

02:19 19   today a few years later, correct?

02:19 20          A.    Yes.

02:19 21          Q.    Based on your knowledge as product manager of

02:19 22   Webex for the past over ten years, do you have an

02:19 23   understanding of what the trends were in 2015 through,

02:19 24   let's say, today of usage?

02:19 25          A.    I do.

535

02:19  1        Q.    What is the basis of that understanding?

02:19  2        A.    Having looked at that usage trend and data

02:20  3    periodically through my time as product manager on

02:20  4    Webex.

02:20  5        Q.    And what is that trend?

02:20  6        A.    The mix of PSTN and Voice over IP usage

02:20  7    percentage has been steadily declining.  I'll say one

02:20  8    supporting fact available or data point available to us

02:20  9    right now is if you looked at that number in the

02:20 10    August 2021, first row in that spreadsheet, and if you

02:20 11    looked at the last row in there, you won't see a

02:20 12    decline in that percentage even within that point,

02:20 13    steadily going down from top to bottom.

02:20 14        Q.    And does that same decline still hold if you

02:20 15    go back starting from 2015?

02:20 16              MS. SRINIVASAN:  Objection.  Beyond the

02:20 17    scope of my recross.

02:20 18              THE COURT:  Sustained.

02:20 19              MS. PIEPMEIER:  No further questions.

02:20 20              THE COURT:  You may step down, sir.

02:20 21    Thank you.

02:20 22              Who will your next witness be?

02:21 23              MS. PIEPMEIER:  Your Honor, Cisco calls

02:21 24    Mr. Nathan Buckles.

02:21 25              (The witness was sworn.)

536

|      |    |                                                           |
|------|----|-----------------------------------------------------------|
| 02:21 | 1 | DIRECT EXAMINATION                                        |
| 02:21 | 2 | BY MS. GARDNER:                                           |
| 02:21 | 3 | Q.    Good afternoon.  My name is Abigail Gardner,       |
| 02:22 | 4 | and I'm here on behalf of Cisco.  With me is Mr. Nathan  |
| 02:22 | 5 | Buckles.                                                 |
| 02:22 | 6 | Mr. Buckles, could you please introduce                  |
| 02:22 | 7 | yourself to the jury?                                    |
| 02:22 | 8 | A.    Afternoon.  My name is Carl Nathan Buckles.  I    |
| 02:22 | 9 | go by Nathan.  I live up in McKinney, Texas, about 30,   |
| 02:22 | 10 | 45 minutes north of Dallas, with my wife and two dogs.  |
| 02:22 | 11 | I have three children, all adults.  I have one daughter |
| 02:22 | 12 | and two sons.                                            |
| 02:22 | 13 | Q.    Have you ever testified at a trial before?        |
| 02:22 | 14 | A.    I have not.  First time ever in a courtroom.      |
| 02:22 | 15 | Q.    Thanks for being here.                            |
| 02:22 | 16 | So I want to start by talking about your                 |
| 02:22 | 17 | background.  Where did you go to school?                |
| 02:22 | 18 | A.    I attended the University of Texas at Dallas      |
| 02:22 | 19 | up in Richardson.  I went there from 1993 to 1998.  I   |
| 02:22 | 20 | graduated with two degrees, a bachelor of science in    |
| 02:22 | 21 | computer science and a bachelor of arts in psychology.  |
| 02:22 | 22 | Q.    And what do you do for work?                      |
| 02:22 | 23 | A.    I'm employed by Cisco Systems.  I've worked       |
| 02:22 | 24 | there for about 25 and a half years.  My current job    |
| 02:22 | 25 | title is distinguished engineer.                        |

537

02:22  1      Q.    Do you enjoy working for Cisco?

02:22  2      A.    I do.  I've been there quite a long time now.

02:23  3  I've had lots of opportunities to work on different

02:23  4  things, learn new technologies, solve interesting

02:23  5  problems.

02:23  6            Cisco's always been a good company to work

02:23  7  for.  They take care of their employees, and they seem

02:23  8  to care about our work/life balance and good things

02:23  9  like that.

02:23  10     Q.    Are you a named inventor on any patents?

02:23  11     A.    I am.

02:23  12     Q.    How many?

02:23  13     A.    About seven.

02:23  14     Q.    And what do they generally relate to?

02:23  15     A.    I received those patents over the course of my

02:23  16  career.  They cover a variety of areas from optical

02:23  17  networking to realtime communications.

02:23  18     Q.    So what roles have you had during your

02:23  19  25 years at Cisco?

02:23  20     A.    I joined Cisco pretty much straight out of

02:23  21  college.  My first job was working on a little program

02:23  22  that turned the lights on in front of a computer from

02:23  23  green to red.  So that was very exciting to see my

02:23  24  programs actually doing something.

02:23  25            I worked at that job for a few years until

538

02:23  1    like the mid-2000s.  Then I moved into a group called

02:23  2    telepresence.  The telepresence team was trying to

02:24  3    greatly improve the quality and usability of

02:24  4    videoconferencing.  At that point in time, it was

02:24  5    pretty difficult to use.  The audio and video quality

02:24  6    was pretty bad, so we were really trying to improve on

02:24  7    those areas.  And that product was fairly successful.

02:24  8    It made its way into different companies' boardrooms,

02:24  9    even some governors' offices, and some things like

02:24  10   that.

02:24  11          In the mid-2000s, I transferred into the Webex

02:24  12   business, and I've worked on Webex ever since.

02:24  13   Q.   Now, you mentioned your title is distinguished

02:24  14   engineer.

02:24  15          What does that mean at Cisco?

02:24  16   A.   My wife says it means I have a lot of gray

02:24  17   hair.  But Cisco says it means that I have a certain

02:24  18   amount of expertise in areas that are important to

02:24  19   their business.  The job has a few different roles.

02:24  20          I mentor and work with younger engineers who

02:24  21   are just coming out of school or early in their careers

02:24  22   to help them, you know, navigate those careers, help

02:24  23   them pursue their own goals, things like that.  I work

02:24  24   as a system architect, working with our product

02:24  25   managers and sales teams to design and develop new

02:25  1    features.

02:25  2          And I work as a -- in the DevOps teams in

02:25  3    which we write code and then sort of operate that code

02:25  4    to make sure our services are always available.

02:25  5    Q.   So there's two main things you mentioned

02:25  6    there.  Can you tell us a little bit more about the

02:25  7    system architect and what the responsibilities in that

02:25  8    role are?

02:25  9    A.   So a system architect are sometimes called a

02:25  10   software architect.  Borrows the term "architect" from

02:25  11   actual architects who might design buildings.  They

02:25  12   might pick the layout of floors and things like that,

02:25  13   but then they sort of hand that design off to someone

02:25  14   else who goes and implements.  Actually does -- builds

02:25  15   the building, right?  The nuts and bolts of everything.

02:25  16         So a software architect or a system architect

02:25  17   is similar.  We do the overall design of how the system

02:25  18   will behave, the different components that may exist,

02:25  19   how those components interact with each other.  We

02:25  20   write detailed specifications for how those components

02:25  21   will behave.

02:25  22         And then we hand off those designs to other

02:25  23   engineers who will write the software to actually

02:25  24   realize those designs and turn that into an actual

02:25  25   program that does those things.

540

02:26   1          Q.    And how about the DevOps role?

02:26   2          A.    So DevOps is an industry term that stands for

02:26   3    development plus operations, development meaning the

02:26   4    writing of the actual software.

02:26   5               When I first started, the way things tended to

02:26   6    work was one team wrote the software.  We took that

02:26   7    software and put it on some floppy disks or a DVD or

02:26   8    something like that, and then we would hand it to

02:26   9    someone else who would install that software onto a

02:26   10   computer, run that software, make sure that software

02:26   11   kept running.  If there were any problems in the

02:26   12   software, then they would try to fix them.  If they

02:26   13   couldn't fix them, then they would tell the developing

02:26   14   team about them.

02:26   15               (Clarification by Reporter.)

02:26   16         A.    In the operations role -- so the DevOps is a

02:26   17   combination of those two roles, the development plus

02:26   18   the operations.

02:26   19               So instead of just handing that software over

02:26   20   to someone else to operate for us, we now operate that

02:26   21   software ourselves.  So this means that, for example,

02:26   22   we're all on call.  We're on pager duty.  We have

02:26   23   little applications on our phone.  So if our software

02:26   24   crashes in the middle of the night, we get woken up and

02:26   25   we get to fix it.

541

BY MS. GARDNER:

Q.    So as a Cisco engineer, what products do you work on?

A.    When I joined fresh out of college, I was working on products in the optical networking area. This -- these are products, for example, that bring fiber Internet to your home or things like that.

So that fiber Internet cable leaves your home, and it goes to one of those little green boxes down by the curb.  Inside that little green box is one of the machines that I worked on potentially.  It's going to take together the fiber optics from your house and your neighbor's house, combine them together into a bigger piece of fiber optic.

And then there's going to be another box that takes maybe the fiber-optic cable from your neighborhood and the neighborhood next door and again makes a bigger cable, et cetera, et cetera, building those things up together.

I worked on those products until the mid-2000s, when Cisco was moving out of that business a little bit, and I was given the opportunity to join the telepresence team I mentioned a little bit ago.  That was my first exposure to what we call realtime media or realtime media processing.

```
02:27   1              I was happy to join that team.  It was
02:27   2   exciting new technology.  People were very excited
02:28   3   about the benefits of the Internet, which was still
02:28   4   pretty -- pretty early in those days.
02:28   5              THE COURT:  You really need to slow down.
02:28   6              THE WITNESS:  Sorry, sir.  Thank you.
02:28   7   A.    People were pretty excited about the Internet
02:28   8   in those days and the different things that you could
02:28   9   do over the Internet, the different type of
02:28  10   applications that we could run.
02:28  11              So our goal, as I said earlier, was to sort of
02:28  12   improve the usability of videoconferencing and to
02:28  13   improve the quality.  We were one of the first people
02:28  14   in the world to do HD-quality video over the Internet.
02:28  15   We were pretty proud of all those achievements.
02:28  16              THE COURT:  If you'll hold on one second.
02:28  17              MR. TRIBBLE:  Objection, Your Honor.  I
02:28  18   mean, he's testifying these long narratives that are
02:28  19   not --
02:28  20              THE COURT:  Sustained.
02:28  21              If you'll break it a little bit for him,
02:28  22   please.  Thank you.
02:28  23              MS. GARDNER:  Thank you.
02:28  24              Mr. Buckles, I know it's your first time
02:28  25   in trial and so the speed --
```

```
02:28   1                    THE WITNESS:  Yes, ma'am.
02:28   2                    MS. GARDNER:  Yeah.  Thank you.
        3    BY MS. GARDNER:
02:28   4         Q.   I know that one of the products you now work
02:28   5    on is Webex, right?
02:28   6         A.   Yes, ma'am.
02:28   7         Q.   So what does Webex products mean?
02:29   8         A.   So Webex was a company that Cisco acquired
02:29   9    back in 2007 or thereabouts.  Its original product is
02:29  10    what we now call Webex Meetings.
02:29  11              Webex is also a brand name for Cisco.  There
02:29  12    are a few different products underneath that brand
02:29  13    name.  Webex Meetings is one of them, and that's the
02:29  14    one I spend most of my time on.
02:29  15              There are a few others such as Webex Calling.
02:29  16                    THE COURT:  If you'll hold on.
02:29  17                    MR. TRIBBLE:  Objection, nonresponsive.
02:29  18    The question was what does Webex products mean, and
02:29  19    we're getting the whole history of Webex.  I mean --
02:29  20                    THE COURT:  Okay.  I think the jury would
02:29  21    do better if we just broke this up a little bit.  And
02:29  22    if you need to lead him a little bit to do that, my
02:29  23    guess is counsel won't mind, so...
02:29  24                    MS. GARDNER:  Sure.
02:29  25    BY MS. GARDNER:
```

544

| | | |
|---|---|---|
| 02:29 | 1 | Q.    And so, Mr. Buckles, if I interrupt you |
| 02:29 | 2 | inadvertently a bit, I apologize in advance. |
| 02:29 | 3 | A.    Sure. |
| 02:29 | 4 | Q.    But we'll just try to get a couple of |
| 02:29 | 5 | postmarks here. |
| 02:29 | 6 | So just to make sure I'm understanding what |
| 02:29 | 7 | you just testified, am I right that Webex is an |
| 02:30 | 8 | umbrella term and there's a number of Webex products |
| 02:30 | 9 | under that? |
| 02:30 | 10 | A.    That's correct. |
| 02:30 | 11 | Q.    And you work in Webex Meetings? |
| 02:30 | 12 | A.    Primarily, yes. |
| 02:30 | 13 | Q.    Any particular features of Webex Meetings that |
| 02:30 | 14 | you focus on? |
| 02:30 | 15 | A.    So I tend to focus on what we call the |
| 02:30 | 16 | realtime media parts of Webex. |
| 02:30 | 17 | Q.    And what do you mean by that? |
| 02:30 | 18 | A.    So the realtime part of that just means right |
| 02:30 | 19 | now, we're in a hurry.  So you might imagine that you |
| 02:30 | 20 | want to watch a Netflix movie or something like that. |
| 02:30 | 21 | It might take you five or ten seconds for that movie to |
| 02:30 | 22 | start. |
| 02:30 | 23 | When we mean realtime, we mean much faster |
| 02:30 | 24 | than that.  We mean basically right now.  I say words, |
| 02:30 | 25 | you hear those words, you know, very, very fast. |

545

02:30  1          Media being primarily audio and video, I speak

02:30  2  and you hear me, or I'm captured by a camera and you

02:30  3  can see me.

02:30  4          There's a few other types of media in Webex

02:30  5  Meeting.  For example, I can share a document.  I could

02:30  6  share a spreadsheet or something like that, and

02:30  7  everyone else in the meeting can see that media as

02:30  8  well.

02:30  9      Q.    Thank you.

02:30  10          What's your understanding of why you're here

02:30  11  today, Mr. Buckles?

02:31  12      A.    I'm here to provide information about how

02:31  13  Webex works.

02:31  14      Q.    And we just -- you know, we heard a lot about

02:31  15  that already, but are you the right guy to be telling

02:31  16  us about this today?

02:31  17      A.    I hope so.  I've been working in Webex for 10

02:31  18  to 15 years now.  I have a decent bit of experience,

02:31  19  and I hope I can make that useful.

02:31  20      Q.    Okay.  So let's dive in.

02:31  21          First of all, who typically uses Webex

02:31  22  Meetings?

02:31  23      A.    Webex is primary customers or businesses.  We

02:31  24  do have a free version of Webex that consumers and

02:31  25  families can use to talk to each other.  But primarily

546

02:31  1    Webex's customers are businesses that want to have

02:31  2    business meetings to plan for the next week or the next

02:31  3    quarter to have a sales call, different business

02:31  4    functions like that.

02:31  5        Q.    Could you please provide a high-level

02:31  6    description of how Webex Meetings works?

02:31  7        A.    Webex is what we call a client server

02:31  8    architecture, and what we mean by that is that every

02:31  9    user who's going to join a Webex Meeting has some sort

02:31 10    of client.  That client might be a landline phone.

02:32 11    That client might be a laptop computer.

02:32 12            You're going to use that client, and that

02:32 13    client's going to get information from you.  It's going

02:32 14    to send that information to a Webex server.

02:32 15            The Webex server's going to process that

02:32 16    information, and it's going to perhaps send that

02:32 17    information to other people in the meeting that are

02:32 18    also using clients.

02:32 19            So all of the information exchanged in a Webex

02:32 20    Meeting is from a client to a server and then to

02:32 21    another client.

02:32 22            This is in contrast to other styles of design.

02:32 23    For example, a peer-to-peer design, in which case

02:32 24    clients might communicate directly to one another.

02:32 25    Webex also uses a client-to-server model.

02:32   1        Q.    So starting at the beginning of the Webex

02:32   2   Meeting, how does someone first set up or schedule the

02:32   3   meeting?

02:32   4        A.    There are a few different ways to set up a

02:32   5   meeting.  The simplest way is you can go to Webex.com.

02:32   6   You can log in or create an account.

02:32   7             From there you would need to have certain

02:32   8   pieces of information such as when do you want to have

02:32   9   the meeting.  Maybe next Friday at 4 o'clock.  You

02:32   10  would need to know some things like who do you want to

02:32   11  invite to that meeting, the different people who need

02:33   12  to be there so you can have a productive conversation.

02:33   13             (Clarification by Reporter.)

02:33   14       A.    And then you might have a small agenda, a

02:33   15  short summary of the meeting.

02:33   16             You would enter that information into the

02:33   17  Webex website, and you would click "schedule meeting."

02:33   18             Webex would then come back with a couple

02:33   19  paragraphs of text.  You can copy and paste that text

02:33   20  into an e-mail invitation, to a chat message, send that

02:33   21  to the other people who need to join the meeting, and

02:33   22  then everyone has all the information they need.  And

02:33   23  when the meeting time comes, they can use that

02:33   24  information to join the meeting.

02:33   25  BY MS. GARDNER:

548

02:33    1        Q.    So for joining the meeting, what are the

02:33    2    different options to connect to it?

02:33    3        A.    There's two basic ways to join the meeting.

02:33    4    The first is that in that text I talked about just a

02:33    5    second ago, there's going to be a phone number that you

02:33    6    can dial.

02:33    7            So you can dial that phone number.  You'll be

02:33    8    presented with some audio prompts:  Thank you for

02:33    9    calling Webex, et cetera.  You'll enter some

02:33    10    information such as what we call a meeting number or a

02:33    11    meeting ID.

02:33    12            Once you do that, you'll be added into the

02:33    13    meeting, and you'll be able to hear the other people

02:34    14    that have maybe already joined that meeting.

02:34    15            The second way to join the meeting is via a

02:34    16    hyperlink.  There'll be such a link in the text that we

02:34    17    talked about earlier.  You can click on that, and it

02:34    18    will open up a web page, or it may open the Webex App

02:34    19    if you've already used Webex before.

02:34    20            Either way, you'll eventually sign in.  You'll

02:34    21    open the Webex App.  The Webex App will ask you for

02:34    22    some permissions.  It will say:  Am I allowed to use

02:34    23    your microphone?  Am I allowed to use your camera?

02:34    24    Things of that nature.

02:34    25            Once that's done and you have gone through

549

| | |
|---|---|
| 02:34 | 1 |

those configuration steps, you'll be added into the
meeting.  And just as with the dial-in option, you'll
be able to hear everyone, and people will be able to
hear you.  And if you've allowed access to your camera,
people will start to be able to see your video.

    Q.   So why are there these two different options,
dial-in and hyperlink, for joining the same meeting?

    A.   So there's two main reasons for that.

       The first one is just personal preference.
Not everyone likes the idea of being on camera.  So
they may want to join using a phone dial-in.  They
think it's simpler.  It's more convenient.  It's more
private.  Things like that.  So that's the first
option, just personal preference.

       The second option is going to depend on the
type of meeting that you're having.  If you can have
that meeting and just talk and resolve all the open
questions, then maybe audio is good enough for you, and
so just dialing in using a phone is good enough.

       But if you're sharing maybe some detailed
blueprints, a spreadsheet or something like that, and
maybe you want to have a detailed conversation about
exactly the contents of that document are similar, then
you probably want to join using the second option so
that you can see the same content as everyone else,

550

02:35  1    you'll have a more productive meeting.

02:35  2        Q.   What types of user devices can connect to a

02:35  3    Webex Meeting?

02:35  4        A.   Lots and lots of different things.  Everything

02:35  5    from landline phones to smartphones, laptops, desktop

02:35  6    computers.  There's a wide variety of things.

02:35  7        Q.   Are there any limitations on the types of

02:35  8    devices that can dial in?

02:35  9        A.   No.  Pretty much anything that can make a

02:35  10   phone call.  So if you can call your mom on your

02:36  11   device, then you can use that device to join a Webex

02:36  12   Meeting.

02:36  13       Q.   What about the types of devices that can use

02:36  14   the hyperlink option?

02:36  15       A.   Sure.  So the hyperlink is basically anything

02:36  16   that -- on which you can browse the Web.  A hyperlink

02:36  17   we're all probably familiar with.  You know, if you go

02:36  18   to Google and you do a search, you get a list of links.

02:36  19   You click on them.  They take you to a web page.

02:36  20            The hyperlink in Webex is very similar to

02:36  21   that.  So any device in which you can browse the

02:36  22   Internet, a smartphone, a laptop computer, all of those

02:36  23   can be used to join a Webex Meeting.

02:36  24            THE COURT:  Counsel, could I have you up

02:36  25   here for one second?

| | | |
|---|---|---|
| 02:36 | 1 | (Bench conference.) |
| 02:36 | 2 | THE COURT:  This isn't going to work. |
| 02:36 | 3 | You either need to slow him down yourself or interrupt |
| 02:36 | 4 | him or do something.  He's -- Kristie can't keep up. |
| 02:37 | 5 | The jury can't keep up.  I don't really care.  I'm not |
| 02:37 | 6 | going to change anything, but, Counsel, if you can ask |
| 02:37 | 7 | the question and get the information out so he doesn't |
| | 8 | have to.  At some point I'm going to be moving in so |
| 02:37 | 9 | however you want to do it. |
| 02:37 | 10 | MR. TRIBBLE:  And, Your Honor, I'm fine |
| 02:37 | 11 | if they want to take a quick break and talk to him or |
| 02:37 | 12 | something like that or just say something to him right |
| 02:37 | 13 | now or -- I don't care. |
| 02:37 | 14 | MS. GARDNER:  I'll mention it again.  You |
| 02:37 | 15 | know, in prep -- this is just -- he's trying his best. |
| 02:37 | 16 | THE COURT:  Yes. |
| 02:38 | 17 | (Bench conference concludes.) |
| 02:38 | 18 | BY MS. GARDNER: |
| 02:38 | 19 | Q.   Okay, Mr. Buckles.  And just one more time.  I |
| 02:38 | 20 | know it's exciting.  We're in trial.  But the cadence. |
| 02:38 | 21 | I'm going to do my best to break up your testimony a |
| 02:38 | 22 | bit with some more questions.  And so I apologize in |
| 02:38 | 23 | advance if I'm cutting you off.  But -- |
| 02:38 | 24 | A.   No problem.  I apologize for talking so fast. |
| 02:38 | 25 | I am a little nervous. |

552

```
02:38   1        Q.    That's all right.
02:38   2              Okay.   Just to reorient, so we talked briefly
02:38   3    about setting up a meeting, joining a meeting over the
02:39   4    two different options.
02:39   5              Once the users have joined the Webex Meeting,
02:39   6    what happens?  What does Webex do when somebody's
02:39   7    speaking?
02:39   8        A.    So if you join the meeting via phone, for
02:39   9    example, that phone will have a microphone and the
02:39  10    handset that you're holding up to your head right next
02:39  11    to your mouth.  That microphone will pick up your
02:39  12    speech as you talk.
02:39  13              That microphone will change that speech from a
02:39  14    sound wave into a series of numbers.  Those numbers
02:39  15    will then be transmitted over a network to the Webex
02:39  16    servers.
02:39  17        Q.    And what about -- apologies.  Were you
02:39  18    finished with PSTN?
02:39  19        A.    Go ahead.  Sorry.
02:39  20        Q.    What about the hyperlink users?
02:39  21        A.    Sure.  So perhaps you joined using your laptop
02:39  22    computer and you're wearing a headset, for example.
02:39  23    That headset similarly has a microphone.  And the same
02:39  24    process will happen.  The microphone will receive your
02:39  25    audio, turn it into a bunch of numbers, and send those
```

02:39  1    numbers up to Webex.

02:39  2        Q.    Is there a background noise that gets picked

02:40  3    up as well?

02:40  4        A.    There is.  The microphone picks up pretty much

02:40  5    all the audio in the space that you're in.  So if there

02:40  6    was air-conditioning noise, a fan, a dog barking,

02:40  7    someone talking, any of those things are the type of

02:40  8    audio that the microphone will be picked up, turned

02:40  9    into numbers, and sent up to Webex.

02:40  10       Q.    And how does Webex distinguish between the

02:40  11   active speech and the background noise, like AC, a dog

02:40  12   barking, that sort of thing?

02:40  13       A.    So the way that the conversion to the numbers

02:40  14   that I mentioned works is essentially at a very simple

02:40  15   level, larger numbers are louder noises.  So we can

02:40  16   simply compare essentially the size of numbers against

02:40  17   each other.

02:40  18             We will notice that in the case where there is

02:40  19   background noise, probably those numbers are fairly

02:40  20   constant, just sort of a flat level of noise, a flat --

02:40  21   all 10s, all 20s, something like that.

02:40  22             And then when you speak, those numbers will go

02:40  23   up.  That's an indication to Webex that perhaps someone

02:40  24   is speaking or there's something interesting happening

02:40  25   from an audio point of view.  And so Webex will detect

‒554‒

```
02:41   1   that.  And we'll make sure that everyone else in the
02:41   2   meeting hears that -- hears that noise.
02:41   3       Q.    So what I'd like to do next is walk through an
02:41   4   example of one of these calls.
02:41   5           And is that something that you could draw to
02:41   6   help us visualize?
02:41   7       A.    Sure.
02:41   8       Q.    If you could please come down to the easel
02:41   9   here.  And you need two colors, right?  I've got black.
02:41  10   And then do you want red or blue?
02:41  11       A.    Black and red is fine.  Thank you.
02:41  12       Q.    All right.  And I believe we have a microphone
02:41  13   for you.
02:41  14           So could you please walk us through an example
02:41  15   of what's happening when you have multiple people
02:41  16   speaking on a Webex conference?
02:41  17       A.    Sure.  So we're going to have a make-believe
02:42  18   conference here.  We're going to have five different
02:42  19   participants.  We're going to note the -- denote these
02:42  20   as Alice, Bob, Carol, Dave, and Elaine.
02:42  21       Q.    Where do those names come from?
02:42  22       A.    So this is basically A, B, C, D, E.  We tend
02:42  23   to just give them names.  We do this sort of modeling
02:42  24   of how different users and people behave in meetings
02:42  25   all the time.  So we just have sort of a convention of
```

555

02:42  1    A, B, C, D, E and then just give them names.  It's a

02:42  2    little easier to remember things like that.

