1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                      WACO DIVISION

3    PALTALK HOLDINGS, INC.   *    August 28, 2024
                             *
4    VS.                     *  CIVIL ACTION NO. 6:21-CV-757
                             *
5    CISCO SYSTEMS, INC.      *

6         BEFORE THE HONORABLE ALAN D ALBRIGHT
                  TRIAL PROCEEDINGS
7                 Volume 3 of 4

8    APPEARANCES:

9    For the Plaintiff:   Max L. Tribble, Jr., Esq.
                          Ryan V. Caughey, Esq.
10                         Amber Brianna Magee, Esq.
                          Susman Godfrey LLP
11                         1000 Louisiana Street, Suite 5100
                          Houston, TX 77002
12
                          Kalpana Srinivasan, Esq.
13                         Susman Godfrey LLP
                          1900 Avenue of the Stars, Ste 1400
14                         Los Angeles, CA 90067-6029

15                         Mark Siegmund, Esq.
                          Cherry Johnson Siegmund James, PLLC
16                         The Roosevelt Tower
                          400 Austin Avenue, 9th Floor
17                         Waco, Texas 76701

18   For the Defendant:   Sarah E. Piepmeier, Esq.
                          Elise Edlin, Esq.
19                         Nate Sabri, Esq.
                          Karl Johnston, Esq.
20                         Perkins Coie LLP
                          505 Howard Street
21                         San Francisco, CA 94117

22                         Ryan Hawkins, Esq.
                          Abigail Ann Gardner, Esq.
23                         Perkins Coie LLP
                          11452 El Camino Real, Suite 300
24                         San Diego, CA 92130

25

694

```
 1                        Jessica J. Delacenserie, Esq.
                          Perkins Coie LLP
 2                        1201 Third Ave., Suite 4900
                          Seattle, WA 98101
 3
                          Andrew T. Dufresne, Esq.
 4                        Perkins Coie LLP
                          33 E. Main Street, Suite 201
 5                        Madison, WI 53703

 6                        Michael E. Jones, Esq.
                          Shaun William Hassett, Esq.
 7                        Potter Minton PC
                          102 North College, Suite 900
 8                        Tyler, TX 75702

 9                        Jonathan Irvin Tietz, Esq.
                          Perkins Coie LLP
10                        700 13th St. NW, Suite 800
                          Washington, DC 20005
11
      Court Reporter:     Kristie M. Davis, CRR, RMR
12                        PO Box 20994
                          Waco, Texas 76702-0994
13                        (254) 340-6114

14        Proceedings recorded by mechanical stenography,

15    transcript produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

12:30

695

| | | |
|---|---|---|
| 12:32 | 1 | (Hearing begins.) |
| 12:32 | 2 | THE BAILIFF:  All rise. |
| 12:32 | 3 | THE COURT:  You may be seated. |
| 12:32 | 4 | I understand we have some issues? |
| 12:32 | 5 | MS. SRINIVASAN:  Your Honor, we have one |
| 12:32 | 6 | issue from yesterday's testimony of Mr. Willis. |
| 12:32 | 7 | Specifically, Mr. Willis was instructing |
| 12:32 | 8 | the jury or testifying in a way that is inconsistent |
| 12:32 | 9 | with the law on the issue of preferred embodiment.  And |
| 12:32 | 10 | what he said is if there's any kind of conflict or |
| 12:32 | 11 | there can be something that conflicts with the claims, |
| 12:32 | 12 | the preferred embodiment effectively can be ignored, |
| 12:32 | 13 | and that's obviously inconsistent with the law. |
| 12:32 | 14 | I'm not really sure that he should be |
| 12:32 | 15 | testifying about that at all, but to the extent he's |
| 12:32 | 16 | given the jury the impression they can disregard the |
| 12:32 | 17 | preferred embodiment in looking at the claims, we think |
| 12:32 | 18 | that's a problem based on his testimony yesterday. |
| 12:33 | 19 | And, Your Honor, we would propose a |
| 12:33 | 20 | curative instruction in light of his testimony. |
| 12:33 | 21 | MR. HAWKINS:  Your Honor, I don't know |
| 12:33 | 22 | what the specific testimony is that he's talking -- or |
| 12:33 | 23 | that counsel's talking about.  Mr. Willis referred to |
| 12:33 | 24 | the specification that stated the inventor's preference |
| 12:33 | 25 | for using the claim language over the specification. |

| | | |
|---|---|---|
| 12:33 | 1 | That's all I can think of. |
| 12:33 | 2 | THE COURT:  Do you have -- does plaintiff |
| 12:33 | 3 | have the specific citation in the record where he said |
| 12:33 | 4 | it? |
| 12:33 | 5 | MS. SRINIVASAN:  I do, Your Honor. |
| 12:33 | 6 | THE COURT:  Could you read to me what |
| 12:33 | 7 | you're unhappy -- |
| 12:33 | 8 | MS. SRINIVASAN:  Sure.  He says -- he |
| 12:33 | 9 | says -- he's asked to read:  Does this statement in the |
| 12:33 | 10 | patent -- and we're at 680 on yesterday's transcript, |
| 12:33 | 11 | starting at Line 8. |
| 12:33 | 12 | He says:  Mr. Willis, what, if anything, |
| 12:33 | 13 | does this statement in the patent indicate to you in |
| 12:33 | 14 | your analysis of what the plain and ordinary meaning of |
| 12:33 | 15 | the term "each" is? |
| 12:33 | 16 | And he said:  Well, let's first think |
| 12:34 | 17 | about what -- where this text comes from.  This is the |
| 12:34 | 18 | introduction to the claims, right?  And it tells us if |
| 12:34 | 19 | there's any doubt about what the claims mean, and there |
| 12:34 | 20 | might be accidental conflict or deliberate conflict |
| 12:34 | 21 | between what the claim language says and what the |
| 12:34 | 22 | patent teaches, but this tells us that the claim itself |
| 12:34 | 23 | is authoritative, not the description of the preferred |
| 12:34 | 24 | embodiment. |
| 12:34 | 25 | And, Your Honor, we just -- there's a |

12:34  1    section above it as well where he is -- on Page 679,

12:34  2    where he's asked:  Mr. Willis, what part of the

12:34  3    specification is that description of echo suppression

12:34  4    in?

12:34  5              I may have mentioned this earlier, but

12:34  6    we're talking about the detailed description of the

12:34  7    preferred embodiment.  This is where the patent author

12:34  8    gets to talk about how their patent would operate in a

12:34  9    perfect world, right?

12:34  10             This is the best way to implement my

12:34  11   patent and at least the best way to implement my patent

12:34  12   that explains how the patents work.  It's not a claim.

12:34  13   It doesn't -- you can't infringe that preferred

12:35  14   embodiment.  It just teaches what that author thought

12:35  15   was the best way to build that system.

12:35  16             We think, Your Honor, if you take those

12:35  17   statements in combination, his implication to the

12:35  18   jury -- and frankly, I'm not sure why he's testifying

12:35  19   about how to interpret a preferred embodiment anyway,

12:35  20   which is a legal issue.

12:35  21             The implication to the jury is that it

12:35  22   has no relevance for looking at the claims and that --

12:35  23   that again, that's a legal issue that he shouldn't be

12:35  24   testifying about.

12:35  25             And is also incorrect as a matter of law.

698

| | | |
|---|---|---|
| 12:35 | 1 | MR. HAWKINS:  Your Honor, there was no |
| 12:35 | 2 | objection to this yesterday, and the specific quote |
| 12:35 | 3 | from the patent that Mr. Willis was referencing was: |
| 12:35 | 4 | Thus, the present invention should not be limited by |
| 12:35 | 5 | any of the above described exemplary embodiments which |
| 12:35 | 6 | should be defined only in accordance with the following |
| 12:35 | 7 | claims and their equivalents. |
| 12:35 | 8 | And he stated how he interpreted that |
| 12:35 | 9 | statement in light of the rest of the patent. |
| 12:35 | 10 | MS. SRINIVASAN:  Your Honor, I don't |
| 12:35 | 11 | think he can be saying things like this is a -- this is |
| 12:36 | 12 | what would happen in a perfect world, you can't |
| 12:36 | 13 | infringe a preferred embodiment, and basically |
| 12:36 | 14 | suggesting it's disconnected from the claims because |
| 12:36 | 15 | that's not the law.  The claims are to be interpreted |
| 12:36 | 16 | in a manner which would not read out a preferred |
| 12:36 | 17 | embodiment. |
| 12:36 | 18 | And so his testimony is inconsistent with |
| 12:36 | 19 | what the law is, and I don't think the jury should be |
| | 20 | left with the impression that he is giving them |
| 12:36 | 21 | guidance on what he can -- what they can take away from |
| 12:36 | 22 | a preferred embodiment.  That's not his role. |
| 12:36 | 23 | THE COURT:  I'm going to overrule the |
| 12:36 | 24 | objection. |
| 12:36 | 25 | Anything else? |

699

| | | |
|---|---|---|
| 12:36 | 1 | MS. SRINIVASAN:  No, Your Honor. |
| 12:36 | 2 | THE COURT:  Bob, if you'd bring the jury |
| 12:36 | 3 | in. |
| 12:37 | 4 | THE BAILIFF:  All rise. |
| 12:37 | 5 | (Jury entered the courtroom.) |
| 12:37 | 6 | THE COURT:  Thank you.  You may be |
| 12:37 | 7 | seated. |
| 12:37 | 8 | Counsel? |
| 12:37 | 9 | MR. HAWKINS:  Your Honor, we call |
| 12:38 | 10 | Mr. Willis back to the stand. |
| 12:38 | 11 | Good afternoon, Your Honor.  Just one |
| 12:38 | 12 | housekeeping item with an exhibit.  Yesterday I |
| 12:38 | 13 | identified the drawing Mr. Willis did as DDX-5.31.  I |
| 12:38 | 14 | wanted to correct the record that it should actually be |
| 12:38 | 15 | DDX-4.33.  We also served a copy of this on counsel |
| 12:38 | 16 | earlier this morning. |
| 12:38 | 17 | DIRECT EXAMINATION CONTINUED |
| 12:38 | 18 | BY MR. HAWKINS: |
| 12:39 | 19 | Q.    Thank you, Mr. Willis, for being here again. |
| 12:39 | 20 | I hope you had a pleasant evening. |
| 12:39 | 21 | A.    Yes.  I did.  Thank you. |
| 12:39 | 22 | Q.    Are you ready to pick up? |
| 12:39 | 23 | A.    Yes.  I am. |
| 12:39 | 24 | Q.    All right.  Mr. Willis, I'd like to start by |
| 12:39 | 25 | just quickly setting the stage of where we were |

—700—

12:39  1    yesterday when we stopped for the evening.

12:39  2         Mr. Willis, once again, what is your

12:39  3    understanding of the meaning of the term "each" as it's

12:39  4    used in the '858 patent?

12:39  5    A.    In every instance I identified of the use of

12:39  6    the word "each" in the '858 patent, it has meant or I

12:39  7    have taken it to mean each and every one of a set.

12:39  8    Q.    And just to confirm your opinion on that term,

12:39  9    you formed that after reviewing the entirety of the

12:39  10   patent?

12:39  11   A.    Yes.

12:39  12   Q.    And that includes the specification?

12:39  13   A.    Yes.

12:39  14   Q.    And that includes the claims?

12:39  15   A.    Yes.

12:39  16   Q.    All right.  Mr. Willis, did your analysis

12:40  17   consider the Court's order that Dr. Schaefer spoke

12:40  18   about yesterday?

12:40  19   A.    Yes.  It did.

12:40  20   Q.    And, Mr. Willis, can you explain to the jury

12:40  21   your understanding of what this order means in relation

12:40  22   to how you performed your analysis of the term "each"?

12:40  23   A.    I understand that the Court has constructed

12:40  24   the term "each" to have the property that it can

12:40  25   include "one or more."  So "one or more" means it might

—701—

12:40  1   include one or it might include anything more than one.

12:40  2   Two, six, everything.

12:40  3         The interpretation has to be made from the

12:40  4   context in which it is used.  The surrounding language,

12:40  5   the way it's used in other parts of the document.  And

12:40  6   by -- that's my interpretation of the construction or

12:40  7   understanding of the construction.

12:40  8      Q.    And so in light of the Court's order that

12:40  9   "each" has a plain and ordinary meaning which can

12:40  10  include "one or more," you considered that and still

12:41  11  determined that it means "all" or "every" or every one

12:41  12  of the set; is that correct?

12:41  13        MR. TRIBBLE:  Objection, leading.

12:41  14  BY MR. HAWKINS:

12:41  15     Q.    Mr. Willis, could you just once again confirm

12:41  16  what your opinion is regarding --

12:41  17     A.    Yes.  I determined that as my understanding of

12:41  18  the construction, "each" can mean "one more" or

12:41  19  "everything."  So I assessed it in place based on the

12:41  20  supporting language as to how I would understand it in

12:41  21  the context of the '858 patent.

12:41  22     Q.    Thank you, Mr. Willis.

12:41  23        Mr. Willis, once again, you have reviewed

12:41  24  Paltalk's allegation that Webex infringes Claims 1

12:41  25  through 5 of the '858 patent?

—702—

```
12:41   1        A.    I have.

12:41   2        Q.    And after reviewing Paltalk's allegations of

12:41   3    infringement against Cisco, what did you conclude?

12:41   4        A.    In my opinion, the Cisco Webex product does

12:41   5    not infringe claims of the -- or the asserted claims of

12:41   6    the Paltalk '858 patent.

12:41   7        Q.    All right.  And just as I said yesterday,

12:42   8    we're going to jump right to the meat of this dispute

12:42   9    here.  I want to talk about your opinion regarding

12:42   10   Limitations [1.5] and [1.6] first.

12:42   11           Mr. Willis, what does Limitation [1.5]

12:42   12   require?

12:42   13       A.    Well, [1.5] reads:  Multiplexing said packets

12:42   14   of audio data received from each client on said active

12:42   15   speakers list into a multiplexed stream.

12:42   16       Q.    And can you provide your opinion to the Court?

12:42   17       A.    Sure.

12:42   18       Q.    I'm sorry.  To the jury about what that means?

12:42   19       A.    In short, we've received some packets of audio

12:42   20   from the active speakers.  That's the said packets of

12:42   21   audio or said packets of audio data.

12:42   22           Obviously, each of those active speakers is on

12:42   23   the -- each is on the active speakers list in this

12:42   24   claim.  So that's the said active speakers list.  And

12:42   25   Claim 5 talks about multiplexing those packets that
```

12:43  1    have been received into a singular -- a multiplexed

12:43  2    stream.

12:43  3         Q.    So could you just clarify?

12:43  4               So "a multiplexed stream," what does that

12:43  5    indicate to you?

12:43  6         A.    That it's into one multiplexed stream.

12:43  7         Q.    Thank you.

12:43  8               So then moving on, could you remind us what

12:43  9    Limitation [1.6] requires?

12:43  10        A.    Okay.  The wording of [1.6] is sending said

12:43  11   multiplexed stream to each of said first subset of a

12:43  12   plurality of clients.

12:43  13        Q.    And once again, can you kind of explain that

12:43  14   in more simple terms to the jury?

12:43  15        A.    Sure.  There's two "saids" we have to

12:43  16   interpret.  We're sending said multiplexed stream.

12:43  17   That's the multiplexed stream we created at the end of

12:43  18   Step 5.  And we are sending that multiplexed stream to

12:43  19   each of said first subset of the plurality of clients.

12:43  20   That's the clients that have the ability to mix with

12:44  21   themselves.

12:44  22               So in plain language, 6 is talking about

12:44  23   sending the previously constructed multiplexed stream

12:44  24   to the clients that are able to receive a multiplexed

12:44  25   stream.

```
12:44   1        Q.    And how many of those clients have to receive

12:44   2   that multiplexed stream?

12:44   3        A.    In this -- due to requirements from Claim 2

12:44   4   having -- needing something to remove, all of them

12:44   5   receive it.

12:44   6        Q.    Okay.  Now, Mr. Willis, does Webex send a

12:44   7   multiplexed stream to each of said first subset of the

12:44   8   plurality of clients as required by Limitation [6]?

12:44   9        A.    No.  It does not.

12:44  10        Q.    Okay.  What does Webex do if -- instead if it

12:44  11   doesn't send a multiplexed stream to each of first

12:44  12   subset of the plurality of clients?

12:44  13        A.    Well, Webex has, rather than a single

12:44  14   multiplexed stream that is sent to all of the clients,

12:45  15   Webex produces multiple unique multiplexed streams.

12:45  16        Q.    Mr. Willis, yesterday we had just started

12:45  17   having you walk through some source code when we

12:45  18   stopped for the day.  I'm sure everyone was probably

12:45  19   pretty happy that they got to get out of here without

12:45  20   having to hear more of that.

12:45  21             Unfortunately, I do want to go through just a

12:45  22   little bit more of that hopefully very briefly.  And I

12:45  23   think today what we'll do is I'm going to put this up

12:45  24   here.

12:45  25             MR. HAWKINS:  We have the --
```

705

```
12:45    1                        Again?  Yes, sorry.
12:45    2                        Your Honor, at this time we're going to
12:45    3    be talking about source code, and I would request that
12:45    4    we go on the confidential record.
12:45    5                        THE COURT:  If you're not under the
12:45    6    protective order, please exit the courtroom.
12:45    7                        (Sealed proceedings.)
```





707







| 12:51 | 1 | |
| 12:51 | 2 | |
| 12:51 | 3 | |
| 12:51 | 4 | |
| 12:51 | 5 | |
| | 6 | |
| 12:51 | 7 | |
| 12:51 | 8 | |
| 12:51 | 9 | |
| 12:51 | 10 | |
| 12:51 | 11 | |
| 12:51 | 12 | |
| 12:51 | 13 | |
| 12:51 | 14 | |
| 12:51 | 15 | |
| 12:51 | 16 | |
| 12:51 | 17 | |
| 12:51 | 18 | |
| 12:51 | 19 | |
| 09:42 | 20 | (Sealed proceedings end.) |
| 12:51 | 21 | BY MR. HAWKINS: |
| 12:52 | 22 | Q.   And just to kind of wrap that up there, what |
| 12:52 | 23 | about the code and the testimony led you to that |
| 12:52 | 24 | conclusion that the Webex products does not meet the |
| 12:52 | 25 | limitation of [1.6]? |

```
12:52   1        A.    Well, [1.6] talks about sending said
12:52   2   multiplexed stream -- that's one stream -- to the
12:52   3   plurality of clients that are able to receive that
12:52   4   stream.  That's a said subset.
12:52   5        Instead of sending that one stream to a
12:52   6   multiplicity of clients, all of the clients, Webex
12:52   7   sends unique streams to each active listener.  There
12:52   8   are many streams as opposed to stream.
12:52   9        Q.    Thank you, Mr. Willis.
12:52  10        So moving on, now I'd like to talk about
12:52  11   Limitations [1.7] and [1.8] kind of quickly here.
12:53  12        What does [1.7] require?
12:53  13        A.    [1.7] is somewhat similar to [1.5], but the
12:53  14   text of it says:  Mixing said packets of audio data
12:53  15   received from each client on said active speakers list
12:53  16   into one combined packet.
12:53  17        So as I did earlier, said packets of audio
12:53  18   data received to each client on said active speakers
12:53  19   list, that's the audio data samples that have come in
12:53  20   from the active speakers who have spoken in the
12:53  21   proceeding in that interval.
12:53  22        And the claim talks about taking that audio
12:53  23   data that they've sent, mixing it into one combined
12:53  24   packet, standard simple mixing operation.
12:53  25        Q.    And then could you -- moving on to Limitation
```

12:53  1    [1.8], what does Limitation [1.8] require?

12:53  2        A.    [1.8] is fundamentally similar to [1.6] and

12:53  3    says:  Sending said combined packet to each of said

12:54  4    second subset of the plurality of clients.

12:54  5        So here the "said combined packet" is the

12:54  6    packet we produced, the combined packet we produced in

12:54  7    the preceding step.

12:54  8        The second subset or said second subset of the

12:54  9    plurality of clients is that group of clients that do

12:54  10   not have the ability to mix on their own and needed the

12:54  11   system to mix for them.

12:54  12       So here we are sending that one singular

12:54  13   combined packet produced in Step 7 to each of the

12:54  14   clients that need to get that type of packet.

12:54  15       Q.    Thank you, Mr. Willis.

12:54  16       And -- and could you just clarify the said

12:54  17   combined packet in Limitation [8], which -- what does

12:54  18   that mean?

12:54  19       The use of that word "said" is a little odd.

12:54  20       A.    Okay.  So "said" means it's been previously

12:54  21   referred to in the -- in the text above it, right?

12:55  22       And here we're saying "said combined packet,"

12:55  23   that's literally referring back to the end of Element

12:55  24   [7] where we have into one combined packet.

12:55  25       So the one combined packet that is being

                                                                    —712—

12:55    1    produced in Step 7 is being referred to in Step 8 and

12:55    2    then sent in Step 8 to each of the clients.

12:55    3        Q.    All right.  Thank you.

12:55    4            So, Mr. Willis, does Webex ever send a

12:55    5    combined packet -- I'm sorry -- send that combined

12:55    6    packet to each of said second subset of a plurality of

12:55    7    clients as is required by Limitation [1.8]?

12:55    8        A.    No.  It does not.

12:55    9        Q.    Once again, what does Webex do that is

12:55   10    different in regards to this if it doesn't send the

12:55   11    said combined packet to each of the second subset?

12:55   12        A.    Well, as we did in [1.6], the packets that are

12:56   13    sent to speakers that are on the active speaker list do

12:56   14    not contain the data that would have been spoken or

12:56   15    sent by the active speaker.  Therefore, they are

12:56   16    different packets.  It's not one combined packet.

12:56   17    There are multiple combined packets with each speaker

12:56   18    getting a different combined packet.

12:56   19        Q.    All right.  Mr. Willis, what evidence have you

12:56   20    relied on in forming your opinion that Webex never

12:56   21    sends the combined packets to each of the second subset

12:56   22    of clients?

12:56   23        A.    Well, primarily I have relied on my reading of

12:56   24    the Webex source code.  I also rely on the testimony of

12:56   25    the Cisco fact witnesses who said that they don't do

12:56  1    that, as I understand it.

12:56  2            I may have gotten ahead of myself.  Would you

12:56  3    repeat the question?

12:56  4        Q.    Sure.

12:56  5            What was the evidence you relied on in forming

12:57  6    your opinion that Webex never sends the combined packet

12:57  7    to each of the second subset?

12:57  8            So you had talked about the source code.

12:57  9        A.    I relied on the analysis of the source code.

12:57  10       Q.    And is there any other evidence that you have

12:57  11   relied on in forming your opinion that Webex never

12:57  12   sends the combined packet to each of the second subset?

12:57  13       A.    Well, it's consistent with the behavior that

12:57  14   I've observed, but I wouldn't say that I've relied on

12:57  15   it.

12:57  16       Q.    Mr. Willis, were you in court yesterday, and

12:57  17   did you hear the testimony of Mr. Buckles and

12:57  18   Mr. Belcher?

12:57  19       A.    Yes.

12:57  20       Q.    And did they provide any testimony that would

12:57  21   support your opinion regarding --

12:57  22       A.    Oh, yes.

12:57  23       Q.    -- Claim Limitation 1. --

12:57  24       A.    Oh.  So as I mentioned earlier, the Cisco fact

12:57  25   witnesses said in particular that they never send a

