—909—

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                      WACO DIVISION

3   PALTALK HOLDINGS, INC.   *    August 29, 2024
                             *
4   VS.                      *  CIVIL ACTION NO. 6:21-CV-757
                             *
5   CISCO SYSTEMS, INC.      *

6        BEFORE THE HONORABLE ALAN D ALBRIGHT
                  TRIAL PROCEEDINGS
7                 Volume 4 of 4

8   APPEARANCES:

9   For the Plaintiff:   Max L. Tribble, Jr., Esq.
                         Ryan V. Caughey, Esq.
10                        Amber Brianna Magee, Esq.
                         Susman Godfrey LLP
11                        1000 Louisiana Street, Suite 5100
                         Houston, TX 77002
12
                         Kalpana Srinivasan, Esq.
13                        Susman Godfrey LLP
                         1900 Avenue of the Stars, Ste 1400
14                        Los Angeles, CA 90067-6029

15                        Mark Siegmund, Esq.
                         Cherry Johnson Siegmund James, PLLC
16                        The Roosevelt Tower
                         400 Austin Avenue, 9th Floor
17                        Waco, Texas 76701

18   For the Defendant:   Sarah E. Piepmeier, Esq.
                         Elise Edlin, Esq.
19                        Nate Sabri, Esq.
                         Karl Johnston, Esq.
20                        Perkins Coie LLP
                         505 Howard Street
21                        San Francisco, CA 94117

22                        Ryan Hawkins, Esq.
                         Abigail Ann Gardner, Esq.
23                        Perkins Coie LLP
                         11452 El Camino Real, Suite 300
24                        San Diego, CA 92130

25
```

910

```
 1                        Jessica J. Delacenserie, Esq.
                          Perkins Coie LLP
 2                        1201 Third Ave., Suite 4900
                          Seattle, WA 98101
 3
                          Andrew T. Dufresne, Esq.
 4                        Perkins Coie LLP
                          33 E. Main Street, Suite 201
 5                        Madison, WI 53703

 6                        Michael E. Jones, Esq.
                          Shaun William Hassett, Esq.
 7                        Potter Minton PC
                          102 North College, Suite 900
 8                        Tyler, TX 75702

 9                        Jonathan Irvin Tietz, Esq.
                          Perkins Coie LLP
10                        700 13th St. NW, Suite 800
                          Washington, DC 20005
11
     Court Reporter:      Kristie M. Davis, CRR, RMR
12                        PO Box 20994
                          Waco, Texas 76702-0994
13                        (254) 340-6114

14      Proceedings recorded by mechanical stenography,

15   transcript produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

08:00

911

| | | |
|---|---|---|
| 08:36 | 1 | (Hearing begins.) |
| 08:36 | 2 | THE BAILIFF:  All rise. |
| 08:36 | 3 | THE COURT:  Thank you.  You may be |
| 08:36 | 4 | seated. |
| 08:36 | 5 | I hear -- I know we have an issue to take |
| 08:36 | 6 | up with regard -- a couple of things with regard to the |
| 08:36 | 7 | verdict and the charge, and we'll take those up after I |
| 08:36 | 8 | hear the motion filed by defendant. |
| 08:36 | 9 | MR. JONES:  Your Honor, if it pleases the |
| 08:36 | 10 | Court, with regard to the motion for mistrial, I think |
| 08:37 | 11 | that the plaintiff's opposition does a good job of |
| 08:37 | 12 | defining the two issues that needs to be addressed with |
| 08:37 | 13 | regard to this particular motion, and that is, they |
| 08:37 | 14 | take the position that Cisco feigned confusion over the |
| 08:37 | 15 | Court's order. |
| 08:37 | 16 | And then secondly, the other issue is |
| 08:37 | 17 | whether the alleged error caused substantial harm or |
| 08:37 | 18 | prejudice. |
| 08:37 | 19 | And at the Court's pleasure, it would |
| 08:37 | 20 | be -- I'll take the first issue and Ms. Piepmeier will |
| 08:37 | 21 | take the second issue. |
| 08:37 | 22 | So the first issue is whether Cisco |
| 08:37 | 23 | feigned confusion over the Court's order, and I think |
| 08:37 | 24 | what's happened here is very clear when the Court looks |
| 08:37 | 25 | at the record. |

08:37 1          At the June 23rd hearing, the motion for

08:37 2  summary judgment was denied, and the Court said that

08:37 3  the reason for its denial was that "each" can mean "one

08:37 4  or more."  No Markman hearing on "each" ever occurred.

08:37 5          A dispute arose after that hearing

08:37 6  between the parties whether that meant that the term

08:37 7  "each" had to mean "one or more."

08:38 8          Paltalk took that position.  Cisco said,

08:38 9  no, that the Court said the term was plain and ordinary

08:38 10 meaning, and the experts could decide how a POSITA

08:38 11 would view that term.

08:38 12          Since there was a dispute, Cisco brought

08:38 13 the issue to the Court.  Cisco filed a motion to

08:38 14 clarify.  And the motion to clarify, I think, fairly

08:38 15 brought up the issue as issue (sic) understood it.

08:38 16          It said it has been clear to Cisco

08:38 17 whether the Court agreed with Paltalk that the plain

08:38 18 and ordinary meaning of the term is a factual dispute

08:38 19 such that the parties will present argument and

08:38 20 testament regarding the meaning of the term or whether

08:38 21 the Court ruled that as a matter of law, the term

08:38 22 "each" means "one or more."

08:38 23          During the meet and confer, Paltalk

08:38 24 indicated its understanding, i.e., that the Court ruled

08:38 25 as a matter of law that the term means "one or more,"

08:38 which I think is clearly the position that Paltalk has taken in this case and has questioned witnesses in that manner in this case.

08:39 Now, since that issue was joined, since there was a disagreement in the parties, we brought that motion to clarify which we believe -- you know, miscommunication happens when parties try hard to understand each other, but we thought that clearly and fairly brought up the issue to the Court.

08:39 And in the August 24th pretrial hearing, the Court decided the issue, we thought, and we thought clearly it had decided it in our favor.

08:39 And I won't read any more transcript to you. I promise I'll just summarize, but I do think this is important.

08:39 Ms. Piepmeier said, and the question we have, Your Honor, is whether Your Honor has ruled that "each" means "one or more." In other words, Your Honor has defined the word "each" in the context of the '858 patent to mean.

08:39 And the Court said: I have not. I have not.

08:40 Ms. Piepmeier: Okay. Just to clarify, Your Honor's ruling is that "each" takes its plain and ordinary meaning and that it can include "one or more."

08:40 And I think this is the reason I'm reading Your Honor the transcript, because at this point in the opposition, they ellipse out the fact that she also said, "it does not have to include," and the Court said, correct. Yes, ma'am. Okay. Thank you.

08:40 And just one other point just because I want to make sure our experts don't run afoul of Your Honor's ruling, that the experts will presumedly provide opinion to the jury as to how one of ordinary skill in the art would understand the plain and ordinary meaning of the term "each." It could be "one or more." It could be "all" or "every," et cetera.

08:40 Now, that brings us up to the first day of trial when we had a dispute over certain slides, and I am the one that got before the Court and made the argument concerning Cisco's understanding.

08:41 And I won't read from that transcript, but I think it couldn't be more clear that my position is totally supported in the record by what happened at the August 24th hearing.

08:41 And I told the Court that I thought the slide which gave information about what the Court had said about the meaning of the term "each" shouldn't be used because the Court had said it was a fact issue to be decided by the POSITA.

08:41    1                    And I think I clearly stated our position

08:41    2    which I think is totally supported by the record on

08:41    3    that issue.

08:41    4                    The Court then told me, no.  I'm going to

08:41    5    allow that slide.  The Court said, by the way, goose

08:41    6    and gander rule, and your slides about the

08:41    7    interpretation of this term can come in too.  And they

08:41    8    did come in.

08:41    9                    At that point, our belief was, well,

08:41   10    here's where we're at.  The Court has said it can be

08:41   11    either "one or more" or it can be "all" and "every."

08:42   12    It's a question for a POSITA to decide and that

08:42   13    there'll be testimony about that from the witnesses.

08:42   14                    And we also felt like, well, they heard

08:42   15    that -- you know, the Court said it can be "one or

08:42   16    more."  There's also this record that clearly shows the

08:42   17    Court thinks it can be "all" and "every."  And then we

08:42   18    prepared to act accordingly.

08:42   19                    When we presented a slide that had both

08:42   20    sides of the issue defined, then the Court said, no.  I

08:42   21    don't want you to present that, that the only part of

08:42   22    your ruling that was really a matter of law, as I

08:42   23    understood the Court's ruling, and you can certainly

08:42   24    correct me if I'm wrong, was that it can mean "one or

08:42   25    more."

916

08:42   1                     That is the record before you,

08:42   2   Your Honor.  I am willing to stand on that record, and

08:42   3   I think everybody on our side is willing to stand on

08:42   4   that record and say we are not faking anything.  We are

08:42   5   not feigning anything.

08:42   6                     That record clearly supports the

08:42   7   understanding that we took on the first day of trial,

08:43   8   that we've taken consistently during this trial, and

08:43   9   that is clearly stated in our motion for mistrial.

08:43   10                    And I think the record clearly

08:43   11  establishes that with regard to this issue whether or

08:43   12  not Cisco has feigned anything is proven to the Court

08:43   13  that we have not faked anything, that we've acted

08:43   14  reasonably.

08:43   15                    And again, miscommunication can occur

08:43   16  when parties attempt to understand each other.

08:43   17  Certainly I believe that has happened, but Cisco's

08:43   18  position in this matter has totally been reasonable,

08:43   19  and it's totally supported by the record.  And I

08:43   20  appreciate the Court's courtesy in allowing us to

08:43   21  address this issue.

08:43   22                    Thank you, sir.

08:43   23                    MS. PIEPMEIER:  Good morning, Your Honor.

08:43   24                    I'm going to address prejudice briefly.

08:43   25  And I want to just dovetail with what Mr. Jones said.

917

08:43  1    I don't want to dwell on this too much, but I have to

08:44  2    tell you that it really had an effect.

08:44  3              When a party tells the Court that we came

08:44  4    to this Court -- that Mr. Jones and I and Cisco came to

08:44  5    this Court feigning ignorance about something,

08:44  6    Your Honor, that is essentially accusing us of

08:44  7    misleading the Court.

08:44  8              And I -- I really can't overstate how --

08:44  9    as much as I admire vigorous defense of our clients,

08:44  10   that's simply a bridge too far.  And I want to be

08:44  11   absolutely clear in everything I've ever said to this

       12   Court.

08:44  13             The entire reason I raised this so many

08:44  14   times was to be absolutely clear that I was faithful to

08:44  15   Your Honor's rulings.  And every time I've raised this,

08:44  16   I have said, I want to make sure I am faithful to Your

08:44  17   Honor's rulings.  And I stand before you today,

08:44  18   Your Honor, hoping that Your Honor knows I certainly

08:44  19   was not misleading the Court.

08:44  20             Now, let me jump to prejudice and explain

08:44  21   why these two things are connected.

08:45  22             The allegations in this brief, frankly,

08:45  23   the attacks on our character, carried over into the

08:45  24   trial.  And the prejudice that we face, Your Honor, is

08:45  25   that the jury has the impression now that we were

918

08:45  1    flouting the Court's order.

08:45  2                    And so the very same thing that I am
08:45  3    personally upset by -- because I feel like my
08:45  4    integrity, Mr. Jones' integrity, Cisco's integrity has
08:45  5    been questioned in this briefing -- that is what
08:45  6    happened before the jury.

08:45  7                    When the jury was shown repeatedly over
08:45  8    and over and over again one order and not the other
08:45  9    one, it's essentially telling the jury Cisco's counsel
08:45  10   is misleading you.

08:45  11                   And I don't believe -- respectfully,
08:45  12   Your Honor, because we came here in good faith so many
08:45  13   times to clarify that we were doing the right thing and
08:45  14   that we were within the bounds of the Court's order, I
08:45  15   don't think that is fair.  I do think that pushes a
08:45  16   thumb on the scale, and I think it prejudices Cisco.

08:45  17                   Now, we've put in our brief, and I'm not
08:46  18   going to restate it, a number of bullet points about
08:46  19   what that prejudice is.  Your Honor has those.  I'm not
08:46  20   going to restate those.

08:46  21                   What I'd like to address is what they put
08:46  22   in their opposition, which came through right before
08:46  23   midnight last night while I was preparing my closing.
08:46  24   And I want to focus on the prejudice section, which is
08:46  25   quite brief.

08:46  1              And there's only two things in this
08:46  2   prejudice section.  One of them is a case law cite, and
08:46  3   that case law cite is irrelevant because it was a bench
08:46  4   trial, as I recall.
08:46  5              The second is a paragraph in the middle,
08:46  6   and, you know, the only thing that paragraph addresses,
08:46  7   two sentences, is that Cisco was allowed to conduct
08:46  8   examinations of its own experts.  It completely misses
08:46  9   the vast majority of the prejudice that we
08:46  10  demonstrated, which is what we were not permitted to do
08:46  11  with Dr. Schaefer.  What we were not -- we had to cut
08:46  12  that examination short, what we were not permitted to
08:46  13  do with Cisco's fact witnesses.  None of that is
08:46  14  addressed.
08:46  15             And the other thing that's not addressed
08:47  16  is the impression that the jury has that Cisco was
08:47  17  flouting the Court's order because it only saw half of
08:47  18  the story.  And for that, Your Honor, I don't think
08:47  19  that Paltalk has a response.
08:47  20             And I want to say one other thing.  We
08:47  21  meant it, Your Honor, when we started our brief the way
08:47  22  we did.  We meant it when we said we respect the
08:47  23  Court's orders.  We wanted to be within the Court's
08:47  24  orders, and we bring this motion humbly and simply
08:47  25  because we believe we don't have a choice.

08:47  1                    And we thank Your Honor for hearing this

08:47  2    motion.

08:48  3                    THE COURT:  Yes, ma'am.

08:48  4                    MS. SRINIVASAN:  Thank you, Your Honor.

08:48  5                    Your Honor, the Court has been clear,

08:48  6    unwaveringly consistent in defining "each" to include

08:48  7    "one or more."  We were before the Court in June of

08:48  8    2023 at a time in which Cisco was advancing a summary

08:48  9    judgment argument that was contingent on "each" meaning

08:48  10   "all," requiring all.  The Court issued a construction

08:48  11   from the bench, it gave a ruling that "each" can

08:48  12   include "one or more."

08:48  13                   The same day or the day after, there was

08:48  14   an ECF notice that the Court had issued a construction

08:48  15   that "each" can mean "one or more."  The Court was

08:48  16   clear about that.  The Court also gave the parties

08:48  17   direction to go back and an opportunity to amend their

08:48  18   expert analysis, conduct expert depositions in line

08:48  19   with the Court's construction.

08:48  20                   What did that mean?  It was incumbent on

08:49  21   that point on Cisco to evaluate whether its

08:49  22   noninfringement positions could stand in light of the

08:49  23   fact that "each" can include "one or more."  It may

08:49  24   have been the case that their infringement,

08:49  25   noninfringement positions needed to be narrowed because

08:49  1  they required "each" to be "all."

08:49  2          And that was the opportunity they had, to

08:49  3  put together noninfringement analyses that reflected

08:49  4  the Court's construction and what noninfringement

08:49  5  positions could still stand if "each" can include "one

08:49  6  or more."  Not that it had to be "all" because that is

08:49  7  the argument that they advanced on summary judgment,

08:49  8  which was denied by the Court and which resulted in the

08:49  9  construction that we were operating under.

08:49  10          Cisco also had the opportunity to revise

08:49  11  its invalidity analysis because the Court had issued a

08:49  12  construction under which ostensibly Cisco could have

08:49  13  said there is new art to be considered if "each" can

08:50  14  mean and include "one or more."  They did not offer new

08:50  15  art, but obviously that was the point of the exercise

08:50  16  for the parties to have an opportunity to revisit what

08:50  17  their infringement and their noninfringement positions

08:50  18  were, what their invalidity and validity positions were

08:50  19  in light of the Court's construction.

08:50  20          It was clear.  The parties went through

08:50  21  that exercise of expert discovery, and, Your Honor,

08:50  22  there are expert reports that expressly reference, all

08:50  23  of them do, the Court's determination that "each" can

08:50  24  include "one or more."  There are reports of Cisco's

08:50  25  experts that reference the ECF notice, that there was a

08:50    1    construction.

08:50    2                   So that was the task that we were all

08:50    3    assigned to go forth and come up with.  And it may be

08:50    4    the case, Your Honor, that Cisco -- some of the

08:50    5    positions as to noninfringement could not stand anymore

08:50    6    given that "each" can include "one or more," that it

08:50    7    was not limited to "all."

08:50    8                   And I think that is part of what has been

08:51    9    evident over the course of trial, that perhaps some of

08:51   10    those noninfringement issues needed to be narrowed or

08:51   11    were eliminated by virtue of a construction.

08:51   12                   But that is what the Court gave the

08:51   13    parties the opportunity to do.  And perhaps there might

08:51   14    be more invalidity arguments since Cisco -- for Cisco

08:51   15    to advance with the construction that was broader.

08:51   16                   When we then returned to the Court on

08:51   17    August 1st, 2024, what counsel asked and what the Court

08:51   18    indicated was no different.  The Court -- counsel asked

08:51   19    can the experts say that they have a view that "each"

08:51   20    can mean "one or more"?  Can they offer a view that

08:51   21    "each" can mean "all"?

08:51   22                   But what an expert is not going to be

08:51   23    able to do is say that there's not -- say that for

08:51   24    noninfringement to be present, it has to be "all."

08:51   25    That would be inconsistent with the Court's ruling.

08:51  1    But nothing that the Court said or indicated on

08:51  2    August 1st was any different than what the parties had

08:52  3    been operating under to that point.

08:52  4            If Cisco's experts could come in here and

08:52  5    say there is noninfringement even if "each" means "one

08:52  6    or more," then they were entitled to put on that

08:52  7    noninfringement position.  Or if they wanted to say the

08:52  8    patents are invalid, because "each" means "one or

08:52  9    more," they were entitled to put on that position.  And

08:52  10   I don't think that has been unclear at all.

08:52  11           The problem is that I don't believe that

08:52  12   Cisco has the ability for many of their noninfringement

08:52  13   positions for them to stand under that construction,

08:52  14   and I think that's the issue that we're facing today.

08:52  15           As to the issue of confusion, Your Honor,

08:52  16   Mr. Bress, Cisco's invalidity expert, was on the stand

08:52  17   yesterday.  He was asked:  What does "one or more"

08:52  18   mean?  And he quite clearly explained it.  He said:

08:52  19   One or more, you can have five.  One or more means one

08:52  20   to five.  "All" is a subset of that; it means "five."

08:52  21   It means it is something narrower than one or more.

08:52  22   "One or more" is a broader term.

08:53  23           He is a person of ordinary skill in the

08:53  24   art.  He did not have any concern about being able to

08:53  25   interpret what the Court's construction meant.  It

08:53  1    meant "one or more."  It can include "one or more."
08:53  2    And so if Cisco has positions that read out, including
08:53  3    "one or more," then that is a problem.  And I think
08:53  4    that they have been allowed and have brought forth
08:53  5    before the jury their position that their experts or
08:53  6    their noninfringement expert viewed "each" as "all."
08:53  7            He testified to that.  He brought that
08:53  8    position forward.  The question for him is whether he
08:53  9    can sustain a noninfringement opinion under the actual
08:53  10   construction that the Court has offered.
08:53  11           And so when we talk about whether there
08:53  12   was a misunderstanding or whether there's something
08:53  13   ambiguous about the Court's construction, we had a
08:53  14   person of skill in the art tell us they know.  They
08:53  15   understand that "one or more" is something broader than
08:53  16   "all."
08:53  17           As to the issue of prejudice, Your Honor,
08:54  18   since our discussions -- and the Court has been very
08:54  19   clear in trial when this issue came up on Monday, when
08:54  20   this issue came up again on Tuesday at length.  The
08:54  21   Court has said again and again that "each" can include
08:54  22   "one or more."  That is a position the Court has taken
08:54  23   and has not deviated from it.
08:54  24           And the sort of the upshot of the motion
08:54  25   for a mistrial is that there's been a change.  There

08:54  1    has not been a change.  We have been operating under

08:54  2    this construction.  And we know that because there's a

08:54  3    suggestion that there was prejudice or the examination

08:54  4    of Dr. Schaefer was cut short.

08:54  5                Respectfully, that did not have anything

08:54  6    to do with the construction.  He was asked:  Did you

08:54  7    analyze infringement with "each" meaning "all"?  And he

08:54  8    said he didn't view infringement through that lens.  He

08:54  9    read it through the lens of "each" meaning "one or

08:54  10   more."

08:54  11               So they elicited testimony, they

08:54  12   cross-examined him on their very position, which is

08:54  13   that "each" should be interpreted to mean "one or all."

08:55  14   They asked him about that.  They got his answer on

08:55  15   that.

08:55  16               Respectfully, I think the examination was

08:55  17   short because there wasn't a lot of discussion about

08:55  18   the technical matters in the case.  There could have

08:55  19   been plenty of opportunity to cross-examine him about

08:55  20   source code, or about technical documents, or about any

08:55  21   of the things he spent many hours up here testifying

08:55  22   about.  But there was certainly no aspect of

08:55  23   examination that was foreclosed by something the Court

08:55  24   said.  It was clear.

08:55  25               And Cisco's own experts -- and,

08:55  1    Your Honor, part of the reason we were going through

08:55  2    the transcript yesterday when we got it, because

08:55  3    Cisco's own experts, who largely testified yesterday,

08:55  4    testified at length that they view "each" as "all" and

08:55  5    why and their bases for doing so.

08:55  6            Mr. Bress offered a view that he didn't

08:55  7    think that he could imagine a world in which "each"

08:55  8    means "one or more."  He offered that testimony.  Is

08:56  9    that consistent with the Court's ruling?  That, you

08:56  10   know, is a bridge farther than we would have expected

08:56  11   an expert to take in light of the Court's ruling, but

08:56  12   he said it on the stand.

08:56  13           He talked about -- Mr. Willis, their

08:56  14   noninfringement expert, talked about preferred

08:56  15   embodiments and whether the preferred embodiment needed

08:56  16   to be read in light of the claims, whether claims could

08:56  17   read out a preferred embodiment.  He talked about the

08:56  18   claim differentiation in light of this construction.

08:56  19           And in other words, Your Honor, there has

08:56  20   been extensive opportunity for the parties to do just

08:56  21   what the Court contemplated, which is to have their

08:56  22   experts give their view in light of a person of

08:56  23   ordinary skill in the art of what "each" means, how

08:56  24   they interpreted it.

08:56  25           If it is the case that Cisco cannot

08:56  1    sustain a noninfringement position, if "each" can also

08:56  2    mean "one or more," that's a different story.  And

08:56  3    again, frankly, that's what the Court asked the parties

08:56  4    to do by having new expert reports after its

08:56  5    construction.

08:57  6                So in short, Your Honor, obviously the

08:57  7    grounds for a mistrial are very high, but we do want to

08:57  8    reiterate that having reviewed all of the transcripts

08:57  9    from the Court, from the pretrial hearings throughout

08:57  10   this trial, the idea that there's been a change or that

08:57  11   Cisco has been foreclosed from making some examination

08:57  12   or offering some testimony in the record is not

08:57  13   supported at all.

08:57  14               And they have not identified something

08:57  15   that they were not able to ask Dr. Schaefer.  They

08:57  16   asked him their central question.  And their experts

08:57  17   got up here and gave their view of what "each" should

08:57  18   mean and whether or not that does or does not, is not

08:57  19   supported by their analysis under that.

08:57  20               So there is no prejudice here.  We don't

08:57  21   believe there's been confusion here, and Cisco's own

08:57  22   experts don't seem to have confusion about how to deal

08:57  23   with what the Court ordered.  They viewed it.  They

08:57  24   explained how they dealt with it.

08:57  25               And we have looked and seen what the

928

08:57   1   Court has done transcript after transcript, and as we

08:58   2   have said, it is unwaveringly consistent.  It is what

08:58   3   the parties have been operating under for more than a

08:58   4   year now with the benefit of expert discovery and

08:58   5   expert depositions.  And it is clear what the Court had

08:58   6   in mind by saying that "each" can include "one or

08:58   7   more."

08:58   8           And it is not a reason now to disrupt the

08:58   9   trial, nor was it any other day this week, to suggest

08:58   10  that this trial could not proceed or that the evidence

08:58   11  had somehow been shortchanged as a result.  That would

08:58   12  be extremely prejudicial to Paltalk, which, of course,

08:58   13  has waited a long time to have its day in court, and

08:58   14  certainly 14, 15 months after we had already received

08:58   15  the Court's construction.

08:58   16          For that reasons, Your Honor, we ask the

08:58   17  Court to deny the motion.  Thank you.

08:58   18          THE COURT:  Thank you, ma'am.

08:58   19          MS. PIEPMEIER:  Your Honor, may I very

08:58   20  briefly respond?

08:58   21          THE COURT:  Sure.

08:58   22          MS. PIEPMEIER:  Thank you for the Court's

08:58   23  indulgence in letting me very briefly respond.  I

08:58   24  just -- I think I have just four points here.

08:59   25          First of all, it's very clear from the

08:59  1   Schaefer cross that this issue was cut short because we

08:59  2   were not permitted to show the full scope of the order.

08:59  3   We were not permitted to show the world in which we

08:59  4   thought we were operating in when we walked in.

08:59  5             The same thing with our examinations of

08:59  6   our own experts.  When -- I'm glad -- I'm very glad

08:59  7   that it appeared that they knew what the answers were

08:59  8   and that they were -- that they were ready to go, but

08:59  9   the fact is that they had a hand tied behind their back

08:59  10  because they had to talk only about the June 29th, 2023

08:59  11  order.  They were not permitted to talk about the other

08:59  12  one.

08:59  13            So I'm very glad that it came across that

08:59  14  they had coherent testimony, but the fact is, that

08:59  15  wasn't a choice.  That was because there was a ruling

08:59  16  that prohibited us from allowing them to testify about

08:59  17  the full scope of the order.

08:59  18            The second part I would say about

08:59  19  Mr. Bress is I think that characterization, very

08:59  20  respectfully, was misleading because he also was clear

09:00  21  about what he thinks the word "each" means.  He just

09:00  22  could only point to what the Court said in June 2023.

09:00  23            The fact is that we were not allowed, and

09:00  24  respectfully, even this argument simply denies the

09:00  25  existence of the relevant part of the August 1st

930

09:00    1    transcript.

09:00    2                    We had our hands tied behind our back,

09:00    3    and the jury had the impression that we were flouting

09:00    4    the Court's order when we were operating under a

09:00    5    holistic understanding of both orders.

09:00    6                    And for that reason, Your Honor, I don't

09:00    7    think that bell can be unrung.  I think the jury has

09:00    8    that impression.  And I can't fix it.  I can't go back

09:00    9    and cross-examine Dr. Schaefer on the issues we weren't

09:00   10    allowed to address.  I can't bring back the other

09:00   11    witnesses and have them testify to the full scope of

09:00   12    their opinion.  The bell can't be unrung,

09:00   13    unfortunately, Your Honor.

09:00   14                    Thank you.

09:00   15                    THE COURT:  The Court is going to deny

09:01   16    the motion.

09:01   17                    Next up we have the issues with respect

09:01   18    to the jury charge and verdict form, I think.

09:01   19                    MR. SIEGMUND:  Your Honor, on the verdict

09:01   20    form, we are all agreed.  So I don't believe there's

09:01   21    anything to take up there.

09:01   22                    THE COURT:  Okay.  Verdict form's done?

09:01   23    Okay.

09:01   24                    MR. SIEGMUND:  Yes.

09:01   25                    THE COURT:  With regard to the charge,

```
09:01   1    what is the issue?
09:01   2                    MR. SIEGMUND:  I don't think there are
09:01   3    any issues other than what we were resolving this
09:01   4    morning.  So I believe we are agreed, but Cisco can
09:01   5    correct me if I'm wrong.
09:01   6                    MS. PIEPMEIER:  Good morning again.
09:01   7                    I think the only issue that was
09:01   8    outstanding was what had been numbered 16, which is
09:01   9    just how "each" will appear in the Court's --
09:01  10                    THE COURT:  Right.  I thought that was
09:01  11    still an issue.
09:01  12                    MS. PIEPMEIER:  That's my point, is I
09:01  13    think that's the one thing that hasn't been resolved,
09:02  14    is how the Court intends to instruct the jury as to
09:02  15    what the meaning of the word "each" is.
09:02  16                    And obviously I -- please don't shoot me.
09:02  17    The -- obviously Cisco believes it should be construed
09:02  18    as "all" or "every."
09:02  19                    THE COURT:  Well, all I need to know is
09:02  20    whether or not if you all have or have not resolved the
09:02  21    issue of what is on the -- as I recall, the verdict --
09:02  22    it was the -- I guess it was in the charge, and the
09:02  23    correction was which of two constructions I gave for
09:02  24    "each."
09:02  25                    Is that resolved or is it not resolved?
```

09:02   1           MS. PIEPMEIER:  That is not resolved,

09:02   2  Your Honor, unless they would like to stipulate that

09:02   3  "each" means "all" or "every."  I'm going to guess the

09:02   4  answer's no.

09:02   5           MS. SRINIVASAN:  We are not.

09:02   6           Your Honor, if I can just clarify, what

09:02   7  we did yesterday is we put in two constructions,

09:02   8  Cisco's construction that it should be "all" or

09:02   9  "every."  Paltalk said it should be "each" has a plain

09:02   10 and ordinary meaning which can include "one or more."

09:02   11          If the Court's ruling is that Paltalk's

09:02   12 construction or the construction that I read last is

09:03   13 what will be -- the jury will be instructed on as

09:03   14 opposed to "all" or "every," then I believe we can

09:03   15 modify it.

09:03   16          I think Cisco doesn't want to waive any

09:03   17 objection that they have.  So they're not agreeing.

09:03   18 But I think that's the only thing that needs to be

09:03   19 resolved.

09:03   20          THE COURT:  Are you saying -- I

09:03   21 understand y'all have an objection if I do it.  Are you

09:03   22 saying that you disagree with the result that she just

09:03   23 said?  What she just said makes logic to me, and then

09:03   24 you would object to it being that.  But the issue will

09:03   25 be resolved as to which one I give.

933

09:03  1                    MS. PIEPMEIER:  Well, yeah.  Your Honor,

09:03  2    I believe the issue is resolved when Your Honor issues

09:03  3    a ruling, right, because Your Honor gets to do that.

09:03  4                    My only point is that, yes.  We maintain

09:03  5    an objection if it is anything other than "all" or

09:03  6    "every."

09:03  7                    THE COURT:  I get -- yeah.  I get that.

09:03  8    So I get that you're unhappy and you object.  And I

09:03  9    understand why.  You just eloquently explained it.

09:03  10                    MS. PIEPMEIER:  You don't want to hear it

09:03  11   again.

09:03  12                    THE COURT:  No, no.  But I want to know

09:04  13   if you agree that my ruling resolves what it will be,

09:04  14   and there's no longer a dispute over what it will be,

09:04  15   although you will be objecting to that.

09:04  16                    MS. PIEPMEIER:  Yes.  I understand that

09:04  17   Your Honor is maintaining the ruling that "each" has

09:04  18   its plain and ordinary meaning which can include "one

09:04  19   or more."

09:04  20                    THE COURT:  Okay.  So whoever's --

09:04  21                    MS. PIEPMEIER:  We object to that,

09:04  22   obviously.

09:04  23                    THE COURT:  Good.  I got that.

09:04  24                    So whoever's printing up the copies, does

09:04  25   that resolve for you what needs to be in the copies?

| | | |
|---|---|---|
| 09:04 | 1 | MS. SRINIVASAN:  It does, Your Honor. |
| 09:04 | 2 | THE COURT:  That's what I care about. |
| 09:04 | 3 | So what I -- aspirationally this morning, |
| 09:04 | 4 | we would get through evidence and me reading the |
| 09:04 | 5 | charge, which I think would be the best for you all. |
| 09:04 | 6 | We'll see where we're at at the end of the evidence |
| 09:04 | 7 | about whether I'm able to read the charge or not in |
| 09:04 | 8 | terms of timing, but that's my goal. |
| 09:04 | 9 | And so whatever happens, we will take a |
| 09:04 | 10 | break between me reading -- between the evidence and |
| 09:05 | 11 | the closing arguments. |
| 09:05 | 12 | MS. PIEPMEIER:  Thank you, Your Honor. |
| 09:05 | 13 | May I ask a clarifying question? |
| 09:05 | 14 | THE COURT:  Sure. |
| 09:05 | 15 | MS. PIEPMEIER:  You know I like to do |
| 09:05 | 16 | that.  Will the closings be after lunch? |
| 09:05 | 17 | THE COURT:  Absolutely. |
| 09:05 | 18 | MS. PIEPMEIER:  Okay. |
| 09:05 | 19 | THE COURT:  Yeah.  For you all's sake, |
| 09:05 | 20 | I'd like to get the reading of the charge done before |
| 09:05 | 21 | lunch. |
| 09:05 | 22 | MS. PIEPMEIER:  I understand. |
| 09:05 | 23 | THE COURT:  There's no chance we will |
| 09:05 | 24 | do -- no matter what happens, unless you all just stop |
| 09:05 | 25 | now, which you're not going to, and I could read the |

935

```
09:05   1   charge right now.  My plan is to -- that you absolutely
09:05   2   would be doing them.  You'll have the lunch break to
09:05   3   prepare your closing arguments.
09:05   4                   And in fact, if you'd like, again, I'm
09:05   5   very flexible.  If you need an extra-long lunch to help
09:05   6   you prepare the closing arguments, there's no need
09:05   7   to -- you know, to rush getting the closing arguments
09:05   8   done depending on when you finish and when I read the
09:05   9   charge.
09:05  10                   MS. PIEPMEIER:  Yep.
09:05  11                   THE COURT:  If I read the charge after
09:05  12   lunch, that's not going to change when -- your ability
09:05  13   to get your closing argument worked on.  So either way,
09:06  14   I think you get what you want.
09:06  15                   MS. PIEPMEIER:  Thank you, Your Honor.
09:06  16   That's extremely helpful.
09:06  17                   I have one other clarification that
09:06  18   follows from Your Honor's comment right now about just
09:06  19   stopping here.  We're not.  We will finish Ms. Kindler.
09:06  20                   But we did receive notice last night that
09:06  21   Paltalk will not be calling Dr. Madisetti.
09:06  22                   THE COURT:  Right.
09:06  23                   MS. PIEPMEIER:  And I believe the Court
09:06  24   received that notice as well, and obviously that's
09:06  25   fine.  And I hope Dr. Madisetti's okay.  They did not
```

```
09:06   1    provide a reason why they're not calling him.
09:06   2                I want to be clear that in my closing,
09:06   3    Your Honor, there will be no implication of anything
09:06   4    about that.  The fact is simply, there won't be a
09:06   5    witness presented on that.  I would never say anything
09:06   6    about why.
09:06   7                I would like to respectfully request that
09:06   8    Paltalk not be able to -- I don't know why he hasn't
09:06   9    appeared, but I would respectfully request that Paltalk
09:06   10   not be able to tell the jury, you know, he's in the
09:06   11   hospital or something like that.  We have no idea what
09:06   12   the situation is.  I hope it's not --
09:06   13                THE COURT:  No.  They're just not calling
09:06   14   him.
09:06   15                MS. PIEPMEIER:  Right.
09:07   16                THE COURT:  I mean, I don't know -- I
09:07   17   don't know why they're not calling him, but they're not
09:07   18   going to get to explain to the jury why they're not
09:07   19   calling him.
09:07   20                MS. PIEPMEIER:  Yes, exactly.
09:07   21                THE COURT:  Or mention it.
09:07   22                MS. PIEPMEIER:  That's exactly my
09:07   23   request.
09:07   24                THE COURT:  He didn't exist.
09:07   25                MS. PIEPMEIER:  Right.
```

```
09:07   1                        THE COURT:  They didn't not call him.  He
09:07   2   just doesn't exist.
09:07   3                        MS. PIEPMEIER:  There's no evidence --
09:07   4   and, Your Honor, yeah.  I want to be clear that I will
09:07   5   be respectful in that issue, and just on the flip side,
09:07   6   I request that they not --
09:07   7                        THE COURT:  Well --
09:07   8                        MS. PIEPMEIER:  -- provide a story on
09:07   9   that.
09:07  10                        THE COURT:  It's like them -- it's like
09:07  11   if you didn't call a damages rebuttal expert, you
09:07  12   wouldn't get to say why you didn't call one and --
09:07  13                        MS. PIEPMEIER:  Exactly.
09:07  14                        THE COURT:  So I get it.
09:07  15                        MS. PIEPMEIER:  Thank you, Your Honor.  I
09:07  16   appreciate it.
09:07  17                        MS. SRINIVASAN:  That's fine, Your Honor,
09:07  18   especially if we're on the same page that they're not
09:07  19   going to reference that in their closing, so we don't
09:07  20   have to say anything about it in advance.
09:07  21                        MS. PIEPMEIER:  I'm not going to say that
09:07  22   you withdrew him or he ran away or anything like that.
09:07  23   I think we're free to say they didn't -- there's no
09:07  24   expert on that issue that provided testimony.
09:07  25                        MS. SRINIVASAN:  I think that then we
```

938

```
09:07   1    might say we just felt we didn't need to bring an
09:07   2    expert on that issue.
09:07   3                    THE COURT:  You can certainly say that.
09:07   4                    MS. PIEPMEIER:  That's fine.  Thank you.
09:07   5                    MS. SRINIVASAN:  We're not going to say
09:08   6    that --
09:08   7                    MR. TRIBBLE:  There's no hospital.
09:08   8                    (Laughter.)
09:08   9                    MS. PIEPMEIER:  I want to be respectful.
09:08  10    I don't know, honestly.
09:08  11                    THE COURT:  Okay.  Anything else?
09:08  12                    Okay.  We'll get the jury lined up.
09:08  13                    THE BAILIFF:  All rise.
09:08  14                    (Recess taken.)
09:13  15                    THE BAILIFF:  All rise.
09:13  16                    THE COURT:  Please remain standing for
09:13  17    the jury.
09:13  18                    (Jury entered the courtroom.)
09:13  19                    THE COURT:  Thank you.  You may be
09:13  20    seated.
09:13  21                    MS. EDLIN:  Good morning, everybody.
09:13  22                    DIRECT EXAMINATION CONTINUED
09:13  23    BY MS. EDLIN:
09:13  24       Q.   Ms. Kindler, we've all seen a lot of testimony
09:13  25    this week.  You have the honor of being the last
```

939

09:13  1   witness that we're going to be speaking with for this

09:13  2   trial.  And so I think we can just get straight to it.

09:14  3   Let's jump right in.

09:14  4           I want to talk a little bit about the work

09:14  5   that you did in this case.