02:42  3         Q.    Okay.  So let's assume we've got multiple

02:42  4    speakers.  What's going on in that call?

02:42  5         A.    So, for example, in this meeting perhaps we

02:42  6    have Alice speaking, we have Bob speaking, and we have

02:42  7    Carol speaking.

02:43  8              As we talked about before, all the audio from

02:43  9    everyone's going to go up to Webex.  Webex is going to

02:43  10   notice that these three people are speaking, and then

02:43  11   Webex is going to make decisions about how we're going

02:43  12   to send audio back to these participants so that

02:43  13   everyone hears all the audio that they need to hear.

02:43  14        Q.    And to tie that to what you testified about

02:43  15   earlier, the active speaking, does that mean their

02:43  16   volume is higher, or what's -- is there background

02:43  17   noise with Dave and Elaine?

02:43  18             Like what's coming from each person?

02:43  19        A.    So it's a relative comparison.  In our

02:43  20   example, we have three people talking very loudly,

02:43  21   which perhaps is not the most productive meeting

02:43  22   scenario but does happen from time to time.

02:43  23             If the case were that Bob and Carol weren't

02:43  24   speaking and perhaps Dave had some background noise,

02:43  25   then perhaps Dave's background noise might become sort

556

02:43  1    of an active speaker.  Dave isn't speaking, but there's

02:43  2    enough for that to be relevant.

02:43  3        Q.    Okay.  But let's assume for this example it's

02:43  4    what you've denoted here.  So you've marked Alice, Bob,

02:43  5    and Carol with red active speakers, right?

02:43  6        A.    Correct.

02:43  7        Q.    What's happening?

02:43  8        A.    So just like in the real world, if we're

02:44  9    sitting in this courtroom and people are speaking, when

02:44  10   Alice speaks, what Alice should hear is what Bob and

02:44  11   Carol are saying.

02:44  12        So if we kind of denote that here, we can say

02:44  13   that there's audio going back to Alice and that's from

02:44  14   Bob.  I'll just put a B, and that's from Carol.  I'll

02:44  15   denote with a C.

02:44  16        Q.    Could you do the same for the other speakers?

02:44  17        A.    Sure.  So Bob likewise would then hear audio

02:44  18   from Alice, and Bob would hear audio from Carol.  Carol

02:44  19   would then hear audio from Bob -- or sorry, from Alice,

02:44  20   and Carol would hear audio from Bob.

02:44  21        Q.    Okay.  And what about Dave and Elaine?  And

02:44  22   they're listening on this call?

02:44  23        A.    Yeah, exactly.  So Dave and Elaine, now what

02:44  24   they need to hear, is the combination of what the three

02:44  25   people who are speaking are saying.  So Dave and Elaine

557

02:44  1   would both hear what Alice is saying, what Bob is

02:44  2   saying, and what Carol is saying.  And, again, hear for

02:44  3   Elaine, Alice, Bob, and Carol.

02:44  4       Q.    Couple of follow-up questions on this.

02:45  5             So one thing I'm seeing here is that Alice,

02:45  6   that's the A, right?

02:45  7       A.    Correct.

02:45  8       Q.    Is being sent to Bob, Carol, Dave, and Elaine;

02:45  9   is that right?

02:45  10      A.    Correct.  Yes, ma'am.

02:45  11      Q.    So why is that not getting sent to Alice?

02:45  12      A.    So it comes down to what we call user

02:45  13  experience.  When you speak in the real world, the

02:45  14  sound leaves your mouth.  It does bounce off the walls

02:45  15  and comes back to your ears, but your brain sort of

02:45  16  filters that out for you.  You don't really hear

02:45  17  yourself speak.  You're obviously aware of the things

02:45  18  you say, but from a hearing point of view, you don't

02:45  19  really hear that.

02:45  20            That doesn't always work.  For example, if you

02:45  21  go into a cave and you yell hello, you will hear the

02:45  22  echo of hello come back to you and you will hear that.

02:45  23  You will perceive it as your own voice coming back to

02:45  24  you.

02:45  25            But in a normal courtroom environment or room,

558

02:45   1   that doesn't happen because the walls are all close

02:45   2   enough that that sound bounces back to you fast enough

02:45   3   that your brain sort of cancels it out for you.

02:45   4           When you're in a Webex Meeting or an online

02:46   5   meeting, that audio is sent all the way up to a Webex

02:46   6   server that's running potentially fairly far away from

02:46   7   you.  It takes time for that audio to go all the way

02:46   8   there, and it will then take time for that audio to

02:46   9   come all the way back.  That amount of time would

02:46   10  create that echo effect that we talked about in the

02:46   11  cave, and that's very sort of annoying and disruptive

02:46   12  in a meeting.

02:46   13          If you're trying to talk and then you hear

02:46   14  what yourself is saying, you send a stop talking and

02:46   15  you get confused.  And it just doesn't lead to a very

02:46   16  pleasant experience.

02:46   17      Q.   So what is getting sent to Alice?

02:46   18      A.   So Alice is receiving the combination of Bob

02:46   19  and Carol's audio.

02:46   20      Q.   Is Alice's audio getting removed from the

02:46   21  stream that's sent to Alice?

02:46   22      A.    No.  I wouldn't describe it that way.  I would

02:46   23  say that Alice's audio's never sort of a candidate for

02:46   24  being sent back to Alice.  So just Bob and Carol's

02:46   25  audio is what's sent back to Alice.

559

02:46  1      Q.    What do you mean Alice's audio isn't a

02:46  2  candidate?

02:46  3      A.    So the Webex servers know that the audio came

02:46  4  from Alice, and so they know that they should not send

02:46  5  that audio back to Alice.

02:46  6      Q.    Okay.  And to make sure we're understanding

02:47  7  this properly, if Alice is speaking, is the same stream

02:47  8  getting sent to the other four participants on the

02:47  9  conference?

02:47  10      A.    No.  We can see here that Bob and Carol are

02:47  11  receiving different things.  Bob is not receiving Bob's

02:47  12  audio.  He's receiving Alice plus Carol, and Carol is

02:47  13  receiving Alice plus Bob.  And then Dave and Elaine are

02:47  14  receiving the same combination of voices, but there can

02:47  15  be differences in the audio sent there for a variety of

02:47  16  factors.

02:47  17      Q.    I want to focus a bit on that last thing you

02:47  18  said, there's differences between what's going to Dave

02:47  19  and Elaine, even though it says A, B, and C.

02:47  20          Could you explain that a bit more for us,

02:47  21  please?

02:47  22      A.    Sure.  So we can pick one example.  Maybe Dave

02:47  23  is at home.  Dave has very good home WiFi.  Dave has a

02:47  24  very good Internet connection.  So really good network.

02:47  25  And so what we can send to Dave might be a really,

560

02:47  1   really good-quality version of the audio.

02:47  2          So we can maybe denote that by saying maybe

02:47  3   Dave is getting four-star audio.  So the audio sounds

02:48  4   really nice.  It's very crisp, it's very clear.

02:48  5   There's no sort of robotic sound or it doesn't sound

02:48  6   like he's under water or any of those sort of things.

02:48  7          Elaine, by counter example, perhaps Elaine is

02:48  8   working out in the field.  Doesn't have any access to

02:48  9   WiFi.  Perhaps she only has one or two bars on her

02:48  10  cellular phone.  So the audio that we send to Elaine

02:48  11  maybe can't be quite as good of a quality as the audio

02:48  12  that we would send to Dave.  And so perhaps Elaine is

02:48  13  only getting two-star audio.

02:48  14         It sounds okay.  She can still understand what

02:48  15  Alice, Bob, and Carol are saying, but it doesn't maybe

02:48  16  have quite the richness of tone and things like that

02:48  17  compared to the audio that's being sent to Dave.

02:48  18     Q.   So let's assume Elaine and Dave actually were

02:48  19  getting the same quality.  Maybe they're in the same

02:48  20  office, same type of device, and it's four stars for

02:48  21  both.

02:48  22         Are there any other differences?

02:48  23     A.   There certainly can be.  Webex is what we call

02:48  24  secured by default.  And what that means is that the

02:49  25  audio that's being sent to everyone is encrypted so

02:49  1    that if someone is looking at the network that these --

02:49  2    that the audio is traveling across, they can't just

02:49  3    look at the network and sort of take those numbers we

02:49  4    talked about and turn them back into speech.

02:49  5            So those numbers are all jumbled and changed,

02:49  6    what we call encryption.  The way that that encryption

02:49  7    is done is using random numbers, so very, very large

02:49  8    random numbers.  Each of those random numbers is

02:49  9    different for each of the participants.

02:49  10           So if you look at the audio on the network

02:49  11   that's being sent to Dave, even if the quality is

02:49  12   exactly the same, they'll have different random

02:49  13   numbers, what we call keys, applied to that audio.  So

02:49  14   the audio sent to Dave and Elaine will be different.

02:49  15      Q.    Okay.  And just stepping back to a higher view

02:49  16   of this whole example you've walked us through, do each

02:49  17   of these users always get their own separate streams?

02:49  18      A.    Yes.

02:49  19      Q.    Okay.  And if you want to go ahead and retake

02:50  20   your seat, and I can take your markers.  We can return

02:50  21   the microphone.  Thank you.

02:50  22      A.    Sure.

02:50  23           MS. GARDNER:  And if we could please mark

02:50  24   this as Demonstrative DDX-6.

      25   BY MS. GARDNER:

02:50   1        Q.    Okay.  So now I want to come back to how the
02:50   2   audio is being processed by Webex.
02:50   3              How is audio processing complicated when there
02:50   4   are multiple speakers who are active on the same
02:50   5   conference?
02:50   6        A.    So like we've talked about a little bit,
02:50   7   there's always multiple sources of noise in the
02:50   8   conference, that even if there's only one person
02:50   9   speaking, you might have air-conditioning noise and
02:50   10  different things like that coming from other places.
02:50   11             So in some ways, multiple active speakers or a
02:51   12  single active speaker with some background noise are
02:51   13  similar problems for us to solve.
02:51   14             At the end of the day, what we need to do is
02:51   15  we need to combine those audio signals together.  And
02:51   16  there's two basic ways that we can do that, and we call
02:51   17  those mixing and multiplexing.
02:51   18        Q.    So could you please describe those for us
02:51   19  starting with mixing?
02:51   20        A.    Sure.  So mixing is a mathematical operation.
02:51   21  We talked about how audio signals are turned into
02:51   22  numbers.
02:51   23             So you can imagine that perhaps Alice's audio
02:51   24  has a value of 100, Bob's audio has a value of 200.  If
02:51   25  you want to mix those together, basically you just add

02:51  1   them together.  100 plus 200 is 300.  That number 300

02:51  2   will then represent the sound that is the combination

02:51  3   of Alice and Bob.

02:51  4        Q.   Is there any analogy that you could use to

02:51  5   help explain that?

02:51  6        A.   Sure.  So a couple analogies that are maybe

02:51  7   useful.

02:51  8             You can imagine if you have some paint colors

02:51  9   or something like that.  You might have yellow paint

02:51  10  and blue paint.  If you mix those together, you get

02:51  11  green paint.  Things like that.

02:52  12            You could also imagine that you have the

02:52  13  ingredients to a cake.  You have some flour, some

02:52  14  sugar, some salt, and you mix those things together and

02:52  15  you create a batter.

02:52  16       Q.   And what about the second one, multiplexing?

02:52  17       A.   So multiplexing has a similar end goal, which

02:52  18  is that the user who is receiving the multiplexed audio

02:52  19  hears those -- those same different voices.

02:52  20            Multiplexing uses a different strategy, and

02:52  21  that strategy is that it keeps the different audio

02:52  22  signals separate but it sends them to the same

02:52  23  destination.

02:52  24            So to build on our analogy from earlier, if

02:52  25  instead of mixing the paint colors together we instead

564

02:52  1    took a yellow crayon and a blue crayon, we could send

02:52  2    both of those crayons to you and then you could make

02:52  3    green out of those for yourself.

02:52  4        Q.    Are there any other advantages to multiplexing

02:52  5    or more functionality that you could do at the client

02:52  6    side when you receive, you know, the crayons versus the

02:52  7    mixed green paint?

02:52  8        A.    Sure.  So one of the features we have in Webex

02:53  9    is something called "spatial audio."  And what that

02:53  10   feature allows you to do, if you imagine that you're

02:53  11   sitting in front of a monitor and maybe you have Alice

02:53  12   on the left side of that monitor and Bob on the right

02:53  13   side of that monitor and you're wearing a pair of

02:53  14   headphones.  So you have a left speaker and a right

02:53  15   speaker.

02:53  16        So when Alice speaks, her voice will come out

02:53  17   of the left earphone, and you will sort of naturally

02:53  18   turn your head and look to the left.

02:53  19        Just like today, if I heard a sound out that

02:53  20   window, I would turn and look to my right.

02:53  21        So the same thing.  By keeping those two

02:53  22   streams separate, we can then play them out of the left

02:53  23   or right speaker independently, and that sort of mimics

02:53  24   the very natural human interaction that you would do if

02:53  25   you were having a face-to-face in-person meeting.

565

02:53  1      Q.    So one thing we discussed a little bit earlier

02:53  2   in your testimony was that calls can be joined from

02:53  3   hyperlink or by dialing in.

02:53  4            How does Webex process audio for those who

02:53  5   have joined using the hyperlink option?

02:53  6      A.    So when you join with a hyperlink option, the

02:53  7   most common end result of that is you end up running

02:54  8   the Webex App piece of code that we've written and

02:54  9   we've delivered to your phone or to your laptop

02:54  10  computer or similar.

02:54  11           That application is our own software, and so

02:54  12  we can take advantage of the multiplexing audio to

02:54  13  realize features like I just talked about with spatial

02:54  14  audio.

02:54  15           We have other features that, for example, you

02:54  16  can have an interpreter onto a meeting.  So if perhaps

02:54  17  everyone is communicating in English but you only speak

02:54  18  German, you could have an interpreter speaking just to

02:54  19  you.  The only person who doesn't understand English,

02:54  20  you could hear a translation of that audio, and so you

02:54  21  can still participate in the meeting.

02:54  22     Q.    So how does it process the audio for users who

02:54  23  did the other option and dialed in?

02:54  24     A.    So when you dial in, you'll end up using

02:54  25  something that is called a "PSTN network."  That stands

566

02:54  1   for Public Switch Telephony Network.  That's a very old

02:54  2   piece of technology.  It goes nearly all the way back

02:54  3   to the invention of phones.

02:54  4        It goes all the way back to switchboard

02:54  5   operators manually plugging cables into giant

02:55  6   switchboards to connect phone calls to each other.

02:55  7        That network was built with a very specific

02:55  8   purpose.  That purpose is to have phone calls between

02:55  9   two people.  It wasn't meant to handle meeting

02:55  10  scenarios where there's more than two people

02:55  11  communicating with each other.

02:55  12       And so that network is a bunch of fundamental

02:55  13  limitations.  One of those limitations is that Webex

02:55  14  cannot send multiplexed audio through the PSTN network.

02:55  15  So Webex is forced to send the mixed audio.

02:55  16  Q.   And first, thank you for checking the speed

02:55  17  here.  I know you're trying, so I appreciate that.

02:55  18       Why does Webex mix the audio into packets for

02:55  19  dial-in users?

02:55  20  A.   So it goes back to that PSTN network.  Because

02:55  21  all dial-in users go through the PSTN network, that's

02:55  22  really the only choice that we have.

02:55  23  Q.   And just by the way, does Webex know anything

02:55  24  about the devices that have joined the meeting from

02:55  25  dialing in?

567

02:55  1      A.    Unfortunately not.  You can imagine that you

02:56  2  can use your smartphone to dial into the Webex Meeting

02:56  3  or you can use your smartphone to run the Webex App.

02:56  4           When you dial into the Webex Meeting, as far

02:56  5  as Webex can tell, you're using an old landline phone.

02:56  6  It just looks to us as if you're using, you know, an

02:56  7  old landline phone from -- you know, that we all had in

02:56  8  our homes 10 or 20 years ago.  And so that --

02:56  9  everything looks the same to us.

02:56  10     Q.    Regardless of whether it's a laptop or a

02:56  11 rotary phone or anything in between?

02:56  12     A.    That's right.

02:56  13     Q.    One thing you mentioned earlier is that mixing

02:56  14 can be thought of as a mathematical process.

02:56  15           What did you mean by that?

02:56  16     A.    So just the example I gave earlier, where you

02:56  17 sort of just have these numbers that represent a

02:56  18 certain piece of audio, and you can simply add them

02:56  19 together to create a mixed piece of audio.

02:56  20     Q.    One important issue in this case I want to

02:56  21 focus on very briefly is whether anyone's audio's

02:56  22 removed from the stream.  And we saw that a bit earlier

02:56  23 with Alice.

02:56  24           Does Webex ever remove anyone's audio from the

02:57  25 stream that's sent to them?

568

```
02:57   1        A.    No.  We do not.

02:57   2        Q.    Why not?

02:57   3        A.    There's a couple of reasons or maybe more than

02:57   4    a couple, but I'll talk about a couple.

02:57   5              When you remove things from a mix, you can

02:57   6    sometimes leave what we call artifacts behind.  So you

02:57   7    change the sound of the audio.

02:57   8              To build on our paint analogy, if you've mixed

02:57   9    yellow and blue together to create green, it's pretty

02:57  10    hard to take the yellow back out of that.  Now, that's

02:57  11    a little bit of an unfair comparison because we're

02:57  12    talking about numbers, not paint.  But the same sort of

02:57  13    principles apply.  But it's not always easy to go

02:57  14    backwards.

02:57  15        Q.    Can you give an example with numbers?  Is that

02:57  16    possible?

02:57  17        A.    Sure.

02:57  18              So computers have limits in terms of the size

02:57  19    of numbers that they can handle.  For audio, those

02:57  20    numbers, the size is relatively small.  It's about

02:57  21    64,000 is about the biggest number that they can keep

02:57  22    track of.

02:57  23              So you can imagine, for example, if Alice and

02:57  24    Bob are both speaking and their audio is equal to the

02:57  25    number 40,000, so what we would do is add 40,000 to
```

569

02:57 1    40,000.  You should get 80,000, but because the biggest

02:58 2    number the computer can handle is 64,000, you'll

02:58 3    actually get 64,000.

02:58 4         So it sort of breaks some fundamental rules of

02:58 5    math, but that's just, you know, limitations that

02:58 6    computers have from time to time.

02:58 7         So the problem then -- I'm sorry.  The problem

02:58 8    then is that if you try to subtract audio back out,

02:58 9    instead of subtracting 80,000 minus 40,000, you would

02:58 10   subtract 64,000 minus 40,000.  You would end up with

02:58 11   24,000.

02:58 12        But 24,000 is not what either Alice or Bob

02:58 13   initially -- their audio was.  Initially started off as

02:58 14   40,000.  So you sort of made mistakes there.

02:58 15        And there's various techniques that you can

02:58 16   use to try to compensate for that.  But the sort of

02:58 17   fundamental problem still remains.

02:58 18     Q.    Okay.  And so returning to our example from

02:58 19   earlier, just want to make sure this is clear.

02:58 20        So does Webex ever send Alice's own audio back

02:58 21   to Alice?

02:58 22     A.    No.

02:58 23     Q.    And would that change if Alice joined via a

02:58 24   hyperlink or via dialing in?

02:58 25     A.    No.

570

02:58  1        Q.    Another important issue in this case has been

02:59  2    surrounding the meaning of the word "each."

02:59  3             And you've been in this field a very long

02:59  4    time, right, Mr. Buckles?

       5        A.    Yes, ma'am.

02:59  6        Q.    Do you have an understanding of what that word

02:59  7    means?

02:59  8                  MR. TRIBBLE:  Objection, Your Honor.

02:59  9                  May we approach?

02:59 10                  THE COURT:  Sure.

02:59 11                  (Bench conference.)

02:59 12                  MR. TRIBBLE:  I think she's asking him

02:59 13    about claim construction.  And the big issue is he was

02:59 14    their 30(b)(6) witness on infringement, and he said

02:59 15    that he only read the claims but he didn't read the

02:59 16    entire patent.  There's no foundation.

02:59 17                  THE COURT:  Is there any evidence that he

02:59 18    has even seen the Court's claim construction?

02:59 19                  MS. GARDNER:  No, Your Honor.  I'm not

02:59 20    planning on asking him with regard to claim

02:59 21    construction of the patent.  I'm just going to ask him

03:00 22    if -- what he thinks the word means.

03:00 23                  THE COURT:  Then that's not really

03:00 24    relevant.  So I'll sustain it.  So I'll sustain the

03:00 25    objection.

571

03:00  1              MS. GARDNER:  Okay.  Thank you.

03:00  2              (Bench conference concludes.)

03:00  3   BY MS. GARDNER:

03:00  4       Q.   Okay, Mr. Buckles.  So back to Alice.  We just

03:00  5   confirmed her own audio never gets sent back to

03:00  6   herself.

03:00  7            And does it ever get removed from the stream

03:00  8   that is sent to her?

03:00  9       A.   No, ma'am.

03:00  10             MS. GARDNER:  Thank you.

03:00  11             No further questions.  And I pass the

03:00  12  witness.

03:00  13                   CROSS-EXAMINATION

03:00  14  BY MR. TRIBBLE:

03:01  15      Q.   Good afternoon, Mr. Buckles.

03:01  16      A.   Good afternoon, sir.

03:01  17      Q.   I'm Max Tribble.  I represent Paltalk.

03:01  18      A.   Nice to meet you.

03:01  19      Q.   So I wanted to ask you, you've read the claims

03:01  20  in the '958 patent?

03:01  21      A.   I have read the claims.

03:01  22      Q.   Excuse me.  The '858 patent.

03:01  23      A.   Yes, sir.  I've read the claims.

03:01  24      Q.   And in fact, you gave a deposition in this

03:01  25  case, right?

572

03:01    1        A.    That's correct.

03:01    2        Q.    And Cisco designated you as their expert,

03:01    3   their corporate -- let me state it this way:  Cisco

03:01    4   designated you as their corporate representative to

03:01    5   tell us in deposition what Cisco's position was on

03:01    6   whether it infringed the patent; is that fair?

03:02    7        A.    I wasn't qualified to offer a legal opinion,

03:02    8   sir.  I was just able to provide information about how

03:02    9   the products behaved.

03:02   10        Q.    Right.  But you were Cisco's designated

03:02   11   representative to testify on Cisco's behalf and

03:02   12   disclose to us all of the positions and evidence that

03:02   13   Cisco believed showed it didn't infringe; is that fair?

03:02   14        A.    I think that's fair to say.  Yes.

03:02   15        Q.    Okay.  And I note today you didn't give any

03:02   16   testimony saying:  We don't infringe the patent,

03:02   17   correct?

03:02   18        A.    That's correct.

03:02   19        Q.    Would it surprise you that 95 percent or more

03:02   20   of how you say Webex operates was exactly the same way

03:02   21   Dr. Schaefer, Paltalk's expert, says it operates and

03:02   22   said in this court?

03:02   23        A.    I don't know Dr. Schaefer, sir.  So I'm not

03:03   24   sure I can answer that.

03:03   25        Q.    Anyone ever have you read his expert reports?

03:03  1        A.    No, sir.

03:03  2        Q.    Okay.  When you were being prepared to testify

03:03  3   as Cisco's expert on noninfringement, did you read the

03:03  4   entire '858 patent?

03:03  5        A.    I did not.

03:03  6             MS. GARDNER:  Objection to the

03:03  7   characterization.  Just objection to the

03:03  8   characterization in that question in that Mr. Buckles

03:03  9   is a fact witness.

03:03  10             MR. TRIBBLE:  He was designated --

03:03  11             THE COURT:  He was designated as the

03:03  12   30(b)(6), correct?

03:03  13             MS. GARDNER:  Yes.

03:03  14             THE COURT:  And I think the context of

03:03  15   your question is in preparation to be a 30(b)(6) --

03:03  16             Ladies and gentlemen of the jury, as I

03:03  17   told you earlier about depositions, another process

03:03  18   that we have is that you can ask individuals to be

03:03  19   deposed and find out what they know.