```
12:57   1    speaker's own audio back to them.
12:57   2            So if that one combined packet were being sent
12:57   3    back to each speaker, that speaker would in fact be
12:58   4    getting that own audio sent back to them.  Cisco says
12:58   5    they never do it.  Therefore, that supports this in
12:58   6    construction of Claim 7.
12:58   7        Q.    Claim 7, or --
12:58   8        A.    Excuse me.  Claim Element [7] and [8] of
12:58   9    Claim 1.
12:58   10       Q.    Okay.  In conclusion, how did your analysis of
12:58   11   Limitation [1.8] of the '858 patent impact your opinion
12:58   12   of whether Cisco infringes the '858 patent?
12:58   13       A.    Well, since the Cisco Webex product, as far as
12:58   14   I can tell, does not send said combined packet to each
12:58   15   of said second subset of plurality of clients, it does
12:58   16   not infringe Element [1.8].
12:58   17       Q.    Okay.  Mr. Willis, I appreciate your testimony
12:58   18   here.
12:58   19            Now that you've walked us through the
12:58   20   limitations in Claim 1 that you contend are not
12:59   21   practiced by the Webex products, what is your overall
12:59   22   opinion regarding infringement of Claim 1?  Let's start
12:59   23   there.
12:59   24       A.    In my opinion, the Cisco Webex product does
12:59   25   not infringe Claim 1 of the Paltalk '858 patent.
```

| | | |
|---|---|---|
| 12:59 | 1 | Q.    Okay.  And how does that conclusion impact |
| 12:59 | 2 | your analysis of the rest of the asserted claims, |
| 12:59 | 3 | Claims 2 through 5? |
| 12:59 | 4 | A.    Well, as I understand the arrangement of |
| 12:59 | 5 | patents, the Claims 2 through 5 are considered to be |
| 12:59 | 6 | dependent on Claim 1. |
| 12:59 | 7 | Claim 1 is an independent claim.  2 through 5 |
| 12:59 | 8 | are independent -- are dependent claims. |
| 12:59 | 9 | And as it has been explained to me, a |
| 12:59 | 10 | product -- an independent claim must be infringed for |
| 12:59 | 11 | the dependent claims that are based on it to be |
| 12:59 | 12 | infringed.  That's to say, you can't infringe Claim 1 |
| 01:00 | 13 | without infringing -- or you can't infringe Claim 2 |
| 01:00 | 14 | without infringing Claim 1.  And since we don't |
| 01:00 | 15 | infringe or Webex doesn't infringe Claim 1, it cannot |
| 01:00 | 16 | infringe Claim 2. |
| 01:00 | 17 | Q.    And what about Claim 3? |
| 01:00 | 18 | A.    Claim 3 is likewise a dependent claim.  So if |
| 01:00 | 19 | we -- Webex does not infringe Claim 1, then it cannot |
| 01:00 | 20 | infringe Claim 3. |
| 01:00 | 21 | Q.    And I'll go ahead and summarize. |
| 01:00 | 22 | Is the same true for 4 and 5? |
| 01:00 | 23 | A.    The same is true for 4 and 5. |
| 01:00 | 24 | Q.    All right.  So one last time, Mr. Willis, what |
| 01:00 | 25 | is your ultimate conclusion as to whether or not Cisco |

716

01:00  1    infringes the '858 patent?

01:00  2        A.    It is my opinion that Cisco Webex does not

01:00  3    infringe any of the asserted claims of the '858 patent.

01:00  4        Q.    All right.  Thank you, Mr. Willis.

01:00  5             Mr. Willis, in addition to your opinion that

01:01  6    Cisco does not infringe Claims 1 through 5 of the '858

01:01  7    patent, what other opinions did you provide here?

01:01  8        A.    Well, I was asked to provide some information

01:01  9    on possible noninfringing alternatives and to do a

01:01  10   technical analysis of Dr. Schaefer's technical

01:01  11   valuation of the allegedly infringing functions from

01:01  12   Patent '858 and to do a technical analysis of

01:01  13   Dr. Schaefer's feature analysis.

01:01  14             I didn't actually do an independent analysis.

01:01  15   I merely comment on Dr. Schaefer's.  In addition to

01:01  16   that, I discuss technically comparable licenses that

01:01  17   may be involved.

01:01  18       Q.    Okay.  Let's start at the beginning there.

01:01  19   So, Mr. Willis, you mentioned noninfringing

01:01  20   alternatives.

01:01  21             What is your understanding of what a

01:02  22   noninfringing alternative is?

01:02  23       A.    A noninfringing alternative is another way

01:02  24   that the accused product could have been built or

01:02  25   designed at the time involved, or at the relevant time,

01:02    1    that alternate method being such that it would not

01:02    2    infringe the patent if the patent were to be deemed

01:02    3    valid and infringed by the current product.

01:02    4    Q.    And what is your understanding of how this

01:02    5    analysis of noninfringing alternatives is going to be

01:02    6    used in this case?

01:02    7    A.    As I understand it, it may have some influence

01:02    8    on the evaluation of licensing fees and damages.  I'm

01:02    9    not a damages expert.  So I can't really speak to that.

01:02    10    Q.    Understood.  Thank you.

01:02    11         So, Mr. Willis, let's talk about these

01:02    12    noninfringing alternatives on this analysis that you

01:02    13    did.

01:02    14         Did you have any opinions as to whether there

01:02    15    are noninfringing alternatives to the '858 patent that

01:03    16    Cisco could have implemented as of January 2004?

01:03    17    A.    Yes.  I did.

01:03    18    Q.    And what are those alternatives?

01:03    19    A.    So I identified two such in my report.  The

01:03    20    first proposed noninfringing alternative is sending

01:03    21    only one active speaker's audio to clients at any given

01:03    22    time.

01:03    23    Q.    Well, let's start there.

01:03    24         Could you further explain what you mean by

01:03    25    this alternative of sending one active speaker's audio

718

01:03  1    as an alternative, I should say?

01:03  2       A.    Sure.  Many conferences -- conference systems

01:03  3    in the past have used a model of only allowing one

01:03  4    speaker at any given time.  You can't talk over someone

01:03  5    else.  A lot of conferences actually run that way.  For

01:03  6    example, the conference products are often used in

01:03  7    schoolrooms where teachers have it set up where

01:03  8    students have to raise their hands to talk.  Only one

01:04  9    person's allowed to talk at a time.

01:04  10          So Cisco could implement that in the code by

01:04  11   simply changing the calculation of the number of active

01:04  12   speakers that Cisco's fact witnesses told us about

01:04  13   yesterday to where they select the most active speaker

01:04  14   to be the active speaker, and that's the only stream

01:04  15   that gets sent at that time.

01:04  16      Q.    So instead of sending, for instance, three

01:04  17   active speakers, we only ever send one at a time.

01:04  18          Thank you.

01:04  19          Mr. Willis, would that change be difficult for

01:04  20   Cisco to have implemented in 2004?

01:04  21      A.    No.  It would not.

01:04  22      Q.    And why do you believe that that would have

01:04  23   been -- not have been difficult for Cisco to have

01:04  24   implemented in 2004?

01:04  25      A.    Well, I've looked at the code and thought

01:04  1   about possibly ways you could make changes to it.

01:04  2   Cisco's fact witnesses talk about how they calculate

01:04  3   the number of active speakers.

01:04  4          I'll also note that that approach to solving

01:05  5   the problem was known at the time.  It was used in

01:05  6   commercial software, and I believe there are patents

01:05  7   that refer to it.

01:05  8      Q.    And, Mr. Willis, if Cisco had wanted to

01:05  9   implement this change, about how many hours do you

01:05  10  believe that would have taken to do?

01:05  11     A.    I estimated 100 hours of engineering time for

01:05  12  the change.

01:05  13     Q.    And what do you believe that would have cost

01:05  14  Cisco?

01:05  15     A.    Depending on which of their development

01:05  16  centers they're working in, from 100 to $200 an hour.

01:05  17  So 10- to $20,000 to make that change.

01:05  18     Q.    Okay.  Now, Mr. Willis, you mentioned that

01:05  19  there was a second alternative.

01:05  20         What is the second noninfringing alternative

01:05  21  that you proposed?

01:05  22     A.    Well, the second alternative is to just go

01:05  23  ahead and send all users mixed audio.

01:05  24     Q.    Can you kind of explain the difference there

01:05  25  between what the '858 patent is talking about and this

720

01:05  1    proposed alternative?

01:05  2        A.    Okay.  So the '858 patent is directed to a

01:05  3    special case where we have some clients in a conference

01:06  4    that have the ability to mix their own audio and other

01:06  5    clients that don't.  So we have to mix audio for some

01:06  6    of them, while others can take a, should I say, a more

01:06  7    raw format or they need a format of the audio.

01:06  8        That requires you to have both of those

01:06  9    features in a conference to infringe.  So if you only

01:06  10   implemented mixing of the audio in the conference, it

01:06  11   wouldn't infringe.

01:06  12       Q.    Would this alternative -- proposed alternative

01:06  13   have been difficult or expensive to implement?

01:06  14       A.    No.

01:06  15       Q.    And why do you believe that it wouldn't have

01:06  16   been difficult or expensive to implement?

01:06  17       A.    Well, for starters, all of the Cisco code

01:06  18   modules and libraries for mixing are already present in

01:06  19   the code base that Dr. Schaefer and I reviewed.  So

01:06  20   clearly they know how to do mixing.

01:06  21       The technology was well known and understood.

01:07  22   Many commercial products at the time implemented it

01:07  23   that way.  And I believe we also have patents that

01:07  24   teach exactly that methodology.

01:07  25       Q.    Mr. Willis, what do you believe the amount of

-721-

01:07  1    time it would have taken Cisco to make this change in

01:07  2    2004?

01:07  3        A.    So it's a little bigger than the previous

01:07  4    suggested alternative, but I estimate about 500 hours

01:07  5    of engineering time.

01:07  6        Q.    And how much would that have cost Cisco?

01:07  7        A.    Roughly 50,000 to $100,000.

01:07  8        Q.    All right.  Thank you.

01:07  9              Mr. Willis, you also commented on the fact

01:07  10   that you provided a technical response to Mr. -- or I'm

01:07  11   sorry -- Dr. Schaefer's valuation of the '858 patent.

01:07  12              Were you here to listen to the testimony of

01:07  13   Paltalk's expert, Dr. Schaefer, that he offered

01:07  14   regarding the technical value of the accused

01:08  15   functionality in the '858 patent?

01:08  16       A.    Yes.  I was.

01:08  17       Q.    Do you agree with Dr. Schaefer's analysis?

01:08  18       A.    No.  I don't.

01:08  19       Q.    And why is -- why do you not agree with

01:08  20   Dr. Schaefer's analysis?

01:08  21       A.    In general, I think that he highly overstates

01:08  22   the benefit of the '858 patent to the Webex product.

01:08  23       Q.    And what is the basis for your belief that he

01:08  24   has overstated the value of the '858 patent?

01:08  25       A.    Well, the fundamental part of that is that

722

01:08  1   Dr. Schaefer seems to have equated the '858 patent with

01:08  2   the ability to include both PSTN and VoIP clients in

01:08  3   one conference.

01:08  4       Q.   And why do you believe this is an inaccurate

01:08  5   description of the invention?

01:08  6       A.   Well, people were putting both PSTN and VoIP

01:08  7   devices into one conference long before the patent was

01:08  8   written or published.  I myself was doing it at MCI.

01:09  9   So I know that could be done.

01:09  10      Q.   Are there additional reasons why you think

01:09  11  this is an accurate description of the invention?

01:09  12      A.   Sure.  The weighting that he puts on --

01:09  13  Schaefer puts on things seems not to include cases

01:09  14  where a system like Webex would naturally not infringe

01:09  15  the patent, such as where we have only one or two users

01:09  16  in a conference.  So if the patent is only applicable

01:09  17  when there are more than two devices or users in the

01:09  18  conference.  So it's just you and I in a conference,

01:09  19  we're not infringing.

01:09  20           Now, the '858 patent is also only applicable

01:09  21  when there's more than one person speaking at the same

01:09  22  time.  A lot of conferences, there's only one person

01:09  23  speaking.  And many conferences are done as one to

01:09  24  many.  For example, the company president is up giving

01:10  25  his speech, and he's the only one who ever says

723

01:10  1   anything, right?

01:10  2        So whatever share of time or utilization that

01:10  3   accounts for in Webex, I don't believe Dr. Schaefer

01:10  4   accounts for.

01:10  5   Q.    Okay.  And, Mr. Willis, did you review any

01:10  6   information about Cisco's patents as part of your

01:10  7   analysis of Dr. Schaefer's technical valuation of the

01:10  8   '858 patent?

01:10  9   A.    Yes.  I did.

01:10  10  Q.    And what did you learn as part of that

01:10  11  analysis?

01:10  12  A.    Well, I spoke to a IP analyst at Cisco named

01:10  13  Saadia Saifuddin, and she told me that Cisco has, well,

01:10  14  a lot of patents.  I think more than 14,000 patents

01:10  15  currently active.  But of that we have -- there's

01:10  16  seven -- well, get out of -- there's 412 patents at the

01:10  17  time I spoke to her, which is in 2022.  There were 412

01:11  18  Cisco patents that apply to Webex Audio.  Of that set,

01:11  19  a fairly large number of them, that's 40, relate to

01:11  20  VoIP and PSTN together.

01:11  21        Another 12 relate to mixing or multiplexing.

01:11  22  Another 11 read echo cancellation and other features

01:11  23  that Dr. Schaefer has talked about being important from

01:11  24  '858.  So there's a lot of work that Cisco has put in

01:11  25  in this field.

—724—

01:11  1            I'd go further and say that Dr. Schaefer seems
01:11  2    to think that the aspects of the patents-in-suit are
01:11  3    all of everything, right?
01:11  4            In addition to what Cisco has put into Webex,
01:11  5    there have been countless hours of engineering effort.
01:11  6    I put 30 years of my life into developing products in
01:11  7    this space.  A lot of my friends did likewise.
01:11  8            There are many other companies here, and we're
01:12  9    actually building sort of on the shoulders of human
01:12  10   technology back to Alexander Graham Bell when the --
01:12  11   the first telephone call, right?
01:12  12           To say that this one patent is valued at or
01:12  13   provides somewhere between, say, 10 and 30 percent of
01:12  14   that entire functionality is just a bit much.
01:12  15   Q.    Thank you, Mr. Willis.
01:12  16           Moving on, did you also review Dr. Schaefer's
01:12  17   analysis of what he contends to be the key features of
01:12  18   Webex?
01:12  19   A.    I did.
01:12  20   Q.    And what were the key features that you
01:12  21   understand that Mr. -- or I'm sorry -- Dr. Schaefer
01:12  22   identified?
01:12  23   A.    Okay.  I'm not endorsing his identification of
01:12  24   key features.  I'm simply repeating what he identified.
01:12  25           And he basically picked out global access,

725

01:13    1    scalability and conference size, conference management,

01:13    2    compatibility with other Webex products, support for

01:13    3    Webex Audio or what he calls hybrid audio meetings and

01:13    4    remaining features.  Sort of unidentified other stuff

01:13    5    that gets lumped into a bucket.

01:13    6         Q.    Do you agree with Dr. Schaefer's conclusions

01:13    7    about these features as being the key features of

01:13    8    Webex?

01:13    9         A.    I do not.

01:13   10         Q.    And why do you not agree that the six features

01:13   11    identified by Dr. Schaefer are a comprehensive list of

01:13   12    the features offered by Webex Audio?

01:13   13         A.    Well, Webex has a lot more features, right?

01:13   14    At the time I was working on this in 2022, I identified

01:13   15    a number of features like automatic gain control and

01:13   16    noise removal and this voice optimization, what they

01:13   17    called optimize my voice, we were hearing about.

01:14   18    Spatial audio, the ability to have sort of stereo

01:14   19    surround sounds.  There are beam forming microphones

01:14   20    that have got hardware innovations, right?

01:14   21             There -- all of the variety of audio encoding

01:14   22    they have including their full band audio.  Things like

01:14   23    automatic language translations, transcribing of

01:14   24    meetings.

01:14   25             And then yesterday we heard Cisco's product

01:14  1    manager speak about this, and he went on with a list of

01:14  2    Cisco features that I as a very casual user of Cisco

01:14  3    Webex hadn't thought about.  But they sounded pretty

01:14  4    impressive.

01:14  5         Q.    Thank you.

01:14  6              Now, Mr. Willis, I understand you're not a

01:14  7    damages expert, and you're not providing a damages

01:14  8    opinion here.  But if you were going to use the

01:14  9    approach that Dr. Schaefer did in trying to calculate

01:14  10   the technical apportionment, how would you adjust

01:15  11   his -- his math, his technical apportionment?

01:15  12        A.    Okay.  So in this chart from my report, the

01:15  13   feature set that Dr. Schaefer identified is down that

01:15  14   left column, feature set.

01:15  15             The next column is the technical weight he

01:15  16   ascribed to the feature.  And not quite right, I think

01:15  17   he had 16.7 percent in each one of those, and my

01:15  18   spreadsheet rounded some of them to 17 and some of them

01:15  19   to 16.  But they still add to 100 percent in there, and

01:15  20   they're roughly similar.

01:15  21             Then we sort of looked at the amount

01:15  22   attributable to the patent-in-suit.  And then based on

01:15  23   the relationship of the feature we're talking about to

01:15  24   the overall contribution, I came up with substantially

01:15  25   different weighted numbers rather than the -- a bit of

—727—

01:15   1   over 30 percent that Dr. Schaefer produced.  My
01:15   2   relative contribution column comes to 10.4 percent.
01:16   3       Q.   All right.  And finally, Mr. Willis, did you
01:16   4   review any Cisco licenses as part of your analysis in
01:16   5   this case?
01:16   6       A.   I did.
01:16   7       Q.   And did you determine that any of the licenses
01:16   8   you reviewed were technically comparable to the
01:16   9   technology at issue here?
01:16  10       A.   I looked at a number of patents that Cisco had
01:16  11   licensed, and I found four that struck me as being
01:16  12   roughly technically comparable to the '858 patent.
01:16  13       Q.   And what license were those four patents?
01:16  14       A.   As I understand it, Cisco licensed all four of
01:16  15   those patents for another company called Meetrix.
01:16  16       Q.   And what is it about these four patents that
01:16  17   led you to believe or that you determined were
01:16  18   technically comparable to the '858 patent?
01:16  19       A.   Well, quickly, the titles stand out.  We look
01:16  20   at that.  They have the '612 patent, which is voice
01:17  21   conference calls using PSTN and Internet networks.
01:17  22           The '332 patent's title is Voice Conference
01:17  23   Call Using PSTN and Internet Networks.
01:17  24           The '997 patent's title is Media Based
01:17  25   Collaboration Using Mixed-mode PSTN and Internet

728

01:17   1   Networks.

01:17   2          And the '525 patent's title is Audio-video

01:17   3   Multi-participant Conference Systems Using PSTN and

01:17   4   Internet Networks.

01:17   5          So they're all clearly closely related to the

01:17   6   subject matter of what Paltalk calls hybrid audio of

01:17   7   mixing VoIP and PSTN in a conference call.

01:17   8      Q.    Okay.  Thank you, Mr. Willis.

01:17   9          In closing, could you summarize -- actually, I

01:17   10   want to step back one thing here.

01:18   11          Mr. Willis, we've talked about Limitations

01:18   12   [1.6] and [1.8] today.  And you provided an opinion

01:18   13   that Cisco does not meet those limitations, correct?

01:18   14      A.    That is correct.

01:18   15      Q.    Mr. Willis, we did not talk about a lot of

01:18   16   other limitations.  We did not talk about Limitations

01:18   17   [1] through [4].

01:18   18          Are -- is there -- what is the reason why you

01:18   19   did not provide an opinion today regarding Limitations

01:18   20   [1] through [4], Limitations [1.6] and [1.8]?

01:18   21      A.    Well, I do discuss those in my report.  Today

01:18   22   we have a limited amount of time available, and I

01:18   23   wanted to concentrate on the key points to have

01:18   24   understood.

01:18   25      Q.    Thank you.

729

| | | |
|---|---|---|
| 01:18 | 1 | So, Mr. Willis, in conclusion, could you |
| 01:18 | 2 | please summarize your opinions for the jury? |
| 01:18 | 3 | A.    So I have two conclusions today.  The first |
| 01:18 | 4 | conclusion is that Cisco Webex does not infringe any of |
| 01:19 | 5 | Claims 1 through 5 of the '858 patent. |
| 01:19 | 6 | The other conclusion I've reached that I want |
| 01:19 | 7 | to share is that Dr. Schaefer dramatically or at least |
| 01:19 | 8 | significantly overstates the value of the '858 patent. |
| 01:19 | 9 | MR. HAWKINS:  At this time I pass the |
| 01:19 | 10 | witness, Your Honor. |
| 01:19 | 11 | MR. TRIBBLE:  Apologies, Your Honor.  I |
| 01:19 | 12 | need a minute to move my stuff up here. |
| 01:19 | 13 | CROSS-EXAMINATION |
| 01:19 | 14 | BY MR. TRIBBLE: |
| 01:20 | 15 | Q.    Good morning, Mr. Willis. |
| 01:20 | 16 | A.    Good morning, sir. |
| 01:20 | 17 | Q.    I'm Max Tribble, and I represent Paltalk. |
| 01:20 | 18 | Do you understand that? |
| 01:20 | 19 | A.    Pleased to meet you, sir. |
| 01:20 | 20 | Q.    In your testimony to the jury yesterday and |
| 01:20 | 21 | today, you did not testify about any of the many, many |
| 01:20 | 22 | Cisco technical documentation documents that |
| 01:20 | 23 | Dr. Schaefer went over in his testimony, did you? |
| 01:20 | 24 | A.    No. |
| 01:20 | 25 | Q.    And you didn't address the majority of the |

—730—

01:21  1    plaintiff's exhibits of source code discussed by

01:21  2    Dr. Schaefer for hours and hours, did you?

01:21  3        A.    No.  I did not.

01:21  4        Q.    Okay.  There have been a lot of times when the

01:21  5    questioning of Jason Katz, Cisco's counsel, has made

01:21  6    reference to paid experts like it's some dirty word.

01:21  7              Did you hear that?

01:21  8        A.    I did not reach that conclusion.

01:21  9        Q.    You're getting paid, correct?

01:21  10       A.    I am.

01:21  11       Q.    How much have you gotten paid so far?

01:21  12       A.    I don't actually know.

01:21  13       Q.    Okay.  Have you produced your invoices to us

01:21  14   on the plaintiff's side?

01:21  15       A.    I have not.

01:21  16       Q.    Okay.  Would you agree with me that as an

01:22  17   expert testifying in patent case -- cases, you're

01:22  18   biased in favor of the defendant and against the

01:22  19   plaintiff?

01:22  20       A.    I disagree.

01:22  21       Q.    Okay.  And in particular with Cisco, you used

01:22  22   to work at Cisco, correct?

01:22  23       A.    I did.

01:22  24       Q.    Do you still have friends there?

01:22  25       A.    I believe I know of one individual who's

-731-

01:22    1    currently employed at Cisco.

01:22    2         Q.    Okay.  You work for -- what is your company

01:22    3    name?

01:22    4         A.    Softarmor Systems, sir.

01:22    5         Q.    You have a web page, don't you?

01:22    6         A.    Yes.  I do.

01:22    7              MR. TRIBBLE:  Mr. Boles, can we bring up

01:22    8    Demonstrative 1?

         9    BY MR. TRIBBLE:

01:22   10         Q.    This is a screenshot of your website with a

01:22   11    callout at the bottom and your picture added, correct?

01:23   12         A.    Yes.

01:23   13         Q.    You wrote these words?

01:23   14         A.    I approved them.

01:23   15         Q.    You approved of these words?

01:23   16         A.    Yes.

01:23   17         Q.    Okay.  And so focusing on the second

01:23   18    paragraph, you say that your company formed as a

01:23   19    Texas-based legal entity in 2007, correct?

01:23   20         A.    Correct.

01:23   21         Q.    And you formed it in order to more effectively

01:23   22    deliver consulting services to the industry, right?

01:23   23         A.    Correct.

01:23   24         Q.    And then this is blown up:  Since that time,

01:23   25    the time you're referring to is since 2007, right?

732

01:23  1      A.    It says that.

01:23  2      Q.    Since 2007, you have operated at almost full

01:23  3  capacity, primarily providing technical consulting

01:23  4  services to attorneys engaged in patent defense cases

01:23  5  related to Voice over IP, correct?

01:24  6      A.    It says that, sir.

01:24  7      Q.    It says that for the last 17 years, you have

01:24  8  been working on the defense side of patent cases,

01:24  9  right?

01:24  10     A.    It says that.

01:24  11     Q.    And yet you would not agree that you're biased

01:24  12  in favor of defendants and against plaintiffs.  Is that

01:24  13  your testimony?

01:24  14     A.    I'm not biased.

01:24  15     Q.    Okay.  And yet for the last 17 years operating

01:24  16  at almost full capacity, primarily you've been helping

01:24  17  attorneys who represent defendants in patent cases,

01:24  18  correct?

01:24  19     A.    No.

01:24  20     Q.    Well, that's what it says here, isn't it?

01:24  21           Primarily providing -- you've been providing

01:24  22  technical consulting services to attorneys engaged in

01:24  23  patent defense cases related to Voice over IP, right?

01:24  24     A.    That is indeed what it says.

01:24  25     Q.    Okay.  Let's go to Demonstrative 2.

01:25   1          This -- in this page you say that the mission

01:25   2   of your company is, among other things, the development

01:25   3   of defensive intellectual property and the invalidation

01:25   4   of intellectual property used offensively, correct?

01:25   5      A.   Yes.  It says that, sir.

01:25   6      Q.   That's your mission, to defeat plaintiffs in

01:25   7   patent cases, isn't it?

01:25   8      A.   That's what it says.  Yes.

01:25   9      Q.   Is it true?

01:25  10      A.   No.

01:25  11      Q.   So the words you wrote aren't true.  Is that

01:25  12   what you're saying?

01:25  13      A.   The words -- honestly, that text has been

01:25  14   present on the website since 2007 without revision.

01:25  15      Q.   Right.  Well, let's go on.

01:25  16          Primarily you've been focused on the

01:25  17   development of defensive intellectual property in the

01:26  18   invalidation of intellectual property used offensively;

01:26  19   is that fair?

01:26  20      A.   That's what it says.  Yes.

01:26  21      Q.   Okay.  Let's go to Demonstrative 3.  This is

01:26  22   the second paragraph on this part of your web page,

01:26  23   correct?

01:26  24      A.   Yes.

01:26  25      Q.   And you're still talking about your mission,

734

01:26   1   right?

01:26   2        A.    Yes.

01:26   3        Q.    Your mission, you say:  When it comes to

01:26   4   patent wars, a well-armed society is a polite society.

01:26   5   Those are your words, right?

01:26   6        A.    Yes.

01:26   7        Q.    And you refer to patent wars, right?

01:26   8        A.    Yes.

01:26   9        Q.    Is Paltalk a soldier in the patent wars, in

01:26   10  your view?

01:26   11       A.    No.

01:26   12       Q.    Okay.  But at any rate, you're telling your

01:26   13  customers that in these patent wars, a well-armed

01:27   14  society is a polite society, right?

01:27   15       A.    That's what the words say, sir.

01:27   16       Q.    Part of your mission is to make sure

01:27   17  defendants in patent cases are well armed, right?

01:27   18       A.    An encouragement that they do their own

01:27   19  patents, sir.

01:27   20       Q.    Now, when you referred a few minutes ago to

01:27   21  Dr. Schaefer's analysis, the apportionment of the

01:27   22  technical features, you said it's a bit much, right?

01:27   23       A.    Yes.

01:27   24       Q.    Doesn't that fit into one of your patent wars

01:27   25  that you're referring to here on your website?  Yes or

735

01:27  1    no?

01:27  2        A.    I wouldn't put it that way.

01:27  3        Q.    Okay.  You put it that way here on your

01:27  4    website, though, right?

       5        A.    No, sir.

01:27  6        Q.    These are your words, aren't they?

01:27  7        A.    Those are my words, sir.

01:27  8        Q.    Okay.  Now, and you told the jury that Cisco

01:27  9    doesn't infringe the '858 patent, right?

01:27  10       A.    That is my opinion, sir.

01:28  11       Q.    Cisco is paying you not only in this case but

01:28  12   also in another case to defend it in another case

01:28  13   alleging that it infringes somebody else's patents,

01:28  14   right?

01:28  15       A.    That is correct.

01:28  16       Q.    How much have you been paid in that case?

01:28  17       A.    I don't actually know, sir.

01:28  18       Q.    Okay.  Now, yesterday you were asked by

01:28  19   Cisco's lawyer:  How are you reading the term "each" as

01:28  20   it's used in the claim language of the patent, right?

01:28  21       A.    Yes.

01:28  22       Q.    And you said --

01:28  23             MR. TRIBBLE:  Can we put up the

01:28  24   demonstrative of his testimony?

       25   BY MR. TRIBBLE:

01:28   1       Q.    Mr. Willis, you recall this?  You were asked:

01:28   2   What is your understanding of this plain and ordinary

01:28   3   meaning of "each"?  Where does that come from?

01:28   4           And your answer was:  Well, I have the plain

01:28   5   and ordinary meaning of someone who's been speaking

01:28   6   English for 60 years, and I do a lot of technical

01:28   7   discussion in standards work, so we're pretty cognizant

01:28   8   of the meaning of words and of this sort that limit or

01:29   9   explain things that apply to this whole exercise of

01:29   10  explaining how things work.

01:29   11          That's what you said, right?

01:29   12      A.    Yes.

01:29   13      Q.    You didn't refer to reading the entire patent

01:29   14  to understand the claim terms, did you, in this

01:29   15  excerpt?

01:29   16      A.    Not there, sir.

01:29   17      Q.    Yes.  This was your answer yesterday, right?

01:29   18      A.    Yes.  I said that yesterday.

01:29   19      Q.    A few minutes ago, Cisco's lawyer led you

01:29   20  through, you know, did you consider the rest of the

01:29   21  patent?  Did you consider the specification?

01:29   22          And you answered:  Yes.  Yes.  Yes.

01:29   23          Right?

01:29   24      A.    Yes.

01:29   25      Q.    Okay.  But when you were asked yesterday, this

—737—

```
01:29   1   was your answer, and you didn't refer to anything about
01:29   2   basing your construction, your reading of "each" on
01:29   3   anything else in the patent, correct?
01:29   4                MR. HAWKINS:  Objection, Your Honor.
01:29   5   Mischaracterizes Mr. Willis' testimony from yesterday.
01:30   6                THE COURT:  Overruled.
01:30   7                He can answer if he -- if he thinks it
01:30   8   mischaracterizes it, he's free to say no.
01:30   9   BY MR. TRIBBLE:
01:30  10      Q.   Do you remember the question?
01:30  11      A.   Yes.  So --
01:30  12      Q.   Let me ask a different question just so we're
01:30  13   clear.
01:30  14           Yesterday when you were asked where does that
01:30  15   come from, where does your understanding of the word
01:30  16   "each" come from, you said:  Well, I'm someone who's
01:30  17   been speaking English for 60 years.
01:30  18           And you did not refer to the specification or
01:30  19   reading the preferred embodiment or looking at the
01:30  20   figures of the preferred embodiment.  You didn't refer
01:30  21   to any of that, did you?
01:30  22      A.   That's correct.
01:30  23      Q.   Okay.  Now, let's be clear.  You're reading
01:30  24   "each" to mean "all," right?
01:31  25      A.   I read "each" to mean "all" where a person
```

738

| | | |
|---|---|---|
| 01:31 | 1 | having a basic understanding, a plain and ordinary |
| 01:31 | 2 | understanding, would read "each" to mean "all." |
| 01:31 | 3 | Q.   A person -- patents are -- this claim language |
| 01:31 | 4 | is supposed to be read by an expert in this field, |
| 01:31 | 5 | right? |
| 01:31 | 6 | A.   Correct.  A person of ordinary standing in the |
| 01:31 | 7 | art. |
| 01:31 | 8 | Q.   And it's supposed to be read by someone who is |
| 01:31 | 9 | reading the claim terms in the context of the entire |
| 01:31 | 10 | rest of the patent, right? |
| 01:31 | 11 | A.   Yes. |
| 01:31 | 12 | Q.   Okay.  And so you're not saying, are you, that |
| 01:31 | 13 | the term "each" cannot mean "one or more."  You're not |
| 01:31 | 14 | saying that, are you? |
| 01:31 | 15 | A.   No.  I'm not. |
| 01:31 | 16 | Q.   And so you would agree with me that the term |
| 01:31 | 17 | "each" can mean "one or more," right? |
| 01:31 | 18 | A.   I so agree. |
| 01:31 | 19 | Q.   Okay.  And so if I were to write on a flip |
| 01:32 | 20 | chart the word "can" and the word "cannot" and ask you |
| 01:32 | 21 | which one to circle, you would say circle "can," |
| 01:32 | 22 | correct? |
| 01:32 | 23 | A.   I'm not entirely sure I understand the |
| 01:32 | 24 | question, sir. |
| 01:32 | 25 | Q.   You agree that "each" can mean "one or more," |

739

01:32  1    correct?

01:32  2        A.    I agree that that is the construction provided

01:32  3    by the Court.

01:32  4                    MR. TRIBBLE:   Can we show the Court's

01:32  5    construction?

       6    BY MR. TRIBBLE:

01:32  7        Q.    Do you see this?   This is the Court's

01:32  8    construction that you're following, right?

01:32  9        A.    I see that.

01:32  10       Q.    And the Court, looking at it, found that in

01:32  11   this patent, the word "each" has a plain and ordinary

01:33  12   meaning can include "one or more."  You agree with

01:33  13   that, don't you?

01:33  14       A.    I concur that that's the Court's construction,

01:33  15   sir.

01:33  16       Q.    Okay.  Now, you talked yesterday about the

01:33  17   preferred embodiment in the patent, correct?

01:33  18       A.    I did.

01:33  19       Q.    In your view, the preferred embodiment is not

01:33  20   covered by Claim 1 of the patent, is it?

01:33  21       A.    I don't believe I stated an opinion on that,

01:33  22   sir.

01:33  23       Q.    But you believe that Claim 1 does not cover

01:33  24   the preferred embodiment set out in the patent,

01:33  25   correct?

740

01:33  1        A.    I believe that Claim 1 is related to the

01:33  2    teachings of the preferred embodiment of the patent,

01:33  3    sir.

01:33  4        Q.    You don't believe -- I'll ask it again.

01:33  5              You don't believe that the preferred

01:34  6    embodiment set out by the inventors as part of their

01:34  7    disclosure to other experts in the field, you don't

01:34  8    believe that that claim covers the preferred

01:34  9    embodiment, that Claim 1 doesn't cover the preferred

01:34  10   embodiment, do you?

01:34  11       A.    No, sir.

01:34  12       Q.    Okay.  And you don't believe that Claim 2

01:34  13   covers the preferred embodiment either, do you?

01:34  14       A.    Not in its entirety, sir.

01:34  15       Q.    So the answer is no.  It doesn't cover it,

01:34  16   right?  Is that right?

01:34  17       A.    Yes, sir.

01:34  18       Q.    And Claim 3 doesn't cover the preferred

01:34  19   embodiment, does it?

01:34  20       A.    Not in its entirety, sir.

01:34  21       Q.    So the answer is no.  It doesn't cover it,

01:34  22   does it?

01:34  23       A.    Yes.

01:34  24       Q.    Yes.  I'm correct?

01:34  25       A.    Your statement is correct, sir.

—741—