09:14  6           Can you please tell the jury what your

09:14  7   assignment was here?

09:14  8   A.   Sure.  So I had two assignments.  My first

09:14  9   assignment was to evaluate the damages opinions put

09:14  10  forward by Mr. Bratic earlier this week.  And my second

09:14  11  assignment was to independently perform my own

09:14  12  evaluation of Paltalk's royalty damages in the event

09:14  13  that the jury is to determine that the patent is in

09:14  14  fact valid and infringed by Cisco.

09:14  15  Q.   So why would you evaluate how much Cisco

09:14  16  should pay Paltalk if it's Cisco's position that it's

09:14  17  not infringing the patent?

09:14  18  A.   Yeah.  So that is absolutely Cisco's position

09:14  19  today, but should the trier of fact, you, determine

09:14  20  that the patent is in fact valid and infringed, it's my

09:14  21  role as an economist and as a damages expert to assist

09:14  22  you in how to think about damages.

09:15  23  Q.   So what happens if the jury finds that Cisco

09:15  24  infringed the patent?

09:15  25  A.   Well, under that finding, there would be no

940

09:15   1   damages, no amount owed to Paltalk from Cisco, and

09:15   2   neither my testimony nor Mr. Bratic's testimony would

09:15   3   be relevant.

09:15   4       Q.    Can you tell us what materials you considered

09:15   5   in making your opinions today?

09:15   6       A.    Yes.  So like Mr. Bratic, I considered a lot

09:15   7   of material available in the case.  It's summarized

09:15   8   here on this slide, but it would include things like

09:15   9   the '858 patent, the HearMe asset purchase agreement,

09:15   10  Webex financial data relating to the accused products,

09:15   11  various marketing materials, Cisco and Webex license

09:15   12  agreements, deposition testimony that's relevant to

09:15   13  damages.

09:15   14       And, of course, I also had discussions with

09:15   15  Mr. Willis, the technical expert we heard from

09:15   16  yesterday, and various Cisco personnel.  So, for

09:15   17  example, Mr. Barave that you also heard testify earlier

09:16   18  this week.

09:16   19       Q.    And have you been in the courtroom all week?

09:16   20       A.    Yes.  I have.  I've heard all of the testimony

09:16   21  and seen all of the evidence that you have this week.

09:16   22       Q.    Great.  So let's cut to the chase.

09:16   23       Do you agree with Mr. Bratic's opinions?

09:16   24       A.    No.  And really for two primary reasons that

09:16   25  you'll hear about.  So the first, in my opinion, his

| | |
|---|---|
| 09:16 | 1 |
| 09:16 | 2 |
| 09:16 | 3 |
| 09:16 | 4 |
| 09:16 | 5 |

royalty opinions are significantly flawed and

overstated because he simply measured the wrong thing.

Mr. Bratic has equated the '858 patent with the ability

to offer both VoIP and PSTN user participants on the

same conference.

And as we've heard through the trial this

week, there were prior Webex products that offered that

exact same capability.  So we heard about the MediaTone

product, for example.  We heard Mr. Belcher, who's the

lead architect on that product, talk about that that

functionality existed prior to 2003 and even beyond

that.

MS. SRINIVASAN:  Objection, Your Honor.

This is beyond the scope of Ms. Kindler's report.

MS. EDLIN:  Your Honor, Ms. Kindler

disclosed this opinion.  It's in Paragraph 202(e) of

her report.  The jury's already seen this document

throughout the week, and it's used in her report to

support her hypothetical negotiation date, which goes

to the same issue of what was in the products

beforehand.

MS. SRINIVASAN:  Your Honor, yes as to

the date, not as to the value.

THE COURT:  I can't hear you.

MS. SRINIVASAN:  Yes.  She did opine as

09:17  1    to the date being based on the MediaTone document, but

09:17  2    not as to the value being based or reduced as a result

09:17  3    of the MediaTone document.

09:17  4                MS. EDLIN:  Your Honor, Mr. Bratic used

09:17  5    two --

09:17  6                THE COURT:  I'll overrule the objection.

09:17  7    A.    And so -- and just to continue my answer, in

09:17  8    addition, we heard Dr. Schaefer also acknowledge in his

09:17  9    testimony that there were other ways prior to the

09:17  10   '858 patent to have conferences with both PSTN and VoIP

09:17  11   users, and even today, there are other ways to do that.

09:18  12               And then second, Mr. Bratic has dismissed and

09:18  13   ignored real-world evidence that in my view would be

09:18  14   very informative to how the parties would think about

09:18  15   valuing the patent.  And in particular, I've identified

09:18  16   a Cisco license agreement that covers very similar

09:18  17   technology.  We heard Mr. Willis discuss this

09:18  18   yesterday.

09:18  19               But it covers patented technology that also

09:18  20   relates to VoIP, PSTN, audio mixing, and covered

09:18  21   similar products.

09:18  22               And so in my view, based on all of the

09:18  23   evidence, which we'll be getting into, appropriate,

09:18  24   reasonable royalty payment for a license to the patent

09:18  25   would be in the range of 1 to $1.5 million.

943

09:18  1    BY MS. EDLIN:

09:18  2        Q.   So let's talk a little bit about the framework

09:18  3    that we used to evaluate this.  And I know we heard

09:18  4    from Mr. Bratic already about the hypothetical

09:18  5    negotiation.  But can you remind us first what the

09:19  6    relevant time period is for the damages in this case?

09:19  7        A.   Yes.  So Mr. Bratic and I both agree that the

09:19  8    damages period starts in July 23rd of 2015, so that's

09:19  9    six years prior to the date of the complaint being

09:19  10   filed.  And that the damages period ends July 22nd or

09:19  11   26th in 2022 when the patent expires.  We agree on the

09:19  12   damages period.

09:19  13       Q.   And so what framework do you use to evaluate

09:19  14   the damages in cases such as this one?

09:19  15       A.   So we also agree on the framework, and this is

09:19  16   what he referred to as the hypothetical negotiation

09:19  17   framework.  And so the idea is to put the parties -- in

09:19  18   this case, it would be Paltalk and Webex because in

09:19  19   2004, Webex had not yet been acquired by Cisco -- back

09:19  20   in a room, so to speak, and hypothesize a license

09:19  21   agreement negotiation that would have occurred back at

09:19  22   that point in time.  And we consider what are the

09:19  23   real-world information they would look to as an

09:20  24   information to value the patent?

09:20  25       Q.   So you just mentioned, and we heard Mr. Bratic

944

1    say, that the hypothetical negotiation date would have

2    been in 2007.

3              Do you recall that?

4         A.    Yes.  And we disagree on this point.  Based on

5    my understanding of Paltalk's initial infringement

6    allegations, it's my view that the appropriate date

7    should be January 2004, and that's when the patent

8    issued.

9         Q.    Why is it called a hypothetical negotiation?

10        A.    So it's called hypothetical because it didn't

11   actually occur.  That's why we're sitting here today.

12   But we have to kind of put ourselves back in time at

13   the point in time that the parties would have

14   negotiated a license and think about all of the

15   relevant economic and business considerations that

16   would drive the outcome of that negotiation.

17        Q.    So it is called a hypothetical negotiation.

18   Does that mean that you ignore the real-world facts at

19   that time?

20        A.    Absolutely not.  So we do need to take into

21   consideration real-world facts and evidence that the

22   parties would consider at the hypothetical negotiation.

23        Q.    So are there certain assumptions that you are

24   required to make when you are performing this

25   evaluation?

945

09:21    1      A.    Yes.  And I think Mr. Bratic and I agree on

09:21    2   these assumptions.  I'll go through them quickly.

09:21    3   They're up here on the slide.  So we have to assume

09:21    4   that both parties are willing to negotiate, that they

09:21    5   have reasonable knowledge and expectations as to

09:21    6   relevant facts.  So this is his idea that he's talked

09:21    7   about the cards are face up, so we have to agree that

09:21    8   they have access to information.

09:21    9         We agree the agreement must be reached, so no

09:21   10   one can walk away from this negotiation.  And finally

09:21   11   and importantly, we have to assume that the patent is

09:21   12   valid and infringed.  This is obviously not the

09:21   13   position Cisco is taking today, but as a damages expert

09:21   14   within this framework, that's an assumption I have to

09:21   15   make.

09:21   16      Q.    And are there -- are there guidelines that you

09:21   17   used to determine what would have happened at the

09:21   18   hypothetical negotiation?

09:21   19      A.    Yes.  So, again, Mr. Bratic went through this

09:22   20   with you, and we use the same framework.  The courts

09:22   21   have said based on a case of this name many years ago

09:22   22   that these are the 15 Georgia-Pacific factors that

09:22   23   should be considered in evaluating a reasonable royalty

09:22   24   negotiation.

09:22   25         Now, in every case, certain factors are more

946

09:22  1   relevant than others, but I absolutely considered all

09:22  2   of them and determined which would be more relevant

09:22  3   here.

09:22  4       Q.    And which are those?

09:22  5       A.    So in my view, it would be Factors 1 and 2, so

09:22  6   those have to do with the payments and royalties made

09:22  7   associated with either the patent, the '858 patent, or

09:22  8   made by the defendant, in this case Cisco or Webex,

09:22  9   with respect to comparable patented technologies.

09:22  10          Also Georgia-Pacific Factor 5 has to do with

09:22  11  the relationship of the parties, the fact that they're

09:22  12  not competitors.

09:22  13          Georgia-Pacific Factors 9 and 10, those relate

09:22  14  to the incremental benefits that can be attributed to

09:23  15  the patented invention.

09:23  16          And also Factor 11 has to do with the extent

09:23  17  of use of the patented invention.

09:23  18          And then finally, Factor 12, which is, you

09:23  19  know, royalties or other payments that have been made

09:23  20  for similar inventions.

09:23  21      Q.    Okay.  So let's get into your evaluation of

09:23  22  Mr. Bratic's damages opinions.  Can you please remind

09:23  23  the jury what approach Mr. Bratic took to calculate

09:23  24  damages here?

09:23  25      A.    Yes.  So this is just a high-level summary of

09:23   1    the math that Mr. Bratic did.  So just to refresh your

09:23   2    memory, he started with total Webex Audio revenues, and

09:23   3    then he applied several different factors to that.

09:23   4           The first one was a profit factor which he

09:23   5    called the gross profit margin.  The second was a

09:23   6    technical apportionment factor.  The third was what he

09:23   7    called a split of the economic benefit.  And doing that

09:23   8    math, he arrived at damages of about $102.6 million.

09:23   9    Q.    Do you have issues with his approach?

09:24   10   A.    Absolutely.  I think given the facts and

09:24   11   evidence in the case, I don't think this supports this

09:24   12   approach at all.  In particular, he has measured the

09:24   13   wrong thing, and he's also, as I mentioned before,

09:24   14   ignored real-world evidence that would suggest an

09:24   15   alternative approach.

09:24   16   Q.    So why do you say that Mr. Bratic measured the

09:24   17   wrong thing?

09:24   18   A.    So these are excerpts from -- the top half is

09:24   19   excerpts from Mr. Bratic's reports in this case.  And

09:24   20   as you can see from the highlighted portions -- I'll

09:24   21   just start with the first one.  I won't read all of

09:24   22   these.  But he said:  The '858 patent provides

09:24   23   conferencing services the ability to support both

09:24   24   legacy switched-based equipment -- so that's PSTN -- as

09:24   25   well as new packet-based systems.  And that's VoIP.  So

948

09:24    1    he's attributing the ability to the patent.

09:24    2            And then similarly, Dr. Schaefer here at

09:24    3    trial, this is actually a quote from his testimony here

09:25    4    at trial on the bottom half.  And he said that:

09:25    5            The flexibility to join a conference through

09:25    6    telephone or desktop -- or desk-based VoIP was the

09:25    7    exact scope and teachings of the '858 patent.

09:25    8            And when asked about that, he said, it fell

09:25    9    within the scope, yes.

09:25    10    Q.    How do you know that the benefit of the patent

09:25    11    is not the ability to have PSTN and VoIP on the same

09:25    12    conference?

09:25    13    A.    Well, we have seen evidence, as I mentioned

09:25    14    before, that that ability that they're attributing to

09:25    15    the '858 patent in these statements and what formed the

09:25    16    premise for their analysis actually existed in prior

09:25    17    Webex products.  You've seen this document.  This is

09:25    18    the Webex MediaTone document from 2023.  It's blocked

09:25    19    out on my screen, but I think it's DX-68.

09:25    20    Q.    That's right.

09:25    21    A.    Is that right?

09:25    22            But it talks about the image on the

09:26    23    left -- Mr. Belcher talked you through this document

09:26    24    and explained that the image on the left is showing

09:26    25    that you could have back in this point in time, and he

09:26  1    said even before this point in time, that MediaTone

09:26  2    always had this capability.  But you could have PSTN

09:26  3    and Internet users, VoIP users on conferences at the

09:26  4    same time.

09:26  5         And so this just shows that the technology

09:26  6    that Mr. Bratic claims to be valuing actually existed

09:26  7    earlier in time in a product that Paltalk has not

09:26  8    accused of infringement.

09:26  9    Q.   And have you ever -- have you seen any other

09:26  10   evidence this week supporting this?

09:26  11   A.   Yes.  So Mr. Belcher talked about this in his

09:26  12   testimony.  And we also -- as I mentioned before, we

09:26  13   heard Dr. Schaefer acknowledge in his cross-examination

09:26  14   that there were other products and other ways to do

09:26  15   conferencing with PSTN and VoIP at the same time that

09:26  16   would not use the patent.  And he even said that was

09:26  17   true prior to the patent being issued.

09:26  18   Q.   Do you have any other issues with Mr. Bratic's

09:27  19   calculations?

09:27  20   A.   Yes.  So that was really about the framework

09:27  21   and the methodology, which I disagree with, but I also

09:27  22   have issues with the math that he did.

09:27  23        So now we're going to get through each step of

09:27  24   his calculation I disagree with and I think is

09:27  25   overstated, and I'll explain why.

950

09:27   1          Q.    Okay.  So let's look at the first step of his
09:27   2   calculation with the total Webex U.S. audio revenues.
09:27   3          Why is the starting point wrong?
09:27   4          A.    So he, again, starts with total Webex Audio
09:27   5   revenues.  And as we've heard through testimony from
09:27   6   Mr. Barave, we talked about with him the usage data.
09:27   7   If you recall the spreadsheet that he was shown and
09:27   8   that usage data that Cisco tracks.  Now, it doesn't
09:27   9   track -- it tracks it on a rolling 13-month basis.
09:27   10         But for the data that we have, which I've
09:27   11  charted here, so this chart is based on the same data
09:28   12  that was shown to you in that spreadsheet that
09:28   13  Mr. Barave was asked about.  But that data goes back to
09:28   14  August 2021.
09:28   15         And the importance of this data is that it
09:28   16  shows during the period of time where that data is
09:28   17  still -- it still exists, even though it was tracked
09:28   18  much earlier than that, we can see -- and this is the
09:28   19  red portion of the chart -- only 24 percent of meeting
09:28   20  minutes had VoIP and PSTN users on those calls, which
09:28   21  means that only 24 percent of the meeting minutes could
09:28   22  possibly use the patented invention.
09:28   23         Because I think it's not disputed that calls
09:28   24  where or meeting minutes where this either VoIP-only
09:28   25  participants or PSTN-only participants, that the patent

| | | |
|---|---|---|
| 09:28 | 1 | would not be implicated in those situations. |
| 09:28 | 2 | Q. Did Mr. Bratic consider this data? |
| 09:28 | 3 | A. No. I think he talked about the data, and he |
| 09:28 | 4 | ignored it because he said that it wasn't available for |
| 09:29 | 5 | a long enough period of time. |
| 09:29 | 6 | I don't want to paraphrase his words. But he |
| 09:29 | 7 | has in a sense dismissed it because he didn't have |
| 09:29 | 8 | access to data going back far enough in his damages |
| 09:29 | 9 | period. But we absolutely have data today, and we have |
| 09:29 | 10 | other information that can help us estimate what that |
| 09:29 | 11 | usage likely would have been. |
| 09:29 | 12 | Q. So looking at the red portion of this chart, |
| 09:29 | 13 | the portion of meeting minutes that have both PSTN and |
| 09:29 | 14 | VoIP users on the conference, is it the case that all |
| 09:29 | 15 | of these meeting minutes allegedly use this patent? |
| 09:29 | 16 | A. No. And so I think we heard Mr. Willis talk |
| 09:29 | 17 | about this, but the patent has additional criteria that |
| 09:29 | 18 | need to be in place in order for it to even be used. |
| 09:29 | 19 | And so we -- we heard about it meets -- the |
| 09:29 | 20 | conference needs to have more than two users on it. So |
| 09:29 | 21 | in addition to needing VoIP and PSTN users on the call, |
| 09:29 | 22 | you also have to have more than two users on the call. |
| 09:29 | 23 | And you also need to have more than two people talking |
| 09:30 | 24 | at once. |
| 09:30 | 25 | And we also heard that that doesn't happen a |

09:30  1    lot of the time.  So it's certainly the case that this

09:30  2    24 percent figure would overstate the instances in

09:30  3    which the patent could potentially be used.

09:30  4        Q.    So looking at this chart, though, the data, it

09:30  5    appears to only be for a one-year period between

09:30  6    August 2021 and August 2022.

09:30  7              But the damages period goes back to July of

09:30  8    2015, right?

09:30  9        A.    That's correct.

09:30  10             And so as an economist, we're often asked to

09:30  11   do this.  We rarely have perfect complete data,

09:30  12   unfortunately.  So I can make some reasonable

09:30  13   assumptions based on other evidence in the record and

09:30  14   try to do my best to approximate what that relative

09:30  15   usage could have been earlier in time.

09:30  16       Q.    And how did you estimate what portion of

09:30  17   Cisco's meeting minutes had both VoIP and PSTN

09:30  18   participants for the time before you had available

09:31  19   data?

09:31  20       A.    So we also heard from Mr. Barave that in his

09:31  21   view as the product manager, having access to this

09:31  22   data, I think he talked about a dashboard, that this

09:31  23   data was always available, either he or his members of

09:31  24   his team periodically reviewed that data.

09:31  25             And he said, based on best recollection, that

953

09:31  1    back in 2015, the usage of PSTN would be about

09:31  2    50 percent relative to VoIP.

09:31  3            And so with that information and given what we

09:31  4    know about the more current data, I've performed two

09:31  5    estimation steps to try to get to a reasonable

09:31  6    approximation.

09:31  7            And so the first step is the blue line.  And

09:31  8    if you look back, it starts in fiscal year 2015.  That

09:31  9    would be the beginning of the damages period.

09:31  10           I very conservatively have assumed that

09:31  11   50 percent of all meeting minutes all the way up to the

09:31  12   period of time where we have actual data would involve

09:31  13   PSTN users, and that's a highly conservative

09:32  14   assumption.

09:32  15           Under that assumption, the result is that the

09:32  16   math would tell us that there would be 47 percent of

09:32  17   meeting minutes over that period on average that could

09:32  18   potentially implicate the patent, meaning would have

09:32  19   VoIP and PSTN users on the same call.

09:32  20           I considered a second approach which took into

09:32  21   account his testimony.  If you'll recall, he said it in

09:32  22   his view, it was steadily declining over time.

09:32  23           And so the green line shows the math that I

09:32  24   did to estimate what that usage -- relative usage would

09:32  25   look like assuming that relatively straight declining

954

09:32  1    trend over time.

09:32  2            And under that method, we get about a third,

09:32  3    33 percent of meeting minutes could potentially --

09:32  4    again, potentially because there's other criteria that

09:32  5    need to be met -- could potentially be implicated by

09:32  6    the patent.

09:32  7        Q.   And so what's the impact on Mr. Bratic's

09:33  8    analysis from him not even attempting to perform this

09:33  9    necessary usage analysis?

09:33  10       A.   Well, his analysis is completely overstated.

09:33  11   So if you recall, he starts with revenues, total Webex

09:33  12   Audio revenues.  And he assumes that the patent is

09:33  13   contributing to all of those revenues.

09:33  14           And we know that cannot be the case, given

09:33  15   that the potential use can only be some portion of

09:33  16   those meeting minutes that are the basis for those

09:33  17   revenues.

09:33  18           And so this chart just shows -- if you take

09:33  19   his pie chart on the left, that's my pie chart based on

09:33  20   his 100 percent assumption.  If you adjusted for

09:33  21   reasonable estimates of what that relative usage would

09:33  22   have been, it's somewhere in the range of 33 to

09:33  23   47 percent.

09:33  24           So the red slices on the second pie chart

09:33  25   would be my adjusted analysis based on his usage, and

955

09:33  1    that shows just how overstated his starting point is

09:33  2    with respect to revenues.

09:33  3         Q.   And what does that 53 percent, more than half,

09:34  4    represent?

09:34  5         A.   Those are meeting minutes that couldn't use

09:34  6    the patent.  Those are meeting minutes that are either

09:34  7    with only VoIP participants or only PSTN participants.

09:34  8         Q.   Okay.  So you also mentioned that Mr. Bratic

09:34  9    overstated the profit margins in his next step.

09:34  10             Why is his profit margins overstated?

09:34  11        A.   So he used what is called a "gross profit

09:34  12   margin," and that means you take revenues and you

09:34  13   deduct only what are called "direct costs."  And we

09:34  14   also refer to it as "cost of goods sold."

09:34  15             But there are many more costs that are

09:34  16   attributable to running the Webex Audio portion of the

09:34  17   business and just Webex business and its entirety, so

09:34  18   things like sales and marketing costs, general and

09:34  19   administrative costs, R&D costs.  And he has completely

09:34  20   ignored those other costs.

09:34  21        Q.   Why is gross margins inappropriate for this

09:34  22   purpose?

09:35  23        A.   So it's important when you're looking at

09:35  24   profit margins that you match up revenues and costs

09:35  25   when you're calculating a margin.  So you want to think

| | | |
|---|---|---|
| 09:35 | 1 | about it in terms of apples to apples. |
| 09:35 | 2 | If you're trying to figure out the |
| 09:35 | 3 | profitabilities associated with a certain product line, |
| 09:35 | 4 | you look at the revenues of the product line, and you |
| 09:35 | 5 | look at the costs of the product line. |
| 09:35 | 6 | And he's not done that.  He's only looked at a |
| 09:35 | 7 | very small subset of the costs that would apply. |
| 09:35 | 8 | Q.    So were there other costs that were available |
| 09:35 | 9 | to Mr. Bratic that he could have taken into account in |
| 09:35 | 10 | his analysis? |
| 09:35 | 11 | A.    Yes.  So interestingly, the data file which he |
| 09:35 | 12 | did not show you, but the data file that he relied on |
| 09:35 | 13 | for the cost of goods sold to calculate his gross |
| 09:35 | 14 | profit margin had just beneath that another line item |
| 09:35 | 15 | called "R&D expenses" that includes what I wrote here |
| 09:35 | 16 | on this slide.  They are associated with engineering |
| 09:35 | 17 | and management personnel that are supporting Webex. |
| 09:35 | 18 | Now, he said he didn't include those because |
| 09:36 | 19 | he said, well, they were allocated by Cisco.  But they |
| 09:36 | 20 | were allocated by Cisco in the normal course of |
| 09:36 | 21 | business, and they are certainly relevant to the |
| 09:36 | 22 | operation of the product.  So in my view, that is not a |
| 09:36 | 23 | reasonable reason to just dismiss them entirely. |
| 09:36 | 24 | And if you include those costs, his profit |
| 09:36 | 25 | margin goes from nearly 70 percent to down to |

957

09:36  1   40 percent, which is roughly a 41.5 percent reduction.

09:36  2   So again, it's just another step in his math that he's

09:36  3   completely overstated what that right metric should be.

09:36  4       Q.    So your example were R&D expenses.

09:36  5             What does R&D stand for?

09:36  6       A.    Okay.  Sorry.  So that's research and

09:36  7   development expenses.  And so that would be the

09:36  8   engineers, the time and resources to not only develop

09:36  9   the product but also add features and testing of the

09:36  10  product and those types of things.

09:36  11      Q.    So if you'd included the R&D costs, would

09:36  12  those additional costs capture all of the relevant

09:37  13  costs for Webex?

09:37  14      A.    No.  So those don't include things like -- and

09:37  15  the file that he relied on stated this.  It doesn't

09:37  16  include things like sales and marketing expenses.

09:37  17            Now, those could also have been allocated.  I

09:37  18  did not do that.  I took the document on its face

09:37  19  value.  But this would -- this number that I calculated

09:37  20  of 40.3 percent would also understate the actual costs

09:37  21  that are associated with the Webex Audio revenues he's

09:37  22  relying on.

09:37  23            And so there's general administrative costs,

09:37  24  sales and marketing costs, and those are not in these

09:37  25  numbers.

09:37  1      Q.   And so I think you mentioned this, but if

09:37  2   those were -- if those operating expenses are deducted

09:37  3   and all those costs are deducted, what's the impact on

09:37  4   Cisco's profit margin?

09:37  5      A.   So it's significant.  It would be lowered by

09:37  6   slightly over 40 percent.

09:37  7      Q.   Let's move to Mr. Bratic's next step, the

09:37  8   technical apportionment factor of 33.75 percent.

09:38  9           Before we get into this, though, what's the

09:38  10  purpose of a technical apportionment factor?

09:38  11     A.   So the idea -- and we do this in every patent

09:38  12  case.  So the idea is that we need to try to isolate

09:38  13  the value that can only be attributable to the patented

09:38  14  invention.

09:38  15          And we're not supposed to be including value

09:38  16  that's attributable to other things, so other features,

09:38  17  functionalities, you know, Cisco's brand name, other

09:38  18  contributions of Cisco.

09:38  19          And that makes sense because the statute says

09:38  20  the patentholder is entitled to a reasonable royalty in

09:38  21  exchange for the use of its patented invention.

09:38  22          And so this is always an important step.  And

09:38  23  in my view, his technical apportionment factor is way

09:38  24  overstated.  And that's tied to what I said at the

09:38  25  outset, is that in my view, he's just measuring the

09:38   1    wrong thing.

09:38   2        Q.    So did Mr. Bratic isolate the -- the invention

09:39   3    of the patent in his analysis?

09:39   4        A.    No.   And he's relying -- you heard him say

09:39   5    he's relying on Dr. Schaefer for this technical

09:39   6    apportionment analysis.

09:39   7            But based on the documentary evidence that

09:39   8    I've reviewed and based on my understanding of what the

09:39   9    patent is claiming, it's completely overstated, and in

09:39  10    my view, it's not even close to reasonable to

09:39  11    attribute -- Mr. Bratic's analysis is essentially

09:39  12    attributing over one-third of Webex profits to this

09:39  13    single patent.

09:39  14            And I -- this is a slide taken straight from

09:39  15    Mr. Bratic's presentation.   I don't know if you recall

09:39  16    this slide.   He characterized this as saying, oh, he's

09:39  17    conservative.   He's only giving 33.75 percent of the

09:39  18    benefit of the product, the entire product to the

09:39  19    patent, and he's leaving two-thirds to Cisco.

09:39  20            But I think if you think about what each of

09:40  21    those slices actually include, that's just not

09:40  22    appropriate at all.   So I've layered in on this next

09:40  23    slide just some examples of what would be in the orange

09:40  24    category, the Cisco contribution category.   And on the

09:40  25    right-hand side for his 33.75 percent, we have one

960

09:40  1    single patent, the '858 patent.

09:40  2              And the implication of this is that what he

09:40  3    says is two-thirds of the benefits of Webex Audio in

09:40  4    its entirety is attributable to things like the Webex

09:40  5    brand, the patents.  We've heard about the 412 Webex

09:40  6    Audio-related patents that Cisco has.  The various

09:40  7    investments.

09:40  8              We've heard about -- I think from Mr. Barave

09:40  9    about the extensive work Cisco does on an annual basis

09:40  10   to make sure that features are being added that are

09:40  11   consumer-demanded features, that the platform is

09:40  12   working and, you know, the R&D and the development

09:41  13   around the platform.

09:41  14             We've heard about security.  End-to-end

09:41  15   encryption security is highly important to customers.

09:41  16   That's not included in Mr. Bratic's analysis.

09:41  17             And then on the bottom left hand, we've got

09:41  18   just a subset of very important audio features that

09:41  19   also would be contributing to the commercial success of

09:41  20   the product and not be related to the patented

09:41  21   invention.

09:41  22   Q.    Have you considered any alternative technical

09:41  23   apportionment factor?

09:41  24   A.    Yes.  So I identified -- I mean, I can

09:41  25   identify that this is overstated for the reasons I've

09:41  1    stated here, but I'm relying on Mr. Willis who you

09:41  2    heard testify yesterday.  And he looked at

09:41  3    Dr. Schaefer's technical analysis and agreed it was

09:41  4    overstated and unsubstantiated and came up with his own

09:41  5    alternative technical apportionment analysis, which I

09:41  6    think I have on the next slide.

09:41  7         And he determined that it would be appropriate

09:41  8    and still conservative to allocate 10 percent of the

09:41  9    technical contribution, or specifically 10.4 percent,

09:42  10   to the patented invention.

09:42  11        And again, this is another input into

09:42  12   Mr. Bratic's analysis that is significantly overstated.

09:42  13   If you reduce the technical contribution to closer to

09:42  14   10 percent, that's nearly a 70 percent reduction.

09:42  15   Q.   Did you see any other evidence this week that

09:42  16   supports that 10.4 percent that Mr. Willis provided?

09:42  17   A.   Yes.  So we -- again, we've talked about the

09:42  18   fact that Mr. Bratic seems to be equating the patent

09:42  19   with the ability to offer PSTN and VoIP users on the

09:42  20   same conference.  But we've seen evidence that that

09:42  21   already existed, that capability existed in other

09:42  22   products.  And we heard Dr. Schaefer agree that there

09:42  23   are other ways to achieve conferencing with VoIP and

09:42  24   PSTN users on the same call.

09:42  25   Q.   Okay.  So you've discussed many problems with

09:42  1    Mr. Bratic's calculations.  What's the impact on his

09:43  2    damages opinions if you correct these problems?

09:43  3        A.    Well, it's significant.  So if I combine all

09:43  4    three of those adjustments, I make the correction at

09:43  5    each step in his analysis, his damages number reduces

09:43  6    from $102.6 million to 5.6 to $8.6 million.

09:43  7             And now the range -- just to remind you, the

09:43  8    range of 5.6 to 8.6 is driven by the fact that I

09:43  9    calculated two different metrics of usage.  So that

09:43  10   first step when I adjust the revenues to account for

09:43  11   the usage, I do two different calculations because I

09:43  12   calculated a range of what the relative usage could

09:43  13   have been.

09:43  14       Q.    Do you think that these corrections fix all of

09:43  15   the problems with Mr. Bratic's calculations?

09:43  16       A.    No.  So I've made these corrections within his

09:43  17   framework.  I disagree with his framework as being

09:43  18   appropriate in light of the facts and the evidence in

09:43  19   the record which we'll be getting into.

09:44  20            But at a minimum, using Mr. Bratic's approach,

09:44  21   I think it's entirely appropriate and reasonable to

09:44  22   make these corrections.

09:44  23       Q.    Okay.  So let's move on to your second

09:44  24   assignment to independently evaluate Paltalk's royalty

09:44  25   damages if the jury determines that the patent is valid

09:44  1    and infringed by Cisco.

09:44  2             How did you perform this evaluation?

09:44  3        A.    And so here I've got just, you know, the

09:44  4    negotiation.  So we're sitting in January 2004.

09:44  5    Paltalk on the one side, Webex on the other side.  And

09:44  6    in my view, these four points are really the key

09:44  7    important considerations that the parties would be

09:44  8    thinking about at the hypothetical negotiation.  I

09:44  9    won't list them all here.  We're going to be going

09:44 10    through each one of those.

09:44 11        Q.    Okay.  So your first point, the limited

09:44 12    contribution of the patent.  And we've already talked a

09:44 13    bit about this, but if you can explain why this is

09:44 14    important.

09:45 15        A.    Sure.  So on the next slide, the first one

09:45 16    we've already talked about, but, again, the majority of

09:45 17    meetings and meeting minutes over the relevant time

09:45 18    period, we're using either VoIP-only or PSTN-only

09:45 19    participants.  So it would not -- the patent would not

09:45 20    be relevant for those meetings and meeting minutes, so

09:45 21    that's one point.

09:45 22             And then the next two points have to do with

09:45 23    my own analysis of what are the key demand drivers for

09:45 24    the product, and I've got slides to show you each of

09:45 25    those.

09:45  1       Q.   So what evidence have you reviewed

09:45  2  demonstrating the limited contribution of the patented

09:45  3  technology?

09:45  4       A.   So I've sought to capture some, if not

09:45  5  all -- I mean, as we heard from Mr. Barave, there are

09:45  6  many, many, many features and functionalities important

09:45  7  to customers.  We saw the video which highlighted some

09:45  8  of those.

09:45  9          But in my own independent research, these are

09:45  10  some key demand drivers.  What I mean by that, things

09:46  11  customers want when they think about purchasing Webex,

09:46  12  and they include things like brand reputation, customer

09:46  13  service, videoconferencing, compatible hardware.

09:46  14          So we talked about the collaboration,

09:46  15  different collaboration products that Webex is selling.

09:46  16  The screen-sharing capabilities, ease of use,

09:46  17  reliability, and importantly, security, this end-to-end

09:46  18  encryption concept that Mr. Barave talked about.

09:46  19       Q.   And just to clarify, what did you mean by

09:46  20  "demand drivers"?

09:46  21       A.   Yeah.  So these are things that are important

09:46  22  to customers.  So Webex, we heard Mr. Barave talk about

09:46  23  they track features.  They look at what features are

09:46  24  important to customers.

09:46  25          I've looked at my own independent research on

09:46  1   what is important to the sale of these products.  And

09:46  2   these features and functionalities and characteristics

09:46  3   of just Webex are very important to the sale of these

09:46  4   products and would need to be taken into account when

09:46  5   trying to figure out what is the contribution of the

09:47  6   patent to that commercial success.

09:47  7      Q.    Okay.  So within the Webex products suite

09:47  8   specifically, does Webex offer important features that

09:47  9   customers care about that are not claimed by the

09:47  10  patent?

09:47  11     A.    Yes.  So the next slide, we're talking about

09:47  12  Webex Audio, but within the Webex Suite of products,

09:47  13  there's many other really important features that

09:47  14  are -- that customers value and that drive demand for

09:47  15  the products, including Webex Audio.

09:47  16         And those include things like messaging,

09:47  17  calling, meetings, polling, events, whiteboarding.  And

09:47  18  all of these things happen within the Webex platform.

09:47  19  But again, these are important demand drivers and

09:47  20  important features for customers when making purchasing

09:47  21  decisions.

09:47  22     Q.    So having evaluated all the features and

09:47  23  factors that drive demand, what does that tell you

09:47  24  about the value of the '858 patent?

09:47  25     A.    It shows me that the contribution is limited.

966

09:47  1    And so, again, we're trying to isolate what is the

09:48  2    contribution of the patent to the commercial success,

09:48  3    to the profits, to the revenues, and especially in

09:48  4    Mr. Bratic's framework where he's starting with profits

09:48  5    and revenues.

09:48  6         And this shows that there are many other

09:48  7    things that are really driving success of Webex and

09:48  8    that the patent would have just a minor contribution.

09:48  9    Q.    Okay.  So going back to your third point, it

09:48  10   was about Webex and Cisco's substantial investments and

09:48  11   contributions.  Can you explain the relevance of this

09:48  12   consideration?

09:48  13   A.    Yes.  So the prior two slides were really

09:48  14   about the consumer facing, you know, the product

09:48  15   features.  There's also contributions that are

09:48  16   important that are more behind the scenes.  So Webex

09:48  17   and Cisco have spent significant resources developing

09:48  18   the products, sales and marketing efforts to promote

09:48  19   and commercialize the products, engineering to support

09:48  20   the products, implementation over time of many

09:49  21   important features that customers want.

09:49  22        And then we've heard about the Webex patent

09:49  23   portfolio.  So Webex has over 400 patents that are

09:49  24   directed to Webex Audio.  And that's also highly

09:49  25   relevant when you think about relative contribution at

967

09:49   1   the negotiation table.

09:49   2           Paltalk would be coming with one patent that

09:49   3   provides a specific way of handling calls with PSTN and

09:49   4   VoIP users, a specific way of handling audio mixing,

09:49   5   for example.  But then we have to justify that and to

09:49   6   compare that to the -- all the Webex contributions that

09:49   7   would be important to the commercial success of the

09:49   8   product.

09:49   9   Q.   Your next point here, you had mentioned that

09:49   10  Paltalk never commercialized the patented technology.

09:49   11          Why is that relevant?

09:49   12  A.   Actually, can we go back to this slide on the

09:49   13  patents?

09:49   14          Sorry, one more.  Sorry.

09:49   15  Q.   There we go.  Going back to the patents.  You

09:50   16  mentioned that Cisco has a lot of its own patents

09:50   17  related to Webex Audio.  What's the significance of

09:50   18  this?

09:50   19  A.   You've already seen this.  I won't read all of

09:50   20  this to you.  Mr. Willis talked about this.  He

09:50   21  obtained information specifically from Cisco on their

09:50   22  patent portfolio.  And he highlighted, for example,

09:50   23  that Cisco has 40 patents that relate to VoIP or PSTN,

09:50   24  for example.  You know, they have patents related to

09:50   25  scalability and patents related to mixing and

09:50  1   multiplexing.

09:50  2          So a lot of the things that Paltalk would like

09:50  3   to say that its patent is responsible for, there's

09:50  4   other patented inventions that Cisco has that relate to

09:50  5   similar features and abilities.

09:50  6   Q.    Thank you.  And I jumped the gun there.  I

09:50  7   apologize.

09:50  8          Let's now go to your point about Paltalk never

09:50  9   commercializing the patented technology.

09:50  10         What's the relevance of this consideration?

09:50  11  A.    So if you'll go to the next slide.

09:51  12         So Mr. Bratic and I disagree on this.  He says

09:51  13  this is entirely irrelevant.  We only need to focus on

09:51  14  Cisco's alleged use of the invention.  But I disagree

09:51  15  as an economist.

09:51  16         If Paltalk is sitting here today saying that

09:51  17  this patent is solely responsible for, you know, a

09:51  18  third of Webex's profits and revenues and is so

09:51  19  important that without it, Webex could not offer the

09:51  20  functionality of having VoIP and PSTN users on the same

09:51  21  call, that's just entirely inconsistent with what

09:51  22  Paltalk has actually been doing over time.