03:04  20             But there are certain issues where you

03:04  21   can require the party to provide someone who speaks on

03:04  22   behalf of the company.  They need to find out the best

03:04  23   information on a particular subject, and then they are

03:04  24   designated to testify as the corporate representative

03:04  25   on a specific issue speaking for the company, not -- I

574

```
03:04   1   know it's metaphysical, but not in their individual
03:04   2   capacity.
03:04   3              So when you hear someone talking about a
03:04   4   30(b)(6) deposition, that's what's going on here.  It's
03:04   5   not what his individual knowledge might be, but it's
03:04   6   what Cisco -- in this case because it was a Cisco
03:04   7   person -- what Cisco prepared him to answer in response
03:04   8   to these questions.
03:04   9   BY MR. TRIBBLE:
03:04  10      Q.   And that's correct.  I'm asking about how you
03:04  11   prepared to testify on Cisco's behalf as its designated
03:04  12   representative in the 30(b)(6) deposition.
03:04  13              Do you understand that?
03:04  14      A.   Yes, sir.
03:04  15      Q.   And when you were being prepared, you were --
03:04  16   you were prepared by Cisco's lawyers; is that fair?
03:05  17      A.   Yes, sir.
03:05  18      Q.   And when they prepared you, let me ask it this
03:05  19   way:  When you -- when you testified as Cisco's
03:05  20   representative, you'd not read the entire patent,
03:05  21   correct?
03:05  22      A.   That's correct.
03:05  23      Q.   Did anyone tell you you need to read the whole
03:05  24   patent?
03:05  25      A.   No, sir.
```

575

| | | |
|---|---|---|
| 03:05 | 1 | Q.   And you did some drawings up here today. |
| 03:05 | 2 | What's -- tell me your title again.  What kind of |
| 03:05 | 3 | engineer? |
| 03:05 | 4 | A.   I'm a distinguished engineer, sir, much like |
| 03:05 | 5 | yourself. |
| 03:05 | 6 | Q.   No, no, no.  I -- that's a big deal.  I |
| 03:05 | 7 | understand that. |
| 03:05 | 8 | But as a distinguished engineer, you have |
| 03:05 | 9 | access to the source code of Webex, right? |
| 03:05 | 10 | A.   That's correct. |
| 03:05 | 11 | Q.   You have access to the documentation about |
| 03:05 | 12 | Webex, correct? |
| 03:05 | 13 | A.   That's correct. |
| 03:05 | 14 | Q.   And in your presentation to the jury today, |
| 03:06 | 15 | you didn't show us any source code, you didn't show us |
| 03:06 | 16 | any Webex documentation, did you? |
| 03:06 | 17 | A.   No, sir. |
| 03:06 | 18 | Q.   Okay.  And I had some other questions, but I |
| 03:06 | 19 | think we're in agreement, you agree Webex multiplexes, |
| 03:06 | 20 | right? |
| 03:06 | 21 | A.   I do, sir. |
| 03:06 | 22 | Q.   It -- and for some clients it mixes audio, |
| 03:06 | 23 | correct? |
| 03:06 | 24 | A.   That's correct. |
| 03:06 | 25 | Q.   Now, I want to clear up one thing.  You were |

576

03:06  1    saying sometimes they participate by computer, and one

03:06  2    of your answers was sometimes by a landline phone,

03:06  3    correct?

03:06  4         A.    Yes, sir.

03:06  5         Q.    But just to be clear, and I think you've made

03:06  6    a reference to this but I want to make sure it's clear

03:06  7    to the jury.

03:06  8              If I used my iPhone or some other smartphone,

03:06  9    I can connect either through PSTN phone lines or as a

03:06  10   computer over the Internet, correct?

03:07  11        A.    That's correct.  You can dial a ten-digit

03:07  12   number, which maps to the PSTN, or you can use our app,

03:07  13   which maps to the Internet connection.

03:07  14        Q.    Okay.  And you'll agree that Webex has active

03:07  15   speakers, correct?

03:07  16        A.    Yes, sir.

03:07  17        Q.    Active speaker lists?

03:07  18        A.    Yes.

03:07  19        Q.    Okay.  And then I just wanted to show you one

03:07  20   document.  See if I've got it here.  Oh, here it is.

03:07  21              MR. TRIBBLE:  Matt, can you put up PX --

03:07  22   Mr. Boles, can you put up PX-213?  I've got a copy of

03:07  23   this for you.

03:07  24              May I approach, Your Honor?

03:07  25              THE COURT:  Yes, sir.

```
03:07    1    BY MR. TRIBBLE:
03:08    2        Q.    And we're going to put it up on the screen,
03:08    3    and so often witnesses don't need to look at the
03:08    4    document.  But in case you wanted to look at the whole
03:08    5    document, I put it there in front of you.
03:08    6            So this is a document that's in evidence, and
03:08    7    I just wanted to go over it with you.
03:08    8            Do you see that this is a Webex internal
03:08    9    documentation, a piece of documentation for Webex?
03:08   10        A.    Yes, sir.  It denotes that on the first page.
03:08   11        Q.    Right.  And it's regarding Hybrid Audio
03:09   12    Architecture Design?
03:09   13        A.    Yes, sir.  That's the title.
03:09   14        Q.    And you realize that the patent is -- the
03:09   15    title begins:  Hybrid server architecture for mixing
03:09   16    and non-mixing client conferencing?
03:09   17        A.    I don't recall that offhand, but I believe you
03:09   18    say it's true.
03:09   19        Q.    Okay.  And the way we read this, it talks
03:09   20    about the revision history.
03:09   21            You'll agree that the date of this is
03:09   22    July 2nd, 2007?
03:09   23        A.    Yes, sir.
03:09   24        Q.    And you'll agree it was the first version.  It
03:09   25    says Rev 1.0?
```

578

| | | |
|---|---|---|
| 03:09 | 1 | A.    First and only, sir. |
| 03:09 | 2 | Q.    Okay.  And are you familiar with this document |
| 03:09 | 3 | already? |
| 03:09 | 4 | A.    I've seen this document before.  Yes. |
| 03:09 | 5 | Q.    Okay.  And so if we turn to Page 3, it says: |
| 03:09 | 6 | The hybrid audio service is a new service that this |
| 03:09 | 7 | engineering release will introduce.  The service will |
| 03:10 | 8 | offer user the capability to join audioconference via |
| 03:10 | 9 | VoIP or PSTN. |
| 03:10 | 10 | Correct? |
| 03:10 | 11 | A.    Yes, sir. |
| 03:10 | 12 | Q.    And so would you agree that this document |
| 03:10 | 13 | shows that the hybrid-type architecture for |
| 03:10 | 14 | conferencing was -- they were planning to add it to |
| 03:10 | 15 | Webex back in July of 2007? |
| 03:10 | 16 | A.    No, sir.  I think there's a misunderstanding |
| 03:10 | 17 | of the word "service" in your explanation. |
| 03:10 | 18 | Q.    I see. |
| 03:10 | 19 | Well, let me ask you it this way.  Let's look |
| 03:10 | 20 | at the purposes. |
| 03:10 | 21 | Would you agree that the purpose of this |
| 03:10 | 22 | revision was it would be improving the audioconference |
| 03:10 | 23 | usability of the Webex Audio system? |
| 03:10 | 24 | A.    Yes, sir. |
| 03:10 | 25 | Q.    And it would offer a competitive advantage |

| | | |
|---|---|---|
| 03:10 | 1 | over traditional audioconference providers? |
| 03:10 | 2 | A.    Yes, sir. |
| 03:10 | 3 | Q.    Do you have an understanding what that refers |
| 03:11 | 4 | to? |
| 03:11 | 5 | Who are the traditional -- what was a |
| 03:11 | 6 | traditional audioconference provider? |
| 03:11 | 7 | A.    That's difficult for me to answer.  This -- |
| 03:11 | 8 | this predates my time in Webex by a little bit.  But I |
| 03:11 | 9 | would imagine it's -- I'm not sure exactly what it |
| 03:11 | 10 | refers to.  I'm sorry. |
| 03:11 | 11 | Q.    This predates your time, so you really |
| 03:11 | 12 | don't -- you don't know.  Is that fair? |
| 03:11 | 13 | A.    I don't know what they mean by traditional |
| 03:11 | 14 | audioconference provider.  No. |
| 03:11 | 15 | MR. TRIBBLE:  Okay.  I pass the witness. |
| 03:11 | 16 | REDIRECT EXAMINATION |
| 03:11 | 17 | BY MS. GARDNER: |
| 03:11 | 18 | Q.    Hi, Mr. Buckles. |
| 03:11 | 19 | MS. GARDNER:  Mr. Boles, could you please |
| 03:11 | 20 | put PX-213 back on the screen? |
| 03:11 | 21 | Thank you so much, and navigate to that |
| 03:11 | 22 | same Page 3.  Thank you. |
| | 23 | BY MS. GARDNER: |
| 03:11 | 24 | Q.    Now, Mr. Buckles, you've seen this before, |
| 03:11 | 25 | right? |

580

```
03:11   1        A.    Yes, ma'am.

03:11   2        Q.    And I believe you just testified that there

03:12   3   might have been some misunderstanding about what

03:12   4   service meant.

03:12   5            Could you elaborate on what your understanding

03:12   6   is of new service in a document like this one?

03:12   7        A.    So service in this context refers to a piece

03:12   8   of code, so my interpretation of this first

03:12   9   introductory sentence is that there's a new service

03:12   10  that's providing the same functionality that was

03:12   11  present before in a new way.

03:12   12           For example, this new service might be more

03:12   13  efficient.  So as before, perhaps Webex could handle

03:12   14  1,000 different audioconferences, and with this new

03:12   15  service, Webex would be able to handle a million

03:12   16  audioconferences.

03:12   17       Q.    So would the underlying capability potentially

03:12   18  already be there?

03:12   19       A.    I believe so.  If we look under Purpose, it

03:12   20  talks about improving the audioconference usability,

03:12   21  not creating or inventing.  So improving upon something

03:12   22  that already existed.

03:12   23       Q.    And so does improving, the purpose is

03:12   24  improving, suggest to you that in fact this did already

03:13   25  exist?
```

03:13  1              MR. TRIBBLE:  Objection, leading and lack

03:13  2     of foundation.  He's already said this predates him,

03:13  3     and he was not familiar with the system back then.

03:13  4              THE COURT:  If you could lay a foundation

03:13  5     for his knowledge of the system at that time.

03:13  6     BY MS. GARDNER:

03:13  7        Q.    You've been at Cisco since what date?

03:13  8        A.    1998.

03:13  9        Q.    And Cisco acquired Webex, right?

03:13  10       A.    Yes, ma'am.  2007.

03:13  11       Q.    And you now work on the Webex product?

03:13  12       A.    Yes, ma'am.  Since about 2014.

03:13  13       Q.    And you're an engineer?

03:13  14       A.    Yes, ma'am.

03:13  15       Q.    You're familiar with these types of documents?

03:13  16       A.    Yes, ma'am.  I'm familiar with some of the

03:13  17    things in this document, for example, the enhanced

03:13  18    imaging.

03:13  19             MR. TRIBBLE:  Objection, Your Honor.  Now

03:13  20    he's now testifying about the document.  He just said

03:13  21    that he didn't start working on Webex until 2014.

03:13  22             MS. GARDNER:  He's laying the foundation,

03:13  23    Your Honor.

03:13  24             THE COURT:  Well, he can lay the

03:13  25    foundation without telling us what's in the documents.

582

03:13  1                    MS. GARDNER:  Okay.

03:13  2    BY MS. GARDNER:

03:13  3        Q.    In your role as an engineer working on Webex,

03:13  4    are you familiar with any of the history of the product

03:14  5    or prior versions of the product?

03:14  6        A.    Yes, ma'am, as well as components of the

03:14  7    product that still exist today.

03:14  8        Q.    Is audio service a component that still exists

03:14  9    today?

03:14 10        A.    Yes, ma'am.

03:14 11        Q.    And are you familiar with the history of it or

03:14 12    past versions of it?

03:14 13        A.    To some degree, yes.

03:14 14        Q.    And what about in this context and the word

03:14 15    "improving," does that suggest anything to you given

03:14 16    your knowledge?

03:14 17                    MR. TRIBBLE:  Objection, Your Honor.

03:14 18                    Can I take the witness on voir dire or --

03:14 19                    THE COURT:  You can.

03:14 20                        VOIR DIRE EXAMINATION

03:14 21    BY MR. TRIBBLE:

03:14 22        Q.    This document's dated 2007.  You didn't start

03:14 23    working with Webex until 2014, correct?

03:14 24        A.    Thereabout, sir, yes.

03:14 25        Q.    And is it fair to say you never saw this

```
03:14    1   document until Cisco's lawyers showed it to you
03:14    2   recently?
03:14    3       A.    That's correct.
03:14    4       Q.    And did you discuss what testimony you'd be
03:15    5   giving about this document?
03:15    6               MS. GARDNER:  Objection, attorney-client
03:15    7   privilege.
03:15    8               THE COURT:  I don't think he's asking
03:15    9   about what --
03:15   10               MR. TRIBBLE:  It's just a yes or no.
03:15   11               THE COURT:  It's just a yes or no whether
03:15   12   or not he discussed it with you all.
03:15   13       A.    Yes.  We did.
03:15   14   BY MR. TRIBBLE:
03:15   15       Q.    Okay.
03:15   16               THE COURT:  Counsel, you've made your
03:15   17   point.  I'm going to exclude it.
03:15   18               MR. TRIBBLE:  Yes, sir.
03:15   19               REDIRECT EXAMINATION CONTINUED
03:15   20   BY MS. GARDNER:
03:15   21       Q.    Mr. Buckles, you're familiar with the source
03:15   22   code, correct?
03:15   23       A.    Yes, ma'am.
03:15   24       Q.    Is the code base historic?
03:15   25       A.    Yes.  We maintain versions of the code that go
```

584

03:15  1    back many years.

03:15  2        Q.    In other words, it builds upon itself?

03:15  3        A.    That's correct.

03:15  4        Q.    So you -- by being familiar with the modern

03:15  5    code, you have some knowledge about how historically

03:16  6    it's worked and how it's built up?

03:16  7        A.    Yes, ma'am.

03:16  8        Q.    And does that knowledge port over to how Webex

03:16  9    Audio services works?

03:16  10       A.    Yes, ma'am.  Sometimes to a limited degree,

03:16  11   but in general, yes.

03:16  12       Q.    Okay.  And so your understanding as a

03:16  13   distinguished engineer, and even setting this document

03:16  14   aside, is that "new service" could be referring to an

03:16  15   existing capability?

03:16  16                  MR. TRIBBLE:  Objection, leading.

03:16  17                  THE COURT:  I'll overrule it.

03:16  18                  Do you have any other substantive

03:16  19   objection to it?

03:16  20                  MR. TRIBBLE:  Well, and foundation,

03:16  21   because he didn't work there at the time.

03:16  22                  THE COURT:  I'll at least sustain it

03:16  23   unless you can lay a foundation.

03:16  24   BY MS. GARDNER:

03:16  25       Q.    Do you know whether this was a new capability,

585

```
03:16   1   do you know?
03:16   2                   MR. TRIBBLE:  Objection, lack of
03:16   3   foundation.
03:16   4                   THE COURT:  Sustained.
03:17   5                   MS. GARDNER:  I have no further
03:17   6   questions.  Thank you.
03:17   7                   MR. TRIBBLE:  One question.
        8                        RECROSS-EXAMINATION
03:17   9   BY MR. TRIBBLE:
03:17  10      Q.   Did you show us any source code in your
03:17  11   presentation to the jury today?
03:17  12      A.   I did not.
03:17  13                   MR. TRIBBLE:  Pass the witness.
03:17  14                   MS. GARDNER:  No further questions.
03:17  15                   THE COURT:  Is he released from the rule?
03:17  16                   MR. TRIBBLE:  Yes, Your Honor.
03:17  17                   THE COURT:  Thank you.  Thanks for being
03:17  18   here, sir.
03:17  19                   MS. GARDNER:  Your Honor, will we be
03:17  20   calling the next witness?
03:17  21                   THE COURT:  That's what I would hope.
03:18  22                   MS. GARDNER:  I'll go grab him.
03:18  23                   Cisco calls Aaron Belcher.
03:18  24                   THE COURT:  Ladies and gentlemen, I don't
03:18  25   know -- it's not really my business -- whether any of
```

| | | |
|---|---|---|
| 03:18 | 1 | you are married, but I have to show my wife a lot less |
| 03:18 | 2 | respect than I do my court reporter, because I spend a |
| 03:18 | 3 | lot more time with my court reporter.  And she would |
| 03:18 | 4 | like a break. |
| 03:18 | 5 | (Laughter.) |
| 03:18 | 6 | THE COURT:  And so since she would like a |
| 03:18 | 7 | break, a break she will have.  So we'll be back in 10 |
| 03:18 | 8 | or 15 minutes. |
| 03:18 | 9 | THE BAILIFF:  All rise. |
| 03:18 | 10 | (Jury exited the courtroom.) |
| 03:19 | 11 | THE COURT:  Anything we need to take up |
| 03:19 | 12 | from plaintiff or defendant? |
| 03:19 | 13 | MS. SRINIVASAN:  Not from plaintiff, |
| 03:19 | 14 | Your Honor. |
| 03:19 | 15 | THE COURT:  I have that our next witness |
| 03:19 | 16 | is -- gosh.  You just told me. |
| 03:19 | 17 | MS. GARDNER:  Aaron Belcher, Your Honor. |
| 03:19 | 18 | THE COURT:  Aaron Belcher. |
| 03:19 | 19 | And then we have your expert, Mr. Willis? |
| 03:19 | 20 | MR. HAWKINS:  Mr. Willis, yes. |
| 03:19 | 21 | THE COURT:  Sir? |
| 03:19 | 22 | (Clarification by Reporter.) |
| 03:19 | 23 | MR. HAWKINS:  Ryan Hawkins. |
| 03:19 | 24 | THE COURT:  Okay.  We'll be back in a few |
| 03:19 | 25 | minutes. |

```
03:19   1                        (Recess taken.)
03:41   2                        THE BAILIFF:  All rise.
03:41   3                        THE COURT:  Please remain standing for
03:41   4    the jury.
03:41   5                        (Jury entered the courtroom.)
03:42   6                        THE COURT:  Thank you.  You may be
03:42   7    seated.
03:42   8                        MS. GARDNER:  Cisco calls Aaron Belcher.
03:42   9                        (The witness was sworn.)
03:42  10                        DIRECT EXAMINATION
03:42  11    BY MS. GARDNER:
03:43  12         Q.    Good afternoon, Mr. Belcher.
03:43  13               Can you please introduce yourself to the jury?
03:43  14         A.    Hello.  My name's Aaron Belcher.
03:43  15         Q.    I understood you flew in from Washington State
03:43  16    last week?
03:43  17         A.    I did.  I live in Bothell, Washington, with my
03:43  18    wife, three dogs -- or three kids, two dogs, and a cat.
03:43  19    Sorry.
03:43  20                        (Laughter.)
03:42  21    BY MS. GARDNER:
03:43  22         Q.    One more time?
03:43  23         A.    Yeah.  I live in Bothell, Washington, with my
03:43  24    wife, three kids, two dogs, and a cat.
03:43  25         Q.    Have you testified at a trial before?
```

588

03:43  1       A.      This is my first time.

03:43  2       Q.      Where did you go to school?

03:43  3       A.      I graduated from the University of Washington

03:43  4   with a computer engineering degree in 1999.

03:43  5       Q.      Did you specialize in anything?

03:43  6       A.      So as a computer engineer, we learned kind of

03:43  7   the lowest level of the computer between the software

03:43  8   and the hardware, so kind of the language that the

03:43  9   computer actually works in or speaks in.

03:44  10      Q.      Have you found that to be helpful throughout

03:44  11  your career?

03:44  12      A.      Yeah.  So at that level, I can understand a

03:44  13  program at a level that a lot of software engineers

03:44  14  cannot.  So if it crashes, I can actually look at the

03:44  15  program as it is and figure out why it crashed without

03:44  16  having to go to the source code.

03:44  17      Q.      Is the University of Washington where you

03:44  18  first learned to code?

03:44  19      A.      I did not learn to code at the University of

03:44  20  Washington.  I obviously got a lot better, but I

03:44  21  learned to code before then.

03:44  22      Q.      And how did you learn to code?

03:44  23      A.      So when I was in high school, we hosted an

03:44  24  exchange student from East Berlin.  It was shortly

03:44  25  after the Berlin Wall fell.  And he knew how to code in

1    this language called "Assembly."

03:44    2              And he taught me to code.  It's very unusual

03:44    3    to learn to code in that language.  That's the

03:44    4    lowest-level language I talked about earlier.  And I

03:44    5    didn't know any better as a, you know, high school

03:44    6    student, but that's where I learned to code.

03:44    7        Q.   And are you an inventor on any patents?

03:45    8        A.   I'm an inventor on five patents.

03:45    9        Q.   I want to turn to your job experience now.

03:45    10             What do you do for work?

03:45    11        A.   So I'm a principal engineer and the head

03:45    12    architect of Webex at Cisco.

03:45    13        Q.   How long have you worked for Cisco?

03:45    14        A.   So I started working at Cisco in 2001.

03:45    15        Q.   Do you like it?

03:45    16        A.   I love it.  As a software engineer, we get to

03:45    17    solve puzzles for a living.  And at Webex, I get to

03:45    18    work on products that millions of people around the

03:45    19    country and the world get to use.

03:45    20        Q.   I want to come back to that soon, but first, I

03:45    21    want to discuss the world of audioconferencing as of

03:45    22    2001 when you first joined Cisco.

03:45    23             So what were you doing right before that?

03:45    24        A.   So right out of college, I worked at a company

03:45    25    called Active Voice.  They did a voicemail product.

590

03:45  1        Q.    And is that what you were working on at Active

03:45  2    Voice?

03:45  3        A.    Yeah.  I was in an advanced technology group

03:45  4    at Active Voice, and my job was to integrate our

03:46  5    voicemail product with the advanced technology at the

03:46  6    time.

03:46  7              At the time there was this technology called

03:46  8    Voice over IP.  It was relatively new and super

03:46  9    exciting.  So I got to integrate our product with that.

03:46  10       Q.    What was that product called?

03:46  11       A.    So the Voice over IP product we integrated

03:46  12   with primarily was a product called Cisco CallManager.

03:46  13   It used to be called Selsius CallManager, but Cisco

03:46  14   acquired them in 2018.  So some people called it still

03:46  15   Selsius CallManager, but...

03:46  16       Q.    And just for the jury's benefit, what were

03:46  17   audioconferences actually like back around that late

03:46  18   '90s, very, very early 2000s time frame?

03:46  19       A.    So in that time frame, you would have a phone

03:46  20   that was connected to the Ethernet or Internet, and it

03:46  21   would call through the CallManager to another phone.

03:46  22   And you could make a call.  You could connect the call.

03:46  23             If you wanted to create a conference, you

03:46  24   could hit the conference button on that phone, call

03:46  25   another phone, answer that phone, and then hit the

591

03:47  1    conference button to complete it.  Then all three of

03:47  2    those phones would be conferenced together into one

03:47  3    conference.

03:47  4            The audio would get sent from each of those

03:47  5    phones up to the CallManager and then back out to the

03:47  6    phones.

03:47  7    Q.    So something we've discussed quite a bit and I

03:47  8    think I've already heard you say in your testimony is

03:47  9    VoIP and PSTN, and specifically having VoIP and PSTN

03:47  10   users on the same conference.

03:47  11           Do you know what VoIP is, Mr. Belcher?

03:47  12   A.    Yes.  I do.  It's -- Voice over IP is what it

03:47  13   stands for, or it's just voice over the Internet.  So

03:47  14   it's making phone calls from a little phone that is

03:47  15   just a mini computer, and that mini computer is talking

03:47  16   over the Internet or Ethernet, which is the name of the

03:47  17   cable that's used for the Internet, up to the server,

03:47  18   back to the other phone.  So it's just making a call

03:47  19   over the Internet.

03:47  20   Q.    And how about PSTN?  Could you please refresh

03:47  21   the jury on that one too?

03:48  22   A.    Yeah.  So PSTN stands for Public Switched

03:48  23   Telephony Network.  It's the kind of phone call you

03:48  24   would take -- do at home, where you just pick up the

03:48  25   phone, dial a ten-digit number with an area code.  If

592

03:48  1   you want to dial an international number, you could

03:48  2   dial a country code.

03:48  3        And so back in that day, most of those kind of

03:48  4   phone calls were actually using that technology.

03:48  5   Today, most of the times you call, you're actually

03:48  6   doing Voice over IP under the covers.

03:48  7        So today, it's mostly a shorthand for dialing

03:48  8   that kind of way, with the ten-digit number, but that's

03:48  9   what PSTN is.

03:48  10   Q.    So in this time frame we're discussing, late

03:48  11   '90s, very, very early 2000s, do you know of any

03:48  12   products that allowed for conference calls with both

03:48  13   VoIP and PSTN users?

03:48  14   A.    Yeah.  The product we were integrating with,

03:48  15   the Cisco CallManager, you could call from one of those

03:49  16   Voice over IP phones to another Voice over IP phone,

03:49  17   you know, answer the call.  You could hit the

03:49  18   conference button, like I mentioned, call out to one of

03:49  19   those ten-digit numbers.  They could answer.  You'd hit

03:49  20   the conference button.  And when you did that, you'd

03:49  21   complete the conference and have a conference with PSTN

03:49  22   and Voice over IP together.

03:49  23        They also had a Meet-Me feature, where you had

03:49  24   a phone number that everyone could dial.  And you could

03:49  25   dial it from a PSTN number or from a Voice over IP

```
03:49   1    phone and create a meeting with all those participants.
03:49   2        Q.   So, Mr. Belcher, I now want to show you an
03:49   3    exhibit --
03:49   4             MS. GARDNER:  And, Mr. Beall, hopefully
03:49   5    you can help me with this.
        6    BY MS. GARDNER:
03:49   7        Q.   -- marked Defendant's Exhibit 68.
03:49   8             MR. SIEGMUND:  Objection, Your Honor,
03:49   9    lack of foundation.  This document's not in evidence.
03:49  10             MS. GARDNER:  My next question is:  Do
03:49  11    you recognize this document?
03:49  12             THE COURT:  Why don't you go ahead and
03:49  13    have him lay a foundation, and then you can move it
03:49  14    into evidence.
03:49  15             MS. GARDNER:  Sure.
       16    BY MS. GARDNER:
03:49  17        Q.   Mr. Belcher, are you familiar with the
03:49  18    MediaTone product?
03:49  19        A.   So I am.  The document just disappeared, but I
03:50  20    am familiar with -- oh.  Yeah.  Okay.
03:50  21        Q.   We'll come back.
03:50  22        A.   Yeah.  Yeah.  So I am familiar with the
03:50  23    MediaTone product.
03:50  24        Q.   And how's that?
03:50  25        A.   Yeah.  So it's the name for the Cisco Webex
```

03:50  1   product.  Back in 1996, when it was first created, when

03:50  2   Cisco acquired the Webex company in 2007, they just

03:50  3   removed the MediaTone name from it and called it Cisco

03:50  4   Webex.

03:50  5        So I'm the head architect for the product that

03:50  6   this document is referring to.  It's an earlier

03:50  7   version, but it's the same product that I'm currently

03:50  8   the head architect for.