```
01:34   1        Q.    Okay.  And you believe that Claims 4 and 5,
01:34   2   those don't cover the preferred embodiment either, do
01:34   3   they?
01:34   4        A.    Not in its entirety, sir.
01:34   5        Q.    And so they -- those claims don't cover the
01:35   6   preferred embodiment, correct?
01:35   7        A.    Yes, sir.
01:35   8        Q.    Now, you went to Texas A&M, correct?
01:35   9        A.    I did.
01:35  10        Q.    Did you take any classes from Dr. Schaefer?
01:35  11        A.    I did not.
01:35  12        Q.    He is the head of the computer science
01:35  13   department at Texas A&M, right?
01:35  14        A.    I believe so, sir.
01:35  15        Q.    And he has a Ph.D., right?
01:35  16        A.    Yes, sir.
01:35  17        Q.    That's a hugely prestigious position, isn't
01:35  18   it, to be appointed head of the computer science
01:35  19   department of Texas A&M University, right?
01:35  20        A.    Yes, sir.
01:35  21        Q.    And I noticed that you're going by
01:35  22   "Mr. Willis."  You don't have a Ph.D. like he does, do
01:35  23   you?
01:35  24        A.    Not in computer science, sir.
01:35  25        Q.    Okay.  And in your testimony yesterday and
```

—742—

01:36   1    today, you didn't cite any source code other than the

01:36   2    sum of the source code exhibits discussed by

01:36   3    Dr. Schaefer, correct?

01:36   4         A.    That is correct.

01:36   5         Q.    Okay.  And so you'd agree, you're looking at

01:36   6    the right code, right?

01:36   7         A.    I agree that code is related, sir.  Yes.

01:36   8         Q.    You don't dispute that most of the elements of

01:36   9    Claim 1 in your -- let me put it this way:  In your

01:36   10   testimony yesterday and today, you haven't offered any

01:36   11   testimony disputing that Claims 1 through 4 and 6 and

01:36   12   Element [8], you haven't offered any testimony that

01:36   13   those elements are not performed by Cisco Webex, have

01:36   14   you?

01:36   15        A.    I spoke about Claims 1 -- Elements [1.6] and

01:36   16   [1.8] today, sir.  None of the others.

01:37   17        Q.    I'll ask it again.

01:37   18              Other than Element [6] and Element [8] of

01:37   19   Claim 1, you have not offered any testimony to this

01:37   20   jury disputing or claiming that Webex doesn't perform

01:37   21   those elements, correct?

01:37   22        A.    That is correct.

01:37   23        Q.    Okay.  Would you agree that you and

01:37   24   Dr. Schaefer agree on most points about how Webex

01:37   25   operates?

743

01:37   1      A.    I'd say there's a majority there, sir.  Yes.

01:37   2      Q.    Okay.  And the -- let me ask you this about

01:38   3  the code.  We'll come to the code in a minute.

01:38   4            Now, under Dr. Schaefer's reading, you would

01:38   5  agree with me that under Dr. Schaefer's reading that

01:38   6  "each" means "one or more," you would agree that

01:38   7  reading it that way, Claim 1 would cover the preferred

01:38   8  embodiment, right?

01:38   9      A.    May I speak at some length, sir?

01:38  10      Q.    No.

01:38  11            Would you agree, yes or no?

01:38  12      A.    No.

01:38  13      Q.    Okay.  Would you agree that Claim 2 covers the

01:38  14  preferred embodiment?

01:38  15      A.    No.

01:38  16      Q.    Okay.  Well, let's pull up the patent.  Let's

01:38  17  go -- do you see the first page?

01:38  18      A.    I do.

01:38  19      Q.    Let's flip to the next page and the next page.

01:39  20            These show the figures in the patent of the

01:39  21  preferred embodiment, right?

01:39  22      A.    Uh-huh.

01:39  23      Q.    Next page.  Next page.

01:39  24            Now, let me ask you this:  Here on the next

01:39  25  page, this is where the specification of the patent

—744—

01:39  1    starts, right?

01:39  2        A.    Yes, sir.

01:39  3        Q.    This is a narrative description that describes

01:39  4    the preferred embodiment of the invention in the

01:39  5    patent, right?

01:39  6        A.    The section that I'm looking at, sir, does not

01:39  7    appear to be the description of the preferred

01:39  8    embodiment.

01:39  9        Q.    So in Column 2 the section titled Summary of

01:39  10   the Invention, that doesn't start a description of one

01:39  11   embodiment on how to practice the claims in the patent?

01:40  12       A.    No, sir.  It's the summary of the invention.

01:40  13       Q.    Okay.  You're still supposed to read all this

01:40  14   in determining what -- how to read the claim terms?

01:40  15       A.    Yes, sir.

01:40  16       Q.    Okay.  Let's -- let's go on to the next page.

01:40  17   There's a section titled Brief Description of the

01:40  18   Figures.

01:40  19             Do you see that?

01:40  20       A.    Yes, sir.

01:40  21       Q.    That description is of figures describing the

01:40  22   preferred embodiment of the patent, right?

01:40  23       A.    No, sir.

01:40  24       Q.    So where it says Figure 1 is a block diagram

01:40  25   illustrating the overall system architecture of an

—745—

01:40  1    embodiment of the present invention showing -- showing

01:40  2    connectivity --

01:40  3        A.    Yes, sir.

01:40  4        Q.    -- among the various components, that's not

01:40  5    referring to the Figure 1 as a embodiment of what is

01:40  6    covered in the claims of the patent?

01:40  7        A.    No, sir.

01:40  8        Q.    Okay.  You'll agree that it says Figure 1 is a

01:41  9    block diagram illustrating the overall system

01:41  10   architecture of an embodiment, correct?

01:41  11       A.    Yes, sir.

01:41  12       Q.    Okay.  Anyway, let's go down.  Then it starts:

01:41  13   The detailed description of the preferred embodiment.

01:41  14           Do you see that?

01:41  15       A.    Yes, sir.

01:41  16       Q.    And that's in Column 3 of the patent, and it

01:41  17   continues on to Column 4 and Column 5 and Column 6 and

01:41  18   most of Column 7.

01:41  19           Would you agree with that?

01:41  20       A.    Yes, sir.

01:41  21       Q.    And so this detailed description of the

01:41  22   preferred embodiments, surely you'll agree that those

01:41  23   are a description of the preferred embodiments covered

01:41  24   by the claims in the patent, right?

01:41  25       A.    That is a detailed description of preferred

746

01:41  1    embodiments, sir.

01:41  2        Q.    Okay.  And yet your reading of the patent is

01:41  3    that none of Claims 1 through 5 would cover the

01:41  4    embodiments described in this section.

01:42  5            Is that fair to say?

01:42  6        A.    Yes, sir.

01:42  7        Q.    Okay.  And let's -- in particular, let's go to

01:42  8    5, Column 5, and so let's go to Line 44.

01:42  9            And this is a description of one of the steps

01:42  10   in the flowchart showing the operation of an embodiment

01:42  11   of the patent that's shown in Figure 2; is that right?

01:42  12       A.    Yes.

01:42  13       Q.    Okay.  And you refer to this, it says:  In

01:42  14   Step 314, active speaker audio data for each and every

01:42  15   active speaker -- no.  It's the second one.  Yes.

01:42  16            In Step 314, active speaker audio data for

01:42  17   each and every active speaker is multiplexed.

01:43  18            You pointed to this as something that you rely

01:43  19   upon, correct?

01:43  20            Yes or no?

01:43  21       A.    Yes.  I do.

01:43  22       Q.    Okay.  It says "each and every."

01:43  23            You highlighted that in your slides, right?

01:43  24       A.    Yes, sir.

01:43  25       Q.    But the next sentence says:  However, however,

—747—

01:43    1   as will be apparent to those skilled in the relevant

01:43    2   arts, if Party J is an active speaker, Step 314 will

01:43    3   not include Party J's own audio data in the multiplexed

01:43    4   packets.

01:43    5           Correct?

01:43    6       A.    Correct.

01:43    7       Q.    And you'll agree with me, won't you, that this

01:43    8   "however" clause in Column 5 is something that shows

01:43    9   that when it says "each and every active speaker is

01:44   10   multiplexed in the prior sentence," this language here

01:44   11   shows that "each and every" language doesn't mean

01:44   12   "all."  It means something other than "all" because it

01:44   13   means that a person skilled in the art, an expert in

01:44   14   this field, would recognize that even though it's "each

01:44   15   and every," if the party is an active speaker, the

01:44   16   multiplexed stream sent to the speaker doesn't include

01:44   17   his own audio.

01:44   18           You'll agree with that, won't you?

01:44   19       A.    Would you restate that question, sir?  I got

01:44   20   lost somewhere in it.

01:44   21       Q.    Okay.  Well, I'll tell you what.  Let me --

01:44   22   can you hand me that?

01:44   23           Bear with me one second.

01:45   24       A.    Of course, sir.

01:45   25       Q.    You studied this section before, correct?

—748—

01:45   1       A.    I have, sir.

01:45   2       Q.    And yesterday you didn't show this "however"

01:45   3   part to the jury, did you?

01:45   4       A.    I did not.

01:45   5       Q.    And why not?

01:45   6       A.    Sir, in my understanding --

01:45   7       Q.    Let me ask it this way.  I'll ask a different

01:45   8   question.

01:45   9            Since the "however" sentence modifies the

01:45  10   sentence before it where it says "each and every," why

01:45  11   didn't you present the "however" sentence to the jury

01:45  12   so that they would understand that when it says "each

01:45  13   and every," that has to be taken in context and

01:45  14   modified?

01:45  15            Why didn't you do that?

01:45  16       A.    Sir, I believe the first part of that

01:45  17   structure in Step 314, active speaker for audio to

01:46  18   be -- active speaker audio data for each and every

01:46  19   active speaker is multiplexed, that is essentially

01:46  20   spoken to by Claim 1 of the patent.

01:46  21            The following section --

01:46  22       Q.    That's not my question.

01:46  23       A.    -- as will be apparent -- I'm sorry, sir?

01:46  24            MR. HAWKINS:  Objection, Your Honor.  He

01:46  25   was -- cut him off from testifying.

01:46   1                    MR. TRIBBLE:  He's answering a different

01:46   2   question.

01:46   3                    MR. HAWKINS:  That is not true,

01:46   4   Your Honor.  He asked --

01:46   5                    THE COURT:  Gentlemen.

01:46   6                    MR. HAWKINS:  The question was --

01:46   7                    THE COURT:  Gentlemen.

01:46   8                    MR. HAWKINS:  I'm sorry.

01:46   9                    THE COURT:  Just let me rule.

01:46   10                   MR. HAWKINS:  Oh, I'm sorry.

01:46   11                   THE COURT:  Ask your question again,

01:46   12  please.

01:46   13                   MR. TRIBBLE:  I'm going to ask it again.

01:46   14       A.    Okay.

01:46   15  BY MR. TRIBBLE:

01:46   16       Q.    You would agree, wouldn't you, that someone

01:46   17  skilled in the art would understand that even that

01:46   18  concept of "each and every" in the first highlighted

01:46   19  sentence would still account for the fact that an

01:47   20  active speaker would not receive back his own audio

01:47   21  data.

01:47   22             That's a fair interpretation, isn't it?

01:47   23             Yes or no?

01:47   24       A.    It is true that given this reading, you would

01:47   25  not expect the active speaker to receive their own

750

01:47 1    audio data back in the completeness of the patent.

01:47 2        Q.    And so the answer is yes --

01:47 3        A.    Yes.

01:47 4        Q.    -- right?

01:47 5            Okay.  And so you need to read both sentences

01:47 6    together.  The first one says "each and every," but a

01:47 7    person of skill in the art would understand from the

01:47 8    "however," the next sentence, that the concept of "each

01:47 9    and every" would still have to account for the fact

01:47 10   that an active speaker would not receive back his own

01:47 11   audio data, right?

01:47 12       A.    I believe so, sir.

01:47 13       Q.    Is that a yes?

01:47 14       A.    Yes.

01:47 15       Q.    You agree with Dr. Schaefer on that point,

01:47 16   don't you?

01:47 17            Yes or no?

01:47 18       A.    In part, sir.

01:48 19       Q.    Okay.  And so the concept of "each and every"

01:48 20   accounts for the fact, includes the fact that some

01:48 21   audio, namely the audio of an active speaker, will not

01:48 22   be included in the multiplexed packet, correct?

01:48 23       A.    As a result, sir, yes.

01:48 24       Q.    The answer is yes?

01:48 25       A.    Yes.

01:48  1      Q.    "Each and every" would not include the active

01:48  2  speaker's own audio, would it?

01:48  3      A.    As a net result, yes.  As an interim result,

01:48  4  no.

01:48  5      Q.    Okay.  And so -- thank you.

01:48  6            Now, were you -- did you hear the testimony

01:48  7  from the Cisco witnesses who testified that the Cisco

01:49  8  lawyers had them read only the claim language without

01:49  9  reading the rest of the patent?

01:49  10      A.    Yes.

01:49  11      Q.    Mr. Buckles, right?

01:49  12      A.    Yes.

01:49  13      Q.    Lawyers didn't give him the rest of the patent

01:49  14  to read so -- right?

01:49  15      A.    I don't know, sir.

01:49  16      Q.    And without that, he wouldn't be able to tell

01:49  17  what the meaning of the claim terms were, right?

01:49  18            MR. HAWKINS:  Objection, calls for

01:49  19  speculation.

01:49  20            THE COURT:  Overruled.

01:49  21  BY MR. TRIBBLE:

01:49  22      Q.    Is that right?

01:49  23            Yes or no?

01:49  24      A.    Well, it's certainly possible -- no.  I can't

01:49  25  say, sir, what he --

752

01:49  1      Q.    No.  Is the answer no?

01:49  2      A.    Literally I can't say what he knows.  He might

01:49  3  have been told those by someone else.  I don't know.  I

01:49  4  cannot know what's in his head.

01:49  5      Q.    Well, you agree that in order to understand

01:49  6  the claim terms, you have to read the whole patent,

01:49  7  right?

01:49  8      A.    Or be instructed by someone who has, sir.

01:49  9      Q.    Okay.  Well, you understand that Dr. Schaefer

01:50  10  agrees with this concept.  He interprets "each" as

01:50  11  meaning one or more.

01:50  12            You understand that, right?

01:50  13     A.    I understand that to be his opinion, sir, yes.

01:50  14     Q.    Okay.  And in the preferred embodiment

01:50  15  disclosed in the patent -- keep that language up.

01:50  16            The preferred embodiment disclosed in the

01:50  17  patent is one in which the audio data for each and

01:50  18  every active speaker is multiplexed.  However,

01:50  19  recognizing as a person of ordinary skill in the art

01:50  20  that that means that if someone is an active speaker,

01:50  21  then their own audio is not sent back to them.

01:50  22            Is that fair?

01:50  23     A.    Yes.

01:50  24     Q.    Okay.  And the final sentence:  This is in

01:50  25  essence an echo suppression function so that Party J

753

01:50    1    will not hear themselves speak.

01:50    2            Correct?

01:50    3        A.    That's what it says, sir.  Yes.

01:50    4        Q.    It only makes sense, right?

01:50    5            I mean, that's a feature you would want in

01:51    6    audioconferencing, correct?

01:51    7        A.    Perhaps, sir.  There are conferences that work

01:51    8    otherwise.

01:51    9        Q.    Well, you were here when Mr. Barave had that

01:51   10    demonstrative that had -- I can't remember if it was 50

01:51   11    to 100,000 participants in a Webex.

01:51   12            Did you see that?

01:51   13        A.    I did, sir.

01:51   14        Q.    Okay.  Certainly you'd want echo suppression

01:51   15    for that?

01:51   16        A.    Perhaps, sir.

01:51   17        Q.    You can't tell?

01:51   18        A.    It depends on your requirement.

01:51   19        Q.    Okay.

01:51   20        A.    Have to elaborate, sir.

01:51   21        Q.    Unless it's a speech by the president, as you

01:51   22    refer to, in a normal Webex conference, there's more

01:51   23    than one active speaker, correct?

01:51   24        A.    There may be.

01:51   25        Q.    In that situation, you would want the system

754

01:51   1    to have echo suppression, right?

01:51   2        A.    In Webex, yes, sir.

01:51   3        Q.    Okay.  And again, you didn't -- this last

01:52   4    sentence about echo suppression, you didn't present

01:52   5    that to the jury, did you?

01:52   6        A.    No, sir.

01:52   7        Q.    Okay.  But in order to have a full and fair

01:52   8    reading of the claim language regarding "each," a

01:52   9    person would have to read both of those following

01:52   10   sentences, wouldn't they?  Yes or no?

01:52   11       A.    No.  I don't think so, sir.

01:52   12       Q.    Okay.  In any event, you didn't present them

01:52   13   to the jury, did you?

01:52   14       A.    No, sir.

01:52   15       Q.    Okay.

01:52   16              MR. TRIBBLE:  And let's pull up this

01:52   17   language at the end of the patent in Column 7 right

01:52   18   before the claims.

        19   BY MR. TRIBBLE:

01:52   20       Q.    Is this the paragraph you cited yesterday?

01:53   21   You cited this, didn't you?

01:53   22       A.    I believe a part of that was cited, sir, but I

01:53   23   can't specify which was.

01:53   24       Q.    And were you trying to say that it's okay for

01:53   25   none of the claims in the patent to cover the preferred

755

01:53  1   embodiments?

01:53  2        A.    No, sir.

01:53  3        Q.    Okay.

01:53  4              MR. TRIBBLE:  Take that down.

01:53  5   BY MR. TRIBBLE:

01:53  6        Q.    The -- you know, don't you -- you were talking

01:53  7   about the law yesterday, but you know that reading the

01:53  8   claims in order to exclude the preferred embodiment is

01:53  9   something that you're not supposed to do when reading a

01:53  10  patent, correct?

01:53  11       A.    I've been told that, sir.  Yes.

01:53  12       Q.    Okay.  And so you agree that the claims should

01:53  13  not exclude the preferred embodiment, right?

01:53  14       A.    That seems reasonable, sir.  Yes.

01:54  15       Q.    Okay.  Now, let's back up.  You're not

01:54  16  contesting infringement of most of the limitations.

01:54  17              And for the ones you did testify, what were

01:54  18  those numbers?  Was it just No. 5 and No. 8?

01:54  19       A.    I won't say we're not contesting those

01:54  20  limitations, but I only spoke to Limitations [1.6] and

01:54  21  [1.8].

01:54  22       Q.    Okay.  That's fair.  You only discussed those

01:54  23  two limitations, [5] and --

01:54  24       A.    [6] and [8], sir.

01:54  25       Q.    [6] and [8].  Excuse me.

—756—

01:54  1          And so those are the only two of the eight

01:54  2  elements that you discussed with the jury yesterday and

01:54  3  today, correct?

01:54  4      A.    Yes, sir.

01:54  5      Q.    Okay.  Let me ask this:  You discussed

01:54  6  Plaintiff's Exhibit 235 yesterday, some of the source

01:54  7  code?

01:54  8      A.    That may have been the exhibit, sir.  I don't

01:55  9  recall the specific exhibit numbers.

01:55  10      Q.    Okay.  Well, let's go over it.

01:55  11              MR. TRIBBLE:  Your Honor, I think we need

01:55  12  to move to the confidential portion of the record.

01:55  13              THE COURT:  Okay.  If you're not under

01:55  14  the protective order, please exit the courtroom.

01:55  15          (Sealed proceedings.)

01:55  16  ████████████

01:55  17  █  ████████████████████████

01:55  18  █  ███████

01:55  19  █  █████████████  ██████

01:56  20  █████████

01:56  21  █  █████████

01:56  22  █  ███

01:56  23  █  ███████████████████

01:56  24  █  ███████████████████

01:56  25  ████

757



758





760

02:00  1        A.    I do agree.

02:00  2        Q.    Okay.  We heard Mr. Buckles say that

02:00  3    yesterday, didn't we?

02:00  4        A.    We did.

02:00  5        Q.    Webex has active speakers, and it creates an

02:00  6    active speaker list, right?

02:00  7        A.    Yes.

02:00  8        Q.    Now, you know one thing we heard from

02:00  9    Mr. Buckles and all of the Cisco witnesses is what a

02:00  10   great company Cisco is and how innovative it is,

02:01  11   correct?

02:01  12       A.    Yes.

02:01  13       Q.    But you don't agree with that, do you?

02:01  14       A.    I think Cisco's a very good company.

02:01  15       Q.    So you do agree?

02:01  16       A.    I --

02:01  17       Q.    Yes or no?

02:01  18       A.    Well, it was a compound statement, sir.  So it

02:01  19   had multiple parts.

02:01  20       Q.    Oh, okay.  So you might have a different

02:01  21   answer regarding whether it's a great company or

02:01  22   whether it's an innovative company.  That's what you're

02:01  23   telling me, right?

02:01  24       A.    Yes, sir.

02:01  25       Q.    You've cited -- you say there are like 420

-761-

```
02:01   1   patents relating to Webex, correct?
02:01   2       A.    That's true, sir.
02:01   3       Q.    That's not a defense to infringing this
02:01   4   patent, is it?
02:01   5       A.    No, sir.
02:01   6       Q.    Okay.  And different patents cover different
02:01   7   things.
02:01   8             You would agree with me that different
02:01   9   patents, one could be much more valuable than others,
02:01  10   correct?
02:01  11       A.    Yes, sir.
02:01  12       Q.    And by the way, the 420 patents that you
02:02  13   discussed and the subcategories listed on your slide
02:02  14   that you showed earlier, you didn't look at those
02:02  15   patents, did you?
02:02  16       A.    Not all of them, sir.
02:02  17       Q.    That was told to you by someone at Cisco,
02:02  18   correct?
02:02  19       A.    That's correct.
02:02  20       Q.    And did you give us any list?
02:02  21       A.    I did not, sir.
02:02  22       Q.    Because anything that you reviewed you would
02:02  23   have listed in your materials reviewed attachment to
02:02  24   your report, correct?
02:02  25       A.    Correct, sir.
```

—762—

02:02  1     Q.    You didn't list any of those patents, did you?

02:02  2     A.    Yes.  I did, sir.

02:02  3     Q.    Okay.  You didn't give us a list of the 420

02:02  4  patents, correct?

02:02  5     A.    That's true, sir.

02:02  6     Q.    And so it's impossible for Paltalk to go look

02:02  7  at the patents to see if they even cover Webex, isn't

02:02  8  it?  Isn't that true?

02:02  9     A.    Go direct on that list, yes, sir.

02:02  10    Q.    Okay.

02:02  11    A.    But the patents are published.  So Paltalk's

02:02  12  free to look them up.

02:03  13    Q.    Well, Cisco says it's got 16,000 patents.

02:03  14          Are you saying that we're supposed to look at

02:03  15  all 16,000 patents and figure out which one -- which

02:03  16  ones fell into the bucket of 420 that you were told

02:03  17  about?  Is that what you're saying?

02:03  18    A.    How am I saying that?  No, sir.

02:03  19            MR. TRIBBLE:  And let's go ahead and pull

02:03  20  up the next demonstrative.  Okay.

02:03  21  BY MR. TRIBBLE:

02:03  22    Q.    Does this appear to be from your LinkedIn page

02:03  23  where it's a comment that you made in LinkedIn at the

02:03  24  bottom?

02:03  25    A.    Yes, sir.

02:03   1          Q.    These are your words, right?

02:03   2                And they're getting rid of more private

02:03   3    offices.  No wonder they have a hard time innovating.

02:03   4                Correct?

02:04   5          A.    Yes, sir.

02:04   6          Q.    Those are your words, right?  Right?

02:04   7          A.    Yes, sir.

02:04   8          Q.    And so it's your view that Cisco has a hard

02:04   9    time innovating, correct?

02:04   10         A.    It's something they have to work at very hard,

02:04   11   sir.

02:04   12         Q.    And you were commenting on someone else's

02:04   13   post, correct?

02:04   14         A.    Yes, sir.

02:04   15         Q.    You're commenting on this post at the top,

02:04   16   Anton Okmyanskiy, right?

02:04   17         A.    I'm sorry.  Yes, sir.

02:04   18         Q.    And he said:  This is just hilarious.  About

02:04   19   ten years ago when I was at Cisco, they did a comp

02:04   20   realignment, which was accompanied by identifying

02:04   21   messaging.  At the time it was just a ploy to reduce

02:04   22   everybody's excessive compensation, correct?

02:04   23         A.    Yes, sir.

02:04   24         Q.    You agreed with him, didn't you?

02:05   25         A.    That it was hilarious?  Yes, sir.

─764─

```
02:05   1        Q.    In other words, he goes on to say that:  The
02:05   2   way they spin it is they say, well, we did a survey of
02:05   3   the employees and they wanted more --
02:05   4              MR. HAWKINS:  Objection, Your Honor.
02:05   5   This is hearsay.
02:05   6              MR. TRIBBLE:  It's an admission by their
02:05   7   own expert.
02:05   8              THE COURT:  Overruled.
02:05   9   BY MR. TRIBBLE:
02:05  10        Q.    What were you commenting on, that it was
02:05  11   hilarious that Cisco was reducing pay for its employees
02:05  12   by pretending that it was something the employees
02:05  13   wanted?
02:05  14              That's what you were commenting about.
02:05  15        A.    No.  As you'll note from the post there from
02:05  16   Anton, the hilarious part is that they used verbatim
02:05  17   the same language they had used ten years before.
02:05  18        Q.    Yeah.  And that language said, the reporter in
02:05  19   the next message says:  I called Cisco, and they told
02:05  20   me they'd done a survey and our employees want lower
02:06  21   bonuses in return for higher salary.
02:06  22              Correct?
02:06  23        A.    He does say that, sir.
02:06  24        Q.    And his point about it is that it was just a
02:06  25   way to spin the fact that they were going to be paying
```

```
02:06    1    their employees less?
02:06    2                    MR. HAWKINS:  Objection, Your Honor.
02:06    3    He's --
02:06    4        A.    I'm not entirely sure what his point was.  It
02:06    5    wasn't what I was --
02:06    6                    THE COURT:  Stop.
02:06    7                    THE WITNESS:  Sorry, sir.
02:06    8                    MR. TRIBBLE:  I'll move on.
09:42    9                    (Sealed proceedings end.)
02:06   10    BY MR. TRIBBLE:
02:06   11        Q.    We'll come back to those exhibit numbers.
02:06   12              Okay.  You didn't testify to the jury about
02:07   13    talking to any of the inventors, did you?
02:07   14        A.    I'm sorry?
02:07   15        Q.    In your testimony to the jury, you didn't
02:07   16    mention talking to any of the inventors of the '858
02:07   17    patent, did you?
02:07   18        A.    Oh, the '858 patent.
02:07   19              No, sir.  I did not speak to them.
02:07   20        Q.    Oh, you didn't speak with any of the
02:07   21    inventors?
02:07   22        A.    Of the '858 patent?
02:07   23        Q.    Yes, sir.
02:07   24        A.    No, sir.
02:07   25        Q.    Okay.  Well, take a look --
```

766

| | | |
|--|--|--|
02:07  1      A.    Not as far as I know.

02:07  2      Q.    Take a look at Plaintiff's Exhibit 80.  I'll

02:07  3  give you a copy.  Okay.

02:07  4             MR. TRIBBLE:  May I approach, Your Honor?

02:08  5             THE COURT:  Yes, sir.

02:08  6      A.    Thank you, sir.

02:08  7  BY MR. TRIBBLE:

02:08  8      Q.    Mr. Willis, do you see that this is a letter

02:08  9  on the letterhead of Perkins Coie?

02:08  10             MR. HAWKINS:  Objection, Your Honor.

02:08  11  Lacks foundation.

02:08  12             MR. TRIBBLE:  Well, I haven't asked my

02:08  13  question yet.

02:08  14             THE COURT:  I agree.

02:08  15  BY MR. TRIBBLE:

02:08  16      Q.    Mr. Willis, do you see that this is a Perkins

02:08  17  Coie letter agreement signed by one of their lawyers

02:08  18  here?  It's a -- it says Retention Agreement with

02:08  19  Mr. Frank Chu, one of the inventors on the '858 patent.

02:08  20        Do you see that?

02:08  21      A.    I see that.

02:08  22             MR. TRIBBLE:  Your Honor, we move to

02:08  23  admit Plaintiff's Exhibit 80.

02:08  24             MR. HAWKINS:  Objection, Your Honor.

02:08  25  Lack of foundation.

767

02:09  1            THE COURT:  Has he ever seen this before?

02:09  2            MR. TRIBBLE:  No, but it is a -- there's

02:09  3  no -- they do not contest the authenticity of this

02:09  4  agreement with the inventor.  And it's clearly an

02:09  5  admission by a party opponent.  And I'm going to ask

02:09  6  him some questions about it, but --

02:09  7            THE COURT:  When did you provide this

02:09  8  document to the other side?

02:09  9            MR. TRIBBLE:  Well, it's Plaintiff's

02:09  10 Exhibit 80.  I mean, it's their document, first of all.

02:09  11 But --

02:09  12           THE COURT:  Well, not --

02:09  13           MR. TRIBBLE:  It's been on the exhibit

02:09  14 list for a long time.

02:09  15           THE COURT:  Is it their exhibit?  Is it

02:09  16 on their list?  It's on your list.

02:09  17           MR. TRIBBLE:  I don't know.  It's on ours

02:09  18 as Plaintiff's Exhibit 80, but it is --

       19           Oh, it is on theirs?

02:09  20           Well, there it is.  It is on theirs.

02:09  21           THE COURT:  If it's on their exhibit

02:09  22 list, then you can use it.  I'll overrule the

02:09  23 objection.

02:09  24 BY MR. TRIBBLE:

02:09  25      Q.    And the --

768

02:09  1                    THE COURT:  I would make sure before we

02:09  2  move forward that it's actually on their list.  That's

02:09  3  your representation.

02:09  4                    MR. TRIBBLE:  Absolutely, Your Honor.

02:09  5                    MS. SRINIVASAN:  Absolutely, Your Honor.

       6  BY MR. TRIBBLE:

02:09  7       Q.   In the meantime, let me ask you some

02:10  8  questions.

02:10  9            Did any of the -- as part of your mission in

02:10  10 this case, you were working with the Cisco lawyers over

02:10  11 here, right?

02:10  12      A.   Yes.

02:10  13      Q.   Okay.  And in your report, you even say things

02:10  14 about you were trying to determine what the intent of

02:10  15 the inventors was, don't you?

02:10  16      A.   Perhaps, sir.

02:10  17      Q.   Okay.  You agree one of the inventors, the

02:10  18 first inventor, the main inventor, is Frank Chu?

02:10  19                   THE COURT:  Keep going.  I thought he had

02:10  20 an objection.  I'm sorry.

02:10  21                   MR. HAWKINS:  Your Honor, the exhibit is

02:10  22 not on our exhibit list.

02:10  23                   MR. TRIBBLE:  They produced it, Your

02:10  24 Honor.  It's --

02:10  25                   THE COURT:  That -- that's different than

02:10  1   whether it was on their exhibit list.

02:10  2               MR. TRIBBLE:  It is -- that's true, and I

02:10  3   apologize, Your Honor.  Somebody on my team thought

02:10  4   that it was.

02:10  5               THE COURT:  Okay.  I'm going to sustain

02:10  6   the objection.

02:10  7               You can move on.

02:10  8               MR. TRIBBLE:  Okay.

02:10  9   BY MR. TRIBBLE:

02:10  10      Q.    And so to determine how to read the patent,

02:11  11   you would have loved to talk to Mr. Frank Chu, correct?

02:11  12      A.    It might have been helpful, sir.  Yes.

02:11  13      Q.    Well, when you said in your report you're

02:11  14   trying to determine the intent of the inventors, did

02:11  15   anyone tell you that Cisco had an agreement with the

02:11  16   first named inventor?

02:11  17               MR. HAWKINS:  Objection, Your Honor.

02:11  18   He's testifying about a document in evidence that --

02:11  19               THE COURT:  He didn't ask a word about

02:11  20   the document.

02:11  21   BY MR. TRIBBLE:

02:11  22      Q.    Did anyone tell you that Frank Chu was on

02:11  23   Cisco's payroll?

02:11  24      A.    Not that I know of, sir.

02:11  25      Q.    If he -- if you'd known that, would you have

```
02:11   1    asked to talk to him?
02:11   2                    MR. HAWKINS:  Your Honor, may we
02:11   3    approach?
02:11   4                    THE COURT:  You can.
02:11   5                    (Bench conference.)
02:11   6                    MR. HAWKINS:  Your Honor, there's a MIL
02:11   7    specifically about the -- implying that the lack of
02:11   8    bringing one of the inventors to --
        9                    THE COURT:  He hasn't said a word about
02:12  10    bringing one of the inventors.  He's asking what this
02:12  11    expert did.  You put him on and said that he did.  He
02:12  12    gets to cross him on whatever he didn't.  That's the
02:12  13    way it works.  There's no MIL on this.
02:12  14                    He can -- he can't talk -- he can't talk
02:12  15    about what's in the document, but he can talk about
02:12  16    whether he talked to any of the inventors.  And if he
02:12  17    didn't, why not.
02:12  18                    Why is that not relevant?
02:12  19                    MR. HAWKINS:  The issue here is
02:12  20    Mr. Tribble has now introduced evidence from the
02:12  21    document.
02:12  22                    THE COURT:  He hasn't said -- there's
02:12  23    nothing in the document in evidence.
02:12  24                    MR. HAWKINS:  He said that we have an
02:12  25    agreement with Frank Chu -- that Perkins Coie has an
```

02:12  1    agreement with Frank Chu.  And he's now asking why --

02:12  2    he just said did you know that they have an agreement

02:12  3    with Mr. Chu?

02:12  4                MR. TRIBBLE:  Well, let me ask it in a

02:12  5    different way, Your Honor.

02:12  6                THE COURT:  But yeah.  Don't go into any

02:12  7    agreement which might indicate -- if the concern of

02:12  8    counsel for Cisco is an indication of a relationship

02:12  9    that you can't get in because the document's not in, I

02:12  10   get that.

02:12  11               But if you're going to talk to him about

02:12  12   what he did and didn't do with respect to communicating

02:13  13   with the expert, you're free to.

02:13  14               MR. TRIBBLE:  Okay.  Thank you.

02:13  15               (Bench conference concludes.)

02:13  16   BY MR. TRIBBLE:

02:13  17   Q.   If you had known that Frank Chu was available,

02:13  18   would you have asked to talk to him in determining how

02:13  19   to read the claims in this patent?

02:13  20   A.   I might have, sir.  I --

02:13  21   Q.   Yes or no?

02:13  22        I mean, you just don't know if you would have

02:13  23   asked to talk to him if you'd known he's available?

02:13  24   A.   I would have asked if he had anything I needed

02:13  25   to know.

772

02:13    1       Q.    Wouldn't you want to ask him how to read the

02:13    2    term "each" in the claim language?

02:13    3             Yes or no?

02:13    4       A.    If I thought he knew something really

02:13    5    significant about it, yes, sir, I would.

02:13    6                   MR. TRIBBLE:  Let's put up Plaintiff's

02:13    7    Exhibit 16.  Let's blow up the top left corner.

         8    BY MR. TRIBBLE:

02:14    9       Q.    This is the patent, first page.  It's

02:14   10    literally under United States patent.  He calls it Chu,

02:14   11    et al.

02:14   12             It's referring to Frank Chu and the other

02:14   13    inventors, right?

02:14   14       A.    It says that, sir, yes.

02:14   15       Q.    And the inventors are listed here.  He's

02:14   16    listed first, correct?

02:14   17       A.    That's true, sir.

02:14   18       Q.    You're aware, aren't you, that the first

02:14   19    inventor listed is usually or often the main inventor

02:14   20    of the inventions that are in the patent, correct?

02:14   21       A.    They very often are, sir.  It's not always.

02:14   22       Q.    Not always but often, right?

02:14   23       A.    You should see some of my patents.

02:14   24       Q.    I'm sorry?  I didn't understand.

02:14   25       A.    Yes, sir.

—773—

```
02:14    1        Q.    Okay.  And, you know, for example, sometimes
         2    people will refer to -- I'll use this as an example.
         3    Someone might refer to this as the Chu patent, correct?
         4        A.    That's true, sir.
         5        Q.    So given that, I mean, let me ask you, when
         6    you were determining how to read the term "each" in the
02:15    7    claim language, if you had known that Frank Chu was
02:15    8    available, you would have wanted to talk to him, right?
02:15    9        A.    I would -- again, maybe.  I would have wanted
02:15   10    to know what he knows.
02:15   11        Q.    Okay.  You don't know for sure whether you
02:15   12    would have wanted to talk to him?
02:15   13        A.    That's correct, sir.
02:15   14        Q.    And you don't know how much you've been paid
02:15   15    in this case?
02:15   16        A.    Also true, sir.
02:15   17        Q.    You don't know how much you've been paid by
02:15   18    Cisco in the other case, right?
02:15   19        A.    That's true, sir.
02:15   20        Q.    Now, let's move on to your opinions about
02:15   21    Dr. Schaefer's method of apportioning the value of the
02:16   22    technology in Webex, okay?
02:16   23        A.    Yes, sir.
02:16   24        Q.    You did the same analysis, right?
02:16   25        A.    No, sir.
```

—774—

02:16  1        Q.    You basically used the same methodology as
02:16  2   Dr. Schaefer, didn't you?
02:16  3        A.    Yes.  I did attempt to apply his methodology.
02:16  4        Q.    And so you didn't find that there was some
02:16  5   other better methodology other than what Dr. Schaefer
02:16  6   used; is that fair?  Yes or no?
02:16  7        A.    That's true, sir.
02:16  8        Q.    Okay.  And you started with a list of
02:16  9   features, right?
02:16  10       A.    In repeating the process that Dr. Schaefer
02:16  11  used, I started with a list of features that he had
02:16  12  identified.
02:16  13       Q.    And you determined the weights to be given to
02:16  14  each of those features, the percentages, right?
02:16  15       A.    Yes, sir.
02:16  16       Q.    You just disagree with Dr. Schaefer on what
02:16  17  the percentages were; is that fair?
02:16  18       A.    In the first column, I did not change his
02:16  19  numbers, sir.
02:17  20             THE COURT:  Counsel, would it be okay if
02:17  21  we took a short break?
02:17  22             MR. TRIBBLE:  Of course.
02:17  23             THE COURT:  Ladies and gentlemen of the
02:17  24  jury, we're going to take a short recess.  We'll be
02:17  25  back in 10 or 15 minutes.

775

| | | |
|---|---|---|
| 02:17 | 1 | THE BAILIFF:  All rise. |
| 02:17 | 2 | (Jury exited the courtroom.) |
| 02:17 | 3 | THE COURT:  You may be seated. |
| 02:17 | 4 | You may step down, sir. |
| 02:17 | 5 | Is there anything we need to take up? |
| 02:17 | 6 | MR. TRIBBLE:  Not at this point. |
| 02:17 | 7 | MR. HAWKINS:  Not at this moment, |
| 02:17 | 8 | Your Honor. |
| 02:17 | 9 | THE COURT:  Okay. |
| 02:17 | 10 | (Recess taken.) |
| 02:35 | 11 | THE BAILIFF:  All rise. |
| 02:35 | 12 | THE COURT:  Please remain standing for |
| 02:35 | 13 | the jury. |
| 02:35 | 14 | MR. TRIBBLE:  Oh, Your Honor.  I had one |
| 02:35 | 15 | matter. |
| 02:35 | 16 | THE COURT:  If you'll hold on one moment. |
| 02:35 | 17 | You may be seated. |
| 02:35 | 18 | Yes, sir. |
| 02:35 | 19 | MR. TRIBBLE:  Your Honor, I would urge |
| 02:35 | 20 | the Court again to admit Plaintiff's Exhibit 240.  This |
| 02:35 | 21 | document is in Mr. Willis' schedule. |
| 02:35 | 22 | The document was used in the deposition |
| 02:36 | 23 | of a Cisco witness named Mr. Hamilton in which he |
| 02:36 | 24 | discussed the document, and he said that he didn't know |
| 02:36 | 25 | the exact date Mr. Chu was retained but that his |

—776—

02:36  1    understanding was sometime in August.  And it's dated

02:36  2    August of '22.  He had this document as a depo exhibit

02:36  3    in front of him.

02:36  4                    Then, that deposition is cited in

02:36  5    Mr. Willis' schedule of materials considered.

02:36  6                    (Clarification by Reporter.)

02:36  7                    MR. TRIBBLE:  Plaintiff's Exhibit 40.

02:36  8    Oh, excuse me.  Plaintiff's Exhibit 80.  Thank you.

02:36  9                    THE COURT:  This exhibit is cited as

02:36  10   something he considered?

02:36  11                   MR. TRIBBLE:  Yes.

02:36  12                   THE COURT:  That this witness considered?

02:36  13                   MR. TRIBBLE:  Mr. Boles, can you push it

02:36  14   up?

02:36  15                   Yes, Your Honor.

02:36  16                   THE COURT:  It's in his report as

02:36  17   something he considered?

02:36  18                   MR. TRIBBLE:  Yes.

02:36  19                   MR. HAWKINS:  This is from another

02:37  20   deposition, an exhibit to another deposition, and

02:37  21   Mr. Willis considered the deposition testimony in this

02:37  22   case.

02:37  23                   MR. TRIBBLE:  Yes.  And this was

02:37  24   Exhibit --

02:37  25                   THE COURT:  Let's slow down.  He didn't

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

| | | |
|---|---|---|
| 02:37 | 1 | say he considered this exhibit.  He considered a |
| 02:37 | 2 | deposition where the witness in the deposition said he |
| 02:37 | 3 | considered this. |
| 02:37 | 4 | MR. TRIBBLE:  And they discussed the |
| 02:37 | 5 | document, this letter agreement in the deposition. |
| 02:37 | 6 | I've got the testimony here if you'd like to look at |
| 02:37 | 7 | it. |
| 02:37 | 8 | THE COURT:  Okay.  I'm going to exclude |
| 02:37 | 9 | it. |
| 02:37 | 10 | You may bring them in. |
| 02:37 | 11 | THE BAILIFF:  All rise. |
| 02:37 | 12 | (Jury entered the courtroom.) |
| 02:37 | 13 | THE COURT:  You may be seated.  Thank |
| 02:37 | 14 | you. |
| 02:37 | 15 | If the witness would take the stand, |
| 02:37 | 16 | please. |
| 02:38 | 17 | MR. TRIBBLE:  Your Honor, there's been a |
| 02:38 | 18 | bit of housekeeping.  I'd like to move into evidence |
| 02:38 | 19 | his web page that was shown earlier as Plaintiff's |
| 02:38 | 20 | Exhibit 246. |
| 02:38 | 21 | MR. HAWKINS:  No objection, Your Honor. |
| 02:38 | 22 | THE COURT:  It's admitted. |
| 02:38 | 23 | MR. TRIBBLE:  And I'd like to move in the |
| 02:38 | 24 | LinkedIn PDF that was -- we've marked as Plaintiff's |
| 02:38 | 25 | Exhibit 247.  We move that into evidence. |

—778—

| | | |
|---|---|---|
| 02:38 | 1 | MR. HAWKINS:  No objection, Your Honor. |
| 02:38 | 2 | THE COURT:  Admitted. |
| 02:38 | 3 | MR. TRIBBLE:  Okay.  Mr. Boles, can you |
| 02:38 | 4 | put up Mr. Willis' slide that discusses noninfringing |
| | 5 | alternatives? |
| 02:39 | 6 | There we go.  This one here. |
| 02:39 | 7 | BY MR. TRIBBLE: |
| 02:39 | 8 | Q.    Mr. Willis, this is your slide, correct? |
| 02:39 | 9 | A.    Yes. |
| 02:39 | 10 | Q.    And you said that Cisco could avoid |
| 02:39 | 11 | infringement by changing Webex to operate differently, |
| 02:39 | 12 | correct? |
| 02:39 | 13 | A.    Yes. |
| 02:39 | 14 | Q.    And one of the changes they could make to |
| 02:39 | 15 | Webex would be sending only one active speaker's audio |
| 02:39 | 16 | to the client at a time, correct? |
| 02:39 | 17 | A.    Yes. |
| 02:39 | 18 | Q.    And that would -- if they changed that part of |
| 02:39 | 19 | Webex, only one person could talk at a time -- could |
| 02:40 | 20 | talk at a time? |
| 02:40 | 21 | A.    Yes. |
| 02:40 | 22 | Q.    And we heard Mr. Barave testify about how |
| 02:40 | 23 | their market of customers is -- I don't know if he said |
| 02:40 | 24 | mainly, but he said a lot of them were corporations, |
| 02:40 | 25 | medium-sized companies and large companies and large |

02:40  1    governmental entities.  I don't know if he gave this

02:40  2    example, but I'd say like a school district or

02:40  3    something like that.

02:40  4          Do you recall that testimony?

02:40  5    A.    Yes.

02:40  6    Q.    Do you think that Webex would be very

02:40  7    competitive for those types of big business customers

02:40  8    if, unlike Zoom or Microsoft Teams, they changed Webex

02:40  9    so that only one active speaker's audio to the clients

02:40  10   would be sent to the clients at a time?

02:40  11   A.    I just can't speak to the competitive

02:40  12   position, sir.

02:40  13   Q.    Okay.  In other words, to be a noninfringing

02:41  14   alternative, there is some standard for that, right?  I

02:41  15   mean, doesn't it have to be like a reasonably

02:41  16   acceptable alternative or something like that?

02:41  17   A.    Yes.

02:41  18   Q.    And so given Mr. Barave's description of their

02:41  19   business market, do you think that Alternative 1,

02:41  20   sending -- letting only one person talk at a time on a

02:41  21   videoconference, that that would be a reasonably

02:41  22   acceptable alternative to Cisco when Microsoft Teams

02:41  23   and Zoom already -- they still offer that feature to

02:41  24   let multiple people talk at the same time?

02:41  25   A.    At the date of 2004, sir, yes.

02:41  1        Q.    Okay.  What about the date 2007?

02:42  2        A.    Perhaps less so but still not completely out

02:42  3   of the question.

02:42  4        Q.    Okay.  Well, we can agree that Webex -- in

02:42  5   general, Cisco would want Webex to have all -- at least

02:42  6   as many features as Microsoft Teams and Zoom.  Would

02:42  7   you agree with that?

02:42  8        A.    Yes.

02:42  9        Q.    Okay.  Fair enough.

02:42  10             And then the other alternative you listed was

02:42  11  to send all users' mixed audio, correct?

02:42  12       A.    Yes.

02:42  13       Q.    And how would that work in your system?  Would

02:42  14  it allow multiple speakers?

02:42  15       A.    Yes.

02:42  16       Q.    You testified about multiplexing yesterday,

02:42  17  and you said that it does improve the sound quality of

02:42  18  the videoconference?

02:42  19       A.    It may.

02:42  20       Q.    Okay.  Dr. Schaefer says that it does.

02:42  21             You agree that at least to the extent that it

02:42  22  may improve sound quality, correct?

02:43  23       A.    Yes, sir.  It may.

02:43  24       Q.    And if instead you mixed all the audio

02:43  25  together and sent it, it may have a lower sound quality

781

02:43  1    as Dr. Schaefer described, correct?

02:43  2         A.    Depends on the effectiveness of the mix, sir.

02:43  3    There's options.

02:43  4         Q.    It's possible that it'll have a lower sound

02:43  5    quality as Dr. Schaefer testified to, isn't it?

02:43  6         A.    It's possible.  Yes.

02:43  7              MR. TRIBBLE:  Okay.  I pass the witness.

02:43  8                   REDIRECT EXAMINATION

02:43  9    BY MR. HAWKINS:

02:43  10        Q.    Mr. Willis, can you hear me?

02:43  11        A.    I can.

02:43  12        Q.    All right.

02:43  13        A.    A little closer, though.

02:43  14        Q.    A little closer, is that what you said?

02:43  15             Mr. Willis, there was some questions about

02:43  16   your website that listed what you had done since 2007.

02:44  17             When was that website written?

02:44  18        A.    2007.

02:44  19        Q.    And has it ever been updated?

02:44  20        A.    I think I might have changed the contact

02:44  21   e-mail address on it.

02:44  22        Q.    Okay.  Mr. Willis, did you provide your CV in

02:44  23   this case?

02:44  24        A.    I did.

02:44  25        Q.    Was your CV attached to the expert report that

—782—

02:44    1    you provided in this case?

02:44    2        A.    Yes.

02:44    3        Q.    Is it your understanding that Paltalk had that

02:44    4    CV?

02:44    5        A.    I would expect so.

02:44    6                MR. TRIBBLE:  Objection, Your Honor.

         7                (Clarification by Reporter.)

02:44    8                MR. TRIBBLE:  Objection.  This exceeds

02:44    9    the scope of cross-examination.

02:44   10                THE COURT:  Overruled.

02:44   11    BY MR. HAWKINS:

02:44   12        Q.    Mr. Willis, in the years since 2007, when you

02:44   13    updated your website, what kind of clients have you

02:44   14    worked for?

02:44   15        A.    I've worked for a large variety of clients,

02:44   16    including primarily larger firms like Apple, Google,

02:45   17    British Telecom, Verizon, Cisco, several others

02:45   18    probably in that class range, Samsung.

02:45   19                I've worked with a few smaller clients that

02:45   20    were primarily individual inventors, such as Centre

02:45   21    Com, Gerard's people and other smaller firms on a

02:45   22    time-to-time basis.  But it's usually the bigger firms

02:45   23    that get involved in the sorts of suits that seem to

02:45   24    require my assistance.

02:45   25        Q.    And, Mr. Willis, in your work since 2007, have