09:51  23         So Paltalk had ownership of the patent when it

09:51  24  issued in 2004.  During this period of time, we heard

09:51  25  Mr. Katz talking about its various products that it

09:51  1    either developed or was acquiring that related to video
09:51  2    chatting.  And we also heard him say that he never
09:51  3    attempted to incorporate the patented invention into
09:51  4    any of those product offerings.
09:51  5         So this just again shows that there's a
09:52  6    disconnect between the ask today of $100 million and --
09:52  7    which seems to be based on the premise that Cisco could
09:52  8    not offer this functionality without the patent, and
09:52  9    the activities that have actually happened over time
09:52  10   with respect to the patent.
09:52  11   Q.    Okay.  The next thing that you mention here
09:52  12   were relevant patent license and sale agreements.
09:52  13   Let's go to that next consideration.
09:52  14        And has Cisco entered into any relevant patent
09:52  15   license agreements?
09:52  16   A.    Yes.  And this goes back to where we started.
09:52  17   I said that there was real-world evidence that
09:52  18   Mr. Bratic just completely dismissed, and he and I
09:52  19   disagree about the relevance of this real-world
09:52  20   evidence.
09:52  21        But Cisco has entered into many license
09:52  22   agreements.  I think 10 or 12 have been produced in
09:52  23   this case.  I reviewed all of them.  All of them have
09:52  24   lump-sum royalty payments in them, so meaning a
09:52  25   one-time payment for access to the technology.

09:53  1            But in particular, I've identified one

09:53  2    agreement that is highly relevant because it covers

09:53  3    patented technologies that also relate to VoIP and PSTN

09:53  4    audio mixing on conference calls.

09:53  5        Q.    Before we take a look at that agreement, can

09:53  6    you explain to the jury why you consider Cisco's

09:53  7    license agreements?  Why are they even relevant?

09:53  8        A.    So two reasons.  So Georgia-Pacific Factor 2

09:53  9    says we need to do that.  But the economic reason for

09:53  10   that is if you think about -- if you're trying to go

09:53  11   out and think about buying any type of asset, so say

09:53  12   you're looking at buying a piece of property.  One way

09:53  13   you're going to approach that is think about what have

09:53  14   others paid for similar properties that have similar

09:53  15   characteristics.  So maybe it's in the same

09:53  16   neighborhood, has the same number of bedrooms, same

09:53  17   square footage.  And that can guide what you're willing

09:53  18   to pay and how you think about value of the house that

09:53  19   you're interested in.

09:54  20           Now, we never have a case where every house

09:54  21   is -- or rarely the exact same.  And so it's important

09:54  22   to look at are there similarities?  Are there

09:54  23   differences?  Is there anything that I need to take

09:54  24   into account in evaluating the relevance of that house

09:54  25   property for the house that I want to buy?

971

09:54    1          And so for our purposes in patent litigation,

09:54    2    that's an important consideration, is what have others,

09:54    3    including Cisco, paid for comparable technology?

09:54    4    Q.    So with that, let's take a look at the license

09:54    5    that you mentioned.

09:54    6          And can you just provide an overview of

09:54    7    Cisco's agreement with Meetrix?

09:54    8    A.    Yes.  We've heard about this agreement.  But

09:54    9    in 2019, Meetrix accused Webex Meetings of infringing

09:54    10   four patents that also related to VoIP/PSTN audio

09:54    11   mixing.

09:54    12         That license that they entered into granted

09:54    13   worldwide rights to all of Meetrix's patents, which

09:55    14   included the four asserted patents but others.  So it

09:55    15   included patents from other patent families.

09:55    16         And in exchange for that license, Cisco paid

09:55    17   Meetrix a one-time payment of $250,000.

09:55    18   Q.    So what's the relevance of this agreement?

09:55    19   A.    Well, even though it occurred later in time,

09:55    20   it's highly relevant because it was entered into by

09:55    21   Cisco, it covers comparable products, and it covers

09:55    22   similar technologies.

09:55    23         But again, it is important to take into

09:55    24   account any differences that may have existed between

09:55    25   the circumstances around this agreement and what we're

09:55  1    trying to measure, which is a hypothetical negotiation

09:55  2    for the '858 patent in 2004.

09:55  3        Q.    And so you analyzed all of the similarities

09:55  4    and differences?

09:55  5        A.    Yes.  I have many pages in my report on this,

09:55  6    but I just summarized here on this slide what those

09:55  7    are.

09:55  8            On the left-hand side, you know, it's similar

09:55  9    licensed technology.  We had -- or heard Mr. Willis

09:56  10   talk about this yesterday.  He identified on a slide

09:56  11   what the various patents were, and the patents said

09:56  12   things like PSTN and VoIP mixing.  I don't have them

09:56  13   here.

09:56  14           So it covers comparable technology.  It

09:56  15   covered comparable products because Webex Meetings was

09:56  16   accused.  And so to the extent the patents are talking

09:56  17   about VoIP and PSTN, in the context of Meetings, that

09:56  18   is also relevant here because -- and so the usage

09:56  19   situation we're talking about would also be relevant.

09:56  20           Similarly situated licensees.  It's Cisco

09:56  21   which acquired Webex.

09:56  22           And then similarly situated licensor, what I

09:56  23   mean by that, this goes back to the commercial

09:56  24   relationship.  Meetrix would not be a competitor

09:56  25   similarly to Paltalk not being a competitor with Webex

09:56  1    at our negotiation.

09:56  2        Q.    So in looking at the differences here, can

09:57  3    you -- can you go through these and explain how you

09:57  4    factored these differences?

09:57  5        A.    Yes.  So I also identified the differences,

09:57  6    and those are on the right-hand side.

09:57  7            The first one is that the Meetrix license

09:57  8    granted a much broader patent license.  So not only the

09:57  9    four asserted patents but also all other patents owned

09:57  10   by Meetrix.  And Meetrix had multiple patent families

09:57  11   and different patents that were being licensed under

09:57  12   this agreement.

09:57  13           The second difference is that, as I mentioned,

09:57  14   it occurred later in time.  And we know that the PSTN

09:57  15   usage has been declining over time.  So it's important

09:57  16   to take that into account because we need to look at

09:57  17   how the parties would have viewed a similar license to

09:57  18   that technology in 2004.

09:57  19           The next point is a minor point, but the

09:57  20   Paltalk license that we're talking about, the

09:57  21   hypothetical license, would be slightly longer than the

09:57  22   license term in the Cisco Meetrix agreement.

09:57  23           And then finally, we have to recognize that

09:58  24   the Meetrix agreement was entered into to settle

09:58  25   litigation, whereas in our negotiation, we're assuming

09:58  1    infringement and validity.

09:58  2            But in my opinion -- and this is why there's

09:58  3    not an arrow next to "settlement agreement."  In my

09:58  4    opinion, there are counterbalancing factors that would

09:58  5    outweigh any impact that might have.  And that would

09:58  6    include the fact that it was a significantly broader

09:58  7    license grant that included more important and more

09:58  8    patented technology.

09:58  9    Q.    So you mentioned that there's no mark next to

09:58  10   that settlement agreement at the bottom there.

09:58  11           Does that mean that you didn't consider it?

09:58  12   A.    No.  I absolutely considered it.  But as I

09:58  13   said, to the extent that the lack of a presumption of

09:58  14   infringement, invalidity, and the Meetrix agreement,

09:58  15   which is different from our hypothetical negotiation,

09:58  16   could have impacted what the parties agreed to accept

09:58  17   in terms of a royalty payment, that that is offset and

09:58  18   outweighed by the fact that there's a significantly

09:59  19   broader license grant that was being offered under the

09:59  20   Meetrix license.

09:59  21   Q.    So even though there are differences, is there

09:59  22   a way to account for these differences that you

09:59  23   mentioned relative to the hypothetical negotiation?

09:59  24   A.    Absolutely.  And we have to do this a lot of

09:59  25   times because as I mentioned in the house analogy, it's

975

09:59  1    really the exact same house.  So it's important to look

09:59  2    at differences and see, how can we make adjustments for

09:59  3    these differences?

09:59  4        Q.    So can you please explain your first

09:59  5    adjustment to the Meetrix payment?

09:59  6        A.    Yes.  So this timeline shows the slight

09:59  7    difference in term length between the two agreements,

09:59  8    and because these agreements -- the Meetrix agreement

09:59  9    was a one-time payment.  That means that it is

09:59  10   including the concept of extent of use.

09:59  11            So all else equal, a longer license should

09:59  12   cost more.  And so I've taken into account that the

09:59  13   Paltalk hypothetical license is slightly longer in term

09:59  14   than what was negotiated between Cisco and Meetrix.

09:59  15   And it's on -- it's about 10 percent longer.  So I take

10:00  16   that adjustment into account.

10:00  17       Q.    Did you make any other adjustments?

10:00  18       A.    Yeah.  So the next adjustment I made has to do

10:00  19   with this difference in time which I'm going to call

10:00  20   "usage adjustment."  But in 2019, as we know from the

10:00  21   testimony and the data, that the PSTN usage has been

10:00  22   declining over time.

10:00  23            And so back in 2004, that would have been

10:00  24   higher, and it would have been potentially more

10:00  25   valuable in 2004.

| | |
|---|---|
| 10:00 | 1 |
| 10:00 | 2 |
| 10:00 | 3 |
| 10:00 | 4 |
| 10:00 | 5 |
| 10:00 | 6 |
| 10:00 | 7 |
| 10:00 | 8 |
| 10:00 | 9 |
| 10:01 | 10 |

1    And so just for very conservative purposes,

2    I've assumed even if you assume all 100 percent of

3    meeting minutes in 2004 at the time of our hypothetical

4    negotiation included PSTN users and therefore would

5    implicate the technology, that results in a factor of

6    3.31, meaning that if we can adjust that payment upward

7    by 3.3 times, that would adequately take into account

8    that difference.

9    Q.    So what's the impact of these two adjustments

10    on the royalty payment?

11    A.    So just doing some simple math, if we apply

12    those two adjustments, the $250,000 payment made by

13    Cisco in 2019 would more appropriately be a payment of

14    $912,000 for similar technology back in 2004, so close

15    to $1 million.

16    Q.    Is it your opinion that this adjusted royalty

17    payment would be a relevant data point that the parties

18    would consider at the hypothetical negotiation?

19    A.    Absolutely.  This is a license that Cisco's

20    entered into for similar technology, covering similar

21    functionalities, and with an entity that's similarly

22    situated to Paltalk.  And even though it occurred later

23    in time, we can make adjustments for that.  And in my

24    view, it's absolutely a relevant consideration.

25    Q.    Thank you.

977

| | |
|---|---|
| 10:01 | 1 |
| 10:01 | 2 |
| 10:02 | 3 |
| 10:02 | 4 |
| 10:02 | 5 |
| 10:02 | 6 |
| 10:02 | 7 |
| 10:02 | 8 |
| 10:02 | 9 |
| 10:02 | 10 |
| 10:02 | 11 |
| 10:02 | 12 |
| 10:02 | 13 |
| 10:02 | 14 |
| 10:02 | 15 |
| 10:02 | 16 |
| 10:02 | 17 |
| 10:02 | 18 |
| 10:02 | 19 |
| 10:02 | 20 |
| 10:02 | 21 |
| 10:03 | 22 |
| 10:03 | 23 |
| 10:03 | 24 |
| 10:03 | 25 |

Did you consider any other agreements to be relevant in your analysis?

A.    Yes.  So there's one additional agreement. We've heard about this agreement.  It has to do with Paltalk's acquisition of the HearMe or certain HearMe assets at the end of 2001.

And so just to remind you, Paltalk purchased certain HearMe assets, including numerous patents and patent applications, one of which ultimately issued as the '858 patent that we are talking about today.

In addition, it acquired other things like trademarks and equipment.  I think we heard Mr. Katz testify that the principal rationale for that acquisition was the patents and patent applications.

And in exchange for that, what he called fire sale -- and we'll get into that -- he paid -- or Paltalk paid $145,000.

Q.    Why is this relevant?

A.    Well, it's relevant because it covers the technology that ultimately issued as the patent, and it's relevant because of the timing of it.

So this is just roughly two years before the hypothetical negotiation, and so the parties would know that Paltalk had acquired that technology for $145,000 and then would be asking Cisco for over $100 million to

10:03  1    have a nonexclusive license to that technology.

10:03  2            And we'll get into, again, the similarities

10:03  3    and differences that are important to take into

10:03  4    account.

10:03  5        Q.   Great.  So let's talk a little bit about that.

10:03  6            Can you explain your analysis to the jury?

10:03  7        A.   Yes.  So again, the similarities are that this

10:03  8    acquisition included the application that became the

10:03  9    '858 patent.  We know Mr. Katz said that the focus of

10:03  10   the acquisition was the patented technology, all

10:03  11   patented technology in that acquisition.

10:03  12           And then, again, it was close in time to the

10:03  13   hypothetical negotiation.  So it would be highly

10:03  14   relevant.

10:03  15           Now, the key differences on the right-hand

10:03  16   side of the screen, it included broader things.  So it

10:03  17   included software, other patents and intellectual

10:04  18   property and equipment.  It also was an agreement for

10:04  19   an asset purchase, not a nonexclusive license.

10:04  20           And so all else equal, owning a patent, which

10:04  21   gives you the right to monetize it across the whole

10:04  22   industry, is more valuable than a nonexclusive license

10:04  23   which gives you the right to only monetize it for your

10:04  24   own products.

10:04  25           The next two are -- have the red arrows.  And

979

| 10:04 | 1 | we've heard about these, but at the time of the |
| 10:04 | 2 | acquisition, the '858 patent hadn't yet issued.  So it |
| 10:04 | 3 | was a pending application. |
| 10:04 | 4 | And I agree with Mr. Bratic and Mr. Katz. |
| 10:04 | 5 | There would be some risk at that point in time that the |
| 10:04 | 6 | patent might not issue, but we can adjust for that. |
| 10:04 | 7 | And then this second -- or second red arrow |
| 10:04 | 8 | has to do with that at the time of the valuation of |
| 10:04 | 9 | $145,000, Mr. Katz referred to that as a fire sale. |
| 10:04 | 10 | And that it was -- "it" being HearMe, was a financially |
| 10:04 | 11 | distressed entity, and so that valuation would have |
| 10:05 | 12 | been discounted by those business considerations. |
| 10:05 | 13 | Which I don't disagree with, but again, there are ways |
| 10:05 | 14 | we can adjust for that. |
| 10:05 | 15 | Q.   And were you able to account for those |
| 10:05 | 16 | differences that you mentioned relative to the |
| 10:05 | 17 | hypothetical negotiation? |
| 10:05 | 18 | A.   Absolutely.  So rather than just dismissing |
| 10:05 | 19 | this data point, I did research -- and I think I have a |
| 10:05 | 20 | slide showing you what I did -- but I made two |
| 10:05 | 21 | adjustments to account for those two factors with |
| 10:05 | 22 | downward arrows. |
| 10:05 | 23 | The first is I looked at data from the U.S. |
| 10:05 | 24 | Patent and Trademark Office.  And we could observe in |
| 10:05 | 25 | 2004 that there -- I looked at patent issuances |

10:05  1    compared to patent applications filed.  And

10:05  2    44.5 percent of patent applications filed became

10:05  3    patents.  So I can make an adjustment based on

10:05  4    real-world data as to what that risk factor might have

10:05  5    been.

10:05  6          The second adjustment I made has to do with a

10:05  7    discount for the fact that the assets were being sold

10:06  8    by a financially distressed entity.  It just so happens

10:06  9    we heard about the dot-com burst.  There was a lot of

10:06  10   academic literature and studies that were performed

10:06  11   after that to measure just this question.  So what

10:06  12   types of discounts were applied as companies like

10:06  13   HearMe were having to get rid of, liquidate assets?

10:06  14         And I looked at a wide range of studies, and I

10:06  15   picked the upper-bound discount that was found in those

10:06  16   studies.  And so up to -- the discount applied would be

10:06  17   up to 76.7 percent.  And there were lower discounts,

10:06  18   but I used the highest one, which is conservative.

10:06  19   Q.    Did Mr. Bratic attempt to make any adjustments

10:06  20   to consider this agreement that happened two years

10:06  21   prior?

10:06  22   A.    No.  He dismissed it entirely and said that

10:06  23   it's just not relevant.

10:06  24   Q.    So specifically which -- what adjustments did

10:06  25   you make?

10:06    1      A.    So if you do the math, based on those two

10:06    2  factors that I calculated, it turns out that the

10:07    3  acquisition price once you adjust it upward for any

10:07    4  discount due to risk of it not being issued, and then

10:07    5  you do another adjustment to adjust upward for any

10:07    6  discount that could have applied due to the fact that

10:07    7  it was a distressed asset, I get to an adjusted royalty

10:07    8  payment of $1.4 million.

10:07    9          And if you'll just recall, Mr. Katz'

10:07   10  testimony, if I understood it correctly, was that

10:07   11  HearMe was seeking a seven-figure amount.  Paltalk was

10:07   12  unwilling to pay that seven-figure amount, and then

10:07   13  later in time when the fire sale occurred, HearMe was

10:07   14  willing to accept the much lower amount of $145,000.

10:07   15          And I would just express that this

10:07   16  $1.4 million adjusted amount is a seven-figure dollar

10:07   17  amount.  So a seven-figure dollar amount is anything,

10:07   18  you know, $10 million or less.

10:08   19      Q.    So what's the implication of this data point

10:08   20  for your -- for the hypothetical negotiation in your

10:08   21  opinion?

10:08   22      A.    So again, I think it's highly relevant.  These

10:08   23  are real-world facts which are relevant to the

10:08   24  hypothetical negotiation.  And so sitting at the table

10:08   25  in 2004, the parties would know that this acquisition

10:08   1    had occurred, and the payment that had been made, they

10:08   2    would know the circumstances under which the payment

10:08   3    was made and seek to make adjustments, appropriate and

10:08   4    reasonable adjustments to that.  And in my view, that

10:08   5    results in an adjusted payment of $1.4 million.

10:08   6         Q.    Thank you.

10:08   7               So now I'm going to back up to your -- the

10:08   8    next and final real-world facts that you claim that

10:08   9    Mr. Bratic ignored.  And that is the acceptable,

10:08   10   available noninfringing alternatives.

10:08   11              Can you explain what this relates to?

10:08   12        A.    Yes.  So noninfringing alternatives are, from

10:08   13   an economic perspective, if you're thinking about any

10:08   14   prudent business sitting down to negotiate a patent

10:09   15   license and being asked to pay a certain amount to use

10:09   16   a patented invention.

10:09   17              One thing that's going to inform your

10:09   18   willingness to pay that is what other options do I

10:09   19   have?  Is there another way that I can do the same

10:09   20   thing or something similar that's not going to impact

10:09   21   my business.

10:09   22              It's not going to impact my profitability or

10:09   23   demand for my product.  And if that exists, that will

10:09   24   limit the amount you're willing to pay for the

10:09   25   technology.

| | | |
|---|---|---|
| 10:09 | 1 | And so in this instance, with Paltalk wanting |
| 10:09 | 2 | $100 million and Cisco knowing that there are other |
| 10:09 | 3 | ways to have VoIP and PSTN callers on the same |
| 10:09 | 4 | conference and not have any material impact to the user |
| 10:09 | 5 | experience, that would absolutely be relevant to how |
| 10:09 | 6 | they would think about valuing a license to the patent. |
| 10:09 | 7 | And we heard Mr. Willis discuss what these two |
| 10:09 | 8 | noninfringing alternatives are. |
| 10:09 | 9 | I can -- I don't know if you have a question |
| 10:09 | 10 | or I can read that -- |
| 10:10 | 11 | Q.   I was going to -- yeah.  If you can explain |
| 10:10 | 12 | the two noninfringing alternatives that Mr. Willis |
| 10:10 | 13 | provided. |
| 10:10 | 14 | A.   Yes.  So these are similar to what you heard |
| 10:10 | 15 | yesterday.  The first would be sending only the loudest |
| 10:10 | 16 | user's audio stream when multiple participants are |
| 10:10 | 17 | speaking at once, and the second would be sending a |
| 10:10 | 18 | mixed audio to all devices instead of only those |
| 10:10 | 19 | devices that can't mix. |
| 10:10 | 20 | And I think we heard Mr. Willis agree that at |
| 10:10 | 21 | least with respect to the second alternative, you still |
| 10:10 | 22 | could have people talking at the same time.  And so the |
| 10:10 | 23 | point is that the functionality would be largely the |
| 10:10 | 24 | same, that this would be easy to implement.  He |
| 10:10 | 25 | quantified, you know, the amount of engineering hours |

984

10:10  1  that it would take, and that these were available back

10:10  2  in 2004.

10:10  3          And so this is highly relevant, again, to how

10:10  4  the parties would think about valuing the contribution

10:10  5  of the patent to the Webex Audio platform.

10:10  6  Q.    And so again, what's the significance of the

10:11  7  noninfringing alternatives in -- when the parties are

10:11  8  sitting at the table?

10:11  9  A.    Well, I think this is actually really

10:11  10  significant in the context of Mr. Bratic's analysis.

10:11  11  So going back to where we started, Mr. Bratic is

10:11  12  valuing the ability to have PSTN and VoIP users on the

10:11  13  same call, and this shows you that that is not what the

10:11  14  invention is.  The invention is a specific way of doing

10:11  15  that.

10:11  16          And so the fact that we have alternative ways

10:11  17  of achieving the same thing shows you that he's

10:11  18  measured the wrong thing, and his royalty damages

10:11  19  numbers are just way too high.

10:11  20  Q.    Okay.  Ms. Kindler, we've gone through a lot.

10:11  21  Can you please summarize for the jury your opinion as

10:11  22  to what the outcome of the hypothetical negotiation

10:11  23  would be between Webex and Paltalk?

10:11  24  A.    Yes.  So based on all of the evidence that

10:11  25  we've been talking about and some of which you've seen

985

| | | |
|---|---|---|
| 10:11 | 1 | already here at trial, it's my view that the parties |
| 10:11 | 2 | would sit down and consider all the real-world |
| 10:12 | 3 | evidence, and that a reasonable royalty amount in the |
| 10:12 | 4 | amount of 1 to $1.5 million would adequately compensate |
| 10:12 | 5 | Paltalk for the alleged use of the '858 patent. |
| 10:12 | 6 | Q.    And in your opinion, is Mr. Bratic's royalty |
| 10:12 | 7 | reasonable? |
| 10:12 | 8 | A.    No.  Not at all.  And again, because I think |
| 10:12 | 9 | he's measured the wrong thing.  But his amount of |
| 10:12 | 10 | $102.6 million, you can see it's significantly greater |
| 10:12 | 11 | than the adjusted amount.  So once you correct for the |
| 10:12 | 12 | specific inputs he's using at each step, we get a |
| 10:12 | 13 | number of 5.6 to $8.6 million within his framework. |
| 10:12 | 14 | But then separately the real-world evidence, |
| 10:12 | 15 | which I think is highly relevant, would indicate that a |
| 10:12 | 16 | range of between 1 and $1.5 million would be more |
| 10:12 | 17 | reasonable and appropriate. |
| 10:12 | 18 | MS. EDLIN:  Thank you very much, |
| 10:12 | 19 | Ms. Kindler. |
| 10:12 | 20 | Cisco passes the witness. |
| 10:12 | 21 | CROSS-EXAMINATION |
| 10:12 | 22 | BY MS. SRINIVASAN: |
| 10:13 | 23 | Q.    Good morning, Ms. Kindler. |
| 10:13 | 24 | A.    Good morning. |
| 10:13 | 25 | Q.    My name's Kalpana Srinivasan.  We have not had |

10:13  1    the opportunity to meet before, correct?

10:13  2        A.    Correct.  Nice to meet you.

10:13  3        Q.    Nice to meet you as well.

10:13  4              I want to start by talking about the Cisco

10:13  5    patents because you showed the jury a stack of patents.

10:13  6    You showed them a breakdown of patents.  I want to talk

10:13  7    about what their role is in this case and in your

10:13  8    analysis.

10:13  9              You agree that Mr. Willis and Mr. Bress are

10:13  10   the technical experts that Cisco has brought in this

10:13  11   case?

10:13  12       A.    Yes.

10:13  13       Q.    That's not your role to do --

10:13  14       A.    I --

10:13  15       Q.    -- pardon me -- to do any kind of technical

10:13  16   analysis?

10:13  17       A.    Absolutely not.  Yes.

10:13  18       Q.    Okay.  Mr. Willis -- and he testified that

10:13  19   patents can have different values.  You heard his

10:13  20   testimony when you were in court here yesterday?

10:13  21       A.    I did.

10:13  22             MS. SRINIVASAN:  And, Mr. Boles, can you

10:13  23   bring that up for us?

10:14  24   BY MS. SRINIVASAN:

10:14  25       Q.    Mr. Willis was asked:

—987—

10:14  1        You would agree with me that different

10:14  2  patents, well, one could be much more valuable than

10:14  3  others, correct?

10:14  4        Yes, sir.

10:14  5        And you don't disagree with Mr. Willis'

10:14  6  testimony here, do you?

10:14  7     A.    No.  I agree with that concept as well.

10:14  8     Q.    And I want to pull up your Slide 29, if we

10:14  9  can.

10:14  10       MS. SRINIVASAN:  Are we able to do that?

10:14  11  BY MS. SRINIVASAN:

10:14  12     Q.    This is the slide that you showed the jury

10:14  13  about what you described as the Webex Audio-related

10:14  14  patents.

10:14  15       Did any of Cisco's technical experts tell you

10:14  16  that any of these patents are comparable to the

10:14  17  teachings of the '858 Paltalk patent?

10:14  18     A.    No.  And I did not ask that question.

10:14  19     Q.    You didn't think that you should know whether

10:14  20  any of Cisco's patents do what is in the Paltalk

10:15  21  patent?

10:15  22     A.    That's a different question.  I'm sorry.

10:15  23  Comparable was I thought the first question.

10:15  24     Q.    Did you think it was important to know whether

10:15  25  there was any Cisco patent in these hundreds and

988

```
10:15   1   hundreds of patents that you've identified that do
10:15   2   something that is comparable to what is in the
10:15   3   '858 patent?
10:15   4       A.   So again, comparable, no, and I'm happy to
10:15   5   explain why.
10:15   6       Q.   No.  My question was just whether you had
10:15   7   asked that question of their experts.
10:15   8       A.   No.  Comparable I don't believe is relevant.
10:15   9       Q.   Did you ask them whether any of those patents
10:15  10   teach what is in the '858 patent?
10:15  11       A.   Again, I wouldn't think that's relevant under
10:15  12   the Georgia-Pacific factors.
10:15  13       Q.   Ms. Kindler, you've been here for the entirety
10:15  14   of trial, correct?
10:15  15       A.   Yes.
10:15  16       Q.   You haven't heard one Cisco witness, whether a
10:15  17   fact witness or an expert witness, suggest that one of
10:15  18   Cisco's patents does what is in the '858 patent,
10:15  19   correct?
10:15  20       A.   No.  And that was not my intention to state
10:16  21   that.  No.
10:16  22       Q.   But you did want to show that there were all
10:16  23   these Webex patents that are out there?
10:16  24       A.   Yes.  For innovation and technical
10:16  25   contribution, yes.
```

989

10:16   1          Q.    But not to suggest that they do something that
10:16   2    is in the Paltalk patent, correct?  You're not making
10:16   3    that suggestion to the jury?
10:16   4          A.    No.  I never said that.
10:16   5          Q.    And, in fact, we heard from Mr. Willis that he
10:16   6    didn't even review all of these patents for the
10:16   7    purposes of his analysis for this case.
10:16   8                You heard that testimony yesterday, did you
10:16   9    not, Ms. Kindler?
10:16  10          A.    Yes.
10:16  11                MS. SRINIVASAN:  And, Mr. Boles, can we
10:16  12    bring that up?
10:16  13    BY MS. SRINIVASAN:
10:16  14          Q.    Mr. Willis was asked:  The 420 patents that
10:16  15    you discussed and the subcategories listed on your
10:16  16    slide that you showed earlier, you didn't look at those
10:16  17    patents, did you?
10:16  18                Not all of them, sir.
10:16  19                That was told to you by someone at Cisco,
10:16  20    correct?
10:16  21                That's correct.
10:16  22                Those subcategories, that's the same thing
10:16  23    that you have on your slide today, correct,
10:16  24    Ms. Kindler?
10:16  25          A.    It is.  Yes.

990

```
10:17   1        Q.    And you know that the technical experts in

10:17   2    this case didn't even look at all of those patents

10:17   3    before they gave you those categories?

10:17   4        A.    Yes.  I don't think that's relevant for how I

10:17   5    used them.  But yes.

10:17   6        Q.    Well, my question to you was:  Did they do it

10:17   7    or not?

10:17   8        A.    My understanding is no.

10:17   9        Q.    Now, I think you said this, but you can't come

10:17   10   up here and say that any of those patents predate the

10:17   11   '858 patent, right?

10:17   12       A.    No.  I have not looked at that, nor have I

10:17   13   said that.

10:17   14       Q.    You don't have any knowledge about the

10:17   15   priority dates for those patents, the dates when they

10:17   16   were filed?

10:17   17       A.    That's correct.

10:17   18       Q.    And you were here for the testimony yesterday

10:17   19   of Mr. Bress, the invalidity expert for Cisco, correct?

10:17   20       A.    Yes.

10:17   21       Q.    And his job is to say whether there is

10:17   22   something that came before the Paltalk patent that

10:17   23   shows what is in the Paltalk patent, correct?

10:17   24       A.    That's my understanding.  Yes.

10:17   25       Q.    And Mr. Bress did not talk about any Cisco
```

991

10:17  1    patent or Webex patents or Webex systems during his

10:18  2    testimony, correct?

10:18  3        A.    That's correct.

10:18  4        Q.    So we didn't talk about any Cisco patents

10:18  5    being comparable to the Paltalk patent.  Instead, you

10:18  6    told us that there's a license agreement for other

10:18  7    patents that is relevant to damages.

10:18  8              Is that a fair way to describe your reliance

10:18  9    on the Meetrix license?

10:18  10       A.    Yes.  Under Georgia-Pacific Factor 2.

10:18  11       Q.    All right.  All right.

10:18  12             MS. SRINIVASAN:  And I'd like to pull up

10:18  13   the Meetrix license agreement.

       14   BY MS. SRINIVASAN:

10:18  15       Q.    You spent some time talking about that today.

10:18  16   And you said:  This license agreement between Cisco and

10:18  17   some other company for some other company's patents is

10:18  18   very, very relevant to your damages analysis.  Is that

10:18  19   fair?

10:18  20       A.    Yes, in my opinion.

10:18  21       Q.    This license agreement was the results of

10:18  22   litigation; it was the settlement agreement, correct?

10:18  23       A.    Yes.

10:18  24       Q.    And I just wanted to clarify.  I think your

10:19  25   testimony, you said that there were many license

992

10:19   1   agreements, but this one you thought was highly

10:19   2   relevant.

10:19   3          But in fact, this is the only agreement that

10:19   4   you found to be comparable for your purposes, correct?

10:19   5      A.   Yes.  Because of the technical comparability.

10:19   6   That's right.

10:19   7      Q.   And this license agreement, it was negotiated

10:19   8   before there had been any finding or determination

10:19   9   whether the patents were valid or infringed, right?

10:19  10      A.   That's correct.

10:19  11      Q.   You said there were four patents from Meetrix,

10:19  12   Meetrix's patents.

10:19  13          What were the dates of those patents?  What

10:19  14   were the -- what is the earliest date that one of those

10:19  15   patents was on file?

10:19  16      A.   I don't recall.  I used the complaint date as

10:19  17   the start date of the term adjustment, and it would

10:19  18   obviously predate that.  But I don't recall.

10:19  19      Q.   You don't know the date -- the patents that

10:19  20   are the subject of this license agreement, you don't

10:19  21   know what dates they are from?

10:19  22      A.   When you say "from," you mean filed?

10:20  23      Q.   Well, let me restate that.

10:20  24          You don't know the dates on which the patents

10:20  25   that are the subjects of this agreement, when they were

10:20  1    filed with the Patent Office?

10:20  2        A.    It wouldn't be relevant to my analysis.  No.

10:20  3        Q.    You don't think it's relevant to know whether

10:20  4    the Meetrix patent came many, many years after the

10:20  5    Paltalk patent?

10:20  6        A.    Not for the purposes of my analysis.  I took

10:20  7    into account the time adjustment, but that sounds more

10:20  8    like an invalidity argument, which I'm not making.

10:20  9        Q.    Ms. --

10:20  10       A.    If I'm understanding.  Sorry.

10:20  11       Q.    Ms. Kindler, let me try to ask it another way.

10:20  12             I did look at the dates that these patents

10:20  13   were filed from the Meetrix agreement.  The very first

10:20  14   one was filed in 2009, nine years after the Paltalk

10:20  15   agreement.

10:20  16             Wouldn't that be something that would be

10:20  17   relevant to your analysis, that the patent -- the

10:20  18   Paltalk patent was issued -- was filed nine years

10:20  19   before any patent that is the subject of this license

10:20  20   agreement?

10:20  21       A.    No.

10:21  22       Q.    Do you know when the first of the Meetrix

10:21  23   patents was issued, not filed, but issued?

10:21  24       A.    Similarly, it would be before the complaint,

10:21  25   but I didn't look at the dates, and again, it wouldn't

994

10:21   1    be relevant.

10:21   2        Q.   When was the complaint filed, Ms. Kindler?

10:21   3        A.   I'd have to look at my timeline.  I don't have

10:21   4    it in front of me.

10:21   5        Q.   All right.  2018, I believe, is what you had

10:21   6    in there.  Does that sound about right?

10:21   7        A.   That sounds right.

10:21   8        Q.   Okay.  So the complaint, the litigation around

10:21   9    this license between Meetrix and Cisco, that was filed

10:21  10    in 2018.

10:21  11             Would you have any reason to dispute that the

10:21  12    issued patent -- the first issued patent at issue in

10:21  13    this litigation was in 2012?

10:21  14        A.   "This litigation" being Meetrix.

10:21  15        Q.   Yeah.  Let me clarify my question because

10:21  16    that's important.

10:21  17             You don't have any reason to dispute that the

10:21  18    first patent that was issued in the fight between

10:21  19    Meetrix and Cisco and their lawsuit was in 2012?

10:21  20        A.   No.  And again, I don't think that's relevant

10:21  21    for my analysis.

10:21  22        Q.   You don't think it's relevant that that patent

10:21  23    was in 2012 but that Paltalk's patent was issued eight

10:22  24    years earlier in 2004?

10:22  25        A.   No.  What's relevant is that they're

995

10:22   1    comparable patented technologies.

10:22   2        Q.    You didn't take into account the fact that

10:22   3    these Meetrix patents that are the subject of this

10:22   4    license came years after the Paltalk license, correct?

10:22   5        A.    You said "license."  I'm sorry.

10:22   6        Q.    Let me restate my question.

10:22   7              You didn't take into account that the Meetrix

10:22   8    patents that are the subject of this license agreement

10:22   9    in DX-308, on which you based a substantial part of

10:22   10   your analysis, that they came eight years after the

10:22   11   Paltalk '858 patent issued.

10:22   12             You did not think that was important to

10:22   13   consider; is that fair?

10:22   14       A.    That's right.  No.

10:22   15             MS. SRINIVASAN:  If we can look at

10:22   16   Section 9.1.

        17   BY MS. SRINIVASAN:

10:22   18       Q.    And again, this is a settlement agreement.  So

10:22   19   the parties were in a lawsuit, and they resolved it.

10:22   20             That's the source of this Meetrix/Cisco

10:22   21   agreement, correct?

10:22   22       A.    That's correct.

10:22   23       Q.    And in Section 9.1, it says:  In neither the

10:23   24   negotiation, execution, nor performance of this

10:23   25   agreement, nor anything contained herein, constitutes

10:23  1    an admission by Cisco, its affiliates or authorized

10:23  2    third parties of liability, infringement, or validity

10:23  3    of the licensed patents.

10:23  4           And would you agree with me that this is a

10:23  5    statement that nobody's saying the patents are valid or

10:23  6    infringed?

10:23  7    A.    Absolutely.  And we see this type of statement

10:23  8    a lot.  But yes.  And I took that into account.

10:23  9    Q.    How big a company was Meetrix when they did

10:23  10   this settlement agreement?

10:23  11   A.    I don't know size of the company.  I think

10:23  12   they were private.  But they had many patents and

10:23  13   patent families.

10:23  14   Q.    Do you know anything about how many employees

10:23  15   they have?

10:23  16   A.    No.  But as I said, they -- in my view, they

10:23  17   were similarly situated to Paltalk.

10:23  18   Q.    My question to you was a little different.

10:23  19          Do you know how many employees Meetrix had at

10:23  20   the time they did this license agreement?

10:23  21   A.    No.

10:23  22   Q.    Do you know how many customers Meetrix had at

10:24  23   the time that it did this license agreement with Cisco?

10:24  24   A.    No.

10:24  25   Q.    What was the status of the case, this lawsuit,

997

10:24    1    between Meetrix and Cisco at the time this license

10:24    2    agreement was done?

10:24    3         A.    I mean, the lawsuit had been filed, and I

10:24    4    don't know where they were with respect to motion

10:24    5    practice. And then the settlement was entered into to

10:24    6    resolve those disputes and resulted in a broader

10:24    7    license grant beyond what was asserted in that case.

10:24    8         Q.    You said you didn't know the status of any

10:24    9    motions or disputes that were going on in the case.

10:24   10         Did you do anything to try to find out, you

10:24   11    know, was the case going well? Were the patents deemed

10:24   12    to be valid in the litigation? You didn't do anything

10:24   13    to evaluate that; is that fair?

10:24   14         A.    I'm not aware of anything that was happening

10:24   15    during the litigation that would be problematic.

10:24   16         Q.    Did you ask Cisco for that information?

10:24   17         A.    No. I think I did my -- me and my team did

10:25   18    own independent research on that.

10:25   19         Q.    Well, Cisco was a party to the litigation.

10:25   20    They could have told you what was happening in the

10:25   21    litigation, what happened in the litigation before the

10:25   22    settlement agreement.

10:25   23         Did you ask them the question?

10:25   24         A.    I didn't talk to anyone at Cisco about the

10:25   25    agreement. I think there was testimony in the record

998

10:25  1  around licensing, and I did review that.  But sitting

10:25  2  here today, I don't recall the details of that.

10:25  3      Q.    You relied on Mr. Willis, Cisco's expert, to

10:25  4  say that the patents in the Meetrix agreement --

10:25  5  Meetrix's patents are similar to Paltalk's patents; is

10:25  6  that fair?

10:25  7      A.    I would restate it as I think the focus was on

10:25  8  the asserted patents and that they were technically

10:25  9  comparable, is how I would rephrase that.

10:25  10     Q.    And I'll accept that rephrase.

10:25  11          Let me put it to you this way:  You relied on

10:25  12  Mr. Willis for an evaluation of whether the patents

10:25  13  that were asserted by Meetrix were technically

10:25  14  comparable to the '858 Paltalk patent; is that fair?

10:25  15     A.    Yes.  In addition to my own review, as I cite

10:26  16  in my report, of what the allegations in the complaint

10:26  17  were, which are similar to the allegations here, and

10:26  18  what the names of the patents are.  But beyond that, in

10:26  19  terms of diving into the details of the patents,

10:26  20  absolutely.

10:26  21     Q.    And you had a conversation with Mr. Willis

10:26  22  about it?

10:26  23     A.    Yes.