03:50  9   Q.   And as the head architect of the Cisco Webex

03:50  10  product that was formerly known as MediaTone, do you

03:50  11  have knowledge of the history of that product, its

03:50  12  documentation?

03:50  13  A.   Very much so.

03:50  14  Q.   Do you happen to work with and know the people

03:50  15  who actually, you know, worked on that product when it

03:50  16  was MediaTone?

03:50  17  A.   Yeah.  A lot of the architects that I worked

03:50  18  with worked with -- on this product back in 2001.

03:51  19  There's a director I worked with.  There's a principal

03:51  20  engineer back from -- or, well, he's almost a principal

03:51  21  engineer.  We're trying to get him promoted.  He worked

03:51  22  for Webex in 2000.

03:51  23        There's a person, a good friend of mine, who's

03:51  24  a principal engineer.  Was an intern in 2004.

03:51  25        And, yeah, I've talked to various people over

595

03:51  1    the years that have worked on Webex for quite a long

03:51  2    time.

03:51  3        Q.    And as this head architect and engineer at

03:51  4    Cisco, do you have access to MediaTone files now in

03:51  5    your files?

03:51  6        A.    Yes.  We do.  And if you look at our source

03:51  7    code at our product, a lot of things on the diagram are

03:51  8    still there.  The same components exist.

03:51  9              MS. GARDNER:  Okay.  I'd now like to move

03:51  10   DX-68 which was also discussed at length without

03:51  11   objection during Mr. Bratic's testimony into the

03:52  12   record.

03:52  13             MR. SIEGMUND:  Sorry, what exhibit?

03:52  14             MS. GARDNER:  68.

03:52  15             MR. SIEGMUND:  Your Honor, we still

03:52  16   object.  The witness does not have personal knowledge

03:52  17   of the document.  He did not work for Webex.  He worked

03:52  18   for Cisco.  We maintain our objection.

03:52  19             THE COURT:  Overruled.  It's admitted.

03:52  20             MS. GARDNER:  It is admitted?

03:52  21             Thank you, Your Honor.

03:52  22   BY MS. GARDNER:

03:52  23       Q.    Mr. Belcher, do you recognize this document?

03:52  24       A.    I do.

03:52  25       Q.    And what do you recognize this to be at a high

596

03:52  1    level?

03:52  2        A.    So this is a marketing document for the Webex

03:52  3    MediaTone product.

03:52  4        Q.    And just to clarify what we sort of discussed

03:52  5    a moment ago, this is the MediaTone product that is an

03:52  6    earlier version.  This is at Webex now.

03:52  7        A.    Yes.  So this is an earlier version of the

03:52  8    product I work on today and am the head architect for.

03:52  9        Q.    How do you know that?

03:52 10        A.    So if you look through the document, it talks

03:52 11    about multiple components that we still have in the

03:52 12    source code today.  It talks about T120 as the protocol

03:52 13    that's used.  In that are these things called PDUs,

03:53 14    which are widely used in certain components inside of

03:53 15    Webex.

03:53 16        Q.    We'll get to that in a moment.

03:53 17              But I think I also heard you testify that you

03:53 18    work with a lot of the same people who worked on this

03:53 19    product when it was Webex --

03:53 20        A.    Correct.

03:53 21        Q.    -- at MediaTone.

03:53 22              Did the Webex folks come over to Cisco along

03:53 23    with the MediaTone product?

03:53 24        A.    Yes.  They did.  When Cisco acquires a

03:53 25    company, we like to keep the engineers who worked on

597

03:53  1    that product so we can build on it and make it into

03:53  2    what we call a billion-dollar effort.

03:53  3            So we need the engineers to be able to do

03:53  4    that.  If we just acquire the product, it didn't have

03:53  5    the engineers along with it, we couldn't grow the

03:53  6    product.

03:53  7            The same thing with the -- well, yeah.

03:53  8    Q.    Thank you.

03:53  9          Do you know when this document is from?

03:53  10   A.    So if you look at the last page of the

03:53  11   document, it is copyright dated 2003 Webex

03:54  12   Communications, Incorporated.

03:54  13   Q.    Do you know whether the underlying MediaTone

03:54  14   product is from before 2003?

03:54  15   A.    Yeah.  So Webex was started in 1996, and it

03:54  16   was -- it's always been known as MediaTone.

03:54  17   Q.    Does this document, that's DX-68, does it show

03:54  18   VoIP and PSTN users on the same meeting?

03:54  19   A.    It does.

03:54  20   Q.    Did -- could you please, yeah, point us to

03:54  21   that and help us understand?

03:54  22   A.    So I think it's Page 3 in the PDF or -- yeah,

03:54  23   there you go.

03:54  24            So if you look at this document, everyone can

03:54  25   see it?  Yeah.  Okay.

598

03:54  1          MS. GARDNER:  Could you please zoom in on

03:54  2  the diagram, Mr. Beall?

03:54  3          Thank you.

       4     A.    Yeah.  There you go.

03:54  5          So if you see the blue line there where you

03:54  6  have access, that lists the different clients that can

03:54  7  join into the conference.  And on the left you have the

03:54  8  Windows, Macintosh, that's just a desktop and a tablet

03:55  9  PC.

03:55  10          So in this product you would join over the web

03:55  11  from those clients, and that would be considered a

03:55  12  Voice over IP connection into it.

03:55  13          On the right you have a cell phone and a

03:55  14  phone, and those are PSTN devices.  So you would join

03:55  15  that.

03:55  16          Also at the bottom you see at the network

03:55  17  thing, network line, there's a PSTN gateway and a

03:55  18  MediaTone switch.  And so the PSTN gateway would be the

03:55  19  component that the phones at the top would join by, and

03:55  20  the MediaTone switch would be the component that the

03:55  21  desktop and tablet PC would join by.

03:55  22  BY MS. GARDNER:

03:55  23     Q.    So for the sake of brevity, I'm not going to

03:55  24  walk through this whole document with you today.  But

03:55  25  are there other parts of it that also show this VoIP

599

03:55  1   and PSTN conference?

03:55  2       A.    Yes.    It's mentioned throughout.    And there's

03:55  3   a standard even mentioned that has a standard for how

03:55  4   you would do those two things at the same time.

03:55  5       Q.    Is your understanding that Webex had this

03:56  6   capability as of at least 2003 or earlier?

03:56  7       A.    Yeah, quite a bit earlier but, yeah, as of

03:56  8   2003.

03:56  9       Q.    In this MediaTone product that became Cisco's

03:56 10   Webex?

03:56 11       A.    Exactly.

03:56 12       Q.    Thank you.

03:56 13              MS. GARDNER:    Mr. Beall, we can please

03:56 14   take that down.

03:56 15   BY MS. GARDNER:

03:56 16       Q.    Okay.    I'd like to refocus on your time at

03:56 17   Cisco.

      18              So when you first started working there in

03:56 19   2001, what did you do?

03:56 20       A.    So I worked for this company called Active

03:56 21   Voice right out of college.    I mentioned that earlier.

03:56 22   But they got acquired by Cisco in 2001.

03:56 23       Q.    And have you had any other role since then?

03:56 24       A.    Yeah.    So since then, I went on to work on

03:56 25   this product called Communication Manager.    It's the

600

| 03:56 | 1 | same product that was called Cisco CallManager back in |
|---|---|---|

03:56   1   same product that was called Cisco CallManager back in

03:56   2   1999.  They just renamed it later on.  From there --

03:56   3   oh, and that product, along with the voicemail

03:56   4   products, have been really successful.

03:56   5        I see them all over the country.  They're at

03:57   6   my local hospital, the local bank.  I see the phones

03:57   7   there.  I've seen the phones from those products on

03:57   8   various presidents' desks over the years.  So, yeah,

03:57   9   those products have been very successful.

03:57   10        But since I worked on that, I went on to work

03:57   11   on to Webex after Cisco Communication Manager.

03:57   12   Q.   And about when did you start focusing on Webex

03:57   13   specifically?

03:57   14   A.   In 2014.

03:57   15   Q.   So what -- what did you do when you started

03:57   16   working on Webex?

03:57   17   A.   So in 2014, I worked on this inner op

03:57   18   component that connected Webex into the Voice over IP

03:57   19   world.  It used a protocol called SIP, but it's just

03:57   20   one of the Voice over IP protocols.

03:57   21   Q.   Were there any other roles you took on with

03:57   22   respect to Webex?

03:57   23   A.   Yeah.  So after I worked on that product,

03:57   24   Cisco was -- or that component, Cisco was looking for

03:57   25   an architect for our U.S. federal and U.S. military

601

03:57  1    efforts to deploy Webex to them.  And I volunteered for

03:58  2    that position.

03:58  3         My dad and brother were both veterans, and my

03:58  4    brother would tell me stories about how they had

03:58  5    computers that you could put a grenade underneath it

03:58  6    and had the grenade go off and the computer would still

03:58  7    keep on working.

03:58  8         So they had really robust computers.  But he

03:58  9    also said they were -- because of that, they were a

03:58  10   little bit older than the commercial computers that you

03:58  11   would have in the commercial world.

03:58  12        I knew the meeting products that were

03:58  13   available to the military in that kind of space, and I

03:58  14   thought Webex would be a really big upgrade for them.

03:58  15   So I wanted to work on that product to help give that

03:58  16   space a much better Meetings experience.

03:58  17   Q.   What's your current role with Webex?

03:58  18   A.   Yeah.  So after I worked on that U.S. federal

03:58  19   effort, and I'm still working on the U.S. federal

03:58  20   effort, I was made the head architect for Webex.

03:58  21        And part of the reason why they wanted me to

03:58  22   be the head architect is they wanted this U.S. federal,

03:59  23   U.S. military solution to be successful.  So now I'm

03:59  24   the head architect for the Webex product.

03:59  25   Q.   And now that you've worked your way up to head

602

| | | |
|--|--|--|
| 03:59 | 1 | architect, what do your responsibilities entail? |
| 03:59 | 2 | A.    Yeah.  So as a head architect for Webex, I'm |
| 03:59 | 3 | an architect first.  So architects take new features, |
| 03:59 | 4 | new capabilities that we want to add to the product, |
| 03:59 | 5 | and we figure out how to modify the system, how to |
| 03:59 | 6 | modify the components to make that feature work. |
| 03:59 | 7 | Sometimes we have to add new components. |
| 03:59 | 8 | Sometimes we remove components because the new |
| 03:59 | 9 | components can do a better job of implementing the |
| 03:59 | 10 | feature.  And yeah.  So we look at -- we design the |
| 03:59 | 11 | system as we're adding -- adding new features to the |
| 03:59 | 12 | product. |
| 03:59 | 13 | The other role of an architect is around |
| 03:59 | 14 | continuous improvement.  So we're constantly monitoring |
| 03:59 | 15 | the system, looking at how it's working for our users, |
| 04:00 | 16 | fixing bugs, fixing things that are not optimal.  So |
| 04:00 | 17 | just works better, faster, and is more reliable for our |
| 04:00 | 18 | users. |
| 04:00 | 19 | So as a head architect, I do that |
| 04:00 | 20 | architectural role for major features that are added to |
| 04:00 | 21 | the product.  But I work with a team of tons of |
| 04:00 | 22 | different architects across the system.  And they do |
| 04:00 | 23 | that same role for various features that are added -- |
| 04:00 | 24 | being added.  And I help review designs, I help mentor |
| 04:00 | 25 | them. |

603

04:00    1              And, you know, sometimes if two architects

04:00    2    have slightly different opinions on how to implement a

04:00    3    feature, I'll come in and referee and help make a

04:00    4    decision, so...

04:00    5        Q.    So are there any particular features of Webex

04:00    6    that you focus on or are primarily responsible for?

04:00    7        A.    Yeah.  So I mentioned the -- I mentioned the

04:00    8    Webex component that integrates with the Voice over IP

04:00    9    solution.

04:00    10             I was the main architect for that component.

04:00    11   Did a ton of the coding for it.  I worked with a team,

04:00    12   and we delivered it together.  But I'm, you know,

04:01    13   heavily responsible for that component.

04:01    14       Q.    It's fair to say you're very knowledgeable

04:01    15   about Webex Audio conferencing?

04:01    16       A.    I -- I am.

04:01    17       Q.    Someone the jury heard from earlier today and

04:01    18   actually right before you was Mr. Nathan Buckles.

04:01    19             Do you know him?

04:01    20       A.    I do know Mr. Nathan Buckles.

04:01    21       Q.    How do you know Mr. Buckles?

04:01    22       A.    So in about 2014, Mr. -- I started working on

04:01    23   Webex, and Mr. Buckles owned a media component.  And I

04:01    24   mentioned that I owned a Voice over IP component.

04:01    25             Media's an important part of a Voice over IP

604

04:01    1    integration.  So we worked really closely on that

04:01    2    feature set, optimizing it, adding features, making

04:01    3    sure it worked better.  And we've both been promoted up

04:01    4    over the years.  He's gotten more and more

04:01    5    responsibility and so have I, and we worked on various

04:01    6    features.

04:01    7         So I've known him for ten years or so.

04:01    8    Q.    Are you two on the same team?

04:01    9    A.    We are.

04:01    10    Q.    In Webex.  Okay.

04:01    11         So how does your role differ from Mr. Buckles'

04:01    12    role on that team?

04:01    13    A.    Yeah.  So Mr. Buckles is the distinguished

04:02    14    engineer over a media subsystem.  I own the overall

04:02    15    system.  But I think of his role -- even though I have

04:02    16    a broader set of responsibility, I think of his role as

04:02    17    like the engine for Webex.

04:02    18         The media is critical.  We are very focused on

04:02    19    making sure we're using the best algorithms, the best

04:02    20    design there.  And so he owns the engine.  I own the

04:02    21    rest of the car.  And I think of his role as slightly

04:02    22    more important than mine.

04:02    23         But we both have a role to play in making sure

04:02    24    Webex is successful.

04:02    25    Q.    Now, we started with audioconferencing back in

04:02  1    the late '90s, early 2000s.  I want to fast-forward to

04:02  2    today and talk about how Cisco's audioconferencing

04:02  3    works now.

04:02  4          Are you familiar with how Webex processes

04:02  5    audio during a meeting?

04:02  6    A.    Yes.  I am.

04:02  7    Q.    And are you familiar with the concept of an

04:02  8    active speaker in Webex?

04:02  9    A.    Yes.  I am.

04:02  10   Q.    What is it in that context?

04:02  11   A.    So an active speaker is just a current person

04:02  12   or group of people that are talking in a meeting.

04:03  13   Anyone that's currently talking is considered an active

04:03  14   speaker.

04:03  15   Q.    So how does Webex keep track of active

04:03  16   speakers?

04:03  17   A.    So we keep track of up to three active

04:03  18   speakers at a time.  And all we do is we look at the

04:03  19   audio streams coming into Webex from those

04:03  20   participants.  And we look at how loud their audio is.

04:03  21         So the three loudest are considered the active

04:03  22   speaker.  Usually there's only one, but the three

04:03  23   loudest are considered the active speaker.

04:03  24   Q.    And if you need to pause and take a drink --

04:03  25   A.    No.  That's okay.

04:03  1     Q.     -- that's all right.  All right.

04:03  2            So you said up to three.  Is it common for

04:03  3     there to be multiple active speakers?

04:03  4     A.     No.  Usually there's only one.

04:03  5     Q.     And why is that?

04:03  6     A.     So in this courtroom, we only have one person

04:03  7     speaking at a time.  If multiple people were speaking,

04:03  8     it'd be hard to follow.  It would be considered rude.

04:03  9            So usually there's only one speaker.  The only

04:03  10    time really you have multiple speakers is when

04:04  11    someone's interrupting each other and you're

04:04  12    transitioning from one speaker to another.

04:04  13    Q.     Why does Webex keep track of active speakers

04:04  14    during a meeting?

04:04  15    A.     We keep track of active speakers because the

04:04  16    person that's speaking is -- has the most interesting

04:04  17    audio.  If we send everyone's audio out to everyone,

04:04  18    we'd be wasting a little bit of what we call bandwidth

04:04  19    or data.

04:04  20           And we want to limit the amount of bandwidth

04:04  21    or data we're sending out because if we send out too

04:04  22    much, we might lose a packet, is what it's called, and

04:04  23    that might hurt the audio quality.  So if we can keep

04:04  24    that down, it helps with the audio quality a bit.

04:04  25    Q.     And with audio processing, so you've got

607

| | | |
|---|---|---|
| 04:04 | 1 | active speakers on the call. |
| 04:04 | 2 | Are they given the same stream? |
| 04:04 | 3 | A.    No.  Let me give you an example.  In the |
| 04:04 | 4 | industry and at Webex, we have these characters called |
| 04:04 | 5 | Alice, Bob, and Carol.  And so in my example, we have |
| 04:05 | 6 | those three people, and they're all speaking at the |
| 04:05 | 7 | same time. |
| 04:05 | 8 | So Alice will receive a stream from Bob and |
| 04:05 | 9 | Carol.  Bob will receive a stream from Alice and Carol, |
| 04:05 | 10 | and Carol will receive a stream from the other two. |
| 04:05 | 11 | Q.    Are they given custom streams? |
| 04:05 | 12 | A.    Oh, yeah.  They're each given their own unique |
| 04:05 | 13 | stream because they have a different group of active |
| 04:05 | 14 | speakers. |
| 04:05 | 15 | Q.    In your example, Alice was given the audio |
| 04:05 | 16 | from Bob and Carol? |
| 04:05 | 17 | A.    Yes. |
| 04:05 | 18 | Q.    Does Webex ever send Alice's audio back to |
| 04:05 | 19 | herself? |
| 04:05 | 20 | A.    No.  We do not. |
| 04:05 | 21 | Q.    Why is that? |
| 04:05 | 22 | A.    Well, so the -- I mentioned the bandwidth |
| 04:05 | 23 | earlier, and we would be wasting a little bit of |
| 04:05 | 24 | bandwidth. |
| 04:05 | 25 | The other reason why we don't want to do that |

608

04:05  1    is if it came back to Alice and Alice -- and it went

04:05  2    out Alice's speaker, Alice would hear an echo.  And

04:05  3    Alice would immediately stop because the echo would be

04:05  4    distracting to her.

04:05  5         In the worst -- worst-case scenario, it would

04:05  6    go out Alice's speaker.  It would go back into her

04:06  7    microphone, go back up to our system, back to Alice's

04:06  8    speaker, back to the microphone, and you'd have what's

04:06  9    called as a feedback loop.

04:06  10        And it's very similar to what you would have

04:06  11   at a banquet hall or church where you put the -- and

04:06  12   maybe here, if you put the microphone too close to a

04:06  13   speaker, you'll hear a shrill high-pitched sound.  So

04:06  14   we try to avoid that at all costs by not sending the

04:06  15   audio back to the active speaker.

04:06  16   Q.   So how does Webex ensure that the user doesn't

04:06  17   hear themself through their own speaker?

04:06  18   A.   So we're very careful and look at our

04:06  19   algorithms.  We review the code to make sure that

04:06  20   doesn't happen.  We also have automated tests and

04:06  21   manual tests to make sure Alice, you know, or the

04:06  22   active speaker never gets their own audio.

04:06  23        If we did see -- if we did have a case that

04:06  24   slipped through, we'd consider it a P1 show stopper,

04:06  25   all-hands-on-deck type of issue that we needed to fix

609

04:07  1   immediately.  So we try very hard to make sure the

04:07  2   audio never goes back to the active speaker.

04:07  3       Q.    Now, setting aside active speakers like Alice,

04:07  4   would listeners get the same stream?

04:07  5       A.    No.  So let's add to my example two other

04:07  6   participants.  Dean and Eugene.  And in that scenario,

04:07  7   let's say Dean has a newer device and Eugene has a

04:07  8   little bit older device.

04:07  9           We would go through and give each person a

04:07  10  custom stream.  We'd get to Dean and we'd say Dean has

04:07  11  a newer device.  It can handle our highest-quality

04:07  12  audio.  We would send the highest-quality audio to

04:07  13  Dean.

04:07  14          Then we'd get to Eugene, and we'd send Eugene

04:07  15  a little bit lower-quality audio.  So it would be a

04:07  16  different stream than what we sent to -- each person

04:07  17  would receive a different stream.

04:07  18      Q.    Is there anything else that would

04:07  19  differentiate those streams?

04:07  20      A.    Yeah.  So both of those participants, they

04:07  21  could be on different, you know, network connections.

04:07  22  So their bandwidth that's available might be different.

04:08  23  So we would adjust the quality of their audio to deal

04:08  24  with that.  So they might have a lower quality or

04:08  25  different audio for that reason.

610

04:08  1              The streams would also be encrypted, and that

04:08  2    would make the streams different.

04:08  3        Q.    Okay.  So like the active speakers, would the

04:08  4    listeners get custom streams?

04:08  5        A.    Yeah.  They'd all get custom streams that

04:08  6    would be different.

04:08  7        Q.    Does Webex send every participant a unique

04:08  8    stream regardless of whether they joined by phone

04:08  9    number dial-in or by clicking a hyperlink?

04:08  10       A.    Yes.  They do.

04:08  11       Q.    Is there ever a scenario where Webex would add

04:08  12   an active speaker's audio to a stream and then remove

04:08  13   it from the stream?

04:08  14       A.    No.

04:08  15             MS. GARDNER:  Thank you.

04:08  16             No further questions.  I pass the

04:08  17   witness.

04:08  18                   CROSS-EXAMINATION

04:08  19   BY MR. SIEGMUND:

04:08  20       Q.    All right.  Good afternoon, sir.  How are you

04:09  21   today?

04:09  22       A.    I'm doing fine.

04:09  23       Q.    We haven't had a chance to meet.  My name's

04:09  24   Mark Siegmund.  Good to meet you.

04:09  25       A.    Nice to meet you, Mark.

611

```
04:09   1        Q.    I just want to ask you a couple of questions,
04:09   2   if I could.  And I'd like to start I guess where you
04:09   3   started with DX-68.
04:09   4             Do you remember discussion about that
04:09   5   document, sir?
04:09   6        A.    Yes.  I do.
04:09   7        Q.    We're not going to go super far into it, but
04:09   8   you would agree with me that this document does not
04:09   9   discuss or use the word "multiplexing," correct, sir?
04:09  10   It's not really a memory test, but...
04:09  11        A.    It uses the word "switch," which sometimes
04:09  12   people consider a synonym from it, but it doesn't use
04:09  13   the word "multiplex."
04:09  14        Q.    So we can agree it does not say multiplexing,
04:09  15   correct, sir?
04:09  16        A.    It does not say multiplex.
04:09  17        Q.    Thank you, sir.
04:09  18             And this document that we -- that you
04:09  19   discussed with your counsel, it does not discuss active
04:09  20   speakers, does it, sir?
04:09  21        A.    Correct.
04:09  22        Q.    And it also does not discuss the word "hybrid
04:09  23   audio" in fact, does it?
04:09  24        A.    No.
04:09  25        Q.    Okay.  And I just want to be clear.  The
```

612

04:10  1    patent was filed in 2001.  I think you're probably

04:10  2    aware of that, correct?

04:10  3        A.    Yeah.  I don't know the exact date of when it

04:10  4    was filed.

04:10  5        Q.    Okay.  Fair enough.  The patent was filed in

04:10  6    2001.

04:10  7              And this document that you talked about was a

04:10  8    2003 document, correct, sir?

04:10  9        A.    Correct.

04:10  10       Q.    And the patent was filed in 2001.  This came

04:10  11   after it, correct?

04:10  12       A.    Correct.

04:10  13       Q.    And you're not here to say that this

04:10  14   particular system is prior art to the '858 patent,

04:10  15   correct, sir?

04:10  16             You're not going to offer us an expert

04:10  17   opinion -- let me clarify.

04:10  18       A.    Yeah.  Yeah.  I'm not an expert opinion -- I'm

04:10  19   not an expert witness.

04:10  20       Q.    Okay.  Fair enough, sir.

04:10  21             Now, sounds like you were pretty familiar with

04:10  22   companies around that time.

04:10  23             Are you aware of a company called HearMe?

04:10  24       A.    I'm not aware of them.

04:10  25       Q.    You're not aware of them.

613

04:10  1                So you're not aware that they also had a Voice

04:10  2    over IP audioconferencing system during the same time?

04:10  3        A.    No.

04:10  4        Q.    Okay.  Fair enough.

04:11  5                Now, you would agree with me, sir, that you

04:11  6    are not here to offer an expert noninfringement opinion

04:11  7    on behalf of Cisco, correct?

04:11  8        A.    Correct.

04:11  9        Q.    And I believe you talked about this, but you

04:11  10   agree that you're not here to opine on the validity of

04:11  11   the '858 patent, right?

04:11  12       A.    Correct.  I'm not here to provide an expert

04:11  13   opinion.

04:11  14       Q.    Fair enough.  Thank you.

04:11  15               And in your testimony just now, you did not

04:11  16   show the jury any source code, correct, sir?

04:11  17       A.    Correct.

04:11  18       Q.    Now, you joined Cisco, I think you said, in

04:11  19   1998; is that correct?

04:11  20       A.    No.  So I joined Active Voice in 1999.  Active

04:11  21   Voice got acquired by Cisco in 2001.

04:11  22       Q.    Thank you, sir.  You're correct.

04:11  23               And you've had responsibility of Webex since

04:11  24   Cisco purchased it thereabouts in 2007?