```
02:45   1   you worked for plaintiffs?
02:45   2       A.    Yes.
02:45   3       Q.    And so you -- have you provided opinions
02:45   4   regarding infringement in those cases?
02:45   5       A.    Yes.  I have.
02:45   6       Q.    And so you have provided expert opinion
02:45   7   work -- I'm sorry.
02:45   8            Mr. Willis, have you provided expert opinion
02:45   9   work for plaintiffs as well as defendants?
02:45   10      A.    Yes.
02:45   11      Q.    All right.  Mr. Willis, do you know how many
02:46   12  times you have provided expert opinion work for
02:46   13  plaintiffs?
02:46   14      A.    I haven't gone through and counted it, but
02:46   15  more than ten.
02:46   16      Q.    All right.  Thank you.
02:46   17            Mr. Willis, there was some questioning about
02:46   18  your bias towards defendants in this case.
02:46   19            Mr. Willis, if you have disagreed with Cisco,
02:46   20  have you made those opinions known in the past?
02:46   21      A.    I've teased them about many things in the
02:46   22  past.
02:46   23      Q.    Mr. Willis, you stated your disagreement of --
02:46   24  with something Cisco is doing on that LinkedIn website,
02:46   25  didn't you?
```

—784—

02:46  1        A.    I laughed at the irony of having a repeat of a

02:46  2   ten-year-old product announcement in a context where

02:46  3   they're talking about increasing innovation.

02:46  4        Q.    And, Mr. Willis, if you had disagreed with any

02:46  5   of Cisco's -- you hadn't agreed that Cisco was not

02:47  6   infringing, would you have felt free to make that

02:47  7   opinion known in this case?

02:47  8        A.    Yes.  I've declined many cases.

02:47  9        Q.    Mr. Willis, there was also questions about

02:47  10  your testimony yesterday, and Mr. Tribble showed you a

02:47  11  portion of that testimony in which you had spoken about

02:47  12  some of the basis for your plain and ordinary meaning.

02:47  13            Do you recall that?

02:47  14       A.    I think so, yes.

02:47  15       Q.    Mr. Willis, do you recall after providing that

02:47  16  testimony, providing further evidence of -- that you

02:47  17  relied on in support of your understanding of the plain

02:47  18  and ordinary meaning of the term "each"?

02:47  19       A.    Yes.

02:47  20       Q.    And in that testimony, what additional

02:47  21  evidence beyond your personal opinion did you walk

02:47  22  through with the jury and rely on in forming your

02:48  23  opinion?

02:48  24       A.    Well, we went through the -- some text from

02:48  25  the body of the patent and explained how in the

785

02:48  1    particular case of Claim 1 it was necessary for Claim 1

02:48  2    to send the packet so that Claim 2 could claim not

02:48  3    sending it.

02:48  4            Now, that influenced the reading of each in

02:48  5    the context of Claim 1.

02:48  6        Q.    So was some of the evidence you relied on the

02:48  7    patent itself?

02:48  8        A.    Yes.

02:48  9        Q.    And did you provide testimony yesterday

02:48  10   regarding your reliance on the patent itself in support

02:48  11   of your opinion that "each" means "all"?

02:48  12               MR. TRIBBLE:  Objection, leading.

02:48  13               THE COURT:  Sustained.  Sustained.

02:48  14               MR. TRIBBLE:  Move to strike, Your Honor.

02:48  15               THE COURT:  It will be granted.  The jury

02:49  16   will disregard the answer.

02:49  17   BY MR. HAWKINS:

02:49  18       Q.    Mr. Willis, in addition to your opinion, your

02:49  19   personal opinion, what evidence did you walk through

02:49  20   yesterday with the jury to explain and support your

02:49  21   opinion regarding the term of "each"?

02:49  22       A.    Well, we talked through some examples, sort of

02:49  23   dictionary-type sounding out of the word.  The code,

02:49  24   the other speech that I'd heard in testimony here.

02:49  25               I'm sure there was something else that I've

| | | |
|---|---|---|
| 02:49 | 1 | forgotten. |
| 02:49 | 2 | Q.   Mr. Willis, were there slides that we included |
| 02:49 | 3 | in your -- that were included in your demonstratives |
| 02:49 | 4 | yesterday that discussed opinions that you provided |
| 02:49 | 5 | or -- I'm sorry -- evidence that you relied on besides |
| 02:50 | 6 | your personal opinion? |
| 02:50 | 7 | A.   Yes. |
| 02:50 | 8 | Q.   And what was the content, like what was that |
| 02:50 | 9 | evidence that you relied on in addition to your |
| 02:50 | 10 | personal opinion? |
| 02:50 | 11 | A.   There's dictionary word meanings of the word |
| 02:50 | 12 | "each." |
| 02:50 | 13 | Q.   I think there's some confusion.  The |
| 02:50 | 14 | implication is that you only relied on your personal |
| 02:50 | 15 | opinion with nothing else. |
| 02:50 | 16 | MR. HAWKINS:  And if it would be helpful, |
| 02:50 | 17 | Your Honor, may I approach to refresh the recollection |
| 02:50 | 18 | of the witness? |
| 02:50 | 19 | THE COURT:  Sure.  Of course. |
| 02:50 | 20 | MR. TRIBBLE:  Your Honor, may we |
| 02:50 | 21 | approach? |
| 02:50 | 22 | THE COURT:  Yes. |
| 02:50 | 23 | (Bench conference.) |
| 02:50 | 24 | MR. TRIBBLE:  He's asking about the |
| 02:50 | 25 | slides he used yesterday.  But after our discussion, |

—787—

02:50  1   they took that out.  And so I hope he's not going to

02:50  2   say any more about dictionary definitions.

02:50  3                MR. HAWKINS:  I'm not trying to --

02:51  4   withdraw that.  I'm not trying to enter that.

02:51  5                MR. TRIBBLE:  Okay.

02:51  6                (Bench conference concludes.)

02:51  7   BY MR. HAWKINS:

02:51  8        Q.    Mr. Willis, after reviewing a portion of your

02:51  9   testimony yesterday, do you recall the additional

02:51  10  evidence that you relied on in forming your opinion

02:51  11  regarding the plain and ordinary meaning of the term

02:51  12  "each"?

02:51  13       A.    Yes.  I do.

02:51  14       Q.    And what was that evidence?

02:51  15       A.    I thought I had explained this a minute ago,

02:51  16  but I relied on the teachings in the patent itself,

02:51  17  reviewed the patent, preferred embodiment, all the

02:52  18  parts of the patent to understand how to use the word

02:52  19  "each."

02:52  20       Q.    And do you feel like you've fully walked

02:52  21  through that analysis of the patent with the jury

02:52  22  yesterday?

02:52  23       A.    I think so, yes.

02:52  24       Q.    Okay.  Mr. Willis, there was also some

02:52  25  questions about the preferred embodiments, and

—788—

| | | |
|---|---|---|
| 02:52 | 1 | Mr. Tribble had begun asking you about a portion of the |
| 02:52 | 2 | specification. |
| 02:52 | 3 | MR. HAWKINS:  Mr. Beall, could we bring |
| 02:52 | 4 | up Column 5?  I believe it's 45 to 52. |
| 02:52 | 5 | BY MR. HAWKINS: |
| 02:52 | 6 | Q.   Do you remember being asked about this? |
| 02:52 | 7 | A.   Yes. |
| 02:52 | 8 | Q.   And, Mr. Willis, we -- did we discuss this |
| 02:52 | 9 | yesterday in your direct testimony? |
| 02:52 | 10 | A.   We discussed the first part of this in the |
| 02:52 | 11 | direct testimony, if I recall correctly. |
| 02:52 | 12 | Q.   All right.  And Mr. Tribble asked you about |
| 02:52 | 13 | your understanding of how this portion of the |
| 02:53 | 14 | specification could or could not comply with the |
| 02:53 | 15 | preferred embodiments and the different claims.  And he |
| 02:53 | 16 | stopped you as you were trying to explain your |
| 02:53 | 17 | understanding of how this relates to the claims. |
| 02:53 | 18 | Would you like to go ahead and provide that |
| 02:53 | 19 | opinion as to how this relates to Claims 1, 2, and 3, |
| 02:53 | 20 | for instance? |
| 02:53 | 21 | A.   Yes.  Thank you. |
| 02:53 | 22 | This is from the preferred -- the description |
| 02:53 | 23 | of the preferred embodiment of the invention.  This is |
| 02:53 | 24 | how I understand them to be telling me how they |
| 02:53 | 25 | vision -- envision the system working. |

789

02:53  1          And the first part up here up to the "however"
02:53  2  essentially is what I understand Claim 1 to have been
02:53  3  drawn from.  Claim 1 is claiming that part of the
02:53  4  preferred embodiment.
02:53  5          Then the second part of that is what I
02:53  6  understand Claims 2 and 3 to have been drawn from; that
02:54  7  is, they're claiming that part of the preferred
02:54  8  embodiment.
02:54  9          Thus, Claim 1 does not read on the entirety of
02:54  10 the preferred embodiment because there are functions in
02:54  11 the preferred embodiment that are not claimed in
02:54  12 Claim 1.
02:54  13    Q.    And where are those functions handled in the
02:54  14 claims then?
02:54  15    A.    Later claims.
02:54  16    Q.    Can you be more specific?
02:54  17          Specifically with this "however" language,
02:54  18 where do you --
02:54  19    A.    Okay.  In -- in particular, the part of not
02:54  20 including Party J's own audio, they're in Step 314.
02:54  21 That is the part we were talking about in Claim 2 or
02:54  22 Claim 3 where the speaker's data is, in the claim,
02:54  23 removed from either the multiplexed stream or from the
02:54  24 combined packet that is to be sent back to the speaker.
02:54  25    Q.    And -- and that portion that's being

790

| | | |
|---|---|---|
| 02:54 | 1 | highlighted there, which claims do you believe that |
| 02:54 | 2 | that is addressing? |
| 02:54 | 3 | A.    That would be Claim 2. |
| 02:55 | 4 | Q.    Okay.  And so then can you clarify once again |
| 02:55 | 5 | your testimony in response to Mr. Tribble's question |
| 02:55 | 6 | that Claim 1 does not include all of the preferred |
| 02:55 | 7 | embodiment? |
| 02:55 | 8 | A.    Correct.  Claim 1 does not include or cover |
| 02:55 | 9 | all of the preferred embodiment. |
| 02:55 | 10 | Q.    Do you believe that this "however" portion is |
| 02:55 | 11 | covered in the rest of the claims, though? |
| 02:55 | 12 | A.    Yes.  I believe that the "however" section, |
| 02:55 | 13 | the way I've highlighted here, is in particular covered |
| 02:55 | 14 | in Claim 2. |
| 02:55 | 15 | MR. HAWKINS:  Pass the witness. |
| 02:55 | 16 | MR. TRIBBLE:  Mr. Boles, can you pull up |
| 02:55 | 17 | the patent, Column 5?  Look at that same part they were |
| 02:55 | 18 | looking at. |
| 02:55 | 19 | RECROSS-EXAMINATION |
| 02:55 | 20 | BY MR. TRIBBLE: |
| 02:55 | 21 | Q.    Okay.  So you just testified -- you're |
| 02:56 | 22 | implying that the first part in Step 314, active |
| 02:56 | 23 | speaker audio data for each and every active speaker is |
| 02:56 | 24 | multiplexed. |
| 02:56 | 25 | Your -- you just testified that that next |

791

02:56  1   sentence, "However, as will be apparent to those
02:56  2   skilled in the relevant art, if a Party J is an active
02:56  3   speaker, Step 314 will not include Party J's own audio
02:56  4   in the multiplexed streams."
02:56  5           You just testified that you shouldn't read
02:56  6   those two sentences together.  But that's not what you
02:56  7   said in your deposition, is it?
02:56  8       A.    I may have worded it differently, yes.
02:56  9       Q.    I'm sorry.  I couldn't hear you.
02:56 10       A.    Yes.
02:56 11       Q.    Okay.
02:56 12           MR. TRIBBLE:  Well, Your Honor, I'd like
02:57 13   to play the clip from his deposition, Page 88.  I think
02:57 14   he goes to maybe page -- what's the last line -- 89,
02:57 15   Line 5?  10?
02:57 16           Line 10.  Go ahead.
02:57 17   (Video deposition of Dean Willis played as follows:
02:57 18       Q.    And read together, the sentence beginning in
02:57 19   Step 314 and the sentence beginning "however," suggests
02:57 20   that even though under this patent, active speaker
02:57 21   audio data for each and every active speaker will be
02:57 22   multiplexed, someone skilled in the art would just --
02:57 23   would understand that even that concept of "each" and
02:57 24   "every" would still account for the fact that an active
02:57 25   speaker would not receive back his own audio data.

—792—

02:57  1              Is that a fair interpretation of those two

02:57  2    sentences?

02:57  3                    MR. HAWKINS:  Objection, Your Honor.

02:58  4    This is --

02:58  5        A.    Roughly, yes.

02:58  6                    MR. HAWKINS:  -- improper impeachment.

02:58  7    This is an inconsistent statement.

02:58  8                    THE COURT:  Overruled.

02:58  9              (Video played.)

02:58  10       Q.    So the concept of "each" and "every" accounts

02:58  11   for the fact that some audio, i.e., the audio of an

02:58  12   active speaker, will be not included in the multiplexed

02:58  13   packet going back to the -- to an active speaker,

02:58  14   right?

02:58  15       A.    I believe that is supported teaching there,

02:58  16   yes, in general.

02:58  17              (End of video deposition.)

02:58  18   BY MR. TRIBBLE:

02:58  19       Q.    You paused for about 15 seconds before you

02:58  20   finally answered that question, didn't you?

02:58  21       A.    I paused.

02:58  22                    MR. TRIBBLE:  I pass the witness.

02:58  23              FURTHER REDIRECT EXAMINATION

02:58  24   BY MR. HAWKINS:

02:59  25       Q.    Mr. Willis, can you hear me again?

793

02:59  1      A.     Yes.  I can.

02:59  2      Q.     Mr. Willis, do you believe there was anything

02:59  3   inconsistent in regards to the testimony that you gave

02:59  4   in your deposition versus what you have stated here in

02:59  5   court?

02:59  6      A.     No.  I don't.

02:59  7      Q.     And once again, can you explain why that is an

02:59  8   inconsistent issue?

02:59  9      A.     If I recall correctly, at the time we were

02:59  10  having this discussion in the deposition, we were

02:59  11  speaking about over the context of the entire patent,

02:59  12  which, as I said, allows for that separate removal in

02:59  13  Claims -- well, it doesn't just allow, it requires that

02:59  14  removal at either Claim 2 or 3.

02:59  15                  MR. HAWKINS:  Thank you.  No further

02:59  16  questions.

02:59  17                  THE COURT:  Anything else?

02:59  18                  MR. TRIBBLE:  No further questions,

02:59  19  Your Honor.

02:59  20                  THE COURT:  You may step down.

02:59  21                  Your next witness, please?

03:00  22                  MR. SIEGMUND:  Your Honor, can we just

03:00  23  approach real quick?  It'll just take a second.

03:00  24                  (Bench conference.)

03:00  25                  MR. SIEGMUND:  Sorry.  We just caught it

—794—

```
03:00   1    that time.  We have an objection -- we have an
03:00   2    objection to these two references.  You excluded them
03:00   3    in the pretrial conference.  And they should not be in
03:00   4    this.  So you excluded them.
03:00   5                MS. DELACENSERIE:  Your Honor, these are
03:00   6    addressed in the background section of Mr. Bress'
03:00   7    original report and they were added as obviousness
03:00   8    prior art in his supplemental report.
03:00   9                Then you moved to strike that ground,
03:00  10    that obviousness ground.  That is all.
03:00  11                We are only -- we're only using these
03:01  12    references as general background.  He's not asserting
03:01  13    that the claims are obvious in view of them.  We are
03:01  14    not pursuing that that is a ground based on either of
03:01  15    these.  Both of them existed in his original report
03:01  16    before the supplementation.
03:01  17                THE COURT:  What's the -- what relevance
03:01  18    does it have?
03:01  19                MS. DELACENSERIE:  They are the H.323 and
03:01  20    SIP protocols that are addressed in the claims.  And
03:01  21    I'll also note the H.323, the version that he used in
03:01  22    his original report, isn't -- sorry -- that version is
03:01  23    not the version that he used in the added ground
03:01  24    that -- the report that Paltalk moved to strike in your
03:01  25    court, and they never moved to strike the background
```

03:01   1   section or discussion of these references in Mr. Bress'

03:01   2   original report which have been there from the

03:01   3   beginning.

03:01   4               THE COURT:  And what does the ground say?

03:01   5   He's just going to say these are background?

03:01   6               MS. DELACENSERIE:  He's just going to

03:01   7   explain what these standards are.  They're in the

03:01   8   claims.  He's going to explain that they exist, how

03:01   9   they were -- at a very, very high level, he's not going

03:01  10   to be tying them to the claims.

03:01  11               And the jury should have these at their

03:02  12   disposal.  They're part of the claims, and the patent

03:02  13   itself explains that they are prior art.  And it's not

03:02  14   something that, you know, is not --

03:02  15               THE COURT:  In light of the -- if they

03:02  16   are part of your invalidity -- part of your --

03:02  17               MS. DELACENSERIE:  It's part of the

03:02  18   explanation of just the state of the art, the

        19   background.

03:02  20               I can show you the section of his report

03:02  21   where he addresses them, which is the background,

03:02  22   again, is from his original report before the

03:02  23   supplementation who addresses -- he talks about a

03:02  24   variety of places where both of these articles were

03:02  25   spoken about generally.

796

03:02  1          And just to explain, to give some context

03:02  2  to what -- I mean, H.323 SIP, what the heck is this?

03:02  3  It's in the claims, and the jury has no idea.

03:02  4          So I think it is entirely appropriate to

03:02  5  give them a copy and talk very generally about them.

03:02  6  We will not be tying them to any claims.  There are no

03:02  7  slides where they're tied to the claims.

03:02  8          THE COURT:  Are either of these

03:02  9  protocols -- on one hand you said background.  How are

03:02  10  they tied to the art that you're using?

03:02  11          MS. DELACENSERIE:  I mean, they're

03:03  12  referenced in the art.  They're referenced in the

03:03  13  patent.  They're referenced in the asserted claims.

03:03  14          THE COURT:  What is he going to say?  Why

03:03  15  does he need to talk about these to explain the art

03:03  16  that he's going to be talking about?

03:03  17          MS. DELACENSERIE:  So one of them just

03:03  18  discusses generally -- and you can see here on the

03:03  19  slide exactly what we plan to do.  It's -- yes.  Here.

03:03  20          So one of the things is just general

03:03  21  background.  Again, this is -- quotes directly from his

03:03  22  original report that Paltalk never sought to strike and

03:03  23  just providing background information about how it was

03:03  24  known to eliminate or attenuate signals.

03:03  25          THE COURT:  You have an objection to this

—797—

03:03  1    slide?

03:03  2              MR. SIEGMUND:  We do.  For the exact same

03:03  3    reason, it violates the Court's MIL.  It's not

03:03  4    relevant.

03:03  5              THE COURT:  I can't hear you.

03:03  6              MR. SIEGMUND:  It's for the exact same

03:03  7    reasons, you already excluded it.  It's not relevant,

03:03  8    and it violates the Court's MIL.

03:03  9              THE COURT:  Either I did or I didn't

03:03  10   exclude it.

03:03  11             MS. DELACENSERIE:  They never asked to

03:03  12   exclude it.  It's from his background section.  They're

03:03  13   limiting it to the discussion that was in the

03:03  14   background section of his report.  But they've never

03:04  15   asked to strike and Your Honor never struck.

03:04  16             THE COURT:  So when will -- I allegedly

03:04  17   excluded it, for example, H.323.  When did I -- when

03:04  18   did I allegedly do that?

03:04  19             MS. DELACENSERIE:  That was at the most

03:04  20   recent -- oh, sorry.

03:04  21             MR. SIEGMUND:  Yes, sir.

03:04  22             THE COURT:  When did I exclude it, at a

03:04  23   pretrial conference?

03:04  24             MR. SIEGMUND:  Yes, Your Honor.  I'll

03:04  25   explain it to you, in fairness to the defendant.

03:04   1              So it was in his original report.  We had

03:04   2      another hearing.  And then you had another final

03:04   3      pretrial conference.  And that is where you excluded it

03:04   4      because they were going to rely on it for prior art.

03:04   5      You said that was not -- they were not allowed to

03:04   6      supplement.

03:04   7              THE COURT:  Did I include the prior art,

03:04   8      or did I exclude the standard he wants to --

03:04   9              MR. SIEGMUND:  You excluded the prior

03:04  10      art.

03:04  11              MS. DELACENSERIE:  You excluded the

03:04  12      obviousness Mr. Bress added in his supplemental report.

03:04  13      Nothing else was addressed in their -- in their motion.

03:04  14      And I'll also note this is a different version.  Sorry.

03:05  15      Sorry.

03:05  16              THE COURT:  So where, Mr. Siegmund, did I

03:05  17      specifically exclude the discussion of these standards?

03:05  18      I mean, I understand that there's supplemental art -- I

03:05  19      did something with regard to 103, but where did I make

03:05  20      it clear to defendant that these standards were out and

03:05  21      they couldn't talk about them?  And why did I do that?

03:05  22              MR. SIEGMUND:  You did it, Your Honor,

03:05  23      because we -- we were allowed to supplement our reports

03:05  24      but only to --

03:05  25              THE COURT:  But she's saying this is in

03:05  1    the original report.

03:05  2              MR. SIEGMUND:  It is.

03:05  3              THE COURT:  So where did I exclude these

03:05  4    standards?  At what -- how did I do it?  What did I

03:05  5    say?  I said -- did you specifically say these

03:05  6    standards shouldn't come in?

03:05  7              And then I said:  I include for some of

03:05  8    these?

03:05  9              MR. SIEGMUND:  Yes.  Because -- because

03:05  10   in their supplemental report, they thought --

03:05  11             THE COURT:  If you think you're right,

03:05  12   here's what we're going to do:  We're going to take a

03:06  13   break.  We're going to find the transcript.

03:06  14             And if I said that, then I'm going to

03:06  15   charge the time against you.  And if you're wrong, I'm

03:06  16   going to charge whatever time it takes between now and

03:06  17   when you find it against her side.  So is that a risk

03:06  18   you want to take?

03:06  19             And I want to make very clear.  I want

03:06  20   the transcript from that hearing that says I

03:06  21   specifically, in excluding these standards -- and you

03:06  22   can't use the sentence not that there's some piece of

03:06  23   art, that you're saying, oh, you know, this -- this was

03:06  24   in their original report.

03:06  25             MR. SIEGMUND:  It was.

—800—

```
03:06   1                    THE COURT:  Then if you have something
03:06   2    where I said they couldn't use these standards and you
03:06   3    think it's in that hearing, I'll break right now and
03:06   4    they just sit and wait for you to find the transcript.
03:06   5    And if you're right and you want -- you think -- if
03:06   6    defendant thinks they're right, someone will lose
03:06   7    whatever time it takes to prove it, or I'm just going
03:07   8    to allow you to use it.  So it's up to you.
03:07   9                    MR. SIEGMUND:  Okay.  I can make it easy
03:07   10   for the Court.  They had it in their original report.
03:07   11   They put it in their supplemental report as prior art.
03:07   12   You excluded it as prior art.
03:07   13                    So I think in fairness, technically you
03:07   14   did not exclude it as background art, but we still have
03:07   15   an objection on the MIL.  I assume the Court's going to
03:07   16   overrule that.
03:07   17                    THE COURT:  I'm going to overrule it.
03:07   18                    MR. SIEGMUND:  Okay.  Understood.
03:07   19                    MS. DELACENSERIE:  Thank you, Your Honor.
03:07   20                    (Bench conference concludes.)
03:07   21                    MS. DELACENSERIE:  Your Honor, Cisco
03:07   22   calls Mr. James Bress.
03:07   23                    (The witness was sworn.)
03:07   24                    DIRECT EXAMINATION
03:07   25   BY MS. DELACENSERIE:
```

03:08  1        Q.    Good afternoon, Mr. Bress.

03:08  2        A.    Good afternoon.

03:08  3        Q.    Can you please introduce yourself to the jury?

03:08  4        A.    Yes.  Good afternoon.  My name's James Bress.

03:08  5  I go by Jim.

03:08  6        Q.    Where are you from?

03:08  7        A.    I'm from Millbrook, Florida.  I moved there in

03:08  8  1995 with my wife to raise our kid and start my

03:08  9  business.

03:08 10        Q.    Thank you.

03:08 11              What do you do for work?

03:08 12        A.    I am the president and CTO of AST Technology

03:08 13  Labs.  I also do consulting work for projects like

03:08 14  this.

     15        Q.    Let's talk a little bit about your role in

     16  this case.

03:09 17              What were you asked to do?

03:09 18        A.    Yes.  I was asked to investigate the validity

03:09 19  of the '858 patent.

     20                 (Clarification by Reporter.)

03:09 21        A.    Yes.  I was asked to investigate the validity

03:09 22  of the '858 patent.

03:09 23  BY MS. DELACENSERIE:

03:09 24        Q.    And were you compensated for your time spent

03:09 25  investigating and assessing the validity of the '858

—802—

03:09    1    patent?

03:09    2        A.    Yes.   At my regular consulting rate.

03:09    3        Q.    Did you reach any conclusions regarding the

03:09    4    validity of the '858 patent?

03:09    5        A.    Yes.   I did.

03:09    6        Q.    And is your compensation at all dependent on

03:09    7    whether the jury agrees with your conclusions?

03:09    8        A.    No.   No.

03:09    9        Q.    And are you aware of Paltalk's infringement

03:09   10    allegations in this case?

03:09   11        A.    I'm aware that Paltalk accuses that Webex

03:09   12    infringes the '858 patent, but I've done no

03:09   13    investigation of that.

03:09   14        Q.    Will you be offering any opinions regarding

03:09   15    infringement today?

03:09   16        A.    No.   I have no opinions on infringement.

03:10   17        Q.    Back to your conclusion that the '858 patent

03:10   18    is invalid, have you prepared any slides to help

03:10   19    explain to the jury why?

03:10   20        A.    Yes.   I have.

03:10   21        Q.    All right.

03:10   22              MS. DELACENSERIE:   Let's pull up your

03:10   23    first slide.

        24    BY MS. DELACENSERIE:

03:10   25        Q.    To start, can you tell us a little bit more

03:10   1    about your company, AST Technology Labs?

03:10   2       A.    Yes.   I'm the -- as I mentioned, I'm the

03:10   3    president and CTO.   That means I'm responsible for all

03:10   4    of our employees.   That's the most important thing.

03:10   5    I'm responsible for the business in general.   And I'm

03:10   6    the CTO.   I'm responsible for all technical aspects of

03:10   7    the business.

03:10   8            And AST is a test lab.   We test

03:10   9    telecommunications equipment for manufacturers all over

03:10   10   the world, and we provide design consulting as well.

03:10   11      Q.    Today, how many employees does AST Technology

03:10   12   Labs have?

03:10   13      A.    We have ten employees.

03:10   14      Q.    And beyond your leadership responsibilities as

03:10   15   president and CTO, what does your day-to-day work

03:10   16   consist of?

03:10   17      A.    Yeah.   Well, I'm an engineer.   At core, I'm an

03:10   18   engineer.

03:10   19           From the very beginning of my career and

03:11   20   certainly beginning of AST, my company, and through to

03:11   21   today, I'm responsible for all technical aspects of the

03:11   22   lab.

03:11   23           So I did -- that means that I designed the

03:11   24   custom test equipment that we have.   That means writing

03:11   25   specifications, developing hardware and software.

804