10:26  24     Q.    Did Mr. Willis tell you that he was an expert

10:26  25  in the Meetrix lawsuit?

999

10:26  1      A.    I didn't ask him that.  I don't recall if he

10:26  2  volunteered that or not.

10:26  3              MS. SRINIVASAN:  Mr. Willis (sic), could

10:26  4  you bring up Mr. Willis' CV, his resume?

       5  BY MS. SRINIVASAN:

10:26  6      Q.    You were here for Mr. Willis' testimony

10:26  7  yesterday, Ms. Kindler?

10:26  8      A.    Yes.

10:26  9      Q.    And he indicated that he had done prior work

10:26  10  in other lawsuits for Cisco.  You heard that?

10:26  11      A.    Correct.

10:26  12      Q.    And one of those lawsuits is -- you can see on

10:26  13  his own resume -- was for the very case that gave rise

10:26  14  to the license agreement that you're relying on,

10:27  15  Meetrix v. Cisco.

10:27  16              Do you see that in his resume?

10:27  17      A.    I do, which means he had good information

10:27  18  about it, but yes.

10:27  19      Q.    Did you ask him anything about the case when

10:27  20  you talked to him?

10:27  21      A.    No.  It didn't come up.  I was focused on the

10:27  22  comparability analysis.

10:27  23      Q.    You didn't ask Mr. Willis whether or not he

10:27  24  thought the patents in that case were invalid?

10:27  25      A.    No.

-1000-

```
10:27   1        Q.    You didn't ask him whether he thought the
10:27   2   patents in that case were infringed?
10:27   3        A.    We did not discuss that.  We discussed the
10:27   4   technological comparison among the asserted patent
10:27   5   here.
10:27   6        Q.    Because you didn't know he was even an expert
10:27   7   in that case?
10:27   8        A.    It did not come up.  No.
10:27   9        Q.    And Cisco didn't tell you that Mr. Willis had
10:27  10   been an expert for them in that very case that you were
10:27  11   relying on?
10:27  12        A.    Not that I recall.  But again, this work was
10:27  13   done, I think, a couple of years ago, but not that I
10:27  14   recall.
10:27  15        Q.    Did Mr. Willis tell you whether he thought
10:27  16   that $250,000 was a fair value for the license
10:28  17   agreement that you're relying on?
10:28  18        A.    That seems outside the scope of a technical
10:28  19   expert.  He did not say that, but I wouldn't expect him
10:28  20   to.
10:28  21        Q.    Now, you were here yesterday when Mr. Willis
10:28  22   was asked about sort of his history of work in lawsuits
10:28  23   defending patents.
10:28  24              You heard that, right?
10:28  25        A.    And he talked about defending plaintiffs, but
```

—1001—

10:28  1    yes.

10:28  2                 MS. SRINIVASAN:  Well, Mr. Boles, could

10:28  3    you bring up Mr. Willis' statement on his Softarmor

10:28  4    Systems page?

10:28  5    BY MS. SRINIVASAN:

10:28  6    Q.   He said that his firm has operated almost full

10:28  7    capacity primarily providing technical consulting

10:28  8    services to attorneys engaged in patent defense cases

10:28  9    related to Voice over IP.

10:28  10                MS. SRINIVASAN:  And then the next one,

10:28  11   Mr. Boles.  Thank you.

10:28  12   BY MS. SRINIVASAN:

10:28  13   Q.   And his mission was the development of

10:28  14   defensive intellectual property in the invalidation of

10:28  15   intellectual property used offensively.

10:29  16        In the Meetrix case, Meetrix was bringing a

10:29  17   lawsuit on their patents.  And you agree with that?

10:29  18   A.   Yes.

10:29  19   Q.   And Mr. Willis was an expert who was involved

10:29  20   in the -- seeking the invalidation of the intellectual

10:29  21   property of Meetrix?

10:29  22   A.   I don't know what his role, if it was

10:29  23   technical, noninfringement, or if it was validity.  I

10:29  24   don't know that.

10:29  25   Q.   And you don't know because he didn't tell you,

-1002-

10:29    1    Cisco didn't tell you, and you didn't have the

10:29    2    opportunity to ask him; is that fair?

10:29    3        A.    I would say I was focused on the comparability

10:29    4    analysis.

10:29    5        Q.    You don't think it would have been relevant to

10:29    6    hear from the expert in the Meetrix litigation about

10:29    7    whether those patents had value or not?

10:29    8        A.    I think that's what I did hear from him is

10:29    9    what the technological contribution of the patents are

10:29    10   compared to the '858 patent.

10:29    11       Q.    But you know that what happens in litigation

10:29    12   can affect the value of a patent?

10:29    13       A.    It depends, but I don't think that we know

10:30    14   that here.  My point is that it's technologically

10:30    15   comparable.

10:30    16       Q.    We don't know that here because the question

10:30    17   was not asked.  And you had an expert available to you

10:30    18   who did know what was happening in that litigation.

10:30    19   You didn't speak to Mr. Willis about the Meetrix

10:30    20   litigation where he was an expert, correct?

10:30    21       A.    We did not talk about that topic.

10:30    22       Q.    I'd like to talk about the features that you

10:30    23   discussed of the Webex Audio product.  You,

10:30    24   Ms. Kindler, haven't independently researched the audio

10:30    25   features that may be unrelated to the accused

1003

| | | |
|---|---|---|
| 10:30 | 1 | functionality? |
| 10:30 | 2 | A.   I disagree with that.  I have a whole section |
| 10:30 | 3 | in my report about that. |
| 10:30 | 4 | Q.   Ms. Kindler, I don't know if you have a copy |
| 10:31 | 5 | of your deposition up there, but... |
| 10:31 | 6 | MS. SRINIVASAN:  Your Honor, may I |
| 10:31 | 7 | approach? |
| 10:31 | 8 | THE COURT:  Yes, ma'am. |
| 10:31 | 9 | BY MS. SRINIVASAN: |
| 10:31 | 10 | Q.   And, Ms. Kindler, if I can point you to |
| 10:31 | 11 | Page 18, Line 21 of your first deposition dated |
| 10:31 | 12 | November 15th, 2022. |
| 10:32 | 13 | A.   I'm sorry.  What page? |
| 10:32 | 14 | Q.   I apologize.  That's in the second deposition |
| 10:32 | 15 | that you took dated October 28th, 2023.  And it is |
| 10:32 | 16 | Page 18, beginning at Line 21. |
| 10:32 | 17 | Are you with me there, Ms. Kindler? |
| 10:32 | 18 | A.   I am. |
| 10:32 | 19 | Q.   And you were asked in that deposition and you |
| 10:33 | 20 | had -- |
| 10:33 | 21 | MS. EDLIN:  Objection.  Sorry, |
| 10:33 | 22 | Your Honor.  This is improper impeachment. |
| 10:33 | 23 | MS. SRINIVASAN:  It's the same question |
| 10:33 | 24 | and a different answer, Your Honor. |
| 10:33 | 25 | THE COURT:  I don't understand the |

1004

| | | |
|---|---|---|
| 10:33 | 1 | objection. |
| 10:33 | 2 | MS. EDLIN:  Sorry. |
| 10:33 | 3 | Ms. Kindler, the answer is not the same. |
| 10:33 | 4 | Well, she's -- qualifies her answer in the deposition, |
| 10:33 | 5 | which is consistent with her answer in the testimony |
| 10:33 | 6 | right now. |
| 10:33 | 7 | THE COURT:  I think the jury can hear the |
| 10:33 | 8 | question and answer from the deposition and evaluate |
| 10:33 | 9 | for themselves.  I'll overrule the objection. |
| 10:33 | 10 | MS. SRINIVASAN:  Thank you, Your Honor. |
| 10:33 | 11 | BY MS. SRINIVASAN: |
| 10:33 | 12 | Q.   You were asked:  And you haven't independently |
| 10:33 | 13 | researched audio features that may be unrelated to the |
| 10:33 | 14 | accused functionality? |
| 10:33 | 15 | And you said:  Not in the context of the |
| 10:33 | 16 | technical apportionment.  Yes.  I can agree with that. |
| 10:33 | 17 | Do you see that? |
| 10:33 | 18 | A.   Yes. |
| 10:33 | 19 | Q.   And that was your testimony that was under |
| 10:33 | 20 | oath in October of 2023, correct, Ms. Kindler?  Yes? |
| 10:33 | 21 | A.   Yes.  But it's about technical apportionment. |
| 10:34 | 22 | It's a different question. |
| 10:34 | 23 | Q.   Ms. Kindler, my question to you was is that |
| 10:34 | 24 | your sworn testimony under oath from October of 2023? |
| 10:34 | 25 | A.   Absolutely.  About technical apportionment. |

—1005—

10:34    1        Q.    Ms. Kindler, you've never researched the Webex

10:34    2   automatic -- let me pull up, actually, Slide 20 of your

10:34    3   presentation.

10:34    4            If you look down here, you noted important

10:34    5   audio features.

10:34    6            Do you see that?

10:34    7        A.    Yes.

10:34    8        Q.    You've never researched the Webex automatic

10:34    9   gaming control feature, correct?

10:34   10        A.    So I know -- I'd like to explain this in my

10:34   11   deposition because we went around and around about this

10:34   12   in my deposition.

10:34   13            THE COURT:  Counsel -- I'm sorry.  Your

10:34   14   counsel will have an opportunity to have you explain

10:34   15   that if she chooses to, but right now, you just need to

10:35   16   answer the question.

10:35   17   BY MS. SRINIVASAN:

10:35   18        Q.    Have you ever researched -- well, let me ask

10:35   19   it this way.

10:35   20            You have never researched the Webex automatic

10:35   21   gaming control feature, correct?

10:35   22        A.    I said that I hadn't done it in the context of

10:35   23   the technical apportionment, but I absolutely had

10:35   24   researched those features in my initial report.

10:35   25        Q.    Ms. Kindler, I'd like you to look at your

-1006-

| | | |
|---|---|---|
| 10:35 | 1 | deposition, Page 19, Lines 1 through 3. |
| 10:35 | 2 | And you were asked:  Have you ever researched |
| 10:35 | 3 | the Webex automatic gaming control feature? |
| 10:35 | 4 | And you said, I have not. |
| 10:35 | 5 | A.    I'm sorry.  Can you point -- page what? |
| 10:35 | 6 | Q.    19. |
| 10:35 | 7 | A.    Oh, 19. |
| 10:35 | 8 | Q.    Line 1 through 3. |
| 10:35 | 9 | A.    Okay. |
| 10:35 | 10 | Q.    And you were asked:  Have you ever researched |
| 10:35 | 11 | the Webex automatic gaming control feature? |
| 10:35 | 12 | And you responded, I have not. |
| 10:35 | 13 | That was your testimony under oath, correct? |
| 10:35 | 14 | A.    Yes.  Which is clarified, but yes. |
| 10:36 | 15 | Q.    The answer is "I have not." |
| 10:36 | 16 | A.    In that sentence, yes. |
| 10:36 | 17 | Q.    Yes. |
| 10:36 | 18 | Okay.  And, Ms. Kindler, let's go back to |
| 10:36 | 19 | Slide 20. |
| 10:36 | 20 | You included something in here about noise |
| 10:36 | 21 | removal.  You've never researched the Webex noise |
| 10:36 | 22 | removal feature, correct? |
| 10:36 | 23 | A.    It would be the same answer. |
| 10:36 | 24 | Q.    The same answer's that you've not? |
| 10:36 | 25 | A.    Subject to the clarification, yes. |

-1007-

```
10:36    1        Q.    Ms. Kindler, you were asked that question in
10:36    2   your deposition.
10:36    3              Have you ever researched the Webex noise
10:36    4   removal feature?
10:36    5              And your answer was, I have not.
10:36    6              Do you see that in your deposition?
10:36    7        A.    I do.
10:36    8        Q.    All right.  That was -- Ms. Kindler, your
10:36    9   answer was, I have not?
10:36   10        A.    Yes.
10:36   11        Q.    That was your testimony under oath, correct?
10:36   12        A.    In that context, yes.
10:36   13        Q.    Okay.  And then you -- going back to Slide 20,
10:37   14   you've never researched the optimized for voice
10:37   15   feature, which is another one you have listed here,
10:37   16   correct?
10:37   17        A.    I mean, it would be the same answer.  Yes.
10:37   18        Q.    The answer is that you did not research that?
10:37   19        A.    Within the context of that question, yes.
10:37   20        Q.    Then because you're saying yes, and I'm saying
10:37   21   no, I want to make sure we're clear.
10:37   22              You have never looked into -- or you have
10:37   23   never researched the optimize for my voice feature,
10:37   24   correct?
10:37   25        A.    Again, in the context of this line of
```

—1008—

10:37  1    questioning, that's right.

10:37  2         Q.   Is that a yes or no, Ms. Kindler?

10:37  3         A.   Yes.  That's right.

10:37  4         Q.   And you never looked into the Webex full

10:37  5    duplex feature, correct?

10:37  6         A.   It would be the same answer.  Yes.

10:37  7         Q.   Yet those are audio features you put on this

10:37  8    slide to say those are things that should be considered

10:37  9    in apportioning damages in this case, correct?

10:37  10        A.   Absolutely, based on input from Mr. Willis.

10:38  11   Yes.

10:38  12        Q.   You haven't done the analysis of whether or

10:38  13   not these features that you've labeled as

10:38  14   demand-driving factors map on to the technical

10:38  15   apportionment that you were given, correct?

10:38  16        A.   Can you restate that question?

10:38  17        Q.   Sure.

10:38  18             You haven't done the analysis of whether or

10:38  19   not these features that you've labeled as driving

10:38  20   demand for Webex Audio, whether they map on to the

10:38  21   technical apportionment that was -- that you rely on

10:38  22   from Mr. Willis, correct?

10:38  23        A.   It was doable at the time of the deposition.

10:38  24   I hadn't compared the two lists was my point.  Yes.

10:38  25        Q.   You hadn't done the mapping.  That was your

-1009-

10:38  1   language, correct?

10:38  2       A.    Yes.  And we can -- yes.  There's more to that

10:38  3   story, but yes.

10:38  4       Q.    And just asking you yes or no, Ms. Kindler.

10:38  5       A.    As of the date of the second deposition which

10:38  6   was focused on my second report, I had not gone back to

10:38  7   my first report to do the mapping.  Yes.

10:39  8       Q.    You're not aware of any consumer surveys

10:39  9   regarding customer demand and preference for these

10:39 10   various Webex features that have been commissioned by

10:39 11   Cisco?

10:39 12       A.    Yes.  That's right.

10:39 13       Q.    Yes, you're not aware?

10:39 14       A.    Yes.

10:39 15       Q.    You didn't go out and commission or conduct

10:39 16   any survey about these various audio features to see

10:39 17   which ones are important to certain consumers.

10:39 18             You didn't do that, correct?

10:39 19       A.    No.  I relied on the documentary evidence.

10:39 20       Q.    Have you ever asked Cisco for any research and

10:39 21   development data?

10:39 22       A.    I'm sorry.  I don't know what research and

10:39 23   development data -- do you mean costs?

10:39 24       Q.    Let me ask it another way.

10:39 25             Have you ever asked Cisco for whether it

-1010-

| | | |
|---|---|---|
| 10:39 | 1 | maintained data about customer demand and preference? |
| 10:39 | 2 | A.    Oh.  I reviewed the evidence in the record and |
| 10:39 | 3 | my own independent research on that topic. |
| 10:39 | 4 | Q.    And my question to you was slightly different. |
| 10:39 | 5 | Did you go to Cisco, who you're doing this |
| 10:40 | 6 | work for, who you've been retained by, and said, what |
| 10:40 | 7 | data do you have about which of these features |
| 10:40 | 8 | customers prefer? |
| 10:40 | 9 | Did you do that, Ms. Kindler, yes or no? |
| 10:40 | 10 | A.    No.  Because I had evidence in the record. |
| 10:40 | 11 | THE COURT:  Listen.  I'm doing my best to |
| 10:40 | 12 | be patient.  But you just need to answer her question |
| 10:40 | 13 | directly.  If your counsel wants to give you an |
| 10:40 | 14 | opportunity to explain why you did something else or |
| 10:40 | 15 | anything else, but for right now, you just need to |
| 10:40 | 16 | answer her question directly.  Okay? |
| 10:40 | 17 | THE WITNESS:  Yes, Your Honor. |
| 10:40 | 18 | BY MS. SRINIVASAN: |
| 10:40 | 19 | Q.    You were here for the testimony -- and I know |
| 10:40 | 20 | you've talked about it -- of Mr. Barave of Cisco.  And |
| 10:40 | 21 | you heard him say that Cisco did not have data ranking |
| 10:40 | 22 | of features and metrics for Webex. |
| 10:40 | 23 | Did you hear that? |
| 10:40 | 24 | A.    I heard his testimony.  Yes. |
| 10:40 | 25 | Q.    I'd like to talk about your use of and your |

1011

10:41  1    reliance on the usage data in this case.

10:41  2         You understand, Ms. Kindler, you told the jury

10:41  3    that there is one -- that there's data only starting in

10:41  4    2021?

10:41  5         A.    August.

10:41  6         Q.    August of 2021, correct?

10:41  7         A.    Uh-huh.

10:41  8         Q.    And so we have one year of data from August of

10:41  9    2021 until the expiration of the patent, correct?

10:41  10        A.    Correct.

10:41  11        Q.    And you heard the testimony of Mr. Barave that

10:41  12   there's no other data available that we can see today

10:41  13   before 2021, correct?

10:41  14        A.    That's correct.

10:41  15        Q.    And you didn't have any other data, internal

10:41  16   data from Cisco available to you prior to August of

10:41  17   2021, correct?

10:41  18        A.    No.    Just his testimony but no actual

10:41  19   quantitative data.    That's correct.

10:41  20        Q.    You relied on a discussion that you had with

10:42  21   Mr. Barave to extrapolate a number from 2015 to 2021.

10:42  22   Is that a fair characterization of what you've done?

10:42  23        A.    I think I would agree with that

10:42  24   characterization under two different approaches.    But

10:42  25   yes.

1012

10:42  1    Q.    And you were here when Mr. Barave said he

10:42  2  doesn't have any data from 2015 to 2021.  He might have

10:42  3  had it at some point, but he doesn't have that data.

10:42  4  He can't go look at it and talk about it anymore,

10:42  5  correct?

10:42  6    A.    Yeah.  I think that's right.

10:42  7    Q.    And at the time you had your phone

10:42  8  conversation with him, he didn't discuss any underlying

10:42  9  documents that he was relying on to provide economic

10:42  10 data to you?

10:42  11   A.    That's right.  I don't think the data exists.

10:42  12   Q.    The data doesn't exist?

10:42  13   A.    Correct.

10:42  14   Q.    He didn't provide any documents to you during

10:42  15 the call, correct?

10:43  16   A.    No.  They don't collect that today.

10:43  17   Q.    Ms. Kindler, did you take any notes during

10:43  18 your call with Mr. Barave?  This call that was supposed

10:43  19 to be about how to figure out what to do before the

10:43  20 data existed, did you take any notes during that call?

10:43  21   A.    No.

10:43  22   Q.    Did you write any memos afterwards,

10:43  23 summarizing what you discussed with Mr. Barave?

10:43  24   A.    No.

10:43  25   Q.    Did anybody on your team do that?

1013

10:43    1          A.    Not that I'm aware of.  No.

10:43    2          Q.    You understand --

10:43    3                 MS. SRINIVASAN:  And I'd like to just

10:43    4    bring up Mr. Barave's testimony that we heard this week

10:43    5    in court.  Mr. Boles, if you could bring up Slide

10:43    6    No. 1.

10:43    7    BY MS. SRINIVASAN:

10:44    8          Q.    And Mr. Barave was asked -- I asked Mr. Barave

10:44    9    that he couldn't tell us what the percentage was -- in

10:44    10   2018 or 2015 or 2016 or 2017, he couldn't tell us the

10:44    11   percentage of calls that had both phone and computer

10:44    12   users, hybrid calls, meetings.  He could not tell us

10:44    13   that.  You heard that testimony?

10:44    14         A.    That's right.

10:44    15         Q.    And because he couldn't -- and one thing he

10:44    16   did tell us, and was information that was not with us

10:44    17   before, was that in 2024, which is outside of the

10:44    18   damages period in this case, that it was 18 percent.

10:44    19                You heard that, correct?

10:44    20         A.    Yes.

10:44    21         Q.    And you understand 2024 is beyond the damages

10:44    22   period that either you or Mr. Bratic are calculating,

10:44    23   correct?

10:44    24         A.    Yes.

10:44    25         Q.    And that in 2022, the percentage of meetings

| | | |
|---|---|---|
| 10:44 | 1 | where there was both a phone user and a computer user |
| 10:45 | 2 | was 24 percent.  You heard that testimony? |
| 10:45 | 3 | A.    Correct. |
| 10:45 | 4 | Q.    And you understand that from your own |
| 10:45 | 5 | analysis, correct? |
| 10:45 | 6 | A.    Yes. |
| 10:45 | 7 | Q.    And Mr. Barave acknowledged that we can't know |
| 10:45 | 8 | if in 2016 or 2017 it was 40 percent, 35 percent, |
| 10:45 | 9 | whether that percentage was greater than what it was in |
| 10:45 | 10 | 2022 because we do not have the data as we sit here |
| 10:45 | 11 | today. |
| 10:45 | 12 | You see that, Ms. Kindler? |
| 10:45 | 13 | A.    I don't see "greater," but I see his |
| 10:45 | 14 | testimony.  Yes. |
| 10:45 | 15 | Q.    Well, Ms. Kindler, I'll point you to the last |
| 10:45 | 16 | question.  We can't know if in 2016 or 2017 it was |
| 10:45 | 17 | 40 percent, 35 percent.  We don't have the data for |
| 10:45 | 18 | that as we sit here today. |
| 10:45 | 19 | We don't have that data today. |
| 10:45 | 20 | A.    Yes. |
| 10:45 | 21 | Q.    You'd agree with me, 35 percent, 40 percent, |
| 10:45 | 22 | that's greater than the 24 percent for the year we have |
| 10:45 | 23 | the data? |
| 10:46 | 24 | A.    Yes. |
| 10:46 | 25 | Q.    Ms. Kindler, you spent some time talking about |

1015

10:46   1   noninfringing alternatives.

10:46   2           Do you recall that testimony?

10:46   3       A.    I do.

10:46   4       Q.    Well, actually, let me ask you this:  How much

10:46   5   have you been paid for your work in this matter?

10:46   6       A.    Nothing.  I don't get paid for my work in this

10:46   7   matter.

10:46   8       Q.    How much will you get paid for your time

10:46   9   performing your expert analysis in this matter?

10:46   10      A.    Nothing.  My firm gets paid.  My firm charges

10:46   11  hourly.

10:46   12      Q.    How much has your firm been paid for your

10:46   13  expert analysis and that of your team in this matter?

10:46   14      A.    I haven't looked at the numbers to date.  I

10:46   15  know back when I did my first report, it was around

10:46   16  $500,000 for all the work that went into my first

10:47   17  report, but I haven't looked at what the number is

10:47   18  today.

10:47   19      Q.    And the date of your first report, that was in

10:47   20  the fall of 2022?

10:47   21      A.    Yes.  The first bulk of work that I did, yes.

10:47   22      Q.    So it's been two years since then.

10:47   23           And you do have a ballpark for how much your

10:47   24  firm has been paid in total for its work in this

10:47   25  matter?

10:47  1      A.    No.  I mean, it would be a lot less than that

10:47  2  amount because we didn't do a lot of work for a long

10:47  3  time, but I don't know what it would be.

10:47  4      Q.    It would be some amount greater than $500,000

10:47  5  because you'd been -- already been paid that up until

10:47  6  the middle of 2022, fair?

10:47  7      A.    Correct.

10:47  8      Q.    Okay.  And what is your hourly rate,

10:47  9  Ms. Kindler?

10:47  10     A.    $970 an hour.

10:47  11     Q.    So you talk a little bit about this

10:48  12  noninfringing alternative, that there might be another

10:48  13  way to implement hybrid audio functionality without

10:48  14  using what's in the patent.

10:48  15           You talked about that today, correct?

10:48  16     A.    Yes.

10:48  17     Q.    And you're relying on Mr. Willis that it would

10:48  18  take less than 100 hours of engineering effort to

10:48  19  implement one of those noninfringing alternatives,

10:48  20  right?

10:48  21     A.    That's what he said.

10:48  22     Q.    And are you relying on that for your analysis?

10:48  23     A.    I did not talk about that today.  I mean, it's

10:48  24  an input that I put in my report.

10:48  25     Q.    Are you relying on Mr. Willis' determination

—1017—

10:48  1    about how long it would take to implement a

10:48  2    noninfringing alternative as part of your analysis?

10:48  3        A.    I think how long it would take, yes.  He said

10:48  4    it could be done relatively easily with changing code.

10:48  5        Q.    Did you take into account how much Mr. Willis

10:49  6    said it would cost to implement a functionality that

10:49  7    didn't infringe the '858 patent?  Did you take that

10:49  8    into account?

10:49  9        A.    I considered it.  It's in my supplemental

10:49  10   report.

10:49  11       Q.    All right.  Well, let's look at -- this is a

10:49  12   Mr. Willis slide.  He said, oh, it'd take 10,000 to

10:49  13   $20,000 to have this alternative.  It would take

10:49  14   500 hours of engineering work, 50- to $100,000 for this

10:49  15   other alternative that he says would be reasonable

10:49  16   alternatives.

10:49  17             You saw that and you heard that testimony,

10:49  18   correct?

10:49  19       A.    I did.  Yes.

10:49  20       Q.    Ms. Kindler, that's a fraction of what your

10:49  21   firm has been paid just for their expert work in this

10:49  22   case, correct?

10:49  23       A.    As a factual math matter, yes.

10:49  24       Q.    You've been paid multiples more than what

10:49  25   Cisco says it would cost to do -- to do something that

1018

10:49  1   would stop infringing the '858 patent, correct?

10:49  2       A.   My firm has.  Yes.

10:50  3            MS. SRINIVASAN:  Pass the witness.

10:50  4                  REDIRECT EXAMINATION

10:50  5   BY MS. EDLIN:

10:50  6       Q.   I have just a few short points of

10:50  7   clarification.

10:50  8            Ms. Kindler, was your reference to Cisco's

10:50  9   patents and/or Meetrix patents related to an invalidity

10:50  10  analysis?

10:50  11      A.   Not in any way.

10:50  12      Q.   And have you seen any evidence this week while

10:50  13  you've been at trial to support the -- what you heard

10:50  14  from Mr. Barave and the conversation you had?

10:51  15      A.   About usage data?

10:51  16      Q.   About usage data.  Yes.  Thank you.

10:51  17      A.   Oh, absolutely.  And so he talked about the

10:51  18  fact that the usage trends have been declining over

10:51  19  time.

10:51  20            So in that testimony about could have been 30,

10:51  21  could have been 45, I mean, the point is that the

10:51  22  actual quantitative number is not knowable today, but

10:51  23  we have enough information about the trends over time

10:51  24  and what the data reflect today to make reasonable

10:51  25  approximations as to what the likely relative usage

10:51  1    would have been over the relevant time period.

10:51  2           And if you'll recall, I did it in a very

10:51  3    conservative way where I assume for my upper bound that

10:51  4    it's 50 percent of the meeting minutes and calls over

10:51  5    the entire period, which is inconsistent with his

10:51  6    testimony that it would be declining over time.

10:51  7    Q.    Do you have any reason to doubt Mr. Barave's

10:52  8    recollection of the trends in this usage?

10:52  9    A.    Absolutely not.  He talked about the economic

10:52  10   justifications for that.  He talked about the features

10:52  11   in the apps being what customers want.  And you don't

10:52  12   get those types of functionalities and features if

10:52  13   you're using PSTN and dialing in by phone, for example.

10:52  14          He talked about the costs, so there's

10:52  15   incentives for companies to be switching to VoIP.  And

10:52  16   so there's lots of economic and market reasons that

10:52  17   would be consistent with the trends that he recalls

10:52  18   having occurred over time in his role as a product

10:52  19   manager of this product since then.

10:52  20   Q.    Okay.  And just finally, counsel asked you

10:52  21   about your research into Webex features.

10:52  22          Do you remember that?

10:52  23   A.    Yes.

10:52  24   Q.    Okay.  And I believe you indicated that there

10:52  25   was additional context that you wanted to provide.  And

1020

| | | |
|---|---|---|
| 10:52 | 1 | if you need me to refresh your recollection, that |
| 10:52 | 2 | was -- we were looking at Page 18 through I believe |
| 10:53 | 3 | around Page 21 of your October 20th, 2023 deposition. |
| 10:53 | 4 | What context would you like to provide about |
| 10:53 | 5 | that line of questioning? |
| 10:53 | 6 | A.    Absolutely.  So that was taken out of context. |
| 10:53 | 7 | I was being asked in my deposition about the specific |
| 10:53 | 8 | features that Dr. Schaefer had identified in his |
| 10:53 | 9 | technical apportionment.  And I'm relying on Mr. Willis |
| 10:53 | 10 | for the justified technical apportionment.  And I was |
| 10:53 | 11 | asked in that second deposition, which I understood to |
| 10:53 | 12 | be only about my second supplemental report, whether or |
| 10:53 | 13 | not I independently evaluated those six features that |
| 10:53 | 14 | Dr. Schaefer chose. |
| 10:53 | 15 | And the answer was no.  And then I said, but I |
| 10:53 | 16 | did in my initial report.  And I just haven't done the |
| 10:53 | 17 | mapping -- that was the mapping context -- of what I |
| 10:53 | 18 | evaluated in my initial report which spanned many |
| 10:53 | 19 | pages, to map those features with the six that |
| 10:53 | 20 | Dr. Schaefer identified. |
| 10:54 | 21 | And so absolutely I did a fair amount of |
| 10:54 | 22 | research as an economist as to what the demand-driving |
| 10:54 | 23 | features are, including the ones that were up on my |
| 10:54 | 24 | slide, and the questions and the answers were taken out |
| 10:54 | 25 | of the context within which they were being asked. |

10:54  1      Q.    And did you have all the information from

10:54  2  Cisco or anywhere else that you needed in order to

10:54  3  evaluate those demand drivers?

10:54  4      A.    Absolutely.  As an economist, a lot of what we

10:54  5  do is evaluating features and what's driving demand.

10:54  6  And that's usually based on a compilation of public

10:54  7  information we obtain because what companies tell

10:54  8  customers in terms of marketing is highly relevant.

10:54  9  It's in combination with discussions with people at the

10:54  10  company, internal documentation about what features are

10:54  11  what customers want.

10:54  12       And I did an extensive analysis around that

10:54  13  and highlighted specific features in my initial report,

10:54  14  which is what I was not being asked about, where I

10:55  15  describe features that were important that were not

10:55  16  related to the patent.

10:55  17       Now, the second part of not related to the

10:55  18  patent is an input from a technical expert regarding

10:55  19  the scope of what is or is not in the patent.  But I

10:55  20  absolutely did a significant amount of work on that.

10:55  21            MS. EDLIN:  Thank you.

10:55  22            No further questions.

       23            MS. SRINIVASAN:  Just briefly,

10:55  24  Your Honor.

10:55  25                 RECROSS-EXAMINATION

| | |
|---|---|
| 10:55 | 1 |

BY MS. SRINIVASAN:

Q.    Ms. Kindler, you testified a moment ago with your counsel that you had heard things from Mr. Barave this week that confirmed your determination about use and your usage percentages.

Do you recall that?

A.    Yes.

Q.    And we heard from Mr. Barave that when he is talking about what usage might have been back in 2015, he's not doing that based on looking at data from 2015, correct?

A.    That's not what I heard, and I'm happy to tell you what I heard, but that's not what I heard.

MS. SRINIVASAN:  Mr. Boles, can you bring up Mr. Barave's testimony?  I think it's at Slide 5.

BY MS. SRINIVASAN:

Q.    Now, Mr. Barave was asked --

MS. SRINIVASAN:  Actually, Mr. Boles, let's go back to the other slide.  Of course you had the right slide to begin with.

BY MS. SRINIVASAN:

Q.    He was asked -- Cisco does not have this usage data.  We talked about that, anything before 2021, correct?

A.    Correct.

10:56  1      Q.    And he was asked:  If we wanted to go look at

10:56  2  the data from 2015 to 2021, we would not be able to see

10:57  3  any data between 2015 and 2021.

10:57  4           And he said, that's correct.  We would not be

10:57  5  able to see it today.

10:57  6           Do you see that?

10:57  7      A.    Today.  I'm sorry if I missed that in your

10:57  8  question.  I did not hear "today" in your question.

10:57  9  But yes.  That's absolutely what he said.

10:57 10      Q.    And then let's look at the next slide.

10:57 11           He says:  Mr. Barave -- he was asked, I asked

10:57 12  him:  You were asked by your counsel that your basis

10:57 13  for what usage might have been back in 2015 would have

10:57 14  been based on having looked at the data in 2015.  But

10:57 15  you can't, as you sit here today, tell us what the data

10:57 16  says, can you?

10:57 17           Not beyond what I remember.

10:57 18           And then he was asked:  You can't tell us what

10:57 19  percentage of meetings had PSTN and VoIP users like all

10:57 20  of the other data we've seen.  You can't tell us that.

10:57 21           I cannot.

10:57 22           So is it your testimony, Ms. Kindler, that

10:57 23  you're relying on what Mr. Barave says he can remember

10:58 24  from 2015 without having any data before him?

10:58 25           Is that your testimony?

10:58  1      A.    Yes.  In addition to the other factors he

10:58  2  described.  Yes.

10:58  3      Q.    So -- and we know Mr. Barave didn't give you

10:58  4  any documents, right?

10:58  5      A.    They don't exist with respect to data.

10:58  6      Q.    And you didn't take any notes, correct, about

10:58  7  your conversation with Mr. Barave?

10:58  8      A.    No.

10:58  9      Q.    So you're relying on your recall of your

10:58  10  conversation with Mr. Barave that occurred in 2023; is

10:58  11  that fair?

10:58  12      A.    My recall in 2023?

10:58  13      Q.    Your discussion with Mr. Barave occurred in

10:58  14  2023?

10:58  15      A.    Yes.  That's right.

10:58  16      Q.    You didn't take any notes, so we're relying on

10:58  17  your recollection of that from 2023, correct?

10:58  18      A.    Yes.

10:58  19      Q.    And that conversation in 2023 was about what

10:58  20  the trends were back in 2015, right?

10:59  21      A.    And in between.  But yes.

10:59  22      Q.    In between.

10:59  23      A.    Yes.

10:59  24      Q.    And Mr. Barave didn't have any notes or

10:59  25  documents or data for that, right?

10:59  1    A.    I don't know if that was asked of him, but no

10:59  2  data.  That data's not collected and kept.  Yes.

10:59  3    Q.    And so he's relying on a conversation you have

10:59  4  in 2023 about what he can remember from data that no

10:59  5  longer exists from 2015.

10:59  6          That's your testimony, correct?

10:59  7    A.    I mean, my testimony stands.  I can agree with

10:59  8  that statement, but there were other factors.  Yes.

10:59  9    Q.    You agree with that statement?

10:59  10   A.    Subject to other factors, yes.

10:59  11   Q.    And that's what you're basing your usage

10:59  12  analysis on, your conversation undocumented from 2023

10:59  13  in which Mr. Barave said what he remembered from up to

10:59  14  eight years earlier without any documents or data

10:59  15  before him, correct?

11:00  16   A.    He testified under oath as well, but yes.

11:00  17  That would be the universe of information.

11:00  18   Q.    Thank you.

11:00  19          MS. SRINIVASAN:  I'll pass the witness.

11:00  20          MS. EDLIN:  No further questions,

11:00  21  Your Honor.

11:00  22          THE COURT:  You may step down, ma'am.

11:00  23          Who's your next witness?

11:00  24          MR. JONES:  That's our last witness,

11:00  25  Your Honor.

-1026-

| | | |
|---|---|---|
| 11:00 | 1 | THE COURT: Ladies and gentlemen of the |
| 11:00 | 2 | jury, we'll take a short recess and we'll come back in |
| 11:00 | 3 | a few minutes. |
| 11:00 | 4 | THE BAILIFF: All rise. |
| 11:00 | 5 | (Jury exited the courtroom.) |
| 11:00 | 6 | THE COURT: You may be seated. |
| 11:00 | 7 | Does the plaintiff have any motions? |
| 11:01 | 8 | MR. SIEGMUND: Yes, Your Honor. |
| 11:01 | 9 | Paltalk moves for JMOL infringement of |
| 11:01 | 10 | Claim 1 because Cisco neither presented evidence of |
| 11:01 | 11 | noninfringement nor contradicted the overwhelming |
| 11:01 | 12 | evidence. |
| 11:01 | 13 | In fact, as the Court knows, the only |
| 11:01 | 14 | real dispute between the suit Cisco raised during trial |
| 11:01 | 15 | was Cisco's engineered claim construction argument, and |
| 11:01 | 16 | Cisco cannot dispute that it infringes Claim 1 if |
| 11:01 | 17 | "each" includes "one or more," and has instead argued |
| 11:01 | 18 | that "each" must mean "all" or "every." |
| 11:01 | 19 | Because Cisco has not presented |
| 11:01 | 20 | substantial evidence to support a noninfringement |
| 11:01 | 21 | verdict, JMOL's appropriate. |
| 11:01 | 22 | And then I have some on invalidity as |
| 11:01 | 23 | well, Your Honor. |
| 11:01 | 24 | THE COURT: Please. |
| 11:01 | 25 | MR. SIEGMUND: Okay. |

| | | |
|---|---|---|
| 11:01 | 1 | Paltalk also moves for judgment as a |
| 11:01 | 2 | matter of law under Rule 50 with respect to Cisco's |
| 11:01 | 3 | invalidity challenges under obviousness for the |
| 11:01 | 4 | '858 patent.  There's insufficient record evidence for |
| 11:01 | 5 | a motivation or a motivation to modify with a |
| 11:01 | 6 | reasonable expectation of success. |
| 11:01 | 7 | Your Honor, there's no evidence of this |
| 11:02 | 8 | factor whatsoever in the trial record.  There was not |
| 11:02 | 9 | even a slide on it.  So we would move for JMOL on that |
| 11:02 | 10 | basis. |
| 11:02 | 11 | Additionally, Your Honor, we would also |
| 11:02 | 12 | argue that there's not sufficient record evidence for a |
| 11:02 | 13 | finding of obviousness that Botzko renders the '858 |
| 11:02 | 14 | obvious to a person of ordinary skill in the art. |
| 11:02 | 15 | Specifically, there's no evidence that a POSITA would |
| 11:02 | 16 | find Claim Elements [1], [2] through [1.8] obvious. |
| 11:02 | 17 | And then finally, Your Honor, we |
| 11:02 | 18 | have -- those are the end of the JMOLs, Your Honor. |
| 11:02 | 19 | THE COURT:  They're overruled. |
| 11:02 | 20 | MR. SIEGMUND:  Understood. |
| 11:02 | 21 | And then lastly, Your Honor, we have a |
| 11:02 | 22 | motion to strike some trial testimony of Mr. Buckles. |
| 11:02 | 23 | And I think the Court probably remembers this.  The |
| 11:02 | 24 | Court will remember that Mr. Tribble voir dired the |
| 11:02 | 25 | witness that he had no foundation for discussing this |

—1028—

| | | |
|---|---|---|
| 11:02 | 1 | particular document, PX-213. |
| 11:02 | 2 | And it was clear that it was only shown |
| 11:02 | 3 | to him during litigation by Cisco's lawyers, and they |
| 11:02 | 4 | discussed with him what to say.  And specifically, |
| 11:03 | 5 | we're moving to strike Page 580, Lines 1 through 21. |
| 11:03 | 6 | I'm happy to show the Court that testimony if you'd |
| 11:03 | 7 | like to see it. |
| 11:03 | 8 | THE COURT:  I don't need to. |
| 11:03 | 9 | A response? |
| 11:03 | 10 | MS. GARDNER:  Good morning, Your Honor. |
| 11:03 | 11 | So first, with respect to a large portion |
| 11:03 | 12 | of the testimony just referenced, there was no |
| 11:03 | 13 | objection to the two questions and answers at the time |
| 11:03 | 14 | of that testimony two days ago.  And there was no |
| 11:03 | 15 | motion to strike on that testimony either. |
| 11:03 | 16 | And the requirement of objecting to |
| 11:03 | 17 | moving and moving to strike in the moment is clear.  On |
| 11:03 | 18 | this point, the Weinstein Federal Evidence treatise is |
| 11:03 | 19 | instructive; that's Section 103.11. |
| 11:03 | 20 | The objection would have been timely as |
| 11:03 | 21 | soon as Paltalk's counsel knew it could have been |
| 11:03 | 22 | applicable.  And on the flip side of that, remaining |
| 11:03 | 23 | silent hoping for a favorable answer would result in a |
| 11:04 | 24 | waiver. |
| 11:04 | 25 | So in this situation, the fuller context |

—1029—

11:04    1    is that counsel asked Mr. Buckles questions on cross.