04:11  25       A.    No.  I said I worked at -- I started working

614

| | | |
|---|---|---|
| 04:11 | 1 | at Webex in 2014. |
| 04:11 | 2 | Q.   Okay.  That's my mistake.  I'm sorry. |
| 04:11 | 3 | A.   No worries. |
| 04:11 | 4 | Q.   And are you aware that Cisco purchased Webex |
| 04:12 | 5 | in May of 2007? |
| 04:12 | 6 | A.   I am. |
| 04:12 | 7 | Q.   And the purchase price that Cisco paid to |
| 04:12 | 8 | acquire Webex was $3.2 million; is that right, sir? |
| 04:12 | 9 | A.   I don't know. |
| 04:12 | 10 | MS. GARDNER:  Objection, Your Honor, lack |
| 04:12 | 11 | of relevance, prejudice. |
| 04:12 | 12 | THE COURT:  Overruled. |
| 04:12 | 13 | He said he doesn't know.  So... |
| 04:12 | 14 | MR. SIEGMUND:  Fair enough.  Fair enough. |
| 04:12 | 15 | BY MR. SIEGMUND: |
| 04:12 | 16 | Q.   Now, do you know Mr. Barave, sir?  I think he |
| 04:12 | 17 | testified earlier. |
| 04:12 | 18 | A.   So I'm horrible with names.  I have slight |
| 04:12 | 19 | dyslexia.  So I may know Barave. |
| 04:12 | 20 | Q.   Not a trick question.  He is the corporate |
| 04:12 | 21 | represent -- well, one of the witnesses of Cisco that |
| 04:12 | 22 | came in and talked to the ladies and gentlemen of the |
| 04:12 | 23 | jury about -- |
| 04:12 | 24 | A.   Oh, Amit you're talking about? |
| | 25 | Q.   Yes, sir.  I -- |

615

| | | |
|---|---|---|
| 04:12 | 1 | A.    Yeah.  So in Webex when you become a VP, |
| 04:12 | 2 | you're known by your first name. |
| 04:13 | 3 | Q.    Oh. |
| 04:13 | 4 | A.    So I know him as Amit, and I know Amit well. |
| 04:13 | 5 | Q.    I learned something today.  Okay. |
| 04:13 | 6 | A.    At least us engineers, we know -- we just use |
| 04:13 | 7 | their first name. |
| 04:13 | 8 | Go on. |
| 04:13 | 9 | Q.    So Mr. Barave testified before the jury that |
| 04:13 | 10 | it's important to read the entire patent.  And that |
| 04:13 | 11 | would make sense, right, sir? |
| 04:13 | 12 | A.    Sure. |
| 04:13 | 13 | Q.    And I believe you have not read the entire |
| 04:13 | 14 | patent, correct, sir? |
| 04:13 | 15 | A.    That is not correct. |
| 04:13 | 16 | Q.    And I think you testified that -- |
| 04:13 | 17 | THE COURT:  He said -- |
| 04:13 | 18 | A.    Not correct.  I haven't read the -- |
| 04:13 | 19 | BY MR. SIEGMUND: |
| 04:13 | 20 | Q.    Oh, I'm sorry.  I wasn't listening.  That's -- |
| 04:13 | 21 | I've got to pay better attention. |
| 04:13 | 22 | So you have read the patent? |
| 04:13 | 23 | A.    I have read the patent. |
| 04:13 | 24 | Q.    And when did you read the entire patent, sir? |
| 04:13 | 25 | A.    Just recently in the hotel room while I've |

616

04:13  1    been waiting for this trial.

04:13  2        Q.    Okay.  So a week ago?

04:13  3        A.    Correct.  I've reviewed parts of it before,

04:13  4    but yes.

04:13  5        Q.    Okay.  So just -- just to clarify, whenever we

04:13  6    had your deposition, you talked -- I think you

04:13  7    testified that you had read the claims but not the rest

04:13  8    of the patent.  Is that fair?

04:13  9        A.    At that time, yes.

04:14  10        Q.    Okay.  And since that time, you've read the

04:14  11    entire patent?

04:14  12        A.    Yes.

04:14  13        Q.    Okay.  So you would agree with me that it's

04:14  14    important to read the entire patent, correct, sir?

04:14  15        A.    Sure.

04:14  16        Q.    And that makes sense, right?  The

04:14  17    specification provides context for the claims of the

04:14  18    patent.

04:14  19              You'd agree with that?

04:14  20        A.    No.  I wouldn't agree with that.  I think the

04:14  21    claims -- I've been trained that the claims are what's

04:14  22    the important part of a patent.

04:14  23        Q.    Well, I agree the claims are certainly

04:14  24    important.  But the specification, the claims are

04:14  25    supposed to be read in light of the specification,

617

04:14    1    correct?

04:14    2         A.    That's not what I've been trained.

04:14    3         Q.    You've not been trained to read the

04:14    4    specification whenever you're looking at the claims?

04:14    5         A.    No.   I've -- I've been told the opposite.

04:14    6               If you want me to go into that training, I

04:14    7    can.

04:14    8         Q.    I -- I think we've made the point.

04:14    9               Now, you probably -- the jury's going to hear

04:14    10   that -- Judge Albright is going to instruct the jury

04:14    11   that patent claims are supposed to be read in light of

04:14    12   the specification.

04:14    13              Are you aware of that?

04:14    14        A.    I'm not aware of that.

04:14    15        Q.    Totally fair.

04:15    16              Now, let me ask you something else, sir.   You

04:15    17   have since read the specification, I think you said?

04:15    18        A.    Yes.

04:15    19        Q.    Now, are you aware of the specification

04:15    20   describes what the term "mux" stands for.

04:15    21              Are you aware of that?

04:15    22        A.    Yes.

04:15    23        Q.    Do you know what that term stands for?

04:15    24        A.    I do.

04:15    25        Q.    What does that stand for?

618

04:15  1       A.    So in Webex -- well, we have a bunch of

04:15  2    three-letter acronyms inside of Cisco.  So we have

04:15  3    another thing that's called an mux.  It has to do with

04:15  4    user experience.

04:15  5            But in context of the patent, you're talking

04:15  6    about multiplex.

04:15  7       Q.    Yes.  Okay.  Thank you, sir.

04:15  8            So we can agree that in terms of the patent,

04:15  9    mux stands for multiplexing?

04:15  10      A.    Correct.

04:15  11      Q.    Okay.  And I don't believe you're going to say

04:16  12   no to this question, but you're not here today to

04:16  13   disagree with what your friend Mr. Buckles testified

04:16  14   about, correct?

04:16  15      A.    I don't know what he testified, but that's not

04:16  16   my purpose.

04:16  17      Q.    Fair enough.

04:16  18            Give me one second.  I think we might be

04:16  19   finished.

04:16  20      A.    Okay.

04:16  21                 (Conference between counsel.)

04:16  22   BY MR. SIEGMUND:

04:16  23      Q.    We already discussed this, sir, but it was my

04:16  24   error, not yours.  The patent was actually filed in

04:16  25   2000.  So we can agree that the patent was filed in

619

04:16  1    2000, and I apologize.

04:16  2                    MR. SIEGMUND:  Thank you very much for

04:16  3    your time.  I really appreciate it.

04:16  4                    THE WITNESS:  Sure.

04:16  5                    MS. GARDNER:  No further questions,

04:16  6    Your Honor.

04:16  7                    THE COURT:  May he be excused from the

04:16  8    rule?

04:16  9                    MR. SIEGMUND:  He may, Your Honor.

04:16  10                   THE COURT:  What that means is that so

04:16  11   occasionally I'll tell people they can just leave, but

04:17  12   then I feel like I'm being ugly to them.  So you're

04:17  13   free to leave.  You're free to go out in the courtroom

04:17  14   and stay here.  In other words, you're free to do

04:17  15   whatever you'd care to do.  If you'd like to stay in

04:17  16   the courtroom, you may now.  But if you want to go back

04:17  17   to Washington, you can do that too.

       18                   THE WITNESS:  Okay.  Thank you.

04:17  19                   THE COURT:  Thank you for being here.

04:17  20                   THE WITNESS:  Yeah.

04:17  21                   THE COURT:  Who's your next witness?

04:17  22                   MR. HAWKINS:  Mr. Dean Willis.

04:17  23                   (The witness was sworn.)

04:19  24                   MR. TRIBBLE:  Your Honor, may we

04:19  25   approach?

620

| | | |
|---|---|---|
| 04:19 | 1 | THE COURT:  Yeah.  Of course. |
| 04:19 | 2 | (Bench conference.) |
| 04:19 | 3 | MR. TRIBBLE:  Your Honor, I was preparing |
| 04:19 | 4 | for the witness, and I don't know how we missed it. |
| 04:19 | 5 | But there is a slide in his demonstratives puts up like |
| 04:20 | 6 | ten dictionary definitions.  At this stage, that is not |
| 04:20 | 7 | the way to construe a claim.  You know, it's supposed |
| 04:20 | 8 | to be read in light of the specification. |
| 04:20 | 9 | MR. HAWKINS:  These dictionary |
| 04:20 | 10 | definitions were in his expert report, and he was |
| 04:20 | 11 | deposed on them.  And they were in the slides that were |
| 04:20 | 12 | sent last night. |
| 04:20 | 13 | MR. TRIBBLE:  That's true. |
| 04:20 | 14 | THE COURT:  So what is he going to say? |
| 04:20 | 15 | MR. HAWKINS:  That he reviewed them as |
| 04:20 | 16 | part of his process of determining what the plain and |
| 04:20 | 17 | ordinary meaning of the term to be. |
| 04:20 | 18 | THE COURT:  If he says -- if this is a |
| 04:20 | 19 | series of questions, what did you do to come up with |
| 04:20 | 20 | your understanding, and he says, well, I read the |
| 04:20 | 21 | patent.  And I looked at these, you know, dictionary |
| 04:20 | 22 | definitions, that's what he did.  That's fine. |
| 04:20 | 23 | MR. HAWKINS:  Yeah. |
| 04:20 | 24 | THE COURT:  But he's not going to spend |
| 04:20 | 25 | any time on what the dictionary says, especially if |

621

| | |
|---|---|
| 04:20 | 1 | it's the word -- I think what we're coming to, which |
| 04:20 | 2 | I've construed.  In fact, actually, I'm -- I don't |
| 04:21 | 3 | think the jury needs to see -- I'm going to keep those |
| 04:21 | 4 | out.  He can say that he did it, but you're not going |
| 04:21 | 5 | to show the slide.  Because the jury does not need to |
| 04:21 | 6 | even contemplate dictionary definitions to have |
| 04:21 | 7 | anything to do with this.  I've construed the term. |
| 04:21 | 8 | What the dictionary says has no relevance |
| 04:21 | 9 | in this case.  And so if he wants to go through and say |
| 04:21 | 10 | what he did, that's what he did.  I don't know why he |
| 04:21 | 11 | would.  But I've construed the term. |
| 04:21 | 12 | And if you -- if he does something that |
| 04:21 | 13 | indicates that anything other than my construction is |
| 04:21 | 14 | what he needs to apply to -- is he just infringement? |
| 04:21 | 15 | MR. HAWKINS:  He is, sir. |
| 04:21 | 16 | THE COURT:  Not invalidity? |
| 04:21 | 17 | MR. HAWKINS:  No. |
| 04:21 | 18 | THE COURT:  If I get the feeling he's |
| 04:21 | 19 | applying something other than my claim term, my |
| 04:21 | 20 | construction to his analysis, I will correct it without |
| 04:21 | 21 | an objection. |
| 04:21 | 22 | MR. HAWKINS:  Your Honor, I just want to |
| 04:22 | 23 | make sure I understand.  Your construction is that it |
| 04:22 | 24 | could mean that, but we thought we had clarification |
| 04:22 | 25 | that -- |

622

```
04:22   1              THE COURT:  My construction was exactly
04:22   2   what I said it was at the hearing.  That's why I said
04:22   3   it.  I don't understand this at all.
04:22   4              I don't understand why we're having these
04:22   5   discussions.  I made it a point to say at the hearing
04:22   6   what the claim term meant.
04:22   7              Now, what you guys -- I get it.  It was
04:22   8   late.  The expert reports have been exchanged,
04:22   9   depositions had been taken, all that stuff.  And y'all
04:22  10   were free to do whatever you needed to do with your
04:22  11   experts post that to make sure that what they were
04:22  12   going to say was consistent with that.  But I had
04:22  13   decided that issue.  It's -- it's not going to be
04:22  14   discussed.
04:22  15              I don't -- I'm completely perplexed over
04:22  16   this.  I've never had anyone -- once I've given a claim
04:22  17   construction, I've never had to deal with it during
04:22  18   trial.  I've had to give claim construction during
04:22  19   trial, and that would be different.
04:22  20              But you have my claim construction.  It's
04:22  21   very clear -- even an English -- I understand.
04:23  22              MR. HAWKINS:  Your Honor, we followed up
04:23  23   and did ask if the experts would be able to give expert
04:23  24   testimony regarding what the plain and ordinary meaning
04:23  25   of the term meant.
```

04:23    1                    THE COURT:  Well, again, here's one of

04:23    2    those things.  If you want him to explain the concept

04:23    3    of plain and ordinary meaning, I don't know why you

04:23    4    would because I'm going to tell the Court (sic).  But

04:23    5    if you are saying to me he needs to explain what it

04:23    6    means for someone to use the plain and ordinary

04:23    7    meaning, he can do that.

04:23    8                    I have told you what the plain and

04:23    9    ordinary meaning of the word is.  He needs -- your

04:23   10    direct needs to be limited to:  Have you reviewed the

04:23   11    Court's construction?  Did you apply it to the

04:23   12    products?  Why don't we infringe?

04:23   13                    That's what you're going to do.

04:23   14                    MR. HAWKINS:  Can I have some time with

04:23   15    counsel for me to discuss this?

04:24   16                    THE COURT:  No.

04:24   17                    MR. HAWKINS:  Okay.

04:24   18                    THE COURT:  I -- I don't understand this.

04:24   19    Why?  I -- I gave this construction at a -- I held a

04:24   20    hearing to do this.  You're about to put him on.  I

04:24   21    couldn't have been any clearer.

04:24   22                    You have the construction.  I've never

04:24   23    had this problem.  I don't understand what this is

04:24   24    about.  I've tried at least as many cases as you all

04:24   25    have as a lawyer.  I never raised this.

624

04:24  1              But I've had a few.  When a court gives a

04:24  2   construction, you have -- he takes the construction and

04:24  3   says, tell the jury why they infringe.  You can take

04:24  4   the construction and say -- tell them why they don't.

04:24  5   You don't say, look, it could mean a lot of things.

04:24  6   That's -- you have it.

04:24  7              MR. HAWKINS:  Okay.  And Dr. Schaefer

04:24  8   gave testimony regarding his understanding of the plain

04:24  9   and ordinary meaning, "one or more."

04:24  10             THE COURT:  And that's -- he gave the --

04:25  11  he gave -- that's my instruction.

04:25  12             MR. HAWKINS:  Understood, Your Honor.

04:25  13             THE COURT:  That's my construction.  He

04:25  14  was consistent.  It wasn't -- it wasn't his

04:25  15  understanding as an expert.  It was his understanding

04:25  16  that as an expert applying my construction, that's what

04:25  17  the construction was.  That's what he did.  I don't get

04:25  18  this.

04:25  19             MR. HAWKINS:  Again, we just had some

04:25  20  confusion about --

04:25  21             THE COURT:  I can't understand how that

04:25  22  could be.  I really can't.

04:25  23             MR. HAWKINS:  Okay.  Understood,

04:25  24  Your Honor.

04:25  25             (Bench conference concludes.)

625

```
04:25   1                    THE COURT:  Actually, ladies and
04:25   2   gentlemen, we're going to take a short recess.  We'll
04:25   3   be back in just five or ten minutes.
04:25   4                    THE BAILIFF:  All rise.
04:25   5               (Jury exited the courtroom.)
04:26   6                    THE COURT:  You may be seated.  You may
04:26   7   step down.
04:26   8               I have to admit, I am absolutely
04:26   9   mystified.  We had a hearing.  I -- on a claim term
04:26   10  that clearly could be interpreted different ways
04:26   11  because it's an English word.  I said "plain and
04:26   12  ordinary meaning."
04:26   13              But having been through a number of
04:26   14  trials where one side says plain and ordinary meaning
04:26   15  is X, the other side, plain and ordinary meaning is Y,
04:26   16  that doesn't work.
04:26   17              So at the hearing, I said what the plain
04:26   18  and ordinary meaning of the claim term was.  What I
04:26   19  expected was for the plaintiff to have their expert
04:26   20  come in and say, based on the Court's construction,
04:26   21  they infringe.  That's what they did.
04:27   22              I now expect the defense expert to say,
04:27   23  based on the Court's construction, that we don't
04:27   24  infringe.
04:27   25              He doesn't get to say this is what I
```

04:27  1    think the plain and ordinary meaning is.  It could be,

04:27  2    you know, tomato, tomato.  It could be a lot of things.

04:27  3                  It is exactly what at the hearing where

04:27  4    I -- you asked me to give you the construction.  It's

04:27  5    exactly that.  And that's what he's going to testify

04:27  6    about.  Is that clear?

04:27  7                  MR. TRIBBLE:  Yes, Your Honor.

04:27  8                  MR. HAWKINS:  Understood, Your Honor.

04:27  9                  THE COURT:  Is that -- hopefully that

04:27  10   helps your expert.  That's -- because I don't want to

04:27  11   put him in bad shape.  I don't know what's in his

04:27  12   expert report.  I don't know what you intended for him

04:27  13   to say, but the expert is limited to applying the

04:27  14   construction I gave to the claim term in his analysis

04:27  15   of whether or not there is infringement.  So...

04:28  16                  MS. PIEPMEIER:  Your Honor, may I ask a

04:28  17   clarifying question?

04:28  18                  THE COURT:  I don't know how I could be

04:28  19   any clearer.  I don't understand how I could be any

04:28  20   clearer.  I mean, I could get it if this were a

04:28  21   difficult technical term that might mean --- you know,

04:28  22   I use a lot "vertical pipe."  What's vertical?  Is

04:28  23   90 degrees vertical?  Is it not?

04:28  24                  If I said "plain and ordinary meaning,"

04:28  25   people might disagree.  And so in that case, I might

627

| 04:28 | 1 | say:  Vertical has to be 90 degrees, or vertical |

04:28  1  say:  Vertical has to be 90 degrees, or vertical

04:28  2  includes 90 degrees, or vertical includes whatever.

04:28  3          That's what I did here on a very plain

04:28  4  English word.  So I don't understand how there can be a

04:28  5  fight over -- I know why you all want to have a fight,

04:28  6  because -- I have to assume it's because your product

04:28  7  infringes under my construction.  That's the only

04:28  8  takeaway I can have from this.

04:29  9          And so you want to fight my construction.

04:29  10  But that's not the way it works.  I mean, the Federal

04:29  11  Circuit might think I'm an idiot and I got it wrong,

04:29  12  but the first step is me construing it.  And I did

04:29  13  that.

04:29  14          What needs to be clarified?

04:29  15          MS. PIEPMEIER:  I sincerely apologize,

04:29  16  Your Honor.  I would like to just express my confusion

04:29  17  for one moment.  I will be very brief.

04:29  18          My confusion is the word "can."  And that

04:29  19  is why, Your Honor, I personally have confusion and

04:29  20  what I expressed at the second pretrial conference.

04:29  21          When Your Honor's construction said --

04:29  22  and I asked about this -- which can include "one or

04:29  23  more," that suggested it also --

04:29  24          THE COURT:  As opposed to "may"?  Like

04:29  25  "can," "may"?

628

04:29    1                    MS. PIEPMEIER:  I apologize.

04:29    2                    THE COURT:  It can.

04:29    3                    MS. PIEPMEIER:  I apologize, Your Honor.

04:29    4                    My understanding of that -- and it could

04:29    5    just be that I'm wrong and you can tell me that.  My

04:29    6    understanding of that is that which can include "one or

04:29    7    more" is different from which means "one or more."

04:29    8                    THE COURT:  I couldn't hear you.

04:30    9                    MS. PIEPMEIER:  I apologize, Your Honor.

04:30    10    I didn't hear you.

04:30    11                    THE COURT:  I couldn't hear you.

04:30    12                    MS. PIEPMEIER:  Oh, well, then may I come

04:30    13    to the podium?

04:30    14                    THE COURT:  Absolutely.

04:30    15                    MS. PIEPMEIER:  Apparently nobody can

04:30    16    hear me, which is because probably my back was hurting

04:30    17    from bending over.  I apologize, Your Honor.  And thank

04:30    18    you for the indulgence.  I would like to explain why

04:30    19    I'm confused.

04:30    20                    The construction that I understand we

04:30    21    received was the plain and ordinary meaning which can

04:30    22    include "one or more."  I personally at least read that

04:30    23    as different from the plain and ordinary meaning is

04:30    24    "one or more."

04:30    25                    THE COURT:  It's not.  It's not "is."

04:30    1    It's "can."  You are correct.  "Which can include."

04:30    2                    MS. PIEPMEIER:  Thank you, Your Honor.

04:30    3                    And so my understanding in the question I

04:30    4    was attempting to pose at the second pretrial

04:30    5    conference is if it can include "one or more," is an

04:30    6    expert free to argue to a jury it can, but when you

04:30    7    look at the claim --

04:31    8                    THE COURT:  No.

04:31    9                    (Simultaneous conversation.)

04:31    10                    THE COURT:  If you're saying it can but

04:31    11    doesn't have to, no.  It can.  It may.  It can.  It

04:31    12    can.  You can drive to New Hampshire, but you don't

04:31    13    have to.  It can include it.  But it doesn't have to be

04:31    14    that.

04:31    15                    And you can't come up with a situation

04:31    16    where it doesn't have to have that.  It's -- it is

04:31    17    as -- I don't know how it could be any more clear.  I

04:31    18    don't.

04:31    19                    MS. PIEPMEIER:  I apologize, Your Honor.

04:31    20                    That's -- I understand Your Honor -- I

04:31    21    understand Your Honor has given a ruling.  I apologize

04:31    22    that I don't personally understand it.

04:31    23                    THE COURT:  You don't need to apologize.

04:31    24                    I just -- I don't get it.  I don't

04:31    25    understand any -- except for a lawyer making an attempt

630

| 04:31 | 1 | to not read the English language in its most natural |
| 04:31 | 2 | way, I don't understand it. |
| 04:31 | 3 | Again, that's why I used "vertical."  I |
| 04:31 | 4 | get vertical can mean different things.  But if I said |
| 04:32 | 5 | vertical pipe can include 90 degrees, you can -- |
| 04:32 | 6 | there's not a situation where you can say, well, in |
| 04:32 | 7 | this case, 90 degrees isn't included.  It can include |
| 04:32 | 8 | it, but it doesn't have to. |
| 04:32 | 9 | MS. PIEPMEIER:  And is it -- am I |
| 04:32 | 10 | correct, then, in understanding that the natural |
| 04:32 | 11 | implication of Your Honor's ruling would be that in the |
| 04:32 | 12 | context of the '858 patent, it has to include "one or |
| 04:32 | 13 | more"? |
| 04:32 | 14 | THE COURT:  I'll say again.  No.  It can |
| 04:32 | 15 | include "one or more," but it doesn't have to. |
| 04:32 | 16 | MS. PIEPMEIER:  Okay.  Thank you, |
| 04:32 | 17 | Your Honor, for the indulgence. |
| 04:32 | 18 | I guess I'll say one other thing, which |
| 04:32 | 19 | is that we're not going to argue this again.  I will |
| 04:32 | 20 | say that I personally have a concern that that presents |
| 04:32 | 21 | a confusion, an O2 Micro confusion to the jury, perhaps |
| 04:32 | 22 | just because I don't personally understand it.  But I |
| 04:33 | 23 | understand it's Your Honor's ruling, and I'm not |
| 04:33 | 24 | seeking to -- |
| 04:33 | 25 | THE COURT:  Well, the time to raise that, |

| | | |
|---|---|---|
| 04:33 | 1 | I disagree, some might say O2 Micro is the last refuge. |
| 04:33 | 2 | MS. PIEPMEIER:  Of the scoundrel? |
| 04:33 | 3 | THE COURT:  I left that part off. |
| 04:33 | 4 | It's the last refuge when things aren't |
| 04:33 | 5 | going your way, but there's no O2 Micro here.  Because |
| 04:33 | 6 | what you're saying is that the words that I've used to |
| 04:33 | 7 | construe the claim term aren't sufficient, and that's |
| 04:33 | 8 | not an O2 Micro. |
| 04:33 | 9 | Maybe I'm screwing up, with all due |
| 04:33 | 10 | respect to me, but it's -- but it's not -- it can't be |
| 04:33 | 11 | an O2 Micro because I gave a construction, plain and |
| 04:33 | 12 | ordinary meaning which includes.  That eliminates the |
| 04:33 | 13 | O2 Micro issue. |
| 04:33 | 14 | The O2 Micro was he said "plain and |
| 04:34 | 15 | ordinary meaning," and then you have one side that says |
| 04:34 | 16 | it means this; one side says it means that.  And |
| 04:34 | 17 | that -- that's not what I did. |
| 04:34 | 18 | MS. PIEPMEIER:  And just so the record is |
| 04:34 | 19 | clear, Your Honor, it's "which can include," correct? |
| 04:34 | 20 | You just said "which includes."  I just want to make |
| 04:34 | 21 | sure. |
| 04:34 | 22 | THE COURT:  "Which can include." |
| 04:34 | 23 | MS. PIEPMEIER:  Okay.  Thank you, |
| 04:34 | 24 | Your Honor. |
| 04:34 | 25 | MR. TRIBBLE:  And do you want to address |

632

04:34  1    it?  I'll do it.

04:34  2                    Your Honor, just on behalf of the

04:34  3    plaintiff, I want to say your construction, in our

04:34  4    view, was absolutely clear, plain and ordinary meaning

04:34  5    which can include.  I don't see how it could be any

04:34  6    clearer.  They should not be allowed to offer a

04:34  7    construction that says --

04:34  8                    THE COURT:  Well, they're not going to

04:34  9    offer -- let me help you.  They are not going to offer

04:34 10    an -- well, they can offer an opinion that's

04:34 11    inconsistent with mine, because I can't -- but if

04:34 12    they -- if the expert -- I apologize.  I'm speaking

04:34 13    about you like you're in the third person.  I see you

04:34 14    sitting there.