```
03:11   1   Everything to do with operating the laboratories.
03:11   2       Q.   And what kind of devices do you work with in
03:11   3   your lab?
03:11   4       A.   So the devices we test, it's been an
03:11   5   evolution, of course.  We started in 1995, and that's
03:11   6   getting to be almost 30 years ago.
03:11   7            So in the beginning, we were testing what
03:11   8   you've heard called PSTN, the --
03:11   9                 (Clarification by Reporter.)
03:11  10       A.   Yeah.  So I was explaining the type of the
03:11  11   devices that we test in the lab.
03:12  12            And so in the beginning, we were testing and
03:12  13   we continue to test devices that connect to the public
03:12  14   switched telephone network, and as labs evolved, we
03:12  15   tested devices that you've heard about called VoIP.
03:12  16   And during telephone calls, devices that enable
03:12  17   telephone calls over the Internet and we also test
03:12  18   mobile devices.
03:12  19   BY MS. DELACENSERIE:
03:12  20       Q.   Let's take a step back for a minute and talk a
03:12  21   little bit about your education.
03:12  22            Where'd you go to undergrad?
03:12  23       A.   I got my bachelor's degree in electrical
03:12  24   engineering from the University of North Carolina in
03:12  25   Charlotte.
```

03:12  1      Q.    And did you have a job in the industry while

03:12  2  working towards your bachelor's degree?

03:12  3      A.    Yes.  While I was going to school, I also

03:12  4  worked at a company called Process Systems.  I was an

03:12  5  engineering technician.

03:12  6      Q.    And what did you do after earning your

03:12  7  bachelor's degree in electrical engineering?

03:12  8      A.    I was hired by Bellcore.  It's Bell

       9  Communications Research.

03:12 10            Bellcore was the research arm for the Bell

03:12 11  operating companies.  You may have heard of the baby

03:12 12  Bells.  That would have been BellSouth and SBC.

03:13 13      Q.    All right.  And did you pursue any advanced

03:13 14  degrees in electrical engineering?

03:13 15      A.    I did.  So after starting at Bellcore,

03:13 16  Bellcore actually paid for me to attend California

03:13 17  Institute of Technology.  Paid my tuition and paid me

03:13 18  while I was there to obtain my master's degree.

03:13 19      Q.    And after obtaining your master's degree, did

03:13 20  you return to Bellcore to continue working?

03:13 21      A.    Yes.  So I earned my master's degree in

03:13 22  electrical engineering.  And the coursework I did at

03:13 23  Caltech was focused in communications, and it was at

03:13 24  that point that I knew I'll say I was hooked on

03:13 25  telecommunications.

—806—

03:13  1          And since then, I went back to work at

03:13  2   Bellcore, and I've been an active engineer in the field

03:13  3   for 40 years now.

03:13  4      Q.   In total, how long did you work at Bellcore?

03:13  5      A.   I was at Bellcore for ten years.

03:13  6      Q.   And what'd you do next?

03:13  7      A.   Well, I was -- the last thing I was doing at

03:13  8   Bellcore was running a test lab inside the company.  I

03:13  9   was able to take that business outside of Bellcore and

03:13 10   start my own company, as I mentioned, AST Technology

03:14 11   Labs.

03:14 12          I developed the -- I moved to Florida.  My

03:14 13   first employee, I'll have to say he was not only my

03:14 14   partner, he was my dad.  He was a retired engineer,

03:14 15   electrical engineer, and probably working on his third

03:14 16   retirement when I pulled him out of that.

03:14 17          And we started -- got to work building the

03:14 18   lab.  And so we started building the hardware and

03:14 19   software to offer the first testing services and

03:14 20   consulting services in 1995.  And as I mentioned, the

03:14 21   lab evolved from there.

03:14 22      Q.   Can you provide a few examples of some of your

03:14 23   more recent projects at AST?

03:14 24      A.   Sure.  As I mentioned, the lab's evolved.

03:14 25   Primarily our business is testing devices that are used

03:14  1   for conferencing, audio and videoconferencing.

03:14  2            So our major projects, our major customers

03:14  3   right now are Microsoft Teams partners.  So they're

03:14  4   device partners that provide audio and video products

03:14  5   that are certified.  So we're Microsoft's approved

03:14  6   certification lab.

03:14  7            And similarly for Zoom, we're Zoom's approved

03:15  8   certification lab for certifying their teams -- their

03:15  9   Zoom partners' devices.

03:15  10           Also, we're an approved lab for Amazon, and we

03:15  11  test other types of products as well.

03:15  12  Q.    Have you offered any publications related to

03:15  13  telecommunications technologies?

03:15  14  A.    Yes.  I'm a named author on four patents.

03:15  15  I've also -- while I was at Bellcore, I was the primary

03:15  16  author and contributor to a number of network and

03:15  17  equipment requirements that the industry used to build

03:15  18  to.

03:15  19           I've also been involved in standards for a

03:15  20  long time, almost 30 years now.  And I've been the

03:15  21  primary author and contributor to many standards that

03:15  22  relate to the performance of telecommunications

03:15  23  devices.

03:15  24  Q.    Have you held any leadership roles within the

03:15  25  telecommunications industry?

—808—

03:15  1        A.    Yes.  And so as I mentioned, I've been the

03:15  2   author of multiple standards.  And that's through an

03:15  3   organization called the Telecommunications Industry

03:16  4   Association, sometimes called TIA.

03:16  5             And so I've been in various leadership roles

03:16  6   to promote the development of these standards.

03:16  7             I'm currently the chairman of TIA's

03:16  8   engineering committee for the performance and

03:16  9   accessibility of communications products.

03:16 10        Q.    Have you been recognized for any of your work

03:16 11   in the industry?

03:16 12        A.    Yes.  Like I said, I've been in this

03:16 13   industry -- the same industry as an engineer for four

03:16 14   decades now, and I've been recognized in multiple ways.

03:16 15             There's one particular award that I'll bring

03:16 16   up that I'm particularly proud of was from the Hearing

03:16 17   Loss Association of America, HLAA.  And I was directly

03:16 18   involved in developing and getting standards published

03:16 19   with -- they had a national scope that impacted devices

03:16 20   that are used by the deaf and hard of hearing.

03:16 21             MS. DELACENSERIE:  Your Honor, Cisco

03:16 22   offers Mr. Bress as an expert in the field of

03:16 23   telecommunications and audioconferencing technology.

03:16 24             MR. CAUGHEY:  No objection.

03:16 25             THE COURT:  He'll be admitted.

809

```
03:17   1   BY MS. DELACENSERIE:
03:17   2       Q.    Mr. Bress, what evidence did you consider when
03:17   3   assessing the validity of the '858 patent?
03:17   4       A.    Well, certainly the '858 patent itself and the
03:17   5   prosecution history.  I reviewed multiple items of
03:17   6   prior art, that means patents, standards, other
03:17   7   publications.  And I certainly relied on my experience,
03:17   8   my education.
03:17   9       Q.    And what opinions did you form based on this
03:17  10   evidence and your own personal experience and
03:17  11   expertise?
03:17  12       A.    Well, two main things.  One, after my analysis
03:17  13   I found that the asserted claims of the '858 patent are
03:17  14   invalid because they would have been obvious to a
03:17  15   person of ordinary skill in the art.  And I'll be
03:17  16   talking about that.
03:17  17             Also, Claims 2 and 3, as we've heard about
03:17  18   from the '858 patent, I've found that those are invalid
03:17  19   because they lack what's known as -- they lack a
03:17  20   written description.
03:17  21       Q.    We've heard a little bit about this concept of
03:17  22   a person of ordinary skill in the art.
03:18  23             Can you just explain what that means to you
03:18  24   and how that factored into your invalidity analysis?
03:18  25       A.    Sure.  So as I said, my task in this was to
```

810

03:18  1    investigate and assess the validity of the '858 patent.

03:18  2    And that's -- and that's done, that process is done

03:18  3    through what's called a person of ordinary skill in the

03:18  4    art.  And I think I've heard that mentioned here during

03:18  5    the week.

03:18  6            But to go into that a little further, this is

03:18  7    from a law.  And so the law says that a person of

03:18  8    ordinary skill in the art is a hypothetical person

03:18  9    who's presumed to have known the relevant art -- that's

03:18  10   the technology -- at the time of the alleged invention.

03:18  11           And so what was the time of the alleged

03:18  12   invention?  It was June 28th in 2000.  Year 2000.

03:18  13   That's the filing date of the '858 patent.

03:18  14       Q.   In your opinion, who would qualify as a person

03:18  15   of ordinary skill in the art of audioconferencing back

03:18  16   in June of 2000?

03:18  17       A.   Right.  So I've got that on the screen.  In my

03:18  18   opinion, that would be somebody with a bachelor's

03:19  19   degree in electrical engineering, perhaps computer

03:19  20   science, computer engineering, and somebody that's

03:19  21   worked two to three years in the field,

03:19  22   telecommunications specifically, audioconferencing.

03:19  23   Somebody that has a grasp of the technology at a level

03:19  24   that they would understand -- they would understand,

03:19  25   you know, patents and standards.

811

03:19  1        Q.    Would a person who did a few years of college

03:19  2   but didn't quite make it but had worked in the industry

03:19  3   for a decade or so, could they qualify as a person of

03:19  4   ordinary skill?

03:19  5        A.    Sure.  So the whole concept of a person of

03:19  6   ordinary skill is that they have a grasp of the

03:19  7   technology at a very solid level.

03:19  8              And so somebody that had worked in the field

03:19  9   say, you know, ten years and maybe had less college

03:19 10   experience or no college experience, they could qualify

03:19 11   as a person of ordinary skill in the art as long as

03:19 12   they had the requisite understanding of the technology.

03:19 13              Likewise, somebody with more education, maybe

03:19 14   less experience, could also qualify as a person of

03:19 15   ordinary skill.

03:19 16        Q.    Back in the year 2000, would you have

03:20 17   qualified as a person of ordinary skill in the field of

03:20 18   audioconferencing?

03:20 19        A.    Like I said, I'm into year 40 of this.  And so

03:20 20   by the year 2000 -- we're talking about 24 years ago.

03:20 21   But even by 24 years ago, I'd had 15 years in the

03:20 22   industry and I had a master's degree.  So I certainly

03:20 23   met the minimum requirements of a person of ordinary

03:20 24   skill.

03:20 25        Q.    Okay.  Let's talk a little bit about what you

03:20  1    or a hypothetical person of ordinary skill would have

03:20  2    known about audioconferencing back in the year 2000.

03:20  3            If you could please turn to Defendant's

03:20  4    Exhibit No. 24 in your binder.

03:20  5        A.    Okay.

03:20  6        Q.    Have you seen this document before?

03:20  7        A.    Yes.  I have.

03:20  8        Q.    What is it?

03:20  9        A.    This is the ITU H.323 standards.  It's -- the

03:20 10    title is Packet-Based Multimedia Communications

03:20 11    Systems.  And this is the version from September of

03:20 12    1999.

03:20 13        Q.    Did you rely on this document in forming your

03:20 14    opinions in this case?

03:20 15        A.    Yes.  I did.

03:20 16            MS. DELACENSERIE:  Your Honor, we move to

03:21 17    admit Defendant's Exhibit No. 24.

03:21 18            MR. CAUGHEY:  No objection.

03:21 19            THE COURT:  Admitted.

03:21 20    BY MS. DELACENSERIE:

03:21 21        Q.    And if you could flip to Defendant's Exhibit

03:21 22    No. 425, please.

03:21 23        A.    Okay.

03:21 24        Q.    Have you seen this document before?

03:21 25        A.    Yes.  I have.

813

```
03:21   1        Q.    What is it?

03:21   2        A.    This is the -- what's called RFC 2543.   Its

03:21   3   title is SIP, Session Initiation Protocol.

03:21   4        Q.    And when was this document published?

03:21   5        A.    It was published in March of 1999.

03:21   6        Q.    And did you rely on this document in forming

03:21   7   your opinions in this case?

03:21   8        A.    Yes.  I did.

03:21   9              MS. DELACENSERIE:  Your Honor, we move to

03:21  10   admit Defendant's Exhibit No. 425.

03:21  11              MR. CAUGHEY:  No objection.

03:21  12              THE COURT:  Admitted.

03:21  13   BY MS. DELACENSERIE:

03:21  14        Q.    You mentioned before that you've been involved

03:21  15   in some standard setting organizations.

03:21  16              Can you please explain to the jury what role

03:21  17   standards played in the telecommunications industry?

03:22  18        A.    For telecommunications systems, standards are

03:22  19   crucial.  They're foundational, really.  For systems

03:22  20   and networks and devices to interoperate and be able to

03:22  21   make the calls that we make from our phones to calls

03:22  22   anywhere in the world, that's all based in standards.

03:22  23              There are multiple standards that are built

03:22  24   into the networks and the devices that we use.  So

03:22  25   they're a very important part for telecommunications
```

814

03:22   1    systems to work together.

03:22   2        Q.    Would a person of ordinary skill be familiar

03:22   3    with standards generally?

03:22   4        A.    Certainly a person of ordinary skill in the

03:22   5    telecommunications field would have to know about

03:22   6    standards.  That's the only way they could actually

03:22   7    build systems that would work.

03:22   8        Q.    And we've heard about two particular standards

03:22   9    that are relevant to this case.  They're up here on

03:22   10   your Slide No. 5, H.323 and SIP.

03:22   11        Would a person of ordinary skill have been

03:22   12   familiar with these standards back in the year 2000?

03:22   13        A.    Yes.  Even today, these standards are relevant

03:23   14   for devices that are -- that are built and connected to

03:23   15   a network.  And certainly in the year 2000, a person of

03:23   16   ordinary skill would have been well aware of these

03:23   17   standards and been -- and working with those to connect

03:23   18   to networks.

03:23   19        Q.    Were you personally familiar with both of

03:23   20   these standards back in the year 2000?

03:23   21        A.    Yes.  As I mentioned, I started my test lab --

03:23   22   my own test lab in 1995, and so the devices that we

03:23   23   were testing were built to connect with equipment and

03:23   24   networks that use these standards.  And so the test

03:23   25   equipment that we built is built to adhere to these

815

03:23  1  exact standards.

03:23  2      Q.   Let's turn to the '858 patent, the patent

03:23  3  asserted in this case.

03:23  4           Do the inventors of the '858 patent claim to

03:23  5  have invented H.323 or SIP?

03:23  6      A.   No.  No.  They don't.

03:23  7      Q.   What does the patent have to say about H.323?

03:23  8      A.   So what I'm showing here is an excerpt from

03:23  9  the '858 patent.  This is some of the text.  And in the

03:24  10  '858 patent, it makes it clear that at the time of the

03:24  11  '858 patent, which is June 2000, it was -- the industry

03:24  12  was aware of the ITUT H.323 version of this from 1996,

03:24  13  March of 1996, more than -- more than four years before

03:24  14  the patent.

03:24  15      Q.   And what does the '858 patent have to say

03:24  16  about SIP?

03:24  17      A.   Similarly.  The patent -- again, this is

03:24  18  another excerpt from the patent.  It mentions that SIP

03:24  19  was well known in the relevant field.

03:24  20      Q.   If you could please turn to Defendant's

03:24  21  Exhibit No. 45 in your binder.

03:24  22           Have you seen this document before?

03:24  23      A.   Yes.  I have.  This is what's known as an

03:24  24  Internet Engineering Task Force document, the IETF.

03:24  25  It's a draft document.  And it's titled An RTP Payload

816

03:24  1    Format for User Multiplexing, and it was published

03:25  2    in -- or it was published in May 6th of 1998.

03:25  3        Q.    Did you rely on this document in forming your

03:25  4    opinions in this case?

03:25  5        A.    Yes.

03:25  6              MS. DELACENSERIE:  Your Honor, Cisco

03:25  7    moves to admit Defendant's Exhibit No. 45.

03:25  8              MR. CAUGHEY:  No objection.

03:25  9              THE COURT:  They're admitted.

03:25  10   BY MS. DELACENSERIE:

03:25  11       Q.    Is this the publication you were just

03:25  12   referring to in your witness binder?

03:25  13       A.    Yes.  That's what's on the top of the cover

03:25  14   page.

03:25  15       Q.    And you referred to this as an Internet draft

03:25  16   that was published by the Internet Engineering Task

03:25  17   Force.

03:25  18              Can you please explain to the jury what that

03:25  19   means?

03:25  20       A.    Yes.  The engineering -- the Internet

03:25  21   Engineering Task Force, also known as the IETF, has

03:25  22   published hundreds of standards that are relevant for

03:25  23   anything that connects over the Internet for voice,

03:25  24   video, messaging.  You name it.  The features and

03:25  25   services that we use that use the Internet are

817

03:25  1    generally standardized by the IETF.

03:25  2        Q.   Is a person of ordinary skill generally

03:25  3    familiar with these source of Internet drafts?

03:26  4        A.   Yes.  They would be well aware of IETF

03:26  5    standards, drafts.  That's how the industry makes

03:26  6    things work together.

03:26  7        Q.   I think you mentioned this, but when was this

03:26  8    Internet draft published?

03:26  9        A.   It was published May 6th of 1998.

03:26  10        Q.   And what is shown in Figure 1?

03:26  11        A.   In Figure 1, it's showing a specific

03:26  12    architecture related to inner connection of PSTN and

03:26  13    the Internet.

03:26  14        Q.   And what is an ITG?  There are two of them

03:26  15    here:  ITG J and ITG K.

03:26  16        A.   Let me step back.  So we see there's the

03:26  17    blocks here called the PSTN.  In the middle is IP net.

03:26  18    That is -- that actually stands for the Internet.  And

03:26  19    in between is the ITG.  And that's the Internet

03:26  20    telephony gateway.

03:26  21             And that's what goes between the public

03:26  22    switched telephone network, the regular telephone

03:26  23    network, and the Internet.  And that's what enables

03:26  24    connections between the two.

03:27  25        Q.   And what does this publication tell us about

818

| | |
|---|---|
| 03:27 | 1 |

how these gateways connect the PSTN and the Internet?

A.    Well, as I mentioned, the standards are what define and make things work together, make things interoperate and be able to connect to each other.

And what this draft document is explaining is that these gateways, these Internet telephony gateways, can be built using SIP, H.323, a combination, or other standards.

Q.    Back to the '858 patent.

Do the inventors of the '858 patent claim to have invented the concept of active speaker determination?

A.    No.  No.  They don't claim that.

Q.    What does the patent say that a person of ordinary skill would have known about active speaker determination?

A.    Well, this is from the '858 patent.  Again, this is an excerpt.  And it makes it clear it's apparent to one skilled in the art.  So that means that it's not novel, it's not innovative.  A person of skill in the art would have known that before the '858 patent with regard to active speaker selection.

Q.    And why would a person of ordinary skill have wanted to determine which audio is coming from an active speaker?

819

03:28  1      A.    Well, there's a number of reasons, one we've

03:28  2   heard quite a bit about.  It's important that in actual

03:28  3   design, that if you're speaking, that you don't hear

03:28  4   your audio coming back to you, that you would hear and

03:28  5   perceive it as a delayed echo.

03:28  6      Q.    And does the '858 patent describe a specific

03:28  7   way to make sure that an active speaker doesn't hear

03:28  8   themselves speak?

03:28  9      A.    Yes.  Again, this is excerpts from the '858

03:28  10  patent.  And we've -- I think we just looked at some of

03:28  11  this text before I got on the stand.  And this is one

03:28  12  of the methods of not having the active speaker hear

03:28  13  their own audio by not including the audio that's sent

03:28  14  back to them.

03:28  15     Q.    And this excerpt here refers to Step 314, and

03:28  16  that's where the active speaker's own audio wouldn't be

03:28  17  included.

03:28  18           What's going on in Step 314?

03:28  19     A.    Well, in Step 314, it's essentially assembling

03:29  20  the audio that's going to be sent back to that -- to

03:29  21  that one participant.  And that participant, if they're

03:29  22  an active -- one of the active speakers, what this

03:29  23  Step 314 is saying, that the -- their own audio would

03:29  24  not be included in the audio that is sent back for them

03:29  25  to hear.

820

03:29  1      Q.    And do the inventors of the '858 patent claim

03:29  2   to have invented this particular way of preventing

03:29  3   active speakers from hearing themselves speak?

03:29  4      A.    No.   And we can see that again.   The author of

03:29  5   the '858 patent makes it clear that this method of not

03:29  6   including audio going back to the active speaker would

03:29  7   have been apparent to those skilled in the art.   That

03:29  8   means it wasn't novel.   It wasn't an invention of the

03:29  9   '858.

03:29  10     Q.    And do any of the standards that existed at

03:29  11  the time of the '858 patent discuss the concept of

03:29  12  active speaker determination?

03:29  13     A.    Yes.   This is a well-known concept in the

03:29  14  industry I've shown here.   There's multiple examples in

03:29  15  patents and standards.

03:29  16           But I'm showing here one example.   In the

03:30  17  H.323 standard that I just mentioned, the words are to

03:30  18  eliminate or attenuate some of the input signals in

03:30  19  order to reduce noise and unwanted signals.

03:30  20           That's essentially saying the same thing as

03:30  21  active speaker selection, to only send the active

03:30  22  speech back.

03:30  23     Q.    You've highlighted here the second sentence.

03:30  24           And what does it mean when the standard says:

03:30  25  The terminals shall assume that their audio's not

821

03:30  1    present in the audio stream returned to them?

03:30  2        A.    Yeah.    That's an important word in standards.

03:30  3    And so when a standard uses the word "shall," that --

03:30  4    you can also interpret that as "must."

03:30  5            And so here, in the H.323 standard, it's

03:30  6    making it clear that if you're building a telephone

03:30  7    device that's conforming with the H.323 standard, then

03:30  8    the -- you have to make sure that the user is not

03:30  9    hearing their own audio coming back.

03:30  10       Q.    Were there multiple ways of doing this, of

03:31  11   ensuring that a terminal's audio is not returned back

03:31  12   to them back in the year 2000 or '99 when this

03:31  13   publication was available?

03:31  14       A.    Your question was, was there multiple ways?

03:31  15       Q.    Yes.

03:31  16       A.    Yes.

03:31  17       Q.    Back in the year 2000, was there a clear

03:31  18   distinction between the mixing capabilities that

03:31  19   communicated over the PSTN as opposed to the Internet?

03:31  20       A.    Absolutely.  And so we tried to simplify the

03:31  21   issues here.  And what we've been talking about quite a

03:31  22   bit this week is the difference between standard

03:31  23   telephone devices that can receive one audio stream but

03:31  24   can only -- it can't mix anything because it can only

03:31  25   receive one audio stream versus computer-type devices

822

03:31  1    that can connect over the Internet and can receive

03:31  2    multiple audio streams.  And therefore, they can do the

03:31  3    mixing of the multiple audio streams at the device, at

03:31  4    the computer device.

03:31  5        Q.    And have you been in the courtroom since we

03:31  6    started trial Monday morning?

03:32  7        A.    Yes.  I have.  I've been here the whole time.

03:32  8        Q.    Through here, I believe Dr. Schaefer testified

03:32  9    about iPhones and the fact that they can communicate

03:32  10   over the PSTN and the Internet.

03:32  11            Do you recall that?

03:32  12       A.    I do.

03:32  13       Q.    Okay.  And did iPhones exist back in 2004?

03:32  14       A.    No.  I believe the first iPhone, I think, was

03:32  15   maybe 2007.

03:32  16       Q.    Were there many, if any, devices back then

03:32  17   that could communicate both over the PSTN and the

03:32  18   Internet?

03:32  19       A.    There may have been some experimental devices,

03:32  20   but certainly as far as the widespread

03:32  21   commercialization, no.  There were devices that

03:32  22   connected to the PSTN.

03:32  23            Everyone would have known what a PSTN phone

03:32  24   was.  We all -- or most of us, if we had landlines, we

03:32  25   had to have a line that connected to the telephone

823

03:32  1   network.

03:32  2           And then we've all seen computers and

03:32  3   computers connecting to the Internet.  And they were

03:32  4   distinct, particularly in the year 2000.

03:32  5      Q.   Back in the year 2000, would a person of

03:32  6   ordinary skill have understood a "non-mixing client" to

03:33  7   refer to a device that can only communicate over the

03:33  8   PSTN?

03:33  9      A.   Yes.  That's what you would characterize.  A

03:33  10  PSTN phone, you would -- we know -- I'm not sure if

03:33  11  everybody would have called it a non-mixing client, but

03:33  12  with regard to this patent, it certainly would refer to

03:33  13  it as a non-mixing client.  Yes.

03:33  14     Q.   Now, since you've been here since the

03:33  15  beginning, I assume you've heard multiple people on

03:33  16  Paltalk's side refer to this person of ordinary skill

03:33  17  in the art as an expert.

03:33  18          Is that -- is it your understanding that a

03:33  19  person of ordinary skill in the field of

03:33  20  audioconferencing needs to be an expert in the field?

03:33  21     A.   No.  I was surprised by that.  That's not how

03:33  22  it's ever been explained to me.

03:33  23          The way it's been explained to me when doing

03:33  24  an invalidity analysis, and we'll talk about what that

03:33  25  means in an obviousness analysis, that it's done

824

03:33  1  through the eyes of a person of ordinary skill in the

2  art.

03:33  3         And what's been explained to me is that a

03:33  4  person of ordinary skill in the art has a level of

03:33  5  understanding of the industry but they're not an

03:34  6  expert.  They don't -- they don't have, you know, 20

03:34  7  years of experience or, you know, or multiple Ph.D.s.

03:34  8         As I've already given you my opinion of what a

03:34  9  person of ordinary skill would be in this case, they

03:34  10  would have a bachelor's degree and they would have a

03:34  11  couple years of experience directly in the field of

03:34  12  audioconferencing.  But certainly not an expert or, you

03:34  13  know, double Ph.D.

03:34  14     Q.    And would a person of ordinary skill set aside

03:34  15  the common or plain English meaning of terms just

03:34  16  because they're used in a patent?

03:34  17     A.    No.  Everything would be considered as a

03:34  18  whole, and that would include the normal meaning of

03:34  19  words.

03:34  20     Q.    Now, on the other hand, do patents ever define

03:34  21  terms in specialized or specific ways?

03:34  22     A.    Yes.  A patent can do that.  It can do that.

03:34  23  It can use a specialized meaning.

03:34  24     Q.    Are there any examples of this in the '858

03:34  25  patent?

825

03:34  1      A.    Yes.  And I'm showing one on the screen.

03:34  2           This is -- this is actually pretty typical in

03:35  3   many different patents and even standards as well.  The

03:35  4   word "client," and what I'm showing here is that in

03:35  5   certain contexts in the '858 patent, the concept of a

03:35  6   "client" and the word "client" is tied to a device.  So

03:35  7   a PC client, PC-based clients.

03:35  8           However, it can also be used to refer to the

03:35  9   person, the participant in the conference.  And that's

03:35  10  what I'm showing there, that the client, that is the

03:35  11  participant, both of these are excerpts from the '858

03:35  12  patent.

03:35  13     Q.    Does the '858 patent specification provide a

03:35  14  specific or specialized definition of the term "each"?

03:35  15     A.    No.

03:35  16           MR. CAUGHEY:  I object, Your Honor.

03:35  17  Mr. Bress in his report said he assumed that the

03:35  18  definition of "each" was "one or more" and did not --

03:35  19           THE COURT:  That's not a -- if you want

03:35  20  to talk about that, approach the bench.  That's not an

03:35  21  objection.  So if you'd like to approach the bench, you

03:35  22  can approach the bench.

03:35  23           MR. CAUGHEY:  It's not in his report,

03:35  24  Your Honor.

03:35  25           THE COURT:  Can you tell me where in his

—826—

03:35  1    report he says what he's about to say?

03:36  2                    MS. DELACENSERIE:  I'll move on.

03:36  3                    THE COURT:  Okay.

03:36  4    BY MS. DELACENSERIE:

03:36  5        Q.    Does the '858 patent provide a specific or

03:36  6    specialized definition of the term "removing"?

03:36  7        A.    No.

03:36  8        Q.    So let's turn to your first opinion that you

03:36  9    prepared to share with the jury today as to why the

03:36  10   claims, the asserted claims of the '858 patent are

03:36  11   invalid.

03:36  12              What do you mean when you say:  The claims of

03:36  13   the '858 patent would have been obvious to a person of

03:36  14   ordinary skill?

03:36  15       A.    Right.  And so "obviousness" is a legal term,

03:36  16   and it's used when you're doing what I've done, which

03:36  17   is to do an investigation of the validity or invalidity

03:36  18   of a patent, in this case the '858 patent.

03:36  19              And what the law says is that a patent claim

03:36  20   is invalid if it would have been obvious to a person of

03:36  21   ordinary skill in the art.

03:36  22              So that means I take the -- as I was doing

03:36  23   this analysis, I'm taking the point of view of a person

03:36  24   of ordinary skill in the art, as I've described that,

03:36  25   and looking -- in this case we'll be looking at prior

827

| 03:36 | 1 | art and determining would -- what's taught in the |
|---|---|---|

03:36   1   art and determining would -- what's taught in the

03:37   2   patent, what's taught in the '858 patent, would that --

03:37   3   would that person of ordinary skill in the art have

03:37   4   found that to be obvious looking at the prior art?

03:37   5          And that's what I'm going to show in my

03:37   6   analysis of that right now.

03:37   7      Q.   How many patents or other publications, I

03:37   8   think what you referred to as prior art, did you find

03:37   9   that you believe render the '858 patent obvious?

03:37   10     A.   So I've reviewed many patents with regard to

03:37   11  this, referring to the '858 patent.  And I found

03:37   12  several that in my opinion would have rendered the '858

03:37   13  patent invalid because it would have been obvious.

03:37   14         However, today I'm just going to show one.

03:37   15     Q.   If you could please turn to Defendant's

03:37   16  Exhibit No. 37 in your binder.

03:37   17     A.   Yeah.  Yes.

03:37   18     Q.   Have you seen this document before?

03:37   19     A.   Yes.  I have.

03:37   20     Q.   What is it?

03:37   21     A.   This is what I'll refer to as the Botzko

03:38   22  patent.

03:38   23     Q.   And when was the Botzko patent filed?

03:38   24     A.   The Botzko patent was filed September 8th,

03:38   25  1997.  So nearly three years before the '858 patent.

828

03:38  1      Q.    Did you rely on this document in forming your

03:38  2  opinions in this case?

03:38  3      A.    Oh, yes.  Very much.

03:38  4           MS. DELACENSERIE:  Your Honor, I move to

03:38  5  admit Defendant's Exhibit No. 37.

03:38  6           MR. CAUGHEY:  No objection.

03:38  7           THE COURT:  Admitted.

03:38  8  BY MS. DELACENSERIE:

03:38  9      Q.    Let's take a look at this patent.  You have it

03:38  10  labeled Botzko's patent.

03:38  11           Who or what is Botzko?

03:38  12      A.    So Botzko is actually a person.  It's Stephen

03:38  13  Botzko.  He's the first named inventor on this patent,

03:38  14  and so I'll refer to it as the Botzko patent or just

03:38  15  sometimes just Botzko.  The Patent Office does that.

03:38  16  We can see it named it Botzko, et al.

03:38  17           And the -- just the background section of it

03:38  18  describes that it's audio processors, and it's

03:38  19  descriptions about audio processors for

03:38  20  audioconferencing.

03:38  21      Q.    And what's shown in Figure 1 of Mr. Botzko's

03:39  22  patent?

03:39  23      A.    So Figure 1 is a very high-level figure, but

03:39  24  it's showing the general architecture.  It's showing

03:39  25  that there's multiple sites called client sites

829

03:39  1    connected to a bridge which has an audio processor.

03:39  2    And so I've shown that figure and the associated texts.

03:39  3         And these were again excerpts now from the

03:39  4    Botzko patent.

03:39  5    Q.    So let's take a little closer look at that

03:39  6    bridge or Server 12.

03:39  7         What's included in that part of Mr. Botzko's

03:39  8    system?

03:39  9    A.    So what I want to focus on is the part that

03:39  10   I've highlighted in yellow.  So that comes from the

03:39  11   high-level view where the clients are connected.  But

03:39  12   now it's showing it zeroing in on the processor part of

03:39  13   that.

03:39  14        And what's important here is it's showing that

03:39  15   this system is built with a -- what's called a

03:39  16   plurality of processors, multiple processors.  And in

03:39  17   this case, in this -- in Botzko's architecture, there's

03:39  18   an audio processor used for each of the sites that are

03:39  19   participants in the conference.

03:39  20   Q.    And when those audio processors receive and

03:40  21   send audio data to these sites, to and from these

03:40  22   sites, how is that data formatted?

03:40  23   A.    So I've highlighted those boxes in red.  As I

03:40  24   mentioned, there is -- in this example, in Botzko's

03:40  25   description here, there's four sites, A, B, C, and D.

| | | |
|---|---|---|
| 03:40 | 1 | And for each one of those sites, there's an interface. |
| 03:40 | 2 | And the interface is what's called RTP, realtime |
| 03:40 | 3 | transport protocol. |
| 03:40 | 4 | And what the patent makes clear in the text |
| 03:40 | 5 | and what I've highlighted is that the audio data's |
| 03:40 | 6 | received from each of the sites, and it's received as |
| 03:40 | 7 | audio packets. |
| 03:40 | 8 | Q.   Are all the audio processors in Mr. Botzko's |
| 03:40 | 9 | audioconferencing system the same? |
| 03:40 | 10 | A.    No.  That's really the main point, as I'll get |
| 03:40 | 11 | to here in a moment, about the Botzko patent, that it |
| 03:40 | 12 | describes -- Botzko describes multiple configurations |
| 03:40 | 13 | of audio processors and particularly one that's used |
| 03:40 | 14 | for providing audio to the non-mixing clients, so |
| 03:40 | 15 | providing a mixed stream to the non-mixing clients. |
| 03:41 | 16 | And then also an audio processor configuration that can |
| 03:41 | 17 | provide multiple streams to clients that can mix, to |
| 03:41 | 18 | mixing clients. |
| 03:41 | 19 | Q.   So let's start with Mr. Botzko's configuration |
| 03:41 | 20 | for non-mixing clients. |
| 03:41 | 21 | What are the key components shown here in |
| 03:41 | 22 | Figure 3? |
| 03:41 | 23 | A.    So the two that I've highlighted are in green. |
| 03:41 | 24 | That's called the likelihood of speech detector, or |
| 03:41 | 25 | Botzko describes it as a selector. |

831

03:41  1          That's what we've been talking about is the

03:41  2  active speech detection.  So that's the same thing.  It

03:41  3  also shows the mixer.

03:41  4      Q.    And what do these colored lines represent?

03:41  5      A.    So what I'm representing here by the colored

03:41  6  lines is showing the speech that's coming into the

03:41  7  bridge.  This would be coming from the sites A, A in

03:41  8  red over Line 19A; in yellow, that's from site B; and

03:41  9  the purple is from site D.

03:41 10      Q.    And what does this likelihood of speech

03:42 11  detector or selector do with the incoming audio?

03:42 12      A.    So the likelihood of speech detector is

03:42 13  receiving the audio, and it's making a determination of

03:42 14  which of those audio streams is the -- are the active

03:42 15  speakers.

03:42 16      Q.    And after the likelihood of speech detector or

03:42 17  selector determines which of the client's sites is an

03:42 18  active speaker, what does it do with this information?

03:42 19      A.    So once a selector, the active speech detector

03:42 20  has determined that -- has found the active speech, it

03:42 21  signals that information.  It sends that information to

03:42 22  the mixer.

03:42 23      Q.    So let's assume, for example, the selector

03:42 24  tells the mixer that the active speakers are Clients A

03:42 25  and B, so the red and yellow.

832

03:42  1            What would happen next?

03:42  2       A.    Right.  So in this case, we're going to assume

03:42  3   that the active speakers are on Lines A and B.  And A

03:42  4   and B then goes into the mixer.  Those are the active

03:42  5   speakers, and they will be mixed, which means combined.

03:43  6            And that's what I'm showing as orange coming

03:43  7   out of the mixer, and the packet would be routed out

03:43  8   and coupled to the site up there on what's labeled as

03:43  9   20, Line 20C.

03:43  10      Q.    Now, on this slide, you referred to an excerpt

03:43  11  from Mr. Botzko's patent that's talking about a

03:43  12  scenario where double talk is not occurring.

03:43  13           What does that mean?

03:43  14      A.    So "double talk" is a common term used when

03:43  15  you talk about conferencing.  It's when two people are

03:43  16  talking at the same time.  So if double talk is not

03:43  17  occurring, that means that only one person is talking

03:43  18  at that time.

03:43  19      Q.    So in a situation where there's only one

03:43  20  active speaker, there's only one person talking at a

03:43  21  time, would Mr. Botzko's audio processor still mix that

03:43  22  speaker's audio before sending it on to a non-mixing

03:43  23  client?

03:43  24      A.    No.  That's one of the key features of

03:43  25  Botzko's invention, is that only when the mixer's

833

03:43  1    needed is when it's enabled.  When it's not needed to

03:43  2    mix, for example, if there's only one active speaker,

03:43  3    then the mixer wouldn't be enabled.

03:44  4        Q.    How is it possible to enable or disable a

03:44  5    mixer?

03:44  6        A.    Well, there's certainly multiple ways.  But

03:44  7    what Botzko teaches is that in most cases it would be

03:44  8    done in software.

03:44  9        Q.    Did Mr. Botzko explain why you wouldn't want

03:44  10   the mixer to be enabled when it wasn't needed?

03:44  11       A.    Yes.  There's multiple reasons why you

03:44  12   wouldn't want to use a mixer if you don't need it.  But

03:44  13   one of them that's described that I've highlighted here

03:44  14   is saving computational resources.  That basically

03:44  15   means not using processor resources when you don't need

03:44  16   them.

03:44  17       Q.    All right.  Let's talk about how Mr. Botzko

03:44  18   described his audio processing for mixing clients.

03:44  19             In Figure 2A here is -- in this scenario, is a

03:44  20   likelihood of speech detector or a selector also used?

03:44  21       A.    Yes.  So what Botzko shows here is the

03:44  22   selector.  It's the same element as the likelihood of

03:44  23   speech detector/selector, what was in the previous

03:44  24   figure.

03:44  25       Q.    So we have our incoming audio, and let's

834

03:45    1    assume again that the selector determines that the

03:45    2    active speakers are client sites A in red and client

03:45    3    site B in the yellow.

03:45    4          What does the selector do with this

03:45    5    information when it's dealing with a mixing client

03:45    6    site?

03:45    7    A.    So this is very similar to what we looked at

03:45    8    before.  We've got the audio coming in from A in the

03:45    9    red and B in the yellow and D in the purple.

03:45    10         But what's important is the active speakers

03:45    11   are selected or determined by the selector, and that

03:45    12   controls the switches that are shown there.  And in

03:45    13   this case, let's say it was A and B, that's the red and

03:45    14   the yellow.  And it controls it so that the multiple

03:45    15   audio streams -- in this case two audio streams are

03:45    16   then coupled to the Site C.

03:45    17   Q.    Would a mixer be used in this scenario?

03:45    18   A.    No.  That's the whole point.  In this case the

03:45    19   design is simplified where incoming audio streams are

03:45    20   simply switched back to the output.

03:45    21   Q.    Does Mr. Botzko's patent discuss any of the

03:45    22   benefits of sending multiple audio streams to these

03:46    23   clients and letting them deal with their own mixing?

03:46    24   A.    Yes.  And I've highlighted a couple of those.

03:46    25   These are excerpts from the Botzko patent.  Botzko

835

03:46    1    makes it clear that there's improved quality of

03:46    2    service, computational savings.  There's multiple

03:46    3    places in Botzko where he makes those points.

03:46    4        Q.    So here we have both of those figures you just

03:46    5    explained a little bit.

03:46    6            And to reiterate, what is the key difference

03:46    7    between the audio processing depicted in Figure 3 and

03:46    8    in Figure 2A?

03:46    9        A.    Well, the key differences that -- for the

03:46    10    non-mixing clients, that is where the audio processor

03:46    11    does the mixing.  So we see on the left, that's where

03:46    12    the mixer comes into play.

03:46    13            When we look at the audio processor that's

03:46    14    configured for the mixing clients, no mixer is needed.

03:46    15        Q.    And what is the key component that is used in

03:46    16    both of those configurations?

03:46    17        A.    So I've got that highlighted in green.  And in

03:46    18    both cases, that's the active speech detector.  So the

03:46    19    speech is coming in, and it selects which are the

03:47    20    active speakers.

03:47    21        Q.    And does Mr. Botzko describe any of the -- any

03:47    22    benefits of this active speaker determination in

03:47    23    selection?

03:47    24        A.    Yes.  We've heard some about this before.  But

03:47    25    the main advantage is that when the device is doing the

03:47  1    mixing, you can have a higher signal quality.

03:47  2        Q.    So what are you showing here on this slide?

03:47  3        A.    So this is pulling it together.  And I think

03:47  4    this is a quote from the cite from the Botzko patent,

03:47  5    and it makes it, I think, very clear what the point of

03:47  6    Botzko is.

03:47  7            And it's that the system can limit the number

03:47  8    of streams it outputs to the number the site can

03:47  9    receive.

03:47  10           So I show on the left, this is the high-level

03:47  11   view that Botzko shows of his audio processor and

03:47  12   audioconferencing system with the sites and the audio

03:47  13   processor, the bridge.

03:47  14           And then what I'm showing is a detail of how

03:47  15   that happens, that if a mixer is needed, a mixer's

03:47  16   enabled for -- that's used for non-mixing telephones,

03:47  17   non-mixing clients.  And when the client can mix, then

03:48  18   the other type of audio processor is used.

03:48  19       Q.    So before we dive into the patent claims, I

03:48  20   want to pull up a slide that we've seen a few times now

03:48  21   from Paltalk's counsel and expert Dr. Schaefer.

03:48  22           Do you recognize this slide from their

03:48  23   presentations?

03:48  24       A.    Yes.  This was a slide that I believe came

03:48  25   from Dr. Schaefer's presentation.

837

| 03:48 | 1 | Q.   Okay.  And do you recall what Dr. Schaefer was |
| 03:48 | 2 | talking about when he pulled up the slide to show to |
| 03:48 | 3 | the jury? |
| 03:48 | 4 | A.   He was discussing the benefits of the |
| 03:48 | 5 | invention, if I understood it correctly, what was |
| 03:48 | 6 | novel, what were the benefits of the '858 patent. |
| 03:48 | 7 | Q.   And do you agree that any of the three things |
| 03:48 | 8 | listed on this slide were new or unique to the alleged |
| 03:48 | 9 | invention claimed in the '858 patent? |
| 03:48 | 10 | A.   Well, we just -- we just walked through the |
| 03:48 | 11 | Botzko patent, which is almost three years before the |
| 03:48 | 12 | '858 patent, and I believe I've covered each one of |
| 03:49 | 13 | these that Botzko discloses. |
| 03:49 | 14 | Q.   To be sure, let's walk through them real quick |
| 03:49 | 15 | here.  So starting with No. 1:  Computer and phone |
| 03:49 | 16 | users can participate in the same conference. |
| 03:49 | 17 | Did Mr. Botzko's audioconferencing system |
| 03:49 | 18 | provide this benefit? |
| 03:49 | 19 | A.   Yes.  I think if you just go maybe one slide |
| 03:49 | 20 | up, that's exactly the point, is that Botzko talks |
| 03:49 | 21 | about mixing -- being able to provide audio processing |
| 03:49 | 22 | for devices that can mix.  Those are the mixing |
| 03:49 | 23 | clients.  And it can provide audio processing for |
| 03:49 | 24 | devices clients that can't mix, which would be a PSTN |
| 03:49 | 25 | device telephone device. |

838

03:49   1    Q.    No. 2:  Computational efficiency.  Servers can
03:49   2  offload audio mixing to the users.
03:49   3          Did Mr. Botzko's audioconferencing system
03:49   4  provide this benefit?
03:49   5    A.    Yes.  I think if you go up maybe two clicks.
03:49   6  Maybe three.  Maybe four.  Okay.
03:49   7          And so this is the mixing clients.  This is
03:49   8  when you can send multiple streams, audio streams, to
03:49   9  the device.  And it can do the mixing on its own.  It's
03:50   10 on its own.
03:50   11         And as I highlighted here, this -- again, this
03:50   12 is text straight from Botzko, straight from the patent,
03:50   13 that you can have increased audio quality and
03:50   14 computational savings, meaning you use less processor.
03:50   15   Q.    All right.  Jump ahead here.  No. 3:  Better
03:50   16 sound quality.
03:50   17         Did Mr. Botzko's audioconferencing system
03:50   18 provide this benefit?
03:50   19   A.    Yeah.  I think I just said that, but I think
03:50   20 I've got other ones highlighted here as well.
03:50   21         Here's another cite from the Botzko patent, so
03:50   22 an excerpt from the patent, showing that when you're
03:50   23 selecting to use the active speakers, that's when you
03:50   24 get the highest signal quality.
03:50   25   Q.    All right.  Mr. Bress, based on your review of

—839—

03:50   1   Mr. Botzko's patent, what is your opinion as to the
03:50   2   validity of Claim 1 of the '858 patent?
03:50   3       A.    Well, I'll step through it claim element by
03:50   4   claim element, because that's the proper way to do an
03:50   5   obviousness analysis.  But I believe what I've just
03:51   6   shown shows that the Claim 1 of the '858 patent would
03:51   7   have been obvious to a person of ordinary skill in the
03:51   8   art.
03:51   9       Q.    All right.  Let's get to it.  The preamble,
03:51   10  the first sentence of the patent recites:  A method of
03:51   11  providing audioconferencing for a plurality of clients
03:51   12  using varying equipment and protocols.
03:51   13          In your opinion, does Mr. Botzko's patent
03:51   14  disclose such a method?
03:51   15      A.    Yes.  The first sentence of a claim is often
03:51   16  called the "preamble."  It's introducing the topic.  In
03:51   17  this case, it's -- the topic is audioconferencing, and
03:51   18  it's using varying equipment and protocols.
03:51   19          And if we look at the text that I've
03:51   20  highlighted here from -- this is straight from the
03:51   21  Botzko patent.  Clearly it's an audioconferencing
03:51   22  system.  It shows a plurality of sites, plurality of
03:51   23  clients.
03:51   24          But the important part is what I've
03:51   25  highlighted in the second part, that Botzko makes it

840

03:51  1    clear that the concept is that you -- the sites can

03:51  2    connect to this bridge multiple ways:  through the

03:52  3    public switched telephone network.  That's the PSTN.

03:52  4    Through direct connection, wireless, local area

03:52  5    networks, and any combination of those.

03:52  6         So Botzko makes that very clear, that that's

03:52  7    the intent of this invention.

03:52  8    Q.   Step 1 of this method, does Botzko disclose

03:52  9    receiving an audio packet from each of a plurality of

03:52  10   clients?

03:52  11   A.   Yes.  And so I've shown that there again with

03:52  12   the high-level overview with the sites connected to the

03:52  13   bridge.  But what's key is the text that -- the

03:52  14   excerpts from the Botzko patent that show that the

03:52  15   audio data is received from the various sites.  And

03:52  16   what's received?  Compressed audio packets.

03:52  17   Q.   And does Mr. Botzko's patent disclose Step 2,

03:52  18   which is determining which of the plurality of clients

03:52  19   is an active speaker in forming an active speakers

03:52  20   list?

03:52  21   A.   Yes.  I've covered that in the intro to

03:52  22   Botzko.  However, there it is.  It's still highlighted

03:53  23   in green, what's called -- that Botzko describes as the

03:53  24   likelihood of speech detector or the selector.

03:53  25        And in the text, Botzko makes it very clear

841

03:53    1    that the selector does the selection.  And what it does

03:53    2    is it provides signal information identifying on which

03:53    3    lines the input speakers can be found.

03:53    4        Q.    Would it have been obvious to a person of

03:53    5    ordinary skill to provide this information as a list?

03:53    6        A.    Yes.  Botzko makes it clear that this would be

03:53    7    implemented in software.  A list is the most basic

03:53    8    fundamental -- probably the most basic fundamental data

03:53    9    structure and software.  So providing information about

03:53    10   multiple active speakers would be in a list.

03:53    11       Q.    Right.  Steps 3 and 4, these are a mouthful:

03:53    12   Determining that a first subset of the plurality of

03:53    13   clients has the capability to mix multiple audio

03:53    14   streams and determining that a second subset of the

03:53    15   plurality of clients does not have the capability to

03:53    16   mix multiple audio streams.

03:53    17            Does Mr. Botzko's patent disclose these steps?

03:54    18       A.    Yes.  As I mentioned before, this is -- this

03:54    19   is really what the thrust of the Botzko patent is

03:54    20   about.

03:54    21            And I'm repeating it here because I think it's

03:54    22   very important and instructional of the key sentence

03:54    23   from Botzko.  These are -- again, these are excerpts

03:54    24   right from the patent:  The system can limit the number

03:54    25   of streams it outputs to the number a site can receive.

842

03:54  1      And what I've shown is the two highlights that

03:54  2  show that that's very clear in Botzko, that the

03:54  3  endpoint sites are able to receive more than one audio

03:54  4  stream and perform their own local mixing.

03:54  5      And then when we're talking about the other

03:54  6  type of client, it's endpoint sites that can receive

03:54  7  only one audio stream.  So both are there.

03:54  8      Q.    To send the endpoint sites the number of

03:54  9  streams that it's capable of receiving, would Botzko's

03:54  10  system have to determine the capabilities of these

03:54  11  devices?

03:54  12      A.    Yes.  In my opinion, that's obvious.  A person

03:54  13  of ordinary skill looking at this and recognizing that

03:54  14  Botzko's design is providing connection to non-mixing

03:55  15  clients and mixing clients, it would be, in my opinion,

03:55  16  very obvious that the system would have to determine

03:55  17  which type of client it's connecting to.

03:55  18      Q.    Steps 5 and 6.  Does Mr. Botzko's patent

03:55  19  disclose multiplexing said packets of audio data

03:55  20  received from each client on said active speakers list

03:55  21  into a multiplexed stream and sending said multiplexed

03:55  22  stream to each of said first subset of the plurality of

03:55  23  clients?

03:55  24      A.    Yes.  I'm showing that here as some of the

03:55  25  excerpted text, and the diagram.

843