11:04    2                  THE COURT:  I'm good.  I'm going to

11:04    3    overrule.

         4                  MS. GARDNER:  Thank you, Your Honor.

11:04    5                  THE COURT:  I'm denying the motion.  And

11:04    6    I'm going to overrule the Rule 50 motions.

11:04    7                  Anything else, Mr. Siegmund?

11:04    8                  MR. SIEGMUND:  No, Your Honor.

11:04    9                  THE COURT:  Any motions from the

11:04    10   defendant?

11:04    11                  MR. JONES:  Yes, Your Honor.  Excuse me,

11:04    12   Your Honor.

11:04    13                  Your Honor, excuse me.  I believe we're

11:04    14   going to file ours in writing, if it's okay with the

11:04    15   Court.

11:04    16                  THE COURT:  Okay.  I'll overrule those.

11:04    17                  Is the -- are the charges here?  Are they

11:04    18   ready for me to read?

11:04    19                  MR. JONES:  Your Honor, you assigned

11:04    20   me -- excuse me.  I'll be directly --

11:04    21                  THE COURT:  You have objections?

11:05    22                  MR. JONES:  You assigned me a duty

11:05    23   yesterday, and I think I need to remind you that we

11:05    24   should object to the Court's charge.

11:05    25                  THE COURT:  You need to do that.  Yes.

—1030—

11:05  1    If you want to do that since you're up there and make

11:05  2    the objections or I'll hear from Mr. Siegmund.  Either

11:05  3    way.

11:05  4                    MR. SIEGMUND:  We're good on objections,

11:05  5    Your Honor.  All we need to do is quickly go back and

11:05  6    rip out the stipulations and stuff like that, but other

11:05  7    than that, it's ready to go.

11:05  8                    THE COURT:  Okay.  Does the defendant

11:05  9    have any objections to the jury charge?

11:05  10                   MR. DUFRESNE:  Other than the objection

11:05  11   to the instruction about the construction of "each"

11:05  12   which Ms. Piepmeier already covered today, we don't

11:05  13   have any further objections, Your Honor.

11:05  14                   THE COURT:  Very good.  Okay.

11:05  15                   So how long will it take -- Mr. Siegmund,

11:05  16   how long will it take for you to get things ready for

11:05  17   us to go?

11:05  18                   MR. SIEGMUND:  Five or ten minutes,

11:05  19   Your Honor.  Not long.

11:05  20                   THE COURT:  Why don't we do this?  Why

11:06  21   don't we plan on me coming back at 11:15 to read the

11:06  22   jury charge, and then we'll figure out -- it'll be

11:06  23   about noon or maybe 12:15 when I finish.  And I'll ask

11:06  24   you all when you would like for me to set the closing

11:06  25   argument.

```
11:06   1              Okay.  And I don't see either lead
11:06   2   counsel, which is absolutely fine with me.  If they are
11:06   3   still in the courtroom but would like to leave, they
11:06   4   are also welcome not to be here during me reading the
11:06   5   jury charge.  No one should feel obligated to be here.
11:06   6   I don't want to be here.
11:06   7              (Laughter.)
11:06   8              THE COURT:  So I'm not offended by anyone
11:06   9   not being here getting ready for their jury charge
11:06  10   (sic).
11:06  11              THE BAILIFF:  All rise.
11:06  12              THE COURT:  When I come back out -- when
11:06  13   I come back out, I'm going to have the plaintiff rest
11:06  14   as well on the record.  That's with the understanding
11:06  15   that there are no -- Mr. Tribble, I'll just say, you
11:07  16   don't need to be here for me reading the jury charge.
11:07  17              You're welcome to be here, but if you're
11:07  18   giving the closing argument and you don't want to be
11:07  19   here to sit and listen to me read the jury charge and
11:07  20   prepare, I'm fine for you -- for lead counsel --
11:07  21   whoever's giving the closing arguments, I'm fine for
11:07  22   them not to be here; I'm fine for them to be here.  So
11:07  23   it doesn't matter to me.
11:07  24              MR. TRIBBLE:  Okay.  Thank you.
11:07  25              (Recess taken.)
```

1032

| | | |
|---|---|---|
| 11:23 | 1 | THE BAILIFF:  All rise. |
| 11:23 | 2 | THE COURT:  Please remain standing for |
| 11:23 | 3 | the jury. |
| 11:23 | 4 | (Jury entered the courtroom.) |
| 11:23 | 5 | THE COURT:  Thank you.  You may be |
| 11:23 | 6 | seated. |
| 11:23 | 7 | Ladies and gentlemen of the jury, I find |
| 11:23 | 8 | it's easier for me to stand and read than to sit and |
| 11:23 | 9 | read -- |
| 11:23 | 10 | Oh, I'm sorry.  Do the defendants rest? |
| 11:23 | 11 | MR. JONES:  Yes, Your Honor.  We do rest. |
| 11:24 | 12 | THE COURT:  And plaintiffs? |
| 11:24 | 13 | MR. TRIBBLE:  Your Honor, Paltalk sees no |
| 11:24 | 14 | need to call any rebuttal witnesses, and so we cede the |
| 11:24 | 15 | rest of our time back to the jury.  We rest. |
| 11:24 | 16 | THE COURT:  Very good.  Thank you, sir. |
| 11:24 | 17 | Ladies and gentlemen, you have a copy of |
| 11:24 | 18 | the jury instructions in front of you that I'm going to |
| 11:24 | 19 | read.  Feel free to read along or not read along or |
| 11:24 | 20 | take notes or not take notes.  Entirely up to you. |
| 11:24 | 21 | Members of the jury, it is my duty and |
| 11:24 | 22 | responsibility to instruct you on the law that you are |
| 11:24 | 23 | to apply in this case.  The law contained in these |
| 11:24 | 24 | instructions is the only law that you may follow. |
| 11:24 | 25 | It is your duty to follow what I instruct |

1033

11:24  1    you the law is regardless of any opinion that you might

11:24  2    have as to what the law ought to be.

11:24  3                    Each of you has your own printed copy of

11:24  4    these final jury instructions I'm giving to you, so

11:24  5    there's no need for you to take notes unless you want

11:24  6    to.

11:24  7                    If I have given you the impression during

11:24  8    the trial I favor either party, disregard that

11:24  9    impression.  If I've given you the impression during

11:25  10   the trial I have any opinion about the facts of this

11:25  11   case, disregard that impression, because you are the

11:25  12   sole judges of the facts in this case.

11:25  13                   These are my instructions to you on the

11:25  14   law, and other than these, disregard anything I may

11:25  15   have said or done during the trial as you arrive at

11:25  16   your verdict.

11:25  17                   You should consider all of the

11:25  18   instructions that I'm about to give you about the law

11:25  19   as a whole.  Regard each instruction in light of the

11:25  20   others.  Do not isolate any particular statement or

11:25  21   paragraph.

11:25  22                   The testimony of the witnesses and other

11:25  23   exhibits introduced by the parties constitute all of

11:25  24   the evidence.  The statements of counsel are not

11:25  25   evidence.  They are only arguments.  It is important

1034

11:25  1    for you to distinguish between arguments of counsel and

11:25  2    the evidence on which those arguments rest.

11:25  3             What the lawyers say or do is not

11:25  4    evidence.  You may, however, consider their arguments

11:25  5    in light of the evidence that has been admitted in

11:25  6    determining whether the evidence admitted in this trial

11:25  7    supports their arguments.

11:25  8             Determine the facts from all the evidence

11:25  9    that you have heard and the other evidence submitted.

11:26  10   You are the judges of the facts.  But in finding those

11:26  11   facts, you must apply the law as I am giving it to you

11:26  12   now in the instructions.

11:26  13            You are required by law to decide this

11:26  14   case in a fair, impartial, and unbiased manner based

11:26  15   exclusively and entirely on the law and on the evidence

11:26  16   presented to you in this courtroom.  Do not be

11:26  17   influenced by passion or prejudice or sympathy you

11:26  18   might have for either party in arriving at your

11:26  19   verdict.

11:26  20            After the remainder of these instructions

11:26  21   after lunch, you will hear closing arguments from the

11:26  22   attorneys.  These are the statements and arguments of

11:26  23   attorneys.  They are not evidence.  They are not

11:26  24   instructions on the law.  But they are intended to

11:26  25   assist you in understanding the evidence and the

| | | |
|---|---|---|
| 11:26 | 1 | parties' contentions. |
| 11:26 | 2 | A verdict form has been -- it's easier |
| 11:26 | 3 | for me to just tell you what's going to happen. |
| 11:26 | 4 | After you hear the closing arguments, |
| 11:26 | 5 | you're going to go back to the jury room, and you're |
| 11:26 | 6 | going to have the verdict form waiting there for you. |
| 11:26 | 7 | Also, Jen will come back, and she will help you with |
| 11:27 | 8 | the monitor that you'll use to look at the exhibits |
| 11:27 | 9 | that were admitted in this trial.  And I'll give you a |
| 11:27 | 10 | couple more instructions about that at the end. |
| 11:27 | 11 | Answer each question in the verdict form |
| 11:27 | 12 | from facts as you find them to be.  Do not decide who |
| 11:27 | 13 | you think should win the case and answer the questions |
| 11:27 | 14 | to reach any result.  Your answers and your verdict |
| 11:27 | 15 | must be unanimous. |
| 11:27 | 16 | Let's talk first about what is evidence. |
| 11:27 | 17 | The evidence that you are to consider |
| 11:27 | 18 | consists of the testimony of witnesses here at trial or |
| 11:27 | 19 | at depositions that were presented to you, the |
| 11:27 | 20 | documents and exhibits that I admitted into evidence, |
| 11:27 | 21 | and any facts the lawyers agree or stipulated to.  You |
| 11:27 | 22 | are to apply any fair inferences and reasonable |
| 11:27 | 23 | conclusions you could draw from the facts and |
| 11:27 | 24 | circumstances if you believe they've been proven. |
| 11:27 | 25 | Nothing else is evidence.  Statements, |

11:27  1    arguments, and questions by lawyers are not evidence.

11:27  2    Objections to questions are not evidence.

11:27  3            The attorneys seated in front of you have

11:27  4    objected if they believed that documents or testimony

11:28  5    that was attempted to be offered into evidence was

11:28  6    improper under the rules of evidence.  I made legal

11:28  7    rulings on those objections, but those rulings are not

11:28  8    evidence.

11:28  9            If I made any comments or asked any

11:28  10   questions, they are not evidence.  Your notes, if you

11:28  11   took any, are not evidence.

11:28  12           But generally speaking, there are two

11:28  13   types of evidence.  One is direct, such as the

11:28  14   testimony of an eyewitness.  The other is indirect or

11:28  15   circumstantial, which is evidence that proves a fact

11:28  16   from which you can logically conclude another fact

11:28  17   exists.

11:28  18           As a general rule, the law makes no

11:28  19   distinction between direct and circumstantial evidence.

11:28  20   It simply requires that you determine the facts from

11:28  21   all the evidence that you've heard in the case, whether

11:28  22   it was direct, circumstantial, or any combination.

11:28  23           When you're judging the facts, consider

11:28  24   all the evidence, both direct and circumstantial, but

11:28  25   that does not mean that you have to believe all the

11:28  1    evidence.  Rather, it is entirely up to you to give the

11:28  2    evidence that you heard in this case whatever weight

11:28  3    you individually as the judges believe it deserves.

11:29  4              It is up to you to decide which witnesses

11:29  5    to believe or not, the weight you give any testimony

11:29  6    you heard, and how much of any witness' testimony you

11:29  7    as the judges choose to accept or not.

11:29  8              The fact that the plaintiff filed a

11:29  9    lawsuit is not evidence that it is entitled to a

11:29  10   judgment.  Because the act of making a claim in a

11:29  11   lawsuit by itself does not in any way tend to establish

11:29  12   that the claim is valid and it is not evidence.

11:29  13             But you must also remember that the fact

11:29  14   that Cisco, the defendant, has raised arguments against

11:29  15   those claims asserted is not evidence, that it is

11:29  16   entitled to a judgment.  Because the act of making

11:29  17   defensive arguments by itself does not in any way

11:29  18   establish that those arguments have merit and,

11:29  19   therefore, they are not evidence.

11:29  20             You must not conduct any independent

11:29  21   research or investigation.  You must make your

11:29  22   decisions based only on the evidence set forth during

11:29  23   the trial and nothing new.

11:29  24             During your deliberations -- this is --

11:29  25   I'm going off script.

1038

11:29  1          During your deliberations, you will have

11:29  2    to remain sequestered with each other, and so you won't

11:30  3    be making any independent investigation.  You'll be

11:30  4    with each other.

11:30  5          Some evidence might have been admitted

11:30  6    for a limited purpose only.  If I instructed you the

11:30  7    evidence was admitted for a limited purpose, consider

11:30  8    it only for that limited purpose, no other.

11:30  9          It's up to you as the judges to determine

11:30  10   the question or credibility of the truthfulness of the

11:30  11   witnesses.  In weighing the testimony of the witnesses,

11:30  12   consider their manner and demeanor on the witness

11:30  13   stand, any feelings or interest they might have had in

11:30  14   the case, any prejudice or bias they might have, and

11:30  15   the consistency or inconsistency of their testimony

11:30  16   considered in the light of the circumstances.

11:30  17         For example, was the witness contradicted

11:30  18   by other credible evidence?  Did he or she make

11:30  19   statements at other times and places contrary to those

11:30  20   made here on the witness stand?  You must give the

11:30  21   testimony of each witness the credibility that you

11:30  22   think it deserves.

11:30  23         Even though a witness may be a party to

11:30  24   the action and is therefore interested to its outcome,

11:31  25   the testimony can obviously still be accepted by you as

—1039—

11:31  1   long as it's not contradicted by direct evidence or by

11:31  2   any inference that may be drawn from the evidence so

11:31  3   long as you believe that testimony.

11:31  4                You're not to decide the case by counting

11:31  5   the number of witnesses who have testified for either

11:31  6   side.  Witness testimony is weighed.  Witnesses are not

11:31  7   counted.  The test is not the relative number of

11:31  8   witnesses but the relative convincing force of each

11:31  9   witness' testimony and the evidence.

11:31  10               The testimony of even a single witness is

11:31  11  sufficient to prove any fact, even if a greater number

11:31  12  of witnesses testified to the contrary, if after having

11:31  13  considered all the evidence, you believe that single

11:31  14  witness.

11:31  15               What does it mean by impeachment?  In

11:31  16  determining the weight to give the testimony of a

11:31  17  witness, consider whether there's evidence that at some

11:31  18  other time he or she did something or failed to do or

11:31  19  say something that contradicted the testimony given by

11:31  20  the witness at trial.

11:31  21               Remember this:  A simple mistake by a

11:31  22  witness does not necessarily mean that the witness was

11:31  23  not telling the truth as he or she remembered it.

11:32  24  Because we're people.  And people forget things.  Or we

11:32  25  remember things inaccurately.

1040

| | |
|---|---|
| 11:32 | 1 |
| 11:32 | 2 |
| 11:32 | 3 |

So if a witness -- if you believe a witness made a misstatement, consider whether it was an intentional falsehood or perhaps an innocent mistake.

The significance of that misstatement may depend on whether it related to something important or an unimportant detail.  This instruction applies to the testimony of every witness that you heard.

Certain testimony may be presented to you through a deposition, which is sworn, recorded answers to questions that the witness was asked in advance of trial.

Under some circumstances, a witness might not be present to testify from the witness stand.  And their testimony may still be presented because it's under oath and it's in the form of a deposition. Sometime before the trial, attorneys representing all the parties in the case questioned the witness under oath.

There was a court reporter there, and he or she recorded the testimony.  The testimony -- the question and answers have been read and/or shown to you.  The deposition testimony is entitled to the same consideration, or I usually say "dignity," and is to be weighed and otherwise considered by you in the same way as if the witness had been present in person and had

1041

11:33  1    testified from the witness stand.

11:33  2              You heard testimony from several experts.

11:33  3    Expert testimony is testimony from a person who has

11:33  4    developed a special skill or knowledge in some science,

11:33  5    profession, or business.  This skill or knowledge is

11:33  6    not common to the average person.  Rather, it has been

11:33  7    acquired by the expert through special study or

11:33  8    experience.

11:33  9              You will get to weigh the expert's

11:33 10    testimony just like you will any other witness'

11:33 11    testimony.  In weighing expert testimony, consider

11:33 12    their qualifications, the reason for their opinions,

11:33 13    and the reliability of the information supporting their

11:33 14    opinions.  And also consider all the factors I've given

11:33 15    you with respect to every witness.

11:34 16              Expert testimony should receive whatever

11:34 17    weight and credit you think appropriate, given all the

11:34 18    evidence in the case.  Measure it against all the

11:34 19    evidence and testimony that you've heard.  Again, like

11:34 20    any witness, you are free to accept and you are free to

11:34 21    reject the testimony of any witness you heard.

11:34 22              You saw certain exhibits shown to you,

11:34 23    such as PowerPoint presentations or perhaps posters or

11:34 24    models, which are only illustrations of evidence.  They

11:34 25    are not evidence themselves.  We called them,

1042

| | | |
|---|---|---|
| 11:34 | 1 | hopefully, so you know the difference, demonstrative |
| 11:34 | 2 | exhibits.  Demonstrative exhibits are a party's |
| 11:34 | 3 | description, picture, or model used to describe |
| 11:34 | 4 | something involved in this trial.  If your recollection |
| 11:34 | 5 | of the evidence differs from the demonstrative exhibit, |
| 11:34 | 6 | rely on your recollection. |
| 11:34 | 7 | I'll divert from the script here for a |
| 11:34 | 8 | second to let you know, occasionally I get notes from |
| 11:34 | 9 | jurors saying they can't find an exhibit.  It is likely |
| 11:34 | 10 | if you can't find an exhibit, it's because it was a |
| 11:34 | 11 | demonstrative exhibit and it was not actually entered |
| 11:35 | 12 | as an exhibit at trial.  You're still welcome to send |
| 11:35 | 13 | me questions, but typically that is the answer you will |
| 11:35 | 14 | get back. |
| 11:35 | 15 | Certain charts and summaries have been |
| 11:35 | 16 | shown to you solely to help explain or summarize facts |
| 11:35 | 17 | disclosed by books, records, and other documents that |
| 11:35 | 18 | are in evidence.  These charts and summaries are not |
| 11:35 | 19 | evidence or proof of any facts unless I specifically |
| 11:35 | 20 | admitted the chart or summary into evidence.  Again, |
| 11:35 | 21 | determine the facts in the case only from the evidence |
| 11:35 | 22 | I admitted. |
| 11:35 | 23 | We're now turning to the burdens of |
| 11:35 | 24 | proof. |
| 11:35 | 25 | In any legal action, civil or criminal, |

—1043—

| | | |
|---|---|---|
| 11:35 | 1 | the facts must be proved by a required amount of |
| 11:35 | 2 | evidence known as a standard of proof.  This is a civil |
| 11:35 | 3 | case.  The cases involve two different standards of |
| 11:35 | 4 | proof.  First, preponderance of the evidence; second, |
| 11:35 | 5 | clear and convincing evidence.  The burden of meeting |
| 11:35 | 6 | the applicable standards of proof is on the plaintiff |
| 11:35 | 7 | on some issues and on the defendant for others. |
| 11:35 | 8 | Let's talk about first the standard of |
| 11:35 | 9 | proof of preponderance of the evidence. |
| 11:36 | 10 | The plaintiff has the burden of proving |
| 11:36 | 11 | its allegations of patent infringement, and, if there |
| 11:36 | 12 | is infringement, the amount of damages by the standard |
| 11:36 | 13 | of a preponderance of the evidence. |
| 11:36 | 14 | What does that mean?  It means to prove |
| 11:36 | 15 | that something is more likely true than not.  Evidence |
| 11:36 | 16 | that persuades you the claim is more likely true than |
| 11:36 | 17 | not. |
| 11:36 | 18 | Sometimes we talk about this, you may |
| 11:36 | 19 | have heard the lawyers say it's the greater weight and |
| 11:36 | 20 | degree of credible testimony.  You can think of the |
| 11:36 | 21 | preponderance of the evidence standard as slightly |
| 11:36 | 22 | greater than 50 percent. |
| 11:36 | 23 | If you think that plaintiff failed to |
| 11:36 | 24 | prove any element of its claim of patent infringement |
| 11:36 | 25 | or damages by a preponderance of the evidence, it |

—1044—

11:36  1    cannot recover for its claim.

11:36  2                    With respect to damages and infringement,

11:36  3    the defendant Cisco has no burden of proof.

11:36  4                    Now, let's turn to clear and convincing

11:36  5    evidence which does have to do with the defendant in

11:36  6    this case.

11:36  7                    The ultimate burden of proof for -- the

11:37  8    ultimate burden of proof of proving by clear and

11:37  9    convincing evidence that the asserted claims of the

11:37  10   patents are invalid is exclusively on the defendant

11:37  11   Cisco.  The burden never shifts.

11:37  12                   For invalidity, you must use a higher

11:37  13   standard, meaning a higher standard than what we just

11:37  14   heard of, of a preponderance of the evidence.  Here,

11:37  15   the higher standard is -- that you must meet is to

11:37  16   decide whether the facts have been proven by clear and

11:37  17   convincing evidence.  That is, have you been left with

11:37  18   a clear conviction that the fact has been proven?  It

11:37  19   is evidence so clear, direct, and weighty and

11:37  20   convincing as to enable you to come to a clear

11:37  21   conviction without hesitancy.

11:37  22                   Now, let me help you out in this way, if

11:37  23   I can.

11:37  24                   You may have heard the criminal standard

11:37  25   of beyond a reasonable doubt.  I've now given you three

−1045−

11:37   1    burdens of proof:  preponderance, clear and convincing,

11:37   2    beyond a reasonable doubt.  On a scale -- if we were to

11:38   3    do a scale from the lightest to the heaviest, on a

11:38   4    scale of various standards of proof, the first that you

11:38   5    would come to would be the preponderance of the

11:38   6    evidence where proof need only be sufficient to tip the

11:38   7    scales in favor of the party proving the fact.  To the

11:38   8    other end, the heaviest burden of proof, which is a

11:38   9    criminal case, of beyond a reasonable doubt.

11:38   10            When you are trying to figure out what

11:38   11   needs to be proved with regard to clear and convincing

11:38   12   evidence, think of it as being between those two

11:38   13   standards.

11:38   14            To help you follow the evidence, I'm

11:38   15   going to give you a summary of the contentions.

11:38   16            The plaintiff filed suit in this court

11:38   17   seeking money damages from Cisco for allegedly

11:38   18   infringing the '858 patent by using in the United

11:38   19   States methods that are covered by Claims 1 through 5

11:38   20   of the '858 patent.  These are the asserted claims.

11:38   21            The products that are alleged to infringe

11:38   22   are Cisco's Webex Audio conferencing products,

11:38   23   including Webex App, Suite, Meeting, Messaging,

11:38   24   Calling, iOS App, Android App, Webex Meeting for iOS,

11:39   25   Webex Meeting for Android, Webex Teams, Webex Meetings

—1046—

| | | |
|---|---|---|
| 11:39 | 1 | for Microsoft Teams, and finally, Webex Training. |
| 11:39 | 2 | Defendant asserts it does not infringe, |
| 11:39 | 3 | and it also argues that the five claims are invalid. |
| 11:39 | 4 | If you decide that any asserted claim of the |
| 11:39 | 5 | '858 patent has been infringed, and you also decide |
| 11:39 | 6 | that none of them are invalid, or at least one is not |
| 11:39 | 7 | invalid, then you will need to decide any money damages |
| 11:39 | 8 | to be awarded to compensate it for the infringement. |
| 11:39 | 9 | Before you can decide many of the issues |
| 11:39 | 10 | in this case, you will need to understand the role of |
| 11:39 | 11 | patent claims.  Patent claims are the numbered |
| 11:39 | 12 | sentences at the end of each patent.  The claims are |
| 11:39 | 13 | important because it is the words of the claims that |
| 11:39 | 14 | define what a patent covers.  The figures and text in |
| 11:39 | 15 | the rest of the patent provide a description and/or |
| 11:39 | 16 | examples of the invention and provide a context for the |
| 11:39 | 17 | claims, but it is the claims that define the breadth of |
| 11:40 | 18 | the patent's coverage.  Therefore, what a patent covers |
| 11:40 | 19 | depends in turn on what each of the claims covers. |
| 11:40 | 20 | Each claim sets forth -- and again, there |
| 11:40 | 21 | are five claims asserted in this case.  Each claim sets |
| 11:40 | 22 | forth its requirements in a single sentence.  The |
| 11:40 | 23 | requirements of a claim are often referred to as claim |
| 11:40 | 24 | elements or limitations.  The coverage of a patent is |
| 11:40 | 25 | assessed in a claim-by-claim basis. |

11:40  1          When a thing, such as a product or

11:40  2  process, meets all the requirements of a claim, it is

11:40  3  said to cover that thing.  That thing is said to fall

11:40  4  within the scope of the claim.  In other words, a claim

11:40  5  covers a product or process where each of the claim

11:40  6  elements or limitations is present in the product or

11:40  7  process.

11:40  8          You should not take my definition of the

11:40  9  language of the claims as an indication I have a view

11:40  10  as to how you as the judges in this case should decide

11:40  11  the issues you are being asked to decide.  For any

11:40  12  words in the claims for which I have not provided you a

11:40  13  definition, apply the ordinary meaning of those terms

11:41  14  in the field of the patent.

11:41  15          Patent claim terms are given their plain

11:41  16  and ordinary meaning as understood by one of ordinary

11:41  17  skill in the art.  This means the claims were read and

11:41  18  understood by a person of skill in the field of the

11:41  19  patent in light of the patent's specification and

11:41  20  prosecution history.

11:41  21          Claim term "each."  "Each" has a plain

11:41  22  and ordinary meaning which can include "one or more."

11:41  23          Okay.  Let's turn now to the difference

11:41  24  between independent and dependent claims in a patent.

11:41  25  There are two, independent and dependent.  They're both

1048

| | | |
|---|---|---|
| 11:41 | 1 | asserted in this case. |
| 11:41 | 2 | What is an independent claim?  An |
| 11:41 | 3 | independent claim sets forth all the requirements that |
| 11:41 | 4 | must be met in order to be covered by that claim. |
| 11:41 | 5 | Therefore, you can look only at that claim, and it's |
| 11:41 | 6 | not necessary to look at any other claim to determine |
| 11:41 | 7 | what an independent claim covers.  In this case, |
| 11:41 | 8 | Claim 1 is the only independent claim. |
| 11:42 | 9 | The remainder of the asserted claims are |
| 11:42 | 10 | dependent claims.  What does that mean?  A dependent |
| 11:42 | 11 | claim does not itself recite all the requirements of |
| 11:42 | 12 | the dependent claim but refers to another claim for |
| 11:42 | 13 | some of its requirements.  In other words, the claim |
| 11:42 | 14 | depends on another claim.  A dependent claim |
| 11:42 | 15 | incorporates all the requirements of the claim to which |
| 11:42 | 16 | it refers.  The dependent claim then adds its own |
| 11:42 | 17 | additional requirements. |
| 11:42 | 18 | To determine what a dependent claim |
| 11:42 | 19 | covers, you must look at both the dependent claim |
| 11:42 | 20 | itself and the other claim to which it refers.  A |
| 11:42 | 21 | method that meets all the requirements of both the |
| 11:42 | 22 | dependent claim and the claim to which the dependent |
| 11:42 | 23 | claim refers is covered by the dependent claim. |
| 11:42 | 24 | If any requirement of either the |
| 11:42 | 25 | dependent claim is not met or if any requirement of the |

—1049—

11:42    1    independent claim from which the dependent claim

11:42    2    depends is not met, then the method is not covered by

11:43    3    that particular dependent claim.

11:43    4              The first issue you'll have to decide in

11:43    5    this case is infringement.  Allow me to tell you what

11:43    6    the plaintiff has to do to prove that Cisco has

11:43    7    infringed any of the asserted claims of the

11:43    8    '858 patent.

11:43    9              First, assess it on a claim-by-claim

11:43   10    basis.  For example, there are five claims asserted.

11:43   11    There may be infringement as to one claim but not

11:43   12    infringement as to another.

11:43   13              If, as here, a patent owner asserts

11:43   14    multiple patent claims against the same product or

11:43   15    method, then you must compare each claim separately

11:43   16    against the product or method to determine whether the

11:43   17    product or method infringes the individual patent

11:43   18    claim.  You may also find that none of the claims are

11:43   19    infringed.

11:43   20              So going back, you can find they all

11:43   21    infringe, you can find that none infringe, you can find

11:43   22    that one or more infringe.  You are the judges in the

11:43   23    case.

11:43   24              Here, the plaintiff alleges that

11:44   25    defendant accused Webex Audio conferencing products,

1050

```
11:44   1    that they infringe Claims 1, 2, 3, 4, and 5 of the
11:44   2    '858 patent.  Determine separately for each asserted
11:44   3    claim whether you believe there's infringement.
11:44   4            For the dependent claims, that's 2
11:44   5    through 5, if you find that a claim to which the
11:44   6    dependent claim refers does not infringe, there cannot
11:44   7    be infringement of the dependent claim.  But if you
11:44   8    find that an independent claim has been infringed, you
11:44   9    must still decide then separately whether the method
11:44  10    meets the additional requirements of the other claims
11:44  11    that are asserted that depend from the independent
11:44  12    claim to determine whether those dependent claims have
11:44  13    also been infringed.
11:44  14            The dependent claim includes all the
11:44  15    requirements of the claims to which it refers plus the
11:44  16    additional requirements of its own.
11:44  17            To prove infringement, the plaintiff must
11:44  18    prove by a preponderance of the evidence that defendant
11:44  19    used a method that infringed any of the asserted claims
11:44  20    of the '858 patent.
11:44  21            Now, let's talk about prior art.
11:44  22            In order for someone to be entitled to a
11:45  23    patent, the invention must actually be new or novel and
11:45  24    not obvious over what came before, which is referred to
11:45  25    as prior art.
```

—1051—

```
11:45   1              Prior art is considered in determining
11:45   2   whether the Claims 1 through 5 of the '858 patent would
11:45   3   have been obvious.  Prior art may include items that
11:45   4   were publicly known or that would have been -- or that
11:45   5   have been offered for sale or used or references such
11:45   6   as publications or patents that disclosed the claimed
11:45   7   inventions or elements of the claimed invention.
11:45   8              The defendant contends the following
11:45   9   prior art references render obvious the asserted claims
11:45  10   of the '858 patent:  One is Botzko Claims 1 through 3,
11:45  11   and one is Botzko + Rosenberg for Claims 4 and 5.
11:45  12              Let's talk about the obviousness defense
11:45  13   defendant is asserting.
11:45  14              Even though an invention may not have
11:45  15   been identically disclosed or described in a single
11:46  16   prior art reference, to be patentable, the invention
11:46  17   must also not have been obvious to a person of ordinary
11:46  18   skill in the field of technology over the patent at the
11:46  19   time the invention was made.
11:46  20              Plaintiff -- I'm sorry.  Defendant
11:46  21   contends that Claims 1 through 3 of the '858 patent
11:46  22   were obvious in light of Patent '597 to Botzko.
11:46  23   They've referred to it as "the Botzko patent."
11:46  24              Then they claim -- they contend that
11:46  25   Claims 4 and 5 of the '858 patent were also obvious in
```

—1052—

11:46  1    view of that prior art, Botzko, B-o-t-z-k-o, in

11:46  2    combination with the IETF Internet draft entitled An

11:46  3    RTP Payload Format for User Multiplexing by Rosenberg,

11:46  4    et al.

11:46  5              Defendant may establish that a patent

11:46  6    claim was invalid by showing by clear and convincing

11:46  7    evidence that the claimed invention would have been

11:46  8    obvious to a person having ordinary skill in the art at

11:46  9    the time the invention was made.

11:46  10             In determining whether a claimed

11:46  11   invention is obvious, consider the level of ordinary

11:47  12   skill in the field of technology of the patent that

11:47  13   someone would have had at the time the claimed

11:47  14   invention was made, the scope and content of the prior

11:47  15   art, any differences between the prior art and the

11:47  16   claimed invention, as well as the ordinary knowledge of

11:47  17   a person of ordinary skill at the time of the

11:47  18   invention.

11:47  19             Don't use hindsight.  Consider only what

11:47  20   was known at the time of the invention of the

11:47  21   '858 patent.  The existence of each and every element

11:47  22   of the claimed invention in the prior art does not

11:47  23   necessarily prove obviousness.  Because most, if not

11:47  24   all, inventions rely on building blocks of prior art.

11:47  25             In considering whether a claimed

1053

| | | |
|---|---|---|
| 11:47 | 1 | invention is obvious, consider whether as of the date |
| 11:47 | 2 | of the asserted patent there was a reason that would |
| 11:47 | 3 | have prompted a person having ordinary skill in the |
| 11:47 | 4 | field to combine the known elements in a way that the |
| 11:47 | 5 | claimed invention does, taking into account the |
| 11:47 | 6 | following factors. |
| 11:47 | 7 | And let me say these factors are not |
| 11:47 | 8 | limiting.  These are suggestive to you. |
| 11:47 | 9 | Whether the claimed invention was merely |
| 11:48 | 10 | the predictive -- predictable result of using prior art |
| 11:48 | 11 | elements according to their known functions; |
| 11:48 | 12 | Whether the claimed invention provides an |
| 11:48 | 13 | obvious solution to a known problem in the relevant |
| 11:48 | 14 | field; |
| 11:48 | 15 | Whether the prior art teaches or suggests |
| 11:48 | 16 | the desirability of combining elements claimed in the |
| 11:48 | 17 | invention; |
| 11:48 | 18 | Whether the prior art teaches away from |
| 11:48 | 19 | combining elements in the claimed invention; |
| 11:48 | 20 | Whether it would have been obvious to try |
| 11:48 | 21 | the combinations of elements such as when there's a |
| 11:48 | 22 | design need or market pressure to solve a problem and |
| 11:48 | 23 | there are a finite number of identified, predictable |
| 11:48 | 24 | solutions; and |
| 11:48 | 25 | Whether the changed result -- whether the |

11:48   1    change would have resulted more from the design

11:48   2    incentives or other market forces.

11:48   3              To find it rendered the claim invention

11:48   4    obvious, you must find that the prior art provided a

11:48   5    reasonable expectation of success.  Obvious to try is

11:48   6    not sufficient in unpredictable technologies.

11:48   7              In determining whether the claimed

11:48   8    invention was obvious, consider each claim separately

11:48   9    and consider only what was known at the time of the

11:48   10   invention.

11:48   11             The defendant also makes an invalidity

11:49   12   argument which is called based on written description.

11:49   13             The patent law requires certain

11:49   14   requirements for the -- for the part of the patent

11:49   15   called the specification.

11:49   16             That's the part that comes before the

11:49   17   claims.

11:49   18             The written description requirement is

11:49   19   designed to ensure that the inventor was fully in

11:49   20   possession of the full scope of claimed invention of

11:49   21   the patent's effective filing date.

11:49   22             Defendant claims -- defendant contends

11:49   23   Claims 1 through 5 of the '858 patent are invalid

11:49   24   because the specification of the '858 patent does not

11:49   25   contain an adequate written description of the

| | | |
|---|---|---|
| 11:49 | 1 | invention. |
| 11:49 | 2 | To succeed, a defendant must show by the |
| 11:49 | 3 | burden of proof of a clear and convincing evidence that |
| 11:49 | 4 | a person having ordinary skill in the field reading the |
| 11:49 | 5 | patent specification as of the claimed effective filing |
| 11:49 | 6 | date of June 28, 2000 would not have recognized that it |
| 11:49 | 7 | describes the full scope of the invention as it is |
| 11:49 | 8 | found and claimed in Claims 1 through 5 of the |
| 11:50 | 9 | '858 patent. If a patent claim lacks adequate written |
| 11:50 | 10 | description, it is invalid. |
| 11:50 | 11 | In deciding whether the patent satisfies |
| 11:50 | 12 | this written description requirement, you must consider |
| 11:50 | 13 | the description from the viewpoint of a person who has |
| 11:50 | 14 | ordinary skill in the field of technology of the patent |
| 11:50 | 15 | as of the effective filing date. |
| 11:50 | 16 | The specification must describe the full |
| 11:50 | 17 | scope of the claimed invention, including each element |
| 11:50 | 18 | thereof, either expressly or inherently. |
| 11:50 | 19 | A claim element is disclosed inherently |
| 11:50 | 20 | if a person having ordinary skill in the field as of |
| 11:50 | 21 | the effective filing date would have understood that |
| 11:50 | 22 | the element is necessarily present in what the |
| 11:50 | 23 | specification discloses. |
| 11:50 | 24 | It is not sufficient that the |
| 11:50 | 25 | specification discloses only enough to make the claimed |

                                                                    —1056—

11:50   1    invention obvious to a person having ordinary skill.