04:34 15                    But if the expert were to offer an

04:34 16    opinion that you believed was inconsistent with the

04:35 17    construction I gave, an objection would be well

04:35 18    received.  Because the expert's not going to give an

04:35 19    opinion that's inconsistent with my construction.

04:35 20                    I can't keep him from giving an opinion,

04:35 21    but I can keep the jury from considering it if I

04:35 22    believe it's inconsistent with mine.

04:35 23                    Now, to avoid what I foresee coming next,

04:35 24    when he gets four words into his question and you jump

04:35 25    up and say something, at least let me hear the whole

633

04:35  1    question so I at least know what's -- you know.

04:35  2                    And if that becomes a problem because you

04:35  3    don't want the jury to hear the questions, we'll deal

04:35  4    with it at the bench again.

04:35  5                    MR. TRIBBLE:  I don't -- that probably

04:35  6    won't be a problem.  I'd just like the expert -- an

04:35  7    agreement that if the expert sees me stand up, he won't

04:35  8    blurt out an answer.

04:35  9                    THE COURT:  If the expert sees you

04:35  10   standing up, he should wait and allow me to hear your

04:36  11   objection.

04:36  12                    MR. TRIBBLE:  Because earlier there was

04:36  13   an issue --

04:36  14                    THE COURT:  I got it.  I got it.

04:36  15                    MR. TRIBBLE:  -- with Mr. Buckles that

04:36  16   we'll address later, Your Honor.

04:36  17                    THE COURT:  Okay.  I'm going to go see

04:36  18   how the jury's doing.  We'll be back in five minutes.

04:36  19                    THE BAILIFF:  All rise.

04:36  20                    (Recess taken.)

04:42  21                    THE BAILIFF:  All rise.

04:42  22                    THE COURT:  Please remain standing for

04:42  23   the jury.

04:42  24                    MR. JONES:  Your Honor, could I ask one

04:42  25   question?

634

| | | |
|---|---|---|
| 04:42 | 1 | THE COURT:  Yes. |

04:42  1                         THE COURT:  Yes.

04:42  2                         MR. JONES:  Obviously, and again, we

04:42  3    apologize for what's happened.  We need to work with

04:42  4    our witness.  If we offered to accept and be charged

04:42  5    with the time -- you said you were going to end the day

04:42  6    at 5:30.  Could we have a recess until tomorrow and

04:42  7    start then?  We understand we would be penalized the

04:42  8    time.

04:42  9                         THE COURT:  Tell them to go put them back

04:42  10   in.

04:42  11                        You may be seated.

04:42  12                        MR. JONES:  You wanted me seated,

04:42  13   Your Honor?

04:42  14                        THE COURT:  No.  Actually, I don't care

04:42  15   what you do.  If you're going to be able to argue this,

04:42  16   I need to hear -- I have another question to ask.

04:42  17                        MR. JONES:  Okay.

04:42  18                        THE COURT:  Whoever is going to be

04:42  19   speaking on your side on this issue, that's who I need

04:42  20   at the podium.

04:43  21                        MR. JONES:  Probably need to let

04:43  22   Ms. Piepmeier do that.  Thank you, Your Honor.

04:43  23                        THE COURT:  I worry that you and I may

04:43  24   not be talking about exactly the same thing, and I want

04:43  25   to make sure that I am.  Maybe that's why I'm

635

| | |
|---|---|
| 04:43 | 1 |
| 04:43 | 2 |
| 04:43 | 3 |
| 04:43 | 4 |
| 04:43 | 5 |
| 04:43 | 6 |
| 04:43 | 7 |
| 04:43 | 8 |
| 04:43 | 9 |
| 04:43 | 10 |
| 04:43 | 11 |
| 04:43 | 12 |
| 04:43 | 13 |
| 04:43 | 14 |
| 04:43 | 15 |
| 04:44 | 16 |
| 04:44 | 17 |
| 04:44 | 18 |
| 04:44 | 19 |
| 04:44 | 20 |
| 04:44 | 21 |
| 04:44 | 22 |
| 04:44 | 23 |
| 04:44 | 24 |
| 04:44 | 25 |

frustrated, and you're frustrated because we're not.

Is the issue over the construction whether something must exist, must be in there?

Is -- is that what your -- where you are leaning to?

MS. PIEPMEIER:  Your Honor --

THE COURT:  Your expert's going to say it doesn't have to be or -- the "can" -- as opposed to the "can," meaning may, but the "can" being able?

MS. PIEPMEIER:  Yes, I think so, Your Honor.  And if I may have a second.  The way I had read your construction and what I understood when we came out of the second pretrial conference is that Your Honor had denied summary judgment of noninfringement because our summary judgment motion was premised on the idea that "each" meant "all" or "every."

THE COURT:  Right.

MS. PIEPMEIER:  And Your Honor said it doesn't have to mean "all" or "every," and so I'm denying summary judgment.

And then what we were confused about, and this is what we filed the motion for clarification on, is is Your Honor ruling it can, but it's going to be up to the experts to present to the jury how one of

636

04:44  1   ordinary skill would understand that word in the

04:44  2   context of the '858 patent, and it could be -- or it

04:44  3   could be "all" or "every" or it could be "one or more."

04:44  4   Or is Your Honor ruling the plain and ordinary meaning

04:44  5   of "each" is "one or more"?

04:44  6              And when I asked that question on

04:44  7   August 1st at the pretrial conference, my understanding

04:44  8   was that your ruling was, no, it -- it can include it,

04:44  9   which -- and then I said, Your Honor, does that mean we

04:44  10  should be presenting expert testimony to the jury

04:44  11  regarding how one of ordinary skill in the art would

04:44  12  understand this?

04:44  13             And my memory is that Your Honor said,

04:44  14  yes, although I don't have the transcript in front of

04:44  15  me.

04:44  16             So my understanding and Cisco's

04:45  17  understanding walking into this is that the experts

04:45  18  would be opining on how "each" would be interpreted to

04:45  19  one of ordinary skill in the art in light of the patent

04:45  20  in the specification.

04:45  21             Mr. Willis has an entire section in his

04:45  22  report on that.  Dr. Schaefer did not have anything in

04:45  23  his report on that but did talk about it in his

04:45  24  deposition.  Dr. Schaefer testified to the jury this

04:45  25  week about how "each" should be interpreted.  And so it

04:45  1    was our understanding that Mr. Willis would be able to

04:45  2    do the same because that "can" word meant, I thought,

04:45  3    it's up to the experts to tell the jury how one of

04:45  4    ordinary skill in the art would understand that term.

04:45  5              THE COURT:  So your -- your position is

04:45  6    what your expert is going to testify isn't in fact --

04:45  7    is consistent with what my construction is.  It's just

04:45  8    going to be what one -- how one skilled in the art

04:45  9    takes what I said and applies the word "can" and what

04:46  10   that means?

04:46  11             MS. PIEPMEIER:  That is 100 percent

04:46  12   correct, Your Honor.  We intended to be completely

04:46  13   faithful to Your Honor's rulings, and our understanding

04:46  14   was that there was a delta between "can" and "must" and

04:46  15   that the delta would be filled by expert testimony.

04:46  16             THE COURT:  Well, I never intended it to

04:46  17   mean "must."  And so -- but what I'm worried about is

04:46  18   whether or not there's a difference between when I --

04:46  19   when I said the word "can," the intent was to mean

04:46  20   "may" as opposed to "able."  And because if it's

04:46  21   "able," then, you know, able to do something as opposed

04:46  22   to may do something.  Those are -- those are different

04:46  23   things.

04:46  24             So, again, what is -- what is your --

04:46  25   what is your expert going to say in terms of, in your

638

04:46  1   opinion, being faithful to my construction, how is he

04:46  2   going to frame it that there's not infringement

04:46  3   consistent with the way I construed the claim term?

04:46  4           MS. PIEPMEIER:  My understanding is that

04:47  5   what our expert will say is that Your Honor has not

04:47  6   ruled out the possibility that it could be "one or

04:47  7   more."  He has not ruled out the possibility that it

04:47  8   could be "all" or "every."

04:47  9           In the context of the '858 patent, you

04:47  10  have to look at the claims and the specification and

04:47  11  determine how the word "each" is used in the claims.

04:47  12          And Your Honor has simply said, look --

04:47  13  in our interpretation -- I'm not going to tell anyone

04:47  14  that it's "all" or "every."  I am not making that

04:47  15  ruling.  If -- if Your Honor had, I think you would

04:47  16  have granted summary judgment, in my humble opinion.

04:47  17          I'm also not going to say that it must be

04:47  18  "one or more."  Because if that's what you meant,

04:47  19  Your Honor, I suspect, would have said that.

04:47  20          So our understanding was that, look, it

04:47  21  can be.  And because it can be, summary judgment of

04:47  22  noninfringement is not appropriate.

04:47  23          But now we need experts to tell the jury,

04:47  24  look.  As one of ordinary skill in the art, reading the

04:47  25  entire specification, reading the entire patent, this

639

| | |
|---|---|
| 04:48 | 1 |
| 04:48 | 2 |
| 04:48 | 3 |

04:48  1    is how I understand the term "each."  And that is what

04:48  2    Mr. Willis did in his report, and that is what he was

04:48  3    going to do.

04:48  4           I have no problem, Your Honor, with

04:48  5    ditching dictionary definitions.  I'm fine with that.

04:48  6    We don't need that.  But --

04:48  7           THE COURT:  Right.  Yeah.  That --

04:48  8           MS. PIEPMEIER:  That's not a problem.

04:48  9    But Mr. Willis has an entire section in his report

04:48  10    where he says, look, I've read the patent.  I've read

04:48  11    Column 5.  I've looked at Figure 3.  I've looked at all

04:48  12    the claims, and this is how you read the patent.  This

04:48  13    is what "each" means.

04:48  14           And I believe that because Your Honor's

04:48  15    construction was not "it does mean" or "it must mean,"

04:48  16    that he should be able to tell the jury, and that's the

04:48  17    question I thought I asked on August 1st, whether in

04:48  18    the context of this patent it does actually mean that.

04:48  19           I know it may mean that, but does it mean

04:48  20    that?  And that is the question that Mr. Willis was

04:48  21    going to answer.

04:48  22           THE COURT:  So --

04:48  23           MS. PIEPMEIER:  Mr. Schaefer already --

04:48  24    Dr. Schaefer already answered that question from his

04:48  25    perspective, to be clear.

04:49   1              And I do believe, very respectfully,

04:49   2    Your Honor, there's an equity point there, that

04:49   3    Dr. Schaefer was permitted to testify about his

04:49   4    understanding of one of skill in the art.  And

04:49   5    Dr. Willis should be able to do that as well.

04:49   6              Both of them are faithful to both of Your

04:49   7    Honor's rulings.  We understood August 1st to also be a

04:49   8    ruling.

04:49   9              THE COURT:  So let me ask you this:

04:49  10    My -- I'm going to read this to make sure I get it

04:49  11    right.

04:49  12              But this is the intent of my

04:49  13    construction, is that it can include "one or more" but

04:49  14    it doesn't have to.  It could be "one or more" or it

04:49  15    could be "all" or "every."

04:49  16              MS. PIEPMEIER:  Yes.  And that is

04:49  17    precisely what Mr. Willis was going to testify, why one

04:49  18    of ordinary skill in the art, when reading Column 5,

04:49  19    when reading the claims, would say that it is "all" or

04:49  20    "every."

04:49  21              And that is, respectfully, Your Honor,

04:49  22    what we would like Mr. Willis to be able to do.

04:49  23              THE COURT:  Mr. Tribble?

04:50  24              MS. SRINIVASAN:  Your Honor, we don't

04:50  25    really think that there -- "one or more," of course,

641

04:50  1    can also include "all."  "All" is a subset of "one or

04:50  2    more."  Even saying that it must be "one or more"

04:50  3    doesn't preclude that it could be "all."

04:50  4                 The problem that we have had is the

04:50  5    suggestion that the expert might come in and say that

04:50  6    it cannot be "one or more" or that "one or more"

04:50  7    wouldn't make any sense or would be nonsensical because

04:50  8    then you're saying it's precluded.

04:50  9                 THE COURT:  You're not intending for him

04:50  10   to say it cannot be "one or more," correct?

04:50  11                MS. PIEPMEIER:  I'm not intending for him

04:50  12   to say it could not be "one or more."  I'm intending

04:50  13   him to say it is his opinion, in light of the

04:50  14   specification, that it is "one or more."

04:50  15                And, Your Honor, I don't know if it's

04:50  16   helpful for me to just put --

04:50  17                THE COURT:  If -- let -- we're going to

04:50  18   move on.  We're going to continue.  Again, he is able

04:50  19   to testify consistent with this, that it could be "one

04:51  20   or more" or it could be "all" or "every."

04:51  21                Now, having said that, do you all need

04:51  22   any additional time?

04:51  23                MS. PIEPMEIER:  Let me make sure I

04:51  24   understand.  Is he -- because obviously I've

04:51  25   misunderstood Your Honor's rulings previously.

04:51  1        Is he able to say it could be "one or

04:51  2  more," it could be "all" or "every," here is the reason

04:51  3  why in light of the specification I believe that one of

04:51  4  ordinary skill would interpret it as "all" or "every"?

04:51  5        THE COURT:  No.  If -- if you're saying

04:51  6  only, that they could only -- if you were saying one,

04:51  7  looking in the specification, could only construe it

04:51  8  that way, the latter way, then yes.  That would -- that

04:51  9  would not be consistent with my construction.

04:51 10        MS. PIEPMEIER:  What about if --

04:51 11        THE COURT:  Again, again, it could be

04:51 12  "one or more" or it could be "all" or "every."

04:51 13        MS. PIEPMEIER:  But it has to be one or

04:51 14  the other of those for the claim to make sense, right?

04:51 15  I mean, we have to have -- the jury has to make a

04:51 16  decision as to what the word "each" means, right?

04:51 17        And so he would say, look, I understand

04:52 18  Your Honor's ruling that it could be "one or more."  I

04:52 19  understand Your Honor's ruling that it could be "all"

04:52 20  or "every."  My opinion as an expert and my disclosed

04:52 21  opinion in my Rule 26 report is that it is "all" or

04:52 22  "every."

04:52 23        I understand that -- is he permitted to

04:52 24  say that?  Because Dr. Schaefer said that -- this is

04:52 25  where I'm confused, is if it could mean "all" or

| | | |
|---|---|---|
| 04:52 | 1 | "every" but it could mean "one or more," respectfully, |
| 04:52 | 2 | Your Honor, I believe it doesn't mean anything. |
| 04:52 | 3 | THE COURT:  A response? |
| 04:52 | 4 | MS. SRINIVASAN:  Your Honor, so in his |
| 04:52 | 5 | report, Mr. Willis said it wouldn't make sense to say |
| 04:52 | 6 | that the audio for "one or more," and he's basically |
| 04:52 | 7 | saying it wouldn't make sense for each to mean "one or |
| 04:52 | 8 | more."  And that is inconsistent with the Court's claim |
| 04:52 | 9 | construction. |
| 04:52 | 10 | To say that "all" is part of "one or |
| 04:52 | 11 | more," and there may be instances where it's "all" -- |
| 04:52 | 12 | is different from saying "one or more" is -- it doesn't |
| 04:53 | 13 | make sense.  So it's not an acceptable interpretation |
| 04:53 | 14 | of "each."  That would be contrary to what the Court |
| 04:53 | 15 | has already ruled. |
| 04:53 | 16 | MS. PIEPMEIER:  Your Honor, if I may |
| 04:53 | 17 | respond. |
| 04:53 | 18 | The problem that I have here is that if |
| 04:53 | 19 | it could mean "one or more" or it could mean "all" or |
| 04:53 | 20 | "every" and the jury has to decide what it means, we |
| 04:53 | 21 | need to provide the jury guidance on what it is. |
| 04:53 | 22 | Now, if your -- if counsel's point is it |
| 04:53 | 23 | could be "one or more" but it could be "all" or "every" |
| 04:53 | 24 | but you can't say it can't be "one or more," |
| 04:53 | 25 | respectfully, that's just the same thing as saying it's |

| | | |
|---|---|---|
| 04:53 | 1 | "one or more."  That is just construing it as "one or |
| 04:53 | 2 | more."  That is -- that is saying it must be "one or |
| 04:53 | 3 | more." |
| 04:53 | 4 | I don't -- I don't understand if you |
| 04:53 | 5 | can't say there's a situation in which it is "all" or |
| 04:53 | 6 | "every," then saying it can be "one or more" is saying |
| 04:53 | 7 | it is "one or more." |
| 04:53 | 8 | And that's not how I understood |
| 04:53 | 9 | Your Honor's construction. |
| 04:53 | 10 | MS. SRINIVASAN:  Your Honor, "all," "one |
| 04:53 | 11 | or more," could be "all," right?  It's more than one. |
| 04:54 | 12 | It could go all the way up to "all."  They're not |
| 04:54 | 13 | alternatives. |
| 04:54 | 14 | And if an expert is going to talk about |
| 04:54 | 15 | "each" meaning "all" in a context, he can do that. |
| 04:54 | 16 | What he can't do is say that "each" cannot mean "one or |
| 04:54 | 17 | more," or that it would be nonsensical or that it would |
| 04:54 | 18 | be -- you know, doesn't work in light of the |
| 04:54 | 19 | specification.  He cannot say that.  And "all" is a |
| 04:54 | 20 | subset of "one or more." |
| 04:54 | 21 | When we talk about them as being like two |
| 04:54 | 22 | different constructions, that's not correct.  "One or |
| 04:54 | 23 | more" is inclusive of "all."  What you can't say is |
| 04:54 | 24 | that "one or more" is excluded, and it is basically a |
| 04:54 | 25 | requirement that it has to be "all" because that's |

645

| | |
|---|---|
| 04:54 | 1 |  exactly what the Court rejected at summary judgment. |
| 04:54 | 2 |                MS. PIEPMEIER:  The -- I guess the |
| 04:54 | 3 |  concern I have here is that setting myself aside, we |
| 04:54 | 4 |  have a whole bunch of really smart lawyers in this |
| 04:54 | 5 |  room.  And for the past week, none of us has been able |
| 04:54 | 6 |  to understand exactly what the word "each" means.  And |
| 04:54 | 7 |  I don't understand how the jury is going to follow |
| 04:55 | 8 |  that. |
| 04:55 | 9 |                And so if the ruling is "each" means "one |
| 04:55 | 10 |  or more" and that's what the ruling is, then that's |
| 04:55 | 11 |  what Your Honor has ruled. |
| 04:55 | 12 |                But "each" can mean "one or more."  To |
| 04:55 | 13 |  the extent the jury's told that, respectfully, I |
| 04:55 | 14 |  believe they're going to be as confused as I am. |
| 04:55 | 15 |                And I'm -- my confusion is legitimate |
| 04:55 | 16 |  here, Your Honor.  It is not -- this is not trying to |
| 04:55 | 17 |  manufacture a defense.  I truly have not understood |
| 04:55 | 18 |  this, which is why we filed a motion for clarification. |
| 04:55 | 19 |                I thought we had a result or a resolution |
| 04:55 | 20 |  on August 1st at the pretrial conference.  I was wrong |
| 04:55 | 21 |  about that, apparently.  But if we're all this confused |
| 04:55 | 22 |  and we're debating about what this means in subsets, |
| 04:55 | 23 |  respectfully, Your Honor, I believe the jury will be |
| 04:55 | 24 |  confused too.  And that's my concern.  Respectfully, |
| 04:55 | 25 |  Your Honor. |

646

04:55  1           MS. SRINIVASAN:  Your Honor, we're not
04:55  2   confused.  "All or more," "one or more" can include
04:55  3   "all."  Okay.  They're not two alternative terms.
04:55  4   That's the problem.  That is what Cisco would like to
04:56  5   advance.  That's what they tried to advance at summary
04:56  6   judgment.  It was rejected.
04:56  7           "One or more" can include -- if you are
04:56  8   saying in the construction of "each" can include "one
04:56  9   or more," that does not read out "all."
04:56  10           But the converse doesn't work.  You can't
04:56  11  say it's "all" and then say it can't be "one or more."
04:56  12  And that's what their expert's -- again, I don't know
04:56  13  what he's going to testify to, but that's effectively
04:56  14  what he's done in his supplemental report, is said,
04:56  15  well, "each or more" doesn't make any sense.
04:56  16           You can't reject the construction that
04:56  17  the Court has already said is permissible.  The expert
04:56  18  can't do that.
04:56  19           MS. PIEPMEIER:  But it does read out
04:56  20  "all."  Saying "one or more" does read out "all."
04:56  21  Saying that it can be "one or more" eviscerates the
04:56  22  concept of "all."  Whether "all" is a subset of "one or
04:56  23  more" or not, it depends on how many items are in the
04:56  24  group, whether it's a null set, a one set, or a five
04:56  25  set.  But you have eviscerated the concept of "all" if

647

04:56  1    you say "one or more."

04:56  2                Now, the whole point here is that the

04:57  3    construction was not it means "one or more."  The

04:57  4    construction was it may be "one or more."  That is why

04:57  5    we have been confused.  I understand what "one or more"

04:57  6    means.  I certainly understand what that means, and I

04:57  7    would have understood if the construction had been

04:57  8    "each" means "one or more."  I certainly understand

04:57  9    that concept.

04:57  10               When it says it may mean "one or more,"

04:57  11   the way I understand that is it may mean "one or more"

04:57  12   or it may mean "all," and we need to see how an expert

04:57  13   is going to explain that in light of the specification

04:57  14   and the claims of the '858 patent.

04:57  15               That's how I interpreted that.  And that

04:57  16   is why I'm saying the jury would be confused, not

04:57  17   because they don't understand what the word "one or

04:57  18   more" means, because that's not the construction.

04:57  19               MS. SRINIVASAN:  Your Honor, I think if

04:57  20   their expert's going to come in and say that he

04:57  21   interprets "each" to mean "all" or whatever he's going

04:57  22   to say about that, that's one thing.  I think the

04:57  23   objectionable part is if he's saying that's the only

04:57  24   thing it can mean, when it can also mean "one or more."

04:57  25               So if he wants to come in and say that's

04:58   1   how I'm reading the term when I'm giving you my

04:58   2   noninfringement opinion, we're not objecting to that

04:58   3   part, even though we -- you know, we're not going to

04:58   4   say that.

04:58   5         But when he says it can only mean "all,"

04:58   6   it can't mean "one or more," then that's where I think

04:58   7   it conflicts with the construction we have.  And I --

04:58   8   what -- I don't really see why that's not something

04:58   9   that the expert can do.  I don't see why he needs to

04:58   10  give an opinion that's contradictory to the

04:58   11  construction.

04:58   12        He can say, you know, how I would view

04:58   13  this here is that this is what happens, all happens

04:58   14  here, where "each" is used.  But the problem is when he

04:58   15  says it can't be "one or more," which is what

04:58   16  Dr. Schaefer opined about.

04:58   17        MS. PIEPMEIER:  But if it always can be

04:58   18  "one or more," then it doesn't make sense to say that

04:58   19  it's "all."  And the whole point -- again, we get back

04:58   20  to if -- if you're saying it can always be "one or

04:58   21  more," then it is "one or more."

04:58   22        THE COURT:  Do one of you have the claim

04:59   23  term?

04:59   24        MS. PIEPMEIER:  It's Claim 1.  Oh, you

04:59   25  have it up.  Okay.

649

| 04:59 | 1 | The two elements, Your Honor, where this |
|---|---|---|

04:59  1          The two elements, Your Honor, where this

04:59  2   comes up are 5 and 6.

04:59  3          THE COURT:  And have you all been reading

04:59  4   both each consistently with each other?

04:59  5          MR. TRIBBLE:  We have.

04:59  6          MS. PIEPMEIER:  Cisco has.  Yes.  We've

04:59  7   been reading all of the "eaches" as "all" or "every."

04:59  8   And my understanding of Your Honor's ruling was that

05:00  9   it -- it could be "one or more" or it could be "all" or

05:00  10  "every."

05:00  11         Now, if what you're saying is it must

05:00  12  always be able to be "one or more," then that means it

05:00  13  has been construed as "one or more," I believe.  That

05:00  14  is not how I interpreted Your Honor's rulings.  But

05:00  15  that is what I feel like I'm hearing right now.

05:00  16         If it has to always be able to be "one or

05:00  17  more," it could never be "all" or "every," which means

05:00  18  that it has been construed as "one or more."  But that

05:00  19  is not what which can include means as I, respectfully,

05:00  20  Your Honor, interpret that language.

05:00  21         MS. SRINIVASAN:  Your Honor, that's not

05:00  22  right.  It doesn't mean that it could never be "all" or

05:00  23  "every."  It means that it isn't required to be "all"

05:00  24  or "every."  That's -

05:00  25         MS. PIEPMEIER:  But you just said the

650

| | |
|---|---|
| 05:00 | 1 |
| 05:00 | 2 |
| 05:01 | 3 |
| 05:01 | 4 |
| 05:01 | 5 |

05:00   1   expert can't say --

05:00   2              THE COURT:  No, no, no.  Just --

05:01   3              MS. PIEPMEIER:  Sorry.  Go ahead.

05:01   4              THE COURT:  I'm saying just talk to me.

05:01   5              MS. SRINIVASAN:  Your Honor, what counsel

05:01   6   is saying is if it has to be "one or more," it could

05:01   7   never be "all" or "every."  That's not correct.  "One

05:01   8   or more" includes "all."  But the converse is not

05:01   9   right.  You can't then say it can never be "one or

05:01   10  more."  Because "all" is a subset of "one or more."

05:01   11             So I don't think it's correct to say that

05:01   12  it can't be "all" or they can't argue -- he can't argue

05:01   13  that I determined that it was not infringing based on

05:01   14  my view of "each" as "all."  He just can't say that it

05:01   15  can't be "one or more."

05:01   16             MS. PIEPMEIER:  If it always has to be

05:01   17  able to be "one or more," it can never be "all," and

05:01   18  that was not Your Honor's construction.

05:01   19             If it always has to be able to be -- if

05:01   20  there always has to be the possibility that it is less

05:01   21  than "all," it can never be "all."  That is the point.