```
03:55   1              So the diagram is from my previous example
03:55   2       where I say the active speakers were determined to be A
03:55   3       and B.
03:55   4              And then the audio from A and B would be put
03:55   5       together and sent out on one channel to site C.  And
03:55   6       that's what the text basically makes clear.  We'll
03:55   7       output the loudest speakers, more than one, in separate
03:55   8       streams.
03:55   9       Q.    Now, you were here for Dr. Schaefer's
03:55   10      testimony.
03:56   11             And was -- is your analysis of these two claim
03:56   12      elements consistent with his analysis for purposes of
03:56   13      infringement?
03:56   14      A.    I believe so, yes.  The way I understand
03:56   15      Dr. Schaefer's analysis that sending -- what he says
03:56   16      there, it's a multiplex -- multiplexing multiple
03:56   17      streams.
03:56   18             So it's multiple streams over a single port or
03:56   19      connection.  That's what I just described.  So I
03:56   20      believe that Dr. Schaefer and I agree on this.
03:56   21      Q.    And do you agree with Dr. Schaefer that
03:56   22      there's many ways you can multiplex?
03:56   23      A.    No.  Certainly.
03:56   24      Q.    And do you recall Dr. Schaefer being asked
03:56   25      about how the concept of switching relates to
```

844

03:56  1    multiplexing?

03:56  2        A.    Yes.

03:56  3        Q.    And how did -- how did he explain that

03:56  4    relationship?

03:56  5        A.    Well, the concept of switching is really what

03:56  6    I've shown, and Botzko I think shows it probably the

03:56  7    best, is with switches.

03:56  8              And so if you're going to select more than one

03:56  9    audio stream, you would use multiple switches to switch

03:56  10   those audio streams from the input to the output.

03:56  11             So I think that's exactly what Dr. Schaefer

03:57  12   was describing.

03:57  13       Q.    So you agree with Dr. Schaefer that switching

03:57  14   is really talking about this combined operation of

03:57  15   multiplexing and sending?

03:57  16       A.    Yes.  That's -- that's consistent.

03:57  17       Q.    All right.  And just to be clear, what --

03:57  18   which element of this figure here in Botzko is -- are

03:57  19   the switches?

03:57  20       A.    Well, the switches are what I've highlighted

03:57  21   in blue.  And so there -- there's multiple switches,

03:57  22   and they're numbered 22A through N.  That means that

03:57  23   however many switches are needed would be implemented

03:57  24   in the design.

03:57  25       Q.    Last two steps.  First, does Botzko disclose

845

03:57  1    mixing said packets of audio data received from each

03:57  2    client on said active speakers list into one combined

03:57  3    packet?

03:57  4         A.    Yes.  I've shown that before.  I showed that

03:57  5    Botzko has active speaker selection, has a mixer.

03:57  6    Would be mixing -- from the example I gave, between,

03:57  7    say, A and B coming in, they would mix those audio

03:58  8    streams, curate the combined packet, and send that out

03:58  9    to site C.

03:58  10        Q.    So to confirm, in your opinion does

03:58  11   Mr. Botzko's patent disclose sending said combined

03:58  12   packet to each of said second subset of a plurality of

03:58  13   clients?

03:58  14        A.    Yes.  So after the mixing is done, the

03:58  15   combined packet is created, it would be sent out to the

03:58  16   site.  And so both claim elements are met, yes.

03:58  17        Q.    Okay.  Last sentence of the -- of Claim 1,

03:58  18   which says that:  Whereby, said plurality of clients

03:58  19   can simultaneously participate in a single

03:58  20   audioconference application.

03:58  21             In your opinion, does Mr. Botzko's patent

03:58  22   disclose this?

03:58  23        A.    Sure.  This is the wrap-up of the claim, and

03:58  24   it's essentially what we heard in the beginning of the

03:58  25   claim, that what's being shown here in the claim is an

846

03:58   1    audioconferencing system for multiple clients.

03:58   2              And what I've cited here from Botzko is the

03:59   3    Figure 1, which is showing an audioconference of

03:59   4    multiple clients, and the text that makes that clear

03:59   5    that it's an audioconference with multiple clients.

03:59   6         Q.    Before I move on, just to wrap up Claim 1

03:59   7    here, in your expert opinion, does -- would a person of

03:59   8    ordinary skill reading Mr. Botzko's patent have found

03:59   9    Claim 1 of the '858 patent obvious?

03:59   10        A.    In my opinion, a person of ordinary skill in

03:59   11   the art reading Botzko would have found every claim

03:59   12   element of Claim 1 obvious and therefore making Claim 1

03:59   13   invalid.

03:59   14        Q.    On to Claims 2 and 3.

03:59   15              What do these claims require?

03:59   16        A.    So Claim 2 and 3 require removing audio.  In

03:59   17   Claim 2, removing audio from multiplexed stream, and in

03:59   18   Claim 3 removing audio from a combined packet.

03:59   19        Q.    Does Mr. Botzko's patent disclose these

03:59   20   removing steps?

03:59   21        A.    Yes.  Yes.  It does.

04:00   22        Q.    Can you explain what's shown here in Figure 2B

04:00   23   and described in the text of Mr. Botzko's patent?

04:00   24        A.    Yes.  In the Botzko patent, as I already

04:00   25   discussed, it describes multiple different types of

847

| | |
|---|---|
| 04:00 | 1 |
| 04:00 | 2 |
| 04:00 | 3 |
| 04:00 | 4 |
| 04:00 | 5 |

1  audio processing.  And in this case, what it's showing

2  is a scenario where the audio comes into the bridge.

3  And what's important is on the right side of this

4  diagram, Figure 2B, in this case all the audio goes to

5  all sites.

6         So all of the sites are going to receive this

7  active speaker audio.

8         Q.    What are you showing here on this slide?

9         A.    Actually, could you go back?

10        Q.    Absolutely.

11        A.    Thank you.

12        So what I wanted to point out is that at the

13  bottom of this, the highlighted part, what is important

14  is that what Botzko says is that when you do this, if

15  you send all of the audio to a site including the

16  active speaker's own speech -- this is the important

17  part -- it must automatically ignore its own

18  transmitted audio.

19        And let me show you what that means.  So here

20  we've got the sites A, B, C, and D.  The audio has come

21  into the bridge.  That's what I'm showing you in

22  Figure 2B, and over on the right side of the

23  participants.  And so we know that site A's audio is

24  the red, site B's audio is the yellow.

25        And so let's talk about site C and D first.

—848—

04:01 1    They're going to -- they want to receive both.  They

04:01 2    want to hear both people talking.  This is an example

04:01 3    of double talk, two people talking at the same time.

04:01 4    They're going to hear the red and the yellow.

04:01 5        But A, site A does not want to hear their own

04:01 6    audio.  And so as Botzko teaches, it has to be ignored.

04:01 7    It's removed at the -- at the client's site, and that's

04:01 8    what would have to happen.

04:01 9        Likewise for site B, site B is in yellow.

04:01 10   Site B doesn't want to hear their own audio.  It is

04:01 11   removed.  And that's what Botzko teaches.

04:01 12   Q.    What are you showing here on this slide?

04:01 13   A.    So on this slide, we've heard a number of

04:02 14   different interpretations of things.  And what I've --

04:02 15   my understanding is that Paltalk, rather than using

04:02 16   what I would think is the plain and ordinary meaning of

04:02 17   the term "removing," has a different position, that

04:02 18   they believe that "removing" could also mean not

04:02 19   including.

04:02 20       That's not my opinion, but that's what I

04:02 21   understand Paltalk's to be.  And if that's the case,

04:02 22   what I'm showing here is in Botzko, Botzko also teaches

04:02 23   not including.  So the previous slide I just showed,

04:02 24   that Botzko teaches truly not removing, but if removing

04:02 25   it means not including, it also shows that.

849

04:02  1      Q.   I think we've seen this Figure 2A before.  But

04:02  2  can you just explain a little bit what you mean by not

04:02  3  including is covered in this scenario?

04:02  4      A.   Yes.  This is -- this is the beauty of

04:02  5  Botzko's design.  It shows that you have an audio

04:02  6  processor for each of the sites.

04:02  7           And if you look at the audio coming in, you

04:03  8  see A, B, and D.  There's no C because this is the

04:03  9  audio processor for site C.  And so if the audio

04:03  10  processor for site C never gets the audio from site C,

04:03  11  it'll never get its audio sent back.  And that's how

04:03  12  there's an audio processor for each one of the sites.

04:03  13           So in this case in the Botzko design, it can

04:03  14  be built in to not include each site's audio.

04:03  15      Q.   And I believe Figure 2A was what you had shown

04:03  16  for mixing client sites.

04:03  17           Does a similar operation happen for non-mixing

04:03  18  clients?

04:03  19      A.   Yes.  Yes.  It'd be the same.

04:03  20      Q.   Before I move on, please just confirm,

04:03  21  Mr. Bress, is it your opinion that a person of ordinary

04:03  22  skill reading Mr. Botzko's patent would have found

04:03  23  Claims 2 and 3 of the '858 patent to be obvious?

04:03  24      A.   Yes.  In my opinion, a person of ordinary

04:03  25  skill reading the Botzko patent and using either one of

| | | |
|---|---|---|
| 04:03 | 1 | the interpretations of removing that we've talked about |
| 04:04 | 2 | here, would have found that these claims were obvious |
| 04:04 | 3 | and therefore invalid. |
| 04:04 | 4 | Q.    Last two claims.  What are Claims 4 and 5 |
| 04:04 | 5 | talking about? |
| 04:04 | 6 | A.    Claims 4 and 5 are talking about specific |
| 04:04 | 7 | equipment using specific protocols. |
| 04:04 | 8 | Q.    And in your opinion, would a person of |
| 04:04 | 9 | ordinary skill have found these claims to be obvious? |
| 04:04 | 10 | A.    Yes.  They would have. |
| 04:04 | 11 | Q.    So let's start with the equipment requirements |
| 04:04 | 12 | of these claims. |
| 04:04 | 13 | Claim 4 says that at least one of said first |
| 04:04 | 14 | subset of the plurality of clients is using PC-based |
| 04:04 | 15 | equipment. |
| 04:04 | 16 | Is this disclosed in Mr. Botzko's patent? |
| 04:04 | 17 | A.    Yes.  So the first, what's described here as |
| 04:04 | 18 | the first subset, that's the -- that's for the mixing |
| 04:04 | 19 | clients.  That's for the clients that are able to mix |
| 04:04 | 20 | their own audio, receive multiple audio streams.  That |
| 04:04 | 21 | was well known in the year 2000 that computers can |
| 04:04 | 22 | connect over the Internet and receive multiple audio |
| 04:04 | 23 | streams. |
| 04:04 | 24 | Q.    And is a computer an example of PC-based |
| 04:05 | 25 | equipment? |

851

04:05  1        A.    Yes, a PC.  Personal computer.

04:05  2        Q.    Claim 5 says:  At least one of said second

04:05  3   subset of the plurality of clients is using a

04:05  4   telephone.

04:05  5             Is that disclosed in Mr. Botzko's patent?

04:05  6        A.    Yes.  The second subset here is the mixing

04:05  7   clients, sending one audio stream to a client that

04:05  8   cannot mix.  The non-mixing clients --

04:05  9             I'm sorry.  I think I misspoke.  This is for

04:05  10  the non-mixing clients, a client that can only receive

04:05  11  one audio stream.

04:05  12            And in this case certainly everyone was -- but

04:05  13  certainly a person of ordinary skill was well aware of

04:05  14  telephones.

04:05  15       Q.    Now, did Mr. Botzko specifically refer to SIP

04:05  16  or H.323 in his patent?

04:05  17       A.    Not directly.  No.

04:05  18       Q.    Would a person of ordinary skill have been

04:05  19  familiar with both H.323 and SIP back in the year 2000?

04:06  20       A.    Yeah.  I mentioned that earlier, that a person

04:06  21  of ordinary skill in the year 2000 working in

04:06  22  audioconferencing, telecommunications, would have been

04:06  23  very familiar with the foundational standards that were

04:06  24  used for inner connection to the network SIP and H.323.

04:06  25       Q.    Let's take a look at one of those publications

852

04:06  1    that you talked about towards the beginning of your

04:06  2    testimony that discussed H.323 and SIP.

04:06  3        Can you just remind the jury what this

04:06  4    document is?

04:06  5    A.    Yes.  This is the IETF draft document that I

04:06  6    described.  It describes multiple ways that gateways

04:06  7    can be connected and used to connect to the PSTN and

04:06  8    connect to the Internet.

04:06  9        The document, it's from Rosenberg.  He's the

04:06  10   first author.  And this is from May 6, 1998.  So over

04:06  11   two years before the '858 patent.

04:06  12   Q.    And you also showed us Figure 1 of

04:06  13   Mr. Rosenberg's publication before.  But can you please

04:06  14   very briefly remind us what we're looking at here?

04:07  15   A.    Yes.  So I mentioned before that in Rosenberg,

04:07  16   it's showing a particular architecture connecting

04:07  17   between the Internet's telephony gateway connecting

04:07  18   between the PSTN and Internet.  It makes it clear that

04:07  19   H.323 and SIP would be used for those types of

04:07  20   connections.

04:07  21   Q.    Now, would a person of ordinary skill reading

04:07  22   Mr. Botzko's patent on one hand and Mr. Rosenberg's

04:07  23   publication on the other have reason to combine the

04:07  24   known elements disclosed in each in the same way that

04:07  25   Claims 4 and 5 of the '858 patent do?

853

04:07    1        A.    Absolutely.   In the beginning I talked about
04:07    2   how do the sites interconnect, couple, to the bridge
04:07    3   that Botzko describes.   And that's the -- what I've
04:07    4   highlighted in here.   It's called the RTP interface,
04:07    5   the realtime transport protocol.
04:07    6            And so that's the interface to the devices.
04:07    7   And that's what Rosenberg's paper, draft paper, is all
04:07    8   about, is multiple ways to format the RTP package
04:08    9   stream.
04:08   10        Q.    And would a person of ordinary skill recognize
04:08   11   any benefits of using Mr. Rosenberg's RTP payload
04:08   12   format in Mr. Botzko's audioconferencing system?
04:08   13        A.    Yes.   That's primarily what the Rosenberg
04:08   14   draft is all about, is, you know, the specific RTP
04:08   15   formats that are described.   I've highlighted a couple
04:08   16   of things here.
04:08   17            Reduction in header, that means making the
04:08   18   amount of data that's transmitted lower.   Improvement
04:08   19   in delays, packetization delays.
04:08   20            So those are improvements that Rosenberg
04:08   21   contemplates in his draft.
04:08   22        Q.   So in your opinion, would a person of ordinary
04:08   23   skill have found -- have thought that Claims 4 and 5 of
04:08   24   the '858 patent were obvious?
04:08   25        A.    Yes.   A person of ordinary skill with Botzko

854

04:08  1    and certainly with Rosenberg would have found that

04:08  2    Claim 4 and 5 were obvious, and therefore they're

04:08  3    invalid.

04:08  4        Q.    So just to summarize your obviousness

04:09  5    opinions, which claims of -- which asserted claims of

04:09  6    the '858 patent are, in your opinion, invalid because

04:09  7    they would have been obvious?

04:09  8        A.    In my opinion, all the asserted claims, and

04:09  9    that's Claims 1 through 5 of the '858 patent, would

04:09  10   have been obvious through the analysis I've just shown.

04:09  11   And therefore, that makes those claims invalid.

04:09  12       Q.    Now, did you provide every excerpt from

04:09  13   Mr. Botzko's patent and Mr. Rosenberg's publication

04:09  14   that supports this opinion?

04:09  15       A.    No.  I was trying to make a -- show the

04:09  16   highlights, keep this as brief as I can.  There's a lot

04:09  17   more detail.  Botzko's patent is very precise, has a

04:09  18   lot of information.  I hopefully made it clear here how

04:09  19   Botzko's patent does invalidate the '858 patent.

04:09  20       Q.    All right.  Moving on to the second reason

04:09  21   that you wanted to present today as to why some of the

04:09  22   asserted claims are invalid, what's that second reason?

04:10  23       A.    So a second reason is that for the -- we'll

04:10  24   look at it here in a moment -- Claim 2 and 3, the ones

04:10  25   that have the removing step, there's what's called a

KRISTIE M. DAVIS, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)

855

04:10  1   "lack of written description."  That's a legal term

04:10  2   that there's no -- there's no description in the

04:10  3   specification of the patent for this removing step, and

04:10  4   we can take a look at that.

04:10  5       Q.   All right.  So I know you're not an attorney,

04:10  6   but what's your understanding of this written

04:10  7   description requirement?

04:10  8       A.   Right.  As I mentioned, so this written

04:10  9   description, or in this case lack of written

04:10  10  description, is a legal matter.  And what the law says

04:10  11  is what I have on the screen, that the patent

04:10  12  specification must describe the claimed invention in

04:10  13  sufficient detail to show that the inventor actually

04:10  14  invented what is claimed.

04:10  15          And one way that I like to think about that is

04:10  16  going back to school and doing math homework.  And if

04:10  17  you remember, teachers would say, you got to show your

04:10  18  work.  You couldn't just give the answer.  You had to

04:11  19  show your work.

04:11  20          And that's really what the written description

04:11  21  requirement is saying.  You've got to show -- the

04:11  22  author, the inventor in the specification, has to show

04:11  23  their work.

04:11  24      Q.   Right.  So we have the patent here.

04:11  25          Where in the patent is the alleged invention

856

04:11   1    defined?

04:11   2        A.    So in any patent, the actual invention is

04:11   3    defined in the claims.  The claims are the actual

04:11   4    invention.

04:11   5        Q.    And what is required by the alleged invention

04:11   6    claimed in Claims 2 and 3 here?

04:11   7        A.    So in this case, in these claims, as I've got

04:11   8    highlighted, it requires removing.  And for Claim 2,

04:11   9    it's removing -- what it says -- from said multiplexed

04:11   10   stream said packets of audio data.  And similar for

04:11   11   Claim 3, for the combined packet.

04:11   12       Q.    All right.  Did the inventors of the '858

04:12   13   patent describe either these removing steps in the

04:12   14   specification of the '858 patent?

04:12   15       A.    No.  And so a patent has generally a cover

04:12   16   page, figures, a specification, and the claims.  And as

04:12   17   I said, the claims define the invention.

04:12   18            But for the -- as I understand the written

04:12   19   description requirement, you have to find written

04:12   20   description for this removing step in the

04:12   21   specification.  And I've reviewed it in detail, and I

04:12   22   find no support, no written description for this

04:12   23   removing step in the specification.

04:12   24       Q.    Does the '858 patent specification ever use

04:12   25   the word "remove"?

857

04:12  1      A.    No.

04:12  2      Q.    Does it ever use the word "removing"?

04:12  3      A.    No.

04:12  4      Q.    Does it ever use the word "removed"?

04:12  5      A.    No.

04:12  6      Q.    To be fair, does a claim automatically fail

04:12  7   the written description requirement if the

04:12  8   specification doesn't use the exact words that are used

04:12  9   in the claim?

04:12  10     A.    No.  Other words could be used, but I found

04:12  11  nothing in the specification that it even comes close

04:12  12  to describing the -- this removing step.

04:13  13     Q.    Did you find anything in the '858 patent, that

04:13  14  specification, that describes ignoring audio packets

04:13  15  that were already included in a multiplexed stream or

04:13  16  combined packet?

04:13  17     A.    No.  That's the way it's described in other --

04:13  18  or that they're in other patent that are publications,

04:13  19  but nothing like that at all in the specification of

04:13  20  the '858.

04:13  21     Q.    Does the '858 patent describe deleting audio

04:13  22  packets from a multiplexed stream or a combined packet?

04:13  23     A.    No.

04:13  24     Q.    All right.  Well, we haven't heard from him

04:13  25  yet, but I understand that Paltalk's expert for

—858—

04:13  1   purposes of validity, Dr. Madisetti, disagrees with you

04:13  2   on this point.

04:13  3          What's Dr. Madisetti's theory of how this --

04:13  4   these removing steps are disclosed or described in the

04:13  5   specification?

04:13  6      A.   Well, if I understand it, what Dr. Madisetti's

04:13  7   setting forth, we've seen some of this.  We've seen it

04:14  8   multiple times now from the '858 patent, is this part

04:14  9   about not including.

04:14  10         And so if I understand the position from

04:14  11  Dr. Madisetti and Paltalk in general is that this

04:14  12  removing step is somehow the same as the "not

04:14  13  including."

04:14  14     Q.   And in your opinion, what's wrong with

04:14  15  Dr. Madisetti's reliance on this disclosure of "not

04:14  16  including"?

04:14  17     A.   Well, you can't remove something if it's not

04:14  18  there.  And so if you haven't -- if it's not included,

04:14  19  you can't then not remove it.

04:14  20         And it's very important here to look at how

04:14  21  this fits into the claims and what the claim -- what

04:14  22  Claim 2 and Claim 3 say.

04:14  23         They're saying:  Removing from said

04:14  24  multiplexed stream.

04:14  25         And so that word "said" is important.  It's

859

04:14    1    saying it's something that's already been -- it's

04:14    2    already there.  It's already been made.  It exists.

04:14    3            And where does it exist from?  It exists from

04:14    4    Claim 1.

04:14    5            And so Claim 1, that's why I put up here the

04:14    6    Step 5 and Step 7 of the Claim Element [5] and Claim

04:15    7    Element [7] from Claim 1.

04:15    8            That's where the -- in Claim Element [5],

04:15    9    that's where the multiplexed stream is created.  And

04:15   10    then it's saying to then remove it.  So how can that

04:15   11    happen?  It doesn't make sense.  It's just the

04:15   12    opposite.

04:15   13       Q.   We've made it to the end.  Thank you,

04:15   14    Mr. Bress.

04:15   15            Before we let you go, can you please just

04:15   16    briefly summarize the two reasons you explained to the

04:15   17    jury today as to why in your expert opinion the claims

04:15   18    of the '858 patent are invalid?

04:15   19       A.   Yes.  So the first reason that I've provided

04:15   20    is that the asserted claims of the '858 patent, in my

04:15   21    opinion, would have been obvious to a person of skill

04:15   22    in the art and, therefore, they're invalid.

04:15   23            And what I just discovered now, that for

04:15   24    Claims 2 and 3, because they don't provide written

04:15   25    description for the removing step, those, they would be

860

04:15  1    invalid for that reason as well.

04:15  2                    MS. DELACENSERIE:  No further questions.

04:15  3                    THE COURT:  Cross?

04:15  4                       CROSS-EXAMINATION

04:15  5    BY MR. CAUGHEY:

04:16  6        Q.    Good afternoon, Mr. Bress.  How are you?

04:16  7        A.    Good.  How are you?

04:16  8        Q.    It's nice to meet you in person.

       9        A.    That's right.

04:16 10        Q.    We met over Zoom, I think, by deposition a

04:16 11    while ago.

04:16 12              And I think you mentioned with your -- with

04:16 13    Cisco's counsel that you've attended most of this

04:16 14    trial, right?

04:16 15        A.    That's correct.

04:16 16        Q.    All of it?

04:16 17        A.    Yeah.  Except for I might have stepped out for

04:16 18    a minute or two, but I think most -- almost all of it.

04:16 19        Q.    And you are being paid by Cisco in connection

04:16 20    with your testimony, right?

04:17 21        A.    I'm being compensated for my time.  That's

04:17 22    right.

04:17 23        Q.    You mentioned you're the president, chief

04:17 24    technology officer, and founder of a company called AST

04:17 25    Technology Labs; is that right?

861

| | | |
|---|---|---|
| 04:17 | 1 | A.    That's correct. |
| 04:17 | 2 | Q.    Has AST ever been a client -- I'm sorry.  I |
| 04:17 | 3 | asked that opposite. |
| 04:17 | 4 | Has Cisco ever been a client of AST's? |
| 04:17 | 5 | A.    I believe so.  We tested -- as I said, AST |
| 04:17 | 6 | tests for multiple companies and industry across the |
| 04:17 | 7 | globe.  I believe Cisco has been a client at some |
| 04:17 | 8 | point. |
| 04:17 | 9 | Q.    Now, you refused to answer that question when |
| 04:17 | 10 | I took your deposition, didn't you? |
| 04:17 | 11 | A.    I did. |
| 04:17 | 12 | Q.    You are not offering any opinions about |
| 04:17 | 13 | whether Cisco Webex infringes the '858 patent, are you? |
| 04:17 | 14 | A.    I am not offering any opinions on |
| 04:17 | 15 | infringement.  That's correct. |
| 04:17 | 16 | Q.    Nor are you offering any opinion about the |
| 04:17 | 17 | amount of damages that Paltalk might be entitled to if |
| 04:17 | 18 | infringement were proven, right? |
| 04:17 | 19 | A.    I have no opinion on damages. |
| 04:18 | 20 | Q.    You've offered opinions solely about validity, |
| 04:18 | 21 | true? |
| 04:18 | 22 | A.    My opinions have been on invalidity.  But |
| 04:18 | 23 | yeah. |
| 04:18 | 24 | Q.    Fair enough. |
| | 25 | A.    Fair enough. |

862

04:18  1        Q.    Two sides of the same coin.

04:18  2              You agree that to offer your opinions and

04:18  3    analysis, and I think you discussed this with counsel

04:18  4    as well, one place to start is the claim language,

04:18  5    right?

04:18  6        A.    Certainly the claims are important.  Yes.

04:18  7        Q.    You got to understand the claims to understand

04:18  8    the invention, right?

04:18  9        A.    That's right.

04:18 10        Q.    And you got to understand the invention to

04:18 11    understand whether it's valid over the prior art,

04:18 12    right?

04:18 13        A.    That's right.

04:18 14        Q.    Okay.  Now, you would agree, and I think you

04:18 15    testified to this with your counsel, that claims,

04:18 16    patent claims, are interpreted from the perspective of

04:18 17    a person of ordinary skill in the art in light of the

04:18 18    language of the claims themselves, the specification of

04:18 19    the patent, and the relevant prosecution history,

04:18 20    right?

04:18 21        A.    That's correct.

04:18 22        Q.    And in putting forth your opinions, you have

04:18 23    used the Court's construction of "each" which specifies

04:19 24    that "each" can mean "one or more," right?

04:19 25        A.    That's correct.

863

04:19  1                 MS. DELACENSERIE:  Objection.  Misstates

04:19  2    the Court's instruction.

04:19  3                 THE COURT:  He gave the answer.

04:19  4                 Overrule the objection.

04:19  5    BY MR. CAUGHEY:

04:19  6        Q.    You don't disagree with the Court's

04:19  7    construction, I assume?

04:19  8        A.    I wouldn't disagree with the Court.  No.

04:19  9        Q.    And -- but it is your opinion that the

04:19  10   construction of the Court in construing "each" as being

04:19  11   able to mean "one or more" broadened the meaning of

04:19  12   "each," right?

04:19  13       A.    I agree with that.

04:19  14       Q.    So the Court's construction broadened the

04:19  15   meaning of "each."  Whereas before, if you thought it

04:19  16   was narrower, after the Court's construction, you now

04:19  17   believe that it's broader, right?

04:19  18       A.    Correct.

04:19  19       Q.    How so?  What's the basis of your view that

04:20  20   the construction is now broader?

04:20  21       A.    Well, if we look at the words.  We've heard it

04:20  22   all here now for three days about the word "each."  And

04:20  23   then it could -- the Court says it can mean "one or

04:20  24   more."  It means it can mean "every."

04:20  25                 But what does that mean?  Let's say you had

864

04:20    1    five things.  One, two, three, four, five.  Five.  So

04:20    2    you have five.  So five is "all."  So five is a subset.

04:20    3    That's the "all."  And one, two, three, four, five,

04:20    4    that's the "one or more."  So that's broader.  "All" is

04:20    5    narrow.

04:20    6        Q.    Okay.  And the Court broadened the

04:20    7    construction of "each," from your perspective?

04:20    8        A.    Again, the construction, as I understand it,

04:20    9    is plain and ordinary.  And what -- and this is what

04:20   10    I've said in my deposition that you mentioned.  My

04:20   11    understanding of it was that the Court is clarifying

04:20   12    that the meaning can include "one or more."

04:20   13        Q.    But your understanding is that the Court's

04:20   14    construction broadened the meaning of "each," right?

04:21   15        A.    I agree with that.  Yes.

04:21   16        Q.    Okay.  And for your analysis, you applied that

04:21   17    broadened construction and in fact assumed that "each"

04:21   18    means "one or more," right?

04:21   19        A.    Can be "one or more."

04:21   20        Q.    Well, it was my understanding, and certainly

04:21   21    correct me if I'm wrong, that for your invalidity

04:21   22    analysis, you actually assumed that the construction

04:21   23    was "one or more" for "each"?

04:21   24        A.    I used the Court's construction that it can

04:21   25    be.

865

| | | |
|---|---|---|
| 04:21 | 1 | Q. Now, you have explained to the Court |
| 04:21 | 2 | previously in a submission that as a person of ordinary |
| 04:21 | 3 | skill in the art, you would understand that most |
| 04:21 | 4 | practical audio systems, quote: Limit the number of |
| 04:21 | 5 | received audio signals to one or more selected active |
| 04:21 | 6 | speakers usually determined by the signal level of the |
| 04:22 | 7 | received audio." |
| 04:22 | 8 | Isn't that right? |
| 04:22 | 9 | A. That's -- that's a reasonable way to put it. |
| 04:22 | 10 | Yes. |
| 04:22 | 11 | Q. And that understanding aligns with the '858 |
| 04:22 | 12 | patent, right? |
| 04:22 | 13 | A. Yes. |
| 04:22 | 14 | Q. Okay. Now, on to your validity opinions, you |
| 04:22 | 15 | have opined to this jury that the '858 patent is |
| 04:22 | 16 | invalid, principally in light of Botzko, right? |
| 04:22 | 17 | A. I'd like to just correct you that my opinions |
| 04:22 | 18 | are actually invalidity opinions. |
| 04:22 | 19 | Q. I meant to say "invalid." |
| 04:22 | 20 | A. Okay. |
| 04:22 | 21 | Q. This needs to be shown -- invalidity must be |
| 04:22 | 22 | shown by clear and convincing evidence, right? |
| 04:22 | 23 | A. That's my understanding. Yes. |
| 04:22 | 24 | Q. This is a higher standard than the |
| 04:22 | 25 | preponderance standard that applies to the question of |

866

04:22  1    infringement, right?

04:22  2        A.    That's right.

04:22  3        Q.    And that is because the '858 patent claims

04:22  4    must be afforded the presumption of validity, true?

04:22  5        A.    That's my understanding.

04:22  6        Q.    And that's because the United States Patent

04:23  7    Office reviewed the patent and issued the claims,

04:23  8    right?

04:23  9        A.    I believe that's correct.

04:23  10       Q.    And the Patent Office examiner, in reviewing

04:23  11   the claims, he was someone with a technical background,

04:23  12   right?

04:23  13       A.    I don't know the examiner.  I would expect

04:23  14   that to be right, but I don't know the examiner.

04:23  15       Q.    You have no reason to believe otherwise?

04:23  16       A.    Like I said, I don't know anything about the

04:23  17   examiner.

04:23  18       Q.    The patent application here was filed in the

04:23  19   year 2000, right?

04:23  20       A.    June 28th, 2000.

04:23  21       Q.    There you go.

04:23  22             And the patent issued when?

04:23  23       A.    I don't like the memory test.  It was sometime

04:23  24   in 2004, I think.

04:23  25       Q.    You were just so good at when the application

—867—

04:23   1    was, I thought you might have the same level of

04:23   2    precision actually better than me.

04:23   3        A.    Well, invalidity analysis is all about the

04:23   4    filing date, June 28th, 2000.  As far as the issue

04:23   5    date, that wasn't an issue for my validity --

04:23   6    invalidity analysis.

04:23   7        Q.    Fair enough.

04:23   8              But you can agree with me that it was about

04:23   9    four years between the application and when the patent

04:24   10   was issued?

04:24   11       A.    That's fair.

04:24   12       Q.    And the prosecution process is the process of

04:24   13   going back and forth between the applicant and the PTO

04:24   14   regarding the claims of the patent and leading up to I

04:24   15   guess in this case eventually an issued patent, right?

04:24   16       A.    Well, in this case, it was an issued patent.

04:24   17   Yes.

04:24   18       Q.    Yes.  And that took four years, and it

04:24   19   involved back-and-forth with the U.S. Patent and

04:24   20   Trademark Office, right?

04:24   21       A.    There were four years, from what you -- I'll

04:24   22   take your word on it.  I think that's right, that it

04:24   23   was issued in 2004.  So approximately four years from

04:24   24   the filing date to the issue date.

04:24   25       Q.    Now, you are offering an opinion that Botzko

868

04:24   1    alone renders Claims 1 through 3 invalid as being

04:24   2    obvious, right?

04:24   3        A.    Well, Botzko, with the knowledge of a person

04:24   4    of ordinary skill in the art, renders it obvious.

04:24   5        Q.    Yes.  Thank you for that clarification.

04:24   6              You are not offering any opinion whatsoever

04:25   7    that some version of Webex or any Cisco product or any

04:25   8    Webex product invalidates the '858 patent, true?

04:25   9        A.    Yeah.  I've done no invalidity analysis with

04:25  10    regard to Webex products.  That's true.

04:25  11        Q.    And if it were true, I would imagine Cisco

04:25  12    would have pointed that invalidating product out to

       13    you.

04:25  14              Would you expect that?

04:25  15        A.    I -- I don't have any expectation of that, no.

04:25  16    Could have, but I don't expect that.

04:25  17        Q.    Well, let me ask you this question:  You

04:25  18    mentioned -- obviously you talked at some length about

04:25  19    Botzko.  You also mentioned I think to counsel that you

04:25  20    had reviewed other pieces of potential prior art in

04:25  21    connection with your analysis, right?

04:25  22        A.    Yes.  Those were mostly patents and other

04:25  23    publications, but not systems.

04:25  24        Q.    Did you personally identify Botzko as prior

04:25  25    art for the '858 patent, or was it given to you by

869

04:26  1    Cisco's counsel?

04:26  2        A.    I remember you asked me that question.  And

04:26  3    after you asked me that question in my deposition, I

04:26  4    went back and checked.  And, in fact, I did find Botzko

04:26  5    as the prior art patent myself.

04:26  6        Q.    Okay.  But you weren't able to tell me that

04:26  7    when I took your deposition, right?

04:26  8        A.    No.  I had to go back and check.

04:26  9        Q.    And now Cisco -- you're not aware of Cisco or

04:26  10   Webex implementing any hybrid audio system before the

04:26  11   2000 priority date on the patent, right?

04:26  12       A.    Again, I've done no analysis on Cisco's

04:26  13   products or Webex.  This was a -- strictly an

04:26  14   invalidity analysis on prior art.

04:26  15       Q.    And you've seen evidence in this courtroom

04:26  16   this week that Cisco first implemented hybrid audio in

04:26  17   Webex in 2007; isn't that right?

04:26  18       A.    Again, I have done no investigation on Cisco's

04:26  19   Webex products.  This was a strict -- my task was

04:27  20   strictly invalidity.

04:27  21       Q.    Now, you would agree that if Claim 1 is not

04:27  22   obvious in light of Botzko, neither are Claims 2, 3, 4,

04:27  23   or 5, right?

04:27  24       A.    I believe -- I think you got that wrong.  My

04:27  25   opinion is that they are -- they are obvious.  Claims

870

04:27    1    1, 2, 3, 4, and 5 of the '858 patent, in my opinion,

04:27    2    are obvious in view of Botzko, a person of ordinary

04:27    3    skill in the art.  And for 4 and 5 in combination with

04:27    4    Rosenberg.

04:27    5        Q.    And I asked that question either backwards or

04:27    6    with great imprecision.  So let me give it another

04:27    7    shot.

04:27    8            If the jury disagrees with you on Claim 1 and

04:27    9    finds that Botzko did not render Claim 1 obvious, there

04:27   10    would be no basis for you to say that Claims 2, 3, 4,

04:27   11    or 5 are obvious either, right?

04:27   12        A.    I think that's correct.

04:27   13        Q.    Because they're all dependent on Claim 1?

04:27   14        A.    That's right.

04:27   15        Q.    So if we can find anything about Claim 1

04:28   16    that's not obvious, that defeats your analysis with all

04:28   17    of Claims 1, 2, 3, 4, and 5, fair?

04:28   18        A.    Right.  Found that Claim 1 was obvious.

04:28   19        Q.    Okay.  I want to focus our discussion today --

04:28   20    it's a somewhat higher level.  I think Paltalk's going

04:28   21    to present its own person of skill to talk about some

04:28   22    of the circuitry diagrams, and maybe we'll get into

        23    that.

04:28   24            But I want to start with some areas of

04:28   25    agreement.  The first one is that you are not saying

871

04:28    1   that Botzko includes each and every element of the '858

04:28    2   patent, right?

04:28    3       A.    I believe with the analysis that I just showed

04:28    4   that we'll talk about the claim, the Claim 1, went

04:28    5   through each and every element of the claim and that

04:28    6   Botzko discloses that with -- especially in view of a

04:28    7   person with ordinary skill in the art.

04:28    8       Q.    Well, you are not saying that it literally

04:28    9   discloses every element.  You're saying that a person

04:29   10   of ordinary skill in the art would understand how to

04:29   11   fill in some gaps to get between Botzko and the '858

04:29   12   patent, right?

04:29   13       A.    The disclosures in Botzko, in view of a person

04:29   14   of ordinary skill in the art, would have found it

04:29   15   obvious.  That's my opinion.

04:29   16       Q.    And you're aware of the anticipation standard

04:29   17   in patent law, right?

04:29   18       A.    I understand it.  Yes.

04:29   19       Q.    And what is it?

04:29   20       A.    I would rather not say right at this point

04:29   21   because I haven't prepared for that, and that's more of

04:29   22   a legal matter.

04:29   23               MR. CAUGHEY:  Okay.  Can we put up the

04:29   24   demonstrative with Paragraph 19 from Mr. Bress'

04:29   25   supplemental report?

872

BY MR. CAUGHEY:

Q.    This is an excerpt from your supplemental report.  It says the word "anticipation," right?

A.    That's right.

Q.    And you say:  I have been informed that a patent claim is invalid under 35 USC Section 102 if it is anticipated by or not novel over a prior art disclosure.

       Right?

A.    That's right.

Q.    I understand that a claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently, in a single prior art reference.

       Right?

A.    You've read that from my report exactly right.

Q.    Okay.  A couple of questions.

       Botzko is a single prior art reference, right?

A.    Botzko is one reference.  That's correct. That's right.

Q.    And you are saying that Botzko as a single prior art reference alone invalidates Claims 1 through 3, true?

A.    I say that it's obvious in view of a person of ordinary skill in the art.

873

04:30  1        Q.    Yes.  But you do not say that Botzko

04:30  2   anticipates Claims 1 through 3, true?

04:30  3        A.    That's true.

04:30  4        Q.    And that is because Botzko does not contain

04:30  5   each and every element as set forth in the claims,

04:30  6   right?

04:30  7        A.    I believe in view of a person of ordinary

04:30  8   skill in the art, it does.

04:30  9        Q.    You have not asserted that it meets this

04:31  10  anticipation standard, correct?

04:31  11       A.    That's correct.

04:31  12       Q.    One sort of footnote question on Paragraph 19,

04:31  13  and then we'll get back to Botzko.

04:31  14             You said:  I understand that a claim is

04:31  15  anticipated only if "each and every" element as set

04:31  16  forth in the claim is found.

04:31  17             Why did you not write only if "each" element

04:31  18  is found?

04:31  19       A.    That's a really good question for today, this

04:31  20  week.  And since that's been brought up, I actually did

04:31  21  some research of this over the last couple of days.

04:31  22             And what I found, what I believe is concluded

04:31  23  from my research, is that when those terms are used,

04:31  24  "each" and "every," it's used for emphasis.  It's not

04:31  25  changing it.  It's only used for emphasis, to make an

874

04:31  1   emphasis that it's "all."  It's "every."

04:31  2              That -- that's what I've found in researching

04:31  3   it over the Internet.

04:31  4       Q.   So "each" wouldn't have got the job done?

04:31  5       A.   Oh, it would have, but it's more emphasized

04:31  6   when it's "each" and "every."

04:32  7              MR. CAUGHEY:  Now, can you pull that

04:32  8   down?

04:32  9   BY MR. CAUGHEY:

04:32  10      Q.   With respect to obviousness, I understand

04:32  11  you're not -- weren't precise on the anticipation

04:32  12  standard before I put it up, but you are offering an

04:32  13  obviousness opinion.

04:32  14             What is the obviousness standard that you have

04:32  15  followed in offering your opinions?

04:32  16      A.   I'd appreciate it if you can pull that section

      17  of my report so that I get it right.

04:32  18             Again, obviousness is a legal matter.  I

04:32  19  summarized it in my slides.  But since it is a legal

04:32  20  matter, I'd like to be precise.  And you showed it in

04:32  21  my report, that would be, I think, fair to show it

04:32  22  again.

04:32  23      Q.   Okay.  I'm thrilled to do so.  I think it'll

04:32  24  make it easier to go about it.  Let's -- but let's

04:32  25  actually go back to anticipation first because I had

875

| 04:32 | 1 | one more question on it.  Let's go back to |
| 04:32 | 2 | Paragraph 19. |
| 04:32 | 3 | And I just want to be very clear about your |
| 04:32 | 4 | testimony, sir. |
| 04:32 | 5 | Is it your testimony that -- as it says here: |
| 04:32 | 6 | Each and every element as set forth in Claims 1, 2, and |
| 04:33 | 7 | 3 is found in Botzko? |
| 04:33 | 8 | A.   With the knowledge of a person of ordinary |
| 04:33 | 9 | skill in the art, yes. |
| 04:33 | 10 | Q.   Okay. |
| 04:33 | 11 | A.   And it's obvious then. |
| 04:33 | 12 | Q.   There is nothing about Claims 1, 2, or 3 that |
| 04:33 | 13 | is missing from Botzko? |
| 04:33 | 14 | A.   Yes.  My opinion -- my obviousness opinion is |
| 04:33 | 15 | that everything in Claims 1, 2, 3 -- 1, 2, and 3 is |
| 04:33 | 16 | disclosed with the knowledge of a person of ordinary |
| 04:33 | 17 | skill in the art. |
| 04:33 | 18 | Q.   Let's just talk briefly about an active |
| 04:33 | 19 | speaker list.  This might be another point of |
| 04:33 | 20 | agreement. |
| 04:33 | 21 | Botzko does not mention an active speaker |
| 04:33 | 22 | list, true? |
| 04:33 | 23 | A.   Doesn't specifically use those words.  That's |
| 04:33 | 24 | true. |
| 04:33 | 25 | Q.   It doesn't use those words, right? |

04:33  1          A.    That's right.

04:33  2          Q.    It doesn't depict an active speaker list,

04:34  3    right?

04:34  4          A.    I believe that when I showed it on my diagram

04:34  5    with the likelihood of speech detector/selector from

04:34  6    Botzko, there's a line, Line 37, that's used to convey

04:34  7    the information of the active speaker information.  So

04:34  8    I believe that Line 37 is a depiction of the active

04:34  9    speakers list.

04:34 10          Q.    That was a yes or no question.

04:34 11                There is no visual depiction of an active

04:34 12    speaker list in Botzko, is there?

04:34 13          A.    I think on Line 37, it's conveying that

04:34 14    information.

04:34 15          Q.    Line 37 of Botzko -- Line 37 of what?

04:34 16          A.    Botzko's diagram, Figure 2.

04:34 17          Q.    Let's pull up --

04:34 18          A.    It might be Figure 3.

04:34 19          Q.    Let's pull up Botzko.

04:34 20                Which figure, sir?

04:34 21          A.    I believe Figure 3.

04:35 22          Q.    There it is.  Let me try to search here.

04:35 23                So that Line 37 is -- it is obvious that

04:35 24    Line 37 is a list?

04:35 25          A.    The way it's described in Botzko, it's the

877

| | | |
|--|--|--|
| 04:35 | 1 | information that conveys the active speakers. |
| 04:35 | 2 | Q.   And I asked you if there was a visual |
| 04:35 | 3 | description of a list in that little pointy arrow line |
| 04:35 | 4 | is what -- is your answer, right? |
| 04:35 | 5 | A.   Well, again, it's the figure with the words |
| 04:35 | 6 | from Botzko that describe it. |
| 04:35 | 7 | Q.   Botzko -- |
| 04:35 | 8 | MR. CAUGHEY:  We can pull that down. |
| 04:35 | 9 | BY MR. CAUGHEY: |
| 04:35 | 10 | Q.   Botzko doesn't include -- mention a list by |
| 04:35 | 11 | any sort of synonym, right?  Active speaker table, |
| 04:35 | 12 | active speaker -- I don't know, any synonym for a list, |
| 04:35 | 13 | there's no description like that in Botzko either, |
| 04:35 | 14 | right? |
| 04:35 | 15 | A.   I think it describes it as the likelihood of |
| 04:35 | 16 | speakers.  It doesn't say "list," but the information |
| 04:35 | 17 | related to the active speaker -- the loudest speakers. |
| 04:35 | 18 | Q.   Well, you were here when Mr. Buckles was |
| 04:36 | 19 | testifying, right? |
| 04:36 | 20 | A.   Yes. |
| 04:36 | 21 | Q.   And being cross-examined, right? |
| 04:36 | 22 | A.   Yes. |
| 04:36 | 23 | Q.   And there were two questions.  I think one |
| 04:36 | 24 | was:  Does Cisco Webex determine whether there's an |
| 04:36 | 25 | active speaker? |

878

04:36    1                    And he answered:  Yes.

04:36    2                    Do you recall that?

04:36    3        A.    I believe so.

04:36    4        Q.    And then there was a second question:  Does

04:36    5    Cisco Webex form an active speaker list?

04:36    6                    He answered that question in the affirmative

04:36    7    also, right?

04:36    8        A.    I'll take your word for it.

04:36    9        Q.    And those are two different concepts.  The

04:36    10   first thing you mentioned when I asked you for a

04:36    11   synonym, what I got was a description about how Botzko

04:36    12   identifies who an active speaker is.

04:36    13                   But you can't point me to any formation of a

04:36    14   list; isn't that true?

04:36    15       A.    The word "list" is not used in Botzko.  That's

04:36    16   correct.

04:36    17       Q.    Now let's talk about multiplexing for a

04:36    18   minute.

04:36    19                   You're familiar with what that term is, right?

04:36    20       A.    Yes.

04:36    21       Q.    It's a well-understood technique, right?

04:36    22       A.    That's true.

04:36    23       Q.    It was in 1997, true?

04:37    24       A.    Certainly.

04:37    25       Q.    And that's, in fact, something that you have

04:37   1   submitted to the Court in this matter.  You've said

04:37   2   that multiplexing is well understood as a technique for

04:37   3   transmitting a number of separate signals

04:37   4   simultaneously over a single channel or line.

04:37   5          You would agree with that definition, right?

04:37   6      A.    That's a reasonable definition.  Yes.

04:37   7      Q.    That's taken from the 1997 Microsoft Computer

04:37   8   Dictionary; isn't that true?

04:37   9      A.    I believe that's -- I believe I had it in my

04:37  10   report that way.  Yes.

04:37  11      Q.    Multiplexing is a significant feature of the

04:37  12   '858 patent, right?

04:37  13      A.    It's a word in the claims.  Yes.

04:37  14      Q.    It's a word in the claims.  It shows up on the

04:37  15   first page of the patent.  It shows up in the

04:37  16   specification.  It is a significant feature of the '858

       17   patent.

04:37  18          Wouldn't you agree with that?

04:37  19      A.    I believe it's a feature of the patent.  Yes.

04:37  20      Q.    That word --

04:37  21      A.    I'm not giving it any certain weight.  But

04:37  22   yes.  It's in the patent.

04:37  23      Q.    That word has been used, gosh, many, many

04:38  24   times this week, right?

04:38  25      A.    I've heard that word many times.  Yes.

880

04:38    1          Q.    Mixing is also a very important concept in the

04:38    2    '858 patent, right?

04:38    3          A.    It's disclosed in the '858 patent.  Yes.

04:38    4                MR. CAUGHEY:  And if you could pull up --

04:38    5    just to get an example, if you could pull up Claim 1 of

04:38    6    the '858 patent, Mr. Boles.

04:38    7    BY MR. CAUGHEY:

04:38    8          Q.    So let's take Claims 5 and 6 refer to

04:38    9    multiplexing and then sending a multiplexed stream,

04:38   10    right?

04:38   11          A.    I'd just like to correct you that it's not

04:38   12    actually Claims 5 and 6.  This is all Claim 1.  These

04:38   13    are Claim Elements [5] and [6].

04:38   14          Q.    You're completely right.

04:38   15                Element [5] talks about multiplexing, right?

04:38   16          A.    The first word is "multiplexing."  That's

04:38   17    correct.

04:38   18          Q.    [6] mentions a multiplexed stream, right?

04:38   19          A.    Right.

04:38   20          Q.    And then [7] and [8] and other parts talked

04:38   21    about mixing or the combined packet that's been mixed,

04:39   22    right?

04:39   23          A.    Correct.

04:39   24          Q.    And that's sort of the yin and the yang of the

04:39   25    '858 patent, right?  If you're a non-mixing client, a

—881—

04:39  1    PSTN device or something that cannot mix, you receive a
04:39  2    combined packet that has been mixed by the server,
04:39  3    right?
04:39  4        A.    That's reasonable.
04:39  5        Q.    And if you have a device that can mix -- I'm
04:39  6    sorry -- if you're a client that can mix, the '858
04:39  7    patent describes audio being multiplexed from the
04:39  8    server by a multiplexer to the client, right?
04:39  9        A.    Multiple streams sent over a channel.  Yes.
04:39  10   Multiplex.
04:39  11       Q.    Yes.  There's mixing and there's multiplexing.
04:39  12           MR. CAUGHEY:  And if you could pull up
04:39  13   the demo on the '858 patent, Mr. Boles.
04:39  14   BY MR. CAUGHEY:
04:39  15       Q.    So mixing, as I said, is kind of the yin.
04:40  16   It's what's described when you're sending data to a
04:40  17   device that can't mix itself.  And I did a little
04:40  18   count, and mixer appears 16 times; mixing, 24; mix, 29.
04:40  19           I'm not going to ask you to confirm those, but
04:40  20   you don't disagree with me, I assume?
04:40  21       A.    Well, I'd like to ask if those are mutually
04:40  22   exclusive so that you have the word "mix."  And does
04:40  23   that include all of the times that the word "mixer" is
04:40  24   there?
04:40  25       Q.    I believe they're mutually exclusive, but that

882

04:40  1    was my intention.

04:40  2        A.    I think that'd be important to know if you're

04:40  3    trying to make a point in numbers.

04:40  4        Q.    I agree with you.  I'm not looking for

04:40  5    precision here.  I'm just trying to reflect it's a

04:40  6    significant concept reflected in the patent.

04:40  7             You'd agree with me there?

04:40  8        A.    It is a concept in the patent.  Yes.

04:40  9        Q.    Okay.  And then could you click through and --

04:40  10   for "multiplexed."

04:40  11            "Multiplexed," I did the same search and found

04:40  12   21, 3, and 3.  And thank goodness, I don't think we

04:40  13   have the same double-counting question here.  Because I

04:41  14   think multiplexing, it's pretty clear that there's 21

04:41  15   multiplexed, and you can't delete that that much.

04:41  16       A.    I'll trust you on your counting.

04:41  17       Q.    Okay.  The yin and yang.

04:41  18            MR. CAUGHEY:  Now, can you pull up --

     19   pull that down.

     20   BY MR. CAUGHEY:

04:41  21       Q.    Let me ask a question.

04:41  22            Botzko talks about mixing all over the place,

04:41  23   right?

04:41  24       A.    A significant part of Botzko, just as you

04:41  25   mentioned in the '858, is the mixing capabilities.

04:41  1      Q.    Uses the word "mix" a whole bunch of times,
04:41  2  right?
04:41  3      A.    I didn't count them, but yes.
04:41  4      Q.    And you might be surprised to know that I
04:41  5  have.  And we'll get there in a second.
04:41  6                  (Laughter.)
04:41  7      A.    Okay.
04:41  8  BY MR. CAUGHEY:
04:41  9      Q.    But --
04:41  10     A.    Can't wait.
04:41  11     Q.    Multiplexing, is that a significant feature of
04:41  12 the Botzko patent?
04:41  13     A.    So in Botzko, I don't think it uses actually
04:41  14 the word "multiplexing."  However, it uses the concept
04:41  15 that's taught, which is multiple streams being sent
04:41  16 back over one channel.
04:41  17     Q.    That wasn't my question, sir.
04:41  18           Is multiplexing a significant feature of the
04:41  19 Botzko patent?
04:41  20     A.    Yes.
04:42  21     Q.    All right.
04:42  22           MR. CAUGHEY:  Could you pull up the
04:42  23 demonstrative for Botzko, Mr. Boles?
04:42  24 BY MR. CAUGHEY:
04:42  25     Q.    Now, I don't have a clue -- I do have a little

884

04:42  1   bit of a clue.  I don't think this is double counted,

04:42  2   but we'll take it either way.  I'll agree with you.

04:42  3   Maybe there's a little double counting here.

04:42  4        I did some searching.  I found mixer, 30;

04:42  5   mixing, 12; mixed, 11; mix, 11.

04:42  6        And then I did the same search.  And what do

04:42  7   you think I found for "multiplex" or any derivation

04:42  8   thereafter?

04:42  9   A.   As I mentioned, I don't think the word

04:42  10  "multiplex" shows up even once in Botzko.

04:42  11  Q.   And as I said, I thought we'd find agreement

04:42  12  and I think we have.

04:42  13       MR. CAUGHEY:  Could you show that,

04:42  14  Mr. Boles?

04:42  15       Okay.  You can pull that down now.

04:42  16  BY MR. CAUGHEY:

04:42  17  Q.   Now, the -- now, you would also agree that a

04:42  18  significant feature or maybe sort of a -- let's start

04:42  19  at the top.

04:42  20       Do you remember what the title of the '858

04:43  21  patent is?

04:43  22  A.   Hybrid audio system?  I don't remember.  I

04:43  23  don't remember it exactly, but something to do with

04:43  24  hybrid audio.

04:43  25  Q.   Exactly.  Hybrid audio's what we remember

04:43   1    about the '858 patent, right?

04:43   2            You've heard that Cisco's feature where Voice

04:43   3    over IP clients can connect with a PSTN on the same

04:43   4    conference, that's also called hybrid audio, right?

04:43   5            Cisco calls it the same thing?

04:43   6        A.   Again, my analysis has been for invalidity and

04:43   7    looking at Botzko and other prior art.  I didn't

04:43   8    analyze Webex.

04:43   9        Q.   Now, I hear that.  But we've all been in court

04:43  10    all week.  We've seen documents where Cisco's called

04:43  11    its -- called its hybrid audio, called its VoIP to PSTN

04:43  12    audioconferences hybrid audio.

04:43  13            You're surely aware of that, right?

04:43  14        A.   I'll take your word for it, but that sounds

04:43  15    right.

04:43  16        Q.   Okay.  Does Botzko ever mention hybrid audio?

04:43  17        A.   Hybrid audio.  I don't believe that word

04:43  18    "hybrid audio" is in Botzko either.

04:43  19        Q.   Okay.  Now, you have -- let's go up to -- I

04:44  20    want to just take a couple of looks at a couple of your

04:44  21    slides just to make sure I understand your point.

04:44  22                MR. CAUGHEY:  So can we go to Slide 7.30?

04:44  23    BY MR. CAUGHEY:

04:44  24        Q.   And I think we might have different slide

04:44  25    numbers.

| | | |
|---|---|---|
| 04:44 | 1 | Oh, no, we don't.  Never mind. |
| 04:44 | 2 | So Slide 7.30 lists claim language about -- |
| 04:44 | 3 | Hold on.  I apologize.  Give me one second.  I |
| 04:44 | 4 | think I might have different claim number -- slide |
| 04:44 | 5 | numbers than what Mr. Boles does.  And I am -- |
| 04:44 | 6 | MR. CAUGHEY:  I'm sorry.  The next slide. |
| 04:44 | 7 | There we go.  Okay. |
| | 8 | BY MR. CAUGHEY: |
| 04:44 | 9 | Q.    Now, you see -- you have advanced the opinion |
| 04:45 | 10 | that Botzko renders Claim 1 obvious, right? |
| 04:45 | 11 | A.    Botzko in view of a person of ordinary skill |
| 04:45 | 12 | in the art, yes. |
| 04:45 | 13 | Q.    Yeah.  I was just reading your heading on this |
| 04:45 | 14 | slide. |
| 04:45 | 15 | A.    Fair enough. |
| 04:45 | 16 | Q.    And Claims 5 and 6, these are a couple of the |
| 04:45 | 17 | claims that are directed at multiplexing, right? |
| 04:45 | 18 | A.    Yes. |
| 04:45 | 19 | Q.    Okay.  And those are listed -- |
| 04:45 | 20 | A.    Actually, I'll just correct you again.  These |
| 04:45 | 21 | are elements of Claim 1. |
| 04:45 | 22 | Q.    Fair enough. |
| 04:45 | 23 | And -- but I just want to understand how you |
| 04:45 | 24 | structured your presentation. |
| 04:45 | 25 | This slide is introducing the support for this |

887

04:45   1   notion that Botzko renders these claim elements

04:45   2   obvious, right?

04:45   3       A.   That's correct.

04:45   4               MR. CAUGHEY:  Okay.  Could you go now a

04:45   5   couple slides forward?  I think it would be Slide 34 on

04:45   6   yours, Mr. Boles.

04:45   7               Now, let's go back one.  I'm sorry.

04:45   8   There we go.

04:45   9   BY MR. CAUGHEY:

04:46   10      Q.   And this is one of the pieces of support,

04:46   11  right, for this notion that multiplexing is present in

04:46   12  Botzko, right?

04:46   13      A.   That's correct.

04:46   14      Q.   Okay.  And you pointed specifically to the

04:46   15  word "switch," right?

04:46   16               You even highlighted it in three different

04:46   17  places to aid the jury, right?

04:46   18      A.   That's how Botzko shows it as switches.  Yes.

04:46   19      Q.   Okay.  And Mr. -- or Dr. Schaefer referred to

04:46   20  switching, right?

04:46   21      A.   Yes.

04:46   22      Q.   As a verb?

04:46   23      A.   Yes.

04:46   24      Q.   He was not using switching as a noun, right?

04:46   25               It's very clear from that sentence.

888

| | | |
|---|---|---|
| 04:46 | 1 | A.    I'm not sure if switching can even be a noun. |
| 04:46 | 2 | Might be, but I think it's more of a verb. |
| 04:46 | 3 | Q.    That seems right to me, too. |
| 04:46 | 4 |       So in the right, you're using "switch" as a |
| 04:46 | 5 | noun, right?  A selector/switch, right? |
| 04:46 | 6 | A.    Switches do switching.  That's how that works. |
| 04:47 | 7 | Q.    Is it -- that wasn't actually my question. |
| 04:47 | 8 |       My question is, are you using that word as a |
| 04:47 | 9 | noun? |
| 04:47 | 10 | A.    These are -- these are words from Botzko.  So |
| 04:47 | 11 | these are -- this is the disclosure in Botzko.  So it's |
| 04:47 | 12 | not my words.  It's Botzko's words. |
| 04:47 | 13 | Q.    Were Botzko's words a noun? |
| 04:47 | 14 | A.    I believe the intent is to show the action of |
| 04:47 | 15 | switching from the switches. |
| 04:47 | 16 | Q.    Were Botzko's words a noun for switch? |
| 04:47 | 17 | A.    I think there it's actually referred to as the |
| 04:47 | 18 | noun.  Yes. |
| 04:47 | 19 | Q.    Okay.  Thanks.  I thought we'd find -- |
| 04:47 | 20 | A.    I think you're right on that one. |
| 04:47 | 21 | Q.    And then these sort of bluish-greenish-Tiffany |
| 04:47 | 22 | blue boxes, are -- those are the switches? |
| 04:47 | 23 | A.    In Botzko -- yes, from the figure in Botzko, |
| 04:47 | 24 | what's labeled as 22A through 22N, those are switches. |
| 04:47 | 25 | Q.    Is a switch a multiplexer in the context of |

889

04:48  1    Botzko?

04:48  2        A.    In this case it's serving as the importance of

04:48  3    creating a multiplexed stream.

04:48  4        Q.    Well, let's go to -- well, let me ask you this

04:48  5    question.

04:48  6              Whereas in the '858 patent, we talked about

04:48  7    this, with mixing and multiplexing, the yin and the

04:48  8    yang.

04:48  9              In Botzko it talks a fair bit about what it

04:48  10   calls two classic types of audio processors, an audio

04:48  11   switch and an audio mixer.

04:48  12             Wouldn't you agree with that?

04:48  13       A.    Yes.

04:48  14       Q.    Okay.  And let's pull up Botzko at Column 1:13

04:48  15   to 14.  I think that's where we're going to find the

04:48  16   language that I just said.  The two types of audio

04:48  17   processors, an audio switch and an audio mixer.

04:48  18             Do you see that, sir?

04:48  19       A.    Yes.  I do see it.

04:48  20       Q.    And not to get too technical, I think we're

04:48  21   going to have help with that tomorrow, but there are --

04:49  22   one of the things that happens in Botzko is that

04:49  23   compressed audio signals are sent to an audio switch,

04:49  24   right?

04:49  25       A.    That's correct.

04:49    1          Q.    Okay.  And if the audio switch were to

04:49    2    multiplex, it would have to decode those compressed

04:49    3    audio signals, right?

04:49    4          A.    That's incorrect.

04:49    5          Q.    Okay.  The audio switch as described merely

04:49    6    passes on audio to endpoints, to sites, right?

04:49    7          A.    That's correct.  That's how Botzko teaches it.

04:49    8          Q.    Okay.  And just merely passing off audio is

04:49    9    not multiplexing, is it?

04:49    10         A.    It's sending multiple streams over one channel

04:49    11   to sites.  So in my opinion, it is.

04:49    12         Q.    Your answer's yes?

04:49    13         A.    My opinion that what Botzko discloses is

04:49    14   multiplexing.

04:49    15         Q.    Even though it doesn't mention the word even

04:49    16   once?

04:49    17         A.    It -- it shows it.  It just doesn't use the

04:49    18   word "multiplexing."  That's right.

04:49    19         Q.    The word was known at the time, as you told

04:50    20   this Court, in a declaration, right?

04:50    21         A.    Yeah.  The word "multiplex" was certainly

04:50    22   known.

04:50    23         Q.    And it was certainly known in 2000 when the

04:50    24   '858 patent was filed and used the word 21 or 15 or

04:50    25   however many -- however you want to do that counting,

891

| | | |
|---|---|---|
| 04:50 | 1 | right? |
| 04:50 | 2 | A.    It was known in 1997 and well before that. |
| 04:50 | 3 | Q.    Yeah.  And we've seen it in Cisco documents, |
| 04:50 | 4 | right? |
| 04:50 | 5 | A.    Again, I didn't do that investigation, but I |
| 04:50 | 6 | think I saw it in some of the testimony this week. |
| 04:50 | 7 | Q.    Okay.  And just to -- I'd like to take another |
| 04:50 | 8 | just very slight step back. |
| 04:50 | 9 | You've talked I think in the beginning of your |
| 04:50 | 10 | presentation and in your report about some of the |
| 04:50 | 11 | history of audioconferencing; isn't that right? |
| 04:50 | 12 | A.    I believe that's correct. |
| 04:50 | 13 | Q.    And you're aware the first commercially-viable |
| 04:50 | 14 | Voice over IP was developed in 1995. |
| 04:50 | 15 | Does that sound right? |
| 04:50 | 16 | A.    First, perhaps.  I believe there was quite a |
| 04:51 | 17 | bit more going on in research.  But as far as what may |
| 04:51 | 18 | have been commercially available, '95 is probably a |
| 04:51 | 19 | reasonable time frame. |
| 04:51 | 20 | Q.    A company called VocalTec. |
| 04:51 | 21 | Do you remember that? |
| 04:51 | 22 | A.    I think so, yes. |
| 04:51 | 23 | Q.    And there were some further developments in |
| 04:51 | 24 | 1996, and that's mentioned in the '858 patent.  And you |
| 04:51 | 25 | talked a lot about standards. |

892

04:51   1           And in 1996, the International

04:51   2   Telecommunications Union telecommunications sector --

04:51   3   that's a mouthful -- adopted the H.323 standard that

04:51   4   you mentioned, right?

04:51   5       A.   The ITU, yes.

04:51   6       Q.   And that the Botzko application came in 1997,

04:51   7   right?

04:51   8       A.   Yes.  I believe September of 1997.

04:51   9       Q.   Now, the '858 patent explicitly mentions Voice

04:51  10   over IP, right?

04:51  11       A.   I think it does.  Yes.

04:51  12       Q.   VoIP.  You've heard -- when you've been in the

04:51  13   courtroom, you've also heard that word used repeatedly

04:51  14   here, right?

04:52  15       A.   Voice over Internet Protocol, yes.  VoIP.

04:52  16       Q.   Okay.  And Botzko doesn't mention "VoIP" or

04:52  17   "Voice over IP," right?

04:52  18       A.   Doesn't use that exact term, no.  It describes

04:52  19   voice going over packets.

04:52  20           And so I believe a person of ordinary skill in

04:52  21   the art would understand that to be Voice over IP.

04:52  22       Q.   Botzko doesn't use the term "VoIP" or "Voice

       23   over IP."

04:52  24           That was my question.

04:52  25       A.   You're right, it does not.

893

04:52  1      Q.    Now, you've said that as of 1997, when the

04:52  2  Botzko patent application was filed, it would have been

04:52  3  obvious to someone with ordinary skill in the art to

04:52  4  implement the invention of the '858 patent, right?

04:52  5      A.    Again, my -- my summary was that the claims of

04:52  6  the '858 patent would have been obvious in view of a

04:53  7  person of ordinary skill in the art with Botzko.

04:53  8      Q.    We're saying the same thing, aren't we?

04:53  9      A.    I think so.  I just wanted to make sure.

04:53  10     Q.    And Botzko was a public disclosure, right?

04:53  11 The 1997 patent application, that was public, right?

04:53  12     A.    As far as when the applications were made

04:53  13 public, but I believe that's right.

04:53  14     Q.    And anyone, anyone from Webex, Cisco, anyone

04:53  15 else could have -- could have seen it, right, and

04:53  16 started to take some steps to implement what it was

04:53  17 teaching, right?

04:53  18     A.    That information was put in the public domain.

04:53  19 That's right.

04:53  20     Q.    Yeah.  And you said it would have been

04:53  21 obvious -- let me back up.

04:53  22           Something that is also probably obvious is

04:53  23 that folks at Webex and Cisco probably have plenty of

04:53  24 people who are folks of ordinary skill in the art under

04:53  25 your definition, right?

894

04:53  1        A.    I expect they have that and experts and

04:53  2   everything in between.

04:53  3        Q.    And those experts could have looked at Botzko

04:53  4   and figured out how to implement the hybrid audio

04:54  5   functionality described in the '858 patent, right, in

04:54  6   1997?

04:54  7        A.    Yes.  The claims would have been -- the

04:54  8   invention of the '858 patent claims were obvious.

04:54  9        Q.    We've heard in fact in this court from

04:54 10   multiple Cisco employees who are persons of ordinary

04:54 11   skill in the art under your definition, right?

04:54 12        A.    They've -- the -- again, I gave it, I believe,

04:54 13   a clear summary of my opinion of what the minimum

04:54 14   requirements for a person of ordinary skill in the art.

04:54 15   But yes.  They -- I believe they all meet the minimum

04:54 16   requirements of a person of ordinary skill in the art.

04:54 17        Q.    I think one, Mr. Buckles, maybe both, had been

04:54 18   at Cisco since the 1990s, right?

04:54 19        A.    They seem very knowledgeable in this area.

04:54 20        Q.    And you're aware that Cisco purchased -- or

04:54 21   we'll get there.

04:54 22              We can agree that Cisco did not develop the

04:55 23   '858 patent -- I'm sorry -- did not develop a hybrid

04:55 24   audio system as disclosed in the '858 patent in 1997 or

04:55 25   1998 or 1999, 2000?  You have no knowledge of that, and

04:55    1    you've heard no evidence of it, right?

04:55    2                MS. DELACENSERIE:  Objection, outside the

04:55    3    scope of direct.

04:55    4                THE COURT:  Overruled.

04:55    5    A.    I'm trying to make sure I got your question.

04:55    6    It was about Cisco's products, right?

         7    BY MR. CAUGHEY:

         8    Q.    Yes.

04:55    9    A.    I said I've done no investigation on Cisco's

04:55   10    products.  So any of the answers to that would be that

04:55   11    I don't have any investigation for that.

04:55   12    Q.    Nor have you seen any evidence or know of any

04:55   13    evidence that Webex had such a hybrid audio product

04:55   14    despite being able to publicly pull up the Botzko

04:55   15    disclosure?

04:55   16    A.    Correct.  I did no investigation of Webex

04:55   17    products.  That's correct.

04:55   18    Q.    Now, in 2007, Cisco acquired Webex, right?

04:55   19    A.    Again, you're asking me questions of

04:55   20    information that I did not investigate about Webex and

04:55   21    about Cisco.  So that's not what I've testified to.

04:55   22    Q.    Have you heard that this week?

04:56   23    A.    I don't want to -- it's a memory test and as

04:56   24    far as dates and when things happened.  And that wasn't

04:56   25    why -- that wasn't what I was here for.  That's not

896

04:56  1    what I testified to.

04:56  2        Q.    Well, on direct you testified at some detail

04:56  3    about Dr. Schaefer's testimony, about what

04:56  4    Dr. Madisetti will testify to.  You referenced

04:56  5    Mr. Buckles' testimony.  You referenced Mr. Belcher's

04:56  6    testimony.

04:56  7            You have no recollection of exhibits being put

04:56  8    up about Cisco hybrid audio in 2007, no recollection

04:56  9    that Cisco acquired Webex in 2007.  I think it was in

04:56  10   opening.

04:56  11       A.    I don't believe I referenced Dr. --

04:56  12   Mr. Buckles or Mr. Belcher, but I did reference to, in

04:56  13   my report, a Dr. Madisetti and in my presentation

04:56  14   today, Dr. Schaefer.

04:56  15       Q.    The question was just:  Do you remember, sir?

04:56  16       A.    You're saying things that I didn't do.

04:56  17       Q.    The question was:  Do you remember?

04:56  18       A.    I didn't do those.  I didn't -- I didn't

04:56  19   reference those -- the people that you said.

04:56  20       Q.    I asked did you remember hearing it in court

04:56  21   this week?

04:56  22       A.    That's not what -- I don't believe that's what

04:57  23   you said.  I think you asked if I -- that I included

04:57  24   those, that I said that.

04:57  25       Q.    All right.  Well, maybe we're misunderstanding

—897—

          1    each other.
04:57     2              Do you remember hearing in court this week
04:57     3    that Cisco acquired Webex in 2007?
04:57     4        A.    That -- I'll take your word for it.
04:57     5        Q.    It was not until after that acquisition that
04:57     6    Cisco first implemented the hybrid audio PSTN-to-VoIP
04:57     7    functionality that's disclosed in the '858 patent in
04:57     8    Cisco Webex, right?
04:57     9        A.    In fact, I think I did hear some things to the
04:57    10    contrary of that.  But again, that wasn't what I was
04:57    11    investigating.  So I don't have opinions on that.
04:57    12        Q.    Now you remember stuff to the contrary.
04:57    13        A.    I've heard a lot this week.  Yes.
04:57    14        Q.    Okay.
04:57    15              MR. CAUGHEY:  Well -- well, let's just
04:57    16    pull up PX-213.
         17    BY MR. CAUGHEY:
04:57    18        Q.    PX-213 is titled Hybrid Audio Architecture
04:57    19    Design, right, sir?
04:57    20        A.    I've never seen this document.
04:57    21              MS. DELACENSERIE:  Objection, outside the
04:57    22    scope of direct.
04:57    23              THE COURT:  First, find out if he's ever
04:58    24    seen this document before.  Was that your question?
04:58    25              MR. CAUGHEY:  That was not my question.

—898—

04:58  1    Although it has been presented in court many times this

04:58  2    week while he's been sitting there.

04:58  3                    THE COURT:  Okay.  And what is the

04:58  4    document?

04:58  5                    MR. CAUGHEY:  It is the document that we

04:58  6    have shown showing that Cisco decided to implement the

04:58  7    hybrid audio VoIP-to-PSTN functionality two months

04:58  8    after acquiring Webex.

04:58  9                    And I'm happy to explain why it's within

04:58 10    the scope and relevant, Your Honor.

04:58 11                    THE COURT:  Why don't you approach the

04:58 12    bench.

04:58 13                    (Bench conference.)

04:58 14                    THE COURT:  I can't imagine why it's

04:58 15    relevant.  How is it relevant to the invalidity?

04:58 16                    MR. CAUGHEY:  If he's saying would it be

04:58 17    obvious to a person of ordinary skill in the art in

04:58 18    1997, this was not introduced until more than a decade

04:59 19    later.  It goes to his credibility, Your Honor.

04:59 20                    MS. DELACENSERIE:  Your Honor, he's

04:59 21    presented one piece of evidence and stating that's a

04:59 22    fact that Cisco did not implement hybrid audio, or

04:59 23    however they keep referring to it, until 2007.

04:59 24                    That is a fact for the jury to decide.

04:59 25    It is not something that has been proven.  It is not a

899

| | | |
|---|---|---|
| 04:59 | 1 | fact that Mr. Bress should assume or should be expected |
| 04:59 | 2 | to assume and expect -- and form opinions here on the |
| 04:59 | 3 | spot. |
| 04:59 | 4 | This is not an analysis he undertook.  He |
| 04:59 | 5 | has not offered opinions, has not examined these |
| 04:59 | 6 | documents.  This is -- it has nothing to do with his |
| 04:59 | 7 | credibility. |
| 04:59 | 8 | THE COURT:  I'm not going to let you use |
| 04:59 | 9 | it up here.  If you want to ask him a hypothetical |
| 04:59 | 10 | that's used in the same place, you can do that. |
| 04:59 | 11 | MR. CAUGHEY:  Absolutely, Your Honor. |
| 04:59 | 12 | (Bench conference concludes.) |
| 04:59 | 13 | BY MR. CAUGHEY: |
| 04:59 | 14 | Q.   Now, if it took Cisco ten years after the |
| 04:59 | 15 | Botzko patent to first plan to implement the hybrid |
| 05:00 | 16 | audio features that you say were obvious in 1997, would |
| 05:00 | 17 | that bear on your obviousness analysis? |
| 05:00 | 18 | A.   No.  My obviousness analysis was an |
| 05:00 | 19 | investigation analysis of the Botzko patent against the |
| 05:00 | 20 | claims of the '858 patent. |
| 05:00 | 21 | Q.   The answer's no? |
| 05:00 | 22 | A.   The answer -- yeah.  I think the answer's no |
| 05:00 | 23 | to your question. |
| 05:00 | 24 | MR. CAUGHEY:  No further questions. |
| 05:00 | 25 | REDIRECT EXAMINATION |

900