11:50   2    The written description does not have to be in the

11:50   3    exact words of the claims.

11:50   4            The requirement may be satisfied by any

11:50   5    combination of words, structures, figures, diagrams,

11:51   6    formulas, et cetera, that are contained in the patent

11:51   7    specification.

11:51   8            Adequate written description does not

11:51   9    require either examples or an actual reduction to

11:51   10   practice of the claimed invention.  However, a mere

11:51   11   wish or plan for obtaining the claimed invention is not

11:51   12   adequate written description.  Rather, the level of

11:51   13   disclosure required depends on a variety of factors,

11:51   14   such as the existing knowledge in the particular field,

11:51   15   the extent and content of the prior art, the maturity

11:51   16   of the science or technology, and other considerations

11:51   17   appropriate to the subject matter.

11:51   18            Again, I've said about a dozen times

11:51   19   level of ordinary skill.  What does that mean?

11:51   20            In deciding what the level of ordinary

11:51   21   skill in the field of the invention is, consider all

11:51   22   the evidence introduced at trial, including but not

11:51   23   limited to (1), the level of education, experience of

11:51   24   the inventor and other persons actively working in that

11:51   25   technological field; (2), the types of problems

11:51  1    encountered in the field; (3), prior art solutions to

11:52  2    those problems; (4), the rapidity with which

11:52  3    innovations are made; and (5), the sophistication of

11:52  4    the technology.

11:52  5              We are now turning to the final element

11:52  6    that you must consider, which is damages.

11:52  7              If you find the defendant did infringe

11:52  8    any valid claim of plaintiff's patent, you must then

11:52  9    consider what amount of damages to award to the

11:52  10   plaintiff.  I'm about to instruct you about what -- how

11:52  11   the measure -- how to measure damages, but by

11:52  12   instructing you about damages, I am not suggesting who

11:52  13   should win this case on any issue.

11:52  14             If you find that the defendant has not

11:52  15   infringed any valid claim of the asserted patents, then

11:52  16   the plaintiff is not entitled to any damages.  But

11:52  17   remember, you are the judges here.  I have no opinion

11:52  18   as to any issue in this case.  If you award damages,

11:52  19   they must be adequate to compensate plaintiff for any

11:52  20   infringement you find.

11:53  21             A damage award should put the plaintiff

11:53  22   in approximately the same financial position it would

11:53  23   have been had the infringement not occurred.  Your

11:53  24   damages award, if you reach the issue of damages,

11:53  25   should not be less than what a patentholder would have

1058

| | | |
|---|---|---|
| 11:53 | 1 | received had it been paid a reasonable royalty. |
| 11:53 | 2 | The damages you award are meant to |
| 11:53 | 3 | compensate the plaintiff. They are not meant to punish |
| 11:53 | 4 | the defendant. You may not include in your award any |
| 11:53 | 5 | additional amount as a fine or penalty above what you |
| 11:53 | 6 | believe as the judges is necessary to compensate the |
| 11:53 | 7 | plaintiff for the infringement in order to punish the |
| 11:53 | 8 | defendant. |
| 11:53 | 9 | The plaintiff has the burden to establish |
| 11:53 | 10 | the amount of damages by the burden of proof of a |
| 11:53 | 11 | preponderance of the evidence. You should award only |
| 11:53 | 12 | those damages that the plaintiff establishes to you as |
| 11:53 | 13 | judges are more likely than not. |
| 11:53 | 14 | While plaintiff is not required to prove |
| 11:53 | 15 | the amount of its damages with mathematical precision, |
| 11:53 | 16 | it must prove them with reasonable certainty. You |
| 11:53 | 17 | should not award damages if they are speculative, only |
| 11:54 | 18 | possible, or based on guesswork. |
| 11:54 | 19 | In this case the plaintiff seeks damages |
| 11:54 | 20 | in the form of what it contends to be a reasonable |
| 11:54 | 21 | royalty. You must be careful to ensure that the award, |
| 11:54 | 22 | if you give one, is no more and no less than the value |
| 11:54 | 23 | of the asserted patent. |
| 11:54 | 24 | A royalty's a payment made to a |
| 11:54 | 25 | patentholder in exchange for the right to make, use, or |

11:54  1    sell the claimed invention.  A reasonable royalty is

11:54  2    defined as the money amount the patent owner and the

11:54  3    alleged infringer would have agreed to if it had

11:54  4    entered a hypothetical negotiation immediately prior to

11:54  5    when the infringement first began.

11:54  6                In considering this hypothetical

11:54  7    negotiation, focus on what the expectations of the

11:54  8    patentholder and the alleged infringer would have been

11:54  9    had they entered into an agreement at that time.  Have

11:54 10    they actually -- and have they acted reasonably in

11:54 11    their negotiations.  In determining this, assume that

11:54 12    both parties believe the patent was valid and infringed

11:54 13    and that they were both willing to enter into an

11:55 14    agreement.

11:55 15                The reasonable royalty you determine must

11:55 16    be a royalty that would have resulted from the

11:55 17    hypothetical negotiation, not a royalty that either

11:55 18    party would have liked or preferred.  Evidence of

11:55 19    things that happened after the infringement first began

11:55 20    can be considered by you in evaluating the reasonable

11:55 21    royalty, but only to the extent that the evidence aids

11:55 22    you in assessing what royalty would have resulted at

11:55 23    the time of the hypothetical negotiation which would

11:55 24    have occurred immediately prior to the first

11:55 25    infringement.

11:55    1          The reasonable royalty award must be

11:55    2    based on the incremental value that the patented

11:55    3    invention adds to the accused process.  When the

11:55    4    infringing methods have both patented and unpatented

11:55    5    features, then you must measure the value and require a

11:55    6    determination of the value added by the patented

11:55    7    feature.

11:55    8          In determining a reasonable royalty, you

11:55    9    must consider all the facts known and available to the

11:55    10   parties at the time the infringement began.  Some of

11:56    11   the kinds of factors you may consider in making your

11:56    12   determination are:

11:56    13         The value that the claimed invention

11:56    14   contributes to the accused product;

11:56    15         The value that factors other than the

11:56    16   claimed invention contribute to the accused product;

11:56    17         Comparable license agreements or other

11:56    18   transactions, such as those covering the use of the

11:56    19   claimed invention or similar technology.

11:56    20         But no one factor is dispositive.  You

11:56    21   can and must consider all the evidence that has been

11:56    22   presented to you in this case on all the factors.  You

11:56    23   may also consider any factor which in your mind would

11:56    24   have increased the royalty or decreased the royalty

11:56    25   that the alleged infringer would have been willing to

—1061—

11:56  1  pay and that the patentholder would have been willing

11:56  2  to accept as long as they acted as normal, prudent

11:56  3  businesspeople.

11:56  4          In deciding what is a reasonable royalty

11:56  5  that would have resulted from the hypothetical

11:56  6  negotiation, you may consider the factors that the

11:56  7  plaintiff and defendant or Webex would consider in

11:57  8  setting the amount Cisco should pay.  Let me list for

11:57  9  you a number of factors commonly known as the

11:57  10  Georgia-Pacific factors that you may consider.  And you

11:57  11  heard about these factors during the trial.  They will

11:57  12  sound -- they should sound familiar to you.

11:57  13          The royalties received by the patentee

11:57  14  for the licensing of the patent -- for the patent -- I

11:57  15  think there's a little typo -- it should be for the

11:57  16  licensing of the patent-in-suit, proving or tending to

11:57  17  prove an established royalty;

11:57  18          The rates paid by the licensee for the

11:57  19  use of other patents that are comparable to the

11:57  20  patent-in-suit.

11:57  21          Someone got overly ambitious on

11:57  22  "patent-in-suit."

11:57  23          The nature and scope of the license, as

11:57  24  exclusive or nonexclusive, or as restricted or

11:57  25  nonrestricted, nonrestricted in terms of territory or

1062

11:57    1    with respect to whom the manufactured product may be

11:57    2    sold;

11:57    3                The licensor's established policy and

11:57    4    marketing program to maintain his or her patent

11:57    5    monopoly by not licensing others to use the invention

11:58    6    or by granting licenses under special conditions

11:58    7    designed to preserve that monopoly;

11:58    8                The commercial relationship between the

11:58    9    licensor and licensee, if there is one, such as whether

11:58   10    they are competitors in the same territory and the same

11:58   11    line of business, or whether they might be inventor and

11:58   12    promoter;

11:58   13                The effect of selling the patented

11:58   14    specialty and promoting sales of other products of the

11:58   15    licensee, the existing value of the invention to the

11:58   16    licensor as a generator of sales of his nonpatented

11:58   17    items, and the extent of such derivative or convoyed

11:58   18    sales;

11:58   19                The duration of the patent and term of

11:58   20    the license;

11:58   21                The established profitability of the

11:58   22    product made under the patents, its commercial success,

11:58   23    and its current popularity;

11:58   24                The utility and advantages of the

11:58   25    patented property over the old modes or devices, if

1063

```
11:58   1    any, that have been used for working out similar
11:58   2    results;
11:58   3               The nature of the patented invention, the
11:58   4    character of the commercial embodiment of it as owned
11:58   5    and produced by the licensor, and benefits to those who
11:58   6    have used the invention;
11:58   7               The extent to which the infringer has
11:59   8    made use of the invention and any evidence probative of
11:59   9    the value of the use;
11:59   10              The portion of the profit or of the
11:59   11   selling price that may be customary in the particular
11:59   12   business or in comparable businesses to allow for the
11:59   13   use of the invention or analogous inventions;
11:59   14              The portion of the realizable profit that
11:59   15   should be credited to the invention as distinguished
11:59   16   from nonpatented elements, the manufacturing process,
11:59   17   business risks, or significant features or improvements
11:59   18   added by the infringer;
11:59   19              The opinion and testimony of qualified
11:59   20   experts;
11:59   21              And the amount that a licensor, such as
11:59   22   the patentee, and a licensee, such as the infringer,
11:59   23   would have agreed upon at the time the infringement
11:59   24   began as long as both acted reasonably and voluntarily
11:59   25   trying to reach an agreement; that is, the amount which
```

—1064—

| | | |
|---|---|---|
| 11:59 | 1 | a prudent licensee -- who desired, as a business |
| 11:59 | 2 | proposition, to obtain a license to manufacture and |
| 11:59 | 3 | sell a particular article embodying the patented |
| 11:59 | 4 | invention -- would have been willing to pay as a |
| 11:59 | 5 | royalty and yet be able to make a reasonable profit and |
| 11:59 | 6 | which amount would have been acceptable by a prudent |
| 11:59 | 7 | patentee who was willing to grant a license. |
| 11:59 | 8 | Any amount you find as damages must be |
| 12:00 | 9 | based on the value attributable to the patented |
| 12:00 | 10 | invention.  That means it must be distinct from the |
| 12:00 | 11 | unpatented features of the accused product or other |
| 12:00 | 12 | factors, such as marketing or advertising or, in this |
| 12:00 | 13 | case, defendant's size or market position. |
| 12:00 | 14 | A royalty compensating the plaintiff for |
| 12:00 | 15 | damages must reflect the value attributable to the |
| 12:00 | 16 | features of the product and no more.  The process of |
| 12:00 | 17 | separating the value of the allegedly infringing |
| 12:00 | 18 | features from the value of all other features and |
| 12:00 | 19 | aspects of the product is called apportionment. |
| 12:00 | 20 | Apportionment can be addressed in a |
| 12:00 | 21 | variety of ways, including by careful selection of the |
| 12:00 | 22 | royalty base to reflect the value added by the patented |
| 12:00 | 23 | features or by adjustment of the royalty rate so as to |
| 12:00 | 24 | discount the value of a product's nonpatented features, |
| 12:00 | 25 | or by a combination thereof. |

12:00  1          When the accused infringing products have

12:00  2    both patented and unpatented features, your award must

12:00  3    be apportioned so as based only on the value of the

12:01  4    patented features, no more.

12:01  5          In other words, the royalty base must be

12:01  6    closely tied to the patented invention.  It is not

12:01  7    sufficient to use a royalty base that is too high and

12:01  8    then adjust the damages downward by applying a lower

12:01  9    royalty rate.  It is not appropriate to select a

12:01  10   royalty base that is too low and then adjust it upward

12:01  11   by applying a higher royalty rate.

12:01  12         You must determine an appropriate royalty

12:01  13   rate and an appropriate royalty base to reflect the

12:01  14   value attributable to the patented invention alone.

12:01  15         Finally, comparable license agreements

12:01  16   are one factor that may inform your decision as to the

12:01  17   proper amount and form of the reasonable royalty award,

12:01  18   similar to the way in which the value of a house is

12:01  19   determined relative to the comparable houses sold in

12:01  20   the same neighborhood.

12:01  21         Whether a license agreement is comparable

12:01  22   to the license under the hypothetical license scenario

12:01  23   depends on many factors, such as whether they involve

12:01  24   comparable technologies, economic circumstances,

12:01  25   structure and scope.

-1066-

12:02  1              If there are differences between a

12:02  2  license agreement and the hypothetical license, you

12:02  3  must take those into account when you make your

12:02  4  reasonable royalty determination.

12:02  5              I wait until after the closing arguments.

12:02  6  The last two pages are just instructions on how to go

12:02  7  about deliberating.  So they're not on the law.

12:02  8              Ladies and gentlemen of the jury, it's

12:02  9  noon.  I suggest -- let me ask counsel.

12:02  10              If we start at 1:30, will that be long

12:02  11  enough, or would you prefer 1:45?  It's entirely up to

12:02  12  you.

12:02  13              MR. TRIBBLE:  1:30 or earlier would be

12:02  14  great for us.

12:02  15              THE COURT:  Okay.

12:02  16              MR. JONES:  1:30's great for us,

12:02  17  Your Honor.

12:02  18              THE COURT:  If you all will -- we've

12:02  19  brought in lunch.  As I told you, y'all are eating

12:02  20  lunch.  I'm going to go to a bar and drink heavily.

12:02  21              (Laughter.)

12:02  22              THE COURT:  So -- not -- no.  I'm not.

12:02  23              So we will start back up at 1:30.  Please

12:02  24  remember my instructions, and enjoy your lunch.

12:03  25              THE BAILIFF:  All rise.

1067

| | | |
|---|---|---|
| 12:03 | 1 | (Jury exited the courtroom.) |
| 12:03 | 2 | THE COURT:  Anything we need to take up? |
| 12:03 | 3 | MR. TRIBBLE:  Nothing from plaintiff, |
| 12:03 | 4 | Your Honor. |
| 12:03 | 5 | MR. JONES:  Nothing from the defendant, |
| 12:03 | 6 | Your Honor. |
| 12:03 | 7 | THE COURT:  Okay.  Thank you. |
| 01:34 | 8 | (Recess taken.) |
| 01:34 | 9 | THE BAILIFF:  All rise. |
| 01:34 | 10 | THE COURT:  Please remain standing for |
| 01:34 | 11 | the jury. |
| 01:34 | 12 | (Jury entered the courtroom.) |
| 01:34 | 13 | THE COURT:  You may be seated. |
| 01:34 | 14 | Counsel? |
| 01:34 | 15 | OPENING ARGUMENT ON BEHALF OF THE PLAINTIFF |
| 01:34 | 16 | MS. SRINIVASAN:  Ladies and gentlemen, my |
| 01:34 | 17 | name's Kalpana Srinivasan, and I want to start by |
| 01:34 | 18 | thanking you for your time and attention this week. |
| | 19 | On behalf of Paltalk and its CEO, Jason |
| 01:35 | 20 | Katz, we are very grateful for the attention that you |
| 01:35 | 21 | have given in this case. |
| 01:35 | 22 | We tried to present the case in a |
| 01:35 | 23 | straightforward fashion, and that's what I'd like to |
| 01:35 | 24 | try to do here today along with my partners who are |
| 01:35 | 25 | going to be assisting in our closing remarks. |

1068

01:35    1                The task that you have is determining

01:35    2    that Cisco infringed the '858 patent from Paltalk.

01:35    3                We presented to you the testimony of

01:35    4    Dr. Scott Schaefer who, as you could see from his

01:35    5    credentials again, is highly regarded in his field as

01:35    6    the head of computer science and engineering at Texas

01:35    7    A&M.

01:35    8                And what he endeavored to do and what he

01:35    9    demonstrated to you in hours of testimony is that he

01:35    10    meticulously reviewed Cisco's source code and technical

01:35    11    documents to determine infringement.

01:36    12                He showed you that he had looked at pages

01:36    13    of code, that he had looked at dozens of internal Cisco

01:36    14    documents.  And you can see some of that that I'm going

01:36    15    to show in the slides today, and you're welcome to

01:36    16    write down the exhibit numbers.  These are all in

01:36    17    evidence, and they will be back there in the jury room

01:36    18    with you.

01:36    19                And as you all know, because you were

01:36    20    here, he went through these documents to show how every

01:36    21    single limitation in the patent was met.

01:36    22                Dr. Schaefer is a very detailed-oriented

01:36    23    person, as you saw.  He did not cut corners.  It is our

01:36    24    job to prove every claim element, and that is what he

01:36    25    did in his testimony before you.

01:36  1          He did it for Claim 1, for all of those

01:36  2   eight elements.  And then he proceeded to do the same

01:36  3   for Claims 2 through 5, the dependent claims that add

01:36  4   other elements to them.  His analysis was rigorous, and

01:36  5   it was based on Cisco's own documentation and code.

01:36  6          One of the very, very surprising things

01:37  7   in this case is that Cisco's own witnesses came forward

01:37  8   and basically said the same thing as Dr. Schaefer.

01:37  9   They conceded that they did what the patent calls for.

01:37  10          You heard from Mr. Buckles, who is a

01:37  11   distinguished engineer at Cisco.  And he told you that

01:37  12   Cisco's Webex multiplexes and it mixes.  He admitted

01:37  13   that.

01:37  14          He told you and agreed that Cisco has

01:37  15   active speakers and active speaker lists.

01:37  16          He told you and agreed that Cisco's Webex

01:37  17   Meetings are capable of determining things about their

01:37  18   clients.

01:37  19          In addition to Mr. Buckles, Cisco also

01:37  20   brought Mr. Belcher, who's Mr. Buckles' boss.  And he

01:37  21   said no different.  He offered the testimony that was

01:37  22   also consistent with what Mr. Schaefer's -- or

01:38  23   Dr. Schaefer's analysis found.

01:38  24          And then Cisco brought an expert forward,

01:38  25   and he told you that really he didn't dispute any of

1070

01:38  1    these analyses that Dr. Schaefer had except with

01:38  2    respect to two elements of Claim 1.  He said for the

01:38  3    rest, Cisco has no dispute as to Paltalk's position

01:38  4    about infringement.  He would agree, and he agrees on

01:38  5    most points about how Webex operates.

01:38  6            And that, ladies and gentlemen, is

01:38  7    something that is unusual, and, frankly, remarkable in

01:38  8    this case, that the majority of witnesses agree about

01:38  9    how Webex works and how its audio functionality

01:38  10   performs.

01:38  11           So then you might ask yourselves, ladies

01:38  12   and gentlemen, why are we here?  Cisco's witnesses

01:38  13   could not say to the contrary about what Cisco does.

01:39  14   They didn't come in here and tell you that the code

01:39  15   shows a different functionality or that Cisco's

01:39  16   documents dispute infringement.  In fact, they didn't

01:39  17   show you any of that.

01:39  18           Each of their witnesses came in here.

01:39  19   They did not show you any source code.  They did not

01:39  20   show you any technical documents.

01:39  21           And I'd just like to really focus on that

01:39  22   issue, because these are high-ranking executives at

01:39  23   Cisco and an expert retained by Cisco.  They have

01:39  24   unlimited access to Cisco information.

01:39  25           You heard Mr. Buckles who admitted that.

—1071—

01:39  1   He has access to the source code of Webex, the

01:39  2   documentation.  Yet he chose not to show any of it in

01:39  3   his testimony to us during the course of this trial.

01:39  4              Instead, the only things we saw from

01:39  5   Cisco were a few drawings that their witnesses put up

01:39  6   on a board and a video about -- that's usually prepared

01:40  7   for Cisco users about the user functionality in Cisco's

01:40  8   Webex Audio.  This is it.

01:40  9              And ladies and gentlemen, you've been

01:40  10  instructed that you are to assess the evidence in this

01:40  11  case.  And I really ask you to consider if Cisco had

01:40  12  documents that showed that it didn't do what Paltalk

01:40  13  says, if it had code that disputed Paltalk's version of

01:40  14  infringement, its analysis, wouldn't they have brought

01:40  15  all of that to court?  Wouldn't they be running into

01:40  16  court to show you why they don't infringe?

01:40  17             These are the very senior engineers

01:40  18  within a company, and they are asking you to look at

01:40  19  drawings they are making.  Not documents, not code, not

01:40  20  work they have done.

01:40  21             They asked you and told you about Cisco's

01:41  22  patents.  You heard numerous times Cisco has 420

01:41  23  patents.  They didn't show you a single one of their

01:41  24  patents ever in the course of this case.  Even if they

01:41  25  had it, it's not a defense to infringement, but again,

1072

01:41   1    I ask you to consider what it means when they have the

01:41   2    ability to show you evidence and they don't do so.

01:41   3                You have been instructed by the Judge in

01:41   4    the case as to what evidence is, what you are to

01:41   5    consider in the course of your deliberations.  That's

01:41   6    Instruction No. 2 in your claim.

01:41   7                We submit that the evidence in this case

01:41   8    is overwhelmingly supportive of Paltalk's position

01:41   9    because we rely on countless documents from within

01:41   10   Cisco, its own code, to show infringement of the

01:41   11   patent.  Cisco, on the other hand, did not move or

01:41   12   present any of that as exhibits into evidence in this

01:41   13   case.

01:41   14               Given this weight of evidence showing

01:42   15   that Cisco does what the '858 patent says, you might

01:42   16   ask, why are we here?  Why are we here?

01:42   17               Cisco had a choice.  It had a choice when

01:42   18   it saw this weight of evidence.  It could have come to

01:42   19   Paltalk and said, we need to take a license because we

01:42   20   are utilizing this functionality that's in the patent.

01:42   21   We can resolve it, and we can take a license.  But it

01:42   22   chose not to do that.

01:42   23               And I think you have to ask why.  Why did

01:42   24   it choose -- knowing that there's agreement largely

01:42   25   about how Webex works and that it does the things that

—1073—

01:42  1    are in the patent, why did it choose to come bring this

01:42  2    to court, to this trial?

01:42  3              And ladies and gentlemen, I think that

01:42  4    Cisco thought that it could create confusion around a

01:42  5    word in the two elements of the claim.  It thought that

01:42  6    it could lead people to look at the patent not as

01:43  7    somebody who is skilled in the art or is an expert in

01:43  8    the field, but to apply an understanding of the patent

01:43  9    terms that is not consistent with the patent.  Cisco

01:43  10   thought that it could get a jury to do that, and that

01:43  11   is why it brought this case here.

01:43  12             Now, you all have heard over and over

01:43  13   again that a patent is to be viewed through the lens of

01:43  14   somebody who has -- of ordinary skill in the art,

01:43  15   meaning somebody who is in the field of the patent.

01:43  16   And they're supposed to do that looking at the patent,

01:43  17   looking at the claims, and the specifications

01:43  18   considering the patent as a whole.

01:43  19             What Cisco has urged you to do many times

01:43  20   in this case is to use some common meaning of the word,

01:43  21   particularly the word "each," and has said to you,

01:43  22   well, this is what my 60 years of English teaches me

01:43  23   about "each" or we all know what "each" means.

01:44  24             That's not the standard, and you all know

01:44  25   that because you heard it now many times.  And not just

—1074—

01:44  1    that, you will see in the instructions, as we will talk

01:44  2    about, that the term is related to how somebody who is

01:44  3    skilled in the invention would look at it.

01:44  4              So I submit, ladies and gentlemen, the

01:44  5    reason we're here is because Cisco wants you all to

01:44  6    think that it can come up and create confusion about

01:44  7    this term, but I know that you're not confused after

01:44  8    hearing the evidence.

01:44  9              You heard Dr. Schaefer talk about what it

01:44  10   is he's supposed to do when he's reading the patent.

01:44  11   He's supposed to bring his expertise, his experience in

01:44  12   the field to understand the meanings of the terms.  And

01:44  13   that is what he did when he analyzed infringement.

01:44  14             Cisco's expert, Mr. Willis, didn't do

01:44  15   that.  In his testimony to you, he started to show you

01:45  16   a part of the patent.  He wouldn't even complete the

01:45  17   slide to let you see the next word.

01:45  18             And why did he do that?  He pointed to a

01:45  19   part of the specification of the patent to say that

01:45  20   this supported his view of how the patent should be

01:45  21   interpreted, but he ignored the very next line.  He

01:45  22   didn't show you that, which said that when you think

01:45  23   about each and every active speaker sending data, you

01:45  24   have to consider, as somebody skilled in the art, that

01:45  25   the active speaker will not be getting its own audio

01:45    1    data back.

01:45    2    And why does that matter?  Because that

01:45    3    interpretation of the patent is squarely what Cisco's

01:45    4    Webex Audio does.  And it is not enough to pick and

01:45    5    choose little pieces from the patent and to ignore what

01:45    6    it says when you are trying to determine infringement.

01:45    7    As you have heard and you saw,

01:45    8    Dr. Schaefer applied the Court's construction of

01:46    9    "each."  "Each" has a plain and ordinary meaning which

01:46   10    can include "one or more."

01:46   11    And I know you all were just instructed

01:46   12    shortly before lunch.  Instruction No. 15 tells you the

01:46   13    same thing.  "Each" has a plain and ordinary meaning

01:46   14    which can include "one or more."

01:46   15    And the Court's construction is clear.

01:46   16    The terms are read and understood by a person with

01:46   17    skill in the field of the patent in light of the

01:46   18    patent's specification and prosecution history, not

01:46   19    just, let's everybody talk about what we think "each"

01:46   20    might mean here in light of the patent.  And that is

01:46   21    what you heard Paltalk's expert do.

01:46   22    And I think ultimately, when we had to

01:46   23    really push Cisco's experts, they too had to admit what

01:46   24    the meaning of "each" is in the context of the patent.

01:46   25    When Mr. Willis was asked -- on

01:47   1    cross-examination by our counsel, he was asked, you're

01:47   2    not saying, are you, that the term "each" cannot mean

01:47   3    "one or more"?  You're not saying that?

01:47   4                    And he said, no.  I'm not.

01:47   5                    So you would agree with me that the term

01:47   6    "each" can mean "one or more," right?

01:47   7                    I so agree.

01:47   8                    We saw excerpts of Mr. Willis' deposition

01:47   9    in which he said, you have to read together the patent.

01:47   10   You have to read together the patent.  He had to admit

01:47   11   that.  And again, he said just what I told you.

01:47   12                   The concept of "each" and "every," it has

01:47   13   to take into account that the data doesn't go back to

01:47   14   the speaker so the speaker's not hearing it twice.  The

01:47   15   echo suppression that we talked about, he said, I

01:47   16   believe that is supported teaching there.  Yes.

01:47   17                   That is what is in the patent, and it is

01:47   18   what is in the Webex Audio system.

01:47   19                   Now, you have been instructed by the

01:48   20   Court that one of the things that you and only you get

01:48   21   to do is consider the credibility of the witnesses.  In

01:48   22   weighing the testimony and considering what weight to

01:48   23   give it, you may consider the credibility of the

01:48   24   witnesses and how much weight their testimony should be

01:48   25   given.  And we'd like you to really pay attention to

01:48   1    that in this case.

01:48   2                    You heard from Mr. Buckles about this

01:48   3    document, PX-213, and I would like you to write that

01:48   4    down and go back and look at that when you're in the

01:48   5    jury room, that document, because it is critical.  It

01:48   6    shows -- it is a Cisco document that it shows in 2007,

01:48   7    Cisco added the hybrid audio functionality to Webex

01:48   8    Audio.  In 2007.  Years after the patent issued and

01:48   9    seven years after the patent was filed.

01:48   10                   And even though this is an internal Cisco

01:48   11   Webex document, Mr. Buckles said he had never seen the

01:48   12   document until Cisco's lawyers showed it to him

01:49   13   recently.  And he discussed what he was going to

01:49   14   testify about that document with the lawyers before he

01:49   15   came here.

01:49   16                   But he is a distinguished engineer from

01:49   17   Cisco and certainly should have looked at key documents

01:49   18   like this long ago and not just in the context of

01:49   19   talking and preparing with his lawyers for this trial.

01:49   20                   You heard from Mr. Barave, and he had to

01:49   21   admit that there is data that Cisco simply does not

01:49   22   keep for whatever reason -- and you can weigh the

01:49   23   credibility of why or why not Cisco chose not to keep

01:49   24   that data, but it is indisputable that Mr. Barave

01:49   25   relied on data that does not exist.

—1078—

01:49    1          There is no data about how Webex Audio

01:49    2    was used before 2021.  It just doesn't exist.  And so

01:49    3    we don't know.  Today we know that in 2021, that there

01:49    4    were 24 percent of users that were on conferences and

01:50    5    meetings where they're both someone calling in by phone

01:50    6    and on a computer.  But that number could have been far

01:50    7    higher in the past.  We don't know because Cisco did

01:50    8    not keep that data, and we can't rely on somebody's

01:50    9    memory of what happened in 2015 without documentation.

01:50   10          You heard from Cisco's damages expert,

01:50   11    Ms. Kindler.  And she had to admit that she didn't

01:50   12    analyze the features of Webex.  She relied on

01:50   13    Mr. Barave who relied on data that does not exist.

01:50   14          Much of her analysis focuses on a case in

01:50   15    which another expert from Cisco was involved, but she

01:50   16    never asked him about that case or whether the patents

01:50   17    really were subject to attack or were valid in that

01:50   18    case.  She didn't ask those questions.

01:50   19          And in fact, she didn't ask any details

01:50   20    about any of Cisco's patents, had never seen them.

01:50   21    Nobody's talked about them in any detail.  And she

01:51   22    ignored the necessity of the hybrid audio function, the

01:51   23    meat of it.  She talked about many other features, but

01:51   24    she didn't talk about needing to be able to allow

01:51   25    people to call in to a meeting.

—1079—

01:51  1              You've heard from Cisco's noninfringement
01:51  2    expert, Mr. Willis.  But I submit Mr. Willis was here
01:51  3    identifying a mission.  He's on a mission to invalidate
01:51  4    intellectual property.  That is not an independent
01:51  5    expert coming in.  Mr. Willis was supposed to be a
01:51  6    third-party expert that Cisco retained, but he has
01:51  7    worked for Cisco in the past, and he identifies his
01:51  8    goal as invalidating IP.
01:51  9              As you have heard from the Court,
01:51  10   Paltalk's burden in this case is to prove patent
01:51  11   infringement and damages by a preponderance of the
01:51  12   evidence.  A preponderance means to prove something is
01:52  13   more likely than not.
01:52  14             And you saw this in the beginning and
01:52  15   opening, when Mr. Tribble was delivering his opening,
01:52  16   that it just means to be a little bit more than 50/50.
01:52  17   That is our burden, to establish infringement and
01:52  18   damages.
01:52  19             And ladies and gentlemen, based on the
01:52  20   evidence we have presented, we believe we have exceeded
01:52  21   that burden in this case to establish infringement and
01:52  22   damages of the '858 patent.
01:52  23             When you are -- have the verdict form
01:52  24   with you, we will, and as you see on the board, we will
01:52  25   ask you to find yes for infringement of Claims 1, 2, 3,

1080

01:52    1    4, and 5 of the '858 patent.  And that's the question

01:52    2    you'll be asked with respect to direct infringement of

01:52    3    Paltalk's patent.

01:52    4              Now, because of this overwhelming

01:52    5    evidence that Webex Audio does exactly what the

01:53    6    '858 patent calls for, Cisco also spent time trying to

01:53    7    talk about whether the patent was valid or not.  And

01:53    8    that standard, as you heard, is different.  It's not

01:53    9    preponderance of the evidence.  It's not a little bit

01:53   10    more.  It's clear and convincing evidence.  It is a

01:53   11    higher standard, and it is one that should allow you

01:53   12    without hesitancy to decide that a patent is invalid.

01:53   13              Ladies and gentlemen, that is not the

01:53   14    evidence you heard from Cisco.  It cannot enable you to

01:53   15    find that the patent is invalid by clear and convincing

01:53   16    evidence.

01:53   17              One of the things you will see in the

01:53   18    instructions, Jury Instruction No. 19, is about

01:53   19    obviousness.  And it will instruct you not to use

01:53   20    hindsight, not to look at the patent and the patented

01:53   21    invention from where we're sitting today in 2024, but

01:53   22    to consider what was known at the time the Paltalk

01:54   23    patent was filed in 2000.  Because that's the way in

01:54   24    which to evaluate this novelty, not from today but from

01:54   25    when the invention was actually filed in the Patent

1081

01:54  1    Office and when it was developed.

01:54  2              And as you saw and you heard over the

01:54  3    course of this case, this patent came from a

01:54  4    revolutionary startup company called HearMe.  That was

01:54  5    ahead of its time.  That developed hybrid audio back in

01:54  6    the late '90s and 2000s that implemented the

01:54  7    functionalities that we're talking about here and

01:54  8    envisioned them to -- then patent them in June of 2000.

01:54  9              They were envisioning already how

01:54  10   critical it would be for people who wanted to get

01:54  11   together, who wanted to be on a meeting, who wanted to

01:54  12   communicate to be able to do so through multiple meets,

01:54  13   through the phone, through the computer, and for that

01:54  14   meeting to be open so that it would invite and allow

01:55  15   participants broadly.

01:55  16             That was critical.  They already knew

01:55  17   that, and HearMe was in the business of audio.  Their

01:55  18   patent was revolutionary in that way.

01:55  19             And how do we know that?  Cisco --

01:55  20             MS. PIEPMEIER:  Your Honor, may we

01:55  21   approach?

01:55  22             THE COURT:  You may.

01:55  23             (Bench conference.)

01:55  24             MS. PIEPMEIER:  I'm very sorry to

01:55  25   interrupt the closing.  I believe that exact

01:55    1    demonstrative was excluded during opening.  It has one

01:55    2    more line on it that was not there in openings.  There

01:55    3    were three lines in openings, but it was just comparing

01:55    4    the patent to HearMe.  Those documents were excluded

01:55    5    when it's comparing it to the Cisco product.

01:55    6                    THE COURT:  Can I see the document?

01:55    7                    MS. SRINIVASAN:  It's the demonstrative,

01:55    8    Your Honor.

01:55    9                    MS. PIEPMEIER:  It was excluded as an

01:55    10    demonstrative in opening.

01:55    11                    THE COURT:  I don't have the

01:55    12    demonstrative.

01:55    13                    MS. PIEPMEIER:  Do we have a copy of it?

01:55    14                    THE COURT:  Can you not show it to me?

01:55    15    Are you just talking about it?

01:56    16                    MS. PIEPMEIER:  I saw it.

01:56    17                    MS. SRINIVASAN:  It's a demonstrative,

01:56    18    but we can move on past it.  I'm not sure whether it

01:56    19    was identical to what was in the opening.

01:56    20                    MS. PIEPMEIER:  They added one line to it

01:56    21    that made it worse.

01:56    22                    (Bench conference concludes.)

01:56    23                    MS. SRINIVASAN:  Now, as I told you,

01:56    24    Cisco's burden is to show that if it is trying to

01:56    25    invalidate Paltalk's patents, it did so by clear and

01:56  1    convincing evidence.

01:56  2                     And I want to remind you of the testimony

01:56  3    that you heard from Mr. Bress, Cisco's expert in this

01:56  4    area.  What did he tell you?  The only thing he pointed

01:56  5    to was one patent.  Not a Cisco patent but a patent

01:56  6    called Botzko.  And he tried to say that Botzko did

01:57  7    what was in Paltalk's patent, the '858 patent.

01:57  8                     But as you can see, his testimony did not

01:57  9    pass the smell test.  He was describing a line in the

01:57  10   patent that said that that was a speaker list, the same

01:57  11   thing that's disclosed in the '858 patent.  It's simply

01:57  12   not.

01:57  13                    When he was cross-examined, Mr. Botzko

01:57  14   had to admit -- Mr. Bress had to admit that the Botzko

01:57  15   patent doesn't even mention the word "multiplex."

01:57  16   There is no world in which the Botzko patent, even

01:57  17   viewed from somebody skilled in the art, could disclose

01:57  18   what was in the Paltalk invention.

01:57  19                    It cannot meet the high burden that it

01:57  20   has to establish that the patent is invalid.  And that

01:57  21   is for good reason.  Paltalk spent four years, three

01:57  22   after its acquisition, one year that HearMe handled,

01:57  23   the prosecution of this patent in the Patent Office.

01:57  24   It was not lightly granted.  The application was filed

01:58  25   in 2000 and issued in 2004.  It comes with a

01:58 1    presumption of validity that the U.S. government

01:58 2    carefully considered the state of the art when it

01:58 3    issued the patent.

01:58 4                    Ladies and gentlemen, when you reach the

01:58 5    question about obviousness, invalidity based on an

01:58 6    obviousness in your verdict form, we will ask you to

01:58 7    find that the answer is no as to every claim in the

01:58 8    patent because Cisco has not met its very high burden

01:58 9    to show the patent is invalid.

01:58 10                   Cisco very briefly presented some

01:58 11   testimony that there was a issue with the written

01:58 12   description that was inadequate in the patent.  It was

01:58 13   probably five minutes of testimony yesterday from

01:58 14   Mr. Bress.

01:58 15                   I submit that cannot, cannot meet the

01:58 16   high burden of clear and convincing evidence to show

01:58 17   the patent's invalid on that basis either.

01:58 18                   And ladies and gentlemen, you know, the

01:58 19   Court has instructed you, you can use -- you can

01:58 20   consider how you look at things from the question of

01:59 21   obviousness.  If something was so obvious, so obvious,

01:59 22   why would an expert spend 55 lines trying to show you

01:59 23   that this Botzko reference invalidates the '858 patent?

01:59 24   It simply cannot be the case.

01:59 25                   Cisco -- one of the few documents that

01:59    1    Cisco did focus on was this MediaTone Document DX-68,

01:59    2    and I imagine you'll hear about it in their closing

01:59    3    today. That document is from three years after the

01:59    4    '858 patent was filed.

01:59    5            And it does include hybrid audio server,

01:59    6    multiplexing, mixing. All of the key elements of the

01:59    7    '858 patent, they are not present in this document.

01:59    8            Instead, as I mentioned to you before, in

01:59    9    PX-213 you will see that Cisco added the hybrid audio

01:59    10    feature in 2007, after it bought Webex for

01:59    11    $3.2 billion. And I'd like y'all to think about that

02:00    12    timeline.

02:00    13            Cisco knew it needed to add audio

02:00    14    functionality. It paid an enormous amount of money to

02:00    15    acquire Webex. And as soon as it did so, it realized

02:00    16    it needed this functionality. It had to have it.