05:01   22             If it always -- if the possibility always

05:01   23  has to exist that it is less than "all," then it is

05:02   24  never "all."  And that was not Your Honor's

05:02   25  construction.

651

05:02  1              Your Honor's construction was not the
05:02  2    plain and ordinary meaning of "each" as "one or more."
05:02  3    And what counsel just said is the possibility always
05:02  4    has to exist that it is less than all, and that is
05:02  5    definitionally saying it can never be "all."  And that
05:02  6    is not what Your Honor's ruling was.
05:02  7              MS. SRINIVASAN:  I just disagree.  I
05:02  8    think the Court said it can include "one or more."  I
05:02  9    don't think that precludes "all."  It just doesn't.
05:02  10             We are -- we don't have an issue with
05:02  11   Mr. Willis being here saying that he viewed "each" as
05:02  12   "all" or he determined noninfringement based on viewing
05:02  13   "each" as "all."  And I think that's what I thought
05:02  14   they wanted to do.  So I don't see that there's an
05:02  15   issue with that.
05:02  16             Obviously Dr. Schaefer's testified that
05:02  17   he viewed it as "one or more."  If -- and so that's
05:02  18   going to be the issue between the experts of how they
05:02  19   interpreted it.
05:03  20             But I think he can do that consistent
05:03  21   with what the Court has already ruled, that it can
05:03  22   include "one or more."  And he took that to mean "all"
05:03  23   when he looked at "each" as a person of one of ordinary
05:03  24   skill in the art determining noninfringement.
05:03  25             THE COURT:  Anything else?

652

05:03    1              MS. PIEPMEIER:  There's a difference

05:03    2    between saying it can include "one or more," which is

05:03    3    that in certain circumstances, maybe it is understood

05:03    4    as "all" and in certain circumstances it is understood

05:03    5    as "one or more."  That is the scenario I thought we

05:03    6    were in.

05:03    7              What I'm hearing now is it must always be

05:03    8    less than "all," because you always have to admit the

05:03    9    possibility that it's "one or more."

05:03   10              If that is the case, then you'll never as

05:03   11    a matter of logic have a situation in which it is

05:03   12    "all."  That was not Your Honor's construction.

05:03   13    Your Honor's construction was that it may be, not that

05:03   14    it must always be able to be "one or more," which is

05:03   15    what counsel here is saying.

05:03   16              If it must always be able to be "one or

05:03   17    more," it is always less than "all."  It is never "all"

05:03   18    just as a matter of logic.  And that was not

05:04   19    Your Honor's construction.

       20              And so we believe that Mr. Willis should

05:04   21    be able to not only say my interpretation -- I'm

05:04   22    sorry -- my analysis of infringement was based on

05:04   23    "all," he should be able to say why.

05:04   24              He should be able to look at Column 5 of

05:04   25    the specification.  He should be able to look at the

653

```
05:04   1    claims, and he should be able to tell the jury why
05:04   2    that's why he made his interpretation that way.  And
05:04   3    that's what he was intending to do this afternoon.
05:04   4                   MR. TRIBBLE:  Your Honor, that's fine
05:04   5    with us.  He can get up there and say that's his
05:04   6    interpretation, and we'll just cross-examine him on it.
05:04   7                   MS. PIEPMEIER:  The --
05:04   8                   THE COURT:  Okay.
05:04   9                   MS. PIEPMEIER:  It is important to note
05:04  10    that this distinction that I'm drawing here results in
05:04  11    a different claim scope.  If it's "all" or if it's "one
05:04  12    or more," that is a different scope of the claims.  And
05:04  13    I think that's why we have a live dispute here as to
05:04  14    the plain and ordinary meaning.
05:04  15                   Thank you, Your Honor.
05:05  16                   THE COURT:  Okay.  "Each" will be for
05:05  17    the -- the jury will decide it.
05:05  18                   MR. TRIBBLE:  Yeah.
05:05  19                   THE COURT:  So we will go back and get
05:05  20    the jury lined up.
05:06  21                   THE BAILIFF:  All rise.
05:06  22                   THE COURT:  Please remain standing for
05:06  23    the jury.
05:06  24                   (Jury entered the courtroom.)
05:07  25                   THE COURT:  Thank you.  You may be
```

654

| | | |
|---|---|---|
| 05:07 | 1 | seated. |
| 05:07 | 2 | DIRECT EXAMINATION |
| 05:07 | 3 | BY MR. HAWKINS: |
| 05:07 | 4 | Q.    Good afternoon, Mr. Willis.  How are you |
| 05:07 | 5 | doing? |
| 05:07 | 6 | A.    Pretty well.  Thank you.  How's the sound |
| 05:07 | 7 | level there? |
| | 8 | Q.    I think it's good. |
| 05:07 | 9 | Well, thank you for being here today. |
| 05:07 | 10 | Mr. Willis, can you please introduce yourself |
| 05:07 | 11 | to the jury? |
| 05:07 | 12 | A.    Sure.  My full name is Edward Dean Willis. |
| 05:07 | 13 | I've gone by Dean my whole life, and I don't know why. |
| 05:07 | 14 | I'm actually from West Texas.  And I don't |
| 05:07 | 15 | mean the place ten miles north of here with the |
| 05:07 | 16 | kolaches, but actual West Texas. |
| 05:07 | 17 | I went to high school in Odessa, Texas.  So if |
| 05:07 | 18 | you've seen Friday Night Lights, that was my life. |
| 05:07 | 19 | I grew up in a house full of computers, |
| 05:08 | 20 | obscure electronics, that I thought everybody had in |
| 05:08 | 21 | the house.  My father taught electronics at the local |
| 05:08 | 22 | junior college and had a radio and TV repair shop in |
| 05:08 | 23 | the house. |
| 05:08 | 24 | Q.    Mr. Willis, where are you living currently? |
| 05:08 | 25 | A.    I currently live in Alpine, Texas, which is |

655

| | | |
|---|---|---|
| 05:08 | 1 | three and a half hours southwest of Odessa.  So I'm |
| 05:08 | 2 | even further west now. |
| 05:08 | 3 | Q.    And, Mr. Willis, what do you -- what do you do |
| 05:08 | 4 | for work? |
| 05:08 | 5 | A.    I have a consulting company called Softarmor |
| 05:08 | 6 | Systems, LLC, also based in Alpine. |
| 05:08 | 7 | Q.    All right.  Mr. Willis, did you prepare any |
| 05:08 | 8 | demonstratives to assist the jury in understanding your |
| 05:08 | 9 | testimony today? |
| 05:08 | 10 | A.    I believe there should be some slides. |
| 05:08 | 11 | Q.    Okay.  And are you able to see those in front |
| 05:08 | 12 | of you? |
| 05:08 | 13 | A.    Yes. |
| 05:08 | 14 | Q.    Okay.  I'd like to start by just talking a |
| 05:08 | 15 | little bit about your background, talking a little bit |
| 05:08 | 16 | about your background. |
| 05:08 | 17 | Where did you go to school? |
| 05:08 | 18 | A.    As an undergraduate, I went to Texas A&M |
| 05:09 | 19 | University and finished up there in 1986.  I then |
| 05:09 | 20 | worked out in industry for a couple of years, and I |
| 05:09 | 21 | went back to graduate school, which I technically |
| 05:09 | 22 | finished in 1994 with a master's degree in computer |
| 05:09 | 23 | science. |
| 05:09 | 24 | Q.    Thank you. |
| 05:09 | 25 | Let's talk about your work experience.  Maybe |

656

05:09  1    it's easiest just to talk between the -- or, you know,

05:09  2    what you did after your bachelor's degree before you

05:09  3    went back to master's.

05:09  4        A.    Okay.  After my bachelor's, I actually

05:09  5    continued working for the university for a while.  I'd

05:09  6    been there for several years as a software developer in

05:09  7    the energy systems lab developing network control

05:09  8    systems for building energy maintenance.

05:09  9            From there I went to a company called Omron

05:09  10   Financial Systems up in Dallas.  Omron was an automatic

05:09  11   teller machine company like Diebold and Olivetti and

05:09  12   those guys.  It was pretty big back in the '80s, but it

05:09  13   dropped out of the business after a while.

05:09  14       Q.    And what did you do after Omron?

05:09  15       A.    I went to work at JCPenney in their data

05:10  16   center up in Dallas.  This was just before JCPenney

05:10  17   moving their headquarters from New York down to Dallas,

05:10  18   but they had a big data center up there.  And I helped

05:10  19   them design their first IP networks and PC local area

05:10  20   networks and developed related applications and

05:10  21   policies and procedures.

05:10  22       Q.    Okay.  And is it my understanding that this is

05:10  23   when you then went back to Texas A&M to get your

05:10  24   master's?

05:10  25       A.    Yes.  After a while at JCPenney, I took a

657

05:10  1    leave and went back to Texas A&M to finish a master's

05:10  2    degree.

05:10  3         Q.   Okay.  Mr. Willis, you said you graduated,

05:10  4    what was it, 1994, is it?

05:10  5         A.   Yes, master's.

05:10  6         Q.   And what did you do after you graduated with

05:10  7    your master's degree in computer science?

05:10  8         A.   Well, after I left Texas A&M, went back to

05:10  9    JCPenney and went back to work more or less at my old

05:10  10   job.

05:10  11        Q.   I actually realized I missed a question.

05:11  12             Did you have any sort of specialization in

05:11  13   your computer science degrees?

05:11  14        A.   Yes.  I did.  Actually, my research area for

05:11  15   my thesis project was in what we call

05:11  16   computer-supported collaborative work,

05:11  17   computer-supported human collaboration.  That's network

05:11  18   and software tools to help people work together more

05:11  19   effectively.

05:11  20             It was done in the what was called the

05:11  21   hypertext lab there, the computer science department at

05:11  22   Texas A&M.  I don't know that the school actually has a

05:11  23   hypertext lab anymore.  They may or may not.

05:11  24             But one of the key things I did as part of

05:11  25   that was work with shared screen editing systems, and

658

05:11  1    we actually implemented a conferencing application.  So

05:11  2    in 1992, I was actually doing telephonic conferencing

05:11  3    over computers in the lab at the school.

05:11  4        Q.    And you said that this was at Texas A&M?

05:11  5        A.    That's correct.

05:11  6        Q.    Okay.  And I'm sorry.  Was this before or

05:12  7    after your second stint at JCPenney?

05:12  8        A.    That was before I went back to JCPenneys.

05:12  9        Q.    Okay.  So you were at the university.  Then

05:12  10   you went back to JCPenney.

05:12  11        What did you do after you left JCPenney?

05:12  12        A.    Well, one of the things I learned when I went

05:12  13   back to JCPenney is it's kind of hard to go home.  I'd

05:12  14   outgrown the operation.

05:12  15        So I went to work for a consulting company, a

05:12  16   little company at the time, called Paranet, that we

05:12  17   grew from 25 people to 2500 people.

05:12  18        But at Paranet, in addition to hiring a whole

05:12  19   lot of people, I got very high-level exposure to

05:12  20   building data networks for companies like Electronic

05:12  21   Data Systems, Sprint, MCI, Department of Defense,

05:12  22   Level 3, as well as more mom-and-pop shops with

05:12  23   Internet firewalls and things of that sort.

05:12  24        But I maintained my interest in collaboration

05:13  25   systems, which at that time were primarily e-mail

659

05:13  1    based.  But we also did related applications for a lot

05:13  2    of people.

05:13  3        Q.    Okay.  And I'm sorry.  So this was still at

05:13  4    Paranet or had --

05:13  5        A.    That's at Paranet.

05:13  6        Q.    Okay.  And then what happened after Paranet?

05:13  7        A.    Well, Paranet was acquired by Sprint, the

05:13  8    phone company.  And I went to work for SIP, for Sprint

05:13  9    for a couple of years.  And while there, I did data

05:13  10   center design and support for some of Sprint's

05:13  11   customers, but I also worked on their early Voice over

05:13  12   IP project called ION.

05:13  13       Q.    Okay.  And can you orient us where we are now

05:13  14   kind of in the timeline?

05:13  15             After you left Sprint, what year was it and

05:13  16   where did you go?

05:13  17       A.    Well, I left Sprint in 1998.  One of the

05:13  18   projects that I had worked on as a Paranet consultant

05:13  19   was a series of projects at MCI, one of those other

05:14  20   alternative phone companies.  And MCI was also up there

05:14  21   in the Richardson area.

05:14  22             So MCI hired me to come be their advisory

05:14  23   engineer to help them figure out how to build Voice

05:14  24   over IP systems and IP telephony, or however you want

05:14  25   to call all of the stuff, and put it together and turn

660

05:14  1    it into actual product for them.  So that was in 1998.

05:14  2        Q.    And how long were you there, Mr. Willis?

05:14  3        A.    I left Sprint in 2001.

05:14  4        Q.    And where did you go after that?

05:14  5        A.    Went to a startup called Dynamic Soft that was

05:14  6    specializing in producing software tools for Internet

05:14  7    telephony and service applications like conferencing

05:14  8    and voicemail and call control.

05:14  9            Paranet was officially in New Jersey, but we

05:14  10   started the Dallas branch of it in my house.  I had 18

05:14  11   people working out of my house in Plano before we got

05:14  12   an office.  It was a bit crazy.

05:15  13       Q.    And then after Dynamic Soft, when did you

05:15  14   leave Dynamic Soft and where did you go?

05:15  15       A.    Well, Dynamic Soft was acquired by Cisco

05:15  16   Systems in 2004.  So I continued to work for Cisco

05:15  17   Systems, also in Richardson, for several years.

05:15  18       Q.    And when we're talking about Cisco Systems,

05:15  19   we're talking about the Cisco Systems that we're here

05:15  20   today?

05:15  21       A.    Same Cisco, yes.

05:15  22       Q.    Okay.  And you said you were there for how

05:15  23   many years?

05:15  24       A.    About two years.

05:15  25       Q.    Okay.  And what did you do after you left

661

05:15  1    Cisco Systems?

05:15  2         A.    So when I left Cisco, I started my own

05:15  3    consulting company, Softarmor Systems, which is where I

05:15  4    still am.

05:15  5         Q.    Okay.  Mr. Willis, can you kind of summarize

05:15  6    what you would say the field that you've been working

05:15  7    in over the past 30 years is?

05:15  8         A.    Well, prior to 30 years ago, I was sort of

05:15  9    doing general IT-type things.

05:15  10        But starting about 30 years ago and from that

05:15  11   time on, I have been quite heavily specialized in

05:16  12   Internet telephony and what we call realtime

05:16  13   communications and Internet multimedia, what we call

05:16  14   streaming media, things like Netflix and that sort of

05:16  15   stuff, as well as conferencing, messaging, and related

05:16  16   applications that sort of still center around this idea

05:16  17   of using computers to help people work together better.

05:16  18        Q.    Okay.  And, Mr. Willis, just briefly, during

05:16  19   your career, have you been a part of any professional

05:16  20   organizations or standards setting organizations?

05:16  21        A.    Sure.  Member of IEEE and a few other

05:16  22   professional organizations.  But I think my -- sort of

05:16  23   my pride and joy, I started while I was at MCI working

05:16  24   heavily with an organization called the Internet

05:16  25   Engineering Task Force, or IETF.

662

05:16  1          The IETF is the standards body for the

05:16  2    Internet.  We put together these complex protocol

05:16  3    specifications that are openly available to anyone to

05:17  4    implement so that Company A's product can work with

05:17  5    Company B's product.

05:17  6          And one of the key things that I did at IETF

05:17  7    was for a full ten years from 1998 through 2008, I

05:17  8    chaired the working group for what's called Session

05:17  9    Initiation Protocol, or SIP.  You've probably heard it

05:17 10    mentioned a few times.

05:17 11          My guys supervised the writing of all of the

05:17 12    specifications around SIP and a whole bunch of

05:17 13    ancillary guides about service documents and how to do

05:17 14    things like voicemail and how to do conferences with it

05:17 15    and this sort of thing.

05:17 16      Q.    Finally here, Mr. Willis, do you have any

05:17 17    patents?

05:17 18      A.    I do.  I have eight patents in the networking

05:17 19    field primarily relating to Voice over IP, to streaming

05:17 20    multimedia, to the provisioning of mobile telephone

05:18 21    devices or telephone terminal adapters like the old

05:18 22    Linksys VoIP phones, things of that sort.

05:18 23          MR. HAWKINS:  Your Honor, at this time

05:18 24    Cisco tenders Mr. Willis as an expert in the

05:18 25    communications field with an emphasis on Voice over IP

05:18   1    and network communications.

05:18   2                    MR. TRIBBLE:  No objection.

05:18   3                    THE COURT:  He'll be admitted as such.

05:18   4    BY MR. HAWKINS:

05:18   5        Q.    Mr. Willis, what is your understanding of why

05:18   6    you're here today?

05:18   7        A.    Well, I understand that I'm here today to

05:18   8    provide technical assessment on several matters

05:18   9    relating to a -- allegations of infringement of a

05:18  10    patent relating to Cisco Webex.

05:18  11        Q.    Mr. Willis, can you give us an overview -- or

05:18  12    I'm sorry.  Can you summarize what your opinions you'll

05:18  13    be discussing with the jury are today?

05:18  14        A.    Sure.  I provided two sets of opinions in my

05:18  15    prior reports and -- that I'll talk about today.

05:18  16              One of those is the question of infringement

05:18  17    or noninfringement, does the Cisco Webex product

05:19  18    infringe the patented matter.  And the other thing that

05:19  19    I opine about is just the technical aspects of the

05:19  20    damages assessment done by Paltalk's expert.

05:19  21              I did not do an independent damages

05:19  22    assessment.  I merely critique the technical aspects of

05:19  23    his.

05:19  24        Q.    Okay.  Mr. Willis, what evidence did you

05:19  25    consider in forming your opinions in this case?

664

05:19  1         A.    Well, first and foremost, I literally have

05:19  2    30 years of experience in this field.  32 now since

05:19  3    I've been working on this.  It was 30 years when I

05:19  4    started this project.  It's 32 years of experience in

05:19  5    it now.

05:19  6              In addition to that, I looked at Webex's

05:19  7    documents and source code that were produced for review

05:19  8    in the case.  I looked at the '858 patent and its

05:19  9    prosecution history.

05:19  10             I looked at the complaint.  I read Paltalk's

05:20  11   allegation of infringement, and I looked at industry

05:20  12   standards, relevant patents, industry journals, old

05:20  13   websites about Webex and conferencing from the time of

05:20  14   the patent, and anything else I could get my hands on.

05:20  15        Q.    Mr. Willis, you said you reviewed Paltalk's

05:20  16   patent that it's asserting in this case, the

05:20  17   '858 patent?

05:20  18        A.    I did.

05:20  19        Q.    In your opinion, what is the invention that is

05:20  20   claimed by the '858 patent?

05:20  21        A.    Sure.  The '858 patent is fairly narrowly

05:20  22   directed to solving a particular configuration of

05:20  23   conferencing clients where we have one set of clients

05:20  24   that have the ability to mix multiple streams of audio

05:20  25   themselves and another set of clients that do not have

05:20  1   the ability to mix a stream of audio, multiple streams

05:21  2   of audio themselves but require assistance doing that

05:21  3   such as via a server.

05:21  4          And in particular, we're talking about an

05:21  5   audioconference that spans those clients, some of which

05:21  6   can mix and some of which cannot mix.

05:21  7       Q.   Mr. Willis, when was the '858 patent

05:21  8   application filed?

05:21  9       A.   Year 2000.

05:21  10      Q.   Okay.  We will talk more about the patent

05:21  11  shortly, but could you just kind of set the stage?

05:21  12  What was happening in the industry kind of right before

05:21  13  the patent issued -- or I'm sorry -- before the patent

05:21  14  application in 2000?

05:21  15      A.   Okay.  Well, as I had mentioned, in 1998, I

05:21  16  joined MCI up in Richardson to work on VoIP systems.

05:21  17  Their head Internet guide is now, I believe, Google's

05:21  18  chief Internet technology evangelist Vint Cerf, had for

05:21  19  several years been promoting the idea that the Internet

05:22  20  was sort of the future of human networking and that in

05:22  21  addition to watching cat videos, we should be able to

05:22  22  do the rest of our communications activities on it.

05:22  23         In particular, he was interested in putting

05:22  24  telephone calls over the Internet.  So he put together

05:22  25  a team to help develop the protocols, standardized

666

05:22  1    that.
05:22  2           And then actually, I had -- by -- before the
05:22  3    year 2000, I had transitioned from that research arena
05:22  4    team into an actual product focus in helping MCI define
05:22  5    and deliver their first Voice over IP protocol or IP
05:22  6    telephony products.
05:22  7    Q.    Mr. Willis, I am not going to ask you to
05:22  8    describe PSTN and VoIP again to the jurors.
05:22  9           The only --
05:22 10    A.    Thank you.
05:22 11    Q.    -- thing I want to know is does the
05:22 12    '858 patent talk about PSTN?
05:22 13    A.    Yes.  The '858 patent talks about PSTN, plain
05:23 14    old telephone networks, and it goes further and talks
05:23 15    about one of the very popular services that was
05:23 16    probably the bane of my existence during those early
05:23 17    days at WorldCom, the telephone conference, which I
05:23 18    spent far too many hours on.
05:23 19           So the '858 patent acknowledges that the
05:23 20    telephone network existed and that it supported
05:23 21    applications like conferencing.
05:23 22    Q.    Okay.  And similarly, what does the
05:23 23    '858 patent say about Voice over IP, or VoIP?
05:23 24    A.    The '858 patent mentions that in recent years,
05:23 25    that possibility of transmitting voice over the

667

05:23  1    Internet had become interesting worldwide.  It talks

05:23  2    about Voice over IP and mentions that it began with

05:23  3    computer scientists experimenting with voice equipment.

05:24  4              That would be me in the lab at Texas A&M in

05:24  5    1992.  And it also talks about using personal

05:24  6    computers, or PCs, equipped with microphones, speakers,

05:24  7    and sound cards.

05:24  8        Q.    Mr. Willis, so the '858 patent talks about

05:24  9    PSTN and VoIP.

05:24  10             But did the '858 patent enable the ability to

05:24  11   include both PSTN and VoIP devices on one

05:24  12   audioconference?

05:24  13       A.    No.  It did not.

05:24  14       Q.    And how do you know that?

05:24  15       A.    Well, I was doing voice conferences with both

05:24  16   PSTN and VoIP equipment in 1998 at MCI.  There were

05:24  17   commercial products available that did this.  It wasn't

05:24  18   a new thing.  There were lots of different ways to

05:24  19   solve that problem, but it's something that we were

05:24  20   dealing with on a daily basis.

05:24  21       Q.    Okay.  Mr. Willis, does the '858 patent talk

05:25  22   about echo suppression?

05:25  23       A.    Yes.  The '858 patent talks about echo

05:25  24   suppression.

05:25  25       Q.    And what does it say about echo suppression?

668

05:25    1      A.    Well, it talks about echo suppression, in

05:25    2   particular here in this quote we've got on the screen,

05:25    3   that as would be apparent to those skilled in the

05:25    4   relevant art, if Party A is an active speaker, then

05:25    5   this particular step of their process will not include

05:25    6   that party's own audio in the stream going back to that

05:25    7   party.

05:25    8         So it acknowledges that echo suppression

05:25    9   exists, that there is an echo problem.  It posits a

05:25   10   particular solution to the echo problem but by no means

05:25   11   is the answer to all possible solutions to that echo

05:25   12   problem.

05:25   13      Q.    Mr. Willis, have you reviewed Paltalk's

05:25   14   allegations that Webex infringes Claims 1 through 5 of

05:26   15   the '858 patent?

05:26   16      A.    I have.

05:26   17      Q.    After reviewing Paltalk's allegations of

05:26   18   infringement against Cisco, what did you conclude?

05:26   19      A.    I actually conclude, based on evaluating

05:26   20   everything that was available to me, that the Cisco

05:26   21   Webex products do not infringe any claims of the

05:26   22   '858 patent.

05:26   23      Q.    All right.  Well, great.  Well, let's start

05:26   24   with your opinion that Cisco doesn't infringe Claim 1,

05:26   25   and we're in the fortunate position that we don't have

669

05:26    1    to go through all of these claims.  We can focus in on

05:26    2    the meaty ones.

05:26    3            I'd like to go directly to Limitation [1.5].

05:26    4            Have you analyzed Paltalk's allegations

05:26    5    regarding Limitation [1.5]?

05:26    6    A.    Yes.  I did.

05:26    7    Q.    What does Limitation [1.5] require,

05:26    8    Mr. Willis?

05:26    9    A.    So I'll read you the text of the limitation,

05:26    10   then sort of explain what it means.

05:26    11           So 1.5 says that the system will be

05:27    12   multiplexing what it calls said packets of audio

05:27    13   received from -- excuse me -- said packets of audio

05:27    14   data received from each client on said active speakers

05:27    15   list into a multiplexed stream.

05:27    16           Now, in plain language, that says that it's

05:27    17   going to take the packets of audio that it got from the

05:27    18   speakers and combine those packets of audio into a

05:27    19   single multiplexed stream potentially so we can do

05:27    20   something else with it.

05:27    21   Q.    And, Mr. Willis, I believe the first time you

05:27    22   read the claim language, you emphasized the word

05:27    23   "each."

05:27    24           Why is that?

05:27    25   A.    Well, as we'll come back to later, if we don't

05:27  1    have all of the inputs received in Claim 1, there's no

05:27  2    reason to do the excluding steps that are taught in

05:27  3    Claims 2 and 3.  We'll come back to that.

05:27  4        Q.   Okay.  Mr. Willis, is there something unique

05:27  5    about the way the '858 patent uses the term "each"?

05:28  6        A.   No.

05:28  7        Q.   Mr. Willis, is it your plain and ordinary --

05:28  8    I'm sorry.

05:28  9             In your opinion, what is the plain and

05:28  10   ordinary meaning of the word "each" as it's used in the

05:28  11   '858 patent?