```
05:00    1    BY MS. DELACENSERIE:
05:00    2        Q.    I just want to clarify.  At the outset of your
05:00    3    testimony, you were asked a few questions about
05:00    4    everyone's favorite word this week, "each."
05:00    5            Did the Court say "each" means "one or more"?
05:01    6        A.    No.  My understanding of the Court's -- the
05:01    7    Court with regard to this was that it "can," it can
05:01    8    mean "one or more."
05:01    9        Q.    In your opinion, does "each" -- does "each"
05:01   10    mean "one or more" in the context of the '858 patent?
05:01   11        A.    In the context of the '858 patent, no.  I
05:01   12    believe that the way the word "each" is used, it was
05:01   13    meant to mean "every."
05:01   14        Q.    Can you think of any context in which "each"
05:01   15    would mean "one or more"?
05:01   16        A.    I have a hard time with that, trying to find
05:01   17    where "each" could mean "one or more."  It means
05:01   18    "every."
05:01   19                MS. DELACENSERIE:  No further questions.
05:01   20                MR. CAUGHEY:  I have no further
05:01   21    questions.
05:01   22                THE COURT:  You may step down, sir.
05:01   23    Thank you.
05:01   24                Who's your next witness?
05:02   25                MS. EDLIN:  Cisco calls Ms. Lauren
```

05:02    1    Kindler.

05:02    2                    (The witness was sworn.)

05:03    3                    THE COURT:  Could I have lead counsel up

05:03    4    here for just a second?

05:03    5                    (Off-the-record bench conference.)

05:04    6                    THE COURT:  So ladies and gentlemen, I

05:04    7    misjudged.

05:04    8                    I'll go ahead and tell her.

05:04    9                    MR. JONES:  I'm sorry.

05:04    10                    THE COURT:  So I was talking to the

05:04    11    lawyers, and they said they wanted to keep you another

05:04    12    two hours.  I said:  No way.

05:04    13                    That's not true.

05:04    14                    So what we're going to do, as you know,

05:05    15    the first part of -- with an expert is them giving you

05:05    16    their qualifications to establish.  That's all we're

05:05    17    going to do today.  We're going to have her proven up

05:05    18    as an expert.

05:05    19                    And then, in fact, I anticipate that

05:05    20    there'll be no opposition to that.  And then we'll

05:05    21    break for the day.

05:05    22                    And we'll start -- for your purpose,

05:05    23    we'll start tomorrow morning at 9:00.

05:05    24                    MS. EDLIN:  Thank you, Your Honor.

05:05    25                        DIRECT EXAMINATION

902

05:05  1   BY MS. EDLIN:

05:05  2      Q.    Ms. Kindler, can you please introduce yourself

05:05  3   to the jury?

05:05  4      A.    Yes.  Hi.  My name's Lauren Kindler.  I'm an

05:05  5   economist, and I was retained by Cisco in this case to

05:05  6   assist as its damages expert.

05:05  7      Q.    Where do you live, Ms. Kindler?

05:05  8      A.    I live in Dallas.  I grew up in Dallas, and

05:05  9   I've lived in Dallas most of my life.

05:05  10     Q.    What's your current job?

05:05  11     A.    I'm a managing principal at a firm called

05:05  12  Analysis Group.  Analysis Group is the largest private

05:05  13  economic consulting firm in the United States.  And

05:05  14  generally as a firm, we assist clients in matters of

05:06  15  economics, finance, and accounting across a wide

05:06  16  variety of cases, some of which involve disputes in the

05:06  17  litigation context and others that do not.

05:06  18     Q.    What are your responsibilities at Analysis

05:06  19  Group?

05:06  20     A.    So as a managing principal, I'm a partner of

05:06  21  the firm.  My primary responsibilities are assisting

05:06  22  clients in matters of economics and damages disputes,

05:06  23  often in the context of patent disputes such as this

05:06  24  one, and I also lead our Dallas office.

05:06  25     Q.    How long have you been in the economic

903

05:06    1    consulting business?

05:06    2        A.    So for my entire career.  So over 25 years.

05:06    3        Q.    Have you prepared any slides to assist with

05:06    4    your testimony today?

05:06    5        A.    Yes.  I have.

05:06    6        Q.    Thank you.

05:06    7              MS. EDLIN:  Permission to present

05:06    8    Ms. Kindler's slides?

05:06    9              Let's pull up the first slide.

         10    BY MS. EDLIN:

05:06   11        Q.    Can you tell us a little bit about your

05:06   12    education?

05:06   13        A.    Sure.  So I went to Tulane University in

05:07   14    New Orleans to get my undergraduate degree in

05:07   15    economics.  And then later I went to SMU in Dallas to

05:07   16    get my master's degree in economics.

05:07   17        Q.    I see a little bit of time in between your

05:07   18    degrees there.  Why is that?

05:07   19        A.    Yes.  So I -- after getting my undergraduate

05:07   20    degree, I went into the field of economic consulting.

05:07   21    Did that for several years.

05:07   22              I got married, started a family.  Moved back

05:07   23    to Dallas and continued to work for economic consulting

05:07   24    firms, but then I really wanted to pursue my career

05:07   25    further and knew that I needed to get a graduate degree

05:07  1    to do that.

05:07  2                So while I had two small toddlers at home and

05:07  3    was working full time at Analysis Group, I also went

05:07  4    back to school at night to get my master's degree in

05:07  5    economics.

05:07  6        Q.    I have two toddlers now and only one job.  So

05:07  7    I can imagine that was a busy time.

05:07  8        A.    It was not a pleasant time of my life, but we

05:07  9    got there.

05:07  10       Q.    How old are your kids now?

05:08  11       A.    Now my children are 21 and 20.  So I have two

05:08  12   boys in college that are adults.  I have a 15-year-old

05:08  13   daughter that's still at home.  So almost not kids

05:08  14   anymore.

05:08  15       Q.    All right.  So let's talk about your

05:08  16   experience a little bit.

05:08  17                What kind of matters do you work on at

05:08  18   Analysis Group?

05:08  19       A.    So as an economic consultant, I work on a wide

05:08  20   range of cases for a wide range of clients across many

05:08  21   different industries, and it's really the thing I love

05:08  22   most about the work that I do, so often in cases

05:08  23   involving patent infringement matters but not always.

05:08  24       Q.    And you've done -- have you done damages

05:08  25   analysis before in patent cases?

905