02:00    17            And so it then went about making sure

02:00    18    this hybrid audio service, a new service in 2007, would

02:00    19    be introduced and that that capability would allow

02:00    20    people to join an audioconference either by phone or by

02:00    21    computer.

02:00    22            It was critically important for Cisco

02:00    23    back in 2007, and ladies and gentlemen, it is

02:00    24    critically important for Cisco during the damages

02:00    25    period in this case from 2015 to 2022.

02:00  1                We're going to talk about the use of the

02:00  2        '858 patent, but let's just be clear.  The Webex Audio

02:00  3        and Webex Meetings, those are all about audio

02:01  4        functionality.

02:01  5                Earlier today Ms. Kindler spent a lot of

02:01  6        time talking about all these other features.  None of

02:01  7        that matters if people cannot get onto this meeting and

02:01  8        hear one another.

02:01  9                If Webex and Cisco didn't have this

02:01  10       functionality, they could not compete in the

02:01  11       marketplace.  They would have Zoom and Teams and Google

02:01  12       Meets doing something that they cannot do.

02:01  13               So while there are other features

02:01  14       associated with Webex Audio, and certainly we accounted

02:01  15       for that in considering the value of the invention

02:01  16       here, I'd really like you to consider that how Cisco

02:01  17       has treated this critical core functionality.  You

02:01  18       simply can't have this service if people cannot dial

02:01  19       and get onto it and be in a meeting together.  And

02:01  20       their own data shows you that.

02:01  21               As you -- as I covered with Mr. Barave,

02:01  22       there were in a one-year period 137 million meetings in

02:02  23       which somebody dialed in by phone, cell phone or

02:02  24       landline, and somebody else participated by computer.

02:02  25       That accounted for 7.5 billion minutes of meetings.

1087

02:02   1          If Cisco or Webex tries to suggest that

02:02   2   this is some side functionality, it's not important,

02:02   3   their own data shows otherwise.  They do not want to

02:02   4   tell their users that 137 million of their meetings

02:02   5   could not happen because they don't have this

02:02   6   functionality.

02:02   7          And interestingly, Ms. Kindler, who

02:02   8   relied on this data, did show it to you today in her

02:02   9   testimony.

02:02   10          As you heard, the patent damages statute

02:02   11   says that you are to look at the use made of the

02:02   12   invention by the infringer in awarding her reasonable

02:02   13   royalty.

02:02   14          And Cisco's own expert admitted that

02:02   15   different patents cover different things, and one can

02:02   16   be more valuable than others.  That is why we look at

02:03   17   the use made by the infringer to determine a reasonable

02:03   18   royalty.

02:03   19          You heard from Mr. Walt Bratic on Tuesday

02:03   20   about the benefits, the financial benefits that Webex

02:03   21   has recognized from using the '858 patent.  And I want

02:03   22   to be very clear.  That top line number, that's how

02:03   23   much Webex makes as a whole, $4.2 billion.

02:03   24          But Webex itself has already isolated the

02:03   25   value of Webex Audio, which is what we are here about,

02:03  1    to $1.27 billion over the damages period in this case.

02:03  2                   Mr. Bratic then made a determination

02:03  3    about the gross profits to be calculated from that.

02:03  4    Based on Dr. Schaefer's lengthy testimony and

02:03  5    explanation, he calculated a technical apportionment of

02:03  6    the value that comes from the benefits of the

02:04  7    '858 patent.

02:04  8                   And I want to mention something.

02:04  9    Ms. Kindler said earlier today, based on the data, that

02:04  10   it looked like 24 percent of calls involve the phone

02:04  11   and a computer.  Well, that is not far off from

02:04  12   Dr. Schaefer's calculation of 33 percent.

02:04  13                  We submit her apportionment is

02:04  14   understated because she only looked at one year of

02:04  15   data, of actual data.

02:04  16                  THE COURT:  Counsel, you have 15 minutes

02:04  17   left.

02:04  18                  MS. SRINIVASAN:  Thank you, Your Honor.

02:04  19                  But it is clear that there are

02:04  20   significant benefits realized by Webex based just on

02:04  21   this audio feature.

02:04  22                  And Mr. Bratic, along with Dr. Schaefer's

02:04  23   analysis, did the hard work of getting down to the

02:04  24   analysis of how much should be owed.

02:04  25                  What Cisco would like to do is to

02:04  1    continue to chip away at that base.  Cisco came in here

02:04  2    to say that the audio revenues, that we should start at

02:05  3    a smaller number.

02:05  4                But that is inconsistent with what its

02:05  5    own executive said.  He said that the revenue data for

02:05  6    Webex Audio is the most granular data you could get to

02:05  7    the most granular revenue level.  And so when

02:05  8    Mr. Bratic started there, that was appropriate for him

02:05  9    to do.

02:05  10               What Cisco would like to do is to take

02:05  11   their apportionment and apply it on top of the

02:05  12   apportionment that Mr. Bratic already did.  That's

02:05  13   double counting.  And it's double counting to try to

02:05  14   get at some small number when the use and the revenue

02:05  15   is significant, hundreds of millions of calls, billions

02:05  16   of dollars in revenue.

02:05  17               You saw Dr. Schaefer work through the

02:05  18   apportionment to look at the very fact that hybrid

02:05  19   audio itself has the percentage of the value

02:05  20   attributable to the patents-in-suit and the other

02:05  21   benefits that Cisco gets, including the scalability,

02:06  22   conference management, compatibility and other

02:06  23   features, with the greatest weight being the ability to

02:06  24   have hybrid audio call, the very thing the patent is

02:06  25   about, the ability of people to get on a meeting

1090

02:06  1   whether they are on a cell phone or a landline or a

02:06  2   computer, and we know that hundreds of millions of such

02:06  3   calls happen every year on Webex Audio.

02:06  4             Mr. Bratic then did additional analyses

02:06  5   and performed additional calculations to arrive at the

02:06  6   royalty figure in this case.

02:06  7             Now, we have given you the total number

02:06  8   that Mr. Bratic has arrived at.  You will be asked on

02:06  9   the verdict form to put in a number.  And we submit to

02:06  10  you that the evidence in this case, the financials, the

02:06  11  analysis performed, the use of the '858 patent supports

02:07  12  the damages number that Paltalk has offered of

02:07  13  $102,581,465.

02:07  14            I won't get a chance to address you

02:07  15  again.  My partners will be doing that in rebuttal.  I

02:07  16  want to thank you again for your service and your

02:07  17  attention.

02:07  18            Thank you very much.

02:07  19  <u>CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT</u>

02:07  20            MS. PIEPMEIER:  Good afternoon, ladies

02:07  21  and gentlemen of the jury.

02:07  22            I'm glad to be back here with you again

02:08  23  with another excuse to use what has been termed the

02:08  24  seventh grade music stand that I have right here.  I

02:08  25  haven't used one of those in a while.

—1091—

02:08   1                      THE COURT:  Counsel, I can't hear you.
02:08   2    Maybe they can, but I can't.
02:08   3                      MS. PIEPMEIER:  I will make the
02:08   4    microphone closer.  How about that?
02:08   5                      THE COURT:  Perfect.  Thank you.
02:08   6                      MS. PIEPMEIER:  Is that better?
02:08   7                      THE COURT:  Yes, ma'am.
02:08   8                      MS. PIEPMEIER:  Thank you.  Thank you for
02:08   9    telling me too.
02:08   10                      Now, it has been my honor to spend the
02:08   11   past four days with you on behalf of Cisco, and I know
02:08   12   it's been a long week.  It feels like a whole week.
02:08   13   It's only been four days.
02:08   14                      And I'm going to say, I've heard the word
02:08   15   "each" more in the past four days than I have heard or
02:08   16   used it in the past four years.  And unfortunately, I
02:08   17   have to say it just a little bit more, and then we're
02:08   18   going to move on.  I promise you, I will never hear
02:08   19   that word or see it in the same way again after this.
02:08   20                      But I want to address that up front, and
02:08   21   then I want to move on to some other things.
02:08   22                      Now, four days ago I stood here at the
02:08   23   music stand, and I told you that the evidence will show
02:08   24   that the only way that Paltalk can demonstrate or
02:09   25   attempt to demonstrate infringement is to redefine the

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

02:09  1    word "each" as "one or more."

02:09  2                    And let's start, because that's precisely

02:09  3    where we are today, four days later.

02:09  4                    Dr. Schaefer admitted -- and you see it

02:09  5    on Slide 2 here.  Dr. Schaefer admitted under

02:09  6    cross-examination that he did not provide an opinion

02:09  7    that Webex meets the claim elements by sending a set of

02:09  8    multiplexed -- a set of multiplexed stream to all

02:09  9    clients with the capability to mix audio.  He said he

02:09  10   doesn't believe he did that.  In other words, if "each"

02:09  11   means "all," he doesn't have an opinion.

02:09  12                   Now, obviously the big elephant in the

02:09  13   room here is does "each" mean "all"?  Does "each" mean

       14   "one or more"?

02:09  15                   And I was thinking about that on my run

02:09  16   yesterday morning.  And it reminded me of Occam's razor

02:09  17   which my dad taught me about when I was little.  And

02:09  18   what he told me about Occam's razor is the simplest

02:09  19   explanation is almost always the right one.

02:10  20                   And I had a lot of anxiety as a kid.  I

02:10  21   was that kid who was always worrying about everything,

02:10  22   always worrying about what could be happening, what

02:10  23   could be coming down the street next, what could be

02:10  24   behind me.

02:10  25                   And I'm not as smart as my dad.  I

1093

02:10  1    certainly don't have a physics degree from MIT the way

02:10  2    he did.  But he explained it to me in very simple terms

02:10  3    that I've always remembered 45 years later.

02:10  4              He said when you hear hooves coming

02:10  5    behind you, is it a horse or a zebra?  It's probably a

02:10  6    horse.  That's the simplest explanation.  Look for the

02:10  7    simplest explanation.  That's what Occam's razor

02:10  8    teaches us.  When you look at a problem that's hard to

02:10  9    figure out, look for the simplest explanation because

02:10  10   that is probably the right one.

02:10  11             And so let's think about that from the

02:10  12   perspective of "each."

02:10  13             The simplest explanation here is that

02:10  14   when patentees wrote "each," it meant "each."  They

02:11  15   probably knew the words "one or more."  If they had

02:11  16   meant to use the words "one or more," probably they

02:11  17   would have written it down.

02:11  18             The simplest explanation here is that the

02:11  19   patent words mean what they say, that the inventors

02:11  20   meant what they said.  They certainly could have told

02:11  21   us otherwise.

02:11  22             Now, you remember a few days ago, I

02:11  23   introduced you to my niece and nephew.  I introduced

02:11  24   you to Maggie and John, who are 9 and 11.  And I told

02:11  25   you that even they know the meaning of the word "each."

```
02:11   1              Now, look.  I get it.  Maggie and John
02:11   2   are not deciding this case.  They are not deciding the
02:11   3   meaning of the word "each" in the '858 patent, though
02:11   4   they will be pretty excited when I tell them that they
02:11   5   made an appearance at this trial.  So there's always
02:11   6   that.
02:11   7              But the question here is what does the
02:11   8   word "each" mean to one of ordinary skill in the art in
02:11   9   light of the entire patent?  I think we're all in
02:11  10   agreement on that, you look at the entire patent.  So
02:11  11   let's take that principle, and let's look at the
02:11  12   patent.
02:11  13              You heard this week from one single
02:11  14   witness.  You heard a lot of attorney argument.  None
02:12  15   of that is evidence.  None of what I'm saying is
02:12  16   evidence.  None of what counsel said is evidence.
02:12  17              You heard from one single witness this
02:12  18   week who told you, set aside common sense because
02:12  19   "each" means "one or more."  And you should replace --
02:12  20   when you see "each" in the patent, you should replace
02:12  21   that with "one or more."
02:12  22              That witness was Dr. Schaefer.  And he
02:12  23   eventually -- sorry about that.
02:12  24              In contrast to that, you heard both of
02:12  25   Cisco's witnesses, Mr. Willis and Mr. Bress, who told
```

```
02:12   1    you that in the '858 patent, the meaning of "all" or
02:12   2    "every," "each" is "all" or "every."
02:12   3                Now, here's the contrast that I think is
02:12   4    important because counsel talked a moment ago about
02:12   5    what Mr. Willis showed you from the '858 patent.  And
02:12   6    they talked a lot about Column 5.
02:12   7                Now, here's the difference between what
02:12   8    Mr. Willis demonstrated and what Dr. Schaefer
02:13   9    demonstrated.
02:13  10                What Mr. Willis demonstrated is not just
02:13  11    one small passage in Column 5.  What Mr. Willis
02:13  12    demonstrated is how you read that passage in
02:13  13    conjunction with Claims 1, 2, and 3.
02:13  14                He didn't just say, okay.  Look.  The
02:13  15    patent says in Column 5 that a person who is skilled in
02:13  16    the art would know you don't send back the active
02:13  17    speaker's data.  He didn't just say that.  Right?  That
02:13  18    is a passage in the patent.  He discussed it on -- on
02:13  19    the stand right there.
02:13  20                But what he said, let me explain to you
02:13  21    how that fits into the claims.  And that's the part
02:13  22    that Mr. Schaefer never did.
02:13  23                What Mr. Schaefer did -- I apologize.
02:13  24    What Dr. Schaefer did is say, because that line is in
02:13  25    the patent, you have to read the scope of Claim 1 to
```

02:13   1   include that.  You have to.  And the way you can do

02:13   2   that, the way you make sense of that is to change the

02:13   3   word from "each" to "one or more."

02:13   4                Now, what Mr. Willis did, by contrast, is

02:13   5   he explained to you.  He stood up here at the stand.

02:14   6   And yes.  His drawing was mocked.  I'm not going to say

02:14   7   it's beautiful.  But his point in making that drawing

02:14   8   was explain to -- explain to you how Column 5 actually

02:14   9   fits in with these three different claims that we've

02:14   10  been talking about.  Dr. Schaefer never did that.

02:14   11               And so what did Mr. Willis tell you?

02:14   12  What Mr. Willis told you is in Claim 1, you send the

02:14   13  multiplexed stream with all audio.  And he spent the

02:14   14  bulk of his presentation talking about Claim 1, which

02:14   15  is why he didn't initially discuss all of the portions

02:14   16  of Column 5 because it's not relevant to -- beyond

02:14   17  Claim 1.

02:14   18               So he tells you, look.  In Claim 1,

02:14   19  you're sending everything.  Claim 2 and 3 teach you

02:14   20  that you remove something from everything.  That's what

02:14   21  the "however, as one who will be skilled in the art"

02:14   22  echo suppression sentence is talking about.  It's

02:15   23  talking about Claims 2 and 3.

02:15   24               He's not reading that out of the patent.

02:15   25  What he's telling you is that Claim 1 says you send

```
02:15   1    everything.  And Claim 2, just look at the language
02:15   2    when you go back in the jury room.
02:15   3                 The language of Claims 2 and 3 say remove
02:15   4    from something.
02:15   5                 Now, let me ask you this.  Let's go back
02:15   6    to the commonsense point.  If you haven't sent
02:15   7    everything, if you haven't created a multiplexed stream
02:15   8    with everything in Claim 1, how are you going to remove
02:15   9    it in Claim 2?
02:15  10                 If you've already removed it in Claim 1
02:15  11    because you've defined "each" in such a way that you
02:15  12    haven't sent everything, what are you doing in Claims 2
02:15  13    and 3?  What are you removing?
02:15  14                 Why would patentee on the one hand -- why
02:15  15    would patentee on the one hand use a different word
02:15  16    than what anyone would mean?  Why would they use "each"
02:15  17    meaning "one or more," and then why would they go
02:15  18    through the trouble of creating Claims 2 and 3 for
02:16  19    removing if you'd already done that in Claim 1?
02:16  20                 Now, I don't know if you know this, but
02:16  21    when you get a patent, you have to pay for every single
02:16  22    one of those claims.  And you have to defend the
02:16  23    validity of every single one of those claims.  Why
02:16  24    would you write extra claims and pay extra money if
02:16  25    what you were talking about in Claims 2 and 3 was
```

—1098—

02:16  1    already in Claim 1?  Again, it simply doesn't make

02:16  2    sense.

02:16  3                 And Mr. Willis is the only one who stood

02:16  4    up here and drew a diagram and stood on the witness --

02:16  5    and sat on the witness stand -- he didn't stand.  He

02:16  6    sat at the witness stand, and he told you, this is how

02:16  7    you harmonize all of it.  I'm not reading out of the

02:16  8    patent the concept of echo suppression.  I'm showing

02:16  9    you where it is.

02:16  10                And that is what Mr. Schaefer never did.

02:16  11   He took the words out of context, and he said, let's

02:16  12   make it make sense by changing the meaning of the word.

02:16  13                And Mr. Willis, by contrast, said, I'm

02:16  14   going to show you not only how this echo suppression

02:16  15   works, I'm going to show you where it is in the patent.

02:16  16                And just ask yourselves -- it's the

02:17  17   commonsense point -- if they meant one or more,

02:17  18   wouldn't they write that?  And if they meant Claim 1 to

02:17  19   be something less than "all," why did they write Claims

02:17  20   2 and 3?

02:17  21                Now, I go through all of that.  I've sort

02:17  22   of preempted my next point, but I want to hit it

02:17  23   because I think it's really important.  And it came up

02:17  24   again just now.

02:17  25                Paltalk's counsel insinuated again just

—1099—

02:17  1   now that Mr. Willis was relying only on his commonsense

02:17  2   understanding of the English language, that all he did

02:17  3   was say, I was speaking English for 60 years, and

02:17  4   that's what "each" means.

02:17  5              And you may remember that Paltalk's

02:17  6   counsel showed you one portion of Mr. Willis'

02:17  7   testimony.  And he put up this portion of Mr. Willis'

02:17  8   testimony.  And over and over and over and over again,

02:17  9   he asked Mr. Willis to confirm that he said those

02:17  10  words.

02:17  11             And Mr. Willis did.  Because Mr. Willis

02:17  12  admitted truthfully that he had said those words.  But

02:18  13  Paltalk's counsel didn't continue the quote.

02:18  14             And, in fact, if you look at the very

02:18  15  next question which Paltalk's counsel didn't show you

02:18  16  when they insinuated over and over and over and over

02:18  17  again including just now that Mr. Willis was only

02:18  18  relying on plain language, they didn't show you the

02:18  19  very next question where he told you:  Did you consult

02:18  20  the '858 patent?  And he said, yes.

02:18  21             And you know what else they didn't show

02:18  22  you?  They didn't show you the three pages of testimony

02:18  23  after that where he explained how this works in the

02:18  24  patent.

02:18  25             And how do you know that's true?  Because

—1100—

02:18  1  he drew the diagram that I just showed you, which was

02:18  2  based on the patent.  That wasn't based on speaking

02:18  3  English.  I don't know that I fully understand the

02:18  4  diagram, but it certainly wasn't just speaking English.

02:18  5  It was a diagram of how he understands the patent.

02:19  6        So the insinuation that Mr. Willis relied

02:19  7  solely on the English language is completely false.

02:19  8  And it is frustrating to me that what you were shown

02:19  9  and over and over and over again wasn't the full story.

02:19  10  And Mr. Willis is the only witness who has actually

02:19  11  explained to all of us and to each of you how you use

02:19  12  Column 5 in the context of the patent.

02:19  13        Now, in contrast, as I said, Dr. Schaefer

02:19  14  doesn't explain any of that.  He never answered the

02:19  15  question why one sentence from Column 5 has to be

02:19  16  shoehorned into Claim 1.  And he never answered what

02:19  17  gets removed in Claims 2 and 3 if they're not included

02:19  18  in Claim 1.

02:19  19        He never answered those questions.  He

02:19  20  simply didn't address that.  He just left that hanging.

02:19  21        Again, the simplest explanation is almost

02:20  22  always the right one, and the simplest explanation

02:20  23  which actually harmonizes all of this is that in

02:20  24  Claim 1, you send all, and in Claims 2 and 3 you

02:20  25  remove.

-1101-

02:20  1    And, again, as we said a moment ago, if

02:20  2    "each" means "all," Dr. Schaefer has no infringement

02:20  3    opinion.  That is the real issue here.

02:20  4    So let's turn to the evidence, and let's

02:20  5    turn to what's disputed here.  Now, beyond the

02:20  6    technical experts, beyond Mr. Willis, beyond

02:20  7    Dr. Bress -- Mr. Bress, we brought real people.  We

02:20  8    brought three Cisco engineers and executives, people

02:20  9    who work on this technology day in and out for

02:20  10   30 years.

02:20  11   You heard straight from distinguished

02:20  12   engineer Nathan Buckles, you heard straight from

02:20  13   principal engineer Aaron Belcher, who's the head

02:20  14   architect of Webex.  And I'm going to admit, they were

02:20  15   both real nervous.  They were both real nervous when

02:20  16   they were testifying.  It is nerve-racking to be

02:20  17   sitting in that box.  I've done it before, and it can

02:21  18   be terrifying.

02:21  19   But they were unequivocal, as the people

02:21  20   who know Webex best, as the head architect of Webex,

02:21  21   that Webex does not send streams in -- as set forth in

02:21  22   [1.6] and does not send the packet as set forth in

02:21  23   [1.8].

02:21  24   Now, I want to note something.  You

02:21  25   didn't hear the word "unique streams" at all in

—1102—

02:21  1    Paltalk's counsel's presentation.  They didn't cover

02:21  2    that at all.  They didn't cover the mountains of

02:21  3    evidence that were put in about what types of streams

02:21  4    Cisco's Webex actually sends.  You just never heard

02:21  5    that.

02:21  6                    So let's look at some of it.  Now,

02:21  7    Mr. Buckles confirmed that users always get their own

02:21  8    separate streams.  Why did that matter?  Because if

02:21  9    users always get their own separate streams, you're not

02:21  10   sending the same stream to all users.

02:21  11                   Mr. Belcher said the exact same thing:

02:21  12   Does Webex send every participant a unique stream?

02:22  13   Yes.  They do.

02:22  14                   That is evidence, and that is evidence

02:22  15   from the people who know it best.  Mr. -- Dr. Schaefer,

02:22  16   I apologize, admitted that as well.  He admitted it.

02:22  17   That's not disputed.

02:22  18                   Now, you heard a lot about how Cisco

02:22  19   should have brought in more documents, more code,

02:22  20   whatever.  First of all, Cisco responded to, and the

02:22  21   witnesses discussed the code that Paltalk had brought

02:22  22   in, Paltalk gets to go first so they get to select that

02:22  23   stuff, and we respond to it.

02:22  24                   But second of all, we brought in the

02:22  25   people.  We didn't just bring in an isolated document

—1103—

02:22  1   from 20 years ago and let somebody talk about a piece
02:22  2   of it.  We brought in the people, and we subjected them
02:22  3   to cross-examination.  And we subjected them to
02:22  4   excellent cross-examination from very capable counsel.
02:22  5   And they still explained to you and they still maintain
02:22  6   Webex sends unique streams.  That is not the way the
02:22  7   patent works.
02:22  8           So why does Webex do it this way?  Why
02:22  9   would you have unique streams?  Mr. Belcher, the head
02:22  10  architect of Webex, explained that to you.  The reason
02:23  11  Webex does this -- and keep in mind, we're more than
02:23  12  20 years past the time of the patent.  Technology is
02:23  13  different.  We're not dealing in a world of dial-up
02:23  14  modems.
02:23  15          Why does Webex do it this way?  It
02:23  16  creates unique streams to address network connections,
02:23  17  different bandwidth availability, encryption,
02:23  18  customer-specific issues.  None of that was an issue
02:23  19  20 years ago.
02:23  20          And so today, Webex is creating unique
02:23  21  streams, and that is simply not what the '858 patent
02:23  22  claims.  And you didn't hear about that at all from
02:23  23  Paltalk's counsel.
02:23  24          The simplistic functionality of the
02:23  25  '858 patent may have made sense in 2000, in June of

02:23   1    2000 when they filed the patent application.  It does

02:23   2    not make sense right now.  It is not how Webex

02:23   3    operates.

02:23   4              Now, let's talk for a minute about the

02:23   5    source code.  Paltalk had its experts spend hours and

02:23   6    hours and hours walking through -- maybe it was just a

02:23   7    couple hours, it felt like a lot of hours -- walking

02:24   8    through source code in technical documents regarding

02:24   9    undisputed aspects of Webex.

02:24   10             And I was clear from opening -- I showed

02:24   11   you the slide I showed you a moment ago.  I was clear

02:24   12   from opening which elements are contested.  They had

02:24   13   deposition testimony on the other elements.  They just

02:24   14   played some of it for you.

02:24   15             So when they stood up here with boxes of

02:24   16   code and went through it all, a lot of that was on

02:24   17   elements that are frankly irrelevant because we don't

02:24   18   dispute them.

02:24   19             For example, sending audio packets.  Does

02:24   20   Webex send audio packets?  You better believe Webex

02:24   21   sends audio packets in an audioconference.  Do we

02:24   22   really need to look at ten source code files on that?

02:24   23   We already had people admit that.

02:24   24             And so when they talk about the mountains

02:24   25   of evidence, think about what of the evidence is

1105

02:24    1    actually relevant to the dispute.  The dispute here is

02:24    2    Elements [1.6], [1.8] in each.  If you have mountains

02:24    3    of evidence that are irrelevant, that doesn't really

02:24    4    push the scale down.

02:24    5                And so I would submit to you, let's look

02:25    6    at the evidence that actually matters.

02:25    7                Now, on that point, I would suggest that

02:25    8    you look at PX-240.  That was one of the source code

02:25    9    lines.  And if you start at Line -- I have it here --

02:25    10   87, that is a source code file that actually is

02:25    11   relevant, that is relevant to a disputed element.  And

02:25    12   Dr. Schaefer discussed it.

02:25    13               But what he didn't do is show you the

02:25    14   whole file when he was up here.  We had it moved

02:25    15   around.  They showed part of it.  Mr. Willis showed you

02:25    16   the entire file.  And the portion of the file that

02:25    17   Dr. Schaefer had not showed you is the portion that

02:25    18   talks about the unique streams.

02:25    19               All the evidence in the world, the boxes

02:25    20   of evidence, don't do a darn thing if you don't show

02:25    21   the relevant part that has to do with the disputed

02:25    22   elements.  And that's what Mr. Willis showed you.

02:25    23               So what did we do?  We focused on what

02:25    24   mattered in our presentation.  We focused on the

02:25    25   disputed elements.

02:25  1              So I would suggest, respectfully, when

02:26  2  you go back to the jury room, look at PX-240 starting

02:26  3  at Line 87.

02:26  4              Now, Paltalk has the burden.  You just

02:26  5  heard that.  We talked a lot about burden.  And I would

02:26  6  suggest to you that Paltalk has not met its burden on

02:26  7  Claim 1.  And the next point I want to cover is that if

02:26  8  they didn't meet their burden on Claim 1, they cannot.

02:26  9  And this is just a legal issue -- but they cannot meet

02:26  10  their burdens on Elements -- or I'm sorry -- Claims 2

02:26  11  through 5.  That is simply the way that the verdict

02:26  12  form works.

02:26  13             So if you find that "each" means "all,"

02:26  14  that they haven't met their burden on Claim 1, you have

02:26  15  to find they didn't meet their burden on the other

02:26  16  claims because they depend from Claim 1.

02:26  17             And I just wanted to explain that.  It's

02:26  18  a little bit tricky.  We did go through the verdict

02:26  19  form, but I don't think we talked about the differences

02:26  20  between independent and the dependent claims.  And so I

02:26  21  wanted to touch that briefly.

02:27  22             Now, I'm going to take a deep breath, and

02:27  23  I'm going to take a sip of water.  And I'm going to

02:27  24  give us a bit of a palate cleanser from this week of

02:27  25  tutorial that we've had on the word "each."

02:27  1              And I want to talk for a moment about

02:27  2     invalidity, which has nothing to do with the word

02:27  3     "each."  And I want to note, you heard a little bit

02:27  4     about this, but Cisco has a burden of clear and

02:27  5     convincing evidence on invalidity but its evidence is

02:27  6     unrebutted.  There is no other counter evidence in

02:27  7     record to the evidence of the Botzko patent and

02:27  8     Mr. Bress' testimony on that.

02:27  9              So we have the burden of clear and

02:27  10    convincing evidence.  That's precisely what we've done

02:27  11    here, is we have demonstrated the invalidity of this

02:27  12    patent by clear and convincing evidence.

02:27  13             Now, I heard a moment ago I think some

02:27  14    criticism that, you know, this isn't even a Cisco

02:27  15    patent, Botzko.  This is a different patent.  It's not

02:28  16    even Cisco's patent that they're putting up here as an

02:28  17    invalidating reference.

02:28  18             Well, yeah, that's right because Cisco

02:28  19    works differently.  The reason that we didn't put up a

02:28  20    Cisco reference as invalidating art is because that's

02:28  21    not how Cisco works.  Cisco's is different from the

02:28  22    '858 patent.  What we found is a patent three years

02:28  23    earlier that predates the '858 patent by three years

02:28  24    and does the exact same thing.

02:28  25             So let's start with what Cisco has to

−1108−

02:28  1    prove.  Now, you just heard in the jury instruction

02:28  2    that Cisco has to -- in order to be entitled to a

02:28  3    patent, the invention must actually be new and not

02:28  4    obvious over what came before.  That is the standard

02:28  5    that we are looking at.  That is one jury instruction.

02:28  6              Next, even though an invention may not

02:28  7    have been identically disclosed, and when I hear that,

02:28  8    think about word choice.  Think about whether the word

02:28  9    "multiplex," "multiplex stream" appears in Botzko.

02:28  10   Even though an invention may not have been identically

02:29  11   disclosed or described in a single prior art reference,

02:29  12   in order to be patentable, the invention must also not

02:29  13   have been obvious to a person of ordinary skill in the

02:29  14   art.

02:29  15             That is what the jury -- what you have

02:29  16   all been instructed here.  So let's look at Botzko.

02:29  17             Now, Mr. Bress showed you the Botzko

02:29  18   patent.  That's DX-37.  It would make sense, if you're

02:29  19   interested in this, to take a look at that when you're

02:29  20   in the jury room.  And I showed you this patent four

02:29  21   days ago in opening, and Mr. Bress obviously went

02:29  22   through this in great detail yesterday.  I'm not going

02:29  23   to go through it in great detail because you just heard

02:29  24   it, and I really don't want to repeat it and waste your

02:29  25   time.

-1109-

```
02:29   1            But he told you -- one thing I thought
02:29   2   was interesting that came out on cross-examination is
02:29   3   he told you that he found this patent himself.  And he
02:29   4   was doing the research himself.  He took this problem
02:29   5   seriously, and he wanted to go out and look for
02:29   6   information himself.  And he found the Botzko patent.
02:29   7   And Botzko showed the same things three years, 1997,
02:30   8   before HearMe's patent.
02:30   9            Now, Paltalk's attorneys have spent a lot
02:30  10   of time telling you that HearMe was the first to figure
02:30  11   out how to have VoIP callers and PSTN callers on the
02:30  12   same conference.  A client that can mix and a client
02:30  13   that can't mix.  But that's exactly what Botzko was
02:30  14   doing three years earlier.  That was the entire point
02:30  15   of the Botzko invention.
02:30  16            And Mr. Bress walked through each element
02:30  17   and showed you in detail -- and I'm not going to repeat
02:30  18   it because you just heard it -- he walked through each
02:30  19   element and showed you in detail how each element was
02:30  20   obvious in view of the Botzko reference.  He went
02:30  21   through Claim 1 and went through all of the eight
02:30  22   elements and the preamble and the last part.  And then
02:30  23   he went through Claims 2 and 3.
02:30  24            And for Claims 4 and 5, he said, when you
02:30  25   combine Botzko -- which you can do in an obviousness
```

-1110-

02:30  1    analysis -- with Rosenberg, 4 and 5 are also invalid.
02:30  2    And he went through that.
02:31  3                    And I think you heard it again today just
02:31  4    now.  The only thing that Paltalk's counsel seriously
02:31  5    questioned was forming an active speaker list and
02:31  6    multiplexing.  So I'm going to go through just those
02:31  7    two things.  I'm not going to go through the whole
02:31  8    thing.
02:31  9                    So let's start with the active speaker
02:31 10    list.
02:31 11                    Now, when they were cross-examining
02:31 12    Mr. Bress, Paltalk seemed to be suggesting that kind of
02:31 13    what was novel about the '858 patent was adding this
02:31 14    active speakers list.  That's, you know, not at all
02:31 15    what they were saying the whole trial.  I hadn't heard
02:31 16    that before and that certainly wouldn't be worth 102
02:31 17    million.
02:31 18                    But more importantly, they're wrong.
02:31 19    Botzko identified active speakers and sending
02:31 20    information to those active speakers.  If you need to
02:31 21    store information about speakers and then send it, you
02:31 22    got to make a list in order to get that out.  That's
02:31 23    just inherent in the entire process.  You don't need to
02:31 24    be a technical expert to know that because it's common
02:31 25    sense.  That's not a patentable invention.

—1111—

02:32   1              But Mr. Bress explained further, the

02:32   2    invention is implemented in software.  The software has

02:32   3    to store that information in a data structure in order

02:32   4    to be able to send it.

02:32   5              Well, what's the simplest type of data

02:32   6    structure to list?  There had to be a list.  You can't

02:32   7    compile a bunch of information and send it if you don't

02:32   8    have a list of it somewhere.  That was obvious.

02:32   9              So let's go back to our horse and our

02:32  10    zebra.  What's the simplest explanation here?  The

02:32  11    simplest explanation was that there was a list, and

02:32  12    that was what was included.

02:32  13              Now, the next thing that they criticized

02:32  14    or they quibbled with was multiplexing.  And they

02:32  15    counted words.  They counted how many times you see

02:32  16    "mix" and how many times you see "multiplex."  That's

02:32  17    the best they could do, is they could count words and

02:32  18    say, I don't see multiplex.

02:32  19              But let's look at what their own expert,

02:32  20    Dr. Schaefer, said about multiplexing when he was

02:32  21    talking about infringement.

02:33  22              Dr. Schaefer said on that witness

02:33  23    stand -- he testified that multiplexing is just taking

02:33  24    multiple streams of data and combining them together to

02:33  25    transmit down to, say, a single connection.  That's how

—1112—

| | |
|---|---|
| 02:33 | 1 |
| 02:33 | 2 |
| 02:33 | 3 |
| 02:33 | 4 |
| 02:33 | 5 |
| 02:33 | 6 |
| 02:33 | 7 |
| 02:33 | 8 |
| 02:33 | 9 |
| 02:33 | 10 |

1    Dr. Schaefer described multiplexing.

2            Now, let's look at the Botzko reference.

3    That's exactly what Botzko is doing.  It's literally

4    doing the same thing.  It's combining streams of data

5    and transmitting them down a single connection.

6            Does it use the word "multiplexing"?  No.

7            Does it tell you about multiplexing using

8    the exact definition that Mr. Schaefer gave you when he

9    was talking about infringement?  Yes.  Multiplexing is

10    in the Botzko patent.

11            Now, I'm just going to cover written

12    description very, very briefly.  The whole concept of

13    written description is the inventors have to show their

14    work.  They have to actually -- it's kind of like, you

15    know, a math problem.  It's not enough to get the right

16    answer.  It's not enough to write down 4.  You actually

17    have to show your work of how you got there.

18            And the point that Mr. Bress explained is

19    that the inventors didn't show their work.  They didn't

20    write down in the specification how they got to the

21    claims.  That's the point of written description, and

22    that will be Question 3 on the jury verdict form.

23            So let's look at the scales again.  They

24    just showed you the scales.  There were like seven tons

25    on the Cisco -- you know, on the side that we had to

—1113—

02:34  1    prove or something.  I can't do it justice.  But this
02:34  2    is the scale that they showed you at the start of
02:34  3    trial.  It doesn't have all the nice metal ton weights
02:34  4    on it.
02:34  5             The situation here is that our evidence
02:34  6    is unrebutted.  What they have is quibbles about active
02:34  7    speaker lists and multiplexed stream.  The evidence,
02:34  8    the actual evidence, is unrebutted.  And I believe that
02:34  9    we heard some criticism of Mr. Bress for spending 55
02:34 10    slides going through it.
02:34 11             Well, just like Dr. Schaefer, Mr. Bress
02:34 12    is thorough.  And Mr. Bress wanted to go through this
02:35 13    and meet his burden and demonstrate where each and
02:35 14    every aspect of the '858 patent is obvious over Botsko.
02:35 15    And he did that.  And he met the clear and convincing
02:35 16    evidence standard, and that evidence stands unrebutted.
02:35 17    If that's not clear and convincing, I frankly don't
02:35 18    know what is.
02:35 19             So let's turn to damages.  Obviously as
02:35 20    Cisco's counsel, I hope that you don't have to reach
02:35 21    the issue of damages, but I'm going to talk about it.
02:35 22    As I said in opening, it's extremely important.
02:35 23             And I want to start a little bit with the
02:35 24    story of HearMe and the alleged value of this
02:35 25    invention.  I want to start with Mr. Katz, the first

—1114—

02:35  1    witness that you heard from this week.

02:35  2                    Now, he is the only witness from Paltalk.

02:35  3    As you know, the only fact witness for Paltalk.  And he

02:35  4    testified about a fire sale where he acquired the

02:35  5    assets of the company for $145,000.

02:36  6                    He said this was a once-in-a-lifetime

02:36  7    opportunity, and he couldn't even put a price on what

02:36  8    it was worth to own that.  That's what he told you.

02:36  9    But he did put a price on it, didn't he?  Paltalk had

02:36  10   the money to pay the seven-figure asking price, and he

02:36  11   didn't.  He paid $145,000.

02:36  12                   So let's look what he actually bought for

02:36  13   $145,000 and what he did with it at the time.  Because

02:36  14   those actions speak louder than his words today.  If

02:36  15   you look at the HearMe Paltalk asset purchase

02:36  16   agreement, PX-12, that is a piece of evidence that will

02:36  17   be back in the jury room that we suggest that you look

02:36  18   at.

02:36  19                   Look at all of the things that came along

02:36  20   with that agreement for $145,000.  All of those pages

02:36  21   that I have to the side are listings of assets that

02:36  22   came along with that $145,000, that once-in-a-lifetime

02:36  23   opportunity.

02:36  24                   And so what did he do with all this stuff

02:36  25   that he got for $145,000?  And it is a lot of stuff.

1115

02:37    1    What did he do with it?

02:37    2                    Well, he used the HearMe name.  He used

02:37    3    the HearMe name in other products, and he used some of

02:37    4    the hardware.  He took those servers, and he put them

02:37    5    to use.  He plugged them in in Paltalk, and he used

02:37    6    them.

02:37    7                    But what didn't he do?  He didn't do

02:37    8    anything with the '858 patent once it issued.  At all.

02:37    9                    He bought the application in 2001 as part

02:37    10   of that huge universe, and he put it on a shelf for

02:37    11   20 years.  And Mr. Katz admitted that Paltalk never

02:37    12   used the patent.  He admitted that no company ever

02:37    13   requested to take a license from the patent.