05:28  12       A.   Well, the way that I've typically used it is

05:28  13   "each" refers to every member of a set taken one at a

05:28  14   time.  That's to say all of a particular group that

05:28  15   you're talking about.  For example, if I said, I took

05:28  16   my boots down to the boot guy and had him shine each of

05:28  17   them, I would think he shined both of my boots.

05:28  18       Q.   Okay.  Mr. Willis, what is your understanding

05:28  19   of this plain and ordinary meaning of "each"?  Where

05:28  20   does that come from?

05:28  21       A.   Well, I have the plain and ordinary meaning of

05:28  22   someone who's been speaking English for 60 years, and I

05:28  23   do a lot of technical discussion in standards work.  So

05:28  24   we're pretty cognizant of the meaning of words and of

05:28  25   this sort that limit or explain things that apply to

671

05:29    1    this whole exercise of explaining how things work.

05:29    2        Q.    In addition to your own personal experience

05:29    3    and understanding of the English language, did you

05:29    4    consult the '858 patent to determine if it uses the

05:29    5    term in the same manner?

05:29    6        A.    Yes.  I did.

05:29    7        Q.    Mr. Willis, did you review the claims of the

05:29    8    '858 patent to see which ones use the word "each"?

05:29    9        A.    Yes.  I did.

05:29    10       Q.    Mr. Willis, we have Claim 1 up here.

05:29    11           How many times does Claim 1 of the '858 patent

05:29    12   use the term "each"?

05:29    13       A.    Five times in that one claim.

05:29    14       Q.    And once again, how did your review of the

05:29    15   claims of the '858 patent inform your decision as to

05:29    16   the plain and ordinary meaning of the term "each" as

05:29    17   used in this patent?

05:29    18       A.    My review of the claims of the '858 patent --

05:30    19   and we'll come back to that, how Claim 1 feeds into

05:30    20   Claim 2 and 3 later -- indicate that we're really

05:30    21   talking about processing all of the packets from the

05:30    22   input clients in Claim 1.

05:30    23       Q.    Okay.  Mr. Willis, did you review the

05:30    24   specification of the '858 patent to see if it used the

05:30    25   word "each"?

672

| | | |
|---|---|---|
| 05:30 | 1 | A.    I did. |
| 05:30 | 2 | MR. HAWKINS:  And actually, Mr. Bress |
| 05:30 | 3 | (sic), could you put up -- I'm sorry. |
| | 4 | BY MR. HAWKINS: |
| 05:30 | 5 | Q.    And your review here of the specification, |
| 05:30 | 6 | we've got up Section 5:44 through 47. |
| 05:30 | 7 | What did this section of the patent inform you |
| 05:30 | 8 | regarding the plain and ordinary meaning of the term |
| 05:30 | 9 | "each"? |
| 05:30 | 10 | A.    Okay.  Well, for starters, this section of the |
| 05:31 | 11 | patent is from what's called the preferred embodiment |
| 05:31 | 12 | of the invention.  It's where the inventors are telling |
| 05:31 | 13 | us how they think the system should work if fully |
| 05:31 | 14 | realized.  Right? |
| 05:31 | 15 | And what it's saying is that in this |
| 05:31 | 16 | particular step, No. 314, the control flow uses the mix |
| 05:31 | 17 | or mux to multiplex the audio stream for all k -- k |
| 05:31 | 18 | being the number of -- active speakers. |
| 05:31 | 19 | So in that step, it goes on to say:  Active |
| 05:31 | 20 | speaker audio data for each and every active speaker is |
| 05:31 | 21 | multiplexed. |
| 05:31 | 22 | That emphasizes to me that this is what I |
| 05:31 | 23 | would use as the normal meaning of "each," which is |
| 05:31 | 24 | every one of a set taken one at a time.  We're going to |
| 05:31 | 25 | multiplex every one of those streams, each and every |

673

05:31  1    stream from an active speaker, into -- well, Patent

05:32  2    1 -- or Claim 1 teaches a little more than we have

05:32  3    printed here.  So I'll stop there.

05:32  4        Q.    Okay.  Mr. Willis, we've also talked about

05:32  5    Claims 2 and 3 in the kind of the -- what we've called

05:32  6    the removing claims.

05:32  7            MR. HAWKINS:  Mr. Bress (sic), could you

05:32  8    put up Claim 1, what we just had up, with Claim 2 and 3

05:32  9    next to it?

05:32  10            Thank you.

      11    BY MR. HAWKINS:

05:32  12        Q.    Mr. Willis, do Claims 2 and 3 make sense to a

05:32  13    person of ordinary skill in the art if "each" doesn't

05:32  14    mean "all"?

05:32  15        A.    No.  Not really.

05:32  16        Q.    Mr. Willis, would it help if you explained why

05:32  17    they don't make sense by using the whiteboard over

05:32  18    here?

05:32  19        A.    Sure.  We could do that.

05:32  20            MR. HAWKINS:  Permission, Your Honor, to

05:32  21    have the witness?

05:33  22        A.    I'll hand this to you.

05:33  23            (Clarification by Reporter.)

05:33  24        A.    Okay.  So I actually sat through the last

05:33  25    period of this trial.  One of the things I've noticed

674

05:33  1    is that no one has actually explained what this patent

05:34  2    is doing.  So I'm going to try to do that in a very

05:34  3    simplistic sort of a model, okay?

05:34  4         So what we have up here is we have some

05:34  5    conferencing clients, maybe phones, maybe PCs, right?

05:34  6    So let's start over here.  I might have -- and I'm not

05:34  7    going to use Alice, Bob, and Charlie.

05:34  8         I have S1, by which I mean Speaker No. 1.

05:34  9    I'll have a second speaker in my demo, Speaker No. 2,

05:34  10   and a listener, L.  That's all we need to demonstrate

05:34  11   what's really going on.

05:34  12        So these guys are participating in this

05:34  13   conference.  And I'll draw this conference server up

05:34  14   here.

05:34  15        Now, I'll note that S1 is going to talk.

05:34  16   They're going to send packets of audio data -- excuse

05:34  17   me.  S1 is going to talk.  When they do that, they're

05:35  18   going to send packets of audio data over the network to

05:35  19   this conference.  Pretty straightforward.

05:35  20        S2 is likewise going to send packets of audio

05:35  21   data into the conference.  And now, L's just listening.

05:35  22   L's not going to send any packets to the conference.

05:35  23   Okay?

05:35  24        Now, what happens is this conference takes in

05:35  25   packets from the centers, and it combines them in some

675

05:35    1    way.  And the mechanism of combining, there's actually
05:35    2    two mechanisms that are taught in the patent.  One is
05:35    3    called mixing and one is called multiplexing.
05:35    4            If you're like a musician and you go to jam
05:35    5    band night at the bar and all the musicians have their
05:35    6    own amplifiers, then that's essentially a multiplexer,
05:35    7    switched audio.
05:35    8            If there's one of those mixing boards, all
05:35    9    their sound is being fixed in the -- fit in the mixing
05:36   10    board where you can adjust the levels and whatnot, and
05:36   11    gets combined into one sound and then sent out to the
05:36   12    PA.  That's basically a mix.
05:36   13            But for the purpose of what I'm explaining
05:36   14    here, we don't really need to think about that.  Okay?
05:36   15            What happens is on the output side -- now,
05:36   16    this is in and this is out sides of the conferencing
05:36   17    unit.  We've got S1, we've got S2, and we have L.  And
05:36   18    these data streams are being -- next life I'm coming
05:36   19    back as an octopus with a lot more hands.
05:36   20            This audio is being taken in the mixer, and it
05:36   21    is being combined into either a mix or a mux.  Doesn't
05:37   22    matter for here.  So it's bringing everything into this
05:37   23    sort of combined space.  Right?  The mixing bowl, if
05:37   24    you want to call it that, and then we're going to take
05:37   25    the data out of here and send it out.

```
05:37   1              So in the basic model taught in Claim 1, what
05:37   2      we're going to do is the sub S1 sent is going to get
05:37   3      sent back out here --
05:37   4                   MR. TRIBBLE:  Excuse me, Your Honor.
05:37   5          A.     -- to S1.
05:37   6                   MR. TRIBBLE:  We want to be able to --
05:37   7          A.     S1 sent is also going to get sent to S2.
05:37   8                   THE COURT:  Excuse me.
05:37   9                   Yes, sir?
05:37  10                   MR. TRIBBLE:  Either I've got to move or
05:37  11      he needs to stand on the other side or --
05:37  12          A.     Let me see if I can reach across.  I need to
05:37  13      be left handed, don't I?
05:37  14              Okay.  And all important, the stuff that S2
05:37  15      sends is going to get sent to listener.  Everybody gets
05:37  16      to listen, right?
05:37  17              Well, the same kind of thing's going to happen
05:37  18      for the stuff that S2 has sent out here.  A copy of
05:38  19      it's going to go to S1, a copy of it is going to go to
05:38  20      S2, and a copy of it is going to go to the listener.
05:38  21      Right?
05:38  22              Whether it's mixed or muxed because it makes
05:38  23      certain that it comes up here.  We haven't talked about
05:38  24      how the system determines which ones of these need
05:38  25      whatever kind of treatment.  That's a different --
```

677

05:38   1    BY MR. HAWKINS:

05:38   2        Q.    Mr. Willis, can I just ask?  So now at this

05:38   3    point, what are you describing in terms of kind of in

05:38   4    relation to the claims?

05:38   5        A.    Okay.  Here we're at the sort of fully

05:38   6    realized version of Claim 1, right, which is teaching

05:38   7    that the audio streams from the various speakers are

05:38   8    being combined in either multiplexed streams -- into

05:38   9    either a multiplexed stream here or a combined mixed

05:38   10   packet here, and that then the system is sending from

05:38   11   that combination the audio out to each of the possible

05:39   12   listeners.

05:39   13           Is that clear?

05:39   14       Q.    That is clear.  And now -- proceed now.

05:39   15   Why -- can you --

        16           (Clarification by Reporter.)

05:38   17   BY MR. HAWKINS:

05:38   18       Q.    Understood.

05:39   19           Now, can you please explain -- you were going

05:39   20   to talk about how Claims -- Claims 2 and 3 wouldn't

05:39   21   make sense if "each" didn't mean "all."

05:39   22       A.    Okay.  So both Claim 2 and 3 teach that we can

05:39   23   remove some audio from what is sent out.

05:39   24           So, for example, we might take this stream

05:39   25   here who is going to S1 and not send it.  Claim 2

678

05:39  1    teaches that not sending operation, or actually

05:39  2    specifically teaches removing that packet from the

05:39  3    stream for the clients that are able to mix themselves.

05:40  4         Claim 3 teaches the same operation, which it

05:40  5    would be removing the data -- it's already been

05:40  6    assembled into a combined packet -- and then sending

05:40  7    that data from the combined packet out to clients but

05:40  8    removing it from at least one of those destinations.

05:40  9    Q.    Okay.  Mr. Willis, you can return to your

05:40  10   seat.

05:40  11        MR. HAWKINS:  This will be -- please let

05:40  12   this be marked as DDX-5.31.

05:40  13   BY MR. HAWKINS:

05:40  14   Q.    And so then just to kind of conclude with

05:41  15   this, so it's your opinion that Claims 2 and 3 wouldn't

05:41  16   make sense to a person of ordinary skill in the art

05:41  17   reading the patent if "each" didn't mean "all" because

05:41  18   there wouldn't be anything to remove in 2 and 3 if it

05:41  19   wasn't added in Claim 1?

05:41  20   A.    Right.  If -- if you don't send the packets to

05:41  21   the listeners in Claim 1, then there's no point in

05:41  22   removing them.  There's nothing to remove in Claim 2

05:41  23   and 3.  And Claim 2 and 3, which they obviously spend a

05:41  24   lot of work on, become redundant and pointless and

05:41  25   there's no reason to have them existing at all.

05:41  1    Q.    Understood.  Thank you.

05:41  2          Okay.  I'd like to flip back to the patent.

05:41  3    Mr. Willis, we talked about this echo suppression

05:41  4    portion of the patent before.

05:42  5          Could you tell us what portion of the patent

05:42  6    this comment is -- or actually, let me step back.

05:42  7          There's been a lot of discussion about this

05:42  8    portion of the specification and how it impacts the

05:42  9    meaning of "each."

05:42  10         Mr. Willis, what part of the specification is

05:42  11   that description of echo suppression in?

05:42  12   A.    Sure.  I may have mentioned this earlier, but

05:42  13   we're talking about the detailed description of the

05:42  14   preferred embodiment.  This is where the patent author

05:42  15   gets to talk about how their patent would operate in a

05:42  16   perfect world, right?

05:42  17         This -- this is the best way to implement my

05:42  18   patent and at least the best way to implement my patent

05:42  19   that explains how the patent works.

05:42  20   Q.    Okay.

05:42  21   A.    It's not a claim.  It doesn't -- you can't

05:42  22   infringe that preferred embodiment.  It just teaches

05:42  23   what that author thought was the best way to build that

05:42  24   system.

05:42  25   Q.    Okay.  And, Mr. Willis, you said you reviewed

05:43   1    the entire patent in helping confirm your understanding

05:43   2    of the terms of the '858 patent?

05:43   3         A.    I did.

05:43   4         Q.    Mr. Willis, I'd like to show you one other

05:43   5    section of the patent.  In fact, this is the last part

05:43   6    of the specification, Column 7, Lines 50 through 54.

05:43   7              Mr. Willis, could you read that portion of the

05:43   8    specification to the jury, please?

05:43   9         A.    Okay.  This says:  Thus, the present

05:43  10    invention -- that's the invention we're talking

05:43  11    about -- should not be limited by any of the above

05:43  12    described exemplary embodiments, but should be defined

05:43  13    only in accordance with the following claims and their

05:43  14    equivalents.

05:43  15         Q.    Mr. Willis, what, if anything, does this

05:43  16    statement in the patent indicate to you in your

05:43  17    analysis of what the plain and ordinary meaning of the

05:43  18    term "each" is?

05:43  19         A.    Well, let's first think about what -- where

05:43  20    this text comes from.  This is the introduction to the

05:43  21    claims, right?  And it tells us that if there's any

05:44  22    doubt about what the claim means, and there -- there

05:44  23    might be accidental conflict or deliberate conflict

05:44  24    between what the claim language says and what the

05:44  25    patent teaches, but this tells us that the claim itself

681

05:44    1    is authoritative, not that description of the preferred

05:44    2    embodiment.

05:44    3        Q.    Were you done?

05:44    4        A.    Yeah.

05:44    5        Q.    All right.  Mr. Willis, I'd like to go on back

05:44    6    to your noninfringement opinion now that we've kind of

05:44    7    talked and squared things away with what your

05:44    8    understanding is of the plain and ordinary meaning of

05:44    9    the term "each."

05:44   10        Once again for the jury, what does Limitation

05:44   11    [1.5] require?

05:44   12        A.    Limitation [1.5] requires multiplexing said

05:44   13    packets of audio data received from each client on said

05:44   14    active speakers' list into a multiplexed stream.

05:45   15        Q.    And I think you already said this is receiving

05:45   16    the audio and multiplexing it into a multiplexed

05:45   17    stream, correct?

05:45   18        A.    That's correct.

05:45   19        Q.    Okay.  Moving on to Limitation [1.6] then,

05:45   20    what does Limitation [1.6] require after [1.5]?

05:45   21        A.    So [1.6] requires sending said multiplexed

05:45   22    stream -- that's the multiplexed stream we just

05:45   23    produced in the previous clause -- to each of said

05:45   24    first subset of the plurality of clients, which that's

05:45   25    this -- that's the set of clients that have the ability

682

05:45  1  to mix for themselves.

05:45  2      Q.    Okay.  Mr. Willis, does Webex send a

05:45  3  multiplexed stream to each of first subset of the

05:45  4  plurality of clients as required by Limitation [6]?

05:45  5      A.    No.  Webex uses a slightly different approach.

05:45  6  Rather than combining all of the incoming data into a

05:45  7  single multiplexed stream and then sending that stream

05:46  8  on to clients, Webex actually buffers the incoming data

05:46  9  and then builds a custom stream for each recipient.

05:46  10     Q.    When you said "for each recipient," that means

05:46  11 all the recipients.  So --

05:46  12     A.    Yeah.  For the recipients.

05:46  13     Q.    Okay.  So if there's five recipients, they're

05:46  14 getting unique streams?

05:46  15     A.    Well, these streams that are sent to listeners

05:46  16 who are not active speakers may be very similar.  And

05:46  17 some, depending on which piece of Webex you're talking

05:46  18 to, they might contain the same data.

05:46  19           The active speakers' streams are always going

05:46  20 to have different data in them.  With encryption and

05:46  21 other things, perhaps all of them are different from

05:46  22 each other.

05:46  23     Q.    All right.  Mr. Willis, I'm going to ask you

05:46  24 to come down here one more time.

05:47  25           Specifically, Mr. Willis, I'd like to show you

683

```
05:47    1    Exhibit 240, which has already been admitted into

05:47    2    evidence.  I'll hand you that.

05:47    3            If you wouldn't mind, Mr. Willis, could you

05:47    4    work with the ELMO just kind of like we did yesterday?

05:47    5    A.    Okay.

05:47    6    Q.    Do we still call it the ELMO?

05:47    7    A.    I may need to get another microphone if I'm

05:47    8    over here.

05:47    9            MS. PIEPMEIER:  Forgive me for

05:47   10    interrupting.  I believe we need to go on the

05:47   11    confidential record if this is source code.

05:47   12            MR. HAWKINS:  I'm sorry.  Yes.

05:47   13            (Sealed proceedings.)
```

684



685



686



```
05:51    1
05:51    2
05:51    3
05:51    4
05:51    5
05:51    6
05:51    7
05:51    8
05:51    9
05:52   10
05:52   11
05:52   12
05:52   13
05:52   14
05:52   15
05:52   16
05:52   17
05:52   18
05:52   19
05:52   20
05:52   21
05:52   22
```

05:52    23          (Sealed proceedings end.)

05:52    24              THE COURT:  Actually, if you'll -- I know

05:52    25    how incredibly entertaining it is for you all to sit

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 05:53 | 1  | here and watch them talk to each other or watch them         |
| 05:53 | 2  | talk to me, especially watch them talk to me.  But I'm       |
| 05:53 | 3  | going to send you home.  And they're going to talk to        |
| 05:53 | 4  | me from where they are, and you're going to go home,         |
| 05:53 | 5  | which it has to be better.                                   |
| 05:53 | 6  | So if you all would be here tomorrow.  I                     |
| 05:53 | 7  | believe we've arranged for lunch.  If you all will be        |
| 05:53 | 8  | here at 11:30.  And then as soon as I can get my             |
| 05:53 | 9  | sentencings done, hopefully -- it usually is about that      |
| 05:53 | 10 | period of time -- then we will -- we'll get started          |
| 05:53 | 11 | hopefully by 12:15 or 12:30.  I plan to go tomorrow          |
| 05:53 | 12 | till about 5:30.                                             |
| 05:53 | 13 | THE BAILIFF:  All rise.                                      |
| 05:53 | 14 | (Jury exited the courtroom.)                                 |
| 05:53 | 15 | THE COURT:  You may be seated.                              |
| 05:54 | 16 | Completely unrelated to this, which I'll                     |
| 05:54 | 17 | get to in a second, my plan is tomorrow whenever I've        |
| 05:54 | 18 | finished sentencings, I'm going to meet with the             |
| 05:54 | 19 | lawyers who are working on the charge.  So if --             |
| 05:54 | 20 | whoever -- if those lawyers -- and only those lawyers        |
| 05:54 | 21 | need to be here, but if you'd be here by about 10:30,        |
| 05:54 | 22 | as soon as I'm done with sentencings, we'll go back and      |
| 05:54 | 23 | we'll resolve the charge.                                    |
| 05:54 | 24 | So I think you have the floor.                               |
| 05:54 | 25 | MR. TRIBBLE:  Your Honor, I object.                          |

688

| | | |
|---|---|---|
| 05:54 | 1 | THE COURT:  I'm sorry.  You can step |
| 05:54 | 2 | down, sir. |
| 05:54 | 3 | MR. TRIBBLE:  I object to the witness. |
| 05:54 | 4 | He keeps asking questions of the jury. |
| 05:54 | 5 | THE COURT:  I was just waiting for you to |
| 05:54 | 6 | object. |
| 05:54 | 7 | MR. TRIBBLE:  Yes. |
| 05:54 | 8 | THE COURT:  That's entirely |
| 05:54 | 9 | inappropriate.  And I don't want to see it again. |
| 05:54 | 10 | And let me make clear.  I mean, I like |
| 05:54 | 11 | hiring good experts.  That's what we all try and find, |
| 05:55 | 12 | but this isn't a conversation with the jury.  This is a |
| 05:55 | 13 | question and testimony. |
| 05:55 | 14 | And if I see it again tomorrow, where he |
| 05:55 | 15 | is essentially turning this into whatever you call what |
| 05:55 | 16 | he was doing from the podium, which was not |
| 05:55 | 17 | testifying -- I don't know what you call it.  There |
| 05:55 | 18 | were no questions -- I will have him sit down.  So I |
| 05:55 | 19 | don't know what you're planning to do, but that's not |
| 05:55 | 20 | the way we're going to run this exchange. |
| 05:55 | 21 | So do you have any other issues? |
| 05:55 | 22 | MR. TRIBBLE:  No, Your Honor. |
| 05:55 | 23 | THE COURT:  Okay.  Anything from the |
| 05:55 | 24 | defendants? |
| 05:55 | 25 | MS. PIEPMEIER:  You will be happy to hear |

689

| | | |
|---|---|---|
| 05:55 | 1 | that my answer is "no" this evening, Your Honor. |
| 05:55 | 2 | THE COURT: I enjoy hearing from you. I |
| 05:55 | 3 | think you're one of the best lawyers I've had the |
| 05:55 | 4 | pleasure of having in my courtroom. So I'm delighted |
| 05:55 | 5 | to have you. |
| 05:55 | 6 | MS. PIEPMEIER: Thank you, Your Honor. |
| 05:55 | 7 | THE COURT: I'm blessed to have -- I |
| 05:55 | 8 | looked forward all week at -- my wife thought I was |
| 05:56 | 9 | nuts. I looked forward all weekend to having these two |
| 05:56 | 10 | firms in my court. I'm very lucky to have a job where |
| 05:56 | 11 | lawyers of this quality are -- not as frequent as I |
| 05:56 | 12 | would like, but pretty frequent, and this has been |
| 05:56 | 13 | great. |
| 05:56 | 14 | So again, tomorrow, the only folks I need |
| 05:56 | 15 | here in the morning are anyone who's going to work on |
| 05:56 | 16 | the jury charge when I finish. If you all would -- if |
| 05:56 | 17 | everyone who's a trial lawyer and the witness would be |
| 05:56 | 18 | here by noon, then we'll get started as soon as I can |
| 05:56 | 19 | get started. |
| 05:56 | 20 | If you are someone who's working on the |
| 05:56 | 21 | charge and you need to eat, bring something with you. |
| 05:56 | 22 | Because I plan to do that here. Because I want to get |
| 05:56 | 23 | like five hours in tomorrow, if we can. |
| 05:56 | 24 | So when Mr. Willis is done, do we have an |
| 05:56 | 25 | invalidity expert? |

690

05:57  1                    MS. PIEPMEIER:  Yes, Your Honor.

05:57  2                    THE COURT:  And after that, damages

05:57  3  expert?

05:57  4                    MS. PIEPMEIER:  That's correct.

05:57  5                    THE COURT:  And then you're done?

      6                    MS. PIEPMEIER:  As far as I know.

05:57  7                    THE COURT:  And then you all, the

05:57  8  plaintiff has -

05:57  9                    MS. SRINIVASAN:  A rebuttal expert for

05:57 10  validity.

05:57 11                    THE COURT:  Okay.

05:57 12                    MS. SRINIVASAN:  And that's it.

05:57 13                    THE COURT:  And again, if I haven't made

05:57 14  clear, the rebuttal is just on the invalidity issue.

05:57 15                    MS. SRINIVASAN:  Yes, Your Honor.

05:57 16                    THE COURT:  And so -- and I'm not picking

05:57 17  on Mr. Bratic, but I've had cases where I've seen the

05:57 18  damages expert for the plaintiff stick around all week

05:57 19  and then be surprised.  What do you mean I'm not going

05:57 20  again?

05:57 21                    So I'm happy to have him here, and I'm

05:57 22  sure he's adding great things to your team and helping

05:57 23  you prepare.  I just -- I've had lawyers get angry.

05:57 24  And Mr. Jones might have been one of them, for all I

05:57 25  know.  And so --

691

05:57  1                    MR. JONES:  No, Your Honor.  I am not one

05:57  2     of those.

05:57  3                    (Laughter.)

05:57  4                    THE COURT:  Thank you all.  I will see

05:57  5     you tomorrow.  Those of you who are working on the jury

05:57  6     charge, I'll see you all tomorrow.  Let me go ahead --

05:57  7                    We can go off the record.

05:58  8                    (Off-the-record discussion.)

       9                    (Hearing adjourned.)

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

692

1   UNITED STATES DISTRICT COURT  )

2   WESTERN DISTRICT OF TEXAS      )

3

4

5                    I, Kristie M. Davis, Official Court

6   Reporter for the United States District Court, Western

7   District of Texas, do certify that the foregoing is a

8   correct transcript from the record of proceedings in

9   the above-entitled matter.

10                   I certify that the transcript fees and

11  format comply with those prescribed by the Court and

12  Judicial Conference of the United States.

13                   Certified to by me this 6th day of

14  September 2024.

15
                               /s/ Kristie M. Davis
16                             KRISTIE M. DAVIS
                               Official Court Reporter
17                             PO Box 20994
                               Waco, Texas 76702
18                             (254) 666-0904
                               kmdaviscsr@yahoo.com
19

20

21

22

23

24

25