```
05:08   1        A.    Yes.  So I've worked on probably hundreds of
05:08   2   patent infringement cases in the context of evaluating
05:08   3   damages.  So for many years, that's been the bulk of
05:08   4   the work that I do.
05:09   5        Q.    Are you always retained by defendants?
05:09   6        A.    No.  I work on behalf of plaintiffs, and I
05:09   7   also work on behalf of defendants.
05:09   8        Q.    Have you ever testified at trial in a patent
05:09   9   case before?
05:09  10        A.    Yes.  Many times.
05:09  11        Q.    Do you do any consulting work outside of
05:09  12   litigation?
05:09  13        A.    Yes.  So I'm often asked by clients to assist
05:09  14   in valuing intellectual property, including patents.
05:09  15   I've also been asked to assist in licensing
05:09  16   negotiations.  So helping clients in real-world
05:09  17   licensing arrangements that are outside the context of
05:09  18   litigation.
05:09  19        Q.    Do you have any professional affiliations that
05:09  20   relate to your work as a patent damages expert?
05:09  21        A.    Yes.  I'm a member of an organization called
05:09  22   Licensing Executives Society, and I've also been named
05:09  23   for several years now by an organization called IAM as
05:09  24   a top patent damages expert in the U.S.
05:10  25                   MS. EDLIN:  So at this time I'd like to
```

906

| | | |
|---|---|---|
| 05:10 | 1 | offer Ms. Lauren Kindler as an expert in patent |
| 05:10 | 2 | valuation and damages. |
| 05:10 | 3 | MS. SRINIVASAN:  No objection. |
| 05:10 | 4 | THE COURT:  She'll be admitted as such. |
| 05:10 | 5 | Thank you for being here, Ms. Kindler. |
| 05:10 | 6 | Ladies and gentlemen, we're going to take |
| 05:10 | 7 | our evening recess.  Please be careful out there.  I |
| 05:10 | 8 | never thought I'd say this in August, but it's raining. |
| 05:10 | 9 | (Laughter.) |
| 05:10 | 10 | THE COURT:  And so I would say that, but |
| 05:10 | 11 | I wouldn't be in Texas when I said it.  So it's |
| 05:10 | 12 | raining.  Please be careful.  We'll see you tomorrow. |
| 05:10 | 13 | If you'll be here tomorrow morning by |
| 05:10 | 14 | 8:45 or 8:50 or so, we'll get started at 9:00.  And |
| 05:10 | 15 | so... |
| 05:10 | 16 | (Jury exited the courtroom.) |
| 05:11 | 17 | THE COURT:  You may be seated. |
| 05:11 | 18 | Ms. Kindler, you may step down. |
| 05:11 | 19 | So other than the motion which we will |
| 05:11 | 20 | take up tomorrow morning at 8:30.  And we will be done |
| 05:11 | 21 | with whatever the argument is by 9:00. |
| 05:11 | 22 | So is there anything we need to take up |
| 05:11 | 23 | tonight?  I assume -- is -- Ms. Kindler's your last |
| 05:11 | 24 | witness? |
| 05:11 | 25 | MS. EDLIN:  Yes, sir. |

907

05:11  1                    THE COURT:  So when we finish with

05:11  2   Ms. Kindler, we'll break.  We'll do the Rule 50 motion.

05:11  3   Then you'll put -- you have just one witness on --

05:11  4                    MS. SRINIVASAN:  Yes, Your Honor.

05:11  5   Dr. Madisetti will be testifying.

05:11  6                    THE COURT:  You have a rebuttal witness.

05:11  7   And then as requested, I don't know where we'll be.

05:11  8   We'll have a -- we'll have a decision to make, whether

05:11  9   to read -- depending where we are, whether for me to

05:12  10  read the charge before lunch or after lunch.

05:12  11                   What that means is I don't know who's

05:12  12  agreed to print up the copies, but we'll need them in

05:12  13  the morning.  And again, someone ought to be sure to

05:12  14  remember -- I'll make it Mr. Jones, but --

05:12  15                   MR. JONES:  Yes, Your Honor.

05:12  16                   THE COURT:  -- or Mr. Siegmund, but if

05:12  17  I -- when everything's done at the end, if I don't

05:12  18  remember to ask you for objections on the jury charge,

05:12  19  someone interrupt me and make sure I give you the

05:12  20  opportunity to do so.  So I make sure to protect you

05:12  21  all's record.

05:12  22                   Okay.  I will see you in the morning at

05:12  23  8:30.

05:12  24                   THE BAILIFF:  All rise.

05:12  25                   (Hearing adjourned.)

—908—

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS    )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10              I certify that the transcript fees and

11    format comply with those prescribed by the Court and

12    Judicial Conference of the United States.

13              Certified to by me this 6th day of

14    September 2024.

15

16                        */s/ Kristie M. Davis*
                        KRISTIE M. DAVIS
17                        Official Court Reporter
                        PO Box 20994
18                        Waco, Texas 76702
                        (254) 666-0904
05:12              19                        kmdaviscsr@yahoo.com

20

21

22

23

24

25