02:37    14                    He admitted that Paltalk never saw any

02:37    15   benefit or value derived from the '858 patent standing

02:37    16   alone.  And that's from the day he bought the patent in

02:37    17   2001 until today.

02:37    18                    Now, with that in mind, I want to turn to

02:37    19   how Paltalk stretches this one patent to justify a

02:38    20   demand for $102 million.  And before I do that, I want

02:38    21   to address something that counsel said just now in

02:38    22   closing.

02:38    23                    Counsel said repeatedly how important the

02:38    24   invention of VoIP over PSTN is.  Now, I'm going to get

02:38    25   to it in a minute.  That's not what actually was

-1116-

02:38  1    invented.  That's not what the evidence has

02:38  2    demonstrated was, if anything invented.

02:38  3            If anything, it was a small improvement

02:38  4    on that type of technology.  It was a specific way of

02:38  5    sending those streams or those packets.

02:38  6            But you know what you didn't hear?  You

02:38  7    heard a lot of attorney argument about how important it

02:38  8    must be, how important it must be to be able to do

02:38  9    these calls like this.  Even if that were the

02:38  10   invention, did you see a single quotation saying this

02:38  11   is crucial to us?

02:38  12           Did you see a single time, did Mr. Barave

02:38  13   say, you know what?  Customers come to me, and when

02:38  14   they come to me, they need to be able to dial into a

02:39  15   Webex call.

02:39  16           He did not say that.  There was not a

02:39  17   single admission that you saw in this closing

02:39  18   evidence -- or this closing argument or in the evidence

02:39  19   that said that Cisco finds that to be some kind of a

02:39  20   critical innovation.

02:39  21           What you actually heard -- and I find

02:39  22   this interesting, because when Mr. Katz was asked, and

02:39  23   I believe it was on redirect:  Well, why didn't you use

02:39  24   the '858 patent?

02:39  25           He said:  Well, we're a videoconferencing

—1117—

02:39  1    company.  Why would we want -- we don't care about

02:39  2    people dialing in.  That doesn't give you the rich

02:39  3    experience.  There's no reason for us to use it.

02:39  4                  Mr. Barave said the same thing.  When he

02:39  5    talked about the seamless transitions that people have

02:39  6    when they go from their car -- from their home to their

02:39  7    car to their office to a conference room, all of that,

02:39  8    that is the innovation that Webex is bringing.  You

02:39  9    can't do that if you dial in.

02:39  10                 That's what Webex values.  He never once

02:39  11   said, yes.  It is critical that people be able to dial

02:40  12   into a videoconference.

02:40  13                 And so when you hear that 33 percent of

02:40  14   the value of Webex Audio should be attributed to VoIP

02:40  15   plus PSTN, does that really make sense?  Just the

02:40  16   ability to dial in?

02:40  17                 I haven't -- I use Webex multiple times a

02:40  18   day.  I haven't dialed into a Webex in I can't tell you

02:40  19   how many years.  And this is a product I use every day.

02:40  20                 If it really were that critical, you

02:40  21   would have heard that it was that critical.  And yet

02:40  22   they say that it contributes a third of the value of

02:40  23   Webex Audio.  That simply doesn't make sense.

02:40  24                 Now, what also doesn't make sense is that

02:40  25   you just heard it's absolutely critical.  Set that

—1118—

02:40  1    aside.  The '858 patent is not VoIP plus PSTN.  That's

02:40  2    not what the patent invented, if it invented anything.

02:41  3    That is the entire -- that is what Mr. Bratic valued.

02:41  4              And how do we know?  Well, let's look at

02:41  5    what Dr. Schaefer said.  He agreed it was possible

02:41  6    prior to the '858 patent to have a VoIP and a PSTN

02:41  7    call.

02:41  8              That's not what the patent invented.

02:41  9    What the patent invented, if anything, was an improved

02:41  10   way of doing that.  And there was a slide that I don't

02:41  11   have access to now.  I believe it was from Mr. Bratic

02:41  12   in his direct that listed specific improvements, you

02:41  13   know, a better user interface, less bandwidth or

02:41  14   whatever.  That's what the '858 patent contributed, if

02:41  15   it contributed anything.  It didn't invent the concept

02:41  16   of VoIP plus PSTN.

02:41  17             How else do we know that?  Because you

02:41  18   heard witnesses testify about earlier PSTN and VoIP

02:41  19   systems.  You heard Mr. Barave testify about web

02:41  20   meeting.  You heard Mr. Belcher testify about

02:41  21   MediaTone.

02:41  22             Now, it's true.  That document was from

02:41  23   2003, but he explained that that was the Webex product

02:42  24   that had gone back well into the early '90s -- late

02:42  25   '90s.  I'm sorry.

02:42   1            And you heard about the Botzko patent.

02:42   2   You heard about all of these early PSTN plus VoIP

02:42   3   systems. This is not what the invention was, and if

02:42   4   it's not what the invention was, then the entire

02:42   5   foundation of Mr. Bratic's valuation is wrong. Because

02:42   6   he's valuing the invention as though it was PSTN plus

02:42   7   VoIP. And he's valuing that invention as though it's

02:42   8   something Cisco cares about today. And there's no

02:42   9   testimony on that whatsoever.

02:42  10             Now, Paltalk promised you in opening,

02:42  11   they promised you in opening and you heard it again

02:42  12   today, that they would demonstrate that Cisco had to

02:42  13   add hybrid audio functionality to Webex. They realized

02:42  14   that in July of 2007. You've heard it again just now.

02:42  15   Cisco realized that to be competitive.

02:42  16             What evidence did you see of that? You

02:42  17   saw a document that said, we're adding a service. And,

02:43  18   you know, certainly Mr. Belcher explained what that

02:43  19   meant, that it was source code.

02:43  20             Did you ever hear -- see an e-mail, a

02:43  21   document, anything that said, oh, in order to be

02:43  22   competitive in July of 2007, Cisco has to add hybrid

02:43  23   audio or VoIP plus audio?

02:43  24             There's not a single document anywhere

02:43  25   showing that. That is literally just attorney

—1120—

02:43 1    argument.  And not only is it literally attorney

02:43 2    argument, it's literally attorney argument that was

02:43 3    contradicted by the very document that Mr. Belcher

02:43 4    testified, the MediaTone document.  That's when Cisco

02:43 5    had this functionality.  It probably was even well

02:43 6    before 2003, but it certainly wasn't introduced in July

02:43 7    of 2007.  That functionality came over with Webex.

02:43 8              What was happening in July of 2007 is

02:43 9    that Cisco was taking the already existing Webex

02:43 10   product and bringing it into its fold and saying, I'm

02:43 11   going to take this code, this functionality from Webex,

02:43 12   and I'm going to put it into Cisco's product because we

02:43 13   think it's great.

02:43 14             It's not that it was created in July of

02:44 15   2007.  It already existed, and it was being

02:44 16   incorporated into Cisco.

02:44 17             So that is simply, frankly, false.

02:44 18   There's just no evidence at all that Cisco actually

02:44 19   created this in July of 2007.

02:44 20             Now, I want to talk for a moment about

02:44 21   the usage data that you heard a moment ago.  And, you

02:44 22   know, when we deal with statistics and when we deal

02:44 23   with percentages, you can either look at the absolute

02:44 24   numbers or you can look at the percentages.  Sometimes

02:44 25   absolute numbers mean something very, very different

02:44  1    than the percentage, right?  And what you heard just

02:44  2    now is a lot of absolute numbers about numbers of

02:44  3    calls.

02:44  4                 What you didn't hear was percentages.

02:44  5    What you didn't hear is how many other calls were going

02:44  6    on that didn't use that technology, and that gives you

02:44  7    a glimpse into how important Cisco found this.

02:44  8                 The other thing you didn't hear -- you

02:44  9    heard the statement, oh, even if it's 25 percent of the

02:45  10   time or whatever, 25 percent of those connections

02:45  11   couldn't be made.  Well, did we ever hear any evidence

02:45  12   that those calls could only be completed by PSTN?  No.

02:45  13   We certainly didn't.  We have no idea what those

02:45  14   numbers represent.  All we know is that they're

02:45  15   actually a small fraction of the total number of calls.

02:45  16                 But you weren't shown that fraction.  You

02:45  17   were shown only the numerator, which is a large number.

02:45  18   You weren't shown that it was divided by a much, much

02:45  19   larger denominator.  Nobody showed you that percentage.

02:45  20   They just showed you the large absolute numbers.

02:45  21                 Now, let's take this a step further.  I'm

02:45  22   going to skip ahead a little bit.  So I have again here

02:45  23   Mr. Bratic's slide, his 33 percent slide.  Now, he is

02:45  24   saying that you should take one-third of the value of

02:45  25   Webex Audio and attribute that to VoIP plus PSTN, which

—1122—

02:45  1    again is not what the patent is.  But setting that
02:45  2    aside.
02:46  3              He never deals with all of the other
02:46  4    factors that make Webex and Webex Audio valuable.  He
02:46  5    simply ignores them.  He doesn't deal with them.  He
02:46  6    doesn't deal with the brand.  He doesn't deal with all
02:46  7    of Cisco's patents.  He completely ignored that.  He
02:46  8    doesn't deal with the security improvements that Amit
02:46  9    Barave testified about, and he doesn't deal with the
02:46  10   other important audio features that Mr. Barave
02:46  11   testified about.  He just simply ignores those.  And he
02:46  12   attributes an enormous amount of value to the
02:46  13   '858 patent.
02:46  14             THE COURT:  Counsel, you have five
02:46  15   minutes left.
02:46  16             MS. PIEPMEIER:  Five minutes?  Thank you,
02:46  17   Your Honor.
02:46  18             Now, in contrast, what did Ms. Kindler
02:46  19   focus on?  She focused on the market value of the
02:46  20   license.  I don't think you heard the word "market" in
02:46  21   the presentation.
02:46  22             What Ms. Kindler did is said how would
02:46  23   the market value this?  What would the market think of
02:46  24   this invention?
02:46  25             And she did two different analyses to

—1123—

02:46    1    look at that.  She looked at the Paltalk HearMe

02:46    2    agreement, and she looked at the Cisco Meetrix license.

02:46    3    And they both came out to a similar number of a

02:47    4    reasonable royalty in the 1 to 1.5 million range.

02:47    5                I submit that the way the market would

02:47    6    look at this is the appropriate way to look at this.

02:47    7                So we've already talked about the HearMe

02:47    8    asset purchase agreement.  I'm not going to go through

02:47    9    that again.  You've heard about it a million times.

02:47    10                I want to talk about the Meetrix license

02:47    11    for a moment because that license covered multiple PSTN

02:47    12    plus VoIP patents.  And it tells you precisely what

02:47    13    Cisco was willing to pay for a license to that.  I

02:47    14    think it was five or six patents.  What they paid was

02:47    15    $250,000.  That was a market transaction.  And she

02:47    16    adjusted that evidence to reflect this case.

02:47    17                Did she decrease it?  No.  She increased

02:47    18    it.  She said, look, in this case, I think 250 is in

02:47    19    the starting point based on the Cisco Meetrix.  I'm

02:47    20    going to adjust that upwards to meet the facts of the

02:47    21    case.

02:47    22                Now, did Mr. Bratic adjust his numbers to

02:47    23    look at how much usage there was?  No.  He didn't.  He

02:48    24    just gave you the numbers.  He didn't actually adjust

02:48    25    them to show the value of this, if any, to Cisco.

—1124—

02:48  1          And so considering all of that, I want to

02:48  2    take a step back and I want to place us at the

02:48  3    hypothetical negotiation in the mid-2000s.  Both

02:48  4    Ms. Kindler and Mr. Bratic discussed that in the

02:48  5    mid-2000s, Paltalk and Webex are sitting at a table and

02:48  6    Webex is asking for a license to the '858 patent.

02:48  7    Cards are up on the table, as Mr. Bratic said.

02:48  8          Webex knows that Paltalk paid just a few

02:48  9    years earlier $145,000 for this.  Webex is a smaller

02:48  10   company.  It's not Cisco.  Is Webex really going to pay

02:48  11   102 million?  Is Webex going to come out of the

02:48  12   hypothetical negotiation a few years after that asset

02:48  13   purchase agreement for 145,000 and pay 102 million for

02:48  14   this?  Is that really what Webex is going to do then?

02:48  15         So I'd like to close in my last two

02:48  16   minutes by walking you through the jury form that

02:49  17   you'll be filling out.  I already went through the

02:49  18   infringement form.  We would respectfully ask that you

02:49  19   check no on infringement for Claims 1 through 5.

02:49  20         For Claim verdict form Question 2, we

02:49  21   would respectfully ask that you check yes, the

02:49  22   '858 patent is invalid based on obviousness, Claims 1

02:49  23   through 5.

02:49  24         Question 3, invalidity written

02:49  25   description, I know that was covered very briefly.

-1125-

02:49  1    Claims 2 and 3 are invalid.

02:49  2              And then with respect to damages, you'll

02:49  3    see an instruction to say proceed only to damages if

02:49  4    you have found the same claim to be valid and

02:49  5    infringed.

02:49  6              And we hope that you do not reach

02:49  7    Question 4.  Obviously, we're representing defendant.

02:49  8    But if you do, Ms. Kindler has provided multiple

02:49  9    alternatives that reflect the market value of whatever

02:49  10   invention is in the '858 patent.  And we ask that you

02:49  11   find -- you find with Ms. Kindler that any market value

02:50  12   would be in the low seven figures.

02:50  13             Now, on behalf of Cisco, of myself, and

02:50  14   all my colleagues, I really want to thank you for your

02:50  15   time and attention this week.  We appreciate it, and we

02:50  16   appreciate you.  And I won't have a chance to speak

02:50  17   with you again, so thank you very much.

02:50  18             THE COURT:  Thank you, ma'am.

02:50  19        CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

02:50  20             MR. HAWKINS:  Good afternoon.  Now, I had

02:50  21   planned to start somewhere else, but I'm actually

02:50  22   pretty shocked right now.

02:50  23             First thing we heard from counsel was

02:50  24   15 minutes on the word "each."  As you ladies and

02:50  25   gentlemen are well aware, the Court just instructed the

-1126-

02:50   1    jury on its definition of the word "each."

02:50   2               It is in the packet that you were given.

02:51   3    It is the law of the case.

02:51   4               Could you put up --

02:51   5               Well, first, throughout this trial with

02:51   6    our witnesses, with Cisco's witnesses, you were shown

02:51   7    this Court's ruling.  It's on the screen.  That ruling

02:51   8    has been memorialized in the charge of the Court in

02:51   9    Jury Instruction No. 15.  It says extremely clear that

02:51   10   claims are read and understood by a person with skill

02:51   11   in the field of the patent in light of the patent's

02:51   12   specification and prosecution history.

02:51   13              It's not Occam's razor.  It's not

02:51   14   nephews.  It is that "each" can include "one or more."

02:51   15   In 15 minutes of speech, counsel did not show you what

02:52   16   the actual law of the case the Court's instruction is,

02:52   17   and what's worse, the Court -- I'm sorry.  Counsel has

02:52   18   said that for noninfringement to be found, you must

02:52   19   conclude that "each" can't include "one or more."

02:52   20              Their position is expressly contrary to

02:52   21   what you see on the screen.  Cisco's counsel is asking

02:52   22   you to disregard this Court's ruling, and you

02:52   23   absolutely cannot do that.

02:52   24              Now, the point here on noninfringement or

02:52   25   infringement is that, yes, we agree of course active

02:52  1    speakers do not receive their own audio.  That was what

02:52  2    Dr. Schaefer testified.  It's what's memorialized in

02:53  3    Column 5 of the patent.  I know you've seen it.

02:53  4    Mr. Willis showed you half of it.  Dr. Schaefer showed

02:53  5    you all of it.  I will show you all of it.

02:53  6                 Could you pull up Column 5?

02:53  7                 Now, I'd like to show you some testimony

02:53  8    from Mr. Willis that counsel did not show you.

02:53  9                 Could you pull up Mr. Willis?

02:53  10                 Mr. Willis testified the preferred

02:53  11   embodiment disclosed in the patent, in other words, the

02:53  12   specification, is one in which audio data for "each"

02:53  13   and "every" active speaker is multiplexed.  That's the

02:53  14   term "each."  That even he recognized that as a person

02:53  15   of ordinary skill in the art, that means that an active

02:53  16   speaker will not receive their own audio.  The experts

02:53  17   are in accord on this point.

02:53  18                 The Court has instructed the jury.  That

02:53  19   is the law.  You should not disregard it as has been

02:54  20   suggested.

02:54  21                 Now, I'm going to continue talking with

02:54  22   what I plan to talk about, and that is responsibility.

02:54  23   In trial, the responsibility has several dimensions,

02:54  24   ladies and gentlemen.  I have responsibility and have

02:54  25   had responsibility to present the issues clearly to you

−1128−

02:54  1    fine folks, to be respectful of your service and your

02:54  2    time.  And Paltalk has had a responsibility.

02:54  3                Could you put up the slide?

02:54  4                Paltalk's responsibility has been to

02:54  5    present evidence.  Now, Paltalk is a property owner.

02:54  6    Paltalk owns the '858 patent.  Patent rights are like

02:54  7    rights to land, and it derives from the U.S.

02:54  8    Constitution.  And if another party uses Paltalk's

02:54  9    property without its permission, Paltalk is entitled to

02:55  10   a reasonable royalty.

02:55  11               But, of course, ladies and gentlemen,

02:55  12   Paltalk can't just wave around the patent and say, hey.

02:55  13   Paltalk must show you, not tell you, that the patent

02:55  14   has been infringed.  Paltalk took its obligation very

02:55  15   seriously and fulfilled it.

02:55  16               You've seen evidence.  You've heard

02:55  17   evidence.  I don't need to remind you, you sat here for

02:55  18   hours while Dr. Schaefer walked painstakingly through

02:55  19   that evidence.

02:55  20               Now, Cisco too, of course, had a

02:55  21   responsibility.  It had a responsibility not to violate

02:55  22   Paltalk's intellectual property.  It also, of course,

02:55  23   had a responsibility at this trial, a responsibility to

02:55  24   you as the ladies and gentlemen of the jury.

02:55  25               When Paltalk showed you that Cisco's

02:55   1   Webex product violated the '858 patent, I expected and
02:56   2   expected very strongly for Cisco to come back and show
02:56   3   you why it did not with the same painstaking detail.
02:56   4           Cisco knows how Webex functions.  Cisco
02:56   5   controls the documents and the people.  Cisco has been
02:56   6   sued for $100 million.  We agree on that.  And I'm
02:56   7   confident they scoured their files, their people, their
02:56   8   information to the ends of the earth.  They talked to
02:56   9   their employees.  And if they had a shred of evidence,
02:56  10   documentary evidence, a real document to show you
02:56  11   suggesting that Cisco Webex does not infringe, you
02:56  12   would have seen it.  There was no evidence of the sort.
02:56  13           There's an inescapable conclusion.
02:56  14   Cisco's technical documents, its source code, its
02:56  15   engineers, its paid experts could not dispute
02:56  16   Dr. Schaefer's analysis.  The only conclusion is that
02:56  17   Cisco infringes.
02:56  18           Just a very brief word on validity.
02:57  19   Again, we saw this.  The point of the '858 patent is
02:57  20   you have mixing on one side, multiplexing on the other.
02:57  21   Botzko does one.  It doesn't do the other.
02:57  22           Now, we talked about "each."  So what I
02:57  23   want to do is now talk about what you have heard from
02:57  24   Cisco in closing.  You haven't heard evidence -- Cisco
02:57  25   did not present a single technical document in this

—1130—

02:57  1    case that we didn't find and present.  Cisco found no

02:57  2    evidence of noninfringement.

02:57  3                    What you have seen are excuses.  Now, in

02:57  4    opening at jury selection, we told you you would see

02:57  5    excuses.  And we've been proven right.  We said wave a

02:57  6    red flag when Cisco tells you that "each" just means

02:57  7    Occam's razor.  You don't look at it through the lens

02:57  8    of a person of ordinary skill, and that's what they've

02:57  9    done throughout the trial.  It's what they've done

02:57  10   again.  They did not show you this Court's order.

02:58  11                   We've heard that Paltalk bought the

02:58  12   patent for a low value.  That doesn't matter.  Read the

02:58  13   Court's instructions.  You won't find an instruction

02:58  14   making it relevant.

02:58  15                   You have heard that Paltalk only bought

02:58  16   an application.  Paltalk didn't even know it would

02:58  17   become a patent.  You've heard that Paltalk didn't

02:58  18   reach out to Cisco.  Look in the instructions.  Not

02:58  19   relevant.  And Mr. Katz told you why.

02:58  20                   Cisco could sue Paltalk first and in a

02:58  21   declaratory judgment action.  That's a massive legal

02:58  22   and financial risk to a company like Paltalk.

02:58  23                   You've heard again Paltalk doesn't use

02:58  24   the product.  That too is irrelevant.  The law again --

02:58  25   the law, ladies and gentlemen, says that if Cisco used

―1131―

02:58    1    Paltalk's patent, Paltalk is entitled to a reasonable

02:58    2    royalty.

02:58    3            Now, with respect to excuses, just

02:59    4    briefly.  We've heard suggestions -- let's put it this

02:59    5    way:  We've heard a lot about Cisco.  But this trial

02:59    6    started with Paltalk and Mr. Katz as our first witness,

02:59    7    and we've seen some testimony from Mr. Katz up on the

02:59    8    screen.

02:59    9            And there's been suggestions, as I said,

02:59   10    that Paltalk hasn't practiced this patent, bought it on

02:59   11    the cheap.  But what you've heard from Mr. Katz -- and

02:59   12    his testimony is credible.  He too sat up here and was

02:59   13    cross-examined.  And what Mr. Katz explained is that

02:59   14    Paltalk has decades of hard work as a small, profitable

02:59   15    innovator.

02:59   16            You heard about Paltalk's foresight to

02:59   17    recognize, before others did, the value of hybrid audio

02:59   18    in 2001.  Paltalk said it was so profound, in fact,

02:59   19    that it wasn't until six years after Paltalk acquired

03:00   20    the 2001 patent that Cisco added it to its Webex

03:00   21    products.

03:00   22            In 2007, Cisco paid $3.2 billion to

03:00   23    acquire Webex, and it did so to achieve a competitive

03:00   24    advantage.  What happened afterward, as we have seen,

03:00   25    is that Cisco grew to become -- I'm sorry -- Cisco

—1132—

03:00  1    Webex grew to become a multibillion-dollar product for

03:00  2    Cisco.  Now --

03:00  3                   MR. TRIBBLE:  Your Honor, how much time

03:00  4    do we have left?

03:00  5                   THE COURT:  None.

03:00  6                   MR. TRIBBLE:  No.  We have two minutes,

03:00  7    don't we?

03:00  8                   Ladies and gentlemen, I just wanted to

03:00  9    say one thing because I was stunned at what opposing

03:00  10   counsel said.  They basically admitted that even if --

03:00  11   they can't win unless the word "each" means "all."

03:00  12                   The Court has instructed you just the

03:01  13   opposite.  And he said their defense has failed.  And

03:01  14   it's just like everything has been carefully

03:01  15   orchestrated.

03:01  16                   You know, let me say one last thing.  I

03:01  17   just want to thank you for your time.  As I said in

03:01  18   opening argument, I think the jury system is one of the

03:01  19   most important rights we have in the United States.  It

03:01  20   sets us apart from a lot of other countries because it

03:01  21   levels the playing field between big companies, small

03:01  22   companies, and individuals so that everybody has to

03:01  23   follow the same rules.

03:01  24                   And the last thing.  You're about to

03:01  25   start deliberating and go back there and consider the

1133

```
03:01   1   evidence.  We've shown you evidence.  The technical
03:01   2   documentation, the source code.  We showed the
03:01   3   testimony that you've heard.
03:01   4              And you'll probably come back with a
03:01   5   verdict this afternoon.  And when you do, the Cisco
03:02   6   corporate representative's going to make a phone call
03:02   7   to her superiors and is going to say one of two things.
03:02   8   She's going to say either, one, we got away with it.
03:02   9   We got away with it.  Fight tooth and nail.  Prep our
03:02  10   witnesses to say what we want them to say so that we
03:02  11   win, and make it a long road to trial.  Make them fight
03:02  12   all the way.  Don't license the patent.  Don't pay for
03:02  13   a license.
03:02  14              Or she's going to say, two, we need to
03:02  15   have a discussion at Cisco.  We need to talk about
03:02  16   changing our business practices.  We need to start
03:02  17   trying to license -- pay for a license when we discover
03:02  18   we're infringing a patent.
03:02  19              And that's a message that goes not only
03:02  20   to Cisco, it goes to companies all around the world
03:03  21   that sell products and services in the United States.
03:03  22              Anyway, I thank you for your time.  I
03:03  23   look forward to your verdict.  Thank you.
03:03  24              THE COURT:  Thank you, sir.
03:03  25              Ladies and gentlemen, I don't think you
```

—1134—

03:03  1    need to turn to the last page.  I can just tell you a

03:03  2    sense of what's going to happen now.

03:03  3                It is your duty to deliberate and consult

03:03  4    with one another in an effort to reach a verdict.  Each

5    of you must decide the case for yourself but only after

03:03  6    an impartial consideration of all of the evidence with

03:03  7    your fellow jurors.

03:03  8                During your deliberations, do not

03:03  9    hesitate to reexamine your own opinions and change your

03:03  10   mind if you're convinced that you were wrong, but never

03:03  11   give up on your honest beliefs because some other juror

03:03  12   disagrees with you or thinks differently or to finish

03:03  13   the case.

03:03  14               At all times you are the judges of the

03:03  15   facts.  You've taken notes during -- you've been

03:03  16   allowed to take notes.  I don't know if you have or not

03:03  17   taken notes during the trial.  If you have taken notes,

03:04  18   remember they're just aids to memory.  They're not

03:04  19   evidence.

03:04  20               If you did not take notes, rely on your

03:04  21   independent recollection of what happened.  Don't be

03:04  22   influenced unduly by what someone else took down as

03:04  23   notes.  They're not evidence.  Notes are not entitled

03:04  24   to greater weight than the recollection or impression

03:04  25   that each of you as judges have.

—1135—

```
03:04   1              So what's going to happen is you're going
03:04   2    to go back to the jury room.  The very first thing that
03:04   3    you have to do is select a jury foreperson.  And
03:04   4    obviously it doesn't matter who it is.  I prefer
03:04   5    someone who writes legibly.  That helps me in case you
03:04   6    all send me a note.  It also helps me figure out who
03:04   7    the foreperson is.  Occasionally we just have to guess
03:04   8    based on the signature.  But that's up to you.
03:04   9              So once you've picked a foreperson, we
03:04   10   won't know that you've picked a foreperson unless you
03:04   11   hand the note to Bob or whoever's sitting outside.
03:05   12   They'll bring the note to me, and I'll let the lawyers
03:05   13   know who the foreperson is.
03:05   14              After that, if you wish to communicate
03:05   15   with the Court, you can -- the foreperson must -- has
03:05   16   to -- if you want to have a question for us, the
03:05   17   foreperson fills out the note, signs it, dates it, puts
03:05   18   the time on it, hands it to Bob, or whoever's sitting
03:05   19   outside, and they'll bring it in and I will very
03:05   20   quickly get you a written response.
03:05   21              Occasionally -- maybe once I've had to go
03:05   22   in and give you an oral response, but more than likely,
03:05   23   it will be a written response.
03:05   24              So Jen will escort you -- Bob will take
03:05   25   you back.  Jen will come back there.  She will help
```

1136

03:05   1   show you how to use the system so that you can look at

03:05   2   the exhibits on the monitor that's in there.

03:05   3               Your verdict must be unanimous.  After

03:05   4   you reach a unanimous verdict, your jury foreperson

03:05   5   will fill out the four questions on the verdict and

03:05   6   return it to us.  If you get through all four

03:05   7   questions, sign it and date it.

03:06   8               After you are finished, I'll give you

03:06   9   more instructions about who you can talk to and all of

03:06   10  that.  I've given you instructions now about what not

03:06   11  to do.  I'll take care of that at the end of the trial.

03:06   12              This is extremely important.  And even

03:06   13  though I've said this occasionally, it's not -- it's

03:06   14  not been followed.

03:06   15              At no time if you send me a note should

03:06   16  we have any indication where you are at in the process.

03:06   17  One of us feels this way or two of us -- we never know

03:06   18  where you're at until we get the verdict form that says

03:06   19  we have a verdict and I get the answers to the

03:06   20  questions that's signed by the foreperson that it's

03:06   21  unanimous.  Other than that, we never -- we should

03:06   22  never know what's happening back there by what's

03:06   23  contained in the notes.

03:06   24              Finally, just so I don't surprise you, at

03:06   25  the end, when you come back in and hand me the verdict

03:07    1    form, I'll read it to the lawyers.  And I'll ask you to

03:07    2    listen carefully.

03:07    3              And after I've read the verdict, I will

03:07    4    ask each of you who agree with it to stand to reflect

03:07    5    that the verdict was unanimous, and then I'll allow you

03:07    6    to go.

03:07    7              As far as deliberations go this

03:07    8    afternoon, you get to work.  And as the afternoon goes

03:07    9    on and passes, we'll determine, you know, what to do

03:07   10    about staying or coming back tomorrow.

03:07   11              Generally speaking, I'm happy to stay.

03:07   12    But you all have long drives, some of you.  So my goal

03:07   13    will be to accommodate whatever works best for the jury

03:07   14    if you go beyond normal business hours today.

03:07   15              So with that being said, you are free to

03:07   16    go back to the jury room.  Please pick a foreperson

03:07   17    relatively quickly.  Get the note to Bob so we know who

03:07   18    it is, and then deliberations are up to you.

03:07   19              THE BAILIFF:  All rise.

03:08   20              (Jury exited the courtroom.)

03:08   21              THE COURT:  You may be seated.

03:08   22              So here's what I would like for the

03:08   23    lawyers to do.  I'd like for everyone who is on the

03:08   24    trial team for each side to remain where you're at

03:08   25    until we get the foreperson note, which is usually

03:08    1    pretty quick.  And if it's not quick, I'll make Bob go

03:08    2    and force them to speed it up.

03:08    3                    But once we have who the foreperson is,

03:08    4    then I need to have at least one lawyer from each side

03:08    5    remain -- everyone's welcome to remain in the courtroom

03:08    6    if that's what you want.  If that's not what you want

03:08    7    to do, I need you to at least stay on the floor so that

03:08    8    if I get a note, I can round you guys up and tell you

03:08    9    how I'm going to respond.

03:09    10                    Except in the most unusual circumstances,

03:09    11    I can tell you that whatever I -- however I respond to

03:09    12    them will provide them with the least information

03:09    13    possible and frustrate them.  And they will -- I will

03:09    14    tell them to keep deliberating.

03:09    15                    It's extraordinarily rare that I give

03:09    16    them anything beyond that.  But occasionally, an issue

03:09    17    does come up.  And in the event it really is something

03:09    18    we need to tell them, I'll let the lawyers contribute

03:09    19    to that.  So, of course, I'll be the arbiter of what I

03:09    20    think I need to gear up on.  And that's pretty rare I

03:09    21    feel that way.

03:09    22                    So to everyone who participated in the

03:09    23    trial, I thought all the lawyers did a great job.  It

03:09    24    met my -- if not exceeded my expectations over the

03:09    25    weekend when I was looking forward to having you all

-1139-

03:09  1   here.  And so we'll see now what the jury does with the
03:09  2   hard work that you've done.
03:09  3                  THE BAILIFF:  All rise.
03:09  4                  (Recess taken.)
03:17  5                  THE COURT:  We have a note.  The jury
03:17  6   forewoman is Emily Parks.
03:09  7                  (Recess taken.)
05:24  8                  (Jury entered the courtroom.)
05:24  9                  THE COURT:  Thank you.  You may be
05:24  10  seated.
05:24  11                 Ms. Parks, my understanding is you're the
05:24  12  foreperson?
05:24  13                 FOREPERSON:  Yes, sir.
05:24  14                 THE COURT:  Would you hand it to him,
05:24  15  please?
05:24  16                 Thank you, sir.
05:24  17                 I would ask the jury to listen carefully
05:24  18  as I read the verdict because at the end, I'll ask to
05:24  19  make sure that it was unanimous.
05:24  20                 With regard to Question No. 1, answer is
05:24  21  yes to Claim 1.
05:24  22                 Claim 2, yes.
05:24  23                 Claim 3, yes.
05:24  24                 Claim 4, yes.
05:24  25                 Claim 5, yes.

1140

| | | |
|---|---|---|
| 05:25 | 1 | With regard to invalidity, Claim 1, no. |
| 05:25 | 2 | Claim 2, no. |
| 05:25 | 3 | Claim 3, no. |
| 05:25 | 4 | Claim 4, no. |
| 05:25 | 5 | Claim 5, no. |
| 05:25 | 6 | With regard to invalidity written |
| 05:25 | 7 | description, Question No. 3, no. |
| 05:25 | 8 | And no on Claim 2 and Claim 3. |
| 05:25 | 9 | With regard to the amount of damages, the |
| 05:25 | 10 | amount of damages -- I'm going to read this carefully |
| 05:25 | 11 | and make sure the jury agrees:  $65,720,700. |
| 05:25 | 12 | Is that correct? |
| 05:25 | 13 | Would everyone who's on the jury please |
| 05:25 | 14 | stand at this time? |
| 05:25 | 15 | Everyone agrees with the verdict. |
| 05:25 | 16 | You may be seated.  Thank you. |
| 05:25 | 17 | Ladies and gentlemen of the jury, let me |
| 05:25 | 18 | sign this real quick and then I'll address you. |
| 05:25 | 19 | Ladies and gentlemen of the jury, allow |
| 05:25 | 20 | me to thank you for the lawyers and their clients for |
| 05:25 | 21 | your hard work this week. |
| 05:26 | 22 | I think this is -- well, I don't think. |
| 05:26 | 23 | This is the greatest country in the world, but I think |
| 05:26 | 24 | that a very large reason it is a great country is |
| 05:26 | 25 | because of the people like you are willing to serve on |

―1141―

05:26  1   juries.  And when you have this kind of dispute between
05:26  2   a company like the plaintiff and the defendant, they
05:26  3   know that they can come into a court and get an
05:26  4   impartial jury to listen to the evidence, to sacrifice
05:26  5   their time, and then render a verdict that's fair and
05:26  6   impartial based on the evidence.
05:26  7           I think -- I can't see how any system of
05:26  8   justice could be better than that.
05:26  9           So earlier this week, I gave you
05:26 10   instructions, one of which was you could not speak
05:26 11   about the case.  That -- it's America.  You can now
05:26 12   speak about the case, with a couple of exceptions.
05:26 13           One, I do not permit the clients or the
05:26 14   lawyers who are involved in the case to talk to you.
05:26 15   That's really not your issue.  It's they're not allowed
05:26 16   to.
05:26 17           Number two, as you saw during the course
05:27 18   of the trial, there were a couple of times when we had
05:27 19   to close the courtroom because you were hearing
05:27 20   confidential information.  You got to hear it because
05:27 21   you were jurors, and I would ask you not to share any
05:27 22   of the information you heard that was deemed
05:27 23   confidential.
05:27 24           And finally, and I won't say most
05:27 25   important but what's very important, is I think it's

05:27    1    critical for our jury system that you all deliberated

05:27    2    in -- privately.  And so I would ask you never to

05:27    3    discuss or publish what it was any of you all said to

05:27    4    each other during the course of your deliberations.

05:27    5    That should always remain confidential in between the

05:27    6    seven of you.

05:27    7            So with respect to my prohibition of

05:27    8    posting things on social media, knock yourself out.

05:27    9    Publish whatever you want.  Again, same restrictions

05:27   10    that I just said.

05:27   11            And, finally, with my restriction on your

05:27   12    doing research or whatever, again, knock yourself out.

05:27   13    If you can't wait to go home and research about how

05:28   14    great I am or how great the lawyers are or anything

05:28   15    else, please feel free to do that.  So that's up to

05:28   16    you.

05:28   17            Now, I would ask a favor of each of you.

05:28   18    I know it's 5:30 on a Thursday, but I ask the jurors to

05:28   19    stay just a couple of extra minutes so that I can thank

05:28   20    you in person for your service.  But if you've had all

05:28   21    of this service that you want and you want to go back

05:28   22    there and grab your purse or whatever you have and head

05:28   23    out, you're free to do so.

05:28   24            But those of you who wait, I'll come back

05:28   25    there and thank you in person for your service.  And I

-1143-

05:28  1   usually ask you all to make -- if there's any way we

05:28  2   can improve the way we treat the jurors and if there's

05:28  3   anything we can do to make that better.  So I like to

05:28  4   hear that.

05:28  5              So with that being said, with the thanks

05:28  6   again from the lawyers and their clients, thank you

05:28  7   very much for your service.  And you are excused.

05:28  8              (Jury exited the courtroom.)

05:28  9              THE COURT:  You may be seated.

05:29  10             Ladies and gentlemen, I won't keep you

05:29  11  for long at all.

05:29  12             As I said at the beginning of the week, I

05:29  13  knew this would be a trial that I would enjoy because

05:29  14  of the quality of the lawyers.

05:29  15             I also thought that the issues were

05:29  16  interesting.  I know that at least with a couple of

05:29  17  you, we had relatively robust discussions of issues.

05:29  18  And I was -- I came away admiring those of you who I

05:29  19  had those discussions with much more than before the

05:29  20  trial.

05:29  21             I thought the lawyers did just a great

05:29  22  job and especially those who I had to -- who may have

05:30  23  felt like I was not happy.  I wasn't unhappy.  I was

05:30  24  just trying to make sure -- I was doing my best to try

05:30  25  and get stuff right.  And like I said, my admiration

1144

```
05:30   1    only grew for several of the lawyers that were here.
05:30   2                    Thank you for the week that we had.  I
05:30   3    thought you did a great job.  I hope your clients feel
05:30   4    like they got great representation.  I certainly feel
05:30   5    like the clients in this case got enormously good
05:30   6    representation.
05:30   7                    And I hope I have the privilege of having
05:30   8    all the lawyers who were involved in this case,
05:30   9    especially the young ones who did I thought a
05:30   10   phenomenal job on both sides.  I would be proud to
05:30   11   have -- if I had a law firm, I'd be proud to have any
05:30   12   of them in my firm.  So both firms were very lucky in
05:30   13   that regard.
05:30   14                    You all be safe going home.
05:30   15                    THE BAILIFF:  All rise.
05:30   16                    (Hearing adjourned.)
        17
        18
        19
        20
        21
        22
        23
        24
        25
```

-1145-

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS      )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10             I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13             Certified to by me this 6th day of

14   September 2024.

15
                         /s/ Kristie M. Davis
16                       KRISTIE M. DAVIS
                         Official Court Reporter
17                       PO Box 20994
                         Waco, Texas 76702
18                       (254) 666-0904
                         kmdaviscsr@yahoo.com
19

20

21

22

23

24

25

KRISTIE M. DAVIS, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)